**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
          kgrombacher@bradleygrombacher.com
          lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone: (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | Case No. **2:21-CV-05122-SVW-JC**<br><br>**APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 4, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10A<br><br>Complaint filed: June 23, 2021 |

APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

Plaintiff Carlos Sanchez (Plaintiff) submits the following Appendix of Evidence in support of his Renewed Motion for Class Certification:

| Exhibit No. | Document Title | Page(s) |
|---|---|---|
| A. | Declaration of Kiley L. Grombacher<br>• **Exhibit 1**: Sam's Club's Associate Pay Policy for California.<br>• **Exhibit 2**: Sam's Club's Facility Closing/Overnight Procedures Policy (AP-23)<br>• **Exhibit 3**: Sam's Club's Associate Pay Management Guidelines Policy for California.<br>• **Exhibit 4**: Sam's Club's Edit Timesheet ETA (time adjustment procedures).<br>• **Exhibit 5**: Sam's Club's Work Group and Block Scheduling Toolkit (*filed under seal*).<br>• **Exhibit 6**: Sam's Club's Key and Door Control Policy AP-05 (*filed under seal*).<br>• **Exhibit 7**: Sam's Club's Closed-Circuit Television and Camera Policy (*filed under seal*).<br>• **Exhibit 8**: Sam's Club's Global Records Policy (*filed under seal*).<br>• **Exhibit 9**: Sam's Club's Records Management Policy (*filed under seal*).<br>• **Exhibit 10**: Sam's Club's Records Retention Schedule (*filed under seal*).<br>• **Exhibit 11**: Sam's Club's Third Supplemental Responses to Plaintiff Carlos Sanchez's First Set of | 007- 693 |

-1-

| Exhibit No. | Document Title | Page(s) |
|---|---|---|
| | Interrogatories. | |
| | • **Exhibit 12**: Sam's Club's Responses to Plaintiff Carlos Sanchez's Third Set of Interrogatories. | |
| | • **Exhibit 13**: excerpts from the deposition of Robert Francis, Defendant's corporate representative witness designated pursuant to FRCP 30(b)(6). | |
| | • **Exhibit 14**: excerpts from the deposition of John Religa, Club Manager at Torrance, California. | |
| | • **Exhibit 15**: excerpts from the deposition of William Marthens, Club Manager at Vacaville, California. | |
| | • **Exhibit 16**: excerpts from the deposition of Mark Jette, Club Manager at Riverside, California. | |
| | • **Exhibit 17**: excerpts from the deposition of William Ramirez, Club Manager at Sam's Club's Yuba City location. | |
| | • **Exhibit 18**: Exhibit 4 to the May 20, 2022 deposition of William Ramirez, Club Manager at Sam's Club's Yuba City location. | |
| | • **Exhibit 19**: excerpts from the deposition of Carlos Gonzalez, who was the Club Manager at Sam's Club's Glendora location. | |
| | • **Exhibit 20**: Exhibit 3 to the May 20, 2022 deposition of Carlos Gonzalez, who was the Club Manager at Sam's Club's Glendora location. | |
| | • **Exhibit 21**: excerpts from the deposition of Paris Nguyen, Club Manager at La Habra California, taken | |

-2-

| Exhibit No. | Document Title | Page(s) |
|---|---|---|
| | on March 29, 2022. | |
| | • **Exhibit 22**: excerpts from the deposition of Benny Mora, Club Manager at San Diego, California. | |
| | • **Exhibit 23**: excerpts from the deposition of Laura Hernandez, Club Manager at Santa Clarita, California. | |
| | • **Exhibit 24**: excerpts from the deposition of John Gaston, Club Manager at Palmdale, California, which I took on December 27, 2023. | |
| | • **Exhibit 25**: excerpts from the deposition of Dustin Schloss, Club Manager at Palm Desert, California, which I took on December 27, 2023. | |
| | • **Exhibit 26**: excerpts from the deposition of Ann Perry, Club Manager at Citrus Heights, California. | |
| | • **Exhibit 27**: excerpts from the deposition of Raul Razo, Club Manager at Oxnard, California. | |
| | • **Exhibit 28**: excerpts from the deposition of the named Plaintiff, Carlos Sanchez. | |
| | • **Exhibit 29**: excerpts from the deposition of putative class member, Jessica Butler. | |
| | • **Exhibit 30**: excerpts from the deposition of putative class member, Pablo Olivarria, Jr. | |
| | • **Exhibit 31**: excerpts from the deposition of putative class member, Michael Ditullio. | |
| | • **Exhibit 32**: excerpts from the deposition of putative class member, Derrick Lamont Maxwell | |

-3-

APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

| Exhibit No. | Document Title | Page(s) |
|---|---|---|
| | • **Exhibit 33**: excerpts from the deposition of putative class member, Yolanda Martinez. | |
| | • **Exhibit 34**: excerpts from the deposition of putative class member, Jennifer Vasquez. | |
| | • **Exhibit 35**: excerpts from the deposition of putative class member, Eduardo Sanchez. | |
| | • **Exhibit 36**: excerpts from the deposition of putative class member, Felice McRoberts. | |
| | • **Exhibit 37**: excerpts from the deposition of putative class member, Juana Meyo Xigue | |
| | • **Exhibit 38**: excerpts from the deposition of putative class member, Matthew Anderson | |
| | • **Exhibit 39**: excerpts from the deposition of putative class member, Brian McCray | |
| | • **Exhibit 40**: Plaintiff's Trial Plan | |
| **Puative Class Member Declarations** | | |
| B. | Declaration of Carlos Sanchez | 694- 698 |
| C. | Declaration of Cheryl Jean Duff | 699- 702 |
| D. | Declaration of Emmanuel Garcon | 703- 706 |
| E. | Declaration of Holly Wagoner | 707- 710 |
| F. | Declaration of Seth Thomas Keller | 711- 714 |
| G. | Declaration of Michael Schirato | 715- 718 |
| H. | Declaration of Willandra Shayne | 719- 722 |
| I. | Declaration of Jane Halliburton | 723- 726 |
| J. | Declaration of Andrew Tovar | 727- 730 |
| K. | Declaration of Pablo Olivarria Jr. | 731- 734 |

-4-

APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

| Exhibit No. | Document Title | Page(s) |
|---|---|---|
| L. | Declaration of Lorraine Rigoli | 735- 738 |
| M. | Declaration of Armando Cortes Toscano | 739- 742 |
| N. | Declaration of Jessica Butler | 743- 746 |
| O. | Declaration of Carrie Codiroli-Aquino | 747- 751 |
| P. | Declaration of Juan Carlos Freyre Jr. | 752- 755 |
| Q. | Declaration of Nelly Wyss | 756- 759 |
| R. | Declaration of Jonathan Cortijo | 760- 764 |
| S. | Declaration of Derrick Maxwell | 765- 768 |
| T. | Declaration of Michael DiTullio | 769- 772 |
| U. | Declaration of Yolanda Martinez | 773- 777 |
| V. | Declaration of Andrew Nazario | 778- 781 |
| | Expert Declarations | |
| W. | Declaration of Dr. Jeffrey Petersen, Ph.D. | 782- 872 |
| X. | Declaration of David Breshears, CPA/CFF | 873- 890 |

Respectfully Submitted,
**BRADLEY/GROMBACHER LLP**

Dated: January 3, 2024

By: */s/ Kiley L. Grombacher*

Kiley L. Grombacher
Attorney for Plaintiff

-5-

APPENDIX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

# EXHIBIT A

**PAGE 007**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:  (805) 270-7589
E-Mail:  mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:    (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No. 2:21-CV-05122-SVW-JC**<br><br>**DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF PLAINTIFF'S CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 4, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10A<br><br>Complaint filed: June 23, 2021 |

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

I, Kiley L. Grombacher, hereby declare as follows:

1.    I am a partner at Bradley/Grombacher, LLP, counsel of record for Plaintiff Carlos Sanchez ("Plaintiff") in the above-captioned case. I am submitting this declaration in support of Plaintiff's Renewed Motion for Class Certification. The following statements are based on my personal knowledge and review of the files and, if called on to do so, I could and would testify competently thereto.

## EXPERIENCE OF COUNSEL

### Bradley/Grombacher, LLP

2.    Bradley/Grombacher LLP is a national law firm with extensive experience litigating wage and hour class and representative actions, as well as complex consumer class actions. Details on the work, experience and accomplishments of the firm can be found at www.bradleygrombacher.com. In just the past few months, two federal district courts have commented on excellent results obtained by Bradley/Grombacher LLP, attributable to our skilled advocacy and determination. *See, In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs. & Prod. Liab. Litig.,* (S.D. Fla. Feb. 28, 2023) 2023 WL 2284684, at *9 ("The Court has observed class counsel's diligence, ability, and experience in pleadings and motion practice; in their presentation of the settlement to this Court; and in their attention to matters of notice and administration after the announcement of the settlement. The excellent job Class Counsel have done for the class is also demonstrated in the benefits afforded by the Settlement."); *Razo v. AT&T Mobility Servs., LLC,* (E.D. Cal. Apr. 26, 2023) 2023 WL 3093845, at *24, *26 (commenting on the skill class counsel displayed when faced with complex issues and significant uncertainty as to the viability of the claims throughout much of the case).

### Experience of Kiley L. Grombacher, Esq.

3.    I have been a member of the State Bar of California since 2006. My involvement in various forms of class action litigation spans more than a decade, during which time I have litigated hundreds of class actions.

4.    I began my legal career at Arias, Ozzello & Gignac, where I specialized in and gained extensive experience litigating consumer cases. Thereafter, I joined Marlin & Saltzman in 2010, where I focused my practice almost exclusively on class, collective and enforcement actions

-1-

including the reported case, *Faulkinbury v. Boyd & Associates,* which clarified the holding in a seminal case, *Brinker Restaurant Corp. v. Superior Court*, to establish that legality of certain company policies could be determined on a class-wide basis even if the application of the polices varies by individual.

5.    I have argued cases before trial courts and courts of appeal. My writings on legal topics pertaining to class and representative actions have appeared in professional publications and I have been called upon to speak at conferences and seminars for professional organizations.

6.    I have also been honored as a Super Lawyer in the area of class actions by Los Angeles Magazine since 2018 and was selected by the magazine as a Rising Star in this area in 2015 and 2016. I was also recently honored as one of the Top 100 Women in Law and the Top 100 Plaintiff's Lawyers for the current year by the Daily Journal.

7.    I, and my firm, have repeatedly received favorable judicial recognition. For example, Judge Singhal recently noted that "Class Counsel's experience in product liability class action litigation generally and experience in false advertising litigation specifically has been brought to bear here, as they effectively worked to bring this case to a successful resolution." *In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Prac. and Prods. Liab. Litig.*, 2023 WL 2284684, at *9 (S.D. Fla. Feb. 28, 2023). Similarly, in June of this year, Cormac J. Carney (US District Court, Central District of California) remarked, "I do want to tell you I appreciate the professionalism in reaching the settlement. I think it's a very fair and good settlement." *Rodriguez v. Mitsubishi Chemical Carbon Fiber and Composite, Inc. et al.,* Case Number 8:21-cvg-01711-CJC-JDE.

8.    My partner, Marcus J. Bradley, and I, at our present firm or at our prior firms, have litigated numerous class actions to favorable results including:

　　　　a.　*Gutierrez v. State Farm Mutual*, Los Angeles Superior Court (BC236552). Class action seeking overtime compensation for approximately 2,600 insurance claims adjusters employed by State Farm. The class was certified, and summary adjudication was granted as to liability in favor of the class. The case settled for $135 million just prior to trial, with final approval granted with no objections filed.

　　　　b.　*Bednar v. Allstate Insurance Company*, Los Angeles Superior Court

-2-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

**PAGE 010**

(BC240813). Class action seeking overtime compensation for approximately 1,200 insurance claims adjusters employed by Allstate. The class was certified, and summary adjudication was granted as to liability in favor of the class. The case settled for $120 million just prior to trial, with final approval granted with no objections filed.

c. *Roberts v. Coast National Insurance*, Orange County Superior Court (01CC08478). Class action seeking overtime compensation for insurance claims adjusters employed by Coast National Insurance. Certification granted, and then the matter was tried before a binding arbitrator. The case settled during the arbitration for in excess of $18 million.

d. *CNA Class Action Litigation*, Los Angeles Superior Court Class (JCCP 4230). Class action seeking overtime compensation for insurance claims adjusters employed by Defendant. The case settled for $33 million, with final approval granted with no objections filed.

e. *Dotson v. Royal SunAlliance*, Orange County Superior Court (02CC01787). Class action seeking overtime compensation for insurance claims adjusters employed by Royal SunAlliance. The case settled for $12.3 million, with final approval granted with no objections filed.

f. *Parris v. Lowe's Home Improvement*, Los Angeles County Superior Court (BC260702). Class action seeking payment of "off-the-clock" hours worked by all hourly employees of Lowe's Home Improvement stores in the State of California. The class was certified by the Court of Appeal and remanded to the trial court for further proceedings. Shortly thereafter, a $29.5 million settlement was reached and approved without objection.

g. *Pardo v. Toyota Motor Sales, et al.* Los Angeles County Superior Court (BC372781). Class action misclassification of workers with claims for overtime and missed meal and rest breaks. The case settled for $7.75 million and was approved with no objections.

-3-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

h. *Smith/Ballard v. Wal-Mart Stores, Inc.* United States District Court for the Northern District of California (Case No. 4:06-cv-05411-SBA). Wage and hour class action seeking unpaid vacation and personal time, unpaid wages, and related penalties on behalf of over 245,000 employees. The action was certified and settled for $86 million while Defendant's appeal of the certification was pending in the Ninth Circuit Court of Appeals.

i. *Hoyng v. AON*, Los Angeles County Superior Court (BC377184). Wage and hour class action seeking overtime and related compensation on behalf of Relationship and Account Specialists. The case settled for $10.5 million and was approved with no objections filed.

j. *In RE Bank of America Wage and Hour Employment Practices Litigation*, MDL 2138, United States District Court for the District of Kansas. California state and FLSA wage and hour litigation for various violations including unpaid overtime and "off-the-clock" work. Settled for $73 million.

k. *Lemus v. H & R Block Litigation*, United States District Court for the Northern District of California (Case No. 3:09-cv-03179-SI). The class was certified, and a settlement was reached prior to trial. Settled for $35 million.

l. *Harris v. Vector Marketing Corporation,* United States District Court for the Northern District of California (Case No. 3:08-cv-05198-EMC). Class action case on behalf of approximately 70,000 employees misclassified as "trainees." The case settled for $13 million.

m. *Bickley v. Schneider National Trucking,* United States District Court for the Northern District of California (Case No. 4:08-cv-05806-JSW). Wage and hour class action on behalf of approximately 6,000 truck drivers. The case settled for $29.5 million.

n. *Roberts v. TJX,* United States District Court for the Northern District of California (Case No. 13-CV-04731-MEJ). Wage and hour violations on behalf of approximately 82,000 employees. The case settled for $8.5 million.

-4-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

o. *Oprychal v. New Your Life Insurance,* United States District Court for the Central District of California (Case No. 2:07-cv-00518-VBF). Class action for the failure to pay commissions pursuant to a compensation plan. The case settled for $10 million.

p. *Neuvenheim v. Gamestop Corp.,* United States District Court for the Central District of California (Case No. 2:09-cv-06799-ODW). Class action on behalf of nonexempt employees for wage and hour violations. The case settled for $4.7 million.

q. *Hightower v. JP Morgan Chase,* United States District Court for the Central District of California (Case No. 2:11-cv-01802-PSG). Class action on behalf of nonexempt employees for wage and hour violations. The case settled for $12 million.

r. *Stern v. AT&T Mobility Corporation f/k/a Cingular Wireless Corporation,* United States District Court Central District of California (Case No. 2:05-CV-08842-CAS). Settlement with total value of the available settlement benefits that could have been claimed equaling $38,280,748.

s. *Lozano v. AT&T Wireless Services, Inc.,* United States District Court Central District of California (Case No 2:02-CV-00090-CAS). Settlement with total value of the available settlement benefits that could have been claimed equaling $42,700,800.

t. *Brenner v. Kevita, Inc.,* Superior Court, State of California, County of Ventura (Case No. 56-2017-00502340-CU-FR-VTA). Settlement with total estimated value of available monetary benefits that could have been claim equaling more than $5,000,000 and injunctive relief valuing between $26,200,446.76 and $34,397,145.69.

9. I have been appointed either lead or co-lead counsel in numerous cases, including cases in multi-district litigation or coordinated proceedings, where I worked collaboratively and cooperatively with co-counsel to bring about an efficient and beneficial resolution for all class

-5-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

members as the above results demonstrate.

## Experience of Marcus J. Bradley Esq.

10.     Mr. Bradley has practiced since 1994. In 2000, Mr. Bradley joined Mazursky, Schwartz & Angelo as an associate and became a partner in January 2005 at which time the firm was renamed Schwartz, Daniels & Bradley. He remained as a partner handling primarily wage and hour class actions until the dissolution of the firm effective December 31, 2008. In January 2009, Mr. Bradley moved his existing practice transferring a number of wage and hour cases to become a partner with the law firm of Marlin & Saltzman, with whom he had been co-counsel on dozens of wage and hour class actions during his tenure at Schwartz, Daniels & Bradley. On September 1, 2016, Mr. Bradley and I formed Bradley/Grombacher LLP.

11.     Mr. Bradley has been responsible for all facets of class action and other complex litigation, from pre-filing investigation through trial and appeal. Since approximately May 2000, he has spent the majority of his time representing workers in wage and hour matters. Mr. Bradley's writings on legal topics pertaining to litigating wage and hour class and representative actions have appeared in professional publications and he has also been called upon to speak at conferences and seminars for professional organizations, including a recent presentation titled "Planning for and Executing Trial in Class and Collective Wage & Hour Cases." Mr. Bradley has been honored as a Super Lawyer in the area of class actions by Los Angeles Magazine for multiple years, including 2023. He is a member of a number of professional organizations including the Consumer Attorneys of Los Angeles, the Consumer Attorneys of California, the California Employment Lawyers Association, and the American Association of Justice.

## Experience of Lisa Johnston-Nicholes, Esq.

12.     Lisa Johnston-Nicholes is a senior associate at Bradley/Grombacher, LLP, and has been a member of the State Bar of California since 2006. Ms. Johnston-Nicholes earned her Juris Doctor from Brigham Young University, *magna cum laude*. During law school, Ms. Johnston-Nicholes clerked for the Honorable B. Lynn Winmill at the United States District Court for the District of Idaho, where she honed her innovative approach to legal researching and writing. Ms. Johnston-Nicholes began her legal career at Arias, Ozzello & Gignac, where she wrote the

-6-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

plaintiff's petition for writ of mandamus in *Douglas v. U.S. Dist. Ct. for Cent. Dist. Of California*, in which the Ninth Circuit (en banc) granted the plaintiff's petition and established that a service provider cannot unilaterally change its terms of service without adequate notice to consumers. Ms. Johnston-Nicholes focuses her practice on class action and mass tort litigation in federal court, including multi-district and coordinated proceedings.

### Experience of Lirit A. King, Esq.

13.    Lirit King is a sixteenth-year associate at Bradley/Grombacher, LLP. Ms. King earned her Juris Doctor from Southwestern University. Ms. King focuses her practice on employment law and is a skilled litigator. Before joining Bradley/Grombacher, Ms. King worked at a national law firm as a staff attorney. Ms. King has also worked at plaintiff employment law firms specializing in discrimination, wage and hour, and ERISA violations, acting as associate counsel and as a second chair trial attorney in numerous successful lawsuits. Ms. King has proven to be a strong asset to the firm.

### Experience of Leslie H. Joyner, Esq.

14.    Leslie H. Joyner is a fourteenth-year associate at Bradley/Grombacher LLP and is the primary associate assigned to this case. Ms. Joyner earned her Juris Doctor from Lewis and Clark Law School. Ms. Joyner's practice has focused on complex litigation in federal and state courts, including wage and hour violations, consumer rights, employment class actions and consumer class actions. Prior to joining our firm, Ms. Joyner worked as an associate at a firm specializing in employment and other class action work, where she was pivotal in obtaining certification in numerous actions and played an integral role in recovering millions of dollars in payments to class members. She served as one of the primary attorneys in *Helmick v. Air Methods Corp.*, Case No. RG13665373, in the Superior Court of California, County of Alameda, which settled in 2020 for $82,273,846. Ms. Joyner also worked as a member of the Los Angeles City Attorney's Complex Litigation Division, where her practice included active involvement in the prosecution of major financial institutions and national corporations engaged in fraud and other unlawful conduct against California consumers. Ms. Joyner has published articles on the field of mass and class action litigation appearing in Forum, which is the Magazine of Consumer Attorneys of

-7-

California.

## Experience of Corey Smith, Esq.

15.    Corey Smith is a seventh-year associate at Bradley/Grombacher, LLP. Mr. Smith earned his Juris Doctor from Pepperdine University. Mr. Smith focuses his practice on employment class action litigation. Before joining Bradley/Grombacher, Mr. Smith worked for Marlin & Saltzman, LLP, another prominent wage and hour class action firm, where he helped secure sizeable settlements in numerous class action and PAGA lawsuits and sat second chair in a class action trial.

## Experience of Emilie MacLean, Esq.

16.    Emilie MacLean is an associate at Bradley/Grombacher, LLP who also worked on this case. Ms. MacLean earned her Juris Doctor and Master of Dispute Resolution from Pepperdine University, and her Master of Laws from the University of Toronto. For nearly 4 years, prior to receiving her license to practice law in California, Ms. MacLean worked as a law clerk at our firm under my supervision, where she has drafted the briefing on a number of complex legal issues.

## Experience of Fernando Valle, Jr., Esq.

17.    Fernando Valle, Jr. received his license to practice law from the New York State Bar in 2023. Mr. Valle received his LL.B. degree from Middlesex University, Dubai in 2019. While in law school Mr. Valle competed in the Willem C. Vis International Commercial Arbitration Moot, where he collaborated in drafting the Memorandum for Claimant and presented three rounds of oral arguments in Vienna, Austria. After law school, Mr. Valle apprenticed for a litigation focused law firm in Dubai. From 2021 until receiving his license to practice law, Mr. Valle was a law clerk at our firm under my supervision and the supervision of my partner. During that time, he drafted numerous motions and pleadings on cases within the firm's employment, consumer, and data breach practice areas.

## OVERVIEW OF COUNSEL'S WORK ON THIS CASE

18.    Our offices have performed substantial work in this litigation to identify, investigate and prosecute the potential class action claims. We have worked closely with the named Plaintiff to understand his experiences working for Defendant and to evaluate his claims. We also have

-8-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

conducted interviews with a number of his co-workers and have worked with many of those individuals to submit declarations to the Court in support of Plaintiff's first motion for class certification, some of which are being resubmitted to the Court with this motion. This work has been important in enabling us to obtain a real-world understanding of the facts and experiences at issue in this case.

19.     With respect to formal discovery, on September 25, 2021, the parties conducted a Rule 26f conference. On October 7, 2021, our offices served Plaintiff's first set of requests for production of documents and special interrogatories on Defendant.

20.     Although Defendant did not serve its responses and objections to Plaintiff's discovery requests until November 22, 2021, on November 11, 2021, our offices initiated a meet and confer with Defendant regarding its stated intent to withhold class contact information and the class list.

21.     Over the next few months, the Parties actively engaged in the meet and confer process regarding Defendant's responses to Plaintiff's written discovery – including an appropriate sampling of putative class member contact information; an appropriate scope of other relevant discovery; developing a procedure for a *Belaire West* Notice; preparing a proposed *Belaire* Notice and Stipulated Protective Order; and selecting and retaining CPT Group to administer the *Belaire* process.

22.     On January 13, 2022, Plaintiff served his second set of requests for documents and interrogatories on Defendant.

23.     Although Defendant had previously stated that it would take 14 days to pull the class contact information and transmit it to CPT Group, this did not occur until February 3, 2022, which was 27 days after the *Belaire* agreement and notice were finalized. Because the additional and unanticipated 13 days of delay in pulling the class list and transmitting it to CPT Group undercut Plaintiff's ability to adequately prepare his certification motion in advance of the March 28, 2022 filing deadline, on February 7, 2022, the parties submitted a joint stipulation to extend the class certification filing deadline by 13 days (ECF No. 35), which the Court granted on March 11, 2022 (ECF No. 40). The *Belaire* notice was issued on February 8, 2022; the response deadline was February 22, 2002; and CPT group provided Plaintiff with a list of 5,823 potential class members

-9-

**PAGE 017**

on February 25, 2022.

24.   On February 25, 2022, Defendant served its first sets of document requests and interrogatories on Plaintiff.

25.   On March 1, 2022, Plaintiff took the deposition of Defendant's corporate representative, Robert Francis, pursuant to Federal Rule of Civil Procedure 30(b)(6).

26.   Defendant served its responses and objections to Plaintiff's second set of discovery on March 4, 2022 and on March 10, 2022, Plaintiff served his third set of requests for documents on Defendant. On April 8, 2022, Plaintiff served his responses and objections to Defendant's discovery requests.

27.   On March 15, 2022, Defendant took the deposition of Plaintiff Carlos Sanchez. During that time period, our offices pushed forward with depositions as well.  In addition to Defendant's Corporate representative, on March 29, 2022, Plaintiff took the depositions of John Religa, Club Manager at Torrance, California, and Paris Nguyen, Club Manager at La Habra, California. On March 31, 2022, Plaintiff took the deposition of William Marthins, Club Manager for the Vacaville, California store. On April 5, 2022, Plaintiff took the deposition of Matthew Jette, Club Manager at Sam's Riverside California location. The testimony of Mr. Religa, Ms. Nguyen, Mr. Marthins and Mr. Jette is cited in the pending motion. We spent considerable time preparing for these depositions.

28.   In addition, we have worked with the named Plaintiff and proposed class representative, Carlos Sanchez, to respond to Defendant's written discovery requests in a timely fashion.  We also prepared the named Plaintiff for deposition and defended him in his deposition on March 1, 2022. Mr. Sanchez has participated actively in this case to assist in its prosecution, including by meeting with counsel, participating in discovery, and sitting for deposition, as discussed above.

29.   Plaintiff filed his motion for class certification on April 11, 2022. (ECF 44). Plaintiff's motion presented written policies, deposition testimony, and declarations from 55 putative class members across 28 of Defendant's California store locations demonstrating that after clocking out at the end of their closing shifts, class members regularly confront locked (and sometimes

-10-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

blockaded) exit doors and therefore must wait or track down a manager or supervisor who is available (in the midst of trying to complete their own closing duties) to walk to the front of the store and unlock the door, resulting in anywhere from 5 to 30 minutes of unpaid time. *Id*. Plaintiff also presented the expert report of Jeffrey Petersen, Ph.D. describing how representative evidence will be utilized to establish the percentage of class members who experienced unpaid wait time, and the frequency and average amount of time to assist the trier-of-fact in making liability, damages and penalty determinations. *Id*.

30.    Defendant filed its opposition on May 11, 2022. (ECF 47). Although Defendant refused to provide Plaintiff with contact information for all putative class members prior to class certification—rending it impossible for Plaintiff to conduct the survey—, Defendant's opposition criticized Plaintiff for not having conducted the survey prior to the certification filing deadline. (ECF 47). Plaintiff noted this Catch-22 in his reply brief, which was filed on June 3, 2022. (ECF 54).

31.    On May 26, 2022, the Parties filed a stipulated protective order. (ECF 49).

32.    On June 3, 2022, Plaintiff filed his reply in support of class certification in which he noted "Sam's has delayed producing and withheld key information that would allow Plaintiff to further demonstrate Sam's knowledge at this stage on the basis the requests exceeded pre-certification discovery. [] The information and documents withheld include ESI showing complaints and internal discussions regarding off the clock wait time, time adjustment data, and footage from the video cameras at exits of Sam's clubs, which Sam's managers have admitted could capture associates waiting for a manger to arrive and let them out." (ECF 54 at p. 6, fn. 6) (internal citation omitted). The information and documents withheld were responsive to Plaintiff's first sets of discovery to Defendant served October 7, 2021.

33.    On June 16, 2022, counsel for Plaintiff filed *Yolanda Martinez v. Sam's West, Inc.* ("*Martinez* PAGA Action"), 22CV012835, in the Superior Court for the County of Alameda. The *Martinez* matter is predicated upon the same Labor Code violations and same theories of liability as this action but seeks only civil penalties pursuant to the Private Attorneys General Act.

34.    On May 4, 2023, in this case, the Court issued an Order denying Plaintiff's motion for

-11-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

class certification based on predominance concerns— stating "certification on this record would mean certifying a class where a substantial number of PCMs may not have been injured at all." (ECF 63 at p. 9). The Court held "[i]n sum, on this record, the Court cannot certify a class. However, if Plaintiff were to augment the record or propose a more narrowly defined class, the Court may reach a different conclusion."

35.    Two business days later, on May 8, 2023, Plaintiff's Counsel emailed Defense Counsel to initiate a meet and confer on Plaintiff's renewed motion for class certification.

36.    On May 31, 2023, after several conferences of counsel, Plaintiff's Counsel sent Defense Counsel a proposed stipulation for a briefing schedule which contemplated further discovery necessary for Plaintiff's expert to conduct a survey (*see* ECF 44-3) to augment the record on Plaintiff's forthcoming motion. Plaintiff's draft stipulation proposed October 4, 2023 as the deadline for Plaintiff to file his opening memorandum.

37.    However, on June 13, 2023, a further telephonic meet and confer was held regarding Plaintiff's proposed stipulation during which Defense Counsel informed Plaintiff's Counsel that Defendant did not believe Plaintiff was entitled to conduct further discovery or that the Court had authorized Plaintiff to file a renewed motion and therefore would not agree to the stipulation.

38.    In response, Plaintiff prepared a Joint Statement on Discovery Dispute, which was filed on June 30, 2023, and sought an "an Order compelling Defendant to produce the names, last known home addresses, telephone numbers, employment dates and employment locations of all members of the putative class who worked 20 or more shifts that ended between 10:00 p.m. and 6:00 a.m. at any time since June 23, 2017." (ECF 67, 68.)

39.    On July 21, 2023, the Magistrate Judge, the Honorable Jacqueline Chooljian, issued an Order granting Plaintiff's Motion Re Discovery Dispute. (ECF 70.)

40.    On August 7, 2023, Defendant produced the names, telephone numbers and addresses for putative class members who worked 20 or more shifts that ended between 10:00 p.m. and 6:00 a.m. at any time since June 23, 2017.

41.    Subsequently, Plaintiff met and conferred with Defendant regarding its failure to produce the putative class members' employment dates and employment locations, necessary to

-12-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

undertake the survey. However, Defendant took the position that because the term "identify" was not defined in the discovery request, Plaintiff was only entitled to contact information, although this argument had not been raised in Defendant's briefing on the motion to compel.

42. On August 15, 2023, Plaintiff filed a request for clarification in light of this further dispute between the Parties regarding the Court's Order. (ECF 71.)

43. On August 22, 2023, a hearing was held on Plaintiff's request for clarification, during which Plaintiff explained that because Plaintiff intended to narrow the scope of the class definition on his renewed certification motion, the survey could not be initiated without employment locations; and that other information, such as employment dates and job titles, was necessary to assess the representativeness of the survey upon completion. During the hearing Judge Choolijian noted that since only employment locations were necessary for Plaintiff's expert to get the survey started, the other information Plaintiff was seeking could be produced on a later date once the survey responses were collected.

44. In light of an accommodation reached during the hearing, Judge Chooljian ordered "(1) Plaintiff's' counsel, within seven (7) days, to identify to Defendant's counsel the subset of Defendant's locations Plaintiff no longer intends to include in Plaintiff's putative class; and (2) Defendant's counsel – within seven (7) days of provision of such information or such later date to which counsel may agree in writing – shall reproduce the list of putative class members/contact information it previously produced in response to the Court's July 21, 2023 Order, but shall omit therefrom those putative class members who last worked at one of the locations identified by Plaintiff's counsel." (ECF 75.)

45. The revised contact information omitting certain store locations was produced to Plaintiff on August 28, 2023, at which time Plaintiff's expert, Dr. Petersen, began the process of conducting the survey.

46. On September 1, 2023, Plaintiff sent an email to Defendant requesting that Defendant supplement its earlier document production and discovery responses to provide Plaintiff any relevant updated policies. The email stated: "I just want to remind you of Sam's duty to supplement under 26(e) to the extent prior disclosures or discovery are in any way incomplete or

-13-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

incorrect at this time. For example, if Sam's Club has issued any updated written policies or altered its practices in any way since responses were last served, we need updated responses/documents produced ASAP."

47.     On September 20, 2023, while the survey was underway, Plaintiff provided Defendant with courtesy copies of the discovery Plaintiff intended to issue as soon as the survey respondents could be identified, seeking those individual's work locations, job titles and employment dates, among other information solely in Defendant's possession, so that the parties "can begin meeting and conferring on the requests to streamline any issues that may arise/need for Court intervention."

48.     Meanwhile, Plaintiff was meeting and conferring with Defendant to increase in the number of depositions per side to accommodate additional investigation necessary for his renewed certification motion.

49.     On October 10, 2023, the survey process was completed, and on that same day Plaintiff formally served on Defendant additional discovery seeking work locations, job titles and employment dates, among other information solely in Defendant's possession. Attached to the discovery was a list that identified the survey respondents by name and Wal-Mart Identification Number.

50.     On October 18, 2023, the parties filed a joint stipulation to set a briefing schedule on Plaintiff's renewed class certification motion which would permit the parties to complete motion and opposition related discovery. (ECF 76.) The stipulation proposed February 23, 2024 as the deadline to file the motion; April 5, 2024 as the deadline to file the opposition and May 3, 2024 as the deadline to file the reply. (*Id.*)  The Court denied the stipulation at that time and set the following briefing deadlines: motion for class certification by January 3, 2024; Opposition is due January 10, 2024; Reply is due January 17, 2024; and hearing to be held on February 5, 2024. (ECF 77.)

51.     On November 8, 2023, Defendant requested an extension on its time to respond to Plaintiff's discovery requests. In light of the January 3, 2024, deadline set by the Court for Plaintiff to file his motion, Plaintiff responded noting that "Sam's Club already knows who the survey

-14-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

respondents are; has all of this information (employment dates, locations and job titles) at its disposal; and has certainly already begun its own analysis. Thus, we can only agree to the extension requested on the condition that Sam's affirms it will be providing substantive responses to these requests. If we are just going to get partial responses or objections only to these requests on the 22nd, it makes more sense for Sam's to provide those on the 9th so we can get the meet and confer and discovery dispute process under way."

52.    In both this case and in the *Martinez* PAGA action the parties have on numerous occasions met and conferred regarding Plaintiff's request seeking security camera footage, which captures the exit through which associates must leave at the end of their closing shifts. During a telephonic meet and confer, defense counsel advised that only recently recorded security footage was available to be provided in response to Plaintiff's request for production propounded in this case on October 7, 2021.

53.    On November 30, 2023, the parties submitted a joint stipulation, which would permit more adequate time for the parties to conduct complete certification related discovery and respond to and conduct requisite discovery and investigation with respect evidence presented in the briefing , proposing February 14, 2024, for Plaintiff to file his motion; March 20, 2024 for Defendant to file its reply; and April 10 2024 for Plaintiff to file his reply. (ECF 83).

54.    On December 4, 2023, the Court issued an Order denying the Parties stipulation to continue the class certification filing deadline and the briefing schedule.

55.    Also on December 4, 2023, Defendant informed Plaintiff that it was considering filing an *ex parte* application "to move out the opposition deadline (but leaving the class certification deadline in place)." In response Plaintiff offered to stipulate to the relief requested so long as the deadline for Plaintiff to file his reply was also continued.

56.    Also on December 4, 2023, Defendant identified thirty survey respondents whose deposition it sought to take in the three weeks that followed, before Plaintiff's opening brief is filed.

57.    Over the weeks that followed, Plaintiff diligently devoted substantial time to coordinating these depositions for Defendant, prepping class members and defending these

-15-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

Case 2:21-cv-05122-SVW-JC   Document 96   Filed 01/03/24   Page 24 of 890   Page ID #:3252

depositions, while working to prepare his certification motion.

58.	On December 7, 2023, Defendant produced certain data necessary to assess the survey responses collected, which was due on November 22, 2023, by agreement of the parties.

59.	That same day, having reviewed the data produced, Plaintiff propounded additional survey related discovery on Defendant, the responses to which are due on January 8, 2024.

60.	Also on December 7, 2023, Defendant produced its Associate Pay Policy which had been updated more than seven months prior (on May 3, 2023) in response to allegations made and arguments presented in this lawsuit. Specifically, throughout this litigation Plaintiff has argued that Defendant's failure to instruct Associates to submit a time adjustment for off the clock exit delay, among other common facts, supports class certification and Defendant's liability. (See, ECF 44, 54.) This updated Associate Pay Policy is precisely the type of discovery Plaintiff explicitly asked for months prior, in its September 1, 2023 email to Defendant.

61.	The next day, on December 8, 2023, Defendant moved *ex parte* for additional time to file its Opposition to Plaintiff's certification motion. (ECF 87.)

62.	Although Plaintiff' opposition noted that he did not oppose the relief request should Plaintiff also be provided similar time to respond to the evidence put forth in Defendant's opposition (ECF 88), the Court granted Defendant's *ex parte* application and provided Defendant five weeks to respond to the evidence submitted with Plaintiff's motion and Plaintiff ten days to respond to the Opposition evidence. (ECF 89.)

63.	On December 24, 2023, Plaintiff noticed the deposition of Defendant with respect to the Updated Associate Pay Policy and attempted to reach Defense counsel regarding the need for additional time to conduct discovery concerning this substantive policy change.

64.	Although Plaintiff's Counsel became aware of Defendant's material late production over the holiday weekend, Plaintiff's Counsel's held off on filing the *ex parte* application until December 26, 2023, out of respect for the Court's and Defense Counsel's potential observance of the Christmas holiday.

65.	On December 27, 2023, Defendant refused to produce a person to testify as to the policy change and Plaintiff initiated a Rule 37-1 meet and confer.

-16-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

66.    On December 28, 2023, the court denied Plaintiff's *ex parte* application. (ECF 92.)

67.    On December 29, 2023, just five days before Plaintiff's certification motion was due, Defendant produced for the first time its Facility Closing Procedures Policy Updated June 14, 2023. As Plaintiff's notice of motion and motion demonstrates, these updated policies impact both the class as alleged and Plaintiff's arguments for class certification. Plaintiff maintains that Defendant's failure to comply with its obligation to timely supplement discovery under Federal Rule of Civil Procedure 26(e)(1)(A) is unjustifiable.

68.    Plaintiff opted not to bring an additional *ex parte* application seeking the modification of filing deadlines and timelines for Plaintiff with respect to the instant motion based upon Defendant's dilatory production of its Facility Closing Procedures Policy Updated June 14, 2023, given that, as set forth above, the Court has already denied Plaintiff similar relief several times previously. Plaintiff reserves the right to raise these issues on appeal.

69.    As the above demonstrates, we have invested significant time and resources in gathering the evidence from class members, conducting the legal research, developing the legal theories, drafting the briefing in connection with class certification, and working with our expert, Dr. Jeffrey Peterson to develop and conduct a survey. We have also retained and worked closely with our damages expert, David Breshears CPA/CFF, who has (and will continue to as more daily timekeeping records and historical compensation records are produced by Defendant) utilized the survey results and statistical analysis to determine the amount of any unpaid regular and overtime pay.

70.    My offices and I are committed to continuing to prosecute the case vigorously on behalf of the Plaintiff and putative class. We have substantial experience litigating wage and hour claims such as this one and will commit the resources necessary to achieve the best result we can for the class. As in our other class action cases, we are committed to fairly and adequately representing the interests of the class here.

## **EXHIBITS**

71.    Attached hereto as **Exhibit 1** is a true and correct copy of all versions of Sam's Club's Associate Pay Policy for California, which Sam's Club has produced in this litigation.

-17-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

72.    Attached hereto as **Exhibit 2** is a true and correct copy of all versions of Sam's Club's Facility Closing/Overnight Procedures Policy (AP-23), which Sam's Club has produced in this litigation.

73.    Attached hereto as **Exhibit 3** is a true and correct copy of all versions of Sam's Club's Associate Pay Management Guidelines Policy for California, which Sam's Club has produced in this litigation.

74.    Attached hereto as **Exhibit 4** is a true and correct copy of Sam's Club's Edit Timesheet ETA (time adjustment procedures), which Sam's Club has produced in this litigation.

75.    Attached hereto as **Exhibit 5** is a true and correct copy of Sam's Club's Work Group and Block Scheduling Toolkit document, which Sam's Club has produced in this litigation.

76.    Attached hereto as **Exhibit 6** is a true and correct copy of Sam's Club's Key and Door Control Policy AP-05, which was produced by Defendant in this litigation; is designated as Confidential pursuant to the Parties' protective Order; and is being filed under seal pursuant this Court's January 2, 2024, Order (ECF No. 94).

77.    Attached hereto as **Exhibit 7** is a true and correct copy of Sam's Club's Closed-Circuit Television and Camera Policy, which was produced by Defendant in this litigation; is designated as Confidential pursuant to the Parties' protective Order; and is being filed under seal pursuant this Court's January 2, 2024, Order (ECF No. 94).

78.    Attached hereto as **Exhibit 8** is a true and correct copy of Sam's Club's Global Records Policy, which was produced by Defendant in this litigation; is designated as Confidential pursuant to the Parties' protective Order; and is being filed under seal pursuant this Court's January 2, 2024, Order (ECF No. 94).

79.    Attached hereto as **Exhibit 9** is a true and correct copy of Sam's Club's Records Management Policy, which was produced by Defendant in this litigation; is designated as Confidential pursuant to the Parties' protective Order; and is being filed under seal pursuant this Court's January 2, 2024, Order (ECF No. 94).

80.    Attached hereto as **Exhibit 10** is a true and correct copy of Sam's Club's Records Retention Schedule, which was produced by Defendant in this litigation; is designated as

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

Confidential pursuant to the Parties' protective Order; and is being filed under seal pursuant this Court's January 2, 2024, Order (ECF No. 94).

81. Attached hereto as **Exhibit 11** is a true and correct copy of Sam's Club's Third Supplemental Responses to Plaintiff Carlos Sanchez's First Set of Interrogatories, which were served on my office on August 9, 2023.

82. Attached hereto as **Exhibit 12** is a true and correct copy of Sam's Club's Responses to Plaintiff Carlos Sanchez's Third Set of Interrogatories, which were served on my office on November 22, 2023.

83. Attached hereto as **Exhibit 13** is a true and correct copy of excerpts from the deposition of Robert Francis, Defendant's corporate representative witness designated pursuant to FRCP 30(b)(6), taken on March 1, 2022.

84. Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from the deposition of John Religa, Club Manager at Torrance, California, taken on March 29, 2022.

85. Attached hereto as **Exhibit 15** is a true and correct copy of excerpts from the deposition of William Marthens, Club Manager at Vacaville, California, and former Co-Manager at Palmdale California taken on March 31, 2022.

86. Attached hereto as **Exhibit 16** is a true and correct copy of excerpts from the deposition of Mark Jette, Club Manager at Riverside, California, taken on April 5, 2022.

87. Attached hereto as **Exhibit 17** is a true and correct copy of excerpts from the deposition of William Ramirez, Club Manager at Sam's Club's Yuba City location, which I took on May 20, 2022.

88. Attached hereto as **Exhibit 18** is a true and correct copy of Exhibit 4 to the May 20, 2022 deposition of William Ramirez, Club Manager at Sam's Club's Yuba City location.

89. Attached hereto as **Exhibit 19** is a true and correct copy of excerpts from the deposition of Carlos Gonzalez, who was the Club Manager at Sam's Club's Glendora location, which I took on May 20, 2022.

90. Attached hereto as **Exhibit 20** is a true and correct copy of Exhibit 3 to the May 20, 2022 deposition of Carlos Gonzalez, who was the Club Manager at Sam's Club's Glendora

-19-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

location.

91.     Attached hereto as **Exhibit 21** is a true and correct copy of excerpts from the deposition of Paris Nguyen, Club Manager at La Habra California, taken on March 29, 2022.

92.     Attached hereto as **Exhibit 22** is a true and correct copy of excerpts from the deposition of Benny Mora, Club Manager at San Diego, California, taken on December 19, 2023.

93.     Attached hereto as **Exhibit 23** is a true and correct copy of excerpts from the deposition of Laura Hernandez, Club Manager at Santa Clarita, California, which I took on December 22, 2023.

94.     Attached hereto as **Exhibit 24** is a true and correct copy of excerpts from the deposition of John Gaston, Club Manager at Palmdale, California, which I took on December 27, 2023.

95.     Attached hereto as **Exhibit 25** is a true and correct copy of excerpts from the deposition of Dustin Schloss, Club Manager at Palm Desert, California, which I took on December 27, 2023.

96.     Attached hereto as **Exhibit 26** is a true and correct copy of excerpts from the deposition of Ann Perry, Club Manager at Citrus Heights, California, which I took on December 27, 2023.

97.     Attached hereto as **Exhibit 27** is a true and correct copy of excerpts from the deposition of Raul Razo, Club Manager at Oxnard, California, which I took on December 29, 2023.

98.     Attached hereto as **Exhibit 28** is a true and correct copy of excerpts from the deposition of the named Plaintiff, Carlos Sanchez, which Defendant took on March 15, 2022.

99.     Attached hereto as **Exhibit 29** is a true and correct copy of excerpts from the deposition of putative class member, Jessica Butler, which Defendant took on May 2, 2022.

100.    Attached hereto as **Exhibit 30** is a true and correct copy of excerpts from the deposition of putative class member, Pablo Olivarria, Jr., which Defendant took on May 3, 2022.

-20-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

101. Attached hereto as **Exhibit 31** is a true and correct copy of excerpts from the deposition of putative class member, Michael Ditullio, which Defendant took on April 22, 2022.

102. Attached hereto as **Exhibit 32** is a true and correct copy of excerpts from the deposition of putative class member, Derrick Lamont Maxwell, which Defendant took on May 3, 2022.

103. Attached hereto as **Exhibit 33** is a true and correct copy of excerpts from the deposition of putative class member, Yolanda Martinez, which Defendant took on April 28, 2022.

104. Attached hereto as **Exhibit 34** is a true and correct copy of excerpts from the deposition of putative class member, Jennifer Vasquez, which Defendant took on December 19, 2023.

105. Attached hereto as **Exhibit 35** is a true and correct copy of excerpts from the deposition of putative class member, Eduardo Sanchez, which Defendant took on December 18, 2023.

106. Attached hereto as **Exhibit 36** is a true and correct copy of excerpts from the deposition of putative class member, Felice McRoberts, which Defendant took on December 21, 2023.

107. Attached hereto as **Exhibit 37** is a true and correct copy of excerpts from the deposition of putative class member, Juana Meyo Xique, which Defendant took on December 21, 2023.

108. Attached hereto as **Exhibit 38** is a true and correct copy of excerpts from the deposition of putative class member, Matthew Anderson, which Defendant took on December 19, 2023.

109. Attached hereto as **Exhibit 39** is a true and correct copy of excerpts from the deposition of putative class member, Brian McCray, which Defendant took on December 19, 2023.

110. Attached hereto as **Exhibit 40** is a copy of Plaintiff's proposed trial plan.

-21-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on January 3, 2024, at Westlake Village, California.

*/s/ Kiley L. Grombacher*
Kiley L. Grombacher

-22-

DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF
PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

# EXHIBIT 1

## Associate Pay Policy

California

Effective: June 22, 2020

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

**Exempt**

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

**Non-exempt**

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

**Full-time status**

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**

- 20 hours per week (If hired prior to September 1, 1979)
    - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
    - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**

- 28 hours per week, regardless of hire date

**Hourly pharmacists:**

- 27 hours per week, regardless of hire date

**PAGE 032**

CONFIDENTIAL

WM-MARTINEZ0000056

**Part-time status**

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

**Overtime pay**

*Overtime* pay applies to all *non-exempt associates*. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day. *Non-exempt* means any associate who is eligible for overtime pay under federal or state law, regardless of whether the associate is paid on an hourly or salary basis. *Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m. *Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

Prior to working overtime hours, you must get permission from your supervisor. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

**Split-shift pay**

Non-exempt associates may receive additional pay if they are required to work a *split shift*.

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

**Weekend premium pay**

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Weekend Premium.

If you are in an eligible Home Office, hourly non-exempt position, you will receive an additional $1.00 per hour for each hour worked on Sunday.

**Reporting pay**

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:

**PAGE 033**

CONFIDENTIAL

WM-MARTINEZ0000057

- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control.*

*Circumstances beyond our control* include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

### Scheduled work meetings

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

### Travel pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:

- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment form on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report on a daily basis your actual time worked and paid travel time as described above by submitting the appropriate time adjustment form. If you will be away from your primary work location on one or more paydays, you should work with your HR representative to make arrangements to receive your pay.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Corporate Travel Site on the WIRE.

### Disaster and Critical Incident Support pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay.  See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

### Other paid activities

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy or the Supply Chain Random Drug Screening Policy.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
  - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
  - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
  - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
  - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

**PAGE 034**

WM-MARTINEZ0000058

If you perform any of these activities while you are not clocked in, you must keep track of all time involved and immediately submit an Electronic Time Adjustment (ETA) or the appropriate time adjustment form when you return to work. We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock.

# Timekeeping Integrity

We are committed to paying all associates correctly, to maintaining accurate payroll records and to compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you.

**Payroll Integrity**

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work.

Only authorized associates may edit time records. An approved time adjustment form may be required before time records can be edited. Hourly associates may adjust their own time by submitting an ETA.

**Working unscheduled hours**

If you are a non-exempt associate, you may not work unscheduled hours unless a salaried member of management approves the work in advance. You must track and record all unscheduled hours and submit an appropriate time adjustment form.

**Prohibition against working off the clock**

We prohibit all *off the clock work,* and will not tolerate working off the clock or requests for others to work off the clock. You must not perform any work without compensation. Supervisors and managers must not request, require, or permit you to perform work without compensation. You should report any possible deviations from this rule. Except where prohibited by law, we will investigate all allegations of violations of this rule promptly and thoroughly.

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device and the associate was not paid for the time worked.

Examples of prohibited off the clock work include but are not limited to:

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time and being asked to wait before clocking in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you will be subject to disciplinary action up to and including termination.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor;
- Your HR representative or

**PAGE 035**

CONFIDENTIAL                                                                                                          WM-MARTINEZ0000059

- Wage and Hour Helpline (800)530-9929 option 6

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: June 22, 2020

**PAGE 036**

CONFIDENTIAL

WM-MARTINEZ0000060



# Associate Pay Policy
## California

Effective: March 12, 2021

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

**Exempt**

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

**Non-exempt**

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

**Full-time status**

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**

- 20 hours per week (If hired prior to September 1, 1979)
    - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
    - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**

- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**

- 27 hours per week, regardless of hire date

PAGE 037
CONFIDENTIAL                                                                      WMSANCHEZ0000378

**Part-time status**

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

**Overtime pay**

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.

*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

**Split-shift pay**

Non-exempt associates may receive additional pay if they are required to work a *split shift.*

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

**Premium pay**

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

If you are in an eligible Home Office, hourly non-exempt position, you will receive an additional $1.00 per hour for each hour worked on Sunday.

**Reporting pay**

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a

PAGE 038
CONFIDENTIAL                                                                                                                    WMSANCHEZ0000379

total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:

- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

**Scheduled work meetings**

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

**Work Related Travel Time pay**

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:

- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment form on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy. SWAT associates please click here for additional information.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

**Disaster and Critical Incident Support pay**

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay. See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

**Other paid activities**

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.

- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
  - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
  - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
  - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
  - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

**Payroll Integrity**

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, an approved time adjustment is required. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

**Working unscheduled hours**

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

**Prohibition against working off the clock**

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.  If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or

PAGE 040
CONFIDENTIAL    WMSANCHEZ0000381

- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: March 12, 2021

PAGE 041
CONFIDENTIAL    WMSANCHEZ0000382

## Associate Pay Policy

California

### Effective: August 28, 2021

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

## Exempt

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

## Non-exempt

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

## Full-time status

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**
- 20 hours per week (If hired prior to September 1, 1979)
  - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**
- 27 hours per week, regardless of hire date

## Part-time status

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**PAGE 042**

WMSANCHEZ0000080

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

### Overtime pay

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.

*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

## Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift.*

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

## Premium pay

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

## Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a

**PAGE 043**                                                                                       WMSANCHEZ0000081

total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:
- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:
- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

### Scheduled work meetings
We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay
If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:
- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment form on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy. SWAT associates please click here for additional information.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Disaster and Critical Incident Support pay
If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay. See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

## Other paid activities
In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

**PAGE 044**

WMSANCHEZ0000082

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
  - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
  - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
  - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
  - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, an approved time adjustment is required. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.  If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:

**PAGE 045**

WMSANCHEZ0000083

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: November 23, 2021

**PAGE 046**

WMSANCHEZ0000084

# Associate Pay Policy

California

Updated: December 9, 2021

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

## Exempt

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

## Non-exempt

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

## Full-time status

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**
- 20 hours per week (If hired prior to September 1, 1979)
  - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**
- 27 hours per week, regardless of hire date

## Part-time status

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**PAGE 047**

WMSANCHEZ0000085

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

### Overtime pay

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day in a workweek.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.
*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

### Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift.*
*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.
If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

### Premium pay

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

### Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.
If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a

                                                                          WMSANCHEZ0000086

total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:
- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:
- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

**Scheduled work meetings**

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:
- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment form on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy. SWAT associates please click here for additional information.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Disaster and Critical Incident Support pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay. See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

## Other paid activities

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

**PAGE 049**

WMSANCHEZ0000087

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
    - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
    - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
    - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
    - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, an approved time adjustment is required. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked. If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time. No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:

WMSANCHEZ0000088

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: December 9, 2021

WMSANCHEZ0000089

# Associate Pay Policy

California

Updated: June 22, 2022

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

## Exempt
Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

## Non-exempt
Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

## Full-time status
Refers to associates who maintain at least the following hours (additional hours may be scheduled):
**Walmart Stores, Sam's Club and Home Office associates:**
- 20 hours per week (If hired prior to September 1, 1979)
  - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**
- 27 hours per week, regardless of hire date

## Part-time status
Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**PAGE 052**

CONFIDENTIAL

WM-MARTINEZ0000061

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

### Overtime pay

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day in a workweek.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.
*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

## Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift*.

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

## Premium pay

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

## Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

**PAGE 053**

CONFIDENTIAL

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:
- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control.*

*Circumstances beyond our control* include, but are not limited to, the following:
- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

#### Scheduled work meetings

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:
- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy. SWAT associates please click here for additional information.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Disaster and Critical Incident Support pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay.  See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

**PAGE 054**

CONFIDENTIAL

WM-MARTINEZ0000063

## Other paid activities

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
    - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
    - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
    - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
    - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, you must review the changes. Walmart US Store associates may review and confirm changes to their timesheet within Me@Walmart or the Timeclock Application, or complete a time adjustment form. All other divisions should continue to use the time adjustment form. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.  If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

**PAGE 055**

CONFIDENTIAL

WM-MARTINEZ0000064

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: June 24, 2022

**PAGE 056**

CONFIDENTIAL                                                    WM-MARTINEZ0000065



## Associate Pay Policy

California

## Updated: September 7, 2022

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

## Exempt

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

## Non-exempt

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

## Full-time status

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**
- 20 hours per week (If hired prior to September 1, 1979)
  - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**
- 27 hours per week, regardless of hire date

## Part-time status

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

PAGE 057
CONFIDENTIAL                                                                                                                          WMSANCHEZ0000351

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

**Overtime pay**

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day in a workweek.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.
*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

## Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift.*

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

## Premium pay

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

## Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

PAGE 058
CONFIDENTIAL      WMSANCHEZ0000352

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:

- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

### Scheduled work meetings

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:

- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Disaster and Critical Incident Support pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay.  See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

CONFIDENTIAL                                                                  WMSANCHEZ0000353

## Other paid activities

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
  - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
  - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
  - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
  - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, you must review the changes. Walmart US Store associates may review and confirm changes to their timesheet within Me@Walmart or the Timeclock Application, or complete a time adjustment form. All other divisions should continue to use the time adjustment form. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.   If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

PAGE 060
CONFIDENTIAL                                                                                                                    WMSANCHEZ0000354

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:
- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:
- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

Last Modified: September 7, 2022

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

PAGE 061
CONFIDENTIAL                                                                                                          WMSANCHEZ0000355

## Associate Pay Policy

California

Updated: May 3, 2023

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

### Exempt

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

### Non-exempt

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

### Full-time status
Refers to associates who maintain at least the following hours (additional hours may be scheduled):
**Walmart Stores, Sam's Club and Home Office associates:**
* 20 hours per week (If hired prior to September 1, 1979)
  * Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
* 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  * Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
* 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
* 28 hours per week, regardless of hire date
* OTR drivers click here for more information

**Hourly pharmacists:**
* 27 hours per week, regardless of hire date

### Part-time status

CONFIDENTIAL                                                                    WMSANCHEZ0000215

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

**Temporary status**

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

**Overtime pay**

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day in a workweek.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.

*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

## Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift.*

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

## Premium pay

Field Supply Chain associates including Drivers should consult the Pay Plan Guidelines to see if you are eligible for Premium Pay.

## Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

**PAGE 063**

CONFIDENTIAL                                                                                                      WMSANCHEZ0000216

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:
- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:
- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

**Scheduled work meetings**

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:
- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Support Pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for Support Pay. See the Support Pay Guidelines for specific information on Support Pay eligibility and options.

**Other paid activities**

**PAGE 064**

CONFIDENTIAL

WMSANCHEZ0000217

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
    - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
    - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
    - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your People Partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue using the MyFeedback Portal.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, you must review the changes. Walmart US Store associates may review and confirm changes to their timesheet within Me@Walmart or the Timeclock Application, or complete a time adjustment form. All other divisions should continue to use the time adjustment form. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it using the MyFeedback Portal.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.   If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or a manager requests, requires or allows you to work without compensation please report it to your People Partner or by using the MyFeedback Portal.

**PAGE 065**

CONFIDENTIAL                                                                                                WMSANCHEZ0000218

Examples of prohibited off the clock work include but are not limited to:

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity. This may include a situation where you are unable to leave the facility immediately after clocking out. If you are unable to fully capture such time while on the clock, you must keep track of that time and submit an appropriate time adjustment promptly.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:

- Your immediate supervisor/manager;
- Your People Partner or
- Complete the form on MyFeedback Portal

Last Modified: October 30, 2023

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

If you are not a supervisor, you have the right to engage in, as well as the right not to engage in, group activity concerning your workplace when that activity is protected by a federal law called the National Labor Relations Act. This includes communications with others about your pay, hours, work schedules, discipline, and other terms and conditions of employment, as well as group activity to address your workplace concerns. Nothing in this policy should be read as interfering with these rights.

CONFIDENTIAL                                                                                                     WMSANCHEZ0000219

# EXHIBIT 2

PAGE 067

Content Name: en_US_09010aff8047d6fe_A_lp-23.htm
Version #: 2.0
Start Date: 2016-12-21 18:43:51
End Date: Currently Active

WM Week 48        WMT $##.## +#.##   Associate Name | Logout



# Facility Closing/Overnight Procedures Policy (AP-23)

## Updated: December 21, 2016

This policy applies to all associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Wal-Mart Stores Inc. policy requires that these closing procedures be followed depending upon hours of operation.

## 24 Hour Facilities

Some local and state laws may forbid the locking or blocking of all or some public exit doors during the overnight timeframe. Contact your Market Asset Protection Manager to determine state and local laws. In the absence of an applicable law, keep one (1) door open during the overnight timeframe that is in a reasonably accessible location to the public.

Associates must enter and exit through the front doors. This includes breaks and meal periods. Only exceptions are:

- Associates may use a designated associate entrance/exit door at the side or rear of the building when this entrance/exit is part of the store's design and use is approved by the Market Manager and MAPM.
- When an associate's vehicle has had service work performed by the TLE during the day, an Associate may pay for the service work and exit at the TLE to pick up their vehicle.

The Electronics department must have a sales associate in the area the entire time the facility is open

### Accounting Office
Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

### Alarm System
A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TMA, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check
In instances where the store/club closes (Christmas), prior to leaving the facility, a salaried member of management must:

- Secure all sales floor cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry Department's safe is locked and not on day-lock.
- Ensure CCTV is properly recording.

### Door Controls
Stores with multiple entrance/exits can power down selected entrance/exits during evening hours if the proper procedures are followed and the local fire department approves the closure procedures.

### Resources
**Walmart Stores:**
Store Manager
Asset Protection Manager
Market Asset Protection Manager

**Sam's Clubs**
Club Manager
Asset Protection Manager
Market Asset Protection Manager

PAGE 068

WMSANCHEZ0000017

Case 2:21-cv-05122-SVW-JC   Document 96   Filed 01/03/24   Page 69 of 690   Page ID #:3297

- Do not lock or block doors when closing them for the evening
- Management must make an announcement over the store intercom 15 minutes prior to closing the GM entrance/exit doors, directing customers and associates to the Grocery exit
- A member of management must assist in evacuation at the GM doors in the event of an emergency

The Exit Door guidance is designed to maintain compliance related to emergency exits during evening hours when customers and associates are in the building, taking into account security related to late night operations. Designated Emergency Exit Doors are clearly identified with an exit sign over the door. The general rule is if a door has an exit sign over it, the door may not be locked during business hours.

If a powered down automatic door creates a security concern because of its location or other condition at the facility, management should consider the following:

- Determine if the automatic sliding door has an electric solenoid device that prevents the door from being slid open within the tracks when powered down (door will still swing open for emergency purposes)
- Discuss the security concern with the local fire department. Obtain written fire department approval to remove the exit sign over the door if there is another exit with panic hardware within 50 feet.
- **Note**: If the exit sign above the door is approved to be removed, also remove the sign indicating the exit must remain open during business hours and cover the strip on the push bar which states "push in case of an emergency.

### Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A customer/member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

## Non-24 Hour Facilities

### Accounting Office

Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

### Alarm System

A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TBC, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas. Manager must set the perimeter alarm (and motion alarms if no one in building) when the closing manager exits the building.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure that they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check

Where the store/club closes prior to leaving the facility, a salaried member of management must:

- Secure all sales floor display cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.

**PAGE 069**

WMSANCHEZ0000018

- Ensure the Jewelry department's safe is locked and not on day-lock.Ensure CCTV footage is properly recording.

**Door Controls**

When closing, a salaried member of management must:

- To allow customers/members to exit, lock all entrance and exit doors inside the vestibule except one (1) controllable door, or in accordance to local regulations,
- A salaried member of management or a responsible associate must stay at the unlocked exit until all customers/members have exited the building.
- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Lock the outside vestibule door and the last inside door once there are no customers/members in the building.
- Position a salaried member of management or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.
- Encourage associates to use the buddy system and walk in pairs to their vehicles.
- Provide an associate escort to his/her vehicle if requested.
- Stores/Clubs with Parking Lot Patrols should conduct frequent patrols of the parking lot, particularly as associates are exiting the building at closing time.
- Only open Receiving Bay doors for the purpose of receiving and unloading merchandise trailers.

**Pharmacy Access**

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A Customer/Member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

**Building Perimeter Check**

- If associates will be in the facility later than usual, the lights may need adjusted to ensure they remain on until all associates have left for the night.
- Always be alert and observant of suspicious vehicles, people, or activities. Report all suspicions to the Facility Manager and Asset Protection Coordinator/Asset Protection Manager, Market Asset Protection Manager, and local authorities
- Prior to leaving the parking lot, management should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly,

Failure to follow these policies may result in disciplinary action up to and including termination.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

**Last Modified: December 21, 2016**

PAGE 070

WMSANCHEZ0000019

Content Name: en_US_09010aff8047d6fe_A_lp-23.htm
Version #: 2.1
Start Date: 2017-09-28 17:45:27
End Date: 2017-10-02 18:23:19

WMT $##.## +#.##   Associate Name | Logout



# Facility Closing/Overnight Procedures Policy (AP-23)

**Updated: December 21, 2016**

This policy applies to all associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Wal-Mart Stores Inc. policy requires that these closing procedures be followed depending upon hours of operation.

## 24 Hour Facilities

Some local and state laws may forbid the locking or blocking of all or some public exit doors during the overnight timeframe. Contact your Market Asset Protection Manager to determine state and local laws. In the absence of an applicable law, keep one (1) door open during the overnight timeframe that is in a reasonably accessible location to the public.

Associates must enter and exit through the front doors. This includes breaks and meal periods. Only exceptions are:

- Associates may use a designated associate entrance/exit door at the side or rear of the building when this entrance/exit is part of the store's design and use is approved by the Market Manager and MAPM.
- When an associate's vehicle has had service work performed by the TLE during the day, an Associate may pay for the service work and exit at the TLE to pick up their vehicle.

The Electronics department must have a sales associate in the area the entire time the facility is open

**Accounting Office**

Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

**Alarm System**

A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TMA, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

**Interior Security Check**

In instances where the store/club closes (Christmas), prior to leaving the facility, a salaried member of management must:

- Secure all sales floor cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry Department's safe is locked and not on day-lock.
- Ensure CCTV is properly recording.

**Door Controls**

Stores with multiple entrance/exits can power down selected entrance/exits during evening hours if the proper procedures are followed and the local fire department approves the closure procedures.

### Resources

**Walmart Stores:**
Store Manager
Asset Protection Manager
Market Asset Protection Manager

**Sam's Clubs**
Club Manager
Asset Protection Manager
Market Asset Protection Manager

PAGE 071

WMSANCHEZ0000020

- Do not lock or block doors when closing them for the evening
- Management must make an announcement over the store intercom 15 minutes prior to closing the GM entrance/exit doors, directing customers and associates to the Grocery exit
- A member of management must assist in evacuation at the GM doors in the event of an emergency

The Exit Door guidance is designed to maintain compliance related to emergency exits during evening hours when customers and associates are in the building, taking into account security related to late night operations. Designated Emergency Exit Doors are clearly identified with an exit sign over the door. The general rule is if a door has an exit sign over it, the door may not be locked during business hours.

If a powered down automatic door creates a security concern because of its location or other condition at the facility, management should consider the following:

- Determine if the automatic sliding door has an electric solenoid device that prevents the door from being slid open within the tracks when powered down (door will still swing open for emergency purposes)
- Discuss the security concern with the local fire department. Obtain written fire department approval to remove the exit sign over the door if there is another exit with panic hardware within 50 feet.
- **Note**: If the exit sign above the door is approved to be removed, also remove the sign indicating the exit must remain open during business hours and cover the strip on the push bar which states "push in case of an emergency.

### Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A customer/member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

## Non-24 Hour Facilities

### Accounting Office

Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

### Alarm System

A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TBC, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas. Manager must set the perimeter alarm (and motion alarms if no one in building) when the closing manager exits the building.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure that they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check

Where the store/club closes prior to leaving the facility, a salaried member of management must:

- Secure all sales floor display cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.

WMSANCHEZ0000021

Case 2:21-cv-05122-SVW-JC Document 96 Filed 01/03/24 Page 73 of 890 Page ID #:3301

- Ensure the Jewelry department's safe is locked and not on day-lock.Ensure CCTV footage is properly recording.

**Door Controls**

When closing, a salaried member of management must:

- To allow customers/members to exit, lock all entrance and exit doors inside the vestibule except one (1) controllable door, or in accordance to local regulations,
- A salaried member of management or a responsible associate must stay at the unlocked exit until all customers/members have exited the building.
- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Lock the outside vestibule door and the last inside door once there are no customers/members in the building.
- Position a salaried member of management or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.
- Encourage associates to use the buddy system and walk in pairs to their vehicles.
- Provide an associate escort to his/her vehicle if requested.
- Stores/Clubs with Parking Lot Patrols should conduct frequent patrols of the parking lot, particularly as associates are exiting the building at closing time.
- Only open Receiving Bay doors for the purpose of receiving and unloading merchandise trailers.

**Pharmacy Access**

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A Customer/Member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

**Building Perimeter Check**

- If associates will be in the facility later than usual, the lights may need adjusted to ensure they remain on until all associates have left for the night.
- Always be alert and observant of suspicious vehicles, people, or activities. Report all suspicions to the Facility Manager and Asset Protection Coordinator/Asset Protection Manager, Market Asset Protection Manager, and local authorities
- Prior to leaving the parking lot, management should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly,

Failure to follow these policies may result in disciplinary action up to and including termination.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

**Last Modified: December 21, 2016**

PAGE 073

WMSANCHEZ0000022

Content Name: en_US_09010aff8047d6fe_A_lp-23.htm
Version #: 3.0
Start Date: 2017-10-02 18:23:19
End Date: Currently Active

WMT $##.## +#.##    Associate Name | Logout



# Facility Closing/Overnight Procedures Policy (AP-23)

## Updated: October 2, 2017

This policy applies to all associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Wal-Mart Stores Inc. policy requires that these closing procedures be followed depending upon hours of operation.

## 24 Hour Facilities

Some local and state laws may forbid the locking or blocking of all or some public exit doors during the overnight timeframe. Contact your Market Asset Protection Manager to determine state and local laws. In the absence of an applicable law, keep one (1) door open during the overnight timeframe that is in a reasonably accessible location to the public.

Associates must enter and exit through the front doors. This includes breaks and meal periods. Only exceptions are:

- Associates may use a designated associate entrance/exit door at the side or rear of the building when this entrance/exit is part of the store's design and use is approved by the Market Manager and MAPM.
- When an associate's vehicle has had service work performed by the TLE during the day, an Associate may pay for the service work and exit at the TLE to pick up their vehicle.

**Accounting Office**

Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

**Alarm System**

A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TMA, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

**Interior Security Check**

In instances where the store/club closes (Christmas), prior to leaving the facility, a salaried member of management must:

- Secure all sales floor cases.
- Ensure all firearms and ammo cases are locked.  In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry Department's safe is locked and not on day-lock.
- Ensure CCTV is properly recording.

**Door Controls**

Stores with multiple entrance/exits can power down selected entrance/exits during evening hours if the proper procedures are followed and the local fire department approves the closure procedures.

- Do not lock or block doors when closing them for the evening

### Resources

**Walmart Stores:**
Store Manager
Asset Protection Manager
Market Asset Protection Manager

**Sam's Clubs**
Club Manager
Asset Protection Manager
Market Asset Protection Manager

**PAGE 074**

WMSANCHEZ0000023

- Management must make an announcement over the store intercom 15 minutes prior to closing the GM entrance/exit doors, directing customers and associates to the Grocery exit
- A member of management must assist in evacuation at the GM doors in the event of an emergency

The Exit Door guidance is designed to maintain compliance related to emergency exits during evening hours when customers and associates are in the building, taking into account security related to late night operations. Designated Emergency Exit Doors are clearly identified with an exit sign over the door. The general rule is if a door has an exit sign over it, the door may not be locked during business hours.

If a powered down automatic door creates a security concern because of its location or other condition at the facility, management should consider the following:

- Determine if the automatic sliding door has an electric solenoid device that prevents the door from being slid open within the tracks when powered down (door will still swing open for emergency purposes)
- Discuss the security concern with the local fire department. Obtain written fire department approval to remove the exit sign over the door if there is another exit with panic hardware within 50 feet.
- **Note**: If the exit sign above the door is approved to be removed, also remove the sign indicating the exit must remain open during business hours and cover the strip on the push bar which states "push in case of an emergency.

**Pharmacy Access**

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A customer/member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

## Non-24 Hour Facilities

**Accounting Office**

Refer to the Accounting Reference Manual (Walmart)
Refer to the Operation Accountability Guide (Sam's)

**Alarm System**

A salaried member of management must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TBC, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.  Manager must set the perimeter alarm (and motion alarms if no one in building) when the closing manager exits the building.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure that they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

**Interior Security Check**

Where the store/club closes prior to leaving the facility, a salaried member of management must:

- Secure all sales floor display cases.
- Ensure all firearms and ammo cases are locked.  In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry department's safe is locked and not on day-lock.Ensure CCTV footage is properly recording.

**PAGE 075**

WMSANCHEZ0000024

Case 2:21-cv-05122-SVW-JC Document 96 Filed 01/03/24 Page 76 of 890 Page ID #:3304

**Door Controls**

When closing, a salaried member of management must:

- To allow customers/members to exit, lock all entrance and exit doors inside the vestibule except one (1) controllable door, or in accordance to local regulations,

- A salaried member of management or a responsible associate must stay at the unlocked exit until all customers/members have exited the building.

- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.

- Lock the outside vestibule door and the last inside door once there are no customers/members in the building.

- Position a salaried member of management or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.

- Encourage associates to use the buddy system and walk in pairs to their vehicles.

- Provide an associate escort to his/her vehicle if requested.

- Stores/Clubs with Parking Lot Patrols should conduct frequent patrols of the parking lot, particularly as associates are exiting the building at closing time.

- Only open Receiving Bay doors for the purpose of receiving and unloading merchandise trailers.

**Pharmacy Access**

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.

- Ensuring all associates have vacated the area.

- Closing and locking all pharmacy windows and doors.

- Ensuring the prescription filling area lights are on.

- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A Customer/Member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

**Building Perimeter Check**

- If associates will be in the facility later than usual, the lights may need adjusted to ensure they remain on until all associates have left for the night.

- Always be alert and observant of suspicious vehicles, people, or activities. Report all suspicions to the Facility Manager and Asset Protection Coordinator/Asset Protection Manager, Market Asset Protection Manager, and local authorities

- Prior to leaving the parking lot, management should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly,

Failure to follow these policies may result in disciplinary action up to and including termination.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

**Last Modified: October 2, 2017**

**PAGE 076**

WMSANCHEZ0000025

Content Name: en_US_09010aff8047d6fe_A_lp-23.htm
Version #: 4.1
Start Date: 2017-11-17 22:31:29
End Date: 2017-12-01 14:48:35

WMT $##.## +#.##    Associate Name | Logout



# Facility Closing/Overnight Procedures Policy (AP-23)
Updated: October 30, 2017

---

This policy applies to all associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Wal-Mart Stores Inc. policy requires that these closing procedures be followed depending upon hours of operation.

## 24 Hour Facilities

Some local and state laws may forbid the locking or blocking of all or some public exit doors during the overnight timeframe. Contact your Market Asset Protection Manager to determine state and local laws. In the absence of an applicable law, keep one (1) door open during the overnight timeframe that is in a reasonably accessible location to the public.

Associates must enter and exit through the front doors. This includes breaks and meal periods. Only exceptions are:

- Associates may use a designated associate entrance/exit door at the side or rear of the building when this entrance/exit is part of the store's design and use is approved by the Market Manager and MAPM.
- When an associate's vehicle has had service work performed by the TLE during the day, an associate may pay for the service work and exit at the TLE to pick up their vehicle.

### Accounting Office
- Refer to the Accounting Reference Manual (Walmart)
- Refer to the Operation Accountability Guide (Sam's)

### Alarm System
A salaried member of management or support manager must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TMA, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check
In instances where the store/club closes (Christmas), prior to leaving the facility, a salaried member of management or support manager must:

- Secure all sales floor cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.

**PAGE 077**

WMSANCHEZ0000026

- Ensure the Jewelry Department's safe is locked and not on day-lock.
- Ensure CCTV is properly recording.

### Door Controls

Stores with multiple entrance/exits can power down selected entrance/exits during evening hours if the proper procedures are followed and the local fire department approves the closure procedures.

- Do not lock or block doors when closing them for the evening
- Management or support manager must make an announcement over the store intercom 15 minutes prior to closing the GM entrance/exit doors, directing customers and associates to the Grocery exit
- A member of management or support manager must assist in evacuation at the GM doors in the event of an emergency

The Exit Door guidance is designed to maintain compliance related to emergency exits during evening hours when customers and associates are in the building, taking into account security related to late night operations. Designated Emergency Exit Doors are clearly identified with an exit sign over the door. The general rule is if a door has an exit sign over it, the door may not be locked during business hours.

If a powered down automatic door creates a security concern because of its location or other condition at the facility, management should consider the following:

- Determine if the automatic sliding door has an electric solenoid device that prevents the door from being slid open within the tracks when powered down (door will still swing open for emergency purposes)
- Discuss the security concern with the local fire department. Obtain written fire department approval to remove the exit sign over the door if there is another exit with panic hardware within 50 feet.
- **Note:** If the exit sign above the door is approved to be removed, also remove the sign indicating the exit must remain open during business hours and cover the strip on the push bar which states "push in case of an emergency.

### Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A customer/member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

## Non-24 Hour Facilities

### Accounting Office

- Refer to the Accounting Reference Manual (Walmart)
- Refer to the Operation Accountability Guide (Sam's)

### Alarm System

PAGE 078

WMSANCHEZ0000027

A salaried member of management or support manager must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TBC, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas. Manager must set the perimeter alarm (and motion alarms if no one in building) when the closing manager exits the building.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure that they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check

When the store/club closes, prior to leaving the facility a salaried member of management or support manager must:

- Secure all sales floor display cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry department's safe is locked and not on day-lock.Ensure CCTV footage is properly recording.

### Door Controls

**Note:** Throughout the course of this policy, "responsible associate" refers to an associate whom is in supervisory role (hourly) or higher.

When closing, a salaried member of management or support manager must:

- To allow customers/members to exit, lock all entrance and exit doors inside the vestibule except one (1) controllable door, or in accordance to local regulations,
- A salaried member of management, support manager, or a responsible associate must stay at the unlocked exit until all customers/members have exited the building.
- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Lock the outside vestibule door and the last inside door once there are no customers/members in the building.
- Position a salaried member of management, support manager, or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.
- Encourage associates to use the buddy system and walk in pairs to their vehicles.
- Provide an associate escort to his/her vehicle if requested.
- Stores/Clubs with Parking Lot Patrols should conduct frequent patrols of the parking lot, particularly as associates are exiting the building at closing time.
- Only open Receiving Bay doors for the purpose of receiving and unloading merchandise trailers.

### Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director

**PAGE 079**

WMSANCHEZ0000028

in an attempt to get a Pharmacist to return to the store. A Customer/Member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

### *Building Perimeter Check*

- If associates will be in the facility later than usual, the lights may need adjusted to ensure they remain on until all associates have left for the night.
- Always be alert and observant of suspicious vehicles, people, or activities. Report all suspicions to the Facility Manager and Asset Protection Manager, Market Asset Protection Manager, and local authorities
- Prior to leaving the parking lot, management should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly,

Failure to follow these policies may result in disciplinary action up to and including termination.

---

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

---

WMSANCHEZ0000029

Content Name: en_US_09010aff8047d6fe_A_lp-23.htm
Version #: 6.0
Start Date: 2017-12-01 14:49:21
End Date: Currently Active

WMT $##.## +#.##    Associate Name | Logout



# Facility Closing/Overnight Procedures Policy (AP-23)

## Updated: October 30, 2017

This policy applies to all associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Wal-Mart Stores Inc. policy requires that these closing procedures be followed depending upon hours of operation.

## 24 Hour Facilities

Some local and state laws may forbid the locking or blocking of all or some public exit doors during the overnight timeframe. Contact your Market Asset Protection Manager to determine state and local laws. In the absence of an applicable law, keep one (1) door open during the overnight timeframe that is in a reasonably accessible location to the public.

Associates must enter and exit through the front doors. This includes breaks and meal periods. Only exceptions are:

- Associates may use a designated associate entrance/exit door at the side or rear of the building when this entrance/exit is part of the store's design and use is approved by the Market Manager and MAPM.
- When an associate's vehicle has had service work performed by the TLE during the day, an associate may pay for the service work and exit at the TLE to pick up their vehicle.

### Accounting Office

- Refer to the Accounting Reference Manual (Walmart)
- Refer to the Operation Accountability Guide (Sam's)

### Alarm System

A salaried member of management or support manager must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TMA, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas.
- Complete regular checks of the perimeter and motion detector alarm systems to ensure they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

### Interior Security Check

In instances where the store/club closes (Christmas), prior to leaving the facility, a salaried member of management or support manager must:

- Secure all sales floor cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.

**PAGE 081**

WMSANCHEZ0000030

- Ensure the Jewelry Department's safe is locked and not on day-lock.
- Ensure CCTV is properly recording.

## Door Controls

Stores with multiple entrance/exits can power down selected entrance/exits during evening hours if the proper procedures are followed and the local fire department approves the closure procedures.

- Do not lock or block doors when closing them for the evening.
- Management or support manager must make an announcement over the store intercom 15 minutes prior to closing the GM entrance/exit doors, directing customers and associates to the Grocery exit.
- A member of management or support manager must assist in evacuation at the GM doors in the event of an emergency.

The Exit Door guidance is designed to maintain compliance related to emergency exits during evening hours when customers and associates are in the building, taking into account security related to late night operations. Designated Emergency Exit Doors are clearly identified with an exit sign over the door. The general rule is if a door has an exit sign over it, the door may not be locked during business hours.

If a powered down automatic door creates a security concern because of its location or other condition at the facility, management should consider the following:

- Determine if the automatic sliding door has an electric solenoid device that prevents the door from being slid open within the tracks when powered down (door will still swing open for emergency purposes).
- Discuss the security concern with the local fire department. Obtain written fire department approval to remove the exit sign over the door if there is another exit with panic hardware within 50 feet.
- **Note**: If the exit sign above the door is approved to be removed, also remove the sign indicating the exit must remain open during business hours and cover the strip on the push bar which states "push in case of an emergency.

## Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A customer/member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

# Non-24 Hour Facilities

### Accounting Office

- Refer to the Accounting Reference Manual (Walmart)
- Refer to the Operation Accountability Guide (Sam's)

### Alarm System

A salaried member of management or support manager must ensure the following:

- Set and secure alarm systems in the Accounting Office, ACC/TBC, and Receiving Bay Doors during the overnight timeframe, unless there will be associates working in these areas. Manager must set the perimeter alarm (and motion alarms if no one in building) when the closing manager exits the building.

**PAGE 082**

WMSANCHEZ0000031

- Complete regular checks of the perimeter and motion detector or alarm systems to ensure that they are working properly.

In the event a facility is closed, a salaried member of management or an approved third party security contractor must be on the premises if the alarms are unable to be set.

## Interior Security Check

When the store/club closes, prior to leaving the facility a salaried member of management or support manager must:

- Secure all sales floor display cases.
- Ensure all firearms and ammo cases are locked. In the event of the store closing for an unknown period of time (Hurricane, flooding, etc.), it is ideal to pull all firearms AND ammunition and secure those items in a locked gun room, gun case or manager's office.
- Ensure the Jewelry department's safe is locked and not on day-lock.Ensure CCTV footage is properly recording.

## Door Controls

**Note**: Throughout the course of this policy, "responsible associate" refers to an associate whom is in supervisory role (hourly) or higher.

When closing, a salaried member of management or support manager must:

- To allow customers/members to exit, lock all entrance and exit doors inside the vestibule except one (1) controllable door, or in accordance to local regulations,
- A salaried member of management, support manager, or a responsible associate must stay at the unlocked exit until all customers/members have exited the building.
- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Lock the outside vestibule door and the last inside door once there are no customers/members in the building.
- Position a salaried member of management, support manager, or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.
- Encourage associates to use the buddy system and walk in pairs to their vehicles.
- Provide an associate escort to his/her vehicle if requested.
- Stores/Clubs with Parking Lot Patrols should conduct frequent patrols of the parking lot, particularly as associates are exiting the building at closing time.
- Only open Receiving Bay doors for the purpose of receiving and unloading merchandise trailers.

## Pharmacy Access

Only a Pharmacist may access the Pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no Pharmacist is present, the prescription area must be secured to include:

- Relocating the will call bin to the prescription area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the prescription filling area lights are on.
- Ensuring the pharmacy alarm is set.

Accessing the Pharmacy without a Pharmacist being present may result in disciplinary action, possible legal action taken by State or Federal Regulatory officials, and the loss of the facility's Pharmacy license.

Access to the Pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry. In the event of an emergency, contact the Pharmacy Manager, Staff Pharmacist(s), Health and Wellness Market Director, or Health and Wellness Regional Director in an attempt to get a Pharmacist to return to the store. A Customer/Member needing a prescription or a non-pharmacist associate leaving a personal item in the Pharmacy does not constitute an emergency.

## Building Perimeter Check

- If associates will be in the facility later than usual, the lights may need adjusted to ensure they remain on until all associates have left for the night.

**PAGE 083**

WMSANCHEZ0000032

- Always be alert and observant of suspicious vehicles, people or activities. Report all suspicions to the Facility Manager and Asset Protection Manager, Market Asset Protection Manager, and local authorities.

- Prior to leaving the parking lot, management should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

Failure to follow these policies may result in disciplinary action up to and including termination.

**This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.**

**Last Modified: October 30, 2017**

PAGE 084

WMSANCHEZ0000033

# Facility Closing Procedures Policy (AP-23)

**Updated:  October 14, 2020**

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies in the United States ("Walmart").

## Policy

Walmart Inc. policy requires these procedures be followed when the facility is closed.

Failure to follow these policies may result in disciplinary action up to and including termination.

## Prior to Closing

**Interior Security Check**

In instances where the facility closes, prior to leaving the facility, the manager-on-duty must:

- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Secure all sales floor lockups.
- Ensure all firearms and ammo cases are locked. In the event the facility is closing for an unknown period of time (hurricane, flooding, etc.), pull all firearms and ammunition and secure those items off the salesfloor.
- Ensure the jewelry department's safe is locked, alarm is set (if applicable), and merchandise secured.
- Ensure CCTV is properly recording.

## Accounting Office

The accounting office must be locked, and alarm system armed, when the facility is closed to customers, and no associates are working in the accounting office. The manager-on-duty must ensure all cash (e.g. change orders, coins, prepared deposits, etc.) is secured in the external vault or loaded into the cash recycler.

**PAGE 085**

WMSANCHEZ0000069

## Alarm System

The manager-on-duty is responsible for arming the alarm system while the facility is closed. Differences apply when associates are in the building during closure, or if the facility will be empty:

**If associates are in the building:**
- Set and secure alarm systems in the accounting office, auto care center or tire mounting area, and receiving bay doors during the closure timeframe, unless there are associates working in those areas.

**If the facility will be empty:**
- Set and secure all alarm zones, including the exterior perimeter alarm.

## Door Controls

All entrances and exits must be secured when a facility is closed. The manager-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.

None of the automated sliding glass doors may be powered down or locked while the building is occupied. Doors with an exit sign overhead must be available for emergency egress. Doors should not be blocked or barricaded unless directed by the Emergency Operations Center.

Differences apply when associates are in the building during closure, or if the facility will be empty.

**If associates are in the building:**
- Facilities with multiple entrances/exits can disable entry on select doors.
- Automatic doors that prevents the door from being slid open within the track may be secured as long as it will swing open in an emergency. These doors should never be key locked or thumb locked unless directed by the EOC to do so.

**If the facility will be empty:**
- Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.
- When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed.

**PAGE 086**

WMSANCHEZ0000070

## Pharmacy Access

Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no pharmacist is present, the prescription area must be secured to include:

- Moving all prescriptions and merchandise to a secured area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the pharmacy alarm is set.

Accessing the pharmacy without a pharmacist being present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.

Access to the pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

## After Closing

### Building Perimeter Check

Prior to leaving the parking lot, the manager-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

---

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

WMSANCHEZ0000071

## Facility Closing/Overnight Procedures Policy

(AP-23)

# Updated: June 8, 2021

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

# Policy

Walmart Inc. policy requires that these closing procedures be followed depending upon hours of operation.

Failure to follow these policies may result in disciplinary action up to and including termination.

# Prior to Closing

## Interior Security Check

In instances where the facility closes, prior to leaving the facility, the manager-on-duty must:

- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Secure all sales floor lockups.
- Ensure all firearms and ammo cases are locked. In the event the facility is closing for an unknown period of time (hurricane, flooding, etc.), pull all firearms and ammunition and secure those items off the salesfloor.
- Ensure the jewelry department's safe is locked, alarm is set (if applicable), and merchandise secured.
- Ensure CCTV is properly recording.

# Accounting Office

The accounting office must be locked, and alarm system armed, when the facility is closed to customers, and no associates are working in the accounting office. The manager-on-duty must ensure all cash (e.g. change orders, coins, prepared deposits, etc.) is secured in the external vault or loaded into the cash recycler. Refer to the Accounting Reference Manual (Walmart).

## Alarm System

The manager-on-duty is responsible for arming the alarm system while the facility is closed. Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|
| • Set the exterior perimeter alarm when the store is closed. <br> • Set alarm systems in the accounting office, auto care center or tire mounting area, and receiving bay doors when there are not associates working in those areas. | • Set and secure all alarm zones, including the exterior perimeter alarm. |

# Door Controls

All entrances and exits must be secured when a facility is closed. The manager-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.

None of the automated sliding glass doors may be powered down or locked while the building is occupied. Doors with an exit sign overhead must be available for emergency egress. Doors should not be blocked or barricaded unless directed by market and/or regional leadership.

**PAGE 088**

WMSANCHEZ0000072

Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|
| • Facilities with multiple entrances/exits can disable entry on select doors.<br>• Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency. These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership. | • Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.<br>• When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed. |

## Pharmacy Access

Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no pharmacist is present, the prescription area must be secured to include:

- Moving all prescriptions and merchandise to a secured area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the pharmacy alarm is set.

Accessing the pharmacy without a pharmacist being present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.

Access to the pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

# After Closing

## Building Perimeter Check

Prior to leaving the parking lot, the manager-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: June 8, 2021

**PAGE 089**

WMSANCHEZ0000073

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

## Policy

Walmart Inc. policy requires that these closing procedures be followed depending upon hours of operation.

Failure to follow these policies may result in disciplinary action up to and including termination.

## Prior to Closing

### Interior Security Check

In instances where the facility closes, prior to leaving the facility, the manager-on-duty must:

- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Secure all sales floor lockups.
- Ensure all firearms and ammo cases are locked. In the event the facility is closing for an unknown period of time (hurricane, flooding, etc.), pull all firearms and ammunition and secure those items off the salesfloor.
- Ensure the jewelry department's safe is locked, alarm is set (if applicable), and merchandise secured.
- Ensure CCTV is properly recording.

## Accounting Office

The accounting office must be locked, and alarm system armed, when the facility is closed to customers, and no associates are working in the accounting office. The manager-on-duty must ensure all cash (e.g. change orders, coins, prepared deposits, etc.) is secured in the external vault or loaded into the cash recycler. Refer to the Accounting Reference Manual (Walmart).

## Alarm System

The manager-on-duty is responsible for arming the alarm system while the facility is closed. Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|
| • Set the exterior perimeter alarm when the store is closed.<br>• Set alarm systems in the accounting office, auto care center or tire mounting area, and receiving bay doors when there are not associates working in those areas. | • Set and secure all alarm zones, including the exterior perimeter alarm. |

## Door Controls

All entrances and exits must be secured when a facility is closed. The manager-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.

None of the automated sliding glass doors may be powered down or locked while the building is occupied. Doors with an exit sign overhead must be available for emergency egress. Doors should not be blocked or barricaded unless directed by market and/or regional leadership.

Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|

**PAGE 090**

WMSANCHEZ0000074

- Facilities with multiple entrances/exits can disable entry on select doors.
- Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency. These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership.

- Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.
- When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed.

## Pharmacy Access

Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no pharmacist is present, the prescription area must be secured to include:

- Moving all prescriptions and merchandise to a secured area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the pharmacy alarm is set.

Accessing the pharmacy without a pharmacist being present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.

Access to the pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

## After Closing

### Building Perimeter Check

Prior to leaving the parking lot, the manager-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last [date]

**PAGE 091**

WMSANCHEZ0000075



# Facility Closing/Overnight Procedures Policy

### (AP-23)

# Updated: June 8, 2021

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

# Policy

Walmart Inc. policy requires that these closing procedures be followed depending upon hours of operation.
Failure to follow these policies may result in disciplinary action up to and including termination.

# Prior to Closing

### Interior Security Check

In instances where the facility closes, prior to leaving the facility, the manager-on-duty must:

- Ask associates to conduct a thorough sweep to ensure his/her areas are clear of customers/members.
- Secure all sales floor lockups.
- Ensure all firearms and ammo cases are locked. In the event the facility is closing for an unknown period of time (hurricane, flooding, etc.), pull all firearms and ammunition and secure those items off the salesfloor.
- Ensure the jewelry department's safe is locked, alarm is set (if applicable), and merchandise secured.
- Ensure CCTV is properly recording.

# Accounting Office

The accounting office must be locked, and alarm system armed, when the facility is closed to customers, and no associates are working in the accounting office. The manager-on-duty must ensure all cash (e.g. change orders, coins, prepared deposits, etc.) is secured in the external vault or loaded into the cash recycler. Refer to the Accounting Reference Manual (Walmart).

## Alarm System

The manager-on-duty is responsible for arming the alarm system while the facility is closed. Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|
| <ul><li>Set the exterior perimeter alarm when the store is closed.</li><li>Set alarm systems in the accounting office, auto care center or tire mounting area, and receiving bay doors when there are not associates working in those areas.</li></ul> | <ul><li>Set and secure all alarm zones, including the exterior perimeter alarm.</li></ul> |

# Door Controls

All entrances and exits must be secured when a facility is closed. The manager-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.

None of the automated sliding glass doors may be powered down or locked while the building is occupied. Doors with an exit sign overhead must be available for emergency egress. Doors should not be blocked or barricaded unless directed by market and/or regional leadership.

PAGE 092
CONFIDENTIAL    WMSANCHEZ0000342

Differences apply when associates are in the building during closure, or if the facility will be empty.

| If associates are in the building: | If the facility will be empty: |
|---|---|
| • Facilities with multiple entrances/exits can disable entry on select doors.<br>• Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency.  These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership. | • Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.<br>• When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed. |

## Pharmacy Access

Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy personnel. If no pharmacist is present, the prescription area must be secured to include:
- Moving all prescriptions and merchandise to a secured area.
- Ensuring all associates have vacated the area.
- Closing and locking all pharmacy windows and doors.
- Ensuring the pharmacy alarm is set.

Accessing the pharmacy without a pharmacist being present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.

Access to the pharmacy is permissible without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

# After Closing

## Building Perimeter Check
Prior to leaving the parking lot, the manager-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: June 8, 2021

PAGE 093
CONFIDENTIAL                                                                                                          WMSANCHEZ0000343



# Facility Closing/Overnight Procedures Policy

(AP-23)

# Updated: December 19, 2022

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

Failure to follow these policies may result in disciplinary action up to, and including, termination.

# Policy

Walmart Inc. policy requires that these closing procedures be followed when the store is closing to customers:

- All areas of the store must be checked to verify all customers/members have exited the facility.
- Doors must be secured to prevent access from the exterior.
- Associates can enter designated entrance/exit door(s) in a controlled manner that prevents unauthorized access.
- Alarms must be set for the cash office, ACC, and receiving area.
- The perimeter alarm must be set when the store is closed to customers/members.
- The leader-on-duty is responsible for confirming all areas are secured, alarms are set, and doors are secured.

# Daily Closing to Customers

- Automatic doors that prevent the door from being slid open within the track may be secured only if the door can be opened in an emergency. These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership.
- Secure all salesfloor lockups.
- Ensure all firearms and ammunition cases are locked.
- The cash office must be locked, and alarm system armed, when no associates are working in the cash office.
- All cash (e.g., change orders, coins, prepared deposits, etc.) must be secured in the external vault or loaded into the cash recycler.
- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors.
- Doors with an exit sign overhead must be available for emergency egress and must not be blocked or encumbered.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.

# Prior to Closing

**Interior Security Check**

When the facility closes, prior to leaving the facility, the leader-on-duty must:

- Secure all salesfloor lockups.
- Ensure all firearms and ammunition cases are locked.

# Closing to Associates

When the facility has been cleared of all customers/members and associates, the leader-on-duty and another associate should lock all doors once closing procedures are completed.

PAGE 094

CONFIDENTIAL

# Cash Office

- The cash office must be locked, and alarm system armed when no associates are working in the cash office.
- All cash (e.g., change orders, coins, prepared deposits, etc.) must be secured in the external vault or loaded into the cash recycler

# Door and Alarm Controls

**Closing with associates in the building:**

- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors.
- Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency. These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership.
- Doors with an exit sign overhead must be available for emergency egress.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.
- Alarms must be set for the cash office, ACC, receiving area, and perimeter.

**Closing where the facility will be empty:**

- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.
- Doors with an exit sign overhead must be available for emergency egress.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.
- Set and secure all alarm zones and confirm interior motion detectors are not bypassed.
- When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed.

# After Closing

**Building Perimeter Check**

Prior to leaving the parking lot, the leader-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly.

# Pharmacy

- Associates accessing the pharmacy without a pharmacist present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.
- Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy associates.

**Closing the Pharmacy**

Prior to closing the pharmacy prescription area, the pharmacist must:

- Move all prescription merchandise to a secured area.
- Confirm all associates have vacated the area.
- Close and lock all pharmacy windows and doors.
- Set the pharmacy alarm.

**Pharmacy Access by Emergency Personnel**

Emergency personal may access the pharmacy without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: December 19, 2022

CONFIDENTIAL

WMSANCHEZ0000362

**PAGE 096**

CONFIDENTIAL

WMSANCHEZ0000363



# Facility Closing/Overnight Procedures Policy
## (AP-23)

# Updated: June 14, 2023

This policy applies to all associates who work for Walmart Inc. or one of its subsidiary companies, in the United States ("Walmart").

Failure to follow these policies may result in disciplinary action up to, and including, termination.

# Policy

Walmart Inc. policy requires that closing procedures be followed when the facility is closing to customers/members:
- All areas of the facility must be checked to verify all customers/members have exited the facility.
- Doors must be secured to prevent access from the exterior.
- Associates can enter designated entrance/exit door(s) in a controlled manner that prevents unauthorized access.
- Alarms must be set for the accounting office, ACC/TBC, and receiving area for those facilities who have alarms in these areas.
- The perimeter alarm must be set when the store is closed to customers/members.
- The leader-on-duty is responsible for confirming all areas are secured, alarms are set, and doors are secured.

# Daily Closing to Customers/Members

- Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency.  These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership.
- Secure all salesfloor lockups.
- Ensure all firearms and ammunition cases are locked.
- The accounting office must be locked, and alarm system armed, when no associates are working in the accounting office.
- All cash (e.g., change orders, coins, prepared deposits, etc.) must be secured in the external vault or loaded into the cash recycler.
- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors.
- Doors with an exit sign overhead must be available for emergency egress and must not be blocked or encumbered.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.

# Prior to Closing

**Interior Security Check**
When the facility closes, prior to leaving the facility, the leader-on-duty must:
- Ensure all firearms and ammunition cases are locked.

# Closing to Associates

When the facility has been cleared of all customers/members and associates, the leader-on-duty and another associate should lock all doors once closing procedures are completed.

# Timekeeping Integrity

CONFIDENTIAL                                                                                    WMSANCHEZ0000364

If the doors are locked, to customers entering the building, after facility hours, it is essential to ensure that associates are able to leave the building immediately after clocking out. The facility keyholder must be available to unlock the door, so an hourly associate does not need to wait to leave the building after clocking out. In a situation in which an associate must wait for the door to be unlocked after clocking out, the associate should keep track of and adjust their time in order to be compensated for waiting.

# Accounting Office

- The accounting office must be locked, and alarm system armed when no associates are working in the accounting office.
- All cash (e.g., change orders, coins, prepared deposits, etc.) must be secured in the external vault or loaded into the cash recycler.

# Door and Alarm Controls

**Closing with associates in the building:**

- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors.
- Automatic doors that prevent the door from being slid open within the track may be secured as long as it will swing open in an emergency. These doors should never be key-locked or thumb-locked unless directed by market and/or regional leadership.
- Doors with an exit sign overhead must be available for emergency egress.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.
- Alarms must be set for the accounting office, ACC/TBC, and receiving area for those facilities who have alarms in these areas. Perimeter alarm must also be set.

**Closing where the facility will be empty:**

- The leader-on-duty is responsible for verifying all primary and secondary entrances are properly controlled after closing.
- Facilities with multiple entrances/exits can disable entry on select doors while customers/members and associates are still in the facility.
- Doors with an exit sign overhead must be available for emergency egress.
- Doors should not be blocked or barricaded unless directed by market and/or regional leadership.
- Set and secure all alarm zones and confirm interior motion detectors are not bypassed.
- When the facility has been cleared of all customers/members and associates, the manager-on-duty and another associate should lock all doors once closing procedures are completed.

# After Closing

**Building Perimeter Check**

Prior to leaving the parking lot, the leader-on-duty should drive behind the building to ensure all outside storage areas are secured and all security lights are working properly. If the leader-on-duty is hourly, the time spent conducting this perimeter check is compensable and the associate time record must reflect this as worked time.

# Pharmacy

- Associates accessing the pharmacy without a pharmacist present may result in disciplinary action, possible legal action taken by state or federal regulatory officials, and the loss of the facility's pharmacy license.
- Only a pharmacist may access the pharmacy and allow entry into the pharmacy by non-pharmacy associates.

**Closing the Pharmacy**

Prior to closing the pharmacy prescription area, the pharmacist must:

- Move all prescription merchandise to a secured area.
- Confirm all associates have vacated the area.
- Close and lock all pharmacy windows and doors.
- Set the pharmacy alarm.

**Pharmacy Access by Emergency Personnel**

Emergency personnel may access the pharmacy without a pharmacist when warranted by an emergency such as a fire or water leak. Only authorized emergency personnel such as firefighters and police officers are to be allowed entry.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with

**PAGE 098**

applicable law.

Last Modified: June 14, 2023

CONFIDENTIAL                                                                                    WMSANCHEZ0000366

# EXHIBIT 3

**PAGE 100**



# Associate Pay Management Guidelines

California

## Effective: August 28, 2021

These guidelines are a supplement to Walmart's Associate Pay Policy - California. They apply to all supervisors and managers who work for Walmart Inc., or one of its subsidiary companies, in **California** (Walmart).

You must follow the procedures outlined in these guidelines

# Job classifications

You are responsible for ensuring associates are correctly classified based on the requirements outlined within the policy.

# Seventh Consecutive Day Pay

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California you must not schedule associates to work more than six consecutive days, except under limited circumstances.

In the event that you must schedule a non-exempt associate to work on a seventh consecutive day, the associate is eligible to receive premium pay, as set forth in the policy. Our payroll system is programmed to automatically calculate the appropriate premium pay whenever an associate works on a seventh consecutive day. However, for those non-exempt associates who work in positions where they are not required to clock-in or clock-out, managers must ensure that premium pay is appropriately calculated and paid.

# Premium pay

Premium pay is automatically calculated based on the schedule and/or hours entered into the system, eligibility and state specific requirements.

# Managing compliance for overtime, weekend premium and split shift pay

If a Facility Manager receives a report or otherwise becomes aware of a potential failure to provide overtime or weekend premium pay in accordance with this policy, you must investigate the report and notify Wage and Hour Helpline (800)530-9929 option 8 if any of the following apply.

1. The time adjustment was not made within the same week that the discrepancy occurred.
2. An adjustment was made, but discrepancies still exist.
3. There are any allegations of time shaving or moving hours from one workweek to another.

However, if the report alleges that the Facility Manager is the cause of the exception, the next level of management and a salaried member of human resources must conduct the investigation.

If the investigation substantiates that an associate violated this policy, the associate must be disciplined, consistent with the Disciplinary Action Policy.

# Reporting pay

- Provide work schedules for all associates in advance of the scheduled work dates.

## Resources

Travels Expense Vouchers

### Stores and Clubs ONLY:
Hours/Pay Adjustment/Prizes and Awards Form

### Field Supply Chain:
Field Supply Chain DC/TO Hours/Pay Adjustment/ Prizes or Awards Form

CONFIDENTIAL

WMSANCHEZ0000310

- When a change in an associate's schedule becomes necessary, provide the associate advance notice of the schedule change.
- If you fail to provide advance notice of the schedule change, provide the associate with either work hours or reporting pay as described in the policy.
- When an associate reports for work as scheduled or if you failed to provide the associate with advance notice of a schedule change, you must attempt to find work for the associate for at least one-half of the associate's scheduled hours, up to a maximum of four hours of work. If work is not available, the associate is eligible to receive reporting pay, at his/her regular hourly rate, for one-half of the associate's scheduled hours, up to a maximum of four total paid hours. If you are able to find work for the associate, but for less than half of his/her scheduled hours, you may provide the associate with a combination of work hours and reporting pay, up to a maximum of four total paid hours.
- An associate will not be provided with less than two total paid hours of work and/or reporting pay unless he/she is regularly scheduled to work less than two hours. If he/she is regularly scheduled to work less than two hours, you must provided him/her work hours and/or reporting pay for the hours he/she is actually scheduled to work.
- In addition, if an associate is required to report for work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with up to two hours of reporting pay at his/her regular hourly rate. **Example:** If you send an associate home for lack of work and instruct him/her to report for work later that same day, but are unable to provide work hours to the associate when he/she reports for work the second time, you must provide the associate reporting pay as follows:
  - For one-half of his/her scheduled work hours, up to a maximum of four hours, for the first time the associate reported for work as scheduled; and
  - Two hours of reporting pay at his/her regularly hourly rate for the second time the associate reported for work as scheduled.

As described in the policy, reporting pay is not required if:
- The associate leaves work by his/her own choice to attend to personal matters;
- The associate reports to work as scheduled, but is in a condition not suitable for work (for example, reporting to work under the influence of alcohol);
- The associate does not report to work on time and as a result, he/she is sent home as a disciplinary action or his/her employment is terminated;
- The associate is on paid standby status and is called to perform assigned work at a time other than his/her regularly scheduled work hours or
- The associate reports to work and advance notice was not provided, but your facility is closed due to *circumstances beyond Walmart's control.*

Note: If you send the associate home because he/she is not performing at an acceptable level and the associate has not worked at least one-half of his/her scheduled work hours, you must provide the associate reporting pay, as described above, because sending an associate home for this reason does not fall within one of the above exceptions. Similarly, you must provide reporting pay, as described above, even if the associate responds affirmatively to a request for volunteers to leave work because you are not able to find enough work for all of the associates scheduled to work at that time.

Circumstances beyond Walmart's control include, but are not limited to, the following:
- When operations cannot commence or continue due to threats to associates or property, or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and you have made every reasonable effort to notify the Associate not to report for work or
- Your facility is closed due to inclement weather or other emergency, as described below.

## Inclement weather or other emergency

Non-exempt associates are not eligible for work hours or reporting pay if they report to work and advance notice was not provided, but your facility is closed due to inclement weather or other emergency (for example, an earthquake, but not a mechanical breakdown).

However, the associate must be paid for all hours worked at his/her regular hourly rate if you require the

CONFIDENTIAL                                                                                                 WMSANCHEZ0000311

associate to remain at or near your facility during inclement weather or other emergency, even if the associate is relieved of his/her work duties during this time (i.e., to wait out a delay caused by inclement weather or other emergency).

## Scheduling work meetings

Supervisors and managers must make every effort to schedule work-related meetings so that associates are able to attend these meetings during their scheduled work hours. As described in the policy, associates are not required to attend any work meeting that is not scheduled during his/her work hours and must receive prior permission from you to do so. If an associate is not able to attend a work meeting and you are not able to schedule an additional meeting, you must provide the associate with the meeting information during the associate's scheduled work hours.

However, if a non-exempt associate attends a work meeting outside of his/her scheduled work hours, even if he/she did not obtain prior permission, you must provide the associate reporting pay consistent with the policy. Example: If the associate attends a one-hour work meeting on a day he/she is not scheduled to work, in addition to pay for attending the one-hour meeting, you must provide the associate with reporting pay so that the combined work hours and reporting pay equal one-half his/her regularly scheduled work hours, up to a maximum of four, and not less than two, hours of pay.

Absent unusual and unforeseeable business circumstances that require a non-exempt associate to attend a work meeting outside of his/her scheduled work hours but prevent him/her from obtaining prior permission, you may take disciplinary action, consistent with the Disciplinary Action Policy.

## Calculating reporting pay

The associate's supervisor or manager must calculate and submit the appropriate number of hours of reporting pay. As shown in the examples below, you must provide an associate with up to a combined maximum of four hours of work and/or reporting pay. However, the total paid hours also should not exceed more than one-half of the associate's scheduled hours. Exception: If the associate is regularly scheduled to work less than two hours, you must provide work and/or reporting pay for hours he/she is actually scheduled to work.

| Hours Scheduled | Hours Worked | Reporting Pay | Total Paid Hours |
|---|---|---|---|
| 10 | 0 | 4 | 4 |
| 8 | 2 | 2 | 4 |
| 6 | 3 | 0 | 3 |
| 6 | 0 | 3 | 3 |
| 4 | 2 | 0 | 2 |
| 4 | 1 | 1 | 2 |
| 1 | 0 | 1 | 1 |

OTR driver reporting pay will be calculated at 1/10 of ADP (average day's pay) for each hour up to a maximum of 4 hours of reporting pay.

If the associate is required to report to work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with at least two total paid hours at his/her regular hourly rate. Example: A non-exempt associate whose regular four-hour shift ends at 3:30 p.m. and who is required to report back to work at 5:30 p.m. on the same day to attend a one-hour work meeting is eligible for one hour of reporting pay because he/she was required to report to work a second time in one workday and was provided less than two hours of work.

# Compensable activities

You must compensate an associate for compensable activities as defined in the policy including all overtime worked. Because it is not possible to define all compensable activities, you should seek guidance from your people partner and/or Legal if you have any questions regarding whether a particular activity is compensable.

**PAGE 103**

CONFIDENTIAL

WMSANCHEZ0000312

# Travel pay

You must pay an hourly associate overtime if his/her compensable travel time plus actual time worked requires overtime pay. Whenever possible, avoid scheduling travel for hourly associates that, when combined with actual work time, require overtime pay. Refer to the Overtime Pay section of the policy for additional information regarding overtime.

The payroll representative at the associate's primary work location, should determine the amount of travel time for which the associate will receive compensation.

When an hourly associate travels to another town or city for a one-day job assignment that does not involve an overnight stay, you must ask the associate to provide his/her normal commuting time and the time spent traveling between the associate's home and the job assignment. You must ensure the associate is paid for any travel time greater than the associate's normal commuting time. You may verify an associate's normal commuting time by using an internet-based service that provides estimated driving times between locations. When an hourly associate cannot clock in and clock out at his/her primary work location because of travel, ensure the associate reports his/her actual time worked and the compensable travel time on a daily basis. When the associate returns to his/her primary work location, you must ensure he or she reviews and signs the time adjustment slip.

When an hourly associate is assigned to work away from his/her primary work location, you must pay the associate for the reported hours worked and compensable travel time and charge this to the other location using a Merchandise Transfer Request or, if appropriate, a Journal Entry.

# Timekeeping Integrity

## Payroll integrity

### Editing time records
All hourly associates may adjust their own time records.

### Manager or supervisor responsibilities
- Ensure that associates timely and accurately report and record all hours worked and correct inaccurate time adjustments
- Ensure that appropriate documentation is obtained from associates prior to editing their time, time actually worked has not been reduced and retain the documentation to verify the time the associate worked is accurately recorded
- Supervisors and managers are not permitted to request, require or allow associates to work off the clock without compensation or adjust time so that the associate is not properly compensated for all time worked.

### Managing compliance for overtime, premium pay and payroll integrity
If a salaried manager receives a report or otherwise becomes aware of a potential failure to provide pay in accordance with this policy, you must investigate the report and notify the Wage and Hour team via the investigation request form or the helpline (800)530-9929 option 8, if any of the following apply:
- The time adjustment was not made within the same week that the discrepancy occurred.
- A time adjustment was made for an improper purpose
- An adjustment was made, but discrepancies still exist.
- The associate disputes an adjustment that reduced their hours worked
- There are any allegations of time shaving, improperly reducing hours of work or moving hours from one workweek to another.

If the report alleges that the Facility Manager is the cause of the exception or involved in a payroll integrity issue, the next level of management and a salaried member of human resources must conduct the investigation.

Take action to preserve accurate payroll records and promptly resolve any inaccuracies to ensure associates are paid timely and accurately.  You should also be prepared for routine audits a regulatory agency upon written request or your people partner. For information on what to do if a regulatory agency requests information see the Reporting Government Agency Regulatory Contact Policy.
- If the investigation substantiates that an associate violated this policy reference the Disciplinary Action Policy to determine appropriate discipline.

**PAGE 104**

WMSANCHEZ0000313

# Working off the clock

## Compliance

All hourly associates must either be clocked in while performing work or maintain another appropriate record of all time worked. Any time worked, that is not recorded in the system, should be reported to payroll during the week in which it was worked.

Time submitted for a previous pay week or pay period must be keyed in the Previous Pay Week/Pay Period Hour Adjustment Screen

All time worked by an associate for or on behalf of the company, will be compensated at the associate's usual rate of pay plus any overtime premiums required by federal, state or local laws.

No manager or supervisor (hourly or salaried) may request, require or permit an associate to work for or on behalf of the company, without appropriate compensation.

## Supervisor and manager responsibilities

- Do not require, request or permit a non-exempt associate to work off the clock.
- Take corrective action if you have knowledge that a non-exempt associate is performing or has performed work without being paid.
- Report any reasonable suspicion of an associate working off the clock to the Wage and Hour helpline.

## Facility Manager responsibilities

- Inform all non-exempt associates during employment orientation, through on-going training and by posted notices where associates clock in and out, that they are prohibited from working off the clock.
- Ensure that associates are properly compensated for their work, including any non-exempt associate who may have worked off the clock in violation of this policy.

## Violations

Any violation of this policy may result in disciplinary action, up to and including termination.  Violations include, but are not limited to:

- Hourly associates who perform work without properly recording their time.
- Managers or supervisors (hourly or salaried) who request, require or permit hourly associates to work off the clock, make inappropriate or improper time adjustments, or who fail to take appropriate corrective action when they know an associate performs work without being paid.

# Reporting violations

## Reporting violations – Walmart, Sam's Club and Home Office

It is mandatory that management associates report to Wage and Hour helpline:

- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Consistent with the Reporting Government Agency Regulatory Contact (OP-35) policy you must report anytime a governmental agency contacts the facility or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact.
- All off the clock occurrences that are (a) brought to the attention of a salaried member of management (b) not corrected and paid within the pay period in which they occurred or (c) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

## Wage and Hour

The Wage and Hour Advisor will assist the facility management team in conducting a thorough investigation, notifying the appropriate levels of management and achieving an appropriate resolution. In some jurisdictions, applicable laws may not permit you to proceed with all steps of an investigation. The Wage and Hour Advisor assigned to the investigation may partner with Legal to determine how best to handle the investigation.

The investigation may include:

- Determining if the associate worked off the clock and why;
- Learning from the associate the amount of time he or she worked off the clock and/or
- Making an individualized determination of the amount of pay owed to the associate by speaking with his/her immediate supervisor, consulting time records and evaluating the reliability of the associate's claim.

**PAGE 105**

WMSANCHEZ0000314

Upon the conclusion of the investigation and consistent with applicable law, the Wage and Hour Advisor will ensure that appropriate steps are taken to:

- Prepare the appropriate form for the associate's signature, documenting the time s/he worked off the clock;
- Pay the associate for all time worked off the clock, including overtime, if appropriate and
- Administer disciplinary action as appropriate and consistent with the Disciplinary Action Policy, up to and including termination.

**Reporting violations – Field Supply chain**

Field Supply Chain managers should follow this alternative process.

It is mandatory that Supply Chain People Partners report the following to the Divisional People Partner Manager immediately:

- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Additionally, the online compliance form on the OneWalmartmust be completed anytime a governmental agency contacts the store or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact
- All off the clock occurrences that are (a) not corrected and paid within the pay period in which they occurred or (b) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

The facility HRM or HRBP/HROM/TM will conduct the investigation and assure that:

- A Time Adjustment Form is completed for the associate to sign if it is determined that work off the clock did occur;
- The associate receives pay for any time worked off the clock, including overtime, if appropriate; and
- If appropriate, disciplinary action is administered, up to and including termination of employment.

# Diaster and Critical Incident Support pay

## Disaster and facility status determination

- If a situation affects the operation of a facility, divisional representatives will determine if the situation is a qualifying event.
- If you need assistance to determine the need for a facility status change, contact your Market Manager (Walmart/Sam's Club), Divisional Vice President/Regional Vice President (Field Supply Chain) or People Partner(Home Office).
- The Market Manager or Divisional Vice President/Regional Vice President will determine whether a field facility's status is Open, Recovery or Closed and is responsible for reporting all changes in a facility's status. An Executive Committee Member will determine whether a Home Office facility's status is Open, Recovery or Closed and Global Communications is responsible for reporting all changes in a Home Office facility's status.

**Facility statuses**

- **Open** - A facility that is operational for associates and the public, if applicable (full or limited).
- **Recovery** - A facility that is operational for associates to assist in restoring the facility to an Open status, but not open to the public.
- **Closed** - A facility that is non-operational. Closed to associates and the public.

**Providing associates with disaster pay**

**First day disaster pay**

- A salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must calculate the appropriate number of first day disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart. Hours should be entered as non-work hours by selecting Disaster Pay as the adjustment type in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

**Second day through fourth day disaster pay**

- **Closed or Recovery for the entire calendar day** - While the facility is in Closed or Recovery status, a salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for

**PAGE 106**

WMSANCHEZ0000315

Supply Chain) from the associate's home facility must enter disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart, and ensure the hours are entered using the Mass Edit feature in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

- **Open at any point during the day** - On the day the facility is opened, a salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must calculate the appropriate number of disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart, and ensure that the hours are entered as non-work hours by selecting Disaster Pay as the adjustment type in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

**Supporting associates during a disaster**

**Closed status**

Associates affected by a disaster have the opportunity to work in a host facility following the first 72-hour period in which their home facility is closed. All associates who would like to work in a host facility are responsible for contacting a salaried member of management at their home facility.

If the associate works in a host facility that is not located in the same state as the home facility, the associate is required to complete any applicable state tax withholding forms so that state taxes will be withheld correctly and the associate will be responsible for filing taxes in the host facility state.

The associate may work at the host facility up to a maximum of six weeks from the time his/her home facility closes due to a disaster. Regardless of the position and job responsibilities the associate has in the host facility, the associate will maintain his/her home facility pay rate.

If an associate is unable to return to his/her home facility or the home facility is not in Open status at the end of the six weeks from the time the associate's home facility closes, you should assist the associate to 1) apply for a leave or 2) complete a transfer request.

Exceptions to extend the six weeks may only be authorized by the applicable HR manager for the appropriate division. If the extension of the six-week time frame is approved, the associate will continue to receive his/her home facility pay rate for the length of the extension.

**Recovery status**

A facility, while not operational, may be undergoing recovery processes (e.g., clearing debris from inside or outside the building, stocking merchandise, providing business-related community assistance, etc.).

All associates should be encouraged to assist in recovery efforts and report to work for their regularly scheduled shift during the Recovery status. Encourage associates not scheduled to work during the Recovery status to ask a salaried member of management if their assistance is needed in the recovery efforts.

Associates who assist in recovery efforts will be paid for hours actually worked, in addition to any eligible Disaster Support Pay, as defined in the Disaster Support Pay Chart.

**Open status**

When a facility's status changes to Open, the Market Manager and People Lead/Market Human Resources Manager (Walmart/Sam's Club) or Divisional/Regional Vice President and Divisional Human Resources Manager (Field Supply Chain) will define the specified time for a field associate to return to his/her home facility. The Home Office People Partner/HR Business Partner will define the specified time for a Home Office associate to report to his/her home facility.

Associates will be notified of the facility's Open status through the Associate Emergency Information Line (800) 236-2875 or other communication channels (e.g., WalmartOne.com, e-mail, etc.).

**Incentive**

For associates who work in a host facility, any incentives will be pro-rated based on the time s/he works in the host facility and the time s/he works in his/her home facility.

**Associate in Critical Need Trust (ACNT)**

Associates who are experiencing economic hardships may be eligible for assistance through the Associate in Critical Need Trust. It is your responsibility, as the home or host Facility Manager, to assist the associate in completing the necessary forms necessary to apply for these funds.

In the event an associate needs evacuation assistance, refer to the company's Disaster Displacement  Assistance Program.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

CONFIDENTIAL                                                                                                    WMSANCHEZ0000316

Last Modified: November 23, 2021

CONFIDENTIAL

WMSANCHEZ0000317



# Associate Pay Policy

California

## Updated: December 9, 2021

Walmart associates are the heart of our company, helping us grow and thrive by taking every opportunity to exceed our customers' expectations. We respect and appreciate the contributions that every member of our team makes to support the success of our company with outstanding work. We are committed to paying all associates correctly and to compensating every associate appropriately.

This policy applies only to associates who work for Walmart Inc., or one of its subsidiary companies (Walmart), in **California**.

Managers and supervisors should use the supplemental Associate Pay Management Guidelines - California for additional guidance in administering this policy.

# Job classifications

Walmart associates must be classified in the company's payroll system as exempt or non-exempt and as full-time, part-time or temporary for purposes of pay and/or benefits administration. Classification as exempt or non-exempt requires a legal analysis based on the duties and responsibilities of the position.

## Exempt

Refers to associates in positions that are exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in exempt positions are paid on a salary basis. An exempt position is commonly referred to as salaried or salaried management. Pay for exempt positions is determined under the Position Pay Range (PPR) salary structure.

## Non-exempt

Refers to associates in positions that are **not** exempt from the minimum wage and overtime pay provisions of federal, state or local law. Associates in non-exempt positions may be paid either on an hourly or salary basis. A non-exempt position is commonly referred to as hourly. Pay for a non-exempt position is determined under the Non-Exempt Position Pay Range (NPPR) salary structure or the Position Pay Grade (PPG) salary structure.

## Full-time status

Refers to associates who maintain at least the following hours (additional hours may be scheduled):

**Walmart Stores, Sam's Club and Home Office associates:**
- 20 hours per week (If hired prior to September 1, 1979)
  - Associates currently within the 20 hour-per-week requirement will be grandfathered in this requirement, regardless of any transition to part-time.
- 28 hours per week (If hired and/or classified as full-time or salaried management on September 1, 1979 through December 31, 2001)
  - Associates currently within the 28 hour-per-week requirement who change status from full-time or salaried management to part-time and back to full-time will be subject to the 34 hour-per-week requirement.
- 34 hours per week (If hired and/or classified as full-time or salaried management on or after January 1, 2002)

**Field Supply Chain associates:**
- 28 hours per week, regardless of hire date
- OTR drivers click here for more information

**Hourly pharmacists:**
- 27 hours per week, regardless of hire date

## Part-time status

Refers to associates who are not temporary associates, and who maintain less than full-time hours, as defined above.

CONFIDENTIAL                                                                                   WMSANCHEZ0000305

## Temporary status

Refers to associates who have been hired to work in an assignment for a limited amount of time based upon the business needs of a particular area and who have no expectation of continued employment after the end of the assignment.

# Types of pay

To fairly and accurately compensate our associates for their various contributions, we have a variety of types of pay.

**Overtime pay**

*Overtime* pay applies to all *non-exempt associates* and is governed by federal, state and local law. *Overtime* means all hours worked (a) over eight hours in a workday, (b) over 40 hours in a workweek or (c) on a seventh consecutive day in a workweek.

With few exceptions, such as working with a customer on the sales floor,, you must get permission from your supervisor before working overtime. If you work more than eight hours in a workday, you will be paid one and one-half (1 ½ ) times your regular rate of pay for all hours over eight (up to 12 hours worked that day, and two times your rate of pay for all hours over 12 worked that day. If you work more than 40 hours in a workweek, you will be paid one and one-half (1 ½) times your regular rate of pay for all hours worked over 40 in a workweek. You are entitled to and will be paid for all hours worked, including overtime hours. However, if overtime hours are worked without permission you may be subject to disciplinary action up to and including termination.

*Non-exempt* means any associate who is eligible for overtime pay under federal, state or local law, regardless of whether the associate is paid on an hourly or salary basis.

*Workday* means the 24-hour period of each day beginning at 12:00 a.m. and ending at 11:59 p.m.

*Workweek* means the period between Saturday at 12:00 a.m. and the following Friday at 11:59 p.m. This fixed period applies to all associates in all facilities, regardless of your own hourly or weekly schedule.

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California, you will not be scheduled to work more than six consecutive days in a workweek, except under limited circumstances. If you are a non-exempt associate and are scheduled to work a seventh consecutive day in a workweek, you will be paid one and one-half times your regular rate of pay for the first eight hours worked on that day, and you will be paid two times your regular rate of pay for all hours worked in excess of eight hours on that day.

## Split-shift pay

Non-exempt associates may receive additional pay if they are required to work a *split shift*.

*Split shift* means a work schedule interrupted by non-paid, non-working periods (excluding rest and meal breaks of 60 minutes or less) that we initiate in the same workday.

If you work a split shift, you will receive an additional one hour of pay at the applicable minimum wage rate for that workday. However, if your hourly rate is more than the minimum wage, we may credit the amount you are paid over the minimum wage, based on the hours worked for that workday, against the additional hour of pay.

## Premium pay

Field Supply Chain associates should consult the Field Supply Chain Wage Guidelines to see if you are eligible for Supply Chain Premium.  Driver premium pay can be accessed here.

## Reporting pay

If changes to your schedule are required, your supervisor or manager will try to notify you either 24 hours in advance or before the end of the shift last worked prior to the shift affected by the change.

If you are a non-exempt associate and did not receive notice of a schedule change and report to work as scheduled, you will either (1) receive *reporting pay* at your regular hourly rate for one-half of your scheduled hours for that day, not to exceed four hours; (2) be allowed to work at least one-half of your scheduled hours for that day, not to exceed four hours or (3) receive a combination of work and reporting pay up to a maximum of four hours at your regular hourly rate. This will be at the manager's discretion, based upon the work needs of your facility.  You will not be provided with less than the total of two hours of work and/or reporting pay, unless you are regularly scheduled to work less than two hours. If you are regularly scheduled to work less than two hours, you will receive work hours and/or reporting pay for the hours you are actually scheduled to work.

*Reporting pay* means pay for hours that a non-exempt associate is scheduled to work, but does not actually work.

If you are required to report to work for a second time in the same workday and are provided with less than two work hours, we will provide you with a

**PAGE 110**

CONFIDENTIAL

WMSANCHEZ0000306

total of at least two hours of work and/or reporting pay at your regular hourly rate.

You will not receive work hours or reporting pay if:

- You leave work by your own choice to attend to personal matters;
- You report to work as scheduled, but you are in a condition not suitable for work;
- You do not report to work on time and as a result you are sent home as a disciplinary action or your employment is terminated;
- You are on paid standby status and are called to perform assigned work at a time other than your regularly scheduled work hours or
- You report to work and advance notice was not provided, but the facility where you work is closed due to *circumstances beyond our control*.

*Circumstances beyond our control* include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and every reasonable effort has been made to notify you not to report for work or
- The facility where you work is closed due to inclement weather or other emergency.

**Scheduled work meetings**

We will make every effort to schedule work-related meetings so that you are able to attend these meetings during your scheduled work hours. You are not required to attend any work meeting that is not scheduled during your scheduled work hours, and you must receive permission from your supervisor or manager to do so. If you are not able to attend a work meeting, your supervisor or manager will provide you with the meeting information during your scheduled work hours.

## Work Related Travel Time pay

If you are an hourly associate working at a location other than your primary work location, in addition to the time you actually work you will be paid for the time you spend traveling to and from the distant location as follows:

- **Between work locations during a workday** - You will not be paid for your normal commute to and from your primary work location. However, if you clock in at your primary work location and are then asked to travel to another location, you will be paid at your usual rate of pay for the time you spend traveling between work locations during the workday. You should return to your primary work location to clock out at the end of the workday, unless it would take less time for you to travel directly home. If you travel directly home at the end of the workday without clocking out, you must complete the appropriate time adjustment form on the next workday. If you do not have a set work location, you will be paid for the time you spend traveling between work locations, but not for travel to or from your home.
- **For one day assignments** - If you travel to another work location for a one-day job assignment that does not require an overnight stay, you will be paid at your usual rate of pay for any time you actually spend traveling between your home and the job assignment, to the extent it is greater than your normal commuting time.
- **Overnight travel** - When you travel to a job assignment that requires an overnight stay, you will be paid for all the time you spend traveling during your normally scheduled work hours, regardless if you travel on your normally scheduled workdays or on your non-work days. You will not be paid for the time you take for your required meal period.
- **Attending an offsite meeting** - If Walmart requires you to travel to attend an offsite meeting on your normally scheduled workday, you will be paid for your actual travel time plus the time you actually spend at the meeting. If this amount does not equal your normally scheduled work hours, you will be paid for your normally scheduled work hours. When the offsite meeting occurs on a non-work day, you will be paid only for the time you actually spend at the meeting and traveling.
- **Reporting travel time** - When you cannot clock in and clock out at your primary work location because of travel, you must report your actual time worked and paid travel time as described above by submitting the appropriate time adjustment.

When you travel for work, you may incur additional expenses. For information regarding expense reimbursement and other travel-related guidelines, see the Global Travel Policy. SWAT associates please click here for additional information.

If you will be away from your primary work location on one or more paydays, you should work with your People Partner to make arrangements to receive your pay.

## Disaster and Critical Incident Support pay

If you are a full-time, part-time or temporary hourly associate and your facility is forced to close outside of its normal operating schedule due to a disaster, winter storm, mandatory evacuation ordered by a governmental authority, or an incident that requires closure for safety, security or other reasons you may be eligible for disaster support pay.  See the Disaster and Critical Incident Support Pay Guidelines for specific information on disaster support pay eligibility and options.

## Other paid activities

In certain limited situations, you may be paid for other, non-work activities. Such activities may include, but are not limited to:

**PAGE 111**

WMSANCHEZ0000307

- Waiting for and/or receiving medical attention on our premises or at the direction of a supervisor or manager during your normal working hours on days when you are working.
- Open Door activities in accordance with the policy.
- Time spent in connection with a required drug or alcohol screen, according to the Alcohol and Drug Free Workplace Policy.
- Time spent interviewing including any travel time to and from the interview location unless you are on a leave of absence at the time of your interview.
- Attendance at meetings, events and seminars during your normal working hours.
- Attendance at meetings, events and seminars outside of your normal work hours that directly relate to your current job, as approved by a salaried member of management.
- Charitable activities, but **only** under the following circumstances:
  - You are designated as the coordinator of the Children's Miracle Network campaign and perform activities in the capacity of the coordinator;
  - You are designated as the coordinator of the United Way drive and perform activities in the capacity of the coordinator;
  - A salaried member of management specifically requests, directs or requires your participation in a charitable activity (either during or outside your regularly scheduled shift) or
  - You work at a charitable activity during your regularly scheduled shift with a salaried member of management's advance knowledge and consent.

We will pay you for all time spent performing these activities, even if you performed them while you were not on the clock. You must keep track of all time involved and immediately submit the appropriate time adjustment when you return to work.

# Timekeeping Integrity

We are committed to correctly paying all associates, maintaining accurate payroll records and compensating every associate for all work performed. To ensure you are paid correctly, you must timely and accurately report and record all the hours you work and all other activities for which we will pay you. If you become aware that your work time is not being reported and recorded accurately please speak to your people partner, supervisor or any salaried member of management to see that the situation is corrected, and you are paid for all time you spent working. You may also report this issue to the Wage and Hour helpline (800)530-9929 option 8.

## Payroll Integrity

The falsification of time records, whether for yourself or others, is strictly prohibited. Assisting or instructing others to falsify time records, clocking in/out for another associate, or failing to report or correct time records that you know to be false, are also prohibited. Violation of this requirement may subject you to disciplinary action up to and including termination.

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned. You must report all the hours you work by the end of the next scheduled shift. We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

Authorized associates may edit time records. However, your time records cannot be edited without your approval. When your time is edited by someone else, an approved time adjustment is required. In no case should you or anyone else edit time records to reduce, eliminate or otherwise adjust the amount of time you spent working. If you have knowledge or a reasonable belief that this policy is being violated, then you should immediately report it to the ethics or wage and hour hotline.

## Working unscheduled hours

If you are a non-exempt associate, you should not work unscheduled hours unless a salaried member of management approves the work in advance. Regardless of whether this approval is provided, you must accurately record your work time by clocking in and out, or if you are unable to clock in, timely and accurately report all hours worked. You will be paid for all hours worked including overtime hours.

## Prohibition against working off the clock

*Off the clock work* means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.   If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or the ethics hotline.

Examples of prohibited off the clock work include but are not limited to:

**PAGE 112**

WMSANCHEZ0000308

- Performing any work prior to clocking in, such as assisting a customer, preparing your work area, or reviewing or discussing your work assignments;
- Conducting comparison shopping before clocking in or after clocking out;
- Performing any work during non-working time, such as while clocked out for your meal period;
- Communicating via text, e-mail, or telephone with other associates to assist them in performing work during non-working time or when you are away from work;
- Taking training manuals home to study or learn skills or information needed on the current job;
- Responding to emails or text messages regarding work-related matters while not on the clock or
- Reporting to work at scheduled time but waiting to clock in.

If you are a non-exempt associate, you must clock in before you begin any work and clock out when you are no longer performing work.

If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at the earliest opportunity.

If you perform any work without properly recording your time, you may be subject to disciplinary action up to and including termination.

# Timekeeping Related to Meal Periods and Rest Breaks

Hourly associates are provided meal periods and rest breaks pursuant to the Rest Breaks, Meal Periods and Days of Rest Policy and in accordance with federal, state and local law all associates must comply with the requirements of that policy including rules for clocking-in and clocking-out to ensure proper pay.

# Reporting Issues and obtaining further Information

We take any reported policy violation seriously and will conduct an appropriate investigation as permitted by law. We strictly forbid retaliation of any kind for reporting conduct that may violate this policy or for cooperating in an investigation of any potential policy violation. Any associate who violates this policy or who retaliates against another associate for reporting a potential violation or cooperating in an investigation will be subject to disciplinary action, up to and including termination.

If you have been asked to work off the clock, are aware of inappropriate adjustments to your recorded work time, or are aware of any other possible deviations from our associate pay practices or have any questions or concerns about your pay, you should immediately contact any of the following:
- Your immediate supervisor/manager;
- Your People Partner or
- Wage and Hour Helpline (800)530-9929 option 8

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: December 9, 2021

CONFIDENTIAL                                                                                          WMSANCHEZ0000309

# Associate Pay Management Guidelines
## California



**Updated: June 24, 2022**

These guidelines are a supplement to Walmart's Associate Pay Policy – California. They apply to all supervisors and managers who work for Walmart Inc., or one of its subsidiary companies, in **California** (Walmart).

You must follow the procedures outlined in these guidelines

# Job classifications

You are responsible for ensuring associates are correctly classified based on the requirements outlined within the policy.

# Seventh Consecutive Day Pay

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy – California you must not schedule associates to work more than six consecutive days, except under limited circumstances.
In the event that you must schedule a non-exempt associate to work on a seventh consecutive day, the associate is eligible to receive premium pay, as set forth in the policy. Our payroll system is programmed to automatically calculate the appropriate premium pay whenever an associate works on a seventh consecutive day. However, for those non-exempt associates who work in positions where they are not required to clock-in or clock-out, managers must ensure that premium pay is appropriately calculated and paid.

# Premium pay

Premium pay is automatically calculated based on the schedule and/or hours entered into the system, eligibility and state specific requirements.

# Managing compliance for overtime, weekend premium and split shift pay

If a Facility Manager receives a report or otherwise becomes aware of a potential failure to provide overtime or weekend premium pay in accordance with this policy, you must investigate the report and notify Wage and Hour Helpline (800)530-9929 option 8 if any of the following apply.
1. The time adjustment was not made within the same week that the discrepancy occurred.
2. An adjustment was made, but discrepancies still exist.
3. There are any allegations of time shaving or moving hours from one workweek to another.

However, if the report alleges that the Facility Manager is the cause of the exception, the next level of management and a salaried member of human resources must conduct the investigation.

If the investigation substantiates that an associate violated this policy, the associate must be disciplined, consistent with the Disciplinary Action Policy.

# Reporting pay

- Provide work schedules for all associates in advance of the scheduled work dates.

## Resources

Travels Expense Vouchers

**Stores and Clubs ONLY:**
Hours/Pay Adjustment/Prizes and Awards Form

**Field Supply Chain:**
Field Supply Chain DC/TO Hours/Pay Adjustment/ Prizes or Awards Form

**PAGE 114**

CONFIDENTIAL

WM-MARTINEZ0000074

- When a change in an associate's schedule becomes necessary, provide the associate advance notice of the schedule change.
- If you fail to provide advance notice of the schedule change, provide the associate with either work hours or reporting pay as described in the policy.
- When an associate reports for work as scheduled or if you failed to provide the associate with advance notice of a schedule change, you must attempt to find work for the associate for at least one-half of the associate's scheduled hours, up to a maximum of four hours of work. If work is not available, the associate is eligible to receive reporting pay, at his/her regular hourly rate, for one-half of the associate's scheduled hours, up to a maximum of four total paid hours. If you are able to find work for the associate, but for less than half of his/her scheduled hours, you may provide the associate with a combination of work hours and reporting pay, up to a maximum of four total paid hours.
- An associate will not be provided with less than two total paid hours of work and/or reporting pay unless he/she is regularly scheduled to work less than two hours. If he/she is regularly scheduled to work less than two hours, you must provided him/her work hours and/or reporting pay for the hours he/she is actually scheduled to work.
- In addition, if an associate is required to report for work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with up to two hours of reporting pay at his/her regular hourly rate. **Example:** If you send an associate home for lack of work and instruct him/her to report for work later that same day, but are unable to provide work hours to the associate when he/she reports for work the second time, you must provide the associate reporting pay as follows:
    - For one-half of his/her scheduled work hours, up to a maximum of four hours, for the first time the associate reported for work as scheduled; and
    - Two hours of reporting pay at his/her regularly hourly rate for the second time the associate reported for work as scheduled.

As described in the policy, reporting pay is not required if:

- The associate leaves work by his/her own choice to attend to personal matters;
- The associate reports to work as scheduled, but is in a condition not suitable for work (for example, reporting to work under the influence of alcohol);
- The associate does not report to work on time and as a result, he/she is sent home as a disciplinary action or his/her employment is terminated;
- The associate is on paid standby status and is called to perform assigned work at a time other than his/her regularly scheduled work hours or
- The associate reports to work and advance notice was not provided, but your facility is closed due to *circumstances beyond Walmart's control.*

Note: If you send the associate home because he/she is not performing at an acceptable level and the associate has not worked at least one-half of his/her scheduled work hours, you must provide the associate reporting pay, as described above, because sending an associate home for this reason does not fall within one of the above exceptions. Similarly, you must provide reporting pay, as described above, even if the associate responds affirmatively to a request for volunteers to leave work because you are not able to find enough work for all of the associates scheduled to work at that time.

Circumstances beyond Walmart's control include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property, or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and you have made every reasonable effort to notify the Associate not to report for work or
- Your facility is closed due to inclement weather or other emergency, as described below.

## Inclement weather or other emergency

Non-exempt associates are not eligible for work hours or reporting pay if they report to work and advance notice was not provided, but your facility is closed due to inclement weather or other emergency (for example, an earthquake, but not a mechanical breakdown).

However, the associate must be paid for all hours worked at his/her regular hourly rate if you require the

**PAGE 115**

WM-MARTINEZ0000075

associate to remain at or near your facility during inclement weather or other emergency, even if the associate is relieved of his/her work duties during this time (i.e., to wait out a delay caused by inclement weather or other emergency).

## Scheduling work meetings

Supervisors and managers must make every effort to schedule work-related meetings so that associates are able to attend these meetings during their scheduled work hours. As described in the policy, associates are not required to attend any work meeting that is not scheduled during his/her work hours and must receive prior permission from you to do so. If an associate is not able to attend a work meeting and you are not able to schedule an additional meeting, you must provide the associate with the meeting information during the associate's scheduled work hours.

However, if a non-exempt associate attends a work meeting outside of his/her scheduled work hours, even if he/she did not obtain prior permission, you must provide the associate reporting pay consistent with the policy. Example: If the associate attends a one-hour work meeting on a day he/she is not scheduled to work, in addition to pay for attending the one-hour meeting, you must provide the associate with reporting pay so that the combined work hours and reporting pay equal one-half his/her regularly scheduled work hours, up to a maximum of four, and not less than two, hours of pay.

Absent unusual and unforeseeable business circumstances that require a non-exempt associate to attend a work meeting outside of his/her scheduled work hours but prevent him/her from obtaining prior permission, you may take disciplinary action, consistent with the Disciplinary Action Policy.

## Calculating reporting pay

The associate's supervisor or manager must calculate and submit the appropriate number of hours of reporting pay. As shown in the examples below, you must provide an associate with up to a combined maximum of four hours of work and/or reporting pay. However, the total paid hours also should not exceed more than one-half of the associate's scheduled hours. Exception: If the associate is regularly scheduled to work less than two hours, you must provide work and/or reporting pay for hours he/she is actually scheduled to work.

| Hours Scheduled | Hours Worked | Reporting Pay | Total Paid Hours |
|---|---|---|---|
| 10 | 0 | 4 | 4 |
| 8 | 2 | 2 | 4 |
| 6 | 3 | 0 | 3 |
| 6 | 0 | 3 | 3 |
| 4 | 2 | 0 | 2 |
| 4 | 1 | 1 | 2 |
| 1 | 0 | 1 | 1 |

OTR driver reporting pay will be calculated at 1/10 of ADP (average day's pay) for each hour up to a maximum of 4 hours of reporting pay.

If the associate is required to report to work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with at least two total paid hours at his/her regular hourly rate. Example: A non-exempt associate whose regular four-hour shift ends at 3:30 p.m. and who is required to report back to work at 5:30 p.m. on the same day to attend a one-hour work meeting is eligible for one hour of reporting pay because he/she was required to report to work a second time in one workday and was provided less than two hours of work.

# Compensable activities

You must compensate an associate for compensable activities as defined in the policy including all overtime worked. Because it is not possible to define all compensable activities, you should seek guidance from your people partner and/or Legal if you have any questions regarding whether a particular activity is compensable.

**PAGE 116**

CONFIDENTIAL

WM-MARTINEZ0000076

# Travel pay

You must pay an hourly associate overtime if his/her compensable travel time plus actual time worked requires overtime pay. Whenever possible, avoid scheduling travel for hourly associates that, when combined with actual work time, require overtime pay. Refer to the Overtime Pay section of the policy for additional information regarding overtime.

The payroll representative at the associate's primary work location, should determine the amount of travel time for which the associate will receive compensation.

When an hourly associate travels to another town or city for a one-day job assignment that does not involve an overnight stay, you must ask the associate to provide his/her normal commuting time and the time spent traveling between the associate's home and the job assignment. You must ensure the associate is paid for any travel time greater than the associate's normal commuting time. You may verify an associate's normal commuting time by using an internet-based service that provides estimated driving times between locations.

When an hourly associate cannot clock in and clock out at his/her primary work location because of travel, ensure the associate reports his/her actual time worked and the compensable travel time on a daily basis. When the associate returns to his/her primary work location, you must ensure he or she reviews and signs the time adjustment slip.

When an hourly associate is assigned to work away from his/her primary work location, you must pay the associate for the reported hours worked and compensable travel time and charge this to the other location using a Merchandise Transfer Request or, if appropriate, a Journal Entry.

# Timekeeping Integrity

## Payroll integrity

### Editing time records
All hourly associates may adjust their own time records.

### Manager or supervisor responsibilities
- Ensure that associates timely and accurately report and record all hours worked and correct inaccurate time adjustments
- Ensure that associates review time edit changes. Walmart US Store associates may review and confirm changes to their timesheet in Me@Walmart or the Timeclock application, or complete a time adjustment form. All other divisions should continue to use the time adjustment form. When a time adjustment form is necessary, retain this in eFile.
- Ensure time actually worked has not been reduced
- Supervisors and managers are not permitted to request, require or allow associates to work off the clock without compensation or adjust time so that the associate is not properly compensated for all time worked.

### Managing compliance for overtime, premium pay and payroll integrity
If a salaried manager receives a report or otherwise becomes aware of a potential failure to provide pay in accordance with this policy, you must investigate the report and notify the Wage and Hour team via the investigation request form or the helpline (800)530-9929 option 8, if any of the following apply:
- The time adjustment was not made within the same week that the discrepancy occurred.
- A time adjustment was made for an improper purpose
- An adjustment was made, but discrepancies still exist.
- The associate disputes an adjustment that reduced their hours worked
- There are any allegations of time shaving, improperly reducing hours of work or moving hours from one workweek to another.

If the report alleges that the Facility Manager is the cause of the exception or involved in a payroll integrity issue, the next level of management and a salaried member of human resources must conduct the investigation.

Take action to preserve accurate payroll records and promptly resolve any inaccuracies to ensure associates are

**PAGE 117**

CONFIDENTIAL

WM-MARTINEZ0000077

paid timely and accurately. You should also be prepared for routine audits a regulatory agency upon written request or your people partner. For information on what to do if a regulatory agency requests information see the Reporting Government Agency Regulatory Contact Policy.

- If the investigation substantiates that an associate violated this policy reference the Disciplinary Action Policy to determine appropriate discipline.

## Working off the clock

### Compliance

All hourly associates must either be clocked in while performing work or maintain another appropriate record of all time worked. Any time worked, that is not recorded in the system, should be reported to payroll during the week in which it was worked.

Time submitted for a previous pay week or pay period must be keyed in the Previous Pay Week/Pay Period Hour Adjustment Screen. This situation requires a completed time adjustment form.

All time worked by an associate for or on behalf of the company, will be compensated at the associate's usual rate of pay plus any overtime premiums required by federal, state or local laws.

No manager or supervisor (hourly or salaried) may request, require or permit an associate to work for or on behalf of the company, without appropriate compensation.

### Supervisor and manager responsibilities
- Do not require, request or permit a non-exempt associate to work off the clock.
- Take corrective action if you have knowledge that a non-exempt associate is performing or has performed work without being paid.
- Report any reasonable suspicion of an associate working off the clock to the Wage and Hour helpline.

### Facility Manager responsibilities
- Inform all non-exempt associates during employment orientation, through on-going training and by posted notices where associates clock in and out, that they are prohibited from working off the clock.
- Ensure that associates are properly compensated for their work, including any non-exempt associate who may have worked off the clock in violation of this policy.

### Violations

Any violation of this policy may result in disciplinary action, up to and including termination. Violations include, but are not limited to:
- Hourly associates who perform work without properly recording their time.
- Managers or supervisors (hourly or salaried) who request, require or permit hourly associates to work off the clock, make inappropriate or improper time adjustments, or who fail to take appropriate corrective action when they know an associate performs work without being paid.

## Reporting violations

### Reporting violations – Walmart, Sam's Club and Home Office

It is mandatory that management associates report to Wage and Hour helpline:
- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Consistent with the Reporting Government Agency Regulatory Contact (OP-35) policy you must report anytime a governmental agency contacts the facility or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact.
- All off the clock occurrences that are (a) brought to the attention of a salaried member of management (b) not corrected and paid within the pay period in which they occurred or (c) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

**Wage and Hour**

## PAGE 118

                                                                          WM-MARTINEZ0000078

The Wage and Hour Advisor will assist the facility management team in conducting a thorough investigation, notifying the appropriate levels of management and achieving an appropriate resolution. In some jurisdictions, applicable laws may not permit you to proceed with all steps of an investigation. The Wage and Hour Advisor assigned to the investigation may partner with Legal to determine how best to handle the investigation. The investigation may include:

- Determining if the associate worked off the clock and why;
- Learning from the associate the amount of time he or she worked off the clock and/or
- Making an individualized determination of the amount of pay owed to the associate by speaking with his/her immediate supervisor, consulting time records and evaluating the reliability of the associate's claim.

Upon the conclusion of the investigation and consistent with applicable law, the Wage and Hour Advisor will ensure that appropriate steps are taken to:

- Prepare the appropriate form for the associate's signature, documenting the time s/he worked off the clock;
- Pay the associate for all time worked off the clock, including overtime, if appropriate and
- Administer disciplinary action as appropriate and consistent with the Disciplinary Action Policy, up to and including termination.

### Reporting violations – Field Supply chain

Field Supply Chain managers should follow this alternative process.

It is mandatory that Supply Chain People Partners report the following to the Divisional People Partner Manager immediately:

- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Additionally, the online compliance form on the OneWalmartmust be completed anytime a governmental agency contacts the store or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact
- All off the clock occurrences that are (a) not corrected and paid within the pay period in which they occurred or (b) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

The facility HRM or HRBP/HROM/TM will conduct the investigation and assure that:

- A Time Adjustment Form is completed for the associate to sign if it is determined that work off the clock did occur;
- The associate receives pay for any time worked off the clock, including overtime, if appropriate; and
- If appropriate, disciplinary action is administered, up to and including termination of employment.

# Diaster and Critical Incident Support pay

## Disaster and facility status determination

- If a situation affects the operation of a facility, divisional representatives will determine if the situation is a qualifying event.
- If you need assistance to determine the need for a facility status change, contact your Market Manager (Walmart/Sam's Club), Divisional Vice President/Regional Vice President (Field Supply Chain) or People Partner(Home Office).
- The Market Manager or Divisional Vice President/Regional Vice President will determine whether a field facility's status is Open, Recovery or Closed and is responsible for reporting all changes in a facility's status. An Executive Committee Member will determine whether a Home Office facility's status is Open, Recovery or Closed and Global Communications is responsible for reporting all changes in a Home Office facility's status.

### Facility statuses

- **Open** - A facility that is operational for associates and the public, if applicable (full or limited).
- **Recovery** - A facility that is operational for associates to assist in restoring the facility to an Open status, but not open to the public.
- **Closed** - A facility that is non-operational. Closed to associates and the public.

### Providing associates with disaster pay

**PAGE 119**

**First day disaster pay**

- A salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must calculate the appropriate number of first day disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart. Hours should be entered as non-work hours by selecting Disaster Pay as the adjustment type in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

**Second day through fourth day disaster pay**

- **Closed or Recovery for the entire calendar day** - While the facility is in Closed or Recovery status, a salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must enter disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart, and ensure the hours are entered using the Mass Edit feature in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

- **Open at any point during the day** - On the day the facility is opened, a salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must calculate the appropriate number of disaster pay hours, as described in the Disaster and Critical Incident Support Pay Chart, and ensure that the hours are entered as non-work hours by selecting Disaster Pay as the adjustment type in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

**Supporting associates during a disaster**

**Closed status**

Associates affected by a disaster have the opportunity to work in a host facility following the first 72-hour period in which their home facility is closed. All associates who would like to work in a host facility are responsible for contacting a salaried member of management at their home facility.

If the associate works in a host facility that is not located in the same state as the home facility, the associate is required to complete any applicable state tax withholding forms so that state taxes will be withheld correctly and the associate will be responsible for filing taxes in the host facility state.

The associate may work at the host facility up to a maximum of six weeks from the time his/her home facility closes due to a disaster. Regardless of the position and job responsibilities the associate has in the host facility, the associate will maintain his/her home facility pay rate.

If an associate is unable to return to his/her home facility or the home facility is not in Open status at the end of the six weeks from the time the associate's home facility closes, you should assist the associate to 1) apply for a leave or 2) complete a transfer request.

Exceptions to extend the six weeks may only be authorized by the applicable HR manager for the appropriate division. If the extension of the six-week time frame is approved, the associate will continue to receive his/her home facility pay rate for the length of the extension.

**Recovery status**

A facility, while not operational, may be undergoing recovery processes (e.g., clearing debris from inside or outside the building, stocking merchandise, providing business-related community assistance, etc.).

All associates should be encouraged to assist in recovery efforts and report to work for their regularly scheduled shift during the Recovery status. Encourage associates not scheduled to work during the Recovery status to ask a salaried member of management if their assistance is needed in the recovery efforts. Associates who assist in recovery efforts will be paid for hours actually worked, in addition to any eligible Disaster Support Pay, as defined in the Disaster Support Pay Chart.

**Open status**

When a facility's status changes to Open, the Market Manager and People Lead/Market Human Resources Manager (Walmart/Sam's Club) or Divisional/Regional Vice President and Divisional Human Resources Manager (Field Supply Chain) will define the specified time for a field associate to return to his/her home facility. The Home Office People Partner/HR Business Partner will define the specified time for a Home Office associate to report to his/her home facility.

Associates will be notified of the facility's Open status through the Associate Emergency Information Line (800) 236-2875 or other communication channels (e.g., WalmartOne.com, e-mail, etc.).

**Incentive**

For associates who work in a host facility, any incentives will be pro-rated based on the time s/he works in the host facility and the time s/he works in his/her home facility.

**Associate in Critical Need Trust (ACNT)**

**PAGE 120**

WM-MARTINEZ0000080

Associates who are experiencing economic hardships may be eligible for assistance through the Associate in Critical Need Trust. It is your responsibility, as the home or host Facility Manager, to assist the associate in completing the necessary forms necessary to apply for these funds.

In the event an associate needs evacuation assistance, refer to the company's Disaster Displacement Assistance Program.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last modified: June 24, 2022

**PAGE 121**

                                                                                                WM-MARTINEZ0000081

## Associate Pay Management Guidelines
California

Updated: May 3, 2023

These guidelines are a supplement to Walmart's Associate Pay Policy - California. They apply to all supervisors and managers who work for Walmart Inc., or one of its subsidiary companies, in **California** (Walmart).

You must follow the procedures outlined in these guidelines

# Job classifications

You are responsible for ensuring associates are correctly classified based on the requirements outlined within the policy.

# Seventh Consecutive Day Pay

As noted in the Rest Breaks, Meal Periods and Days of Rest Policy - California you must not schedule associates to work more than six consecutive days, except under limited circumstances.

In the event that you must schedule a non-exempt associate to work on a seventh consecutive day, the associate is eligible to receive premium pay, as set forth in the policy. Our payroll system is programmed to automatically calculate the appropriate premium pay whenever an associate works on a seventh consecutive day. However, for those non-exempt associates who work in positions where they are not required to clock-in or clock-out, managers must ensure that premium pay is appropriately calculated and paid.

# Premium pay

Premium pay is automatically calculated based on the schedule and/or hours entered into the system, eligibility and state specific requirements.

# Managing compliance for overtime, weekend premium and split shift pay

If a Facility Manager receives a report or otherwise becomes aware of a potential failure to provide overtime or weekend premium pay in accordance with this policy, you must notify Global Ethics through Report a Concern, ethics@walmart.com, or 1-800-WMETHIC (1-800-963-8442) if any of the following apply.
1. The time adjustment was not made within the same week that the discrepancy occurred.
2. An adjustment was made, but discrepancies still exist.
3. There are any allegations of time shaving or moving hours from one workweek to another.

However, if the report alleges that the Facility Manager is the cause of the exception, the next level of management and a salaried member of human resources must conduct the investigation.

If the investigation substantiates that an associate violated this policy, the associate must be disciplined, consistent with the Disciplinary Action Policy.

# Reporting pay

**PAGE 122**

CONFIDENTIAL                                                                                    WMSANCHEZ0000208

- Provide work schedules for all associates in advance of the scheduled work dates.
- When a change in an associate's schedule becomes necessary, provide the associate advance notice of the schedule change.
- If you fail to provide advance notice of the schedule change, provide the associate with either work hours or reporting pay as described in the policy.
- When an associate reports for work as scheduled or if you failed to provide the associate with advance notice of a schedule change, you must attempt to find work for the associate for at least one-half of the associate's scheduled hours, up to a maximum of four hours of work. If work is not available, the associate is eligible to receive reporting pay, at their regular hourly rate, for one-half of the associate's scheduled hours, up to a maximum of four total paid hours. If you are able to find work for the associate, but for less than half of their scheduled hours, you may provide the associate with a combination of work hours and reporting pay, up to a maximum of four total paid hours.
- An associate will not be provided with less than two total paid hours of work and/or reporting pay unless they are regularly scheduled to work less than two hours. If they are regularly scheduled to work less than two hours, you must provided them work hours and/or reporting pay for the hours they are actually scheduled to work.
- In addition, if an associate is required to report for work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with up to two hours of reporting pay at their regular hourly rate. **Example:** If you send an associate home for lack of work and instruct them to report for work later that same day, but are unable to provide work hours to the associate when they report for work the second time, you must provide the associate reporting pay as follows:
  - For one-half of their scheduled work hours, up to a maximum of four hours, for the first time the associate reported for work as scheduled; and
  - Two hours of reporting pay at their regularly hourly rate for the second time the associate reported for work as scheduled.

As described in the policy, reporting pay is not required if:

- The associate leaves work by their own choice to attend to personal matters;
- The associate reports to work as scheduled, but is in a condition not suitable for work (for example, reporting to work under the influence of alcohol);
- The associate does not report to work on time and as a result, they are sent home as a disciplinary action or their employment is terminated;
- The associate is on paid standby status and is called to perform assigned work at a time other than their regularly scheduled work hours or
- The associate reports to work and advance notice was not provided, but your facility is closed due to *circumstances beyond Walmart's control.*

Note: If you send the associate home because they are not performing at an acceptable level and the associate has not worked at least one-half of their scheduled work hours, you must provide the associate reporting pay, as described above, because sending an associate home for this reason does not fall within one of the above exceptions. Similarly, you must provide reporting pay, as described above, even if the associate responds affirmatively to a request for volunteers to leave work because you are not able to find enough work for all of the associates scheduled to work at that time.

Circumstances beyond Walmart's control include, but are not limited to, the following:

- When operations cannot commence or continue due to threats to associates or property, or when recommended by civil authorities, such as a terrorist event;
- When public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system;
- An unexpected or unusual occurrence during off hours makes it impossible for the facility to open for business and you have made every reasonable effort to notify the associate not to report for work or
- Your facility is closed due to inclement weather or other emergency, as described below.

## Inclement weather or other emergency

Non-exempt associates are not eligible for work hours or reporting pay if they report to work and advance notice was not provided, but your facility is closed due to inclement weather or other emergency (for example, an earthquake, but not a mechanical breakdown).

However, the associate must be paid for all hours worked at their regular hourly rate if you require the associate to remain at or near your facility during inclement weather or other emergency, even if the associate is relieved of their work duties during this time (i.e., to wait out a delay caused by inclement weather or other emergency).

## Scheduling work meetings

Supervisors and managers must make every effort to schedule work-related meetings so that associates are able to attend these meetings during their scheduled work hours. As described in the policy, associates are not required to attend any work meeting that is not scheduled during their work hours and must receive prior permission from you to do so. If an associate is not able to attend a work meeting and you are not able to schedule an additional meeting, you must provide the associate with the meeting information during the associate's scheduled work hours.

However, if a non-exempt associate attends a work meeting outside of their scheduled work hours, even if they did not obtain prior permission, you must provide the associate reporting pay consistent with the policy. Example: If the associate attends a one-hour work meeting on a day they are not scheduled to work, in addition to pay for attending the one-hour meeting, you must provide the associate with reporting pay so that the combined work hours and reporting pay equal one-half their regularly scheduled work hours, up to a maximum of four, and not less than two, hours of pay.

**PAGE 123**

CONFIDENTIAL                                                            WMSANCHEZ0000209

Absent unusual and unforeseeable business circumstances that require a non-exempt associate to attend a work meeting outside of their scheduled work hours but prevent them from obtaining prior permission, you may take disciplinary action, consistent with the Disciplinary Action Policy.

## Calculating reporting pay

The associate's supervisor or manager must calculate and submit the appropriate number of hours of reporting pay. As shown in the examples below, you must provide an associate with up to a combined maximum of four hours of work and/or reporting pay. However, the total paid hours also should not exceed more than one-half of the associate's scheduled hours. Exception: If the associate is regularly scheduled to work less than two hours, you must provide work and/or reporting pay for hours they are actually scheduled to work.

| | |
|---|---|
| Hours Scheduled | 10 |
| Hours Worked | 0 |
| Reporting Pay | 4 |
| Total Paid Hours | 4 |
| | |
| Hours Scheduled | 8 |
| Hours Worked | 2 |
| Reporting Pay | 2 |
| Total Paid Hours | 4 |
| | |
| Hours Scheduled | 6 |
| Hours Worked | 3 |
| Reporting Pay | 0 |
| Total Paid Hours | 3 |
| | |
| Hours Scheduled | 6 |
| Hours Worked | 0 |
| Reporting Pay | 3 |
| Total Paid Hours | 3 |
| | |
| Hours Scheduled | 4 |
| Hours Worked | 2 |
| Reporting Pay | 0 |
| Total Paid Hours | 2 |
| | |
| Hours Scheduled | 4 |
| Hours Worked | 1 |
| Reporting Pay | 1 |
| Total Paid Hours | 2 |
| | |
| Hours Scheduled | 1 |

**PAGE 124**

CONFIDENTIAL

WMSANCHEZ0000210

| | |
|---|---|
| Hours Worked | 0 |
| Reporting Pay | 1 |
| Total Paid Hours | 1 |

OTR driver reporting pay will be calculated at 1/10 of ADP (average day's pay) for each hour up to a maximum of 4 hours of reporting pay. If the associate is required to report to work for a second time in the same workday and is provided with less than two hours of work, you must provide the associate with at least two total paid hours at their regular hourly rate. Example: A non-exempt associate whose regular four-hour shift ends at 3:30 p.m. and who is required to report back to work at 5:30 p.m. on the same day to attend a one-hour work meeting is eligible for one hour of reporting pay because they were required to report to work a second time in one workday and was provided less than two hours of work.

# Compensable activities

You must compensate an associate for compensable activities as defined in the policy including all overtime worked. Because it is not possible to define all compensable activities, you should seek guidance from your People Partner and/or Legal if you have any questions regarding whether a particular activity is compensable.

# Travel pay

You must pay an hourly associate overtime if their compensable travel time plus actual time worked requires overtime pay. Whenever possible, avoid scheduling travel for hourly associates that, when combined with actual work time, require overtime pay. Refer to the Overtime Pay section of the policy for additional information regarding overtime.

The payroll representative at the associate's primary work location, should determine the amount of travel time for which the associate will receive compensation.

When an hourly associate travels to another town or city for a one-day job assignment that does not involve an overnight stay, you must ask the associate to provide their normal commuting time and the time spent traveling between the associate's home and the job assignment. You must ensure the associate is paid for any travel time greater than the associate's normal commuting time. You may verify an associate's normal commuting time by using an internet-based service that provides estimated driving times between locations.

When an hourly associate cannot clock in and clock out at their primary work location because of travel, ensure the associate reports their actual time worked and the compensable travel time on a daily basis. When the associate returns to their primary work location, you must ensure they review and sign the time adjustment slip.

When an hourly associate is assigned to work away from their primary work location, you must pay the associate for the reported hours worked and compensable travel time and charge this to the other location using a Merchandise Transfer Request or, if appropriate, a Journal Entry.

# Timekeeping Integrity

## Payroll integrity

### Editing time records
All hourly associates may adjust their own time records.

### Manager or supervisor responsibilities
- Ensure that associates timely and accurately report and record all hours worked and correct inaccurate time adjustments
- Ensure that associates review time edit changes. Walmart US Store associates may review and confirm changes to their timesheet in Me@Walmart or the Timeclock application, or complete a time adjustment form. All other divisions should continue to use the time adjustment form. When a time adjustment form is necessary, retain it in eFile.
- Ensure time actually worked has not been reduced
- Supervisors and managers are not permitted to request, require or allow associates to work off the clock without compensation or adjust time so that the associate is not properly compensated for all time worked.

### Managing compliance for overtime, premium pay and payroll integrity

CONFIDENTIAL

WMSANCHEZ0000211

If a salaried manager receives a report or otherwise becomes aware of a potential failure to provide pay in accordance with this policy, you must notify Global Ethics through Report a Concern, ethics@walmart.com, or 1-800-WMETHIC (1-800-963-8442), if any of the following apply:

- The time adjustment was not made within the same week that the discrepancy occurred.
- A time adjustment was made for an improper purpose
- An adjustment was made, but discrepancies still exist.
- The associate disputes an adjustment that reduced their hours worked
- There are any allegations of time shaving, improperly reducing hours of work or moving hours from one workweek to another.

If the report alleges that the Facility Manager is the cause of the exception or involved in a payroll integrity issue, the next level of management and a salaried People Partner must conduct the investigation.

Take action to preserve accurate payroll records and promptly resolve any inaccuracies to ensure associates are paid timely and accurately. You should also be prepared for routine audits a regulatory agency upon written request or your People Partner. For information on what to do if a regulatory agency requests information see the Reporting Government Agency Regulatory Contact Policy.

- If the investigation substantiates that an associate violated this policy reference the Disciplinary Action Policy to determine appropriate discipline.

## Working off the clock

### Compliance

All hourly associates must either be clocked in while performing work or maintain another appropriate record of all time worked. Any time worked, that is not recorded in the system, should be reported to payroll during the week in which it was worked.

Time submitted for a previous pay week or pay period must be keyed in the Previous Pay Week/Pay Period Hour Adjustment Screen. This situation requires a completed time adjustment form.

All time worked by an associate for or on behalf of the company, will be compensated at the associate's usual rate of pay plus any overtime premiums required by federal, state or local laws.

No manager or supervisor (hourly or salaried) may request, require or permit an associate to work for or on behalf of the company, without appropriate compensation.

### Supervisor and manager responsibilities

- Do not require, request or permit a non-exempt associate to work off the clock.
- Take corrective action if you have knowledge that a non-exempt associate is performing or has performed work without being paid.
- Report any reasonable suspicion of an associate working off the clock using the Wage and Hour form in the ServiceNow portal.

### Facility Manager responsibilities

- Inform all non-exempt associates during employment orientation, through on-going training and by posted notices where associates clock in and out, that they are prohibited from working off the clock.
- Ensure that associates are properly compensated for their work, including any non-exempt associate who may have worked off the clock in violation of this policy.

### Violations

Any violation of this policy may result in disciplinary action, up to and including termination. Violations include, but are not limited to:

- Hourly associates who perform work without properly recording their time.
- Managers or supervisors (hourly or salaried) who request, require or permit hourly associates to work off the clock, make inappropriate or improper time adjustments, or who fail to take appropriate corrective action when they know an associate performs work without being paid.

## Reporting violations

### Reporting violations – Walmart, Sam's Club and Home Office

It is mandatory that management associates report using the Wage and Hour form in the ServiceNow portal:

- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Consistent with the Reporting Government Agency Regulatory Contact (OP-35) policy you must report anytime a governmental agency contacts the facility or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact.
- All off the clock occurrences that are (a) brought to the attention of a salaried member of management (b) not corrected and paid within the pay period in which they occurred or (c) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

**PAGE 126**

**Wage and Hour**

The Wage and Hour Advisor will assist the facility management team in conducting a thorough investigation, notifying the appropriate levels of management and achieving an appropriate resolution. In some jurisdictions, applicable laws may not permit you to proceed with all steps of an investigation. The Wage and Hour Advisor assigned to the investigation may partner with Legal to determine how best to handle the investigation. The investigation may include:

- Determining if the associate worked off the clock and why;
- Learning from the associate the amount of time they worked off the clock and/or
- Making an individualized determination of the amount of pay owed to the associate by speaking with their immediate supervisor, consulting time records and evaluating the reliability of the associate's claim.

Upon the conclusion of the investigation and consistent with applicable law, the Wage and Hour Advisor will ensure that appropriate steps are taken to:

- Prepare the appropriate form for the associate's signature, documenting the time they worked off the clock;
- Pay the associate for all time worked off the clock, including overtime, if appropriate and
- Administer disciplinary action as appropriate and consistent with the Disciplinary Action Policy, up to and including termination.

### Reporting violations – Field Supply chain

Field Supply Chain managers should follow this alternative process.

It is mandatory that Supply Chain People Partners report the following to the Divisional People Partner Manager immediately:

- All notices of state or federal Department of Labor Wage and Hour investigations or audits.
  - Additionally, the online compliance form on the OneWalmartmust be completed anytime a governmental agency contacts the store or contact is made with an agency. This contact may occur verbally, face to face, via telephone, or in writing. Contact with a governmental agency must be reported online within 24 hours of the initial contact
- All off the clock occurrences that are (a) not corrected and paid within the pay period in which they occurred or (b) not keyed within the week the time adjustment was submitted.
- All off the clock occurrences that are investigated and resolved but discrepancies still exist.

Routine time adjustments for missed punches and income replacement benefits such as PTO are not required to be reported.

The facility HRM or HRBP/HROM/TM will conduct the investigation and assure that:

- A Time Adjustment Form is completed for the associate to sign if it is determined that work off the clock did occur;
- The associate receives pay for any time worked off the clock, including overtime, if appropriate; and
- If appropriate, disciplinary action is administered, up to and including termination of employment.

# Support pay

### Disaster and facility status determination

- If a situation affects the operation of a facility, divisional representatives will determine if the situation is a qualifying event.
- If you need assistance to determine the need for a facility status change, contact your Market Manager (Walmart/Sam's Club), Divisional Vice President/Regional Vice President (Field Supply Chain), or People Partner(Home Office).
- The Market Manager or Divisional Vice President/Regional Vice President will determine whether a field facility's status is Open or Closed and is responsible for reporting all changes in a facility's status. An Executive Committee Member will determine whether a Home Office facility's status is Open or Closed, and Global Communications is responsible for reporting all changes in a Home Office facility's status.

### Facility statuses

- **Open** - A facility that is operational for associates and the public, if applicable (full or limited).
- **Closed** - A facility that is non-operational. Closed to associates and the public.

### Providing associates with support pay

- A salaried member of management (People Partner/HR Manager/HR Office Manager/Training Manager for Supply Chain) from the associate's home facility must calculate the appropriate number of support pay hours, based on the associates schedule for each day closed, as described in the Support Pay Chart. Hours should be entered as non-work hours by selecting Disaster Pay as the adjustment type in the Time and Attendance system. If you cannot access the Time and Attendance system, contact your People Partner.

### Supporting associates during a disaster

Associates affected by a disaster have the opportunity to work in a host facility following the first 72-hour period in which their home facility is closed. All associates who would like to work in a host facility are responsible for contacting a salaried member of management at their home facility.

CONFIDENTIAL

WMSANCHEZ0000213

If the associate works in a host facility that is not located in the same state as the home facility, the associate is required to complete any applicable state tax withholding forms so that state taxes will be withheld correctly and the associate will be responsible for filing taxes in the host facility state.

The associate may work at the host facility up to a maximum of six weeks from the time their home facility closes due to a disaster. Regardless of the position and job responsibilities the associate has in the host facility, the associate will maintain their home facility pay rate.

If an associate is unable to return to their home facility or the home facility is not in Open status at the end of the six weeks from the time the associate's home facility closes, you should assist the associate to 1) apply for a leave or 2) complete a transfer request.

Exceptions to extend the six weeks may only be authorized by the applicable People Partner for the appropriate division. If the extension of the six-week time frame is approved, the associate will continue to receive their home facility pay rate for the length of the extension.

### Open status

When a facility's status changes to Open, the Market Manager and People Lead/Market People Partner (Walmart/Sam's Club) or Divisional/Regional Vice President and Divisional Human Resources Manager (Field Supply Chain) will define the specified time for a field associate to return to their home facility. The Home Office People Partner will define the specified time for a Home Office associate to report to their home facility.
Associates will be notified of the facility's Open status through the Associate Emergency Information Line (800) 236-2875 or other communication channels (e.g., WalmartOne.com, e-mail, etc.).

### Incentive

For associates who work in a host facility, any incentives will be pro-rated based on the time s/he works in the host facility and the time they work in their home facility.

### Associate in Critical Need Trust (ACNT)

Associates who are experiencing economic hardships may be eligible for assistance through the Associate in Critical Need Trust. It is your responsibility, as the home or host Facility Manager, to make the associate aware of this benefit.

In the event an associate needs evacuation assistance, refer to the company's Evacuation Assistance Program.

## Resources

Travels Expense Vouchers

## Stores and Clubs ONLY:
Hours/Pay Adjustment/Prizes and Awards Form

## Field Supply Chain:
Field Supply Chain DC/TO Hours/Pay Adjustment/ Prizes or Awards Form

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

## Last modified: May 3, 2023

**PAGE 128**

CONFIDENTIAL                                                                                        WMSANCHEZ0000214

# EXHIBIT 4

Edit Timesheet (ETA) – Job Aid



WM-MARTINEZ0000367

Edit Timesheet (ETA) – Job Aid



WM-MARTINEZ0000368

Edit Timesheet – Job Aid



WM-MARTINEZ0000369

Edit Timesheet (ETA) – Job Aid



## Edit Existing Punches

- o  Select or click on the punch to be edited
- o  Enter the correct punch time
- o  Select the Type from the drop-down menu (ON, MEAL or OFF)
- o  Select Submit
- o  To remove or delete an existing punch, select the Trash Can icon and then select Submit

## Add Missing Punches

- o  Select or click the Add icon (+) for the date with the missing punch
- o  Enter the missing punch time in the Time window
- o  Select the Type from the drop-down menu, then select Add
- o  When all missing punches are added select Submit

**Note:  All hours entered in Edit Timesheet (ETA) must be entered in Military time, use the chart below to convert hours, minutes are the same 00 to 59.**

### Hours (Military = AM/PM)

| | | | |
|---|---|---|---|
| 1:00 = 1am | 7:00 = 7am | 13:00 = 1pm | 19:00 = 7pm |
| 2:00 = 2am | 8:00 = 8am | 14:00 = 2pm | 20:00 = 8pm |
| 3:00 = 3am | 9:00 = 9am | 15:00 = 3pm | 21:00 = 9pm |
| 4:00 = 4am | 10:00 = 10am | 16:00 = 4pm | 22:00 = 10pm |
| 5:00 = 5am | 11:00 = 11am | 17:00 = 5pm | 23:00 = 11pm |
| 6:00 = 6am | 12:00 = 12pm | 18:00 = 6pm | 24:00 = 12am |

WM-MARTINEZ0000370



WM-MARTINEZ0000371

Edit Timesheet – Job Aid



## Estimated Punches and Centralized Clocking

o  Before Centralized Clocking, GTA Timesheet did not display punch activity until the entire set of punches was completed for the day.  Only then would all punch activity display in Timesheet.

o  Centralized Clocking places punch activity directly into GTA Timesheet at the time the punches occur.

o  Estimated punches are also generated at the time corresponding punches are displayed in Timesheet.  The punches are based on either the associates scheduled hours or average hours worked.

- **Clock In** punches will have an estimated Clock Out punch displayed
- **Meal Start** punches will have an estimated Meal End punch displayed

WM-MARTINEZ0000372

Edit Timesheet (ETA) – Job Aid



CONFIDENTIAL                                    WM-MARTINEZ0000373



CONFIDENTIAL                                    WM-MARTINEZ0000374



Edit Timesheet – Job Aid

## Timesheet Review

- The Work Details window opens when the Day/Date link is selected
- View additional Timesheets by using the paging arrows

*Note: The Timesheet displays a 7-day period, defaulting to week 1 of the 2-week pay period. Use the paging arrow to navigate from week 1 to week 2.*

- Select Punches from View drop-down menu to open the Clocks Applied window
- Now displayed are the punch log details of Clock Time, Type and Reader

CONFIDENTIAL                                                        WM-MARTINEZ0000375

Edit Timesheet (ETA) – Job Aid





CONFIDENTIAL                                                        WM-MARTINEZ0000377

Edit Timesheet – Job Aid

## Estimated Punches and Centralized Clocking

o   Before Centralized Clocking, GTA Timesheet did not display punch activity until the entire set of punches was completed for the day.  Only then would all punch activity display in Timesheet.

o   Centralized Clocking places punch activity directly into GTA Timesheet at the time the punches occur.

o   Estimated punches are also generated at the time corresponding punches are displayed in Timesheet.  The punches are based on either the associates scheduled hours or average hours worked.

   ▪   **Clock In** punches will have an estimated Clock Out punch displayed
   ▪   **Meal Start** punches will have an estimated Meal End punch displayed



Estimated Punch Summary will display any punches that are currently estimated on the Timesheet.

In this example the Meal End and Clock Out punches are both estimated.

## PAGE 141

CONFIDENTIAL                                                    WM-MARTINEZ0000378



CONFIDENTIAL                                              WM-MARTINEZ0000379



CONFIDENTIAL                                                                 WM-MARTINEZ0000380

Edit Timesheet 3372 – Job Aid



CONFIDENTIAL                                                WM-MARTINEZ0000381

Edit Timesheet (ETA) – Job Aid



CONFIDENTIAL                                                        WM-MARTINEZ0000382

Edit Time Sheet – Job Aid



CONFIDENTIAL                                        WM-MARTINEZ0000383

## Estimated Punches and Centralized Clocking

o  Before Centralized Clocking, GTA Timesheet did not display punch activity until the entire set of punches was completed for the day. Only then would all punch activity display in Timesheet.

o  Centralized Clocking places punch activity directly into GTA Timesheet at the time the punches occur.

o  Estimated punches are also generated at the time corresponding punches are displayed in Timesheet. The punches are based on either the associates scheduled hours or average hours worked.

▪  **Clock In** punches will have an estimated Clock Out punch displayed

▪  **Meal Start** punches will have an estimated Meal End punch displayed



CONFIDENTIAL                                                      WM-MARTINEZ0000384

# EXHIBIT 5

# UNDER SEAL

# REDACTED

# DOCUMENT

REDACTED

**PAGE 149**

REDACTED

**PAGE 150**

# EXHIBIT 6

# UNDER SEAL

# REDACTED

# DOCUMENT

REDACTED

**PAGE 152**

REDACTED

**PAGE 153**

REDACTED

**PAGE 154**

REDACTED

**PAGE 155**

REDACTED

**PAGE 156**

REDACTED

**PAGE 157**

REDACTED

**PAGE 158**

REDACTED

**PAGE 159**

REDACTED

**PAGE 160**

REDACTED

**PAGE 161**

REDACTED

**PAGE 162**

REDACTED

**PAGE 163**

REDACTED

**PAGE 164**

REDACTED

PAGE 165

REDACTED

PAGE 166

REDACTED

PAGE 167

REDACTED

**PAGE 168**

REDACTED

PAGE 169

REDACTED

**PAGE 170**

REDACTED

**PAGE 171**

REDACTED

**PAGE 172**

REDACTED

**PAGE 173**

**REDACTED**

**PAGE 174**

REDACTED

Case 2:21-cv-05122-SVW-JC    Document 96    Filed 01/03/24    Page 175 of 890    Page ID #:3403

**PAGE 175**

REDACTED

**PAGE 176**

REDACTED

**PAGE 177**

REDACTED

PAGE 178

REDACTED

**PAGE 179**

REDACTED

**PAGE 180**

REDACTED

**PAGE 181**

REDACTED

**PAGE 182**

REDACTED

**PAGE 183**

REDACTED

**PAGE 184**

REDACTED

**PAGE 185**

REDACTED

**PAGE 186**

REDACTED

**PAGE 187**

REDACTED

**PAGE 188**

REDACTED

**PAGE 189**

REDACTED

**PAGE 190**

REDACTED

**PAGE 191**

REDACTED

**PAGE 192**

REDACTED

**PAGE 193**

REDACTED

**PAGE 194**

REDACTED

**PAGE 195**

REDACTED

**PAGE 196**

REDACTED

**PAGE 197**

REDACTED

**PAGE 198**

REDACTED

**PAGE 199**

**PAGE 200**

**PAGE 201**

**PAGE 202**

**PAGE 203**

REDACTED

PAGE 204

REDACTED

**PAGE 205**

REDACTED

PAGE 206

REDACTED

PAGE 207

# EXHIBIT 7

# UNDER SEAL

# REDACTED

# DOCUMENT

REDACTED

PAGE 209

REDACTED

**PAGE 210**

REDACTED

**PAGE 211**

REDACTED

**PAGE 212**

REDACTED

**PAGE 213**

REDACTED

**PAGE 214**

REDACTED

**PAGE 215**

REDACTED

PAGE 216

REDACTED

**PAGE 217**

REDACTED

PAGE 218

REDACTED

**PAGE 219**

PAGE 220

# EXHIBIT 8

# UNDER SEAL

# REDACTED

# DOCUMENT

PAGE 221

**PAGE 222**

REDACTED

**PAGE 223**

REDACTED

**PAGE 224**

REDACTED

**PAGE 225**

# EXHIBIT 9

# UNDER SEAL

# REDACTED

# DOCUMENT

REDACTED

**PAGE 227**

REDACTED

**PAGE 228**

REDACTED

**PAGE 229**

REDACTED

**PAGE 230**

PAGE 231

REDACTED

**PAGE 232**

REDACTED

PAGE 233

REDACTED

**PAGE 234**

REDACTED

**PAGE 235**

REDACTED

**PAGE 236**

REDACTED

PAGE 237

Case 2:21-cv-05122-SVW-JC    Document 96    Filed 01/03/24    Page 237 of 890    Page
ID #:3465

REDACTED

**PAGE 238**

# EXHIBIT 10

# UNDER SEAL

# REDACTED

# DOCUMENT

REDACTED

**PAGE 240**

REDACTED

PAGE 241

REDACTED

PAGE 242

# EXHIBIT 11

**PAGE 243**

Paloma P. Peracchio CA Bar No. 259034
paloma.peracchio@ogletree.com
Carmen M. Aguado CA Bar No. 291941
carmen.aguado@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

Mitchell A. Wrosch CA Bar No. 262230
mitchell.wrosch@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA  92626
Telephone:  714-800-7900
Facsimile:   714-754-1298

Attorneys for Defendant
Sam's West, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>            Defendant. | Case No. 2:21-cv-05122-SVW-JC<br><br>**DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSES TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES**<br><br>Complaint Filed:  June 23, 2021<br>Trial Date:          None Set<br>District Judge:     Hon. Stephen V. Wilson<br>Magistrate Judge: Hon. Jacqueline Chooljian |

Sanchez - Third
Supplemental

Case No. 2:21-cv-05122-SVW-JC
DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSE TO
PAGE 244 PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES

Accordingly, Plaintiff shall not construe Defendant's response or objection to any Interrogatory as Defendant's admission that it accepts or admits the existence of any facts assumed by the Interrogatory, and Plaintiff shall not construe Defendant's response or objection as admissible evidence of any such assumed facts.

## II.

## INTERROGATORIES AND RESPONSES

**INTERROGATORY NO. 1:**

IDENTIFY each and every PUTATIVE CLASS MEMBER.

**RESPONSE TO INTERROGATORY NO. 1:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it violates the privacy rights of uninvolved third parties; (3) it is not proportional to the needs of the case because Plaintiff's putative class has not been certified; (4) it is premature because the parties have not yet agreed on the scope of pre-certification discovery.

Subject to and without waiving the foregoing objection, Sam's Club responds as follows: Sam's Club will provide contact information for a sample of putative class members, subject to an opt-out notice to protect the privacy rights of third parties. Sam's Club is willing to meet and confer with Plaintiff to determine an appropriate sample of putative class members' contact information.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-

year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it violates the privacy rights of uninvolved third parties; (3) it is not proportional to the needs of the case because Plaintiff's putative class has not been certified; (4) it is premature because the parties have not yet agreed on the scope of pre-certification discovery; (5) it is unduly burdensome because the putative class in this case consists only of hourly associates who worked one or more closing shifts during the covered period, and to determine the identity of each putative class member would require Sam's Club to assess each associate's time records to determine if he/she ever worked a closing shift over a four year period.

Subject to and without waiving the foregoing objection, Sam's Club responds as follows: Sam's Club provided a 33% sample of contact information pertaining to all hourly associates in the State of California during the covered period, subject to a *Belaire West* privacy/opt-out notices.

**FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it violates the privacy rights of uninvolved third parties; (3) it is not proportional to the needs of the case because Plaintiff's putative class has not been certified; (4) it is premature because the parties have not yet agreed on the scope of pre-certification discovery; (5) it is unduly burdensome because the putative class in this case consists only of hourly associates who worked one or more closing shifts during the covered period, and to determine the identity of each putative class member would require Sam's Club to assess each associate's time records to determine if he/she ever worked a closing shift over a four year period.

Sanchez - Third Supplemental

Subject to and without waiving the foregoing objection, and pursuant to the Order Submitting, Vacating Hearing On And Granting Plaintiff's Motion Re Discovery Dispute (ECF No. 70), Sam's Club responds as follows: Sam's Club will produce the first and last name, and last known contact information (home address and telephone number) for all hourly associates who were employed at Sam's Club in California at any time between June 23, 2017 and the present and who, during that period, worked 20 or more "closing shifts" (defined as a shift in which the associate's punches reflect that they clocked out for the day at any time between 10:00 p.m. and 6:00 a.m.), subject to protective order.

**INTERROGATORY NO. 2:**

State the total number of PUTATIVE CLASS MEMBERS.

**RESPONSE TO INTERROGATORY NO. 2:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it is premature because the parties have not yet agreed on the scope of pre-certification discovery.

Subject to and without waiving the foregoing objections, Sam's Club responds as follows: Sam's Club has employed approximately 16,740 non-exempt, hourly associates in California from June 23, 2018 to October 22, 2021. The putative class would be an unknown subset of this number.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss

Sanchez - Third Supplemental

4    Case No. 2:21-cv-05122-SVW-JC

PAGE 247    DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES

Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it is premature because the parties have not yet agreed on the scope of pre-certification discovery; (3) it is unduly burdensome because the putative class consists only of hourly associates who worked one or more closing shifts during the covered period, and to determine this precise number would require Sam's Club to assess each associate's time records to ascertain whether he/she ever worked a closing shift during a four year period.

Subject to these objections, Sam's Club responds as follows: The number of putative class members in this action is not known.

**FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and the court granted the motion as to Plaintiff's claim for restitution under the UCL and so the three year statute of limitations applies to Plaintiff's claims for unpaid wages; (2) it is premature because the parties have not yet agreed on the scope of pre-certification discovery; (3) it is unduly burdensome because Plaintiff defines the putative class as hourly associates who worked one or more closing shifts during the covered period, and to determine this precise number would require Sam's Club to assess each associate's time records and the operating hours of the club where the associate worked at the time and on a given day to ascertain whether he/she ever worked a closing shift during a period of over four years; (4) the term "PUTATIVE CLASS MEMBER" as defined is not proportional to the needs of the case and overbroad as it includes hourly associates who worked closing shifts, regardless of whether they were required to wait to be let out of the club after clocking out.

Sanchez - Third Supplemental

5    Case No. 2:21-cv-05122-SVW-JC

PAGE 248    DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES

Subject to these objections, and subject to the parties' agreement that a "closing shift" is defined as a shift where the associate clocked out after 9:00 p.m., Sam's Club responds as follows: There are approximately 15,954 hourly, non-exempt associates who worked at least one "closing shift" between June 23, 2018 and February 1, 2023.

**INTERROGATORY NO. 3**

State the total number of PUTATIVE CLASS MEMBERS who no longer work for YOU.

**RESPONSE TO INTERROGATORY NO. 3:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be dismissed; (2) it is premature because the parties have not yet agreed on the scope of pre-certification discovery; (3) the term "YOU" as defined is not proportional to the needs of the case and overbroad as it includes alleged contractors, employees, and other undefined "representatives" of Sam's Club.

Subject to and without waiving the foregoing objections, approximately 10,958 non-exempt, hourly Sam's Club associates in California have stopped working for Sam's Club between June 23, 2018 and October 22, 2021. The putative class would be an unknown subset of this number.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is overbroad as to time and not proportional to the needs of the case because it seeks documents outside of the statute of limitations. Sam's Club has moved to dismiss Plaintiff's claim for restitution and injunctive relief under the UCL, which has a four-year statute of limitations, and Sam's Club anticipates that the UCL claim will be

Sanchez - Third Supplemental

**PROOF OF SERVICE**
*Carlos Sanchez v. Sam's West, Inc. dba Sam's Club, et al.*
**Case No. 2:21-cv-05122-SVW-JC**

I am and was at all times herein mentioned over the age of 18 years and not a party to the action in which this service is made. At all times herein mentioned I have been employed in the County of Los Angeles, in the office of a member of the bar of this court at whose direction the service was made. My business address is 400 South Hope Street, Suite 1200, Los Angeles, CA 90071, and my electronic service address is chere.castille@ogletree.com

On **August 9, 2023**, I served the following document(s):

**DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSES TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES**

by placing ☐ (the original) ☒ (a true copy thereof) in an email addressed as stated on the attached service list.

☒     **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the person(s) at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒     **(Federal)**    I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **August 9, 2023**, at Los Angeles, California.

CHEREE L. CASTILLE            */s/ Cheree L. Castille*

Type or Print Name            Signature

Sanchez - Third Supplemental

Case No. 2:21-cv-05122-SVW-JC
DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES

## **SERVICE LIST**

Marcus J. Bradley, Esq.
Kiley L. Grombacher, Esq.
Lirit A. King, Esq.
Leslie H. Joyner, Esq.
BRADLEY/GROMBACHER, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA  91361

*Attorneys for Plaintiff*,
CARLOS SANCHEZ individually and on behalf of all others similarly situated
Telephone:      805-270-7100
Facsimile:      805-270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
lking@bradleygrombacher.com
ljoyner@bradleygrombacher.com
mvalle@bradleygrombacher.com
SBoucher@bradleygrombacher.com
emaclean@bradleygrombacher.com
csmith@bradleygrombacher.com

Sahag Majarian, II, Esq.
MAJARIAN LAW GROUP APC
18250 Ventura Boulevard
Tarzana, CA  91356

*Attorneys for Plaintiff*,
CARLOS SANCHEZ individually and on behalf of all others similarly situated
Telephone:      818-609-0807
Facsimile:      818-609-0892
sahagii@aol.com

Sanchez - Third
Supplemental

Case No. 2:21-cv-05122-SVW-JC
DEFENDANT SAM'S WEST, INC.'S THIRD SUPPLEMENTAL RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S FIRST SET OF INTERROGATORIES
57551612.v1-OGLETREE

# EXHIBIT 12

**PAGE 252**

PALOMA P. PERACCHIO, CA Bar No. 259034
paloma.peracchio@ogletree.com
CARMEN M. AGUADO, CA Bar No. 291941
carmen.aguado@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

MITCHELL A. WROSCH, CA Bar No. 262230
mitchell.wrosch@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA  92626
Telephone:  714-800-7900
Facsimile:   714-754-1298

Attorneys for Defendant
SAM'S WEST, INC. DBA SAM'S CLUB

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>        Defendant. | Case No. 2:21-cv-05122-SVW-JC<br><br>**DEFENDANT SAM'S WEST, INC.'S RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S INTERROGATORIES (SET THREE)**<br><br>Complaint Filed:  June 23, 2021<br>Trial Date:         None Set<br>District Judge:    Hon. Stephen V. Wilson<br>Magistrate Judge: Hon. Jacqueline Chooljian |

Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC. DBA SAM'S CLUB'S
RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S INTERROGATORIES (SET THREE)

off duty. For the purpose of this interrogatory, the phrases "front door/exterior access doors," "signed in and out daily," "accounted at the end of the business day by a salaried member of management," "remain in the possession," and "when off duty" are defined consistent with YOUR Key and Door Control Policy. WMSANCHEZ112-158.

**RESPONSE TO INTERROGATORY NO. 21:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is vague, ambiguous, and overbroad as to the term "issued"; (2) it is unduly burdensome; (3) it violates the privacy rights of uninvolved third parties; (4) it calls for speculation; (5) it assumes facts not in evidence; (6) it is unintelligible and/or incomprehensible.

Subject to and without waiving the foregoing objections, and subject to Sam's Club's understanding of the vague and ambiguous language in this Interrogatory, Sam's Club responds as follows: Club Managers in California may select up to four Team Leads to carry and utilize facility keys for the entirety of their shift, to be kept in their possession and not checked back in at the end of their shift.

**INTERROGATORY NO. 22:**

IDENTIFY each and every PUTATIVE CLASS MEMBER who has submitted one or more-time adjustments for unpaid time spent waiting to be released from a retail club location in California at the end of a closing shift during the RELEVANT TIME PERIOD.

**RESPONSE TO INTERROGATORY NO. 22:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is vague, ambiguous, and overbroad as to the terms "submitted"; (2) it is unduly burdensome; (3) it violates the privacy rights of uninvolved third parties; (4) it is overbroad as to scope; (5) it is harassing; and (6) it calls for speculation.

Subject to and without waiving the foregoing objections, and subject to Sam's Club's understanding of the vague and ambiguous language in this Interrogatory, Sam's Club responds as follows: instances of time adjustments submitted by

4      Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC. DBA SAM'S CLUB'S
RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S INTERROGATORIES (SET THREE)

PUTATIVE CLASS MEMBERS for "unpaid time spent waiting to be released from the retail club location at the end of closing shifts[,]" is not subject to identification because data would not reflect whether a time adjustment was submitted for this reason. The only way to identify these PUTATIVE CLASS MEMBERS would be to make an individualized inquiry into the circumstances surrounding each time adjustment to an "out" punch that was submitted during the relevant period.

**INTERROGATORY NO. 23:**

For each PUTATIVE CLASS MEMBER identified in response to Interrogatory No. 22 state the date(s) on which the time adjustment was requested, the reason code provided and the basis of your belief that the adjustment relates to unpaid time spent waiting to be released from the retail club location at the end of closing shifts.

**RESPONSE TO INTERROGATORY NO. 23:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is vague, ambiguous, and overbroad as to the terms "submitted"; (2) it is unduly burdensome; (3) it violates the privacy rights of uninvolved third parties; (4) it is overbroad as to scope; (5) it is harassing; (6) it calls for speculation; (7) it is not full and complete in and of itself; and (8) it is compound.

Subject to and without waiving the foregoing objections, and subject to Sam's Club's understanding of the vague and ambiguous language in this Interrogatory, Sam's Club responds as follows: Sam's Club is unable to respond to this interrogatory as it did not identify any PUTATIVE CLASS MEMBERS in response to Interrogatory No. 22.

**INTERROGATORY NO. 24:**

DESCRIBE in detail all methods and/or procedures by which a PUTATIVE CLASS MEMBER can submit a time adjustment to record time spent off-the-clock

waiting to be released from YOUR retail club locations at the end of closing shifts during RELEVANT TIME PERIOD.

**RESPONSE TO INTERROGATORY NO. 24:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is vague, ambiguous, and overbroad as to the terms "methods, procedures, and/or systems" and "record"; (2) it is unduly burdensome; and (3) it calls for speculation.

Subject to and without waiving the foregoing objections, and subject to Sam's Club's understanding of the vague and ambiguous language in this Interrogatory, Sam's Club responds as follows:   Sam's Club expects associates to submit a time adjustment to account for any time spent off-the-clock waiting to be released from the club after closing and/or inform a member of management and request a time adjustment be submitted to account for any such time. Associates may adjust their own time punches using the GTA Portal, located on the time clock, or on WalmartOne which is accessible on computer terminals located in Sam's Club locations. Sam's Club also will produce in connection with these responses a document entitled "Edit Timesheet (ETA) – Job Aid," which it incorporates into this response pursuant to Federal Rules of Civil Procedure, Rule 33(d).

**INTERROGATORY NO. 25:**

IDENTIFY all PUTATIVE CLASS MEMBERS who YOU have COMMUNICATED with concerning any of the allegations in the operative Complaint.

**RESPONSE TO INTERROGATORY NO. 25:**

Sam's Club objects to this Interrogatory on the following grounds: (1) it is vague, ambiguous, and overbroad as to the terms "concerning any" and "allegations"; (2) it is unduly burdensome; (3) it calls for speculation; (4) it violates the attorney-client and attorney work product privileges; (5) it violates the privacy rights of uninvolved third parties; (6) it is unduly burdensome because it would require Sam's Club to investigate

## CERTIFICATE OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California; I am over the age of 18 years and not a party to this action.  My business address is 400 South Hope Street, Suite 1200, Los Angeles, California 90071.

On **November 22, 2023**, I served the following document(s) described as:

**DEFENDANT SAM'S WEST, INC.'S RESPONSE TO PLAINTIFF CARLOS SANCHEZ'S INTERROGATORIES (SET THREE)**

on the persons below as follows:

Marcus J. Bradley, Esq.
Kiley L. Grombacher, Esq.
Lirit A. King, Esq.
Leslie H. Joyner, Esq.
BRADLEY/GROMBACHER, LLP
31365 Oak Crest Drive, Suite 240
Westlake Village, CA  91361

**Attorneys for Plaintiff**
CARLOS SANCHEZ
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
Email:mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
lking@bradleygrombacher.com
ljoyner@bradleygrombacher.com

Sahag Majarian, II, Esq.
MAJARIAN LAW GROUP APC
18250 Ventura Boulevard
Tarzana, CA  91356

Attorneys for Plaintiff
CARLOS SANCHEZ
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
Email:        sahagii@aol.com

☒    **BY ELECTRONIC TRANSMISSION:** I caused the documents to be sent to the persons at the e-mail addresses listed on the attached service list I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful

I am employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Los Angeles, California.

☒    **(Federal)**    I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **November 22, 2023**, at Los Angeles, California.

CHEREE L. CASTILLE                              */s/ Cheree L. Castille*

Type or Print Name                                  Signature

1

CERTIFICATE OF SERVICE

# EXHIBIT 13

**PAGE 258**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually )
and on behalf of other )
individuals similarly )
situated, ) Case No. 2:21-CV-05122-SVW-JC
)
                Plaintiff, )
)
vs. )
)
SAM'S WEST, INC., dba SAM'S )
CLUB, an Arkansas )
corporation, )
)
              Defendant. )
_____)

REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF SAM'S WEST, INC.

ROBERT FRANCIS

March 1, 2022

Reported by: Vanessa S. Gosney, CSR, RPR

Page 1

REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF SAM'S WEST, INC.

BE IT REMEMBERED that the remote videotaped deposition of ROBERT FRANCIS, 30(b)(6) designee for SAM'S WEST, INC. was taken via videoconference by the Plaintiff before Veritext Legal Solutions, Vanessa S. Gosney, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Tuesday, the 1st day of March, 2022, commencing at the hour of 10:01 a.m. Pacific Daylight Time in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff:   BRADLEY/GROMBACHER, LLP
                     By:  Kiley L. Grombacher, Esq.
                          Lirit A. King, Esq.
                     31365 Oak Crest Drive, Suite 240
                     Westlake Village, California  91361
                     Telephone:  (805) 270-7100
                     Facsimile:  (805) 270-7589
                     kgrombacher@bradleygrombacher.com
                     lking@bradleygrombacher.com

For the Defendant:   OGLETREE, DEAKINS, NASH,
                     SMOAK & STWEARD, P.C.
                     By:  Paloma P. Peracchio, Esq.
                     400 South Hope Street, Suite 1200
                     Los Angeles, California  90071
                     Telephone:  (213) 239-9800
                     Facsimile:  (213) 239-9045
                     paloma.peracchio@ogletree.com

Videographer:   Dan DeFrank

Also Present:   Jennifer Bechet

Page 2

employment at Sam's Club?

A.   For the ones I have personally visited, Fresno, Corona, Marietta, San Diego, Riverside, Keno, Ontario, Sacramento, Torrance, and I want to say Long Beach, but I don't remember for sure.

Q.   Fair enough.  There's two Sacramento's listed.

Do you know which or both you have visited?

A.   I would have to look and see.

Q.   Okay.  That's fine.

But you believe it is one or the other, not both?

A.   I believe whenever I went there was only one.  So I would have to verify that.

Q.   Okay.  Well, you've been up and down the state.

So in your experience with the California retail Sam's locations, is it your understanding that associates are expected to enter and exit through the front doors of the facility?

MS. PERACCHIO:  Object that that is vague and outside the scope.

THE WITNESS:  Yes.

Q.   BY MS. GROMBACHER:  For closing shifts

Page 55

are associates required to enter through -- pardon me.  Strike that.

For closing shifts in the State of California, are associates expected and required to exit through the front door of the facility?

A.   Yes.  That is the expectation.

Q.   And then if you look at this little rendering, there is one checkout area, presumably with multiple checkout stands.

Is that generally consistent that there will be a checkout area in the front of the store location?

A.   Yes.

Q.   Is it also in your experience standardized that there would be a restroom facility in the front of the store facility?

A.   Generally, yes.

Q.   Are there additional break areas for associates that have restroom facilities?

MS. PERACCHIO:  Objection.  Vague.

THE WITNESS:  Could you clarify the question?

Q.   BY MS. GROMBACHER:  Sure.  There's a front area with restrooms that are presumably open to the public and perhaps to associates as well.

Page 56

THE WITNESS: Yes. 12:51

Q. BY MS. GROMBACHER: Have you seen any video cameras at the California Sam's locations that you visited? 12:51

A. Yes, I've seen video cameras at those. 12:51

Q. Do you know if every Sam's location has at least one video camera? 12:51

MS. PERACCHIO: Objection. Outside the scope. 12:51

THE WITNESS: Yes. 12:51

Q. BY MS. GROMBACHER: And that was somewhat of a bad question. It was "do you know if." 12:51

So is that a yes, they do, or a yes, I know? 12:51

A. Yes, I know. 12:51

Q. Okay. Yes, you know. 12:51

And is the answer, yes, they do, as well? 12:51

MS. PERACCHIO: Objection. Outside the scope. 12:51

THE WITNESS: Yes, they do. 12:51

Q. BY MS. GROMBACHER: Okay. Do you know if that video camera is located by the front doors of the store? 12:52

Page 68

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  Yes, they normally have a camera at the door.

Q.   BY MS. GROMBACHER:  Okay.  Have you ever reviewed any footage from any video cameras in a Sam's retail location?

A.   Yes, I have.

Q.   On what type of -- under what type of scenario would you review such footage?

A.   Typically in regards to an asset protection situation.  I'll usually partner with the asset protection managers to determine any accountability needed.

Q.   When you've seen those videos, typically what is the view of the camera showing?  Is it just -- can you see people walking in and out of the store?  Is it, you know, positioned so you can see them exiting, that you can see them standing within the store?  What is the view that that captures?

MS. PERACCHIO:  Objection.  Vague as to scope.

THE WITNESS:  It will depend on the camera used.

Page 69

Q.   BY MS. GROMBACHER:  Have you ever seen any footage from any cameras that recorded a store in the state of California?   12:53

A.   Yes.   12:53

Q.   Have you seen footage from any cameras that recorded a store in the state of California in the last four years?   12:53 / 12:54

A.   Yes.   12:54

Q.   Have you seen any cameras with footage from a store in the state of California in the last four years that would show the area -- the interior of the store area by the front doors?   12:54

A.   That's going to be a little speculative on my part because I don't remember the exact situation I had to look at video for.   12:54

Q.   Okay.  Do you know if those cameras run 24 hours?   12:54

MS. PERACCHIO:  Objection.  Outside the scope.   12:54

THE WITNESS:  Yes.   12:54

Q.   BY MS. GROMBACHER:  Would you have any understanding regarding the retention of any video footage from those cameras?   12:54 / 12:55

MS. PERACCHIO:  Objection.  Outside the scope.   12:55

Page 70

So I'm going to let you explain what a night shift is and then I will adopt your rule because I want to be on the same page and use the same terms that you all use, so rather than invent it and do a bad job.

How many shifts does Sam's locations in the state of California generally have in a 24-hour time period?

A. Are you wanting the number of scheduled shifts or are you talking like day shift, evening shift, night shift? What are you referring to?

Q. The latter. So more generalized. Day shift, closing shift, night shift, however you call them.

How many categories of shifts do you have?

A. I would say unofficially, because this is not an official Sam's Club, but unofficially we usually say there's a morning shift, a day shift, evening shift, and then prior to June of 2019 would be -- there would be a night shift.

Q. Okay. Is there no longer a night shift following June of 2019?

A. Generally on a regular basis, no.

Q. Do you know why the elimination of the

Page 78

night shift occurred?

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  In June of 2019 we went to block scheduling, and at that point in time we did get rid of the overnight shifts.

Q.  BY MS. GROMBACHER:  You mentioned that earlier.  And I thought you said block scheduling and I wrote it down and then I have it to go back to.  So you did.

What does that mean, "block scheduling"?

A.  Block scheduling is for our full-time associates.  Full-time associates will be able to select more of set schedule to be able to work either in the mornings or the evenings.  The club manager at the time would go through and talk to each full-time associate and give them options as to what shifts were available and then the associates would be able to select that.  And so at that point in time is when we also disbanded the night crew or night shifts.

Q.  Would the schedule selections, the a.m. or the p.m. that an associate selected, would that be housed in any type of database?

MS. PERACCHIO:  Objection.  Outside the

Page 79

Do you understand?    13:39

A.    Yes, ma'am.    13:39

Q.    I will have you turn to Exhibit Share, and there should be another document in your folder now, Exhibit 5.    13:39

(Deposition Exhibit No. 5 marked.)    13:40

THE WITNESS:  Yes, ma'am.    13:40

Q.    BY MS. GROMBACHER:  It is Bates numbered WMSANCHEZ0000034.    13:40

Do you see that document?    13:40

A.    Which document are you referring to again?  I'm sorry.    13:40

Q.    Exhibit 5, the 2021 pay policy.    13:40

A.    Okay.  Yes.    13:40

Q.    Have you seen this document before?    13:40

A.    Yes, ma'am.    13:40

Q.    Did you review this document to prepare for the deposition today?    13:40

A.    Yes, ma'am.    13:40

Q.    What other documents did you review to prepare for the deposition today?    13:40

A.    There was the opening/closing procedures policy.  The fresh holiday closing procedures document.  An opening and closing procedures document.  And I believe there was one more.  I'd    13:41

Page 88

have to see.    13:41

Q.    Okay.  Well, maybe if I pull it out you'll -- you'll remember.    13:41

Did you have any hand in drafting Exhibit 5?    13:41

A.    Clarify "drafting."    13:41

Q.    Did you write this document?    13:41

A.    By myself and in whole, no, ma'am.    13:41

Q.    Okay.  Did you review any drafts of this document?    13:41

A.    Yes, ma'am.  I was a part of a team that collaborated on updating the language in this policy.    13:41

Q.    To your recollection what updates were made in this January 1st, 2021, document?    13:41

A.    There were too many to be named, honestly.  We did it over a six-week time period taking pieces of a policy each week and looking through the verbiage to make sure that it related to either a Neighborhood Markets, a Sam's Club, Walmart, AC, you know, and tried to get the language all similar so the policy pertained to all formats.    13:42

Q.    And this document, I think is what you were just saying, applies to both Sam's Club and    13:42

Page 89

Walmart and other formats that Sam's operates or is operated by the same companies, correct?

A.   That's correct.

Q.   On the right side it says "State Specific."

What does that indicate?

A.   In those states listed underneath "State Specific," they may have different wording or different pieces of the associate pay policy that pertains specifically to either that state or that locale.

Q.   California is one of the enumerated states specific -- one of the enumerated states under the State Specific heading; is that correct?

A.   That is correct.

Q.   Is there an associate pay policy that has applied in the last four years that is specific to the state of California?

A.   Yes.  This one does.

Q.   This one does.  Okay.

Are there any other documents or have there been any other documents in the last four years that describe associate pay policies vis-à-vis the state of California?

A.   I would have to look at previous pay

Page 90

Veritext Legal Solutions
866 299-5127

is.

THE WITNESS:  Yes, ma'am.

Q.   BY MS. GROMBACHER:  This document has an effective date of January 1, 2021.

How was this document disseminated -- or first, I guess, was this document disseminated to associates in the state of California?

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  Yes, ma'am.  This document would be available to all associates through the company intranet.

Q.   BY MS. GROMBACHER:  Okay.  Do you know if associates receive any type of notification when a new policy or document is uploaded onto the company intranet?

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  I'm not aware that all associates do.  There may be some departments or some groups of associates that may receive notification.

Q.   BY MS. GROMBACHER:  Okay.  So if there's an update to a policy, how are associates at the store level made aware of the new -- the new

Page 93

written policy?

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  It will depend upon the communication.  If there was any communication sent out there may be some communication from the managers to the associates.  But I'm not aware of any electronic communication or anything that would go out to the store facilities.

Q.   BY MS. GROMBACHER:  Okay.  Were you responsible for looking for documents to produce in this litigation?

A.   No, ma'am.

Q.   Do you know who was responsible for pulling documents such as this that were produced in this litigation?

MS. PERACCHIO:  I will object to the extent he implicates any attorney/client privileged information.

Q.   BY MS. GROMBACHER:  I think this question is just do you know?

A.   No, ma'am.

Q.   Okay.  This document in conjunction with a California-specific policy, would that be all of the documents, all of the written policies, that

Page 94

back taking care of closing duties that we have a    13:58

key carrier at the front that would let them out    13:58

the front door, yes.    13:58

Q.    Is the expectation of Sam's that there    13:58

will always be a manager at the front of the store    13:58

during the whole time that associates are closing    13:58

until the last associate leaves the store?    13:58

A.    No.    13:58

Q.    Okay.  Are there times where there is    13:58

neither a key carrier nor a manager at the front of    13:59

the store after the door is locked?    13:59

A.    Could you restate that?    13:59

Q.    Sure.  Once the store is closed to    13:59

customers -- I know you have a name for them but I    13:59

forgot.    13:59

A.    Members.    13:59

Q.    Members, that's it.    13:59

Okay.  Once a store is closed to    13:59

members, the door is locked; is that correct?    13:59

A.    Once they have cleared the building of    13:59

all members, yes, they will typically lock the    13:59

front door.    13:59

Q.    Okay.  And at that time it's the    13:59

expectations that associates will complete their    13:59

closing duties like put backs and zoning?    13:59

Page 101

A.   Good job.  Yes, that is correct.   13:59

Q.   Until they complete all of their   13:59
required tasks; is that correct?   13:59

A.   That is correct.   13:59

Q.   Okay.  And then the expectation is that   13:59
they'll perform all of those closing duties on the   14:00
clock; is that correct?   14:00

A.   That is correct.   14:00

Q.   Okay.  So once they've completed all   14:00
their closing duties, Sam's expectation is that   14:00
they will then notify their manager and clock out;   14:00
is that correct?   14:00

A.   They will notify their manager or   14:00
supervisor, yes.   14:00

Q.   Okay.  Are they instructed to clock out   14:00
immediately upon completion of the duties or clock   14:00
out after they speak with the manager or   14:00
supervisor?   14:00

A.   After they're cleared with the manager   14:00
or supervisor.   14:00

Q.   Okay.  At that time it's the expectation   14:00
that a manager or a supervisor will either walk   14:00
them to the front or be present at the front so   14:00
that they can exit the facility and go home; is   14:00
that correct?   14:00

Page 102

A.   Yes, that's correct.  There is an expectation that a manager or supervisor be at the front doors or within earshot or eye shot of the doors to allow them out.

Q.   Have you ever heard of associates using an intercom to page a manager because he or she wasn't present at the door or within earshot so that he or she could leave?

A.   Have I heard them using an intercom? No, I haven't.

Q.   Okay.  Have you ever heard of them using -- an associate having to utilize a walkie-talkie to reach a manager or supervisor because no one was present at the door or within earshot?

A.   No, ma'am.

Q.   Would it surprise you to hear that an associate had to utilize a walkie-talkie to contact a manager or a supervisor so that he or she could leave the facility?

MS. PERACCHIO:  Objection.  Vague.

THE WITNESS:  Honestly, nothing surprises me now.

Q.   BY MS. GROMBACHER:  Why are associates not permitted to just leave the facility after they

Page 103

shift?

A. Again, that's going to be a club-by-club basis based on the contract with the security company. A lot of times they will be outside the facility driving around or hanging around the parking lot to make sure that it's safe for the associates to go out. There may be some within the facility. We had a lot, especially during COVID, you know, with a lot of that stuff so we did have some inside there. But again, it's going to depend on the club and the contract that we have with that third party.

Q. Okay. Are there instances where associates are required to remain while a manager completes closing duties and walk out with a manager?

A. Not that I'm aware of.

Q. So it's Sam's expectations that there will always be two managers, or a manager and a lead or a key carrier at a closing shift?

A. The expectation is to have multiple key carriers within a closing shift so that way one stays within earshot or eye shot of the front doors, and then the other one can roam around and make sure all of the closing duties are being

Page 107

performed by the various departments.                14:07

Q.   How does Sam's ensure that a key carrier is available and staffed at the closing shifts?

MS. PERACCHIO:   I will object that it's vague.

Q.   BY MS. GROMBACHER:  Do you know of any policy or procedure whereby Sam's can ensure that there are adequate number of managers during closing shifts?

A.   Are you asking about a policy of how many managers are scheduled?

Q.   Any policy whereby Sam's can ensure that there are at least two or more managers on a closing shift, managers including key carriers, somebody who is capable of releasing employees from a store location.

MS. PERACCHIO:   I'm going to object that it's vague.

THE WITNESS:  For that, I mean, schedules are one.  We have typically two managers scheduled on top of at least one team leader, so there could be possibly three key carriers at any one time. But in cases of where associates may call out or something like that, that would still allow for two key carriers.

Page 108

member services; is that right?   14:11

A.   That is correct.   14:11

Q.   Is there anybody who stays for closing   14:12
duties that was assigned to member services once   14:12
members have left the building?   14:12

A.   Yes, ma'am, there may be.   14:12

Q.   Okay.  Would those individuals be   14:12
amongst the first to complete closing duties as   14:12
well?   14:12

A.   They could be, yes.   14:12

Q.   So if a key carrier is towards the front   14:12
but he or she notices that all the associates in   14:12
that area have already completed the closing   14:12
duties, is it the expectation that they will remain   14:12
in the front or that they will go and assist other   14:12
associates or managers with closing duties?   14:12

A.   Most times they would help with other   14:12
areas to finish up their closing duties, such as   14:12
the front end.   14:12

Q.   Okay.  Would the expectation be that   14:12
they are never to leave earshot of the front door?   14:13

A.   Who do you refer to as "they"?   14:13

Q.   Sorry, that's a good question.  I start   14:13
to get so lazy on my questions.   14:13

Is it the expectation that the key   14:13

Page 111

carrier who is assigned to work at the front door   14:13

never leave the area where he or she is within   14:13

earshot of that front door?   14:13

A.   That is correct.   14:13

Q.   Okay.  So if that key carrier has helped   14:13

everybody in the front and they have all left, the   14:13

expectation is that they will remain by the front   14:13

door and not assist other associates or managers   14:13

further back in the store if it would cause them to   14:13

be outside of earshot; is that correct?   14:13

MS. PERACCHIO:  Objection.  Assumes facts.   14:13

THE WITNESS:  That is correct.   14:13

Q.   BY MS. GROMBACHER:  If an associate   14:13

completes his or her duties and can't locate a   14:14

manager and has to wait in the front of the store   14:14

for, let's say, five or ten minutes, is it Sam's   14:14

expectation that he or she should be paid for this   14:14

time or that that waiting should be unpaid time?   14:14

A.   So the expectation is to have the key   14:14

carrier by the door.  If something were to happen   14:14

to where the associate did wait a little bit   14:14

longer, then it is the expectation that the   14:14

associate submits a time adjustment to be paid for   14:14

that time.   14:14

Q.   Okay.  So we've got some class members   14:14

Page 112

MS. PERACCHIO: Objection. Outside the scope.

THE WITNESS: No, ma'am.

Q. BY MS. GROMBACHER: Does it surprise you that you didn't receive even one time adjustment from anybody saying they had to wait even two or three minutes?

MS. PERACCHIO: Objection. Misstates testimony. Assumes facts. And argumentative.

THE WITNESS: Time adjustments normally didn't come to me, so no, ma'am, it doesn't surprise me. I would not have seen time adjustments.

Q. BY MS. GROMBACHER: Okay. That makes sense.

Are you aware of any documents that let associates know that if your key carrier's missing for some reason, we want to pay you for this time, this is compensable time? Are you aware of any policy that would let an associate know that the time spent waiting to be released after they clocked out is compensable time?

A. With that specific verbiage I am not aware of any policy.

Q. Are you aware of any training materials

Page 114

or scripts or information that would be messaged to an associate that would let them know that this is compensable time according to Sam's?

A.    I'm not aware of any material, no, ma'am.

Q.    But if an associate had to wait to be released at the end of the day, Sam's would want to pay that associate for that time; is that correct?

A.    Yes, ma'am.  And if they said something to the manager, the manager would at that time explain the time adjustment.

Q.    Okay.  If -- do you know how the time adjustments -- well, first of all, do you know if -- how does an associate submit a time adjustment?

A.    There are a couple of different ways. First and foremost they can use the time clock.  So when they clock in that next shift they can do a time adjustment if needed, or at any time during their shift they can submit a time adjustment based on using the time clock.

They also can use any computer terminal to log in and submit a time adjustment as well.

Q.    Okay.  If they -- if they submit a time adjustment, is there certain codes that they have

Page 115

to put or do they put an explanation?  How do you know, and "you" being Sam's, how do you know why the adjustment is being made?  Or do you know why the adjustment is being made?

A.   There are notifications sent to the managers to review the time adjustments.  And there is some options available for the associate to select whenever they are completing the time adjustment.

Q.   Do you know if this time spent waiting to be released has an attendant code that an associate could select if they were making a time adjustment?

A.   Not that I'm aware of.

Q.   Does a manager have to approve all associate time adjustments?

A.   No, ma'am.  Any associate time adjustment that is submitted is automatically approved.

Q.   Has the time adjustment system that you just described been the same system in effect in the last four years?

A.   I'm thinking.  Yes.  GTA system has been the same system that we use.

Q.   And what is the name of the system?

Page 116

What was it?

A.    We call it GTA, which is global time and attendance.  I don't know the official name, if there is one, that operations uses.

Q.    Has it always -- has it in the last four years been the case that if a time adjustment is submitted that it's automatically approved?

A.    As far as I'm aware of, yes.

Q.    Is it possible to pull reports from the GTA system to show all time adjustments that are made in a given time period?

MS. PERACCHIO:  Objection.  Outside the scope.

THE WITNESS:  I know we can pull reports, I just don't know how far back we can pull.

Q.    BY MS. GROMBACHER:  Have you ever pulled a report that showed time adjustments?

A.    Yes.

Q.    Is it a difficult, time-consuming task to pull this?

MS. PERACCHIO:  Objection.  Vague.

THE WITNESS:  Can you clarify "difficult" and "time consuming"?

Q.    BY MS. GROMBACHER:  Well, for me, anything with a computer, as witnessed by Exhibit

Page 117

Veritext Legal Solutions
866 299-5127

**PAGE 283**

ma'am. 14:27

Q. Okay. All right. 14:27

This is a document entitled, "Opening 14:27
and Closing Procedures." 14:27

How is this document used at Sam's Club? 14:27

A. This is a generalized document that is 14:27
used for closing down a facility. It looks like 14:27
more for the -- for any time that there is a day 14:27
that we are not going to be opening up the next 14:28
day. So completely closed for a day, these are the 14:28
procedures that we would use to make sure and 14:28
secure the facility. 14:28

Q. Okay. Do you know in the state of 14:28
California whether most Sam's Clubs operate 14:28
seven-days a week? 14:28

A. Yes. They are open seven days a week. 14:28

Q. Okay. So typically this will only 14:28
happen if it's a holiday or something like that, 14:28
that they would be closed a subsequent day; is that 14:28
correct? 14:28

A. Correct. Such as Easter, Thanksgiving, 14:28
Christmas, New Years. 14:28

Q. So this document provides that all doors 14:28
are locked at closing time. 14:29

That is generally correct for any 14:29

Page 121

closing shift; is that -- is that accurate?          14:29

A.    That is correct.          14:29

Q.    Okay.  The next bullet point says, "All          14:29
associates leaving in groups for safety."          14:29

Is it the policy that associates should          14:29
leave in groups during a closing shift?          14:29

A.    Preferably, yes.          14:29

Q.    If associates have to leave in groups,          14:29
wouldn't that necessarily require some associates          14:29
to wait for others before they can leave the          14:29
facility?          14:29

MS. PERACCHIO:  Objection.  Calls for          14:29
speculation.  Assumes facts.          14:29

THE WITNESS:  That is why I say          14:30
"preferably," because if there are instances where          14:30
it is one associate, that's where the manager or          14:30
team leader would walk out with that associate, a          14:30
lot of times to their vehicle, but at least to the          14:30
front of the parking lot to watch that associate          14:30
make it to their car.          14:30

Q.    BY MS. GROMBACHER:  Is it your          14:30
expectation that associates will generally complete          14:30
their closing duties in groups?          14:30

MS. PERACCHIO:  Objection.  Vague.          14:30

THE WITNESS:  Again, it depends on the          14:30

Page 122

it the expectation that that associate is paid for   14:32

all the time that they are present with the closing   14:32

manager while securing the club?   14:32

A.   Generally, it is not an hourly associate   14:32

for that specific reason.  Again, that's the one of   14:32

the two salaried members of management.  But if   14:32

there is an instance where there is one, they would   14:32

stay on the clock until all of the closing   14:32

procedures are done with the exception of setting   14:32

the alarm and walking out.  They would clock out at   14:32

that point in time, go to the alarm panel, set the   14:32

alarm, walk out the back -- walk out the front   14:32

door.   14:32

Q.   Is there an area in the store where the   14:32

alarm is typically located?   14:32

MS. PERACCHIO:  Objection.  Outside the   14:32

scope.   14:32

THE WITNESS:  Generally all alarm panels are   14:32

open -- are right next to the entrance and exit   14:32

doors.  In the instance where they are separated,   14:33

so some clubs will have the entrance and exit right   14:33

next to each other.  In other clubs, such as your   14:33

example earlier on the layout where they are   14:33

separated, they will generally be by the entrance   14:33

door.   14:33

Page 124

MS. GROMBACHER:  Okay.  Let's take another  14:33
break.  I don't think I have -- let's go off the  14:33
record.  14:33

THE VIDEOGRAPHER:  All right.  Going off the  14:33
record.  The time is 1:33.  14:33

(Break taken from 1:33 p.m. to 1:50 p.m.)  14:33

THE VIDEOGRAPHER:  We are back on the  14:50
record.  The time is 1:50.  14:50

Q.   BY MS. GROMBACHER:  I want to circle  14:50
back a little bit to the duties.  I know during a  14:51
closing shift we talked a little bit about  14:51
associates and that will vary by department, but I  14:51
don't have a good listing or idea of what managers  14:51
are tasked with during a closing shift.  14:51

So in the last four years in California,  14:51
what are the duties of a manager who is assigned a  14:51
closing shift?  14:51

MS. PERACCHIO:  Objection.  Outside the  14:51
scope to some degree.  14:51

THE WITNESS:  In general -- again, I'm not  14:51
going to be able to list all of them because,  14:51
honestly, I wouldn't remember all of them.  But a  14:51
lot of it is going to be to make sure and secure  14:51
all of the cash registers and secure the accounting  14:51
office.  14:51

Page 125

And then a lot of it is mainly going around to make sure each department is finishing up their closing duties. For instance, there may be things with jewelry to make sure, you know, it's safe. Making sure the cleaning is happening in the fresh department. A lot of it is going to be going around to make sure everything is taking place.

Also, they would go by and secure all outside doors to make sure that they are locked. For instance, in our receiving areas we're going to have the truck bays that we need to make sure that are locked so obviously that there's no easy way to gain entrance into the facilities. That's, again, generally.

Q. BY MS. GROMBACHER: Is there a document that lists all of the closing duties for a manager at a closing shift that you're aware of?

MS. PERACCHIO: Objections. Outside the scope.

THE WITNESS: That lists every single thing? I would say no.

Q. BY MS. GROMBACHER: Are there any studies done by Sam's to determine how long it takes managers to do all of the duties that they're assigned on a closing shift?

Page 126

help also.  So if somebody is behind, they may help take out the trash.  They may help zone, just depending on what needs to be done.  But, yes, generally that is the case.

Q.  So, you know, if there are multiple departments that are performing closing shifts that all need to be signed off on before those associates can leave, how does Sam's account for the fact that one manager has to remain at the front door or near the front door throughout the duration of all the associates' closing shifts?

MS. PERACCHIO:  Objection.  Misstates testimony and outside the scope.

THE WITNESS:  Typically one of the managers works with the front end.  They will be there with the front end to make sure everything is getting done.  A lot of times there are two member service managers who are in charge of the front end, so one of them may be closing and one of them opening. And so they will stay with those -- that group and then let them out whenever their duties are done.

The other manager will be taking care of, you know, the back half of the club, and so they will have a good grasp on those associates.

Also, managers know when most associates

Page 128

are getting off.  Through block scheduling there's typically only one closing shift for a department, so that may end at 9:00 and that might be for several departments.  And so at 9:00 they know that most of these departments are going to be leaving so they would definitely need to be up at the front doors to allow associates out.

Same thing with the merchandise team. Their closing shift usually is at like 11:30. There is always a manager back there making sure that everything is happening.  And so once all of those duties are done, they will walk up to the front with those associates and let them out the door at that time too.

Q.    BY MS. GROMBACHER:  So managers might be moving around the store, not necessarily stationed exactly at the front or exactly in earshot as long as they know generally when an associate or group of associates should be leaving the store; is that correct?

MS. PERACCHIO:  Objection.  Misstates testimony.

THE WITNESS:  So no.  The expectation is to have that key carrier there at the door or within earshot or eye shot of that door.

Page 129

So if that key carrier is a team lead, then yes, there could be two managers roaming the store. If that key carrier is a manager, one of them stays there. The other manager roams around with the team leader. Again, it depends on how they divvy up the duties for that exit door at that time on that night.

Q. BY MS. GROMBACHER: And when is the expectation that the exterior doors get locked?

A. The exterior doors?

Q. Yeah. Like the loading docks where the trucks would be coming in.

MS. PERACCHIO: Objection. Outside the scope.

THE WITNESS: Once they finish unloading for the night.

Q. BY MS. GROMBACHER: So that could be happening while associates are still in the store performing their closing duties; is that correct?

MS. PERACCHIO: Objection. Outside the scope.

THE WITNESS: That's correct. If the last truck shows up at 10:00 and they unload by 10:30, they could lock all the doors at 10:30.

Q. BY MS. GROMBACHER: So it's possible

Page 130

that if there were two managers in the store, one could be dealing with the loading dock, one could be reviewing associate work toward the back of the store, and there would be no associate or -- or key carrier or manager available to release associates at the front door; is that correct?

MS. PERACCHIO:  Objection.  Misstates testimony and assumes facts.

THE WITNESS:  No.  The expectation is that one manager, or if there is only the two managers, then that manager would stay up close to the front of the facility.  If there is a key carrier that is an hourly team lead, again, they could be the one that would be stationed at the door.

Again, that's the expectation that we have for the management team is to make sure that that door has somebody that can unlock it and allow associates to leave.

Q.   BY MS. GROMBACHER:  To ensure that that can happen, do you schedule closing shifts for managers to provide additional time for them to do some of the duties they might not be able to get to if they have to stay stationed at the front?

MS. PERACCHIO:  Objection.  Assumes facts.

THE WITNESS:  I would have to look and see

Page 131

what the schedules say or what the template has.  I

don't know what the closing shift is for an

assistant manager.  Again, I'd have to speculate on

that.

Q.   BY MS. GROMBACHER:  Would you assume that if there is a -- a department lead who's the second manager that there would be additional time provided so that he or she can complete all the duties they need to do and still remain stationed at the front?

MS. PERACCHIO:  Objection.  Outside the scope and calls for speculation.

THE WITNESS:  I guess I don't quite understand the question.

Q.   BY MS. GROMBACHER:  Would you expect that where there's only two managers, additional time be provided in the schedule for them to complete all the duties they have to do and have one remained stationed at the front?

MS. PERACCHIO:  Objection.  Assumes facts.  Calls for speculation.  Outside the scope.

THE WITNESS:  I would -- I don't know.  I'd have to look at the schedules and see.

Q.   BY MS. GROMBACHER:  If the expectation is that managers remain at or near the front door,

would I be able to see managerial employees on the video footage that Sam's records at the front doors?

MS. PERACCHIO:  Objection.  Outside the scope.  Calls for speculation.  And misstates testimony as well.

THE WITNESS:  It depends on where they're standing as to what the camera shots have and where they're standing.  So it's possible they could or could not be on the video.

Q.   BY MS. GROMBACHER:  And you said that it's your understanding video footage is maintained somewhere between 30 and 60 days; is that correct?

MS. PERACCHIO:  Objection.  Asked and answered.  Outside the scope.

THE WITNESS:  Again, depends on the system.

Q.   BY MS. GROMBACHER:  Okay.  Are you aware of any audits or studies or surveys conducted by Sam's following the filing of this lawsuit about associates having to remain in facilities and wait to be let out?

A.   No, ma'am.  I'm not aware of any.

Q.   Are you aware of any type of investigation or audit conducted by Sam's that relates to any of the claims in the Sanchez

Page 133

REPORTER'S CERTIFICATE

STATE OF IDAHO   )
                 )  ss.
COUNTY OF ADA    )

I, VANESSA S. GOSNEY, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 2nd day of November, 2022.

VANESSA S. GOSNEY
CSR, RPR and Notary
Public in and for the
State of Idaho.

My Commission Expires:  10-29-25

Page 140

Paloma P. Peracchio, Esq.

paloma.peracchio@ogletree.com

March 17, 2022

RE: SANCHEZ vs. SAM'S WEST, INC.

March 1, 2022, ROBERT FRANCIS 30(b)(6), JOB NO. 5091929

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

    a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 141

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 142

# EXHIBIT 14

PAGE 298

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually )
and on behalf of other        )
individuals similarly         )
situated,                     )
                              )
          Plaintiff,          )
                              )Case No.
vs.                           )2:21-CV-05122-SVW-JC
                              )
SAM'S WEST, INC. dba SAM'S    )
CLUB, an Arkansas             )
corporation,                  )
                              )
          Defendant.          )

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF

JOHN RELIGA

(All participants appeared via videoconference.)

DATE:  MARCH 29, 2022

REPORTED BY:  Lori L. Thielmann, RPR, CCR #21-0014

Page 1

A P P E A R A N C E S

(All parties appearing via videoconference.)

FOR PLAINTIFF:

LESLIE JOYNER

Bradley/Grombacher, LLP

31365 Oak Crest Drive

Suite 240

Westlake Village, California 91361

805.270-7100

ljoyner@bradleygrombacher.com

FOR DEFENDANT:

PALOMA P. PERACCHIO

Ogletree, Deakins, Nash, Smoak &
  Steward, PC

400 South Hope Street

Suite 100

Los Angeles, California 90071

213.239.9800

paloma.peracchio@ogletree.com


ALSO PRESENT:   ROEDY WIBOWO, Videographer

JENNIFER BECHET, Walmart Inhouse Counsel

* * * * *

Page 2

then just making sure the club is neat, clean, and straight for the next day.

Q. So when you are the manager on a closing shift, are you generally down in the store or up in your office?

A. Always on the floor, like out on the sales floor.

Q. And that's after the store closes, correct?

A. Generally, yes. There's times after the store closes that I am in my office.

Q. What sort of tasks would be you doing in your office after the store closes?

A. Schedules, writing schedules, planning or covering financials.

(Exhibit 3 was marked.)

BY MS. JOYNER:

Q. Let me try to put another exhibit in here. Okay. Do you see that document? It's titled, Facility Closing/Overnight Procedures Policy (AP-23).

A. Not yet. It booted me out, so I'm signing back in. Now it's saying no account found. Let me try something else.

(Discussion with counsel and the witness regarding technological issues.)

MS. JOYNER: Can we go off the record for a

Page 33

second?    11:07:39

THE VIDEOGRAPHER:  Okay.  Please stand by.    11:07:39
We are going off the record.  The time is 11:07 a.m.    11:07:41

(Off the record from 11:07 a.m. to 11:21 p.m.)    11:07:46

THE VIDEOGRAPHER:  We are back on the    11:20:20
record.  The time is 11:21 a.m.    11:21:17

BY MS. JOYNER:    11:21:22

Q.  Okay.  Were you able to access the document    11:21:23
Facility Closing/Overnight Procedures Policy (AP-23)?    11:21:32

A.  Yes.    11:21:32

Q.  Okay.  So have you seen this document before?    11:21:34

A.  No.    11:21:39

Q.  Do you -- do you have any policies regarding    11:22:04
the practices for store closing?    11:22:19

A.  Yes.    11:22:25

Q.  And what are those policy documents called?    11:22:27

A.  Club closing procedures.  This document looks    11:22:31
like it's from Walmart.    11:22:59

Q.  Does Walmart have separate policies from Sam's    11:23:01
as far as you're aware?    11:23:07

A.  Some policies are the same and some are    11:23:09
specific to Sam's Club and I'm assuming some would be    11:23:15
specific to Walmart.    11:23:19

Q.  Okay.  Well, let's turn to the page marked at    11:23:20
the bottom WMSANCHEZ 32?    11:23:26

Page 34

last inside door once there are no customers/members in the building.

Does that apply at the Torrance store?

A.   Yes.

Q.   And then the next bullet point below that says, Position a salaried member of management, support manager, or responsible associate at the front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.

Does that apply at Torrance as well?

A.   Yes.

Q.   Do you have the authority to deviate from Sam's written policies?

MS. PERACCHIO:   I'm going to object to that as it's a bit vague and ambiguous.

BY MS. JOYNER:

Q.   Do you understand the question?

A.   No.

Q.   If you decided -- could you decide at the Torrance store not to lock the doors at closing even though this policy requires you to?  Would you have to follow this policy?  Do you have the authority to not follow the policy?

A.   I don't really understand the question.

Q.   Could you -- okay.  So let me back up a bit.

Page 37

Veritext Legal Solutions
866 299-5127

So this policy as we just discussed requires you to lock all the doors once there are no more customers or members in the building.  Could you just decide that you weren't going to follow that practice at Torrance or do you have to follow this policy?

A.   Someone could, but that would be a violation of policy.

Q.   Okay.  Who typically locks the last door at the Torrance store after all the customers have left?

A.   Either the closing managers or the closing team lead.

Q.   How does that person know it is their turn to lock the doors or they're the one responsible for locking the doors on a given shift?

A.   The leadership team works together during the closing shift, so they devise a plan on who's responsible for what, which would include the door, like unlocking it and locking it.

Q.   Have you ever locked the door -- been the person to lock the door on closing shift?

A.   Yes.

Q.   So you have keys to the Torrance store, correct?

A.   Yes.

Q.   And do you have any training regarding key

Page 38

before their scheduled shift time when they've completed their work?    11:45:00 11:45:04

A. With leadership approval, yes.    11:45:05

Q. So that means they would go ask a manager if they can clock out early; is that correct?    11:45:10 11:45:18

A. Yes.    11:45:20

Q. Are there video cameras at the Torrance store that capture the exit?    11:45:20 11:45:37

A. Yes.    11:45:39

Q. Have you ever seen the footage from those cameras?    11:45:42 11:45:47

A. Yes.    11:45:48

Q. Can you kind of tell me what you can see when you're looking at the footage?    11:45:48 11:45:52

A. There's a camera that faces the exit door from the parking lot in and then there's a camera that faces -- that's inside the club that you can oversee the second set of exit doors.    11:45:53 11:46:14 11:46:18 11:46:24

Q. So if I was to look at the footage from that video camera, I would see associates just walking out immediately, I wouldn't see anyone waiting around; is that correct?    11:46:27 11:46:33 11:46:39 11:46:43

A. You mean like after we're closed?    11:46:43

Q. Yes, correct, after you're closed.    11:46:58

A. Well, no, because there's a manager and a key    11:47:05

Page 46

carrier that let's the associates out, so.                     11:47:12

Q.   Okay.  So --                                              11:47:14

A.   -- the door.                                              11:47:16

Q.   Okay.  So if I was to see video footage from             11:47:17
the door when the store's closed at Torrance, I would          11:47:22
say someone stationed there at the door with a key             11:47:27
letting associates immediately out of the store?               11:47:31

A.   Yes.                                                      11:47:34

Q.   Okay.  Do you know how long the video footage            11:47:34
from that Torrance store is maintained?                         11:47:41

A.   I think it depends on the camera.  Some video            11:47:43
cameras reset after 24 hours and then other ones, the          11:48:02
DVR saves it for about like 30 days.                           11:48:09

Q.   Do you know if footage is being maintained for          11:48:16
the purpose of this lawsuit of the Torrance store?             11:48:20

A.   I do not know anything about that.                       11:48:24

Q.   Nobody's mentioned that to you?                          11:48:30

A.   No.                                                       11:48:32

Q.   Do you have people onsite who are responsible           11:48:32
for maintaining the footage --                                 11:48:39

A.   No.                                                       11:48:41

Q.   -- or is that -- do you know if it's the same           11:48:49
at other stores:  Oxnard, Santa Clarita?                       11:48:53

A.   Yes, each club has a camera at the exit door.           11:48:57

Q.   And as far as you know, that's being maintained         11:49:03

Page 47

provided to associates?

A. I don't -- it's not provided, but it's accessible to them on the Wire. They can access it.

Q. Okay. So let's see, if you turn to the page -- the very bottom of the page marked WMSANCHEZ 88, prohibition against working off the clock. At the bottom there and then going on to page 89, you'll see there are examples of prohibited off-the-clock work listed.

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. However, it does not appear that time spent waiting to be released from the store at the end of closing shifts is included; is that correct?

A. It doesn't say anything about waiting at the door, but it says if you're performing work, you must keep track of all your time, so that is where like an associate's held up at the door, they would do a time adjustment.

Q. Okay. Are you aware of associates doing time adjustments for time spent waiting at the door to be let out on closing shifts?

A. I don't know of a specific time adjustment for an associate waiting at the exit door, but associates

Page 52

Veritext Legal Solutions
866 299-5127

**PAGE 307**

are responsible for keeping track of their time and          12:01:03

creating time adjustments if they need to just to make       12:01:07

sure they're adequately paid.                                12:01:10

Q.  Okay.  Let's turn back to 87 at the very bottom          12:01:12

again and then going over to 88, other paid activities.      12:01:20

In certain limited situations, you may be paid for other     12:01:26

non-work activities.  Such activities may include, but       12:01:29

are not limited to -- and then there's a list.               12:01:33

Do you see time spent waiting to be released                 12:01:37

from the store at the end of closing shifts anywhere on      12:01:40

this list?                                                   12:01:44

A.  What page are we on?  I'm sorry.                         12:01:46

Q.  So it's the bottom of 87, the top of 88.  It is          12:01:50

Other Paid Activities is the heading.                        12:01:55

A.  The -- there is nothing in that list that says           12:01:58

paid for standing at the door.                               12:02:38

Q.  Okay.                                                    12:02:42

A.  But it does say in certain limited situations            12:02:44

you may be paid for non-work activities, so I would          12:02:49

consider that a non-work activity.                           12:02:53

Q.  Okay.  Have you ever had occasion to inform an           12:02:55

associate that time spent waiting at the door to be          12:02:58

released is compensable?                                     12:03:01

A.  No, it's never come up.                                  12:03:12

Q.  But you stated that you would expect an                  12:03:14

Page 53

automatically approved.    12:07:27

Q.  Okay.    12:07:30

A.  I guess -- I guess I'm guessing on that last    12:07:31
one.  Like, when I was an assistant manager, we would    12:07:35
approve the time adjustments.  I can't specifically -- I    12:07:39
shouldn't -- I can't say if they need approval at this    12:07:42
time right now.    12:07:44

Q.  Okay.  I won't hold you to that.    12:07:44

A.  Okay.    12:07:46

Q.  Do associates get any training on time    12:07:47
adjustments?    12:07:51

A.  Yes.    12:07:51

Q.  And what is that training?    12:07:56

A.  It's covered during orientation and we have    12:07:59
CBLs on it and also on-the-job training where if    12:08:10
something happens where they are missing a punch or    12:08:18
whatever the case may be, then that's when they partner    12:08:21
with their supervisor to do the time adjustment.    12:08:25

Q.  Okay.  Is there like a code or something    12:08:27
associated with a time adjustment that explains the    12:08:42
reason it's being submitted by the associate?    12:08:46

A.  Associates can code their time adjustments,    12:08:48
yes.    12:08:57

Q.  What sort of codes are there available to use?    12:08:57

A.  Missing punch, worked off the clock, worked at    12:09:02

Page 56

another location, other.    12:09:22

Q.  But as far as you know, is there nothing    12:09:33
specific to waiting at the end of a closing shift to be    12:09:36
let out?  No specific code for that?    12:09:40

A.  No, that would be work off the clock or other.    12:09:43

Q.  Back on the document at page 89, the very last    12:09:55
section, Reporting issues and obtaining further    12:10:10
information.  This section refers to a Wage and Hour    12:10:13
Helpline that associates can call.  Do you see this?    12:10:18

A.  Yes.    12:10:21

Q.  Do you -- what do you know about the Wage and    12:10:22
Hour Helpline?    12:10:28

A.  It's a resource for associates or managers to    12:10:29
call if they need assistance with anything that's wage    12:10:35
and hour related.    12:10:42

Q.  Did you say it's for associates and managers to    12:10:44
call?    12:10:49

A.  I've only had experience with managers calling.    12:10:49
I've never known of an associate to call the Wage and    12:10:53
Hour Hotline.    12:10:57

Q.  And what sort of reasons were those managers    12:10:58
calling the helpline?    12:11:01

A.  We've had as managers been -- we've had to call    12:11:04
Wage and Hour if we've had integrity issues with    12:11:11
associates like fabricating their punches and things    12:11:16

Page 57

C E R T I F I C A T E

I, LORI L. THIELMANN, a Certified Court Reporter licensed in and for the State of Washington and a Registered Professional Reporter, do hereby certify that the witness, JOHN RELIGA, before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting by me or under my direction; that the foregoing pages are a true and accurate transcript of all proceedings had upon the taking of said testimony, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of April, 2022.

LORI L. THIELMANN, RPR, CCR

License No. 21002182

Page 69

KILEY GROMBACHER

ljoyner@bradleygrombacher.com

APRIL 1, 2022

RE: CARLOS SANCHEZ VS. SAM'S WEST, INC.

MARCH 29, 2022, JOHN RELIGA, JOB NO. 5149117

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 70

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 71

# EXHIBIT 15

PAGE 314

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-o0o-

CARLOS SANCHEZ, individually )
and on behalf of other )
individuals similarly )
situated, )

)

)

    Plaintiff, )

)

vs. ) Case No.
) 2:21-CV-05122-SVW-JC
SAM'S WEST, INC. dba SAM'S )
CLUB, an Arkansas corporation, )

)

)

    Defendant. )
_____)

-o0o-

VIDEO-RECORDED DEPOSITION OF WILLIAM MARTHINS

TAKEN REMOTELY FROM VACAVILLE, CALIFORNIA

March 31, 2022

-o0o-

Reported Remotely By:

Lynne A. Howe, CSR

License No. 13003

Page 1

A.   Can you be more -- like at what time?  Are we talking at closing shift or when are we talking?

Q.   I'm actually just speaking generally.

Is it like a physical key?  I'm picturing like a large glass door.  Does it go in at the bottom?  I'm just trying to visualize what it would look like.

A.   Oh.  Yeah, it's a key.  Both the inside and outside door are locked with a key.

Q.   Is the key, does it go in at the bottom or by the handle or...

A.   Right in the middle.

Q.   Right in the middle.  Okay.

Is it fairly time-consuming to lock and unlock the double doors, or about how long does it take to do that?

A.   Five seconds.  It is not complicated.

Q.   Is there any particular door that associates who work closing shifts -- again that's shifts that end after the store is closed -- is there a particular door they're required to exit through?

A.   They are required to go through at least the exit or entrance door.

Q.   Okay.  And are the exit and entrance doors, are they locked once the store is closed and the last customer leaves?

Page 19

A.   Yes.

Q.   And that's at Vacaville we're talking about, correct?

A.   Yeah.  Yes.

Q.   How about at Palmdale?

A.   I can't speak for how they operate now, but when I was there, yes, they would lock them after the store closes.

Q.   And how about Gardena when you were there?

A.   Yes.  When I was there they were locked after the store was closed.

Q.   Can you tell me where the time clock is at Vacaville?

A.   The time clock is in the break room.

Q.   And how does one clock out using the time clock?

A.   They have a clock in and out badge that they will use to swipe on the time clock.

Q.   And are there computers or other locations where associates can clock in and out at Vacaville?

A.   Yes.

Q.   And what are those locations?

A.   So there is one that is in our team lead office and then there's also a terminal in our optical center as well as our tire and battery center.

Q.   Are those the only other three locations where

Page 20

there are computers that can be clocked in and out on?   10:26:51

A.   No.   10:26:55

Q.   Where else?   10:26:57

A.   There is terminals in the break room.  There is   10:26:59
terminals in our receiving area.  There's --   10:27:02

Q.   So this was -- go ahead.  Sorry.   10:27:10

A.   I was just trying to go around the club to just   10:27:14
think of any other terminals.   10:27:18

Yes, that would be all of them.   10:27:25

Q.   And so this isn't a special terminal?  It's just   10:27:27
a computer where they can access the time clock; is that   10:27:30
correct?   10:27:33

A.   Yes.   10:27:33

Q.   Are there video cameras at the Vacaville store   10:27:37
which would capture the area around the entrance and   10:27:41
exit?   10:27:45

A.   Yes.   10:27:46

Q.   Have you ever seen footage from those cameras?   10:27:47

A.   Just in general?   10:27:52

Q.   Yes.   10:27:54

A.   Yes.   10:27:55

Q.   What sort of instances would you be reviewing   10:27:58
footage from those cameras?   10:28:03

A.   If there was a theft and we were trying to   10:28:05
identify somebody coming in or out.  If there was any   10:28:08

Page 21

type of situation where we're unsure of, they -- did somebody leave the building, a member, did they actually leave the building or did they go out the entrance or did they go out the exit.

Q. Okay. So when you looked at that footage, can you kind of describe to me like physically what you can see at the store?

A. Yeah. General overview of the entrance door and the exit door. Each camera will show from the outside looking in, from the inside looking out, and have various angles of those camera angles.

Q. Okay. So if there were associates standing around the entrance or exit waiting to leave, would the video camera capture that?

A. Yes.

Q. Do you know how long video camera footage at Vacaville is maintained?

A. I do not know for sure.

Q. Do you know if it's being maintained for this lawsuit?

A. I do not know for sure.

Q. Are there video cameras that capture the cafe at Vacaville?

A. In the cafe or the overall cafe seating area?

Q. Let's do both. Let's start with the seating

Page 22

Q.   Yes.   Just an overall estimate.                    10:35:22

A.   I would say estimated 25.                           10:35:25

Q.   Can you give an estimate for Palmdale?              10:35:38

A.   I cannot.   I don't remember.                       10:35:45

Q.   What about Gardena?                                 10:35:48

A.   I don't remember there either.                      10:35:51

Q.   Okay.   So you mentioned that associates, the       10:35:52
afternoon shift is getting off at 11:30 p.m., 9:00 p.m.  10:36:08
Are there other times after the store is closed when     10:36:17
associates would be getting off work?                    10:36:21

A.   No, not normally.                                   10:36:24

Q.   So is it typical at Vacaville that you'd have       10:36:26
associates getting off at 9:00 p.m. and then at 11:30    10:36:30
p.m.?                                                    10:36:34

A.   Yes, that's typical.                                10:36:35

Q.   Are associates permitted to clock out before       10:36:37
their scheduled shift end time if they've completed their 10:36:42
work?                                                    10:36:46

A.   If they've completed their work and they've         10:36:47
checked out with a manager or team lead, yes.            10:36:50

Q.   Would you say that associates at Vacaville          10:37:02
typically leave in groups or one by one?                 10:37:06

A.   They typically leave as groups.                     10:37:11

Q.   This may be a little too general, but I'm just      10:37:26
wondering if you could generally describe to me what the 10:37:29

Page 26

BY MS. JOYNER:                                          10:42:50

Q.  Do you understand the question?                    10:42:50

A.  Not really.  Can you --                            10:42:53

Q.  Like how keys are handled.  Are you able to just   10:42:55
set them down on a counter?  Can you hand them off to   10:42:59
people?  Any sort of training regarding how to have to   10:43:04
maintain, take care of the keys.                        10:43:07

A.  Just overall keys, that they need to be with        10:43:09
you.  It's very -- yeah, like just to own your keys     10:43:11
basically as far as that, yes.                          10:43:20

Q.  You have training on that?                          10:43:24

A.  When you say -- what do you mean by -- like a       10:43:27
conversation with your reporting manager or a CBO?     10:43:30

Q.  So this would be one of those times I'm going      10:43:37
outside of the time period I talked about.             10:43:40

It would be in order to become a key carrier, do       10:43:43
you go through training in order to have keys to the   10:43:46
store?                                                 10:43:48

A.  Yes.                                               10:43:49

Q.  Okay.  And that training includes what you can     10:43:50
and can't do with the keys?                            10:43:57

A.  Yes, and criteria that needs to be met to carry    10:43:59
the keys.                                              10:44:02

Q.  What are those criteria?                           10:44:04

A.  I can't recall all the criteria, but being a       10:44:09

Page 30

salaried member of management is one of them.  Being --   10:44:14
understanding the opening and closing procedures.  That's   10:44:20
all I can remember for now.   10:44:27

Q.   Okay.  Is there an alarm at the Vacaville store?   10:44:29

A.   Yes.   10:44:34

Q.   And in the evenings what time is that alarm   10:44:36
typically set?   10:44:40

A.   So there's two different alarms that get set.   10:44:43
There's a perimeter alarm that gets set right after the   10:44:47
nine o'clock associates leave, and then there's the full   10:44:54
motion alarm that's set when everybody leaves at 11:30.   10:45:00

Q.   So when you are letting the associates out at   10:45:12
11:30 p.m. does that perimeter alarm needs to be turned   10:45:20
off?   10:45:25

A.   Yes.   10:45:26

Q.   Do you know what alarm company is used at the   10:45:31
Vacaville store?   10:45:36

A.   I do not.   10:45:38

Q.   Have you ever handed your keys off to someone   10:45:54
else to lock the door or unlock the door?   10:45:58

A.   No, I have not.   10:46:02

Q.   Is that permitted by Sam's?   10:46:04

A.   Yes, we would not do that.   10:46:09

Q.   So it's prohibited?   10:46:11

A.   I don't know if there's a specific policy on it,   10:46:14

Page 31

Q.   Once the exit door is locked at Vacaville, is there someone stationed at that door with no other job duties?

A.   No.   There's not typically anyone there.

Q.   Do you station someone at the door?

MS. MOON:   Objection.   Vague.

BY MS. JOYNER:

Q.   At the Vacaville store is someone stationed at the door once the door is locked?

A.   No.   There's not typically somebody there.

Q.   Who is responsible for letting associates out the door at the Vacaville store on closing shifts?

A.   A key-carrying associate.

Q.   Is there a key carrier stationed within earshot or eyesight of the exit door once the door is locked on a closing shift at Vacaville?

A.   Not at all times.

Q.   What sort of duties do team leads have at -- after the store has closed?

A.   They would be following up on associates on the progress of the zoning.   They would follow up on the progress of the stocking at the end of the night, as well as the overall cleaning at the end of the night.

Q.   And so would these activities take them sort of throughout the store?

Page 34

Q.  Did you know that it is Sam's policy that if associates are waiting at the front door for someone to unlock the door and release them that that time should be paid?

A.  I am -- I know there's a lot of policies within Sam's Club.  But as far as being paid, yes, they should be paid for the time that they are waiting.

Q.  Is that your position or Sam's position or both?

A.  I believe -- well, yeah, it's both.  But it would be tied to Sam's Club's off-the-clock policy, working on the clock.

Q.  Great.  Thank you.

So have you seen a written policy of Sam's that states that time spent waiting to be released from the store at the end of closing shifts is compensable time?

A.  Like I don't know all the details of every policy.  I'd have to look into, you know, the certain policies to see that specific wording.

Q.  Have you received an email from Sam's Club stating that time spent waiting to be released from the store at the end of closing shifts is compensable?

A.  I don't recall.

Q.  Okay.  Let's do Exhibit 3 will be the associate pay policy.

(Whereupon, Plaintiff's Exhibit 3 was marked for

Page 42

you will see that time spent waiting to be released at    11:06:28

the end of closing shifts is not listed there.    11:06:32

Do you want to take a second to read through it?    11:06:35

A.  You're okay.    11:06:40

Q.  You got it?  Okay.    11:06:41

So I just want you to confirm that it's not    11:06:44

listed there, time spent waiting to be released at the    11:06:46

end of closing shifts.    11:06:49

A.  No, I don't see that.    11:06:51

Q.  Then if you go to the bottom of 88, on to Page    11:06:56

89, the document lists examples of prohibited    11:07:00

off-the-clock work and then there is -- there are some    11:07:03

bullet points there as well.    11:07:09

Do you see time spent waiting to be released at    11:07:12

the end of closing shifts listed there?    11:07:15

A.  Can you say that again?    11:07:40

Q.  Sure.  I just want to know if time spent waiting    11:07:42

to be released at the end of closing shifts is provided    11:07:47

as an example of off-the-clock work.    11:07:50

A.  No, I don't see that.    11:08:00

Q.  Have you personally told any associates that    11:08:02

time spent waiting to be released from the store at the    11:08:05

end of closing shifts is compensable?    11:08:10

A.  Not that I recall.    11:08:14

Q.  Have you had any discussions with your assistant    11:08:17

Page 44

managers about that time being compensable?    11:08:23

A.  Not that I recall.    11:08:26

Q.  Have you had any discussions with your team    11:08:27 leads about time spent waiting to be released at the end    11:08:30 of closing shifts being compensable?    11:08:36

A.  Not that I recall.    11:08:41

Q.  Have you disciplined an hourly worker for    11:09:00 working off the clock at Vacaville?    11:09:04

A.  Not that I recall, no.    11:09:11

Q.  So if you look at the pay policy at Page 89, at    11:09:21 the very bottom of the examples of prohibited    11:09:25 off-the-clock work it says if you perform any work    11:09:29 without properly recording your time, you may be subject    11:09:33 to disciplinary action up to and including termination.    11:09:36 Do you see that?    11:09:41

A.  Yes.    11:09:42

Q.  Have you -- never mind.  Strike that.  Sorry.    11:09:44

Right above there it says that if an associate    11:09:55 is unable to clock in or out due to the nature of their    11:09:59 job, they must keep track of their time and submit an    11:10:04 appropriate time adjustment form.    11:10:08

Can you explain to me what a time adjustment    11:10:10 form is?    11:10:12

A.  Sure.  It's just a form they fill out to keep    11:10:14 track of any hours that were not entered or they didn't    11:10:18

Page 45

clock in and out that they need to add additional hours

for --

Q.   Is that -- is that a paper form?

A.   Yes.  But it is electronic now.

Q.   It used to be paper?

A.   Yes.

Q.   Do you remember when it switched to electronic?

A.   Not exactly.

Q.   Are associates trained on submitting time adjustments?

A.   Not that I'm aware of.

Q.   Can an associate make a time adjustment electronically on their own or do they need a supervisor?

A.   They can make the adjustment themselves.

Q.   Do you know how they make the adjustment electronically?

A.   Yes.  They would go into the global time adjustment form and they would edit their time punch.

Q.   Okay.  Is there a -- do associates need to provide a reason for making a time adjustment?

A.   Yes.  There's a section for them to enter why they're making the adjustment.

Q.   Is this -- is it a coded section or is it -- can they put in a note to describe?

A.   It's autopopulated with a general description.

Page 46

Veritext Legal Solutions
866 299-5127

**PAGE 327**

Q.   Do you know if there is an autopopulated    11:12:13
response for unpaid time spent waiting to be released    11:12:15
from the store at the end of closing shifts in the time    11:12:21
adjustment form?    11:12:25

A.   Not that I know of.    11:12:27

Q.   Have you seen a time adjustment submitted at the    11:12:31
Vacaville store for unpaid time spent waiting to be    11:12:39
released at the end of a closing shift?    11:12:43

A.   Not that I recall.    11:12:46

Q.   Do you usually review time adjustments?    11:12:49

A.   No, not typically.    11:12:53

Q.   Who does that at the Vacaville store?  Does    11:12:55
anyone?    11:12:59

A.   Their -- the direct manager would review that.    11:13:00

Q.   Are you familiar with the wage and hour hotline    11:13:07
at Sam's?    11:13:11

A.   Yes.    11:13:13

Q.   Can you tell me what that is?    11:13:15

A.   I -- from my understanding, it's a hotline for    11:13:20
them, for anyone in the store to call if there is a wage    11:13:23
and hour dispute or if there is any issues with the --    11:13:29
anybody getting paid correctly.    11:13:34

Q.   Do you know who mans the wage and hour hotline?    11:13:38

A.   No, I do not.    11:13:45

Q.   Do you know where that is staffed -- strike    11:13:47

Page 47

DECLARATION UNDER PENALTY OF PERJURY

*** 

I, WILLIAM MARTHINS, the witness herein, declare under penalty of perjury that I have read the foregoing deposition in its entirety and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Dated this _____ day of _____, 20_____, at_____, California.

_____
                    WILLIAM MARTHINS

Page 53

Veritext Legal Solutions
866 299-5127

State of California,

County of Fresno.

I, LYNNE A. HOWE, License No. 13003, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the witness in the foregoing deposition named was present at the time and place herein specified;

That the said proceeding was taken before me as a Certified Shorthand Reporter at the said time and place and was taken down in shorthand writing by me;

That the said proceeding was thereafter, under my direction, transcribed with the use of computer-assisted transcription, and that the foregoing transcript constitutes a full, true, and correct report of the proceedings which then and there took place;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 5th day of April, 2022.

Lynne A. Howe, CSR

License No. 13003

Page 54

WILLIAM MARTHINS

wkmarth.s06433.us@samsclub.com

APRIL 5, 2022

RE: SANCHEZ V. SAM'S WEST

MARCH 31, 2022, WILLIAM MARTHINS, JOB NO. 5162935

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 55

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not

requested before the completion of the deposition.

Page 56

# EXHIBIT 16

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

CARLOS SANCHEZ, INDIVIDUALLY AND
ON BEHALF OF OTHER INDIVIDUALS
SIMILARLY SITUATED,

        Plaintiff(s),

    v.              No. 2:21-CV-05122-SVW-JC

SAM'S WEST, INC. dba SAM'S CLUB,
AN ARKANSAS CORPORATION,

        Defendant(s).

_____/

VIDEOTAPED DEPOSITION OF

MARK JETTE

TUESDAY, APRIL 5, 2022

Reported by:

KAREN A. URBANO, CSR License No. 6698

Registered Professional Reporter

Job No:  5167963

Page 1

APPEARANCES


   For the Plaintiff:

           BRADLEY/GROMBACHER

           BY:  LESLIE JOYNER, ESQ.

           BY:  FERNANDO VALLE, JR., LAW CLERK

           31365 Oak Crest Drive, Suite 240

           Westlake Village, CA  91361

           805.270.7100

           jleslie@bradleygrombacher.com


   For the Defendants:

           OGLETREE, DEAKINS, NASH, SMOAK & STEWART

           BY:  PALOMA P. PERACCHIO, ESQ.

           400 South Hope Street, Suite 1200

           Los Angeles, CA  90071

           213.239.9800

           paloma.peracchio@ogletree.com


   Also Present:

           PHIL LOVE, Videographer

           JENNIFER BECHET




                                          Page 2

INDEX OF EXAMINATION

EXAMINATION                                                    PAGE

   By Ms. Joyner                                                 6


                      INDEX OF EXHIBITS

                  Deposition of MARK JETTE

                  TUESDAY, APRIL 5, 2022

EXHIBIT                                                        PAGE

Exhibit A   Notice of Deposition                                8


                         ---o0o---

Veritext Legal Solutions
866 299-5127

A.    You could call it the back end, but it's not the back of the building.  It's in the front of the building all the way over on the west side of the building.

Q.    Okay.                                          10:23

A.    Toward the wall.

Q.    Okay.  Can you tell me where the time clocks are located at the Riverside store?

A.    Time clock's located in the break room, but associates can punch out at any -- any -- any computer    10:23 in the building.

Q.    Okay.  And where are these computers located?

A.    We have one at the tire shop.  We have one in membership desk.  We have one in our recycle room.  We have one in the AP office.  We have one at the jewelry    10:23 counter.  One up in my office.

Q.    Okay.  Do you know if those computers are powered down at closing?

A.    No.

Q.    You don't know -- no, you don't know or    10:24 they're not?

A.    No, they're not powered down.

Q.    Okay.  So on closing shifts, is there a particular door that associates are required to exit through after the store is closed?    10:24

Page 17

A.    An exit door.

Q.    And are there video cameras around the exit door?

A.    Yes, ma'am.

Q.    Can you -- have you ever looked at the     10:24 footage from those video cameras?

A.    Yes, ma'am.

Q.    Can you describe to me what you would see looking at that footage what the camera captures?

A.    The entire front end.  You have one that     10:24 captures the inside of the building front end.  Then you have one that captures the vestibule, and then you have one that captures just outside the door.

Q.    Okay.  Are there double -- is it a double door, the exit?     10:25

A.    It's a sliding glass door.

Q.    Just a single one?

A.    Yes, ma'am.

Q.    If there were associates waiting around at the door to leave in the evening, is that something     10:25 the video camera would capture?

A.    Yes, ma'am, it should.

(Reporter clarification.)

Q.    BY MS. JOYNER:  Do you know how long video camera footage of the Riverside store is maintained?     10:25

Page 18

A.        I want to say two months roughly.

Q.        Okay.  Do you know if video footage is being maintained for this lawsuit?

A.        We keep videotape for two months, ma'am.

Q.        Okay.  So has anyone asked you to keep the          10:26 video footage longer because of this lawsuit?

A.        We don't -- to my knowledge, we can't do that because it's on DVR.  So it recycles itself.

Q.        Are you involved in scheduling associates?

A.        Just my management team.                               10:26

          (Reporter clarification.)

          MS. PERACCHIO:  Can I -- sorry to interject. Mark, is it maybe -- because it seems like your volume is down maybe.  So can you maybe check your audio settings.  That might help.                               10:27

          MS. JOYNER:  Thank you, Paloma.

          MS. PERACCHIO:  I think you might be able to increase the microphone volume.  I don't know.

          THE WITNESS:  It's as high as it will go.

          MS. PERACCHIO:  That's as high as it will go.  10:27

          THE WITNESS:  I'm at as high as it will go, yes, ma'am.

          MS. PERACCHIO:  So I guess just try to --

          THE WITNESS:  You want me to yell.  Sorry. Is this okay?  Is this loud enough?                          10:27

                                                    Page 19

(Discussion off the record.)

Q.     BY MS. JOYNER:  Okay.  Can you tell me who scheduled the associates at your store?

A.     Assistant managers.

Q.     Do you know how they come up with the schedule?                                    10:28

A.     When the schedule -- when the schedule downloads, it comes out with a mock schedule, and then we go back through and make adjustments to it.

Q.     How many full-time employees do you have at Riverside?                              10:28

A.     I don't know that right off the top of my head.

Q.     Okay.  Could you estimate -- give me an estimate?                                   10:28

A.     I could tell you a percentage.  I have about 55 percent full-time, maybe 40-45 percent part-time.

Q.     Okay.  That's helpful.  Thank you.

       Does your store, the Riverside store, use block scheduling?                         10:28

A.     We do use block scheduling, yes, ma'am.

Q.     Can you explain to me what that is?

A.     Full-time associates are on what we call block scheduling.  They're in at a certain -- I mean like cashiers come in at 7 o'clock.  Full-time morning  10:29

Page 20

block is 7:00 a.m. to 3:30. Closing block is, I think, 12:30 to 9:00, and each area has a different start time, different go-home time.

Q.    Okay. Are there hourly paid associates in the store after 9:00 p.m.?    10:29

A.    Yes, ma'am.

Q.    And what time does the last associate leave?

A.    11:30 at night.

Q.    So I asked you for Riverside, but have you -- did you ever work closing shifts at Ontario?    10:30

A.    Occasionally.

Q.    Occasionally. Okay. When you say "occasionally," can you give me an estimate? Are we talking once a week, once a month?

A.    It could be once or twice a month.    10:30

Q.    Okay.

A.    But my closing shift Monday night, rarely stay past 10 o'clock at night. I mean it would be not until 11:30.

Q.    Okay. What time did the Ontario store close when you were there?    10:30

A.    We ran a night crew. So I mean if the club actually -- I mean the club closed at 8:30.

Q.    Okay. And then what was the night crew doing?    10:31

Page 21

the door until 9:00 p.m., and then associates just walking right out?

A.        At 9:00 p.m., no.  I mean the door greeter -- when the door greeter goes away to go punch out, we lock the door.  And then a manager will generally be 10:37 up there or a team leader will be up there letting associates out.

Q.        So when you say a manager or team leader will be there to let associates out, does that mean that that person is stationed at the door, or are they just 10:37 in the front area?

A.        They're on the front end.  I mean my MEMs would be on the front end making sure things are getting taken care of upfront, like registers being cleaned, floor being swept, so on and so forth. 10:38

          So the same way with the MSLs or the supervisors on the front end.  They're on the front end making sure that the front end is clean, so on and so forth.

Q.        So once the exit door is locked, is it a 10:38 correct statement that at Riverside there is no one just stationed at the door with no other job duties?

A.        Once the door is locked, generally -- generally our departments 9 o'clock, like, fresh departments --

Page 26

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting;

That before completion of the deposition, review of the transcript {X}was, { }was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of April, 2022.

KAREN A. URBANO

California CSR No. 6698

Page 46

PALOMA P. PERACCHIO, ESQ.

paloma.peracchio@ogletree.com

April 7, 2022

RE: CARLOS SANCHEZ vs. SAM'S WEST, INC.

April 5, 2022, MARK JETTE, JOB NO. 5167963

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

  to schedule a time to review the original transcript at

  a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

  Transcript - The witness should review the transcript and

  make any necessary corrections on the errata pages included

  below, notating the page and line number of the corrections.

  The witness should then sign and date the errata and penalty

  of perjury pages and return the completed pages to all

  appearing counsel within the period of time determined at

  the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

  Counsel - Original transcript to be released for signature

  as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

  time of the deposition.

Page 47

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 48

# EXHIBIT 17

**PAGE 346**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, )
individually and on )
behalf of other )
individuals similarly ) Case No.
situated, ) 2:21-CV-05122-SVW-JC
)
          Plaintiff, )
)
vs. )
)
SAM'S WEST, INC. dba )
SAM'S CLUB, an Arkansas )
corporation, )
)
          Defendant. )
_____)

REMOTE VIDEOTAPED DEPOSITION OF WILLIAM RAMIREZ

May 20, 2022

Reported by:  Maryann Matthews, CSR

Page 1

REMOTE VIDEOTAPED DEPOSITION OF WILLIAM RAMIREZ

BE IT REMEMBERED that the remote videotaped deposition of WILLIAM RAMIREZ was taken via videoconference by the Plaintiff before Veritext Legal Solutions, Maryann Matthews, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Friday, the 20th day of May, 2022, commencing at the hour of 10:07 a.m. Pacific Standard Time in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff:

                    BRADLEY/GROMBACHER, LLP
                    By:  Kiley L. Grombacher, Esq.
                         Leslie Joyner, Esq.
                    31365 Oak Crest Drive, Suite 240
                    Westlake Village, California  91361
                    Telephone:  (805) 270-7100
                    Facsimile:  (805) 270-7589
                    kgrombacher@bradleygrombacher.com


For the Defendant:

                    OGLETREE, DEAKINS, NASH, SMOAK &
                    STEWARD, P.C.
                    By:  Paloma P. Peracchio, Esq.
                    400 South Hope Street, Suite 1200
                    Los Angeles, California  90071
                    Telephone:  (213) 239-9800
                    Facsimile:  (213) 239-9045
                    paloma.peracchio@ogletree.com


Also Present:  Peter DeFrank, Videographer

                                                    Page 2

back up -- was signed under the penalty of perjury, correct?

A.   Yes, ma'am.

Q.   So it has the same force and effect as if you had testified in court when you signed this.  Do you understand that?

A.   Yes, ma'am.

Q.   Okay.  And did you know that this document would be submitted to the court?

A.   Yes, ma'am.

Q.   Okay.  Paragraph three says that the Yuba City club closes at 8:00 p.m. during the week and 6:00 p.m. on Sundays.

And that means closes to the general public, right?

A.   Yes, ma'am.

Q.   Okay.  And so you said that the layout of the club at Yuba City is different because the doors -- the exit and entrance doors aren't as close to one another as they typically are in Sam's Club facilities that you've been in; is that right?

A.   Yes, ma'am.

Q.   So when the club closes for the night, it's the practice at Yuba City to lock both the entrance and exit doors; is that correct?

Page 24

A.   Yes, ma'am.                                      10:36:56a

Q.   Was that also the practice at Concord?          10:36:57a

A.   Yes, ma'am.                                      10:37:02a

Q.   And was that also the practice in Palmdale?     10:37:03a

A.   Yes, ma'am.                                      10:37:06a

Q.   Did you work at any other Sam's locations       10:37:08a
during your 17-year tenure with the company?         10:37:11a

A.   Yes, ma'am.                                      10:37:14a

Q.   What locations did you work at other than       10:37:15a
the three we just talked about?                      10:37:18a

A.   Santa Clarita.                                   10:37:20a

Q.   Okay.                                            10:37:23a

A.   And San Fernando.  That building doesn't        10:37:24a
exist no more, though.                               10:37:29a

Q.   Right.  I know they close sometimes             10:37:31a
unfortunately.  Was it the practice at Santa Clarita 10:37:34a
to lock the doors when the store closed to customers 10:37:37a
at the end of the day?                               10:37:41a

A.   As far as my knowledge, yes.  But I was an      10:37:42a
hourly back then, so --                              10:37:47a

Q.   How about at San Fernando?  Were the doors      10:37:49a
locked at San Fernando when the store closed to      10:37:52a
guests?                                              10:37:55a

A.   I -- I would guess yes, but I won't --          10:37:56a

Q.   Okay.                                            10:38:00a

Page 25

A.   Don't hold me to that.   10:38:00a

Q.   Okay.  Let's not do that one.   10:38:02a

A.   Yeah.   10:38:03a

Q.   I don't want guessing.  I want just what you know --   10:38:04a   10:38:08a

A.   Yeah.   10:38:08a

Q.   -- just what you know.   10:38:08a

So as for all the stores, you can remember the practice at every Sam's location is to lock the entrance and exit doors when the store closes to the general public, correct?   10:38:10a   10:38:13a   10:38:16a   10:38:20a

A.   Yes, ma'am.   10:38:22a

Q.   Okay.  And in all of the stores that you worked at, is it true that hourly associates do not have keys to lock and unlock the entrance and exit doors?   10:38:22a   10:38:27a   10:38:31a   10:38:37a

A.   That is not true.   10:38:37a

Q.   Okay.  How is that incorrect?   10:38:40a

A.   Supervisors which are hourly, team leads, have access to keys to unlock and lock the doors.   10:38:42a   10:38:47a

Q.   So the leads have access to keys.  Does that mean that they have them on their person at all times or that they have to go unlock -- check them out somewhere or through some other process get them?   10:38:51a   10:38:56a   10:38:59a   10:39:03a

A.   We have associates -- not all supervisors   10:39:05a

Page 26

A.   No.                                          10:45:47a

Q.   Okay.  This declaration that you submitted,    10:45:47a
does it and all the contents apply solely to your time    10:45:58a
as a manager at Yuba City?                        10:46:04a

A.   No.                                          10:46:05a

Q.   Okay.  So let's back up.  For paragraph    10:46:10a
four I think we established that at all the stores    10:46:15a
that you can recall working at or all the stores that    10:46:20a
you worked at where you can recall the procedure, the    10:46:23a
entrance and exit doors are locked once customers    10:46:27a
leave the store; is that correct?                10:46:31a

A.   Yes, ma'am.                                 10:46:33a

Q.   Okay.  At Concord you never worked a    10:46:34a
closing shift, right, that you --                10:46:41a

A.   I wouldn't say -- I wouldn't say never.  I    10:46:43a
just don't recall it.                            10:46:46a

Q.   Okay.  So does any part of this declaration    10:46:46a
refer to your time working at Concord?           10:46:50a

A.   No, ma'am.                                  10:46:55a

Q.   Okay.  At Palmdale you worked closing    10:46:55a
shifts frequently?                               10:47:00a

A.   Yes, ma'am.                                 10:47:01a

Q.   At Palmdale was it the practice to have a    10:47:02a
front end manager or team lead stationed near or at    10:47:11a
the exit doors during the closing shift?         10:47:15a

Page 31

A.   I wouldn't call it stationed.  Our front ends are typically close to the exit door, so they do their work nearby.

Q.   Okay.  Was it also the case at Palmdale that there would be times during the closing shift where the exit door was locked but there was no front end manager or team lead near that door because they were in other parts of the facility performing duties?

A.   Yes, ma'am.

Q.   Did you have access to the exit door keys when you were the assistant manager at Palmdale?

A.   Yes, ma'am.

Q.   So was it one of your duties to let employees out during closing shifts after the store had closed to the general public and the doors were locked?

A.   Yes, ma'am.

Q.   Okay.  Was there ever an occasion that you can recall in Palmdale where you came to open the door and there were a number of employees waiting there to leave for the day during the closing shift?

A.   Yes, ma'am.

Q.   Okay.  How frequently did that occur when you worked a closing shift at Palmdale?

A.   Very rare.

Page 32

Q. Would you be surprised if more than one of your associates complained that they were waiting to be released?          10:59:16a 10:59:20a 10:59:23a

A. Yes.          10:59:27a

Q. Would you be surprised if more than three of your associates complained that they were waiting to be released?          10:59:27a 10:59:27a 10:59:28a

A. I would be surprised if any of my associates complained about it, yes, ma'am.          10:59:28a 10:59:32a

Q. Do you ever review security footage from the Yuba City store?          10:59:41a 10:59:46a

A. Yes, ma'am.          10:59:49a

Q. And there are security cameras at the Yuba City store. That's correct, right?          10:59:49a 10:59:54a

A. Yes, ma'am.          10:59:56a

Q. And are the security cameras positioned towards the exit of the Yuba City store or --          10:59:57a 10:59:59a

A. There are cameras overseeing the exit doors, yes, ma'am.          11:00:04a 11:00:09a

Q. In the security footage that you reviewed, have you ever reviewed footage that shows the area around the exit doors?          11:00:10a 11:00:16a 11:00:18a

A. I've seen that camera shot.          11:00:22a

Q. Okay.          11:00:25a

A. I've seen it.          11:00:26a

Page 40

Q.   So with that camera shot, would you be able to see if associates were standing there waiting to be released?    11:00:27a 11:00:30a 11:00:33a

A.   Yes, ma'am.    11:00:34a

Q.   Have you ever reviewed any security footage to see if associates were waiting to be released at the end of the closing shift?    11:00:35a 11:00:39a 11:00:42a

A.   No, ma'am.    11:00:43a

Q.   So in number six paragraph you say that there will be times when associates will shop in the store after closing.  Is that true?    11:00:45a 11:00:58a 11:01:01a

A.   Yes, ma'am.    11:01:03a

Q.   So on those occasions, is it required that the tills not be picked up and that all of the closing procedures not be started until those associates have completed shopping?    11:01:04a 11:01:09a 11:01:13a 11:01:17a

A.   No, ma'am.  We have self-checkouts that don't require cash.    11:01:20a 11:01:22a

Q.   Okay.    11:01:24a

A.   And also Scan and Go where they can scan their own stuff out.    11:01:25a 11:01:28a

Q.   You have scanning what?    11:01:29a

A.   It's an app that is available on the Sam -- on Sam's Club.  You can go, as you do your shopping throughout your --    11:01:31a 11:01:36a 11:01:39a

Page 41

my program, when I was at the door, if there's a    11:09:44a

situation where -- so somewhere in here we speak    11:09:52a

about -- I speak about a radio, a walkie-talkie, being    11:09:54a

left at the door.    11:09:59a

An associate calls me and says, "Hey, I'm    11:10:00a

waiting at the door."  My first question to that    11:10:02a

associate if I know they're new is, "Did you clock out    11:10:03a

already?"  "Yes."    11:10:05a

"Next time you call me on the radio and    11:10:07a

then you go clock out because I will -- you got to get    11:10:10a

paid for this whole time.  Don't call me once you're    11:10:15a

off the clock.  Make a time adjustment, but understand    11:10:17a

that you need to get paid."  It happens rarely.    11:10:20a

Q.  Uh-huh.    11:10:24a

A.  In my experience it's happened rarely.  I    11:10:24a

didn't have to deal with that often.  That's besides    11:10:27a

the conversation of, "You don't work off the clock."    11:10:35a

That's personally what I've been involved in.    11:10:38a

Q.  Do you know whether any of your managers or    11:10:43a

team leads have ever told an associate to submit a    11:10:48a

time adjustment for waiting to be released at the end    11:10:51a

of a closing shift after clocking out?    11:10:54a

A.  In Yuba City?    11:10:58a

Q.  Yes.    11:10:59a

A.  I don't recall ever having a conversation    11:11:00a

Page 48

with --

Q.   Okay.

A.   -- any of them about it.

Q.   Do you have a lot of turnover with your team leads at Yuba City?

A.   No, ma'am.

Q.   How about your front end managers?

A.   No, ma'am.

Q.   You say that associates submit time adjustments regularly in this declaration in paragraph ten.  What does that mean?

A.   Things happen and associates will have to get paid for time.  So if a manager doesn't show up on time to open the building at 4:00 in the morning and they're running late and they show up to open the building at 4:10, the associates will start getting paid at their scheduled start time regardless of whatever time they showed up.

If they're standing there when the manager or supervisor was late, they're going to get backed up their time until 4:00 o'clock or whatever the time is of their beginning of their shift.

There's time adjustments done -- you know, there's -- my biggest conversation with associates is they always (Garbled audio) me specifically as a club

Page 49

Q.   Okay.   That's fair.   I know, it's difficult.   11:28:10a

The employee swore under the penalty of perjury that he   11:28:16a

had been waiting five minutes or longer -- I'm sorry.   11:28:22a

He had been waiting for four minutes and some   11:28:27a

of his colleagues had been waiting for five minutes, and   11:28:29a

after about three minutes of waiting he took this video.   11:28:36a

I'm going to share my screen.   It's a little bit loud.   11:28:45a

THE REPORTER:   Counsel, do you want me to   11:28:52a

take down the content of the video?   11:28:56a

MS. GROMBACHER:   No, because there's not real   11:28:58a

words.   It's mostly background noise.   11:29:00a

THE REPORTER:   Thank you.   11:29:04a

(Video playing.)   11:29:20a

(Video stopped.)   11:29:56a

MS. GROMBACHER:   I'm going to mark another   11:29:58a

exhibit.   11:30:06a

(Deposition Exhibit No. 4 was marked.)   11:30:18a

Q.   (BY MS. GROMBACHER) Were you working on May   11:30:18a

19th of this year?   11:30:19a

A.   Yesterday?   11:30:22a

Q.   Yesterday.   11:30:26a

A.   I worked in the morning.   11:30:28a

Q.   Okay.   But not the closing shift?   11:30:32a

A.   No.   11:30:34a

(Video playing.)   11:30:52a

Page 53

(Video stopped.)                                    11:31:01a

Q.   (BY MS. GROMBACHER) So based on your           11:33:19a
testimony, associates, under the policies and       11:33:23a
practices that you have in place at Yuba City, should  11:33:30a
never be waiting like what we just witnessed?       11:33:32a

MS. PERACCHIO:  I'm just going to insert an          11:33:35a
objection that the video lacks foundation.  It's not  11:33:37a
authenticated that it's in Yuba City, it's not      11:33:41a
authenticated that it's the time period that it says  11:33:43a
as the time period because you represented that it is.  11:33:47a
But he can go ahead and answer.                     11:33:49a

MS. GROMBACHER:  That's fine.                       11:33:50a

Q.   (BY MS. GROMBACHER) Do you recognize the       11:33:51a
facility in the video?                              11:33:52a

A.   I mean, it's very, very close -- it's a        11:33:55a
door.  I recognize the associates.                  11:34:00a

Q.   Okay.  Because managers have their own         11:34:04a
duties during closing shifts, associates being forced  11:34:15a
to wait can occur at the facilities.                11:34:26a

Is this correct?                                    11:34:31a

A.   Yeah.  It's not impossible.                    11:34:31a

Q.   Right.  And while you testified that this      11:34:34a
never happens at Yuba City, you don't know what     11:34:39a
happens when you're not there, correct?             11:34:42a

MS. PERACCHIO:  Objection.  Misstates his           11:34:45a

Page 54

testimony and calls for speculation.

THE WITNESS: I believe I was testifying to my knowledge of it, right?

Q. (BY MS. GROMBACHER) Sure. But you also testified that you knew what happened when you weren't at the facility because you relied on statements from your managers that said things like, "Should I go let them out or you," around the time that you would expect that they should be heading to the front door.

A. I --

Q. Do you want to change that testimony?

A. I testified that there's a process in place.

Q. There would have been a process in place last night, correct?

A. Correct.

Q. And yet the associates had to wait more than a minute, more than two minutes, more than three minutes, correct?

MS. PERACCHIO: I'm going to object to the extent that it relies on video that hasn't been authenticated and also I think it fast-forwards some of the time stamps, so --

Q. (BY MS. GROMBACHER) I can roll the whole thing for you. But assuming the video is accurate,

Page 55

the associate would have had to wait -- two associates would have had to wait much longer than you ever anticipate in your declaration; is that right?

A.   Yes, ma'am.

Q.   Do you think that your declaration has more weight than an associate who worked a shift talking about their experience working off the clock at Yuba City?

MS. PERACCHIO:  I'm going to object that that's a vague and ambiguous question and also potentially implicates a legal conclusion in terms of admissibility.

MS. GROMBACHER:  I'll strike it.  I'll ask it a different way.

Q.   (BY MS. GROMBACHER) Other than the once a week that you typically work and attempt to let associates out of the facility yourself, you don't know what happens at Yuba City the times that you're not in the facility; is that correct?

A.   It's correct to say that I don't know what happens when I'm not here.

Q.   Do you think that your policies and practices at Yuba City are sufficient, having seen the videos?

MS. PERACCHIO:  I'll object that that's

Page 56

vague and ambiguous.    11:37:09a

THE WITNESS:  Being -- basing it on two    11:37:11a
situations, I wouldn't say that there's a process --    11:37:16a
or there's -- the policies?  There's no policy.  The    11:37:19a
process needs to be addressed because there's no    11:37:24a
consistency, according to the two videos.    11:37:29a

Q.   (BY MS. GROMBACHER) Well, you're sitting    11:37:33a
here today.  We were able to get a video the night    11:37:34a
before you came, and I can represent that was the only    11:37:39a
night that we sent somebody out.  So we were one for    11:37:41a
one.    11:37:46a

That doesn't raise any red flags for you?    11:37:47a

MS. PERACCHIO:  Objection.  Argumentative.    11:37:50a
Again, the video lacks foundation and it's --    11:37:51a

MS. GROMBACHER:  All right.  I'll strike    11:37:56a
it.    11:37:57a

Q.   (BY MS. GROMBACHER) Having seen this video,    11:37:58a
would you want to conduct any study or survey or    11:38:00a
investigation at your club to determine whether this    11:38:04a
is happening on a more frequent basis?    11:38:08a

MS. PERACCHIO:  Same objection on the video    11:38:10a
authentication.  You can answer.    11:38:12a

THE WITNESS:  Yes, ma'am.    11:38:15a

MS. GROMBACHER:  I have no more questions.    11:38:18a

MS. PERACCHIO:  Okay.  I have nothing.    11:38:21a

Page 57

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                 )  ss.
COUNTY OF ADA    )

I, MARYANN MATTHEWS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 24th day of May, 2022.

<%11030,Signature%>
MARYANN MATTHEWS
CSR and Notary
Public in and for the
State of Idaho.

My Commission Expires:  04-13-27

Page 60

PALOMA P. PERACCHIO, ESQ.

paloma.peracchio@ogletree.com

May 24, 2022

RE: SANCHEZ VS. SAM'S WEST, INC.

MAY 20, 2022, WILLIAM RAMIREZ, JOB NO. 5241952

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

    a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, noting the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 61

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page  62

# Exhibit 18:

**Exhibit 4 to the May 20, 2022 deposition of William Ramirez, Club Manager at Sam's Club's Yuba City location.**

**LODGE WITH THE COURT**

# EXHIBIT 19

**PAGE 367**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ,                )
individually and on           )
behalf of other               )
individuals similarly         )
situated,                     )
                              )
          Plaintiff,          )
                              )
vs.                           ) Case No.
                              ) 2:21-CV-05122-SVW-JC
SAM'S WEST, INC. dba          )
SAM'S CLUB, an Arkansas       )
corporation,                  )
                              )
          Defendant.          )
_____)

REMOTE VIDEOTAPED DEPOSITION OF CARLOS GONZALEZ

May 20, 2022

Reported by:  Maryann Matthews, CSR

Page 1

Veritext Legal Solutions
866 299-5127

**PAGE 368**

REMOTE VIDEOTAPED DEPOSITION OF CARLOS GONZALEZ

BE IT REMEMBERED that the remote videotaped deposition of CARLOS GONZALEZ was taken via videoconference by the Plaintiff before Veritext Legal Solutions, Maryann Matthews, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Friday, the 20th day of May, 2022, commencing at the hour of 12:01 p.m. Pacific Standard Time in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff:

                    BRADLEY/GROMBACHER, LLP
                    By:  Kiley L. Grombacher, Esq.
                         Leslie Joyner, Esq.
                    31365 Oak Crest Drive, Suite 240
                    Westlake Village, California  91361
                    Telephone:  (805) 270-7100
                    Facsimile:  (805) 270-7589
                    kgrombacher@bradleygrombacher.com


For the Defendant:

                    OGLETREE, DEAKINS, NASH, SMOAK &
                    STEWARD, P.C.
              By:  Paloma P. Peracchio, Esq.
                    400 South Hope Street, Suite 1200
                    Los Angeles, California  90071
                    Telephone:  (213) 239-9800
                    Facsimile:  (213) 239-9045
                    paloma.peracchio@ogletree.com


Also Present:   Peter DeFrank, Videographer


                                        Page 2

Sundays?                                                              12:34:34a

A.   Yes.                                                            12:34:35a

Q.   When you worked at Torrance, were the doors                    12:34:35a

locked to the facility between 9:00 and the time the                 12:34:43a

last employee left the building?                                     12:34:48a

A.   Yes.                                                            12:34:50a

Q.   And on Sundays at Torrance, were the doors                     12:34:51a

locked around 7:00 p.m. and until the last employee                  12:34:58a

left the facility?                                                   12:35:04a

A.   Yes.                                                            12:35:05a

Q.   When the club closes in Glendora, you                          12:35:08a

testified that you have a front door greeter who is                  12:35:22a

stationed until that 9:00 o'clock hour when the doors                12:35:25a

are closed; is that correct?                                         12:35:28a

A.   Yes.                                                            12:35:30a

Q.   After 9:00 p.m. does that greeter leave the                    12:35:32a

facility or does he or she remain at work?                           12:35:38a

A.   Leaves the facility.                                           12:35:44a

Q.   Okay.  Once the customers have left the                        12:35:45a

store and the door is locked, can the associates                     12:35:59a

freely leave the building or do they require a key to                12:36:05a

get out?                                                             12:36:08a

A.   Require a key to get out.                                      12:36:12a

Q.   Is that true in Torrance as well?                             12:36:15a

A.   Yes.                                                            12:36:19a

Page 26

during those closing shifts that you worked?                    12:39:40a

A.    9:00 p.m.                                                  12:39:46a

Q.    So you don't have any personal knowledge of              12:39:47a
what happens in the stores that you work at -- in the           12:39:58a
Long Beach store after 9:00 p.m.; is that correct?             12:40:05a

A.    No.                                                       12:40:07a

Q.    Okay.  How am I wrong?                                    12:40:13a

A.    Well, just because I don't stay, I don't --             12:40:18a
necessarily means I don't know what happens.  I do             12:40:23a
talk to my managers and we have procedures that we             12:40:26a
have to follow.                                                 12:40:28a

Q.    Are there any security cameras in the Sam's             12:40:29a
Club location in Glendora?                                      12:40:36a

A.    Yes.                                                      12:40:37a

Q.    Are there any security cameras in the Sam's             12:40:39a
Club location in Torrance?                                      12:40:45a

A.    Yes.                                                      12:40:46a

Q.    Are there any security cameras in the Sam's             12:40:48a
Club location in Long Beach?                                    12:40:51a

A.    Yes.                                                      12:40:53a

Q.    In Glendora do the security cameras show               12:40:54a
the exit doors to the facility -- do any of the                12:41:01a
security cameras show the exit door of the facility?           12:41:07a

A.    Yes.                                                      12:41:10a

Q.    In Torrance do any of the security cameras            12:41:10a

Page 29

Veritext Legal Solutions
866 299-5127

**PAGE 371**

show the exit doors to the facility?        12:41:14a

    A.   Yes.        12:41:16a

    Q.   In the Long Beach store do any of the        12:41:18a

security cameras show the exit door to the facility?        12:41:20a

    A.   Yes.        12:41:25a

    Q.   In the Glendora store at a closing shift        12:41:26a

after the doors are locked, are associates required to        12:41:30a

exit the facility through the exit door?        12:41:33a

    A.   Yes.        12:41:36a

    Q.   In the Torrance club once the doors are        12:41:36a

locked on a closing shift, are associates required to        12:41:41a

exit the facility through the exit door?        12:41:44a

    A.   No.   They went out through the entrance        12:41:47a

door.        12:41:56a

    Q.   In Torrance are there any security cameras        12:41:57a

that show the entrance to the facility?        12:42:01a

    A.   Yes.        12:42:04a

    Q.   In the Long Beach store are hourly        12:42:06a

associates that work the closing shift required to        12:42:11a

exit the facility through the exit door?        12:42:14a

    A.   No.   Through the en -- yes, through the        12:42:17a

exit door.        12:42:34a

    Q.   Have you ever reviewed any security footage        12:42:34a

to see whether hourly associates were waiting to be        12:42:38a

released on a closing shift?        12:42:42a

Page 30

Q.   Okay.  How many times were you present when associates were leaving at 9:00 o'clock?                    12:49:32a / 12:49:42a

A.   I don't recall how many times.                    12:49:44a

Q.   I think you testified you worked closing shift until about 9:00 o'clock twice a week when you worked at Glendora; is that correct?                    12:49:49a / 12:49:54a / 12:49:57a

A.   That is correct.                    12:49:58a

Q.   Would you have been present when employees were being released at least once every week?                    12:49:59a / 12:50:04a

A.   You could say that.                    12:50:09a

Q.   Well, I don't want to say anything.  I want to know.  Would it be once every week?  Would it be once a month?  Would it be once every two months?                    12:50:11a / 12:50:15a / 12:50:18a

(Unintelligible crosstalk.)                    12:50:21a

Q.   (BY MS. GROMBACHER) How many times were you standing at the front door -- or strike that.                    12:50:22a / 12:50:23a

How many times were you standing at the exit door when employees were being released at 9:00 o'clock when you worked in Glendora?                    12:50:25a / 12:50:27a / 12:50:30a

A.   At least once a week.                    12:50:33a

Q.   How many times were you present at the exit door witnessing employees being released and the door being unlocked at 11:30 in Glendora?                    12:50:36a / 12:50:44a / 12:50:48a

A.   I wasn't there until 11:30.                    12:50:53a

Q.   Okay.  So never?                    12:50:58a

Page 34

A.    Never.                                         12:50:59a

Q.    How about in Long Beach?  What are the         12:51:00a
closing schedules in Long Beach?                     12:51:08a

A.    The same.                                      12:51:09a

Q.    Okay.  I know you haven't been at Long         12:51:12a
Beach very long.  Have you ever been present and seen   12:51:17a
with your eyes a manager unlocking a door and        12:51:21a
releasing employees at 9:00 o'clock at night in Long   12:51:24a
Beach?                                               12:51:27a

A.    I haven't.                                     12:51:27a

Q.    Okay.  Have you ever seen employees leave      12:51:31a
their shift at 9:00 p.m. at Long Beach?              12:51:43a

A.    No.                                            12:51:48a

Q.    When you worked in Torrance, how many times    12:51:58a
did you unlock doors so associates could exit the    12:52:06a
facility?                                            12:52:11a

A.    A few times.                                   12:52:12a

Q.    Ten?                                           12:52:19a

A.    I don't recall.                                12:52:22a

Q.    Can you recall five instances?                 12:52:23a

A.    Yes.                                           12:52:37a

Q.    Okay.  Do you believe you can recall any       12:52:37a
more than five?                                      12:52:40a

A.    Don't recall.                                  12:52:42a

Q.    Okay.  Was there ever a time you came to       12:52:45a

Page 35

out at the tire shop?                                    12:55:52a

        A.   Don't recall.                              12:55:54a

        Q.   More than once?                            12:56:00a

        A.   Don't recall.                              12:56:04a

        Q.   Once?                                      12:56:09a

        A.   Don't recall that, how many associates I   12:56:17a

saw clocking out.                                        12:56:20a

        Q.   Okay.  You, in paragraph nine, say it is   12:56:23a

the practice in Glendora to have a team lead or          12:56:37a

manager arrive at the exit door five minutes before     12:56:47a

each group of associates.                                12:56:50a

             Do you see that?                            12:56:52a

        A.   Yes.                                       12:56:53a

        Q.   How do you know that's happening?          12:56:55a

        A.   Those are the expectations, and that's what 12:57:00a

managers are committed to do and team leads.            12:57:10a

        Q.   Have you ever reviewed any security footage 12:57:13a

to see if they're doing that?                            12:57:15a

        A.   No.                                        12:57:16a

        Q.   Have you ever personally witnessed them    12:57:17a

doing that?                                              12:57:20a

        A.   Being at the door?                         12:57:24a

        Q.   Five minutes before.                       12:57:25a

        A.   Yes.                                       12:57:27a

        Q.   On how many occasions have you seen them at 12:57:28a

Page 38

Veritext Legal Solutions
866 299-5127

**PAGE 375**

Q.    So is your testimony that you didn't hear anybody call on a walkie to be let out and that's what you're basing your testimony on?

A.    No.

Q.    Okay.  I'm just trying to figure out if you weren't there to see them unlock the door, how do you know that they were there unlocking the door at the time that they were supposed to be?

MS. PERACCHIO:  Objection.  These questions are all very vague and ambiguous, but that one was in particular.

MS. GROMBACHER:  It's hard because he can't give me a day or any specifics.

MS. PERACCHIO:  I understand.  But the questions are very long-winded and hard to follow even for myself, so I'm just saying they are vague and ambiguous.  But he can answer if he gets it.

THE WITNESS:  Can you repeat the question one more time?

Q.    (BY MS. GROMBACHER) Sure.  If you left and you did not see the door get unlocked, do you know one way or another whether managers were there to timely open the door for associates during closing shifts?

A.    I don't.

Q.    Okay.  The next sentence says:

Page 41

"The manager or Team Lead will also wait at least another 10 minutes at the exit door before re-locking it to ensure that all of the associates scheduled to leave at that time can promptly exit the club."

What personal experience is that statement based on?

A.   Those are the expectations given to the managers and the team leads.

Q.   Okay.  Is that based solely on your expectation of what should happen?

A.   Yes.

Q.   Have you ever personally observed a manager or team lead waiting ten minutes at an exit door before relocking it?

A.   I don't recall.

Q.   Okay.

MS. PERACCHIO:  Kiley, can we take a five-minute break?

MS. GROMBACHER:  Absolutely.

MS. PERACCHIO:  It's been about an hour.

MS. GROMBACHER:  Sure.

MS. PERACCHIO:  Okay.

THE VIDEOGRAPHER:  Going off the record.

Page 42

A.    Yeah, that is correct.    01:12:00a

Q.    Okay.  Would waiting for a manager to let you out after you clock out be considered off-the-clock work that should be paid by Sam's?    01:12:03a / 01:12:09a / 01:12:12a

A.    Yes.    01:12:15a

Q.    Okay.  So if there were associates who clocked out but had to wait before the exit door was unlocked, they should be paid for that time; is that correct?    01:12:16a / 01:12:21a / 01:12:24a / 01:12:27a

A.    Yes.    01:12:28a

Q.    How do associates know that that is considered work that they should be paid for?    01:12:29a / 01:12:36a

MS. PERACCHIO:  Objection.  Calls for speculation.    01:12:41a / 01:12:42a

MS. GROMBACHER:  It might.  Let me strike it.    01:12:44a / 01:12:46a

Q.    (BY MS. GROMBACHER) Are you aware of any training by Sam's that would let associates know that time is considered compensable time and should be paid for?    01:12:46a / 01:12:49a / 01:12:52a / 01:12:56a

A.    Can you repeat the question?    01:12:57a

Q.    Certainly.  In all your time working at Sam's, are you aware of any training document that would let an hourly associate know that they should be paid if they clock out but have to wait to be released    01:13:08a / 01:13:13a / 01:13:18a / 01:13:22a

Page 44

from the facility?                                          01:13:29a

A.    I don't recall any training.  But if I'm          01:13:32a

not mistaken, it's in their orientation training when      01:13:35a

they come into the building, when they start their         01:13:40a

job.                                                        01:13:45a

Q.    Would that be on a document?                     01:13:45a

A.    You know, I don't know.                           01:13:51a

Q.    Okay.  When you do the orientation for           01:13:54a

associates, what do you tell them about clocking out       01:14:00a

and having to remain in the facility?                      01:14:05a

MS. PERACCHIO:  Objection.  Assumes facts.         01:14:08a

Q.    (BY MS. GROMBACHER) Let me ask you this.         01:14:12a

Do you do any of the employee orientation?                 01:14:15a

A.    No, I don't.                                      01:14:17a

Q.    Oh, I'm sorry.  I thought, from the              01:14:18a

testimony, that you did.  Then how do you know that is      01:14:20a

covered during the orientation?  What is that based         01:14:23a

on?                                                         01:14:27a

A.    There is a work document that the team           01:14:32a

leads and the managers go through.  Like I told you, I      01:14:38a

don't know if it's in there but I think they do             01:14:41a

communicate that, but I don't know -- you know, I           01:14:46a

haven't seen it.                                            01:14:49a

Q.    Are you guessing or do you know this for a        01:14:52a

fact?                                                       01:14:59a

Page 45

A.    I don't know.                                         01:15:00a

Q.    Okay.  So you're not sure whether or not             01:15:03a
this is covered during employee training; is that          01:15:09a
correct?                                                   01:15:12a

A.    That is correct.                                     01:15:12a

Q.    Okay.  Have you ever personally told an              01:15:16a
hourly associate that they should be paid if they          01:15:24a
clock out but have to wait for the door to be unlocked     01:15:28a
at the end of a closing shift?                             01:15:33a

A.    Normally they don't clock out until the              01:15:34a
door is open.  That's why the clock-out is next to the     01:15:43a
exit door.  So I don't recall telling an associate         01:15:46a
that, but they wait until the manager arrives to the       01:15:50a
door and then they clock out.                              01:15:54a

Q.    Okay.  So you believe that associates wait           01:15:56a
until the door is unlocked and then clock out; is that     01:16:04a
correct?                                                   01:16:07a

A.    I don't believe that.  Usually what happens          01:16:08a
at the --                                                  01:16:16a

(Unintelligible crosstalk.)                                01:16:17a

Q.    (BY MS. GROMBACHER) Would you be surprised            01:16:17a
if employees clocked out and then waited and left the      01:16:19a
facility?                                                  01:16:26a

A.    Can you repeat the question again?                   01:16:28a

Q.    Sure.  Would it surprise you if you                  01:16:30a

Page 46

discovered that an employee clocked out before the    01:16:35a

door was unlocked?    01:16:41a

A.    It would surprise me.  But sometimes it    01:16:45a

does happen, and that's why they can do the    01:16:48a

missed-punch form so it be adjusted and they can get    01:16:51a

paid for it.    01:16:56a

Q.    And how do you know that employees    01:16:56a

typically wait until the door is unlocked before they    01:17:00a

clock out if you have been present for very few shifts    01:17:05a

where employees are being released?    01:17:12a

A.    Well, the times that I've been at the door    01:17:14a

that has been the process, so two -- or one out of    01:17:19a

every week, and that's the process that I see.  And    01:17:23a

then I'll talk to my managers as well and that's what    01:17:26a

happens, so --    01:17:29a

Q.    But I believe you testified you've never    01:17:30a

been present at 11:30 when employees were leaving; is    01:17:33a

that correct?    01:17:38a

A.    At 11:30 they all leave together with the    01:17:38a

manager because he is also leaving the premises with    01:17:41a

them at 11:30.  But you're right, I've never been at    01:17:45a

11:30 in the club.    01:17:49a

Q.    So you don't know if they have to wait for    01:17:50a

the manager to get there, correct?    01:17:52a

A.    No.    01:17:55a

Page 47

**PAGE 381**

Q.   Have you been at the exit door more than five times during a closing shift when employees are being released?

A.   I've been at the door plenty times, but I cannot give you a number.  I cannot say more than ten, more than 15.  I cannot give you a number, but I've been at the door when associates are leaving the building.

Q.   Okay.  Let's talk about time adjustments.  You say that the expectation is that an hourly associate would submit a time adjustment if they're waiting.

Let me ask you this.  How does an employee submit a time adjustment?

A.   They go to the terminal.  They clock in and they can adjust either five, ten, 15 minutes, whatever time they can put into the system.

Q.   Do they have to give a reason?  Is there, like, a drop-down or something that they do to tell Sam's why they're making the adjustment?

A.   No.

Q.   No?  There's no pre-populated list or anything?  It --

A.   No.

Q.   -- doesn't -- no.  How many times have you

Page 50

time spent waiting to exit the club after their shift ends?

    MS. PERACCHIO:  Objection.  Calls for speculation.

    THE WITNESS:  I think it's in their training modules that they do when they do orientation that talks about time adjustments and so forth.  So every associate has to go through the training before going to the floor.

    Q.  (BY MS. GROMBACHER) And that belief is based on what?

    A.  Well, I haven't gone through -- because their training is different than my training.  So I think it's in there but I'm not sure that it's in there, but --

    Q.  It's okay to say you don't know.  I don't want you to guess.  It's okay.

    A.  Yeah.  I don't know.

    Q.  It's okay.  All right.  I'm going to introduce another exhibit.  I'm going to try to introduce another exhibit, and I'm going to share my screen so you can actually see it.

    (Deposition Exhibit No. 3 was marked.)

    Q.  (BY MS. GROMBACHER) Did you work on May 13th of this year in Glendora?

    A.  May 13th.  No.

Page 53

Q.   You would have already been in Long Beach at that time, right?          01:27:36a / 01:27:40a

A.   Yes.          01:27:41a

Q.   I'm going to show you a video.          01:27:49a

(Video playing.)          01:28:08a

(Video stopped.)          01:32:41a

Q.   (BY MS. GROMBACHER) Do you recognize that building?          01:33:36a / 01:33:56a

A.   Not really.          01:33:57a

Q.   Do you recognize any of the associates who came out of that building?          01:34:04a / 01:34:08a

A.   They were wearing masks, so I --          01:34:10a

Q.   That's okay.  That does make it difficult.          01:34:16a

A.   Yes.          01:34:19a

Q.   We'll represent to you that this is the Glendora store.          01:34:19a / 01:34:22a

MS. PERACCHIO:  Objection.  Lacks foundation.  Lacks authentication as to the location and the time and the date.          01:34:25a / 01:34:28a / 01:34:31a

Q.   (BY MS. GROMBACHER) Did you observe any individuals run back into the store after the door was unlocked to clock out?          01:34:34a / 01:34:37a / 01:34:42a

MS. PERACCHIO:  Objection.  What am I objecting to?  Vague and ambiguous.  The running back into the store to clock out assumes facts that they          01:34:45a / 01:34:48a / 01:34:53a

Page 54

had to do that, to clock out.    01:34:56a

Q.    (BY MS. GROMBACHER) Did you observe anybody    01:35:03a

do anything other than exit the facility after the    01:35:05a

door was unlocked?    01:35:09a

MS. PERACCHIO:  Objection --    01:35:13a

THE WITNESS:  No.    01:35:13a

MS. PERACCHIO:  -- calls for speculation.    01:35:14a

Q.    (BY MS. GROMBACHER) I'm just asking what    01:35:19a

you observed, you know.  You may not know everything,    01:35:21a

but did you see anybody go back into the building    01:35:23a

after the door was unlocked?    01:35:27a

A.    No.    01:35:31a

Q.    I'm going to mark another exhibit.  Hold    01:35:35a

on.  It might be the same one that I -- okay.  I'm not    01:36:31a

going to prolong this.    01:36:47a

If associates were, in fact, having to    01:37:00a

wait, as you saw in the video, off the clock because    01:37:04a

they didn't return to clock out, would you want to    01:37:14a

perform any type of investigation at Glendora to    01:37:19a

determine whether that happened frequently at that    01:37:22a

store?    01:37:27a

MS. PERACCHIO:  Lacks foundation and    01:37:28a

assumes facts about what the video actually    01:37:29a

represents.    01:37:32a

You can answer.    01:37:36a

Page 55

THE WITNESS:  If it was brought to my attention, yeah, I would definitely look into it and see what's going on.

Q.   (BY MS. GROMBACHER) Having watched that video of the Glendora location, would you want to perform any studies or investigation at Long Beach to determine whether it's happening at that location?

MS. PERACCHIO:  Objection.  Assumes facts about what the video represents and where it is.  You can answer still.

THE WITNESS:  Once again, if it was brought to my attention, absolutely I would look into it.

Q.   (BY MS. GROMBACHER) Does watching the video that was taken at 11:30-plus p.m. on the 13th give you any concern about the practices at the Glendora location?

MS. PERACCHIO:  Objection.  Lacks foundation about what the video represents and when it was taken and also vague and ambiguous as to concerns.

You can answer.

THE WITNESS:  You can also put time adjustment on another day.  Doesn't have to be the day of.  So we don't know if they put time adjustment after the fact.

Q.   (BY MS. GROMBACHER) That's right, we don't.

01:37:37a
01:37:41a
01:37:44a
01:37:47a
01:37:49a
01:37:53a
01:37:58a
01:38:01a
01:38:03a
01:38:17a
01:38:19a
01:38:21a
01:38:24a
01:38:30a
01:38:41a
01:38:45a
01:38:46a
01:38:48a
01:38:51a
01:38:58a
01:38:59a
01:39:02a
01:39:06a
01:39:09a
01:39:09a

Page 56

But we know that you haven't been able to establish any training that they should submit a time adjustment for that time, right?

A.   Yes.

Q.   Okay.  But the fact that the video contradicts what you had believed to be the practice at the Glendora store, does it make you question your prior belief about what was happening or what is happening at that location?

MS. PERACCHIO:  Objection.  Lacks foundation and assumes facts about what the video actually represents.

You can answer.

THE WITNESS:  Well, that's one instance and, like I told you, we don't know if they went and did time adjustments or so forth.  And it's one instance.  It might happen, but doesn't mean it happens all the time.

Q.   (BY MS. GROMBACHER) Well, it's one instance, but you can't point to how many instances you witnessed where it didn't occur, correct?

A.   Correct.

MS. PERACCHIO:  Objection.  Vague and ambiguous and misstates testimony potentially.

Q.   (BY MS. GROMBACHER) So you can't tell us

Page 57

how many times you've seen associates clock out after    01:40:34a

the door was open and leave the facility, but you have    01:40:40a

now seen associates wait for not one minute, not two    01:40:45a

minutes -- it felt like forever, right -- to be    01:40:50a

released from that facility.    01:40:53a

          Does watching that video raise any concerns    01:40:55a

for you about the practices at the Glendora location?    01:40:59a

          MS. PERACCHIO:  Objection.  Lacks    01:41:04a

foundation about what the video shows.  Argumentative.    01:41:06a

Asked and answered as well, I believe.    01:41:10a

          Q.   (BY MS. GROMBACHER) You can answer.    01:41:14a

          A.   Like I answered before, I told you no, I    01:41:15a

have to look at the facts, see what happened, before    01:41:19a

it raises any concerns of what happened.    01:41:22a

          So I need to look at the whole picture and    01:41:25a

go find out what's going on and then go from there.    01:41:27a

But once again, I don't know if they put time    01:41:30a

adjustment after the fact like I told you before,    01:41:32a

so --    01:41:35a

          Q.   Right.  But even assuming that they didn't,    01:41:36a

your understanding of how it should work there is that    01:41:40a

they should not be made to wait, correct?    01:41:43a

          A.   (Witness indicates.)    01:41:48a

          Q.   So having seen --    01:41:49a

          MS. PERACCHIO:  Objection.  That misstates    01:41:52a

Page 58

his testimony.  Sorry.                                      01:41:54a

Q.   (BY MS. GROMBACHER) Having seen the video,      01:41:55a
would you want to do some investigation like you            01:42:00a
talked about right there to determine what's really         01:42:02a
going on at the Glendora store?                             01:42:06a

MS. PERACCHIO:  Objection.  Lacks                    01:42:09a
foundation as to what the video shows.  I don't know        01:42:10a
how many times you're going to ask him questions about      01:42:13a
a video that he hasn't authenticated that he knows          01:42:18a
it's in Glendora and pretend that it is in Glendora,        01:42:18a
but he can answer the question even though it lacks          01:42:19a
foundation.                                                  01:42:24a

THE WITNESS:  Will you repeat the question            01:42:25a
again, please?                                              01:42:28a

Q.   (BY MS. GROMBACHER) Sure.  A minute ago you     01:42:28a
testified you'd like to do investigation and look at        01:42:31a
the facts.                                                  01:42:34a

Having seen this video, do you want to now           01:42:35a
do some investigation about what's really going on in       01:42:39a
Glendora during the closing procedures?                     01:42:43a

MS. PERACCHIO:  Same objections.                     01:42:46a

THE WITNESS:  I told you I would have to go          01:42:48a
and look at the facts and see what happened from            01:42:52a
beginning to end.  And once again, I would check if         01:42:54a
the associates got time adjustment or not.                  01:42:58a

Page 59

We don't know what information the manager gave the associates to do after the fact as well. There's a lot of things that we don't know based on that video.

Q.   (BY MS. GROMBACHER) Okay.  So having seen a video where associates are waiting in the Glendora store, you, as a representative of Sam's Club, don't want to do any investigation, isn't intending to do any investigation to determine whether associates are being made to wait off the clock?

MS. PERACCHIO:  Objection.  Lacks foundation as to those associates being off the clock. He is going to answer this one more time.  You have not established those associates are off the clock. You have not established anything.

He can answer the question -- he already has -- but you're being very argumentative at this point about a video we know nothing about foundationally and has not been authenticated.

You can answer.

THE WITNESS:  I told you I would go and look at the facts and see what happened, what transpired.  We're just going based on one small sample of video.  But I'll go look at the facts and see what's going on.

Page 60

REPORTER'S CERTIFICATE

STATE OF IDAHO      )
                    )  ss.
COUNTY OF ADA       )

        I, MARYANN MATTHEWS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

        I further certify that I have no interest in the event of the action.

        WITNESS my hand and seal this 24th day of May, 2022.

                              <%11030,Signature%>
                              MARYANN MATTHEWS
                              CSR and Notary
                              Public in and for the
                              State of Idaho.

My Commission Expires:  04-13-27

Page 63

PALOMA P. PERACCHIO, ESQ.

paloma.peracchio@ogletree.com

May 24, 2022

RE: SANCHEZ VS. SAM'S WEST, INC.

MAY 20, 2022, CARLOS GONZALEZ, JOB NO. 5241952

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 64

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 65

# EXHIBIT 20:

**Exhibit 3 to the May 20, 2022 deposition of Carlos Gonzalez Club Manager at Sam's Club's Glendora location.**

## LODGED WITH  THE COURT

**PAGE 394**

Case 2:21-cv-05122-SVW-JC   Document 96   Filed 01/03/24   Page 395 of 890   Page ID #:3623

# EXHIBIT 21

**PAGE 395**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually )
and on behalf of other       )
individuals similarly        )
situated,                    )
                             )
          Plaintiff,         )
                             )Case No.
vs.                          )2:21-CV-05122-SVW-JC
                             )
SAM'S WEST, INC. dba SAM'S   )
CLUB, an Arkansas            )
corporation,                 )
                             )
          Defendant.         )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION

OF

PARIS NGUYEN



    (All participants appeared via videoconference.)






DATE:  MARCH 29, 2022

REPORTED BY:  Lori L. Thielmann, RPR, CCR #21-0014

Page 1

A P P E A R A N C E S

(All parties appearing via videoconference.)

FOR PLAINTIFF:

KILEY GROMBACHER

Bradley/Grombacher, LLP

31365 Oak Crest Drive

Suite 240

Westlake Village, California 91361

805.270-7100

ljoyner@bradleygrombacher.com

FOR DEFENDANT:

PALOMA P. PERACCHIO

Ogletree, Deakins, Nash, Smoak &

Steward, PC

400 South Hope Street

Suite 100

Los Angeles, California 90071

213.239.9800

paloma.peracchio@ogletree.com

ALSO PRESENT:   ROEDY WIBOWO, Videographer

JENNIFER BECHET, Walmart Inhouse Counsel

* * * * *

Page 2

A.   What do you mean by minimum?  Like in each area?

Q.   So I mean, is there -- I know that there could be some fluctuations in the number of individuals who work a closing shift, but is there -- just a minimum number of individuals who will be working the closing shift that you know of that will always be at least X amount of people working a closing shift at La Habra?

A.   Oh, we have associates on block schedules.  I mean, those are our full timers.  They are -- they have -- their days are consistent where every week they pretty much work the same days.

Q.   Okay.

A.   And then we have part-timers that fill those days when one of our full timers are off.  So when we do schedules, they're based upon the allocations of the hours and the business needs that's in the system.

Q.   And I did depose somebody from the company who talked about that, you guys use a software, but I can't remember the name of it.  Do you happen to remember the name of the scheduling software that does the block schedules?

A.   JDA?

Q.   It's not a test.  I was just going -- I just wanted to use the name if you remember it.  I don't

Page 35

A.   So the door greeter leaves at night and that's why the other closing manager will be there after that door greeter is there.

Q.   Okay.  So at the La Habra location, a door greeter remains at the door until 9:00 p.m.?

A.   Yes.

Q.   Okay.  Does the La Habra store have security videos at that location?

A.   Yes.

Q.   Are the cameras positioned towards the entrance and exit doors, do you know?

A.   Yes.

Q.   Have you reviewed any security footage taken by video cameras stationed near the entrance or exit doors at the La Habra Sam's location?

A.   I view it with my compliance manager, because I don't know the camera system here.

Q.   That makes sense.  I've never seen any of the security footage.  What is the view like?  What does it show you?  How much do you see?

A.   Well, it shows who's entering and exiting the door.

Q.   Does it show you any area within the Sam's location?

A.   Like, what do you mean?

Page 47

Q.  So I understand that it -- there's a view of the door.  Can you see any of the interior of the facility from the camera?

A.  Yes, I mean, I don't -- in La Habra store, I don't know where the cameras are stationed unless I have a member complaint.  I mean, I haven't viewed what camera's where.

Q.  Okay.  So in the La Habra location, you've never viewed any security footage?

A.  Only when there are members complaining about it.

Q.  Okay.  So you have reviewed security footage?

A.  Let me clarify.  Okay.  So if a member complains and let's say they were in the front end that stuff they left behind or got charged, we would have to view that.  And if there's a door run, let's say if a theft that took place, we would have to see which door they went out of.

Q.  Okay.  So there is some video though that shows footage of the front end of the store?

A.  Yes.

Q.  If there were associates who were waiting to be released at the end of the day, would that front end footage show individuals waiting by the door -- like would you -- would that be within the view?

Page 48

A.    Yes.                                            15:22:28

Q.    Okay.    At the San Bernardino location, are the    15:22:29
entrance doors locked once the store is closed to the    15:22:43
general public?                                      15:22:47

A.    Yes.                                            15:22:48

Q.    Are the exit doors locked in San Bernardino    15:22:49
once the store is closed to the general public?    15:22:54

A.    Yes.                                            15:22:58

Q.    In Long Beach, are the entrance doors locked    15:22:58
once the store is closed to the general public?    15:23:04

A.    I don't recall on that one, because it was a    15:23:08
long time ago --                                     15:23:16

Q.    Okay.                                          15:23:17

A.    -- I've been --                               15:23:18

Q.    That's fair.    And it could be different.    When    15:23:20
you were there would be probably all I could ask you and    15:23:23
if you don't recall, that's fine.                    15:23:26

Do you know why the exit door is unlocked in La    15:23:36
Habra after --                                       15:23:41

A.    Because we have --                            15:23:42

Q.    Hold on one second.    That's my fault, because I    15:23:44
added stuff at the end.    Let's strike it and start    15:23:48
again.                                               15:23:52

Do you know why the exit door is unlocked at La    15:23:53
Habra even after the store closes to the general public?    15:23:56

Page 49

A.  Sometimes we have associates that leaves at  15:23:59

8:30 or between 8:00 and 8:30.  Sometimes we still have  15:24:03

a few straggler of members in there so we can't just  15:24:08

lock the door until members -- and then sometimes  15:24:12

associates are paying at the checkout.  15:24:16

Q.  What time does the La Habra store close to the  15:24:19

general public?  15:24:25

A.  8:00 the entrance door gets closed.  15:24:26

Q.  Okay.  Is that true on Sunday as well?  15:24:29

A.  Sunday, we close at 6:00.  15:24:34

Q.  Is the exit door ever locked at any point  15:24:36

during a closing shift at La Habra?  15:24:44

A.  After hours or after -- clarification.  15:24:46

Q.  Sure.  After the store closes to the public, is  15:24:52

the La Habra exit door ever locked?  15:24:59

A.  I don't know.  15:25:02

Q.  Do you know whether the exit door in La Habra  15:25:04

is ever locked at any point during a closing shift?  15:25:16

A.  I don't know other than that the door greeter  15:25:19

leaves at whatever the door greeter leaves at that time.  15:25:27

But like I said, door greeter leaves at 9:00 -- the exit  15:25:31

door greeter leaves at 9:00, so even on a Sunday because  15:25:35

we have full-time block schedules, there should be --  15:25:38

there's people there until 9:00 in the front end.  But  15:25:42

once the door greeter leaves, then we have manager that  15:25:49

Page 50

-- that locks or unlocks that door and a team leads, the Merch team leads.

Q.  Okay.  So at some point during the closing shift, both the entrance and exit doors are locked at La Habra?

A.  Yes.

Q.  Correct?  Okay.  However, it's your expectation that there would be an individual who has keys at or near the door; is that correct?

A.  Yes -- yes.

Q.  And your expectation is based on what?

A.  As experience that I dealt with running a business.

Q.  Okay -- okay.  So what experience are you drawing from?

A.  Okay.  So as a manager, you are responsible for the whole club, so like I said, if associates doesn't come out on time or, you know, they always come and address it, but I mean, I have no issues that since I've been in La Habra that any associates complain about not being let out.  So the process that was in place here, I mean, I didn't have any complaints out of the years I've been, you know, in here, San Bernardino, or Long Beach.  So when the complaints arise, we address the issues.

Q.  Okay.  So because you've never experienced an

Page 51

C E R T I F I C A T E

I, LORI L. THIELMANN, a Certified Court Reporter licensed in and for the State of Washington and a Registered Professional Reporter, do hereby certify that the witness, PARIS NGUYEN, before testifying was duly sworn to testify to the whole truth; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting by me or under my direction; that the foregoing pages are a true and accurate transcript of all proceedings had upon the taking of said testimony, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of April, 2022.

LORI L. THIELMANN, RPR, CCR

License No. 21002182

Page 74

KILEY GROMBACHER

ljoyner@bradleygrombacher.com

APRIL 1, 2022

RE: CARLOS SANCHEZ VS. SAM'S WEST, INC.

MARCH 29, 2022, PARIS NGUYEN, JOB NO. 5149117

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 75

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 76

# EXHIBIT 22

**PAGE 407**

# Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 19, 2023

In the matter of:

# SANCHEZ v SAMS WEST, INC., et al.

## BENNY MORA



Reported by:

Cherie Anderson
RMR, RPR, CRR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**PAGE 408**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
2:21-CV-05122-SVW-JC

CARLOS SANCHEZ, individually and :
on behalf of other individuals    :
similarly situated,               :
                                  :
          Plaintiff,              :
                                  :
     vs.                          :
                                  :
SAM'S WEST, INC., d/b/a SAM'S     :
CLUB, an Arkansas corporation,    :
                                  :
          Defendant.              :
_____

    VIDEOTAPED DEPOSITION OF BENNY MORA
_____

DATE TAKEN:        Tuesday, December 19, 2023

TIME BEGAN:        10:10 a.m. Pacific

TIME ENDED:        11:44 a.m. Pacific

LOCATION:          Conducted via videoconference

REPORTED BY:       Cherie J. Anderson, RMR, RPR, CRR
                   Steno
                   315 West 9th Street, Suite 807
                   Los Angeles, CA  90015
                   (310) 573-8380
                   NV FIRM# 108F

APPEARANCES:


            BRADLEY/GROMBACHER LLP
            BY:  MARCUS J. BRADLEY, ESQUIRE
            31365 Oak Crest Drive, Suite 240
            Westlake Village, California  91361
            (805) 270-7100
            mbradley@bradleygrombacher.com
            (Appearing via videoconference)
            Representing the Plaintiff



            OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
            BY:  PALOMA P. PERACCHIO, ESQUIRE
            400 South Hope Street, Suite 1200
            Los Angeles, California  90071
            (213) 239-9800
            paloma.peracchio@ogletree.com
            (Appearing via videoconference)
            Representing the Defendant



ALSO PRESENT REMOTELY:  Autumn Taylor, Videographer

                        Jennifer Bechet, Esq.

**PAGE 410**

Q   Okay.  So when employees leave for their shift at 11:30, what doors do they exit the building?

A   The exit, for the most part.

Q   What do you mean?

A   The exit side.  The exit side.

Q   Okay.  So on the left of that picture, there's kind of a blue square, and it looks like somebody's exiting the building or standing -- or is that where the exit doors are?

A   That's correct.

Q   Are they double doors like the entrance?

A   They're double doors, yes.

Q   So how is it determined what doors the employees exit when the shift is over at 11:30?

A   It's up to the person who is opening the door. For the most part, for -- unless there's -- they're waxing the floors or something, they're cleaning or something, they pick that exit door for people to leave -- associates to leave.

MR. BRADLEY:  All right.  So Paloma, can you put up Exhibit 2, the next picture?

MS. PERACCHIO:  Yes.

Q   All right.  And I believe at the outset of the deposition, Mr. Mora, you said that that doesn't look familiar to you.  Is that correct?

A   Yeah.  They're the same.

Q   I mean the same since you've been there in June of 2023.  Right?

A   Correct.

Q   Are there video cameras in the San Diego club?

A   Yes.

Q   Do you know where the video cameras are located?

A   Yes.

Q   Where are they located?

A   Throughout the club.  We cover exits, entrances, pharmacy.  Like as specific areas of the club:  jewelry, front end, member desk, back room, aisles throughout the club, registers, you know, tire -- tire shop -- tire-shop area, vision.  Like, pretty much the whole club is being recorded.

Q   Do you know if it's -- the recordings are 24 hours a day?

A   Yes, sir.

Q   Are they 24 hours a day?

A   24 hours a day.

Q   Do you know how long the recordings are kept?

A   Not sure exactly how long the company keeps them.  It's a long time, though.

Q   More than a month?

**PAGE 412**

A   I'm not sure.  I can't say exactly, but more than a month.

Q   So focusing on the cameras on the doors that are marked Entrance and the doors that are marked Exit, there are security cameras running 24/7 on both of those locations.  Correct?

A   Correct.

Q   Have you ever reviewed any footage of security cameras at either the front entrance or the exit?

A   Yes.

Q   What caused you to do that?

A   Issues with the members, a death, accident, for the most part.

Q   Have you ever reviewed video-camera footage of the closing shift where you observed associates waiting to be let out of the store at the end of the shift at 11:30?

A   No.

Q   You had said earlier you have been at the closing shift -- or strike that.

You had said you had been there when the store closes to customers at 8 o'clock.  Correct?

A   Correct.

Q   Have you ever been present when the 11:30 -- the people who conclude their shift at 11:30 are let

at the time, until the associate goes to their car and they leave.

Q   Okay.  Let me break this down even more.  Okay.  So at 8 o'clock, the customers -- at or around 8 o'clock, because there might be some straggler customers, somebody goes and locks the doors for the entrance and the exit.  Correct?

A   Correct.

Q   And there's a metal gate.  Is that in front of the doors or on the outside of the door?

A   They are inside the club in the interior part of it.

Q   Okay.  The metal doors?

A   Yes.

Q   Do the metal doors roll down?

A   We -- yes.  We use the key, and they roll down, to protect --

Q   Sorry.  Go ahead.

A   Just to protect, like, anybody having access to go in the club through those doors, we shut the gate, and we have one of the entrance, one of the exits.

Q   Do those -- do they roll down?

A   Correct.

Q   And are those locked -- those metal gates --

**PAGE 414**

or is it just when you turn in the key, it automatically shuts?

A    No.   We have to turn the key up and have to turn the other way down.   And they don't have -- nobody has -- but the key carriers will have a key for that.

Q    Okay.   The key isn't in that receptacle where -- it's not left in where --

A    No.

Q    -- you turn to turn it up or turn it down?

A    No.

Q    The key carrier holds that key as well?

A    Correct.

Q    And the key carrier holds the keys to the double doors for the entrance and the exits as well. Correct?

A    It's the same key.

Q    It's the same key.   Okay.

All right.   So the employees collect their stuff from upstairs, whatever, and they walk down. Do they walk down in a group or you don't know?

A    They -- I don't know.   It is possible, but I don't know.

Q    So the key carrier, the assistant manager, is standing at whatever exit they have decided that the

A    Okay.

Q    Let me know when you're finished.  I don't mean to rush you, but --

A    Okay.  So I don't -- I don't see specifically about talking about wages [unintelligible], but there's a piece here that it shows working unscheduled hours that --

Q    But there's nothing specific to waiting to be let out of the store at the end of the shift.  Correct?

A    Not that I see, no.

Q    Okay.  Do you ever tell employees who are subject to having to wait at the end of a shift to be let out after they've clocked out that they are entitled to adjust their time?

MS. PERACCHIO:  Objection.  Assumes facts.

Q    Have you ever told that to employees?

A    I'm not sure if I have, but if at any point I know that they work off the clock, I'll pay them.  No doubt.

Q    Have you ever paid any employees for waiting to be let out of the store after they've clocked out at the end of their shift at 11:30?

MS. PERACCHIO:  Objection.  Vague and ambiguous as to "paid."

**PAGE 416**

A   No, not me.

Q   Have you ever instructed any assistant manager or key carrier to inform the employees that if they are waiting to be left out -- to let -- waiting to be let out at the end of the shift after they've clocked out that they're entitled to a pay adjustment?

A   Not specifically about waiting, but specifically about anybody working while they're not on the clock, like text messaging associates or -- I have talked to them about making sure that we compensate the associates for doing work-related activities.

Q   But nothing specific as to making a pay --

A   No.

Q   -- adjustment if they are waiting to be let out of the store at the end of the shift after they've clocked out.  Correct?

A   Correct.

MR. BRADLEY:  All right.  Let's go off the record for a couple of minutes.  I'm just going to look through my notes.  I don't think I have much, if anything, left.

So if you will indulge me while I do that, and then we'll -- Paloma, like five minutes?

MS. PERACCHIO:  Yes.  That sounds good.

CERTIFICATE OF REPORTER

I, Cherie J. Anderson, Registered Merit Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate, and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on this 1st day of March 2023, at Wilmington, New Hanover County, North Carolina.

_____
Cherie J. Anderson, RMR, CRR
My Commission expires
December 22, 2026

# EXHIBIT 23

**PAGE 419**

# Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 22, 2023

In the matter of:

# SANCHEZ v SAM'S WEST, INC., et al.

## LAURA HERNANDEZ



**CERTIFIED COPY**

**Reported by:**

Maureen M. Elrod
CSR No. 809476

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**PAGE 420**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case No:  2:21-CV-05122-SVW-JC


CARLOS SANCHEZ, individually and        )
on behalf of other individuals similarly )
situated,                                )
                                         )
                Plaintiff,               )
                                         )
v.                                       )
                                         )
SAM'S WEST, INC., dba SAM'S             )
CLUB, an Arkansas corporation,           )
                                         )
                Defendant.               )
_____)




            REMOTE VIDEOTAPED DEPOSITION OF LAURA

HERNANDEZ, located in California, commencing at 10:01

A.M. Pacific Time, on Friday, December 22, 2023, before

Maureen M. Elrod, Certified Shorthand Reporter 809476,

in and for the State of Florida.




STENO
Concierge@Steno.com
(888)707-8366

APPEARANCES VIA ZOOM:

FOR THE PLAINTIFF:

    MITCHELL A. WROSCH, ESQUIRE - via Zoom
    Ogletree, Deakins, Nash, Smoak & Steward, P.C.
    Park Tower, Fifteenth Floor
    695 Town Center Drive, Suite 1500
    Costa Mesa, California  92626
    (714) 800-7900
    Email:  mitchell.wrosch@ogletreedeakins.com

FOR THE DEFENDANT:

    KILEY L. GROMBACHER, ESQUIRE - via Zoom
    Bradley/Grombacher, LLP
    31365 Oak Crest Drive, Suite 240
    Westlake Village, California 91361
    (805) 270-7100
    Email:  kgrombacher@bradleygrombacher.com

IN-HOUSE COUNSEL FOR WALMART:

    JENNIFER B. BECHET, ESQUIRE - via Zoom
    Stone Pigman Walther Whittmann, LLC
    546 Carondelet Street
    New Orleans, Louisiana 70130
    (504) 581-3200

ALSO PRESENT:

    Mason Dyer, Videographer

**PAGE 422**

to Sam's when you worked at 6614?

A    No.

Q    Okay.  What about when you worked at 6626; did you have a key list?

A    I don't remember.

Q    Okay.  Fair enough.  How many individuals are in the store after it is locked and closed to the general public who have keys, typically, at Santa Clarita?

A    Typically, it will be between one to three.

Q    What determines how many are in the store on a particular shift?

A    I look at our busiest days.  I obviously start off with our weekends, to Monday or Friday.  And I will always schedule two, plus the merch team lead, on those days.  And then Tuesday, Wednesday will probably be about two.

Q    Do you use closed-circuit cameras at Santa Clarita?

A    We do use cameras, but closed-circuit, I'm not -- is that a --

Q    Let me just say, do you use any kind of security cameras at Sam's Club?

A    We do.

Q    How many cameras do you have at Santa Clarita?

A    I don't know.

Q    Do you ever review the footage from the cameras?

A    Yes.

Q    Do you know the location of any of the cameras that are at Santa Clarita?

A    Yes, I do.

Q    Where are they located, to the best of your recollection?

A    I have a couple in the parking lot.  I have a couple in our vestibule; one in TMA; above the registers; above self checkout; in receiving; outside of receiving; and then numerous scattered throughout the entire 135-square-foot building.

Q    That makes sense.  For the ones in the parking lot, are any of those -- do any of those show the exit door of the facility?

A    Yes.

Q    How many capture the exit door of the facility?

A    Two of them.

Q    And the one in the vestibule, does that also capture footage that shows the exit door of the facility?

A    Yes.

Q    Is that an internal view of the exit door?

A    It's facing towards the club -- yes.  Yes.

Q    Okay.  Do you use these cameras for security purposes at Santa Clarita?

A    Yes.

Q    Do you ever use them to look at customer flow at Santa Clarita?

A    Can you ask me that again?

Q    Sure.  Do you ever use these cameras to help you determine how customers move in and out of the store at Sam's Club?

A    No.

Q    Okay.  Do you use the security footage for anything other than just security purposes at Santa Clarita?

A    We do review them to review our forklift drivers, just to make sure that they're, you know, driving safe, following the processes.

And mainly just to investigate security, fraud.

Q    Do you have any security guards that work in the parking lot at Santa Clarita?

A    I do.

Q    How many security guards do you have?

A    One.

**PAGE 425**

Q   Does that employee work -- or does that position -- is that -- strike that.

Is that position staffed at Santa Clarita every day the store is open to the public?

A   It's a third-party contractor company that we use and they are scheduled every day.

Q   Does the security individual remain at the store or on the premises after the store's closed to the general public?

A   From 9 to 10, he stays at the exit.  But other than that, he's walking in the parking lot, for the most part.

Q   Does his shift end at 10 p.m.?

A   Correct.

Q   Does the security individual stationed at the exit have the ability to open the door once it's closed to the general public?

A   He doesn't have the ability to lock it, but he does stay there with the doors unlocked.

Q   Okay.  What time do the exit doors get locked at Santa Clarita?

A   At 10:00.

Q   For the associates who are managerial employees, the assistant manager, what are their duties and responsibilities between the hours of 10 p.m. and

facility to ensure that the store was ready for the next day.

A    Yes.

Q    And is that the same at Store 6626?

A    Yes.

Q    Is there a requirement that a key carrier stay at the exit door after it's closed to the -- after 10 p.m.?

A    Can you ask me that again?

Q    Yeah.  I asked it poorly.  After 10 p.m., is there a requirement that an individual remain at the exit door who has the ability to unlock the door?

A    They're not to -- they're not required to stay there or stand there, but we do know, again, due to the block schedule, our managers are expected to let the associates out right before -- after the security guard leaves.

Q    Has anybody ever complained to you about having to wait around to be let out of the store after 10 p.m.?  Any of the hourly associates?

A    No.

Q    Have you ever personally seen any hourly associates waiting at the door to be let out after 10 p.m., after they've clocked out?

A    No.

**PAGE 427**

Q    Have you ever reviewed any security footage to see if employees are waiting at the front door to be left [sic] out, after they've clocked out?

A    No.

Q    Did Sam's ever ask you to review that footage?

A    No.

Q    Having reviewed the camera footage, would it be possible to see if employees were waiting to be let out at the end of a shift, based on the review of the film captured by those cameras?

A    Yes.

Q    Would it be possible to see if a manager was there unlocking the door after the employees clocked out, based on that security camera footage?

A    Yes.

Q    Do you know if there is any litigation holds on that security camera footage at the Santa Clarita store currently?

A    No, I do not.

Q    No, you do not know, or, no, there is not one?

A    No, I do not know.

Q    Okay.  If there was a litigation hold on a particular document at Sam's Club, at your facility, would you know about it?

A    Yes.

Q    In -- in -- is it your understanding that if employees have to wait to be let out of the store at the end of a closing shift, after they've clocked out, that time would be compensable time that they should be paid?

A    Yes, they should be paid if that's happening.

Q    Okay.  Has Sam's Club ever told you that?

A    Yes.

Q    Do you know who at Sam's Club told you that that should be the policy?

A    I don't have an exact person, but that is a policy that -- or a focus point that we do have in our company.

Q    Okay.  That's fine.  Do you know of any documents that say that, when employees are in the -- in the store, if they have to wait to be released, after the doors are locked, that they should be paid for that time?

A    I don't recall the exact policy, but there is one that we reviewed, approximately, about a year ago, just to ensure that everybody is getting paid if they're on the clock -- or in the building.

Q    And when you said, we reviewed it a year ago, did you review it with an attorney?

A    No.

Q    Who did you review it with?

A    I reviewed it with my team, with my managers and my key holders.

Q    Do you -- was this during a particular meeting?

A    It was a particular one meeting for this discussion, but I also did one-on-ones.

Q    Okay.  Do you have -- do you keep minutes of any of those meetings so that we could see, like, what day it was, specifically, or what the policy was that you looked at?  Because I know it's hard to remember.  Like, would there be a document that could refresh your memory about what you looked at during that meeting?

A    You know, I actually do save, for a few months, but, thereafter, I actually throw that away.  And I do remember doing that, because I no longer needed it.  It's been a few months.

Q    Sure.

A    But other than that, I don't have anything else.

Q    That's fine.  But you remember personally speaking to your assistant managers and letting them know that if employees were waiting to be let out after the doors were locked, they should be paid for that time, correct?

A    Absolutely.  Yes.

Q    That was about a year ago?

A    Correct.

Q    Okay.  And did that meeting also include -- or did you also talk to the team leads?

A    No.  Just my key holders, my managers.

Q    Okay.  If a team lead was a key carrier, would they have been involved in this conversation?

A    From the managers' point, yes.

Q    Okay.  So this was an assistant managers' discussion?

A    Correct.

Q    Okay.  Totally get it.  Did any managers say, yeah, shoot, that's been happening here, sorry, we didn't know that was the policy, or anything along those lines?

A    No.

Q    Did anyone ever mention that that had happened on any occasion at the Sam's Club, in Santa Clarita, during the six years you'd been there?

A    No.

Q    Would it be possible that employees would have waited in the store on at least one closing shift to be let out after the doors were locked?

MR. WROSCH:  Objection.  Calls for speculation.  You can answer.

MS. HERNANDEZ:  It can be.  I'm not there 24/7, but my managers understand the policy of letting associates out on time.  If anybody had approached me with an open door, we know the process, which is basically making sure that we have them fill out the form and pay them for their time.

BY MS. GROMBACHER:

Q   Okay.  That's -- that brings me to a second point.  So if this were to happen, the expectation from Sam's is that those associates would fill out a form so that they could be paid for that time, is that -- am I understanding that correctly?

A   Correct.

Q   And what is the name of that form?

A   Wage and hour.

Q   Okay.  Is it something that they fill out online, or how do they access that form?

A   Online.

Q   Okay.  Do you know if there is any training provided to the hourly associates that lets them know that time waiting, if they work a close shift when the doors are locked, is supposed to be paid time?

A   We do have computer-based training that our associates take upon orientation and throughout their

whole tenure and it does cover not working off the clock.

Q    Okay.  So it covers off the clock.  Do you know if it specifically includes this type of off the clock where they'd just be waiting as opposed to, let's say, doing take-backs or scanning merchandise, or something like that?

A    I do not know.

Q    Okay.  That's fine.  When they fill out those wage forms electronically, are there drop-down menus to tell them, kind of, what's happening or do they type it in?  How do they let -- how do they let you and Sam's know why they worked off the clock?

A    We actually have to sign off on that.

Q    Okay.  So -- I don't know if I've personally seen the forms.  So they put in their name.  They put in their shift.  And then do they just write happened, or is there -- do they select something, or how do they -- how do they fill it out?

A    They add the additional time.

Q    Okay.  At Santa Clarita, has anyone ever asked for additional time for waiting to be let out of the facility?

A    No.

Q    So there's never been a wage adjustment, that

you know of, based on somebody waiting at the facility to be let out?

A    If -- no.

Q    Okay.

A    Not in that cir -- no.

Q    Okay.  Do you remember, when you worked at 6614, if anybody ever filled out a form to be paid for time waiting to be let out, after the doors were locked?

A    I don't remember.

Q    I'm not even going to ask about 6626 because --

A    Yeah.

Q    -- you probably don't remember.

Let's take a really -- do they have to -- before we take a really quick break, on the time sheet, do they have to put a reason or a code in for why the time didn't get clocked, on the time adjustment form?

A    There is a reason.

Q    Okay.  And do they supply the reason or is there a choice of reasons?

A    The associate supplies the reason.

Q    Okay.  So it's fillable.  They just type it in themselves.

A    Correct.

Q    Okay.  So it's not a drop-down.  It's not --

Q    What was he doing?

A    Just stocking the building, merchandising.

Q    Okay.  What are the work duties of your hourly associates at Sam's, generally?

A    What are the work duties?  Just merchandising the product, recovery, auditing items to make sure our on-hands are correct.

Q    Who is responsible for training employees about their work duties?

A    Myself and assistant managers.

Q    What training do employees -- hourly employees receive about when they should be clocked in to perform work?

A    Again, we do have the computer-based training that makes it very clear not to be working off the clock.

Q    Does the computer-based training give examples of off the clock work, to your knowledge?

A    Not -- I don't know, to my knowledge.

Q    In terms of training specifically in your stores, do you ever provide associates with a list of job duties?

A    Yes.  We have job descriptions.

Q    On the job descriptions, do any of the duties include waiting in the store, after the doors are

locked?

A    No, it does not.

Q    Can you give me examples of some of the job duties that are on those job descriptions, just generally?

A    It will cover just ensuring or taking care of the member, proper dress code.  We use proper etiquette, respect for the individual, regardless of who the individual is.  And then it will go into specifics, depending on each area.

Q    During the entirety of your time, over a decade at Sam's, are you aware of any document that advised hourly associates that time spent waiting, after the doors were locked, to be released, after they clocked out, should be paid time?

A    No, I am not.

Q    Okay.  Do you know of any memos that may have gone out in Santa Clarita to associates telling them, specifically, that time spent waiting in the store, after doors were locked to be let out after they clocked out, should be paid time?

A    No, I don't.

Q    Okay.  In terms of the wage and hour line, other than the one time you recall, a few months ago -- or I may be wrong on time -- where one associate

reported another associate was in the building,

merchandising off the clock, do you know of other

instances where it was reported to you that employees

were performing work duties off the clock?

A    No.  That's the only one that was reported to me.

Q    Have you ever worked with wage and hour for any other issues that have arisen in the Santa Clarita store?

A    I have not, no.

Q    Okay.  Have you ever worked with them on issues that may have arisen at 6614?

A    I don't remember.

Q    Okay.  And I think this is going to be a long shot, but do you remember ever working with them at 6626 about any wage and hour issues?

A    I do not.

Q    Do you know if any off-the-clock time that was submitted on a time adjustment by an employee at Santa Clarita was ever denied?

A    No.

Q    Do you know of any employees at Santa Clarita that were ever reprimanded for working overtime hours?

A    Can you ask me that again?

Q    Yes.  Are you aware of any coaching or

counseling for employees -- hourly employees at Santa Clarita in conjunction working overtime hours?

A    Yes.  I can't give you --

Q    On how -- oh, sorry.  Go ahead.

A    Go ahead.

Q    On how many occasions are you aware of there being coaching for associates working overtime hours at Santa Clarita?

A    I don't recall the associate, but I know it has happened maybe a handful of times.  Five.

Q    And is that in the six years that you've been in charge of that store?

A    Correct.

Q    Okay.  Are you aware of any associates who've been coached or counseled for working off the clock at Santa Clarita?

A    Yes.  The one that I just mentioned, that I had reported.  Both the associate and the manager were held accountable.

Q    And what -- what -- how was the manager held accountable?

A    The manager was held accountable because he was in the building, as well.

Q    Okay.  Was he reprimanded or did he receive some kind of warning?

A    I'm sorry, held accountable means he received a written warning.  Both of them.

Q    Okay.  So they both got written warnings?

A    Correct.

Q    Okay.  Did they ever say anything about why they were working off the clock or why the manager was permitting off-the-clock work to occur?

A    My associate stated that he was helping my manager.  And my manager did not give me a reason or why.

Q    Okay.  I'll look really fast, because I don't think I have many more questions for you.

After the meeting that you had about a year ago, with your assistant managers, are you aware of any team huddles or meetings that those managers had with hourly associates about remaining in the facility, off the clock, waiting to be left out -- let out?

A    No.

Q    Do you -- was there any reason, specifically, why you decided to have that meeting with your assistant managers?

A    It was a direction from home office.

Q    Okay.  Do you ever participate in meetings with other club managers?

A    Yes.

Q   In the last six years, while you've been at Santa Clarita, do you recall having any conversations or meetings with other district managers about employees waiting in the store locations after they clocked out, to be let out, to have the doors unlocked?

A   No.

Q   When you got direction from home office about the meeting, do you recall whether that was in a written document?

A   We have received a written document, yes.

Q   Okay.  Do you know who sent that to you?

A   It comes out as club communication from our home office, so it's just sent to all club managers.

Q   Got it.  Do you know if the legal department is responsible for generating any of those -- or generating that document, specifically?

A   I'm sure they're involved.

Q   Was it from the legal department?

A   I don't recall.

Q   Do you know the -- what did the -- the content of the document, do you know what it said?

A   I do not.

Q   But based on that document, you held the meeting and reminded your assistant managers that if employees ever have to wait to be let out, after the

doors were locked, that time is compensable; is that
accurate?

A     It was about working off the clock.

Q     Oh, it was more generally about working off
the clock?

A     Correct.

Q     Okay.  Did you specifically talk about time
spent waiting in the store, after the doors were locked?

A     No.

Q     Have you ever -- have you ever spoken with
your assistant managers advising them that if employees
are in the store waiting to be let out, after the doors
were locked, that time should be paid?

A     No.

Q     Are you aware of any written instruction from
Sam's, to assistant managers, letting them know that if
employees are in the store, after the doors are locked,
waiting to be released, that time should be paid?

A     In my -- can you ask me that again?

Q     Sure.  Do you know of -- yeah, it was probably
a crazy one.  Are you aware of any documents from Sam's,
to your assistant managers, regarding the policy that if
employees have to wait to be released at the end of
their closing shifts, after they lock -- after they
clocked out, because the doors were locked, that that

time should be paid?

A     No.

Q     Okay.  And you're not aware of any training for associates specifically on that point, that they should be paid for time they spent waiting, if any, after the doors are locked, to be let out, correct?

A     No.  Correct.

Q     Are you aware of any specific documents that advised them that time adjustments should be used if they are waiting to be let out, after the doors are locked, after they've clocked out?

A     No.

Q     Are you aware of associates ever being told that they should stay on the clock and wait for a manager to unlock the door before they clock out at the end of the day?

A     Can you ask me that again?

Q     Sure.  Are you aware of any associates ever being told to stay on the clock until the door is unlocked, and then clock out at the end of their closing shift?

A     No.

Q     Employees are instructed to clock out after their closing shift, and then proceed to the exit; is that correct?

**PAGE 442**

A     That is correct.

Q     Okay.

MS. GROMBACHER:  I think that's all I have.  I want to keep you moving.  So hopefully I didn't miss anything major.  But I'm going to let you go.

VIDEOGRAPHER:  Any other questions from counsel?

MR. WROSCH:  Not from me.

VIDEOGRAPHER:  All right.  Well, before I take us off the record, would anyone like to get their transcript or video orders in, on the record?

MS. GROMBACHER:  I'm gonna have -- I don't know what everyone's doing.  So apologies.  So I'm going to have our office call you right -- right away, if that's okay.

VIDEOGRAPHER:  All right.

MR. WROSCH:  Not at this time for me.

VIDEOGRAPHER:  All right.  And with that, I can go ahead and take us off the record.

This concludes the deposition of Laura Hernandez, in the matter of Sanchez versus Sam's West, Incorporated.  We are now off the record. The time is 11:28 p.m. Pacific time.  Thank you all very much.

(The proceedings concluded at 11:28 a.m.

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, licensed by the State of Florida, being empowered to administer oaths and affirmations remotely pursuant to Administrative Order AOSC20-17, of the Supreme Court of Florida, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that before the completion of the proceedings, review of the transcript was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:   December 22, 2023

_____
Maureen M. Elrod, CSR No. 809476
Notary Public No. HH 266810
Expires:  July 17, 2026

# EXHIBIT 24

**PAGE 445**

# Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 27, 2023

In the matter of:

# SANCHEZ v SAM'S WEST, INC., et al.

# JOHN GASTON

**CERTIFIED COPY**

**Reported by:**

Nicole Hatler
CSR No. 13730

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**PAGE 446**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

CARLOS SANCHEZ, individually and on
Behalf of other individuals similarly
situated,

      Plaintiffs,

vs.                                   No. 2:21-CV-05122-SVW-JC

SAM'S WEST, INC., d/b/a SAM'S
CLUB, an Arkansas corporation,

      Defendants.
_____/

VIDEOTAPED REMOTE CONFERENCING DEPOSITION OF JOHN GASTON

Stenographically reported by NICOLE HATLER

California CSR No. 13730

December 27, 2023

opportunity that we have, we just communicate it at a high level.

Q. Have you ever coached an hourly associate who had to wait for a manager after they clocked out to let them out of the facility?

A. No.

Q. Do you have a general set schedule that you work as a club manager at Palmdale?

A. Yes. Off Sunday and Monday -- I mean Sunday and Wednesday, and then close on Tuesday. Everyone other day is usually 6:00 to 4:00 or 7:00 to 5:00, depending on what the business needs are.

Q. Okay. And if you're working closing which you do on -- what day do you work closing?

A. 12:00 to 10:00.

Q. What time -- let me ask this.

Does the Palmdale store lock the exit and the front doors when the stores close to the general public in the evening?

A. Yes. And all facilities should, but yes.

Q. Perfect.

A. That's --

Q. Do you have -- what time are those doors locked?

A. As soon as the last member leaves out. So

it varies.

Q. Okay.

A. Depending when the last member leaves out.

Q. What time does Palmdale store generally close to the -- to the public?

A. At 8:00 p.m.

Q. So do the doors get locked at Palmdale sometime between 8:00 and 9:00 p.m., would you say --

A. Yes.

Q. -- generally?

A. Yes.

Q. Okay. What hourly associates -- scratch that.

What positions staff by hourly associates remain in the building after the -- the doors are locked to the general public?

A. It just depend -- it depends on their schedule.

Q. Okay.

A. Because we actually have a freight flow team that comes in at 9:00; fresh leaders usually work, if they're closing, 1:00 to 9:30; your floor associates; part-timers. It -- I mean, it's a broad scope, so it's, kind of, hard just to

that's working -- I'm sorry.  9:00 p.m. to 5:30 a.m.  I'm sorry.  You might have said 8:30 or 9:30.  I couldn't really hear it.

Q.  Okay.  So --

A.  Those aren't all the associates, no.

Q.  Okay.  So other than those associates, people shouldn't be leaving in the middle of the night.  Everybody should be gone by 9:30 in terms of hourly associates?

A.  Yes.

Q.  Okay.  Thank you.  Those weren't artfully asked questions, but I think it's clear.

A.  You're fine.  You're fine.

Q.  Okay.  Thanks.

In the last few years, have you had any meetings with your managerial employees about employees being -- having to wait at the facility after clocking out at the end of their shifts?

A.  No, no.

Q.  Are you aware of any changes to any policies that relate to employees remaining in the facility after they've clocked out because the doors were locked and they were waiting for a manager to let them out?

A.  It is a policy, AP23, which is the closing

procedures and overnight procedure policy that does state -- and the verbiage does change from time to time.  I don't know what was on it previously, but as of June, it states that those associates must keep track of their time to do a time adjustment so that they could be compensated for their time.

Q.  So in June, did you have any meetings with the hourly associates, or anyone on your team have any meetings with the hourly associates to go over that policy with them?

A.  It was already something that we already covered.  Because our associate pay policy has never changed, from that perspective, as to associates being compensated for their time of just being at the facility.  You -- this -- you can't work off the clock for any reason as an hourly associate.  So that hasn't changed.

Q.  Do you know --

A.  I think it's more detailed, but it's never changed there.

Q.  Okay.  Do you know of any written policy that explains to an hourly associate that waiting in the facility after they clocked out for a manager to release them is time off the clock that they should be compensated for?

up the facility and they weren't there. So hey, all the associates knew, hey, we have to go in and do a time adjustment even though we're here waiting. We haven't performed any job functions, but we should be compensated for our time because it wasn't an issue that -- I mean, it was an issue that prevented us from either doing our job or coming from our job. So I think it's vice versa there.

Q. That makes sense.

Do you review the time adjustments?

A. Do I personally? No. But we do have salaried leaders that review time adjustments.

Q. Do you know whether anyone at Palmdale has ever submitted a time adjustment asking to be paid for the time that they've had to wait to be released at the end of their closing shift after clocking out?

A. No.

Q. No, you don't know, or no, they have never submitted one?

A. No. I've never seen one submitted for that --

Q. Okay.

A. -- or even heard of one being submitted for

that.  Now once again, we're talking about the closing process.  But for the open process, yes, I have, but not to be let out during close.

Q.  Yeah.  Well, that makes sense to me.  If you're waiting to do your job and you just can't get in, I could see how people report that.

When people fill out time adjustments, is that something they do electronically or is that a paper form?

How is that done?

A.  It's electronically.

Q.  Okay.

A.  They just go in, put the time and date actually arrive to the facility or the time that they left the facility.  And the reason why they actually do it is because, like, we may have different time clock issues, or once again, it may be issue like we just talked about, Hey, I was supposed to be here at 4:00 a.m.  The door wasn't open until 4:30.  So my time adjustment is going back to 4:00 because I should be paid for the time I was actually at the facility.

Q.  Do they have -- they have to give them the reason why they need the time adjustment, correct?

A.  Yes, yeah.  It's a dropdown for reasons.

JOHN GASTON
DECEMBER 27, 2023

JOB NO. 810289

Q.   Do you know if any of those dropdown reasons include time waiting to be released after they clocked out?

A.   That, I'm not sure.

Q.   Okay.  When you learned about the lawsuit and the claims, did you talk to any of your assistant managers and ask them whether they had ever seen employees in the facility waiting to be let out after they clocked out?

A.   No, I haven't.

Q.   Is there any reason why you didn't investigate that claim?

A.   Because it's something that's commonly known that my team does a really good job at.  So I didn't have to over communicate something that we already set the standard of.

Q.   And how -- how do you know that it's commonly done?

A.   By coaching, by walking around.  I hear different things like the -- for us, as associates are clocking out getting ready to leave, we already have one team lead that's at the door waiting for them.  And if not a team lead, we have the manager that's there waiting to let them out because they want to make sure that all their associates get out

significantly.

Q.   Okay.  So you had a block schedule that went, for hourly associates, from 3:00 to 11:30 from the time you started at the club up until about what time?

A.   Maybe October or November of last year.

Q.   And how many times -- oh, I'm sorry. Scratch that.

How many times did you work until 11:30 --

A.   About --

Q.   -- with --

A.   I don't.  I don't work until 11:30.

Q.   Okay.  So you don't know what happens with that team, personally?

A.   Left out?

Q.   Correct.

A.   Yeah.  I don't work until 11:30.  Closing shift, for me, is 12:00 to 10:00 or 11:00 to 9:00 or something else like that.

Q.   So when you've witnessed employees leaving from a closing shift, it's either the 9:30 leaving time or the 5:30 a.m. --

A.   Yes.

Q.   -- is that correct?

A.   Yes.  Correct.

Q. Do you have security videos or security cameras at the Palmdale store?

A. Yes.

Q. How many of those do you have?

A. Over 40 -- over 40 to 50.

Q. How many time clocks do you have?

A. One. There's one time clock in the break room.

Q. And is the break room upstairs in the back of this facility?

A. Yes. Not -- more so towards the back, but it's a little bit further down soon as -- once you get past the entrance door.

Q. Okay. How long does it take to walk from the time clock to the exit door?

A. Probably 2 to 3 minutes.

Q. Okay.

A. 2 to 3 minutes taking your time. And once again, the associates that's usually leaving out, they all leave together.

Q. Do you ever hear complaints that people have to wait a long time for the time clock because they're all leaving at the same time?

A. Yes.

Q. Is --

A.   I have heard of that one before.

Q.   Did you ever ask for or consider getting another time clock for the facility?

A.   No.   We just utilize the rest of our resources.   We can clock out electronically, as well.

Q.   How does that work?

A.   You just go to a desktop and clock yourself out, the same way you do a time adjustment.

Q.   And where -- where are those desktops located?

A.   They're -- those are everywhere throughout the club.   There's one right near the exit door, there's three in the manager's office, there's two upstairs in marketing, receiving office has some.

Q.   Do the hourly associates use the computer by the front door uniformly?

A.   I -- no.   I only see them do it -- they'll clock out from there every now and then, but no. It's not -- because we want you to use the time clock.   And when you think about it, it takes a couple seconds, you slide it, clock out, and you're done.   So probably 20 to 25 seconds per associate. It's usually never -- never that log.

Q.   In terms of the security cameras -- I'm

going to go back to those for a second -- do you have any that are in the parking lot that face the -- the -- the front doors or the exit doors of the facility?

A.   Yes.

Q.   Do you have any inside the store that would show the area where the hourly associates are leaving after they clock out once these stores close to the general public?

A.   Yes.

Q.   That's something you can see within the security video footage?

A.   Yes.

Q.   Do you know if there's any litigation hold on the security footage at the Palmdale store?

A.   I'll have to discuss with Mitch on that one, but I'm not sure.

Q.   Okay.  If there was a hold on something at the facility, a litigation hold, is that something that you would know about?

MR. WROSCH:  Objection.

Go ahead.  You can answer.

THE WITNESS:  Oh, we'll -- we'll be communicated if it is.  But once again, I get so many of them, I don't know if it's one currently

**PAGE 458**

active.  So that's why I said I'll need to discuss with Mitchell so we can see if there is one, but it may be --

BY MS. GROMBACHER:

Q.  No problem.  Like I said, I only want your best testimony as you sit here today.

Did you ever review any security footage to see if any employees were waiting in the facility after 11:30 for somebody to let them out after they had clocked out?

A.  No, I haven't.

MS. GROMBACHER:  Okay.  Let's take a quick -- let's take a quick break --

THE WITNESS:  Okay.

MS. GROMBACHER:  -- if you don't mind, maybe 5 or 10 minutes.  I'm trying to go through this as fast as I can to get you out of here --

THE WITNESS:  Okay.

MS. GROMBACHER:  -- but I don't want to miss stuff.

THE WITNESS:  No.  You're fine.  Thank you.

MS. GROMBACHER:  Okay.

THE VIDEOGRAPHER:  The time is 1:43 p.m. Pacific time.  We are off the record.

JOHN GASTON
DECEMBER 27, 2023

JOB NO. 810289

bring different items up to the meeting. We talk about the members, how to make sure that we're providing legendary member service. I mean, it could be anything that we're talking about in those meetings.

Q. Does Sam's ever have you go over any policies or changes to policies during those meetings?

A. No. Your -- your meeting is whatever you want to cover.

Q. Okay. Do you --

A. That's anything that's it's important to talk about. So if it was a concern, then we would talk about it -- or an issue.

Q. Have you ever talked about off-the-clock issues during those meetings?

A. No, no.

Q. Okay. Have you ever talked about overtime during those meetings?

A. Absolutely.

Q. Okay. What type of issues have you talked about that relate to overtime during those meetings, can you give me some examples?

A. More than anything, it's just following your schedule. If you have overtime, you were

**PAGE 460**

JOHN GASTON
DECEMBER 27, 2023

JOB NO. 810280

helping a member, you got caught up doing whatever it is, that's fine.  That's fine.  But let's make sure that we're just following our schedules.  If you're scheduled 8:00 to 3:30, let's not just make a decision and work 8:00 to 6:00 because I had A, B, C, and D to do.  Let's make sure that we communicate with a leader so we can prevent as much overtime as possible.  Because, once again, we will have some overtime just because, you know, taking care of members or, Hey, I had to do this, I had to do that, and of course, business needs, as well. But just making sure that overtime does stay controlled.

Q.  Do you have any security guards that work at the Palmdale location?

A.  It is.  Not in the facility, but outside of the facility, yes.

Q.  Is that through a third party vendor?

A.  Yes.  Brosnan Security.

Q.  Okay.  And how late does the security guard work?

A.  Through about 10:30, sometimes 11:00.

Q.  Okay.  And it's always been the practice since you've been there that the door is locked after the store is closed to the general public?

A.   Yes.

Q.   Do you know if that was the practice at the club before you joined?

A.   Yes.

Q.   Okay.

A.   The club before I joined, so my last previous club?

Q.   No.  Sorry.  That was -- that was an unclear question.  I meant at the Palmdale club before you were the manager.

A.   I'm not sure.

Q.   Okay.  Are you aware of any instance where you or any member of your team specifically instructed an hourly associate that time waiting after they clocked out was considered work time?

A.   I'm sorry.  Repeat that.

Q.   Sure.

Are you aware of any written communications between yourself or your assistant managers where it was communicated to an hourly associate that time spent waiting after they clocked out was compensable time?

A.   Yes.  It's, once again, in that ULearn assignment that they have where they learn about work and unwork time, what they should be paid for,

JOHN GASTON
DECEMBER 27, 2023

JOB NO. 810289

REPORTER'S CERTIFICATE

I, NICOLE HATLER, a Shorthand Reporter,
State of California, do hereby certify:

That JOHN GASTON, in the foregoing
deposition named, was present and by me sworn as a
witness in the above-entitled action at the time
and place therein specified;

That said deposition was taken before me at
said time and place, and was taken down in
shorthand by me, a Certified Shorthand Reporter of
the State of California, and was thereafter
transcribed into typewriting, and that the
foregoing transcript constitutes a full, true and
correct report of said deposition and of the
proceedings that took place;

That before completion of the proceedings,
review of the transcript [] was [X] was not
requested.

IN WITNESS WHEREOF, I have hereunder
subscribed my hand this 27th day of December 2023.

_____
NICOLE HATLER, CSR NO. 13730
State of California

**PAGE 463**

# EXHIBIT 25

**PAGE 464**

## Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 28, 2023

In the matter of:

# SANCHEZ v SAM'S WEST, INC., et al.

## Dustin Schloss



**Reported by:**

Lynette L. Chase
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**PAGE 465**

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and :

on behalf of other individuals    :

similarly situated,                :

            Plaintiff,             :

v.                                 :   Case No.:

SAM'S WEST, INC., dba SAM'S CLUB,:   2:21-cv-05122-SVW-JC

an Arkansas corporation,           :

            Defendant.             :
_____

REMOTE VIDEOTAPED DEPOSITION OF DUSTIN SCHLOSS, commencing at 10:02 A.M. PST, on THURSDAY, DECEMBER 28, 2023, before LYNETTE L. CHASE, Notary Public in and for the State of New York.

APPEARANCES VIA ZOOM:


FOR THE PLAINTIFF:

        BRADLEY/GROMBACHER, LLP

        BY:  KILEY GROMBACHER, ESQUIRE

        31365 Oak Crest Drive

        Suite 240

        Westlake Village, CA 91361

        (805)270-7100

        Kgrombacher@bradleygrombacher.com


FOR THE DEFENDANT:

        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

        BY:  MITCHELL A. WROSCH, ESQUIRE

        Park Tower

        695 Town Center Drive

        Suite 1500

        Costa Mesa, CA 92626

        (714)800-7912

        Mitchell.wrosch@ogletree.com


OTHER APPEARANCES:

DON MICK - LEGAL VIDEOGRAPHER

                ---oOo---


                STENO.COM

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

co-manager in Ontario.

Q    Okay.  Is that the same for Glendora?  Did you assist at Glendora during the time you were a co-manager at Ontario?

A    Yes.

Q    Okay.  And how long was your time assisting the in Glendora store?

A    Three or four weeks.

Q    When you worked in the Riverside location did you work any shifts where the store was locked to the general public?

A    Yes.

Q    When you worked at La Habra did you ever find yourself in the store after it was locked to the general public?

A    No.

Q    In Glendora were you ever in the store after it was locked to the general public?

A    No.

Q    Do you know if the Glendora store locks their doors after the store closes to the general public?

A    Yes, they do.

Q    Do you know what time they lock their store doors?

A    Roughly after the last member left.

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

Q   Does that store close to the public at 8:00 p.m.?

A   Yes.

Q   Okay.  Do you know if Glendora has a security guard that works at that location?

A   I do not know.

Q   Do you know if La Habra locks their doors after the store is closed to the general public?

A   They do.

Q   Do you know approximately what time La Habra store doors are closed and locked?

A   Roughly after the last member leaves.

Q   Do you know if La Habra has a security guard that works at that facility?

A   I do not.

Q   Does the Riverside door -- strike that.

Does the Riverside store lock their doors after the store closes to the general public?

A   Yes.

Q   Do you know approximately what time the doors at Riverside are closed?

A   Roughly after the last member leaves.

Q   Do you know if Riverside uses block scheduling for hourly associates that work a closing shift?

A   They do.

Q   Do you know if La Habra uses block scheduling for

STENO.COM

**PAGE 469**

A   Yes.

Q   Do you know how many you have?

A   No.

Q   Do you ever watch footage from the security cameras?

A   Yes.

Q   Do you know if any of the security cameras installed at the Palm Desert location would show the entry way to the store so that you can determine whether employees were waiting for someone to unlock the door after they clocked out?

A   Yes.

Q   Yes, there is one?

A   (No verbal response.)

Q   Do you know if there is a litigation hold on any of that footage at Palm Desert?

A   No.

Q   No, there is isn't; or no, you don't know?

A   I don't know.

Q   Okay.  When you worked at Ontario were there also security cameras at the Ontario location?

A   Yes.

Q   And do you know whether there were any cameras pointed in that location that would have shown whether employees were waiting at the end of a shift to be released

A   They -- they all have access to the policies through the computer.

Q   So is it the expectation that the individuals will constantly monitor the policies and review them to see if there's been any edits to them?

A   Is it --

One more time.

Q   Sure.

Is it -- since the hourly associates have access to the policies is it the expectation that it's their obligation to go into the system and constantly review the policies to see if anything has changed with any of them?

A   If that's something they choose to do yeah.

Q   If there's a change to one of the policies, let's say the pay policy, are those ever e-mailed to the associates?

A   I wouldn't know that.

Q   Okay.  In the time that you've been a club manager at Palm Desert do you remember ever having any meetings with any hourly associates where you discuss changes to a pay policy at Sam's?

A   Specifically changes to a pay policy no.

Q   Okay.  If -- have you ever -- strike that.  I'll start over.

At Palm Desert what time -- are the doors locked

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

A    Yes.

Q    Is it a written list or you just know it because there's three of them?

A    I just know because there's three.

Q    If, theoretically, an associate was waiting to be let out after the 11:30 shift what would that associate have to do to get paid for that time?

A    They would just need to fill out a time adjustment.

Q    Okay.  Do you review time adjustments at Palm Desert?

A    No.

Q    Do you know if when an employee submits a time adjustment whether they have to provide a reason that they -- that the time -- that they worked the time that it needs to be paid?

A    I believe they do.

Q    Do you know if it's like a fillable form or if there's a dropdown?

Do you know how it's filled out?

A    I believe it's -- it's on the computer and there's a drop-down box for whatever reason they would have for doing that.

Q    Do you know if waiting to be let out after clocking out is one of the drop-down options?

DUSTIN SCHLOSS                                                JOB NO. 810291
DECEMBER 28, 2023

A    I do not.

Q    Do you know whether any employee has ever submitted a time adjustment at Palm Desert asking to be paid for time that they had to wait after a closing shift after clocking out to be let out of the store?

Was that a confusing question?  Should I reask it or do you understand?

A    Nobody's brought that to my attention.

Q    Okay.  You're not aware of any time adjustments being submitted for that?

A    Correct.

Q    If -- if there are time adjustments is there a -- do you know whether there would be a way to determine whether somebody asked -- strike that.

For the time adjustments, is there a report you can pull that shows all the time adjustments at your store?

A    I don't know.

Q    Okay.  At the Ontario location did they use block scheduling for closing shifts for hourly associates?

I think you said yes.

A    Yes.

Q    Do you know what those closing shifts were at Ontario?

A    3:00 to 11:30 for merchandising and 12:30 to 9:00 p.m. for front end associates.

STENO.COM

Q    Were you ever in the store at 11:30 when you worked as a co-manager at Ontario?

A    No.

Q    Were you ever in the store at 9:00 p.m. when you worked as a co-manager at Ontario?

A    No.

Q    Do you know if anyone ever submitted a time adjustment in the Ontario store asking to be paid for the time that they spent waiting to be released after a closing shift after clocking out?

A    I do not know.

Q    Did anyone ever complain to you at Ontario that they had to stay late waiting for somebody to unlock the door after they clocked out on a closing shift?

A    No.

Q    For the key carriers and the managers who work closing shifts, are they required to stay stationed at the exit door the entire time the closing shift runs?

A    You're asking if they're required to stay over there from 3:00 to 11:30?

Q    Yes.

A    No.  They're not.

Q    Are they required to be there at 11:30?

A    They're required to be there before 11:30.

Q    Do they have any duties that they have to perform

**PAGE 474**

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

between 11:00 and 11:30?

A   I mean, the only main duty is to be there to let associates out at, you know, five/ten minutes before 11:30.

Q   They don't have anything else they have to do like say in the loading dock?

A   It just depends on what's going on in the club.

Q   At Fullerton did you ever work -- were there -- there were block schedules I believe you testified earlier.

Do you know what the closing schedules were for associates at Fullerton?

A   The same.  3:00 --

Q   3:00 to 11:30 and 12:30 to 9:00?

A   Yes.

Q   Were you ever in the store after -- at 11:30 when you worked in Fullerton?

A   Yes.

Q   Did you ever have to unlock the door to let employees out at the end of their closing shift at 11:30 p.m.?

A   In Fullerton?

Q   Yes.

A   Yes.

Q   Do you recall on how many occasions you did that when you worked at Fullerton?

A   A lot.

STENO.COM

**PAGE 475**

A    No.

Q    Why not?

A    I'd have to look at it myself and see that there's not a code or one that says other.

Q    So if all the other codes are itemized you think it should be on the employee to select other and figure it out that that time is compensable?

MR. WROSCH:  Objection.  Argumentative. Misstates his testimony.

Q    You can answer.

You can answer.

A    What was the question again?

MS. GROMBACHER:  Can you read it back.

THE COURT REPORTER:  One moment.

(Whereupon, the last question was read.)

A    They could ask for help.

Q    I'm going to show one more document.

(SCHLOSS Deposition Exhibit 2 was marked for identification and is attached to the transcript.)

Q    You see this -- this pay policy?

A    Yes.

Q    This is a document that is Bates-stamped WM Sanchez 00000215 to 219 and it has an updated May 3, 2023, date.

Have you seen this document before?

A    Yes.

Q    Do you recall when you most recently saw this document?

A    No.

Q    The document says it was updated March 3, 2023. Do you see that?

A    Yes.

Q    Do you know how this document was updated?

A    No.

Q    Did you provide this updated document to your hourly associates?

A    They all are provided access to our -- the WIRE with all this information.

Q    Okay.  Did they receive an alert that there was an updated policy and they should check the WIRE?

A    I don't know.

Q    Did you hold a team meeting and say, hey, guys, there's an updated associate pay policy, you guys should check the WIRE?

A    No.

Q    Do you know if any of your assistant managers did that?

A    I do not know.

Q    Let's scroll down.

Okay.  Do you see the prohibition against

STENO.COM

DUSTIN SCHLOSS
DECEMBER 28, 2023

JOB NO. 810291

Q   Do you know why that language was included in this document -- this updated document?

A   No.

Q   Would you agree that this makes it more clear to associates that time spent waiting when they're unable to leave the facility after clocking out should be paid time?

A   I believe it calls it out, but I think the other one was just as clear.

Q   But this calls it out?

A   It does.

Q   Do you know if this new language was called out to the attention of any of the hourly associates at the Palm Desert location?

A   I do not know.

Q   But you didn't tell anybody that they should review the updated associate pay policy; is that correct?

A   Correct.

Q   And you're not aware of any notifications from Sam's to the associates that they should review the updated pay policies; is that correct?

A   Not that I'm aware of.

Q   Does Sam's routinely update the policies without advising the hourly associates?

A   I don't know.  I don't know how often they update them.

STENO.COM

Do you recall any time between May 3, 2023, and today's date that you reviewed this document?

MR. WROSCH:  Objection.  Asked and answered.

Q    Other than Tuesday can you think of any other date?

A    Not that I remember.

Q    Did you review any other documents to prepare for the deposition?

A    No.

Q    What made you decide to review this document?

MR. WROSCH:  Objection.

Actually I'm going to instruct you not to answer that question under attorney-client privilege.

MS. GROMBACHER:  I'll respect that.  I'll respect that.

BY MS. GROMBACHER:

Q    Okay.  Do you know if this document is available in the Sam's intranet site currently?

A    Like the one that the associates have access to in the club?

Q    Yes.  Thank you.  That's what I'm trying to ask.

A    I would -- it should be in there.

Q    Okay.  Do you know when this document was made available to associates on the site?

A    I do not.

STENO.COM

CERTIFICATE OF REPORTER

---oOo---

I, the undersigned, being empowered to administer oaths and affirmations remotely, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.


DATED:   December 28, 2023    _____

                             Lynette L. Chase




                    STENO.COM

# EXHIBIT 26

**PAGE 481**

Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 28, 2023

In the matter of:

# SANCHEZ v SAM'S WEST, INC., et al.

## ANN PERRY



**CERTIFIED COPY**

**Reported by:**

Lynette L. Chase
Notary Public

**Steno**
**Official Reporters**

**315 W 9th St.**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(310) 573-8380**
**NV: FIRM #108F**

**PAGE 482**

ANN PERRY
DECEMBER 28, 2023
JOB NO. 805363

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and :

on behalf of other individuals   :

similarly situated,              :

          Plaintiff,             :

v.                               :  Case No.:

SAM'S WEST, INC., dba SAM'S CLUB,:  2:21-cv-05122-SVW-JC

an Arkansas corporation,         :

          Defendant.             :
_____

          REMOTE VIDEOTAPED DEPOSITION OF ANN PERRY,

commencing at 1:02 P.M. PST, on THURSDAY, DECEMBER 28, 2023,

before LYNETTE L. CHASE, Notary Public in and for the State

of New York.

STENO.COM

A    It's downstairs.  They don't have an upstairs.

Q    Okay.  And South Sacramento, where was the time clock located?

A    Upstairs.

Q    Okay.  Generally how long does it take to walk from the time clock to the exit doors at Citrus Heights?

A    A minute maybe.  Maybe two.

Q    Is that about the same time for Concord?

A    Yes.

Q    Would that be true for all the facilities?  The time clocks -- a minute or two from the door?

A    Yuba City might be one minute just because it's a little bit closer, but the same for South Sac is about the same for Citrus Heights.

Q    How big is the Citrus Heights facility?  Do you know?

A    130,000 square feet.

Q    How about Concord?

A    101,000 square feet.

Q    Do you know Yuba City?

A    I think it's like 135.

Q    Do you know South Sacramento while we're at it?

A    It's about the same probably.  135/130. Concord's a small club.

Q    Does the Citrus Heights location have security
STENO.COM

ANN PERRY
DECEMBER 28, 2023

JOB NO. 805363

video cameras installed on the premises?

A    Yes.

Q    Do you know how many?

A    Offhand no.

Q    Do you ever review the footage from the security videos?

A    Not unless I'm needed to.

Q    Do you know whether any of those security cameras would capture footage that would show whether or not associates were waiting in the front of the store to be let out at the end of a closing shift?

A    Yeah.

Q    What about at Concord?  Were there videos there?

A    Yeah.  I'm assuming, yeah, they have video.

Q    Do you know if they had any cameras that would have recorded the front of the store so you can see whether associates were waiting at the end of a closing shift?

A    I'm not sure.  I'm assuming so.

Q    Okay.  I don't want you to guess.  I only want to know what you really know or remember so don't feel bad.

A    No.

Q    Do you know anything about the security footage, or the -- you know, whether there was any at Yuba City?

A    I'm assuming they do, but I don't watch their videos so I'm not sure.

STENO.COM

**PAGE 485**

ANN PERRY
DECEMBER 28, 2023

JOB NO. 805363

Q    Okay.  Did you ever watch the video when you were a front end manager?

A    No.

Q    Okay.  How about when you were a fresh manager?

A    Maybe once or twice maybe, but --

Q    Do you know whether there were security cameras at South Sacramento?

A    I'm assuming there is.  Yeah.

Q    Okay.

A    Yes.

Q    But you don't -- you wouldn't know of --

A    I was hourly.  I was never salaried in that building so I don't know what the shots are.

Q    Okay.  Thank you.

Do you know if there is any litigation hold on the security footage at Citrus Heights currently?

A    I do not.

Q    You don't know?

A    No.

Q    Okay.  If there is a litigation hold on security footage or other documents at that facility is that something you would ordinarily know?

A    I don't think so no.

Q    Okay.  Have you ever personally seen associates waiting to be to let out after clocking out at the Citrus

STENO.COM

A    Mitch.

Q    Okay.  So other than speaking with an attorney did you speak with any other employees of Sam's about the deposition today?

A    No.

Q    Did you speak to any employees of Sam's who weren't attorneys about the litigation more broadly?

A    No.

Q    Do you know what the claims are in this case?

A    I think it's about the waiting at the door to be let out -- or the associates that were supposedly not on the clock waiting to be let out.

Q    Got it.

Did you review any documents to prepare for the deposition?

A    No.

Q    Did you look at any associate pay policies or any policies?

A    Yes.

Q    What did you look at?

A    Just the updated version of the pay policy.

Q    Did you review any of the older versions of the pay policy?

A    No.

Q    Do you know what the date was for the updated

STENO.COM

version that you looked at?

A    I think it was May of 2023.

Q    Had you seen that document before you reviewed it for the deposition?

A    No.

Q    Do you know if any of the associates that worked at Citrus Heights have reviewed that policy that you looked at?

A    I'm not sure.  Nobody had said anything.

Q    Okay.  Do you know if the policy that you looked at is the current policy in effect at Sam's or if it is just a draft?

A    I'm sure it's the policy in effect.

Q    Okay.  Did you pull the policy yourself by logging into any kind of computer systems or anything like that?

A    No.

Q    Okay.  Did you -- or have you ever been asked to look for any documents that relate to this case?

A    No.

Q    Have you ever talked to any other club managers about associates waiting in the facility after they've clocked out on a closing shift?

A    No.

Q    Okay.  Have you ever talked to any associates

Q    When you were -- strike that.

Okay.  So at Concord -- I can't read my notes, but I believe you said you did not work any shifts after 10:00 p.m. when you were the co-manager at Concord; is that correct?

A    That is correct.

Q    Okay.  So you wouldn't know anything about whether associates were waiting at the front or not personally because you weren't physically there to witness it?

A    I know that they have a routine and they all leave together.

Q    Okay.  You didn't watch video to make sure that was the case?

A    No.

Q    So where is your understanding coming from?

A    They had a process every night and if they were for some reason waiting they knew that they need to do a time adjustment to correct that time.

Q    Okay.  When did you tell the associates to do that?

A    That is just a plan that's been in place at that club.

Q    Okay.  So who tells the associates that?

A    They just know.  They -- nothing's ever been

brought to my attention of an associate waiting, but every night there's somebody there to let somebody out.

Q    But if you're not there how do you know that?

A    I'm just -- I mean, I'm just assuming that that's what taking place.

Q    Okay.  That's fine.

That's your expectation?

A    Yeah.

Q    Okay.  And do you have -- when you say that the associates know to do the time adjustment what are you basing that on?

A    Because that's always been the thing to do if you're waiting, you can't be let out.  There's -- they've always known that.

Q    So who tells the associates?  How do they know that?

A    I'm not sure.  That's just something that's always been done.

Q    How many time adjustments have you seen from hourly associates asking to be paid for time that they spent waiting?

A    Maybe a handful.  Not waiting from -- not waiting to be let out, but maybe for like a missed punched or something.  So associates obviously want to be paid for working so they won't not say that.

STENO.COM

**PAGE 490**

working, or something like that -- options?

A   I'd have to look at it.  It's been a long time.

Q   So you wouldn't know whether there was an option for waiting off the clock?

A   I wouldn't know.  No.

Q   Okay.  Have you ever personally told, and I think I know the answer to this but just so I'm clear, an associate to fill out a time adjustment for time they spent waiting after the facility was closed?

A   I have not.

Excuse me.

Q   That's okay.

I know you said when you were an hourly associate you were never a key carrier, but do you have any individuals at Citrus Heights that are key carriers that are not managerial employees?

A   Yes.

Q   What are the requirements for somebody to be a key carrier if they're not a manager?

A   They have to be approved/state certified with -- like it's a state test that they have to take.  And they also have to have an alarm code from MASweb to be able to open and close the door and de-arm the building.

Q   How many key -- how many of those types of individuals do you currently have at Citrus Heights?

A    I want to say like 14.  I think maybe 13.

Q    Okay.  Do they get to keep the keys or do they sign them in and out?

A    They keep them.

Q    Okay.  Do you have a list of them somewhere like a written list?

A    It's not a written list.  It's on our MASweb where it kind of goes through and shows people.  You can take them on and off.

Q    Okay.  But everyone who is a key carrier gets an alarm code from --

Is that coming from Sam's Club or where does that come from?

A    Yes.  It comes from our alarm central.

Q    The associate pay policy that you reviewed recently, did you ever personally provide that to any of the associates at Citrus Heights?

A    No.

Q    Do you know whether they ever received any kind of e-mails or alerts from you or Sam's Club letting them know there was an updated policy?

A    No.

Q    When Sam's updates a policy is there a general procedure for letting hourly associates know about new policies?

ANN PERRY                                          JOB NO. 805363
DECEMBER 28, 2023

A    Sometimes it is on the WIRE.  Depends on how significant it is.  Sometimes it's just like a little ant pass that shows updated policy, or --

Q    Is the WIRE something that only managers get or is that something that everybody gets?

A    Anybody can log in.  Like when you log into the WIRE any -- all the associates -- yeah.

Q    Got it.

Okay.  Do you have to log -- is that how you clock in or something?  Do you log into that every time you --

A    You don't have to log into the WIRE, but you can log in to check your e-mail, or if you want to, you know, put in vacation, or if you want to something, do CBLs or something.

Q    Okay.

A    But every associate has a log in.

Q    Does every associate receive e-mails that they have to check each shift?

A    Not every.  No.

Q    But the -- they would log in if they want to put in time off or something?

A    (No verbal response.)

Q    Okay.

A    I'm sorry, yes.

STENO.COM

**PAGE 493**

CERTIFICATE OF REPORTER

---oOo---

I, the undersigned, being empowered to administer oaths and affirmations remotely, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:   December 28, 2023   _____

Lynette L. Chase

**PAGE 494**

# EXHIBIT 27

**PAGE 495**

Deposition Transcript

Case Number: 2:21-cv-05122-SVW-JC

Date: December 29, 2023

In the matter of:

# SANCHEZ v SAM'S WEST, INC., et al.

## RAUL RAZO



**Reported by:**

Kimberly Folds
RPR, Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**PAGE 496**

                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA


CARLOS SANCHEZ, individually and
on behalf of other individuals
similarly situated,

          Plaintiff,

 vs.                      Case No: 2-21-CV-05122-SVW-JC

SAM'S WEST, INC., dba SAM'S
CLUB, an Arkansas corporation,

          Defendant.

_____


REMOTE VIDEOTAPED DEPOSITION OF:

    RAUL RAZO, Examination of a Witness, taken at

the instance of the Plaintiff, pursuant to

Federal Rule of Civil Procedure before Kimberly

Folds, a Registered Professional Reporter and

Notary Public, on December 29th, 2023, commencing

at 2:05 p.m. and concluding at 2:51 p.m. Pacific

time.

        All parties, including the witness,

appearing remotely.

store close to the general public?

A.   At 8 o'clock.

Q.   Are the doors locked when it closes to the general public?

A.   The entrance, yes.

Q.   Is there anyone stationed at the entrance at that time?

A.   I'm sorry.  One more time?

Q.   Anyone stationed like a greeter or security guard at that -- at that time?

A.   At the entrance door at 8 o'clock, yes.

Q.   How long does that person work until? Strike that.  How long does that person remain stationed at the door?

A.   Just until we lock the doors.

Q.   Okay.  Do you lock the doors right at 8 o'clock or do you wait until the last customer leaves the store?

A.   If we see members coming up, we will let the members in.  So we always look at the parking lot and see if members are coming in.

Q.   Would you say the doors are locked by 9 o'clock p.m.?

A.   The entrance door, yes.  The exit door can vary.  But by 9 o'clock p.m., yes --

**PAGE 498**

generally, yes.

Q.   What about the exit door?  Is that locked at some point during -- after the store closes to the general public?

A.   Yes.  Once we feel the last member has exited, then yes.

Q.   So by 9 o'clock both of those doors are typically locked; is that fair?

A.   Yes.  That's correct.

Q.   How many associates do you have at Oxnard currently?

A.   A quick estimate, 190 to 200.

Q.   That's fair.  I just want an estimate. When you worked at the Torrance location, were the doors locked after the doors was closed to the general public?

A.   Generally, when I worked at Torrance, I didn't do a lot of closing shifts.

Q.   Okay.  So you don't know?

A.   No.

Q.   Okay.  Fair enough.  Good.  I don't want you to guess.  I appreciate you being honest. What about Long Beach, do you know whether the store doors were locked after the store closed to the general public?

Q.   How many do you have?

A.   I wouldn't be able to answer that.  Was quite a few --

Q.   Do you ever review security footage at Oxnard?

A.   Yes.

Q.   Have you ever had to provide the police with security footage for any like incidents that occurred at the Oxnard store?

A.   Yes.

Q.   Is that something that you do or is that something that's done through a third-party company if you have to, you know, pull the footage and give it to somebody else?

MS. PERACCHIO:  Objection.  Vague and ambiguous.  You can answer.

BY MS. GROMBACHER:

Q.   Let me ask you this:  When you provided security footage from the Oxnard store to the police department, did you pull that footage and turn it over to them yourselves?

A.   One of my team members usually does it.

Q.   So it's something you can do in-house?

A.   Yes.

Q.   Do you know if any of the security

cameras are pointed towards the exit door so that you would be able to see whether employees are waiting in the facility after they clock out at the end of a closing shift?

A.    Yes.

Q.    Is there one camera that would show that or two cameras or do you -- do you know?

A.    I don't know how many it would be.

Q.    Do you know if there is any litigation hold on any of the security camera footage currently?

A.    I remember being notified that there's a hold.  I do remember.

Q.    Okay.  Do you remember when that was?

A.    I do not.

Q.    Do you know how long the footage has been preserved?

A.    I don't.

Q.    Okay.  Generally, is this the type of security cameras where the footage gets wiped and erased after a certain period of time?

A.    Yes.

Q.    Do you know how long that period of time is?

A.    A guess would be six months.  My guess.

RAUL RAZO
DECEMBER 29, 2023

Q.   That's okay.  Do you use block scheduling for associates at Oxnard for the closing shift?

A.   Yes.

Q.   What would be the blocks for associates working closing shifts at Oxnard?

A.   If you're a merchandiser, 11:30.  If you're a front line associate, it's 9:00.  If you're a full-time associate.  Block only refers to full-time associates.

Q.   Okay.  So do you have some associates that leave at different times than that?

A.   Generally, we like to keep it at hourly or half hour rates; but, yes, it could be different times, yes.

Q.   How many associates do you have that were work closing shifts that are not full-time associates at Oxnard?

A.   I wouldn't have the answer for that.

Q.   Is there any particular positions that work closing shifts that aren't full-time positions at Oxnard?

A.   Repeat the question, please.  I'm sorry.

Q.   Sure.  If I'm trying to figure out -- are most of your -- Strike that.  Are most of the

A.   Mostly assistant managers.

Q.   Are you responsible for training any associates on the off-the-clock policy at Sam's?

A.   No.

Q.   So you've never personally told an employee that time spent waiting after they've clocked out on a closing shift is off-the-clock time for which they should be paid?

A.   Not that specific, no.

Q.   Do you know whether you've ever instructed an employee to fill out a -- well, strike this.  If an employee performs off-the-clock time, what is the procedure they should follow to ensure that they get paid for that time?

A.   Fill out a time adjustment.

Q.   How does an employee fill out a time adjustment?  Is that manual, electronic, how does it work?

A.   It's manual.  They fill out a sheet.

Q.   Are there boxes that they check that let you know the reason why they worked or what they were doing for which they want to be compensated or is it something they just write things in? How does it work?

RAUL RAZO
DECEMBER 29, 2023

JOB NO. 810292

A.   I haven't seen one in a while, but as I recall, you put your times -- like, if you missed a meal punch or if you've missed an exit punch or if you need to adjust or add time, I remember there was positions for that.

Q.   Do you review time adjustments that are submitted by hourly associates?

A.   No.

Q.   Who is responsible for submitting -- or for reviewing time adjustments, if anyone?

MS. PERACCHIO:   Objection.   Vague and ambiguous.

MS. GROMBACHER:   Yeah, I can go back.

Q.   Is anyone at the Oxnard store responsible for reviewing associate time adjustment forms?

A.   All the assistants on their associates, yeah.

Q.   Do you know whether an associate at Oxnard has ever submitted a time adjustment asking to be paid for time they spent waiting after clocking out at the end of a closing shift?

A.   No.

Q.   "No" you don't know?   Or "no" they have not done that?

**PAGE 504**

A.    I don't know, no.

Q.    Does -- does anyone who isn't a manager at your store carry keys for the store that can unlock the doors of the facility?

A.    Yes.

Q.    How many individuals carry keys that aren't managers?

A.    I don't have the total in front of me, but it's several supervisor positions, team leads.

Q.    Okay.  Do the team leads, are they required to have any certifications to carry the keys?

A.    Food safety.  Food safety.

Q.    Do you have a list of the individuals who carry the keys somewhere in an office or on a computer or something?

A.    I'm sure I can find one, yes.

Q.    Do you know whether those individuals also have to receive alarm codes from Sam's?

A.    I don't think they do.  So my answer would be, I don't know.

Q.    When you worked at El Monte or Santa Clarita, were you ever in the clubs after -- or at 11:30 p.m.?

A.   Yes.

Q.   Do you -- when you worked at El Monte and Santa Clarita, were there individuals that were team leads or not managerial employees that were able to carry keys to the facility?

A.   I don't remember.

Q.   Do you remember about any of the other facilities -- Long Beach, Torrance or Gardena -- whether they had key carriers that were not managerial employees?

A.   I don't recall.

Q.   Okay.  That's fine.  Do you have any responsibility for training associates on time adjustments?

A.   There could be an occasion when I could be asked and I would show them where they can get it and fill it out, yes.

Q.   Did anyone ever ask you if they should submit a time adjustment for time that they spent waiting in the facility after clocking out?

MS. PERACCHIO:  Objection.  Asked and answered.

A.   No.

MS. GROMBACHER:  Let's take a quick break.  I want to get you out of here as soon as

record.  The time is 2:39 p.m. Pacific time.

(Recess was taken from 2:30 p.m. to 2:46 p.m.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 2:46 p.m. Pacific time.

MS. GROMBACHER:  Okay.  I'm almost done. I don't have much more for you.

Q.  I'm going to share my screen, and I'm going to show you the Associate Pay Policy.  So it's going to be my only exhibit, it's WM Sanchez 0000215 to 219.  Maybe I'm not going to share my screen.  Okay.  Let's see -- I only have one screen so you get to see everything.  So I'm going to minimize this.

Okay.  Have you seen this document before?  And I'm happy to scroll through it.

A.  Yes.

(Exhibit 1 marked for identification.)

Q.  Is this the document that you reviewed to prepare for the deposition?

A.  Yes.

Q.  The document is dated May 3rd, 2023.  Do you see that here on this page it says, Updated?

A.  Yes.

Q.  Do you recall whether you saw this

document first around May 3rd, 2023, or is it some other time?

A.     Yeah, I wouldn't be able to remember.

Q.     No problem.  Did you have any role in drafting that?

A.     No.

Q.     Do you know why this updated document was drafted?

A.     No.

Q.     Do you know whether this updated document was provided to hourly associates?

A.     No.

Q.     Did you ever personally provide this document to hourly associates?

A.     No.

Q.     Did you hold any meeting --

(Zoom technical difficulties.)

Q.     Are we going too fast?  Do you need me to slow down?

THE WITNESS:  No.  For me, I'm fine.

Q.     Okay.  Did --

A.     You did break up a little bit.

Q.     Sorry.  I'm almost done.  Did you have any meetings or did your assistant managers have any meetings with hourly associates where this

pay policy was discussed?

A.   No.

MS. GROMBACHER:  I think that's all the questions I have for you today.  I appreciate you taking time.

THE WITNESS:  Perfect.  Thank you.

THE VIDEOGRAPHER:  Ms. Peracchio, any questions for you?

MS. PERACCHIO:  Oh, I'm sorry.  I don't have anything.

Ms. GROMBACHER:  We were on the edge of our seat, Paloma.

MS. PERACCHIO:  I was checked out, apparently.  No, I have nothing.  Sorry.

THE VIDEOGRAPHER:  It's okay.  No worries.  All right.  Just need to confirm orders before I read us out.

Ms. Grombacher, we have a standard video and an electronic copy transcript.  Any other add-ons or details you would like?

MS. GROMBACHER:  No add-ons.  And I do need the electronic transcript expedited, but I don't need the video expedited.

THE VIDEOGRAPHER:  Excellent.  Thank you for clarifying.  And orders for you,

RAUL RAZO
DECEMBER 29, 2023

JOB NO. 810292

STATE OF WISCONSIN        )
                          ) SS.
COUNTY OF MILWAUKEE        )

I hereby certify that the witness in the foregoing deposition, RAUL RAZO was by me duly sworn to testify to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; and that the deposition is a true record of the witness' testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of December, 2023.

reading and signing was:

xx___requested      ____waived   __not requested

_____
KIMBERLY R. FOLDS, RPR

Registered Professional Reporter

# EXHIBIT 28

**PAGE 511**

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated, | ) Case No.<br>) 2:21-cv-05122-SVW-JC<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| SAM'S WEST, INC., dba SAM'S CLUB, an Arkansas corporation, | )<br>)<br>) |
| Defendant. | )<br>) |

--------------------------------

Deposition of CARLOS SANCHEZ

March 15, 2022

Cheryl L. Marquis, CSR No. 6731
481637

 



BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

**PAGE 512**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually     ) Case No.
and on behalf of other           ) 2:21-cv-05122-SVW-JC
individuals similarly situated,  )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
SAM'S WEST, INC., dba SAM'S      )
CLUB, an Arkansas corporation,   )
                                 )
          Defendant.             )
---------------------------------

        Videotaped Deposition of CARLOS SANCHEZ, taken

on behalf of the Defendant remotely via Zoom

Videoconferencing commencing at 10:05 A.M. on

Tuesday, March 15, 2022, before Cheryl L. Marquis,

Certified Shorthand Reporter No. 6731.

2

CARLOS SANCHEZ

BARKLEY
Court Reporters

APPEARANCES:


For Plaintiff:

          BRADLEY / GROMBACHER, LLP
          BY:  KILEY L. GROMBACHER
          Attorney at Law
          31365 Oak Crest Drive
          Suite 240
          Westlake Village, California 91361
          (805) 270-7100
          kgrombacher@bradleygrombacher.com


For Defendant:

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART,
          P.C.
          BY:  MITCHELL A. WROSCH
          Attorney at Law
          695 Town Center Drive
          Park Tower, Fifteenth Floor
          Costa Mesa, California 92626
          (714) 800-7900
          mitchell.wrosch@ogletree.com


The Videographer:

          BARKLEY COURT REPORTERS
          BY:  SAMUEL RAMIREZ
          (800) 222-1231

3

CARLOS SANCHEZ

BARKLEY
Court Reporters

the end of shifts during store closing procedures."

Do you see that?

A    Yes.   That means like multiple times.

Q    I'm asking what -- what are you referring to here by "store closing procedures"?   What do you mean by that?

MS. GROMBACHER:   I will object that it calls for potentially attorney-client communication or work product and legal conclusion.

But go ahead and respond.

THE WITNESS:   Like waiting for someone to let us out.

Q    BY MR. WROSCH:   Okay.   That's what I was asking.   Is that what you are referring to?   You are referring to being let out of the club?

A    Yes, released.

Q    Can you please describe the procedure for being released from the club, the El Monte club that you worked at for Sam's Club?

A    Like a typical day?

Q    Please, yeah.

A    So for cashiers, what we would do is we will get people out of the door, of course paid for all their groceries, and we will sweep the floors, meaning we would walk down aisles.   And I would proceed to go

25

CARLOS SANCHEZ

BARKLEY
Court Reporters

to the front of the store cash out all these other people that had their groceries. And after that, we would collect carts, because we had carts at our register because we had to transfer, you know, your groceries from the cart to another cart to make sure we scan every individual item. So we would go -- and we would have a lot of go-backs. So say you don't want something from your groceries, you are like, oh we don't want it, so I would take it from you and put it into the go-backs. So we would do go-backs for the meantime. So put all the products back that we had, like frozen and all that. And then we would head upstairs. We will be released individually, so it depends which of us is running, whether they would want to keep with them, you know what I'm saying. So we're released, and then we would walk up the stairs and clock out and pick up our belongings and head to the front of the store to exit the store. When we get to the front of the store, it's locked a hundred percent of the time at the end of the closing shifts. So we would have to wait for a manager, or to find a manager, in order to let us out of the building.

Q    Did you always work closing shifts?

A    Sometimes. It was random.

Q    So about how long did you work for Sam's Club?

26

CARLOS SANCHEZ

**PAGE 516**

BARKLEY
Court Reporters

A    A couple months.

Q    Two months?  Is that an estimate?

A    Longer.  I can't recall exact dates.

Q    Can you give me an estimate for which percentage of shifts you worked were closing shifts?

A    75.

Q    When you worked a closing shift, what time did your shift end?

A    It would vary.  Depending on how much go-backs and how much we got to take care of.

Q    So what time did the club close?  I'm sorry.

A    I don't remember.  I believe it was like eight.

Q    Okay.

A    Eight --

Q    So if the club closed at eight, can you give me an estimate as to like a range of when your shifts would end?

A    Like ten.  It could vary.  Don't want to give you a wrong number.

Q    Did you report the time spent waiting to be released to anyone at Sam's Club?

A    No, I just told the managers.  Everybody would just complain and just say it's not fair they had to wait here.

27

CARLOS SANCHEZ

**PAGE 517**

BARKLEY
Court Reporters

Q    Which managers did you complain to?

A    We'd tell Kelly.

Q    And what did you say to Kelly?

A    "Why do we have to wait here to be let out?"

Q    Do you remember how Kelly responded to that?

A    Not really responded at all.  She just wanted to let us out as well.

Q    Do you recall who you reported to at Sam's Club?

A    Like I said before, it depends.  There was always a different supervisor on the floor.

Q    Did you ever complain to any of your direct supervisors about this?

A    Yeah.  Well, they would have issues getting out too, because they don't have the keys as well.

Q    So did you -- I'm sorry.  Did you say you did complain to your direct supervisors?

A    Always like remarks like it is not fair that they keep us in here after we're done with our shifts.

Q    Can you identify any of those supervisors that you made remarks to?

A    I could not.  I apologize for that.

Q    Where did you clock out at the end of your shifts?

A    Second floor next to break room.

28

CARLOS SANCHEZ

BARKLEY
Court Reporters

Q    And I believe you said after you clock out, you would collect your belongings?

A    Correct.

Q    Where were your belongings?

A    Lockers.

Q    Where were the lockers?  I'm sorry, go ahead.

A    In our break room, second floor.

Q    Did you do this every shift?

A    Yes.

Q    Were there any other ways to clock out?

A    No.

Q    Do you clock out at computer terminals?

A    Yes.

Q    Did you exit the club with other associates?

A    Sometimes.  It was always like a -- you know, swift.  So like there will be -- sometimes there would be four people going out same time as you, sometimes it would be two, sometimes it will be three, sometimes it would be the whole night shift.  It would all vary. Everyone would be released at different times.

Q    Do you know why it varied?

A    No, not really honestly.

Q    Did you have to check in with a manager or team lead or supervisor after finishing your job duties for the day --

29

CARLOS SANCHEZ

BARKLEY
Court Reporters

A    Yes.

Q    -- to confirm?

A    I'm sorry.

Q    I'm sorry.

A    Go ahead.  Sorry.

Q    All right.  I was going to start the question over.

A    Sorry.  Okay.

Q    It's all right.

Did you have to check in with a manager, supervisor or team lead after finishing your job duties to confirm that you completed everything that you had to do for the day?

A    Yes.  To be released?  Yes.

Q    And who would you check in with?

A    I don't recall their names.  It is the same COSs.

Q    What do you mean by COS?  What does that stand for?

A    Team lead.  They wore the green vests.  I wore the blue one.  They were above us.

Q    So you would check in with them just to show that you did everything that was required of you for the day and it was time to leave?

A    Yes.

30

CARLOS SANCHEZ

BARKLEY
Court Reporters

Q    Could those associates unlock the door for you?

A    No.  Most of the times it was just the managers that had the key.  The only benefit of them is sometimes they would have the walkies to call for the manager, wherever they may be.  But most times, you know, they had the walkies on the chargers, and they would wait for them to charge.

Q    Is the cashier the same as a merchandiser?

A    I don't believe -- I don't think so.

Q    No?

A    I'm not fully -- I'm not fully aware of how things work now.  You know, they might have different descriptions of which does what.  I think they may be different.

Q    Did all cashiers leave at the same time?

A    No.

Q    Did you ever ask a manager or a supervisor to go to the front door because you were ready to leave after you clocked out?

A    Yes.

Q    And what was the response?

A    "I will be there in a second."

Q    Do you recall which manager or managers you asked to meet you at the front door because you clocked

31

CARLOS SANCHEZ

BARKLEY
Court Reporters

waited at the door to be let out?

A    I would honestly look for someone to let me out some of the times.

Q    So what would that entail?  Walking around the club to try to find someone?

A    In the store, look down, as you can see from the cashiers, you could look straight down, see in the back maybe somebody flys by -- not flys like literally but, you know, walks by --

Q    So where I'm sorry.  I cut you off.  Were you finished with that or -- I don't want to cut you off.

A    Yes.

Q    Where -- where exactly was the exit at the club that you would leave from?

A    The front.

Q    So the same -- so the front exit that members would also leave from?

A    Sometimes.  So there is two doors.  There is the entrance, and then there is an exit.  But they would close down the entrance to show they were closed, and they would have -- there is two doors, so there is the front door and there is another door after that one, the locked door for the carts.  So we would come out of this door, the left door.  And this one will be closed and locked with the metal gate.

37

CARLOS SANCHEZ

**PAGE 522**

BARKLEY
Court Reporters

You can respond.  Sorry.

THE WITNESS:  That's because I can't see you so I don't know if I --

MS. GROMBACHER:  I know, sorry.  Sorry.

THE WITNESS:  Yeah.

Q   BY MR. WROSCH:  And when other associates used the intercom to be let out of -- to ask to be let out of the club, did someone come and let them out of the club?

A   Most of the time, no.  We would still be waiting there.

Q   Could you have waited until the door was unlocked before clocking out?

MS. GROMBACHER:  I will object it may call for speculation.

You can respond.

THE WITNESS:  No.

Q   BY MR. WROSCH:  Why not?

A   Because we would have to walk back.

Q   What do you mean, walk back from the door to the time clock?

A   Kelly -- well, Kelly my job was -- what she told me to do was to clock out, grab my belongings and go by the door, see if you find someone to open it for us.  And I felt like, that's what I was supposed to.  I

40

PAGE 523

CARLOS SANCHEZ

BARKLEY
Court Reporters

didn't know that I would have to grab my stuff, walk down, tell someone to open the door, wait for them to open the door, go up and clock out. That wasn't the way she told me.

Q   Are you aware of any associates -- any other associates waiting in the until the door was unlocked to go clock out?

A   Yes, we would wait with each other.

Q   I'm sorry. Let me -- I asked the question incorrectly.

Are you aware of any associates who would wait for the door to be unlocked and then go clock out?

A   No.

Q   Was there a computer terminal near the exit where you clocked out? I'm sorry, where you could clock out?

A   Not that I'm aware of.

Q   I believe earlier you testified that there -- you couldn't clock out from computer terminals?

A   On the second floor.

Q   On the second floor? So were there no computer terminals on the first floor to clock out at?

A   Not to clock out. They are just the member desk computer, I believe for the memberships.

Q   Where was the computer terminal located on the

41

CARLOS SANCHEZ

BARKLEY
Court Reporters

second floor that you could use to clock out?

A    Next to the break room.

Q    And the time clock is in the break room?

A    Yes.  It is when you walk up the stairs, it is like directly in front, like when you walk upstairs.

Q    So how far was the computer terminal on the second floor that you could clock out at from the time clock?

A    15 feet, say.  I don't know if they, you know, changed anything.  Honestly, I haven't been there.

Q    Do you know what time the door was locked at the El Monte club?

A    I do not.  All I know is when the last customer I believe exits the building, they have to lock it.

Q    Can you give me an estimate of how many times were you able to exit the club without waiting at least five minutes?

A    When I was on the day shift.

Q    Good answer.  How about can you give me an estimate as to how many times you were able to exit the club without waiting five minutes when you worked a closing shift?

A    So how many times -- I would always wait when I was closing.

42

CARLOS SANCHEZ

BARKLEY
Court Reporters

floor.

Q    When you started, meaning at the beginning of your employment or at the beginning of your shift?

A    Beginning of employment.

Q    Okay.  So you were -- were you taught about time adjustments then at the beginning of your employment?

A    No, not that I recall.

Q    So when you learned about time adjustments was during this period when you did the training and someone submitted an adjustment for you, is that accurate?

A    I asked her how -- like because you know you get your pay stubs and it says training, I just asked her how that worked, exactly for the four hours.  So I just asked her how it worked, and she just said she adjusted it.  So that's what I thought adjustment was.

Q    Did you ever submit a time adjustment for any of the time that you spent waiting to be let out of the club at the end of your closing shift?

A    No, not for waiting to leave at close.

Q    Why not?

A    Because we were -- I was told to clock out, and then grab get my belongings and head to the door. I wasn't told to -- as I said, get my belongings, head

46

CARLOS SANCHEZ

BARKLEY
Court Reporters

to the door, tell them I need to go, wait for them to get to the door and head back upstairs and clock out.

MR. WROSCH:  Okay.  Kiley, do you mind if we take a quick restroom break?

MS. GROMBACHER:  Not at all.

MR. WROSCH:  Fantastic.

THE VIDEOGRAPHER:  Going off the record.  The time reads 10:58 A.M.

(Recess taken.)

THE VIDEOGRAPHER:  We are now back on the record.  The time reads 11:11 A.M.

Q   BY MR. WROSCH:  Mr. Sanchez, before we took a break, we were discussing a time adjustment you received at the beginning of your employment with Sam's Club.  Do you remember that?

A   Yes.

Q   Could you describe again what the adjustment was for?  I believe you said it was for training, but what exactly were -- are you referring to?  Were you personally doing training?  Were you training someone?

A   I was being trained, I guess, for the sales floor.

Q   Being trained for the sales floor?

A   Yes and how to work the cashier.

Q   So what was the adjustment for?

47

CARLOS SANCHEZ

BARKLEY
Court Reporters

A    No, I was just told that whenever the COSs --

THE REPORTER:  I'm sorry.  I didn't understand what you said.  Can you repeat it?

THE WITNESS:  Me?

THE REPORTER:  Yes.

THE WITNESS:  Oh, can you repeat the question again?  I'm sorry.

Q    BY MR. WROSCH:  Yeah.  I was just asking if -- I asked if anyone at Sam's Club ever told you that you are supposed to let a manager or supervisor know before you clock out that you are clocking out, so they can be ready to unlock the door for you when you get downstairs?

A    No.  The only ones that opened doors was managers.  The COSs would be waiting with us sometimes as well.  And they are considered my supervisor.

Q    And I believe you testified earlier that during your employment there were two managers who opened the doors for you.  Is that correct?

A    Yes.  It would vary.

Q    When you say, "it would vary," what do you mean by that?  Were there more than two managers or what do you mean?

A    Like I said before on the days -- it always depends on who is working.

52

CARLOS SANCHEZ

**PAGE 528**

BARKLEY
Court Reporters

concerning the allegations in your Complaint?

A    What do you mean, like write down what's going on?

Q    Yeah, for example, on X day I had to wait 20 minutes to be let out of the club?

A    Say that again.  Sorry.

Q    Did you ever write down anything at all about any of the allegations in your Complaint?

A    No.

Q    When you complained to -- or when you contacted HR after your employment regarding your final check, was that in an e-mail?

A    It was on the phone.

Q    So you testified that you would have to wait between 5 and 20 minutes every closing shift?

A    Yes.

Q    Is there any way to determine how long you waited on any specific date?

A    Honestly, maybe the cameras from Sam's Club. I don't know if you guys keep those records, but it will show us standing right there at the front door. It will give you a better estimate, a better picture too as well.

Q    Have you ever been arrested?

A    No.  I want to become a law enforcement so you

62

CARLOS SANCHEZ

**BARKLEY**
*Court Reporters*

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF LOS ANGELES  )

I, CHERYL L. MARQUIS, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 6731 issued by the Certified Court Reporters' Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a)(1)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me.  (Fed. R. Civ. P. 28(a)(a)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action.  (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

70

CARLOS SANCHEZ

BARKLEY
Court Reporters

of the testimony given by the witness.  (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [xx] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated:  March 21, 2022

*Cheryl L. Marquis*

_____

71

CARLOS SANCHEZ

BARKLEY
Court Reporters

# EXHIBIT 29

**PAGE 532**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

      Plaintiff,

   v.                    Case No.

SAM'S WEST, INC., dba SAM'S    2:21-cv-05122-SVW-JC

CLUB, an Arkansas corporation,

      Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

JESSICA BUTLER

DATE:         Monday, May 2, 2022

TIME:         1:48 p.m. Pacific Daylight Time

LOCATION:    Remote Proceeding

             Hemet, California

REPORTED BY:  Jess Wakefield, Notary Public

JOB NO.:     5211728

Page 1

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CARLOS SANCHEZ:

    LESLIE JOYNER, ESQUIRE (by videoconference)

    Bradley/Grombacher, LLP

    2815 Townsgate Road, Suite 130

    Westlake Village, California 91361

    ljoyner@bradleygrombacher.com


ON BEHALF OF DEFENDANT SAM'S WEST, INC., dba SAM'S CLUB:

    ANDREW B. LEVIN, ESQUIRE (by videoconference)

    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

    2415 East Camelback Road

    Phoenix, Arizona 85016

    andrew.levin@ogletree.com

    602-778-3711

Page 2

come let you out of the store?

A    Yes.  Many times.

Q    Okay.  And what was the shortest amount of time you recall a manager came after you buzzed them on the intercom system?

A    Fifteen minutes.

Q    Okay.  And what about the longest?

A    Half hour.

Q    Okay.  Do you recall any other associates utilizing the intercom system to page a manager?

A    Many.

Q    Okay.  And would you say the short and long durations were similar to what you just provided me?

MS. JOYNER:  Objection.  Calls for speculation.

THE WITNESS:  Yes.

BY MR. LEVIN:

Q    When you were clocking out at the end of your shift, did you ever wait for a manager to get to the exit before you clocked out for the day?

A    Can you repeat that again?  I'm sorry.

Q    Sure.  So at the end of the day, did you ever wait before clocking out until you saw that a manager was at the front door to let everyone out?

A    No.

Page 15

Q    Okay.  And why not?

A    Because we had to clock out at our time that we clocked out unless we were asked to work overtime, which was only the manager's approval.  So we just clocked out -- if we were scheduled to clock out at 11:30, we had to clock out at 11:30.  Because no overtime was authorized unless a club manager, Chris, said, "Yes, you can work overtime."  Or he asked you to work overtime.

Q    Okay.  Did you ever ask a manager to go to the exit before you clocked out so that when you left, after you clocked out, the manager was already there at the door?

A    No.

Q    Okay.  And why didn't you ask a manager to do that?

A    Because they know that -- what the schedule of the associates are every day.  They know the schedule.

Q    Okay.

A    So they have to let associates in and, you know, they have an overnight crew that came in at the same time we were let out.

Q    Okay.  And earlier, I asked you about the longest amount of time and shortest amount of time it took for a manager to respond to your intercom, but now

Page 16

associate ever given a key to let others out of the store?

A    Yes.

MS. JOYNER:  Objection.  Calls for speculation.

You can answer.

BY MR. LEVIN:

Q    Were you ever aware of any associate being given a key to let you out of the store?

A    Yes.

Q    Okay.  And was the amount of time you had to wait for the associate less or -- less than, equal to, or greater than what you had to wait for a manager?

MS. JOYNER:  Objection.  Vague.

THE WITNESS:  Equal to.

BY MR. LEVIN:

Q    Okay.  Did you ever complain about the times that you had to wait between clocking out and leaving the store to management?

A    Several times.

Q    Okay.  And when do you recall complaining about that?

A    I don't recall.

Q    Okay.  And do you recall who you complained to?

Page 21

A   The -- my direct manager.  At the time, I was doing the merchandising, which is Loralei.  And the team lead, which is Barbi.  Those are the two people that were in charge of the night crew at that time.

Q   Okay.

A   And -- you know, so those are the two.

Q   And what did Lora or Barbi say in response to your complaints?

A   They didn't say anything.  They said, "We're just busy.  We're just busy.  We're just busy.  We'll get to you when we can get to you."

Q   Okay.

A   "We'll be there when we can."

Q   Okay.

A   So that was always the answer.

Q   Okay.  Were there any occasions in which you stayed in the store after your closing shift to talk with friends or to shop?

A   After closing, no.

Q   Okay.  How about waiting inside the store for a ride to come pick you up?

A   No.

Q   Okay.  The last thing that I just wanted to ask you was that in your declaration in paragraph nine, you say, and I'll quote here:  It was generally known

Page 22

CERTIFICATE OF DEPOSITION OFFICER

I, JESS WAKEFIELD, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JESS WAKEFIELD

Notary Public in and for the

State of Washington


[X] Review of the transcript was requested.

Page 25

CERTIFICATE OF TRANSCRIBER

I, SUSAN BUTLER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SUSAN BUTLER

Page 26

ANDREW B. LEVIN, ESQ.

andrew.levin@ogletree.com

May 5, 2022

RE: SANCHEZ VS. SAM'S WEST, INC.

MAY 2, 2022, JESSICA BUTLER, JOB NO. 5211728

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 27

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not

requested before the completion of the deposition.

Veritext Legal Solutions
866 299-5127

# EXHIBIT 30

**PAGE 543**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

     Plaintiff,

  v.                 Case No.

SAM'S WEST, INC. dba SAM'S     2:21-cv-05122-SVW-JC

CLUB, an Arkansas corporation,

     Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

PABLO OLAVARRIA, JR.

DATE:        Tuesday, May 3, 2022

TIME:        12:00 p.m. Pacific Standard Time

LOCATION:     Remote Proceeding

              El Monte, California

REPORTED BY:  Jess Wakefield, Notary Public

JOB NO.:      5202589

Page 1

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CARLOS SANCHEZ:

    LESLIE JOYNER, ESQUIRE (by videoconference)

    Bradley Grombacher, LLP

    2815 Townsgate Road, Suite 130

    Westlake Village, CA 91361

    ljoyner@bradleygrombacher.com


ON BEHALF OF DEFENDANT SAM'S WEST, INC. DBA SAM'S CLUB,

ARKANSAS CORPORATION:

    CARMEN AGUADO, ESQUIRE (by videoconference)

    Ogletree, Deakins, Nash, Smoak, and Stewart, PC

    400 South Hope Street, Suite 1200

    Los Angeles, CA 90071

    carmen.aguado@ogletree.com

    213-239-9806

Page 2

Q    When you would close, where would you typically clock out?

A    On the second floor where the offices are.

Q    And after you clocked out, you would go to the exit, is that correct?

A    Yeah.  We would go back down the stairs and close to -- to the exit doors.  Yeah.

Q    Was there a computer or terminal that you could clock out at that was closer to the exit?

A    Yeah.  I found out later there was at the customer service desk.

Q    How long after you started working for Sam's did you find out about the terminal to clock out at that was closer to the exit?

A    Maybe a few months before I left, give or take.

Q    Okay.  And from the second-floor clock out location to the exit, how long would it take you to walk from the second floor to the exit?

A    That's a good -- it's been a couple years. Maybe 30-some seconds, maybe?  Because you got to walk down the stairs and then walk all the way to the front.

Q    Okay.  And after you found out about the terminal that was closer to the exit, did you start clocking out at that terminal?

Page 19

what I know, we were supposed to clock out at the clock, and that's what I did.  I never used the computer and stuff.

Q   Okay.  So I'm trying to understand why you thought you weren't supposed to clock out at the terminal that was closer to the exit.

A   Well, for me it was closer to go to the second floor because in order for us to clock out where you're talking about, you got to go way from the back way to the front.  That doesn't -- and we're trying to clock out on time.  They don't want us doing overtime.

Q   Okay.  When you worked the closing shift, how many ways was there to get in contact with either the closing manager or supervisor?  Just that.  Sorry.

A   Well, from the -- from the -- if you were by the exit doors right there by customer service, there's a -- a phone you can use for the speakers to let them know, you know, "Hey.  We're at the front, you know, trying to get out."

Q   Okay.  So how many times did you have to wait at the exit for someone to let you out?

A   How many times?  I couldn't -- I don't recall how many times, but it was more than once.

Q   Was it more than five times?

A   Yeah.

Page 21

A    No.  No one's ever told me that.  No.

Q    Did you ever clock out, get down to the exit, and a manager was already present?

A    No.  I'd never see anyone there ready for us to leave.

Q    On average -- or how about this.  You said that you had to wait about 20 or more times.  What is the longest amount of time that you had to wait for a manager to open the door once you got to the exit?

A    From what I recall, the longest I waited was probably about an hour and 15 minutes.

Q    On how many occasions did you have to wait an hour and 15 minutes for a manager to open the door?

A    That was just one time that I remember because I live a couple of minutes from there and I -- especially by the time I got home, it was late.  It was already past 1:00.

Q    So that happened one time?

A    Yeah.  That happened one time.  I remember that.

Q    Generally, or on average, how long did you have to wait by the exit door?

A    Usually 15 to 20 minutes.

Q    Did you ever work overtime?

A    One time I did work overtime.  There was a

Page 25

clocking out?

A    Yeah.  In the beginning, yeah.

Q    Was there any reason that you did not fill out a time adjustment for the time that you had spent waiting for the door to be opened after you had clocked out?

A    No.  Because they wouldn't have done that.  We were -- we were off the clock.  We were already clocked out, so there's no way they would --

Q    And -- go ahead.  I'm sorry.

A    Yeah.  There's no way they would have adjusted that.

Q    How do you know?

A    Because every time we would tell them, "Hey, you know, it's late" or someone would say anything.  No -- none of -- nobody's time was adjusted while we were --

Q    Did you ever ask for your time to be adjusted for that time period where you were waiting?

A    No because I -- no.

Q    No.  Okay.  Do you know if any of your co-workers asked for their time to be adjusted during that time they were waiting?

A    No.  Because the policy -- for them, I guess their policy is we have to wait for someone to open the

Page 27

door for us.  We don't have the keys.  The only ones that has it is the managers.

Q    Right.  But I'm asking about the time adjustment policy right now.  Did you have an understanding that it was Sam's Club's policy that associates or employees could not work off the clock?

A    Yeah.

Q    At your store, was an associate ever given a key and stationed by the exit?

A    No.

Q    Did you ever make any complaints while you were working with Sam's Club?

A    I -- I -- I don't recall freshly, but I don't remember we might have brought it up to one of them.  But I mean, I couldn't -- I don't remember.  It's a couple years ago plus as far as that.

Q    You don't have any recollection of making complaints?

A    Maybe once, that's about it.  But they never -- nobody ever fixed it.

Q    Okay.  That one time that you may have complained, when about was that?

A    Maybe -- maybe around December or so.  I don't know.

Q    So are you guessing that you may have

Page 28

because they complained?

A    No.

Q    Do you know anyone who was treated poorly by management because they complained about having to wait by the door?

A    No.  But I know -- I'm sure it's happened. You know?  They, you know, if -- if we were even to talk while we were working just a little, you know, the way they treat you is just -- it's not, you know, a lot of the times, they're not respectful.

So that's why people feel like that.  You know?  They just wanted to get their work done and go home, you know?  We got families.

Q    So you were assuming that if you complained a lot, you would be treated poorly?

A    For me, yes.  For sure.

Q    But you don't actually know anyone that was treated poorly because they made a complaint?

A    No.

Q    And did you have any understanding that you could not submit a time adjustment for that time that you were waiting by the exit door?

A    Yeah.  That's what I -- that's what I thought. We didn't have no say over that.  We just clock out when we're told to and wait for them to open the door.

Page 31

Q   So Pablo, you mentioned that there was -- was it a computer or what was it that was closer to the exit you would clock out at?

A   It's a computer at the customer service desk.

Q   Okay.  And how far was that from the exit?

A   If I had to give an estimate, 35 to 40 feet.

Q   Okay.  And could you physically see the exit from that computer?

A   Yeah.

Q   Could you physically see the exit from the location where you actually clocked out?

A   No.  From where I clocked out, no.

Q   Were you ever explicitly told, did anyone verbally tell you that you had to clock out before you went to the exit?

A   Yeah.  That was the rule.  At 11:30, clock out.

Q   Okay.  And who told you that?

A   Well, it was the rule.  Our shifts were 3:00 to 11:30 and no overtime.

Q   So you previously mentioned that you worked overtime, and you were paid for it.  Correct?

A   That was one time.

Q   Did you ever remain at Sam's Club after you completed your closing shift for reasons other than

Page 34

CERTIFICATE OF DEPOSITION OFFICER

I, JESS WAKEFIELD, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JESS WAKEFIELD

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Page 39

CERTIFICATE OF TRANSCRIBER

I, MEREDITH WEEKS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Dated: May 5, 2022

MEREDITH WEEKS

Page 40

Ms. Carmen Aguado, Esq.

carmen.aguado@ogletree.com

May 5, 2022

RE: CARLOS SANCHEZ vs. SAM'S WEST, INC.

May 3, 2022, Pablo Olavarria, Jr. (JOB NO. 5202589)

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the

   time of the deposition.

Page 41

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not

requested before the completion of the deposition.

Page 42

# EXHIBIT 31

**PAGE 557**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

      Plaintiff,

  v.                    Case No.

SAM'S WEST, INC. dba SAM'S      2:21-cv-05122-SVW-JC

CLUB, an Arkansas corporation,

      Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

MICHAEL DITULLIO

DATE:         Thursday, April 28, 2022

TIME:         3:31 p.m.

LOCATION:     Remote Proceeding

              Los Angeles, CA 90017

REPORTED BY:  Joshua Mariano, Notary Public

JOB NO.:     5202582

Page 1

the electronics department, then I got changed just as a stocker, 'cause they eliminated that position.

Q    They eliminated the electronic sales position?

A    They did, yes.

Q    You worked closing shifts under both job titles?

A    Yes.

Q    All right.  Where did you clock out at the end of your closing shifts?

A    You'd go upstairs at that Sam's Club there was an upstairs area where you walked up a flight of stairs or you took an elevator that would go up to a timeclock that was by the stairwell.

Q    Were there any other computers or time clocks --

A    There was a timeclock in the jewelry department that was in electronics, but it was some distance from the front door.  It wasn't in -- close proximity to the exit door.

Q    Okay.  So you -- you had the timeclock upstairs and is it a computer terminal in jewelry?

A    It was a terminal, yeah.

Q    Were there any other terminals in the club that you could clock out of?

A    Not that I was aware of, no.

Page 10

Q    Any terminals near the entrance or near the manager's office?

A    No.  There were -- the manager's office was upstairs -- there wasn't -- downstairs.

Q    Did you ever clock out from the terminal in jewelry?

A    Sometimes if I was near that terminal I would.  It's only if I was near that terminal, but most of the time it was upstairs at the time clock.

Q    Did you ever clock out and then walk to the exit and when you got to the exit there was already a manager or someone with keys at the exit?

A    No.  There was never a manager there.  You had to call someone to get them to open the door.

Q    Did you exit the club with other associates?

A    When there was associates that were there as the -- when I was leaving, then I would go home with them, too, and there would be other people waiting up there too, as well.

Q    Did you ever wait for -- did you ever wait to clock out -- sorry, strike that.

Did you ever wait for a manager to get to the exit before clocking out?

A    Rephrase that again?

Q    Yeah.  Did you ever -- so I'm asking you if

Page 11

you ever waited to clock out until there was already a manager at the exit?

A    No, I never -- I never did that.  I mean, I'd clock out and go up to the door, and then wait for a manager.

Q    Did you ever request that a manager go to the exit before you clocked out so that you wouldn't have to wait?

A    I would go on the walkie on the thing and say, "I need someone to open the door; I'm going home," and they'd say, "I'll be there in a minute."  And then I'd go up there and be still waiting for someone to come up there.

Q    All right.  What was the longest amount of time you had to wait to exit the club?

A    Maybe ten minutes sometimes, maybe 15.  It just depends on the manager for that night.

Q    Can you give me an estimate as to the shortest amount of time you had to wait?

A    Maybe six minutes.

Q    Did you ever work overtime?

A    No.  We weren't allowed to get overtime.

Q    So can you tell me --

A    That was a write-up if you got overtime or counseling.

Page 12

Q    Can you tell me again, how long you worked at Sam's Club.

A    About a year and a half.

Q    So is it your testimony that you never worked overtime during the year and a half?

A    Not that I can remember, no.  I mean, I haven't looked at my paycheck stubs in a long time, so I wouldn't know.

Q    Did you ever submit any time adjustments when you worked at Sam's Club?

A    Yeah.  When my time was wrong for maybe for lunch or something or I didn't clock out for lunch.  But not for staying -- waiting for someone to open the door, no.

Q    Why didn't you submit adjustments for that time?

A    'Cause that was never given as an option by the manager when we left.

Q    Did you ever shop in the club after clocking out?

MS. JOYNER:  Objection.  Vague.

A    What do you mean as far as shopping?

Q    I don't know.  After clocking out from a closing shift, did you ever buy something in the club?

A    Well, yeah.  You would have to buy it after

Page 13

4 (Pages 10 - 13)

you clocked out. You couldn't buy it on Walmart time.

Q   Right.  But I guess what I'm asking is:  So you work a closing shift and then you clock out at the end of the shift; did you ever go buy something after that?

A   Sometimes, yeah.

THE REPORTER:  And sorry to interrupt, I just want to jump back a few questions ago.

Leslie, that objection was vague did you say?

MS. JOYNER:  Yes.

THE REPORTER:  Okay, thank you.

Sorry to interrupt, Counsel.

MR. WROSCH:  I said it would be short.

That's all I have, Mr. Ditullio.

THE WITNESS:  Okay.

THE REPORTER:  Okay.  We'll go by the same stipulations as last time, Counsel.

And I'll take us off the record for now. We can discuss anything further off the record, then.

I'm going to take us off the record, now at 3:44 p.m.  Stand by.

(Signature reserved.)

(Whereupon, at 3:44 p.m., the proceeding was concluded.)

Page 14

CERTIFICATE OF DEPOSITION OFFICER

I, JOSHUA MARIANO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

[X] Review of the transcript was requested.

JOSHUA MARIANO
Notary Public in and for the
State of California

Page 15

CERTIFICATE OF TRANSCRIBER

I, MOLLY MCCOLM, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

MOLLY MCCOLM

Page 16

LESLIE JOYNER, ESQUIRE

ljoyner@bradleygrombacher.com

MAY 3, 2022

RE: SANCHEZ V. SAM'S WEST

APRIL 28, 2022, MICHAEL DITULLIO, JOB NO. 5202582

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 17

5 (Pages 14 - 17)

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 18

SANCHEZ V. SAM'S WEST

MICHAEL DITULLIO (#5202582)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

WITNESS                    Date

Page 19

6 (Pages 18 - 19)

# EXHIBIT 32

**PAGE 562**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

      Plaintiff,

  v.                   Case No.

SAM'S WEST, INC. dba SAM'S      2:21-cv-05122-SVW-JC

CLUB, an Arkansas corporation,

      Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

DERRICK LAMONT MAXWELL

DATE:         Tuesday, May 3, 2022

TIME:        10:02 a.m. pacific standard time

LOCATION:    Remote Proceeding

              Elk Grove, California

REPORTED BY:  Jess Wakefield, Notary Public

JOB NO.:      5202589

Page 1

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CARLOS SANCHEZ:

    LESLIE JOYNER, ESQUIRE (by videoconference)

    Bradley Grombacher, LLP

    2815 Townsgate Road, Suite 130

    Westlake Village, CA 91361

    ljoyner@bradleygrombacher.com


ON BEHALF OF DEFENDANT SAM'S WEST, INC. DBA SAM'S CLUB,

ARKANSAS CORPORATION:

    CARMEN AGUADO, ESQUIRE (by videoconference)

    Ogletree, Deakins, Nash, Smoak, and Stewart, PC

    400 South Hope Street, Suite 1200

    Los Angeles, CA 90071

    carmen.aguado@ogletree.com

    213-239-9806

Page 2

A    The only one who had walky-talkies were the management, or supervisors, to communicate with each other.  But as far as other people in my department, we had no walky-talkies.  I don't even recall we had even phones next to our registers to page anyone.

Q    So there was no intercom system that you could use, for example?

A    If there was one, we were unaware of it.

Q    Okay.

A    I've never seen anyone use it.

Q    Okay.  So when you clocked out, what was your typical procedure?  You would clock out, then walk to the exit door, and what would happen?

A    I would clock out and sometimes, when we were trying to walk towards exit doors, I noticed a pattern that some of the workers from the back would take pallets and block them at the front door.  So if we even tried to get out, we couldn't physically because I noticed that they were being freight in from the back, and they would put them in front of the doors, and it -- to me it started looking like a pattern.

And that's when I noticed that we would all be grouped up and then, once everyone was pretty much -- they were done what they were doing, those pallets would be removed.  And it was maybe in one circumstance or a

Page 23

few circumstances, if I had to estimate, we would just wait at the front.

Q    Okay.  And how many times did you have to wait at the front?

A    Approximately about two to three times.  One to three times.  Again -- again, I only closed about one to three times if I had to.

Q    And we're talking per week.  Correct?

A    I do not recall.

Q    Okay.  So while you were employed with Sam's Club, if you could estimate.  I know it was a couple of months or a few months, how many times did you work a closing shift?

A    Again, if I had to estimate, maybe one to -- one to three times.  I was only there for a short amount of time before I got sick.

Q    Okay.  And this may have been my fault previously.  Just so I can lock this down.  And I know it may seem like I'm asking the same question, but it's just because I'm trying to make sure I have it down correctly.

From December 2021 to March 2022, the time that you worked at Sam's Club, you as you sit here today recall working only one to three closing shifts.  Is that correct?

Page 24

A    I would say I do not recall.  I think I'm misunderstanding the question.

Q    Yeah.  So from December 2021 to March, the time period that you were working at Sam's, if you could estimate or you could even give me a range, how many closing shifts did you work?  Was it more than ten?  Less than ten?

A    Less than ten.

Q    Do you think it was more than five or less than five?

A    About five.

Q    Okay.  And you mentioned that you had to wait at the door to exit.  Each time that you worked a closing shift, at least it's about five times, each time that you worked closing shift, did you have to wait at the exit door?

A    Yes.

Q    And what were you waiting for?

A    We were waiting for either one, for those people to remove the freight from the door or two, we would have to find a store manager to physically come down, open the door, unlock it, and let us all out.

Q    Okay.  Of the times that you closed, was there ever an instance when you arrived to the exit door where there was already a manager or supervisor already at the

Page 25

exit door ready to open it for you?

A    I can only maybe recall that happening once, and it was a holiday.  I think it was Christmas Eve or something around -- around that time.

Q    So all the other instances, you had to wait?

A    That is correct.

Q    What is the longest amount of time that you had to wait?

A    I would estimate about 25 minutes.

Q    So of the four times that you had to wait, how many times did you have to wait 25 minutes?

A    About four.  Again, about four -- four out of the five times.

Q    Did you ever -- or let me ask you this.  Could you have, on your way to clocking out, found someone and said, "Hey.  I'm clocking out.  I'm going to be at the exit in five minutes.  Meet me there"?

MS. JOYNER:  Objection.  Calls for speculation and incomplete hypothetical.  You can answer.

THE WITNESS:  Could I have?

BY MS. AGUADO:

Q    Yes.

A    If they were visible.

Q    So --

Page 26

Q    Before you clocked out?

A    That is correct.

Q    So the four times where you had to wait after you had already clocked out, what was the difference there?  Why didn't you find the manager before you clocked out?

MS. JOYNER:  Objection.  Calls for speculation.

BY MS. AGUADO:

Q    To his own personal knowledge.  Why didn't you find the manager in those instances?

A    Because they were hard to find.

Q    So because you could not --

A    I can't find somebody if they're not visibly to be found.  I mean, I can only do so much walking around a store.  If I don't see someone, I can't find them.  I can't -- I mean that's kind of self-explanatory.  It's like looking for an invisible person.

Q    Well, so what's not self-explanatory to me and what I'm trying to understand is then why clock out?  Why not find them?  Wait until you find them, and then clock out?

A    Because if you don't clock out, you would be in violation.  If you do not clock out at your specific time, you are violating.  And I knew I'm starting at a

Page 28

job where I do not want to break any violations.  So therefore, I'm going to do what I was told to do to clock out at your scheduled time.  So that's what I'm going to do.

Q    Okay.  And that's what I was getting at if there was a reason why you didn't find the manager before you clocked out.  And it sounds like you were concerned that you might be in violation of a rule.  What rule was it exactly that you were concerned with violating?

A    If you clocked out before your shift ended, you would get a half of a point docked against you.  Within your probationary period, you get -- out of -- of -- if I had to estimate maybe one to three points, you were terminated.  No if, ands, or buts.

So personally, I'm going to try to do what was, you know, so I don't get violated.  And so yeah.  That's pretty much it.

Q    Okay.  And did you ever have a half a point docked against you?

A    Yes.  I've had several.

Q    And what were they in relation to?

A    I do not recall.  I didn't get to see what those were.  I know if I had to remember, there was a time we were told to clock out early within my first

Page 29

week of working there. We were -- my shift ended at 8:00. I was told to clock out at 7:00. I believe it was a -- I can't recall what event day that you have to stay.

You can't clock out early or you can't -- you have to stay the whole shift on their event day, and we were told to clock out early because they -- everybody wanted to go home. And I noticed that -- I looked in my Walmart One thing where it comes to attendance, and there -- that date that they told me to clock out was that half a point present.

Q    Did you ever ask anyone about the half a point?

A    Yes. And I asked it to be removed when it was not our fault. When the manager who told us to clock out knew she told us to clock out early that day.

Q    And what happened once you addressed it with a manager?

A    Nothing was resolved. Those -- those points are still there even on my termination letter.

Q    Did you ever get docked half a point for clocking out too late?

A    Yes. Because we were stated that I was not able to get overtime.

Q    How often did you work overtime?

Page 30

to work off the clock?

A    I know by law that's not the -- you shouldn't work off the clock, period.  But again, Sam's Club never sat down and say, "This is the policy of working off the clock."

Q    Did you ever lodge any complaints with Sam's Club, either verbally or in writing?

A    Verbally.

Q    How many?

A    Again, the one to three times that I got violated.

Q    So the one to three times that you got the half-point docked, you've complained about the half-point?

A    I have.

Q    Aside from those one to three times where you complained about the docked point, did you make any other complaints with Sam's Club?

A    Yes.

Q    Okay.  How many other complaints did you make?

A    I made at least another one to two complaints about being locked in, standing at the door knowing that I have to leave and take certain medications.  My husband has been sitting outside for almost 20 minutes, approximately, waiting to pick me up because again, like

Page 39

I said, I take certain medication.

I have an underlying health condition -- issue, and I've suffered from that -- these violations because of not properly managing my medication.

Q   The one to two times that you complained about being locked in and standing at the door to wait, who did you complain to?

A   I've complained to Pa, who was a manager.  Do not recall her last name.  I've reported it to Ashley, and I've reported it to the CSO supervisor, Laura.

Q   When you complained to Pa, what did Pa say in response?

A   I do not recall.  I just know --

Q   Do you know about -- oh, I'm sorry.  I didn't mean to cut you off.

A   I just know she said she will handle it.  That was pretty much their way of being passive about it.  Saying, "Oh, we'll handle it" is pretty much all the response you'd get out of them.

Q   Okay.  And when you complained to Ashley, what did Ashley say in response?

A   She'll take care of it.

Q   Okay.  and what about when you complained to Laura?

A   Laura said -- not verbatim but, in essence,

Page 40

"You have to report to those main managers" because it's out of her control.  She does not have the proper whatever, I guess, authority to do that, so I have to report to Ashley.

Q    Did you ever remain after your shift for any reason other than waiting by the exit door?  For example, you went shopping?

MS. JOYNER:  I just want to -- sorry.  I just want to clarify for the record.

THE WITNESS:  That's not -- like --

MS. JOYNER:  Are you talking about closing shift or other shifts?

MS. AGUADO:  Closing shifts.  Sorry.

THE WITNESS:  No.

BY MS. AGUADO:

Q    Okay.  And if you could estimate.  The time period that you made the complaint, when would you say the first complaint was made?

A    Again, I would have to say around the first week I worked there.

Q    Okay.  And when was the last complaint that you made?  And I'm talking about just the complaints about the waiting at the door.  When was the last complaint that you made?

A    I do not recall the direct day and time, no.

Page 41

CERTIFICATE OF DEPOSITION OFFICER

I, JESS WAKEFIELD, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JESS WAKEFIELD

Notary Public in and for the

State of California

[X] Review of the transcript was requested.

Page 45

CERTIFICATE OF TRANSCRIBER

I, MEREDITH WEEKS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Dated: May 5, 2022

*MWeeks*

MEREDITH WEEKS

Page 46

Ms. Carmen Aguado, Esq.

carmen.aguado@ogletree.com

May 5, 2022

RE: CARLOS SANCHEZ vs. SAM'S WEST, INC.

May 3, 2022, Derrick Lamont Maxwell (JOB NO. 5202589)

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the

   time of the deposition.

Page 47

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 48

# EXHIBIT 33

**PAGE 579**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

        Plaintiff,

    v.                              Case No.

SAM'S WEST, INC. dba SAM'S          2:21-cv-05122-SVW-JC

CLUB, an Arkansas corporation,

        Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

YOLANDA MARTINEZ

DATE:           Thursday, April 28, 2022

TIME:           11:01 a.m.

LOCATION:       Remote Proceeding

                Los Angeles, CA 90017

REPORTED BY:    Joshua Mariano, Notary Public

JOB NO.:        5202582

Page 1

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CARLOS SANCHEZ:

LESLIE JOYNER, ESQUIRE (by videoconference)

Bradley Grombacher LLP

2815 Townsgate Road, Suite 130

Westlake Village, CA 91361

ljoyner@bradleygrombacher.com

ON BEHALF OF DEFENDANT SAM'S CLUB:

MITCHELL A. WROSCH, ESQUIRE (by videoconference)

Ogletree Deakins Nash Smoak & Stewart PC

695 Town Center Drive, 15th Floor

Costa Mesa, CA 92626

mitchell.wrosch@ogletree.com

714-800-7900

Page 2

out would take an average of about ten to 15 minutes for a manager to come and lock the doors so that I could go. Is that a true statement?

A    Yes.

MR. WROSCH:  Did I share that with you?

THE WITNESS:  No.

MR. WROSCH:  Sorry about that.

THE WITNESS:  It's okay.

MR. WROSCH:  Okay.  Just so we're sure, I just wanted you to see that what I was reading was from your declaration, beginning with, "After locating a manager."

BY MR. WROSCH:

Q    Why didn't you go find the manager and tell him or her that you were going to clock out and that you would then meet them at the entrance or the exit?

A    Due to the fact that they were always in the offices.  And our policy was when our time was -- that we were supposed to clock out, we were supposed to go straight upstairs and exit, but the exit was always locked.

Q    And during your employment with Sam's Club, did you always work closing shifts?

A    Most of the time I did.

Q    Was there ever a day that you worked a closing

Page 12

shift where you did not have to wait at the exit of the club, meaning a manager was there when you arrived at the exit, and you were able just to walk out the exit?

A    There was, maybe once out of a week that would happen.

Q    Did you ever complain to any management at Sam's Club about having to wait at the exit before being let out at the end of your shift?

A    Yes, I have.

Q    Do you recall who you complained to?

A    Michael, my manager.

Q    Do you know the date or approximate date when you complained?

A    I do not.

Q    Did Michael respond to your complaint?

A    He did.

Q    And how did he respond?

A    He -- he just laughed and -- kind of, like it wasn't a big deal -- just, that was what we had to do every day.

Q    Did you ever complain in writing?

A    I did not.

Q    Did you regularly work overtime at Sam's Club?

A    I did not.

Q    Did you ever work overtime?

Page 13

A    Just the one time where I got fed-up with clocking out and waiting for a manager to come.  I stayed clocked in and in the result of that, it accumulated to overtime.  So my manager had came to me and told me that if I was to do it again, I would get a write up because it was unauthorized overtime.

Q    The instance that you're referring to, do you remember the date this happened?

A    I do not.

Q    What about this particular occasion caused you to be fed-up as opposed to previous occasions, for example?

A    It was routinely -- it was -- it was almost every day, and I was staying back for a long time -- long periods of time, and it was affecting my babysitting situation.

Q    Were you ever told that you had to clock out prior to going to the exit?

A    Yes.

Q    Who told you that?

A    It was my manager.

Q    Was that Michael?

A    Yes.

Q    Did you ever try to have a manager get to the exit before you clocked out?

Page 14

A    We weren't -- we were supposed to go straight, clock out at our time, so I didn't have time to look for a manager.

Q    Did you ever remain inside the club after completing a closing shift, for any reason other than waiting to be let out by a manager?  For example, to talk to a colleague, or to wait for a ride, or to go shopping, et cetera?

A    To go shopping.

Q    Did you ever submit a time adjustment to be paid for any of the time that you spent waiting for a manager to unlock the exit?

A    I did not.

Q    Do you know what a time adjustment is?

A    I do.

Q    Why did you not submit a time adjustment to try to capture that time?

A    Because of the fact that I had already been told by my manager that if it was unauthorized, then I would get a write up and I was in fear of losing my job.

        MR. WROSCH:  Okay.

        Leslie, I'm done, unless you have questions?

        MS. JOYNER:  No.  I don't have any questions.

Page 15

CERTIFICATE OF DEPOSITION OFFICER

I, JOSHUA MARIANO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

[X] Review of the transcript was requested.

JOSHUA MARIANO

Notary Public in and for the

State of California

Page 17

CERTIFICATE OF TRANSCRIBER

I, MOLLY MCCOLM, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

MOLLY MCCOLM

Page 18

LESLIE JOYNER, ESQUIRE

ljoyner@bradleygrombacher.com

MAY 3, 2022

RE: SANCHEZ V. SAM'S WEST

APRIL 28, 2022, YOLANDA MARTINEZ, JOB NO. 5202582

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the

time of the deposition.

Page 19

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 20

Veritext Legal Solutions
866 299-5127

**PAGE 589**

# EXHIBIT 34

**PAGE 590**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

     Plaintiff,

vs.                                    No. 2:21-cv-05122-

                                   SVW-JC

SAM'S WEST, INC. dba SAM'S CLUB,

an Arkansas corporation,

     Defendant.

_____/


VIDEOCONFERENCE

DEPOSITION OF JESSICA VASQUEZ


Stenographically taken before SUSAN L. GARSIDE

CSR No. 13712

December 19, 2023


Page 1

Q.   Okay.  Do you know Elaine and David's last name?

A.   No, I do not.

Q.   And then the six other direct managers that you talked about, do you recall their names?

A.   No, I don't.  They changed -- they varied at the time, so I have no recollection.

Q.   How many departments have you worked at?

A.   One.

Q.   And how many Clubs --

A.   Actually, like, in my contract, one.  Well, like, helped out?  I probably helped out, like, two other -- or one other -- two other departments.  Yeah.

Q.   How many Clubs have you worked at?

A.   One.

Q.   Do you know what time adjustments are?

A.   Yes, I do.

Q.   Okay.  What are they?

A.   It's when you physically go into, like, your portal and you fix the time that you either clocked in or clocked out.  So let's say I clock out exactly at 10:03. -- no.  Let's say 4:03 and my -- and that's my fifth hour -- I were to hit my fifth hour.  I can go back in and, like, fix it and say that I took my lunch prior to that. Yeah.

Q.   Were you familiar with time adjustments when you

Page 17

worked at Sam's Club?

A.   Yes.

Q.   Were you aware that Sam's Club had a policy prohibiting working off the clock?

A.   Yes.

Q.   Were you trained at any time by Sam's Club on how to accurately keep track of your time?

A.   No.

Q.   Were you trained on time adjustments?

A.   No.

Q.   Did you ever make time adjustments in the timekeeping system?

A.   That I can remember, only for my lunch.  Because I would be working over my fifth -- over my fifth hour and I would have -- I would not remember.  So I would have to go back and change it after that.  So yeah.

Q.   How many times did you adjust your time for that?

A.   Maybe a handful of times, on average, for my meal.  Yeah, for my meal.

Q.   And what's the number of -- or handful of times is that?  Five?

A.   Yeah, five, six.

Q.   Okay.  And you said it was -- it had to do with your -- your meal.  What exactly were you adjusting?

Page 18

Q.   Were there ever times that you didn't adjust your time even though a manager told you to?

A.   No.

Q.   Did you ever make adjustments to your time when you worked a closing shift?

A.   No.

Q.   Focussing on closing shifts that you worked during your entire employment.  Were you ever unable to leave the Club after you clocked out?

A.   Yes.  I would -- that has happened.  It happened a handful of times or, on average, like, half the time. And it would be -- for safety reasons, they lock it so that nobody -- no other members can come in after hours. And with that being said, that means that we're locked in as well.  And we would just have to wait for a manager or a supervisor, anyone who has a key at the time, to open up to -- the doors.  And it could be that the manager or whoever is in charge is either doing other job responsibilities or they're not accessible at the moment. So you'd just have to wait there and wait until they decide to let us out.

Q.   Were you -- okay.  You said a "handful of times" and then you said "half of the time."

A.   Yeah.

Q.   Which one is it?

Page 21

Q.   What were the reasons why some managers were faster than others when heading to the front to let employees out after closing?

A.   I can't tell you an exact reason.  For -- from my recollection, it would be that some would automatically know, like, "Hey, like, these" -- "these amount of people are about to leave; I'm going to just go stand by the door and hold it open for them to exit." Some of them would just be to (as said) focus on their work, whatever it may be, whether it would be in the cash office in the back, or whatever it may be -- that they would just, like, totally forget about us.

Q.   How far is the cash office from the exit door?

A.   Like, time frame or --

Q.   Time frame.

A.   Maybe two, three minutes.  Yeah.

Q.   Would you say that you were ready to leave at about the same time every -- every night?

A.   Yes.

Q.   Did it ever vary from shift to shift?

A.   Not that I can remember.

Q.   If someone were to watch videos of employees exiting your store after closing, do you think the video would show that some employees were able to walk out because the manager was waiting by the door?

Page 26

MS. KING: Object. That's compound. And also, it's an incomplete hypothetical. You can go ahead and answer. Sorry.

THE WITNESS: Yes.

BY MS. KIM:

Q. Do you think the video for your store would show that some employees were delayed by only seconds when exiting after closing?

MS. KING: Same objection.

THE WITNESS: I don't know. Yes.

BY MS. KIM:

Q. Did you ever not wait at all to leave the Club after closing shifts?

A. Yes. That happened as well, I didn't have to wait at all. But that would mean that my at-the-time supervisor had to be at the door, and I would just be able to exit.

Q. How would you define "waiting to exit"?

A. Say that again.

Q. How would you define "waiting to exit"?

A. Stressful, irritating. If I'm doing my job, why can't you do your job. I think that's how I see it. It was very frustrating, especially for me. I was a student -- I was a student at the time. That meant that I had to still do work before 12:00 -- before 11:59. And if I was

Page 27

is that what we're saying, like, if the three minutes is, like, an estimate for, like, the waiting time and the door was locked?

Q.  Okay.  I'm just going to repeat my question.  Do you think your estimate that we just talked about is an accurate measure of the average time you were delayed at closing due to the door being locked when you reached the front of the store?

A.  I can't -- I'm so sorry.  I can't -- I don't understand the question to me.  Sorry.

Q.  Did you ever submit a time adjustment to adjust your punch-out time for the day to account for the time you spent waiting to be let out of the Club?

A.  No.

Q.  Why not?

A.  At the time, I didn't think that was allowed.  So if I'm off at 10:00, I'm off at 10:00.  Even if I have to wait six, seven more minutes, then those six, seven minutes that I have to wait in the Club, then -- it is what it is.  Like --

Q.  Did you ever ask -- did ever ask if you could?

A.  No.

Q.  Was there a time clock near the front door that you could have used to clock out?

A.  No.  It's in the break room.

Page 32

REPORTER'S CERTIFICATE

I, SUSAN L. GARSIDE, a Shorthand Reporter, State of California, do hereby certify:

That JESSICA VASQUEZ, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, a review of the transcript was requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 21st day of December 2023.

SUSAN L. GARSIDE CSR NO. 13712

State of California

Page 38

HEIDI G. KIM, ESQ.

heidi.kim@ogletree.com

                                        December 21, 2023

RE: CARLOS SANCHEZ   vs.  SAM'S WEST, INC.

December 19, 2023-JESSICA VASQUEZ-JOB NO.6356014

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

    a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, noting the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

                                        Page 39

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page  40

# EXHIBIT 35

**PAGE 601**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CARLOS SANCHEZ, individually and )Case No.
on behalf of other individuals )2:21-cv-05122-SVW-JC
similarly situated, )
)
            Plaintiff, )
)
    v. )
)
SAMS WEST, INC. dba SAMS CLUB, )
an Arkansas corporation, )
)
            Defendant. )
------------------------------------)


            REMOTE PROCEEDINGS OF THE

    VIDEOTAPED DEPOSITION OF EDUARDO SANCHEZ

            MONDAY, DECEMBER 18, 2023


REPORTED BY NANCY J. MARTIN

CSR. NO. 9504, RMR, RPR

PAGES 1 - 47

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


CARLOS SANCHEZ, individually and    )Case No.

on behalf of other individuals      )2:21-cv-05122-SVW-JC

similarly situated,                 )

                                    )

                Plaintiff,          )

                                    )

        v.                          )

                                    )

SAMS WEST, INC. dba SAMS CLUB,      )

an Arkansas corporation,            )

                                    )

                Defendant.          )

------------------------------------)



                    - - -

            MONDAY, DECEMBER 18, 2023

                    - - -

    Remote Videotaped Deposition of EDUARDO SANCHEZ, beginning at 12:32 P.M., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter.  All parties appeared remotely.

Page 2

A. I'm very sure on that answer.    13:22:21

Q. All right. And what would you say is the    13:22:22

average wait time that you would spend, on those    13:22:27

shifts that you were waiting for a manager to let you    13:22:29

out?    13:22:32

MS. KIM: Objection. Asked and answered.    13:22:33

THE WITNESS: For me, I personally would wait    13:22:35

anywhere from 10 to 15. For me.    13:22:39

BY MR. SMITH:    13:22:45

Q. And how sure are you in that answer?    13:22:45

A. I'm very positive on that answer.    13:22:47

Q. And if there was video footage of the store    13:22:51

on one of the nights that you were waiting, the video    13:22:54

footage would show you waiting for 10 to 15 minutes    13:22:58

prior to being let out; right?    13:23:01

A. Correct.    13:23:03

Q. Did you know that time spent waiting to be    13:23:07

let out of the store is time you should be paid for?    13:23:10

A. Again, I've never had to deal with this. I    13:23:13

just thought it was how it was done. So it never    13:23:17

crossed my mind.    13:23:20

Q. You were never told that you were supposed to    13:23:21

be paid for that time?    13:23:23

A. No.    13:23:24

Q. Were you ever told that you could be    13:23:29

Page 40

disciplined if you worked overtime without permission?    13:23:31

A.   Yes.   They would say that unauthorized    13:23:35

overtime is grounds to being written up, correct.    13:23:39

Q.   When you said earlier that that's -- you said    13:23:52

something along the lines of "that's what they do    13:23:55

here," what were you talking about?  Were you talking    13:23:57

about how you have to wait for someone to let you out    13:24:01

of the door?    13:24:03

A.   That's -- I don't know about any club, but    13:24:06

that's just what they did at this particular club.    13:24:07

Q.   Would you describe the 10- to 15-minute    13:24:19

average as including time you would walk back and    13:24:21

forth to the office to try to get a manager to let you    13:24:24

out; right?    13:24:28

A.   Correct.    13:24:29

Q.   Did that time, though, also include time you    13:24:29

were standing at the door waiting?    13:24:33

A.   I calculated overall in general.  From there,    13:24:34

going back, and then going back and standing again.    13:24:37

Q.   Okay.  So it also includes the time you were    13:24:44

standing around and waiting?    13:24:46

A.   Correct.    13:24:48

MR. SMITH:  I think that's all I have as    13:25:16

well.    13:25:17

THE VIDEOGRAPHER:  Nancy, do you want the    13:25:28

Page 41

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

<%s;signature%>

Nancy J. Martin, RMR, CSR

Dated: 12/24/23

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

Page 44

COREY SMITH, ESQ.

csmith@bradleygrombacher.com

December 24, 2023

RE: CARLOS SANCHEZ VS. SAMS WEST, INC.

DECEMBER 18, 2023, EDUARDO SANCHEZ, JOB NO. 6355981

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 45

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

# EXHIBIT 36

**PAGE 609**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually   )  Case No.
and on behalf of other         )  2:21-cv-05122-SVW-JC
individuals similarly situated,)
                               )
          Plaintiff,           )
                               )
   vs.                         )
                               )
SAM'S WEST, INC. dba SAM'S     )
CLUB, an Arkansas corporation, )
                               )
          Defendant.           )
_____)

--oOo--

DEPOSITION OF

FELICE McROBERTS

THURSDAY, DECEMBER 21, 2023

Reported by:  TAMARA BERLIN, CSR 9706

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually    )  Case No.
and on behalf of other          )  2:21-cv-05122-SVW-JC
individuals similarly situated,)
                                )
           Plaintiff,           )
                                )
    vs.                         )
                                )
SAM'S WEST, INC. dba SAM'S      )
CLUB, an Arkansas corporation,  )
                                )
           Defendant.           )
_____)

Deposition of FELICE McROBERTS taken on behalf of the Defendants, via Zoom videoconferencing, beginning at 1:05 PM and ending at 3:20 PM, on THURSDAY, DECEMBER 21, 2023, before Tamara Berlin, Certified Shorthand Reporter No. 9706.

Page 2

A P P E A R A N C E S

(VIA ZOOM TELECONFERENCING)


For the Plaintiff CARLOS SANCHEZ:

        BRADLEY/GROMBACHER, LLP

        BY:  COREY SMITH, ESQ.

             EMILIE MACLEAN, ESQ.

        31365 Oak Crest Drive, Suite 240

        Westlake Village, CA 91361

        (805) 270-7100

        emaclean@bradleygrombacher.com

        csmith@bradleygrombacher.com



For Defendant SAM'S WEST, INC. dba SAM'S CLUB:

        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

        BY:  ROBERT R. VORHEES, ESQ.

        Park Tower, Fifteenth Floor

        695 Town Center Drive

        Costa Mesa, CA 92626

        (714) 800-7900

        robert.vorhees@ogletree.com

Page 3

MR. SMITH:  I'm going to object; misstates prior testimony.

BY MR. VORHEES:

Q.    Is that right?

A.    I'm sorry?

Q.    I just want to focus on the closing shifts where you were the last -- the last shift in your position that was working that day.

A.    Okay.

Q.    And my understanding is that that only happened when you were a cashier; is that correct?

A.    Correct.

Q.    And so focusing, then, on that time frame when you were working as a cashier, were you ever unable to leave the club after you had clocked out of your shift?

A.    Yes.

Q.    Okay.  Why was that?

A.    The doors were locked.

Q.    And what percentage of the closing shifts that you worked were you unable to leave after you clocked out?

A.    I would have to say all -- they would lock the doors at 8:30 so no customers would come back in or try to come in and shop, so they would lock both the entrance and the exit doors.

Page 29

Q.   Did you ever clock out after the doors were open for you?

MR. SMITH:  Objection.

THE WITNESS:  No.

BY MR. VORHEES:

Q.   Were you waiting for a manager or, you know, supervisor to let you out?

A.   Yes.

Q.   And so what would happen?  Would you, you know, wait by the front door for someone to let you out?

A.   Correct.

Q.   And did the manager see that you were trying to leave and walk over or did you have to, you know, contact the manager?  How did this -- how did it occur?

A.   After we would clock out, we would walk towards the -- the exit door.  They -- we would then notify someone or a supervisor would -- who happened to be there would see us walking towards the exit door and then they would follow us or we would call on the radio saying, you know, We need the doors unlocked; we're leaving, and then we would wait for them to unlock the doors for us.

Q.   Okay.  Was there usually a manager positioned so he could see the door after hours?

A.   The manager's office is -- is not near the exit door.  They would have to walk out of the office to -- to

Page 30

look towards the exit door to see.

Q.   And so how far away would the supervisors be located from the door?

A.   The supervisors could be anywhere in the store. They weren't always in a certain area.  They didn't stay in a certain area, they -- they moved around, so that's why we would use a radio.  We'd ask someone to use a radio and let them know we are heading towards the exit door.

Q.   So is it fair to say sometimes they could be very close to the exit door, sometimes they wouldn't be as close?

A.   Correct.

Q.   It just depended on where the supervisors were at any given day?

A.   Correct.

Q.   And so were there times where the supervisor would be, you know, right by the door and just let you out?

A.   Yeah.  There were times, yes.

Q.   And so -- I just want to get a sense how many times or what kind of percentage of the time was there a supervisor that was, you know, by the door by the time you got there and were ready to leave.

A.   I would have to say about 10, 15 percent of the

Page 31

time; they had other duties to do.  And then -- yeah.  I would have to say about 15 percent of the time.  They had -- they had their own duties to do while we were closing, so no -- there was no -- no one always available to stand by the door waiting for us.

Q.   Could you -- and then how many -- what would you say the percentage of the time that you would have to contact somebody on a radio or -- or were they walkie-talkies?

MR. SMITH:  I'm going to object.

THE WITNESS:  Yes.

MR. SMITH:  Vague as to time.

BY MR. VORHEES:

Q.   Just to be clear, I'm talking when you're a cashier, because you worked those night shifts, right?

So did you --

A.   Correct.

Q.   -- understand that question?

A.   Correct.

Q.   So how many -- what would be the percentage of the times when you were trying to leave, the door was locked, and you'd have to contact a supervisor on the radio?

A.   I would have to say 80 percent of the time.

Q.   Okay.  And how long would it take to get -- for

Page 32

someone to respond to let you out?

A.    That could take anywhere from two to -- two to ten minutes, depending on who had the keys to the exit door and where they were in the -- in the warehouse, in the store.

Q.    So it varied from day to day how many minutes --

A.    Correct.

Q.    -- you'd have to wait?

How many times would a supervisor see you, percentages of times, would a supervisor see you walking towards the exit and, you know, follow you so they could let you out?

A.    I would say, you know, 80 percent of the time that we had a radio.  I'd 20 percent of the time they would see us, they happened to be in the front area and see us, and -- and let us out.

Q.    So you said 80 percent of the time you'd have to use the radio, but 20 percent of the time they would either be right there or they would follow you to the exit?

A.    Correct.  They happened to be in the area and see -- and see us moving towards the door, yes.

Q.    Could you call a manager on the radio or over the phone before you clocked out and have them meet you at the door?

Page 33

A.    Yeah.  We could and we -- and we did.  It all depended on where they -- what they were doing at that time.  Sometimes we were told that we'd have to wait because they were in the middle of something and just, you know, they'll meet us at the door.  But, yes, we could call them ahead of time, let them know that we were heading towards the door.

Q.    Were there times where you just didn't clock out until you got confirmation that they would be waiting for you at the door?

A.    No.

Q.    Was it always over radio or was it over the phone?

A.    At the time we had radios.

Q.    Did you always have access to your radio to use to contact a supervisor to let you out of the door?

A.    We would -- we would have someone at -- at that point as we clocked out, we had already turned our radios in, so we would ask someone who had a radio to let them know that we were -- we were heading towards the door.

Q.    Did managers or supervisors -- well, strike that.

Did -- other than supervisors or managers, did anyone else have a key to -- to let you out of the front door?

Page 34

A.   60 percent of the time we would have to wait over five minutes.

Q.   Is that 60 percent of the time of all the times that you would have to wait or is it just out of all the times that you left the store?

A.   I would have to say it was all the time.

Q.   Okay.  So 60 percent?

A.   Was -- yeah, it was over five minutes.

Q.   So how did you arrive at that estimate?  Are we talking about -- let's just go back.

80 percent where you'd have to wait a certain period of time, how did you arrive at that estimate?

A.   Just thinking about on -- on the times that I recall working at nights, we were always having to wait at the door.  We considered ourself lucky when the supervisor happened to be right there and was able to let us out.  But, more often than not, we had to wait for someone who had the keys to come to the front and let us out.  It was -- it was fairly common.

Q.   How long did it usually take from when you clocked out to when you were able to leave the club?

A.   The distance from the time clock to the exit door generally took us a minute to two minutes, just the location of the clock out to the exit door.

Q.   So you gave a range of time, you know, on those

Page 42

when you were a cashier?  Is it the same as when you were a specialist?

A.   Yes.  It's in the same spots for all employees.

Q.   Okay.  Were there any other time clocks?

A.   No.  Time clocks, no.

Q.   And do you think your estimate is an accurate measure of the average time you were delayed at closing due to the door being locked when you reached the front of the store?

A.   I would say it was fairly accurate.

Q.   On a scale of, like, one to five, with one being not sure at all; two, slightly sure; three, moderately sure; four, very sure; and five being completely sure, what would you say your estimate is in terms of how sure you are?

A.   Moderately.

Q.   So three?

A.   Yeah.

Q.   And what makes you moderately sure or less than completely sure?

A.   It's a long time ago.

Q.   Did you ever submit a time adjustment to adjust your punch out time for the day to account for the time you spent waiting to get out of the club?

MR. SMITH:  I'm going to object asked and

Page 46

answered.

You can answer.

THE WITNESS:  No.

BY MR. VORHEES:

Q.   So -- so you didn't submit a time adjustment to account for the time waiting at the door to be let out of the club?

MR. SMITH:  Asked and answered.

THE WITNESS:  No.

BY MR. VORHEES:

Q.   And why not?

A.   I wasn't aware that we could do that.

Q.   Did you ever ask if you could do that?

A.   No.

Q.   Was there a time clock or any other device near the front of the door that you could have used to clock out?

A.   There was a computer at our store at the tire area, which is located next to the exit, that we could use to clock in and clock out of.  We were encouraged -- we -- we were encouraged not to use it for the fact that it wasn't really a time clock.

Q.   Okay.  How close to the front was the computer located?

A.   20 feet.

Page 47

Q.   Were you asked about what activities you did after clocking out before leaving the store when you answered the survey?

A.   I don't recall.

Q.   Other than going to the restroom, did you do anything else, like after clocking out, between the time when clocking out to waiting at the door to leave on a closing shift?

A.   No.

Q.   Did you ever mention to any of the supervisors or managers during your employment that you had been waiting at the door to leave after clocking out?

A.   We would mention it, yes.

Q.   What did you mention, specifically?

A.   That it was -- you know, we -- when we had to close, we would have to wait at the door.

Q.   Did you ask to have that time accounted for or adjusted?

A.   No, because I didn't know we could.

Q.   Who did you mention this issue to of having to wait at the door?

A.   Fellow employees or a supervisor.  You know, anyone who I knew worked at the store.  It was a general conversation on how -- you know, how we had to wait.

Q.   Do you recall any names?

Page 53

A.   No.

Q.   Any dates of when you had those conversations?

A.   No.

Q.   What was the response to you -- to you talking about having to wait at the door?

A.   It was always -- it was a chuckle on, you know, who -- you're waiting for the forklift to come zooming up and to let us out so they can go back to their work.  You know, our just waiting for someone to come.  You know, generally light-handed, light-hearted.

Q.   But just to clarify.  You never asked for that time to be added, the closing time waiting at the door, from the time you clocked out to be added to your time, correct?

MR. SMITH:  Asked and answered.

THE WITNESS:  No.

Are you waiting on me?  I'm sorry.

MR. VORHEES:  Yeah.  No.  I don't have any other questions.

MR. SMITH:  Okay.  I have some questions.

EXAMINATION

BY MR. SMITH:

Q.   I believe you testified that your response to the survey about how often you waited at the door before you could leave the store was never, right?

Page 54

Q.   And that's why, if the survey was about all the positions you had had at Sam's, that's why you would have answered never?

A.   Correct.

Q.   I think that you testified -- testified earlier that the -- at the time you took the survey, you did not know that the survey was related to a lawsuit, right?

A.   Correct.

Q.   But by the time that you finished the survey on the phone, had you been informed that the survey was about the lawsuit -- about a lawsuit?

A.   I believe so.  It's been a while.  Yes.

Q.   You said that you were -- you were trained on time adjustments with the time clocks at Sam's Club?

A.   Yes.

Q.   Were you -- were you ever trained to include the time spent waiting at the door at the end of a closing shift with -- with -- to adjust your time for those occasions?

A.   No.

Q.   Were you ever told by -- by Sam's Club, or anyone representing Sam's Club, like a manager or a supervisor, that you should be getting paid for time you were spending waiting at the door before you could be let go?

Page 56

A. No.

Q. So during the time that you were working as a frontline employee, you said that you worked closing shifts approximately 50 percent of the time, right?

A. Yes.

Q. And of your closing shifts, you had to wait at the front door approximately 80 percent of those shifts?

A. Correct.

Q. And the other 20 percent, I think that you said, would not take -- you were not waiting. And I wanted to clarify something.

Because I think you said there were some instances when a manager would see you and follow you to the door; is that correct?

A. Correct.

Q. And were there also incidents where -- instances where a manager was actually waiting before you got to the door?

A. Yes. They would -- would be there having let another group out, so they just stayed there when they saw another group coming up.

Q. Okay. So out of that 20 percent of the time that you didn't have to wait, could you tell us how -- what percentage was a manager waiting at the door for you?

Page 57

REPORTER'S CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing proceedings was previously sworn to testify to the truth, the whole truth, and nothing but the truth; that said proceedings were taken by me stenographically and were thereafter transcribed into typewriting under my direction, said transcript being a true and accurate transcription of my shorthand notes.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties. In witness whereof, I have this date subscribed my name.

Dated:  December 28, 2023.

TAMARA BERLIN, CSR #9706

Certified Shorthand Reporter

Page 72

ROBERT R. VORHEES, ESQ.

robert.vorhees@ogletree.com

December 28, 2023

RE: SANCHEZ vs. SAM'S WEST, INC.

December 21, 2023, FELICE McROBERTS, JOB NO. 6356035

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext
   to schedule a time to review the original transcript at
   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF
   Transcript - The witness should review the transcript and
   make any necessary corrections on the errata pages included
   below, notating the page and line number of the corrections.
   The witness should then sign and date the errata and penalty
   of perjury pages and return the completed pages to all
   appearing counsel within the period of time determined at
   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of
   Counsel - Original transcript to be released for signature
   as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the
   time of the deposition.

Page 73

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_x_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 74

# EXHIBIT 37

**PAGE 629**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually   )   Case No.
and on behalf of other         )   2:21-cv-05122-SVW-JC
individuals similarly situated,)
                               )
          Plaintiff,           )
                               )
   vs.                         )
                               )
SAM'S WEST, INC. dba SAM'S     )
CLUB, an Arkansas corporation, )
                               )
          Defendant.           )
_____)

--oOo--

DEPOSITION OF

JUANA MEYO XIQUE

THURSDAY, DECEMBER 21, 2023

Reported by:  TAMARA BERLIN, CSR 9706

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ, individually    )  Case No.
and on behalf of other          )  2:21-cv-05122-SVW-JC
individuals similarly situated,)
                                )
            Plaintiff,          )
                                )
    vs.                         )
                                )
SAM'S WEST, INC. dba SAM'S      )
CLUB, an Arkansas corporation,  )
                                )
            Defendant.          )
_____)

            Deposition of JUANA MEYO XIQUE, taken on
            behalf of the Defendants, via Zoom
            videoconferencing, beginning at 8:02 AM and
            ending at 10:19 AM, on THURSDAY, DECEMBER 21,
            2023, before Tamara Berlin, Certified Shorthand
            Reporter No. 9706.

Page 2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A P P E A R A N C E S

(VIA ZOOM TELECONFERENCING)


For the Plaintiff CARLOS SANCHEZ:

BRADLEY/GROMBACHER, LLP

BY:  EMILIE MACLEAN, ESQ.

31365 Oak Crest Drive, Suite 240

Westlake Village, CA 91361

(805) 270-7100

emaclean@bradleygrombacher.com



For Defendant SAM'S WEST, INC. dba SAM'S CLUB:

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

BY:  ROBERT R. VORHEES, ESQ.

Park Tower, Fifteenth Floor

695 Town Center Drive

Costa Mesa, CA 92626

(714) 800-7900

robert.vorhees@ogletree.com


Also present:  Jacqueline Moore, Interpreter

Page 3

Q.   Did you ever make any adjustments, time adjustments, in the timekeeping system?

A.   No.

Q.   Was there ever a time where you contacted a supervisor or anybody else at Sam's Club to make a correction to your -- your time?

A.   No.

Q.   And did you ever need to make any corrections to your time within the timekeeping system?

A.   No.

Q.   If you did need to make a correction in the timekeeping system, can you explain kind of the process for doing that?  What would you do to make the adjustment?

A.   No, because I didn't know it.  I don't know, and I didn't have adjustments.

Q.   If -- if you did have an adjustment, would you have let Christina know?

A.   Yes.

Q.   But you didn't do that, because you didn't think that you needed to; is that correct?

A.   No, because since I only worked very few hours, I didn't have a correction.

Q.   Now, focusing on the shifts where you clocked out at 10 o'clock, your normal stop time from June 23rd,

Page 25

2017, to when you quit Sam's Club, were you ever unable to leave the club after you had clocked out?

A.    No.  Just 5 percent, that's it.

Q.    And can you -- what happened -- you said 5 percent of the times?

A.    Yes.  Only for three minutes, that's it.

Q.    And during those times, you said about 5 percent three minutes or so, were you waiting for a manager or supervisor to let you out?

A.    Yes, because they would close the door and you had to get out.

Q.    And so what would you do on those occasions? Would you wait by the front door and then a manager would walk over and open the door to let you out?

A.    Yes.  I would call the manager or someone who had a key.

Q.    Was there usually a manager positioned so he could see the door after hours?

A.    Yes.

Q.    And how far away usually was the -- was the manager?

A.    Excuse me?

Q.    Just asking -- you mentioned there's -- the manager is near the door after hours; I'm just trying to get a sense of the distance.  You know, how far away is

Page 26

he from the door?

A.   Close to the office.  Not too far in time.

Q.   Can you estimate just, you know, in terms of, like, feet or distance?

A.   In feet -- in feet, about 50, 100 feet.  No --

Q.   About 50 or 100 feet?

A.   -- A little more.

Q.   Okay.  Would you say 120 feet or 150 feet or -- I'm just going to get -- I understand you don't know exactly, but kind of your best estimate.

A.   Yes.  For three minutes; about 150 feet.

Q.   And it would take him three minutes?

A.   Yes.

Q.   Would it ever take less than three minutes?

A.   Yes.

Q.   Were there times when the manager was right there next to the door and could immediately let you out?

A.   Yes.

Q.   Were there times where you could unlock the door yourself?

A.   No.

Q.   Were there exits that were one way that you could just exit out of instead of using the main door?

A.   Only the main door, because since it was the last shift, the door was closed.

Page 27

time clock by the door and waiting until the manager opened the door for you to leave?

A.   No.

Q.   And did you ever submit a time adjustment on those occasions where you had to wait a few minutes for the door to be opened?  Did you ever do anything to try to adjust your clock out time?

A.   No.

Q.   And -- and why not?

A.   Because those had been the hours that I had worked.

Q.   So was it your understanding that because you didn't perform any work that you didn't need to, or did you feel that you should have, you know, had those hours included?

A.   No, because the schedule was the schedule.

Q.   Did you ever ask anybody if you could adjust your clock out times to make an adjustment to include the, you know, few minutes that you were waiting by the door to leave?

A.   No.

Q.   Now, going back.  If you can think when you answered the survey.  And you said in September.

Do you remember providing an answer giving the amount of time you spent in the club after clocking out

Page 38

A.   You're welcome.

Q.   -- Sam's Club ever tell you that you could be paid for the time you spent waiting to be let out of the store?

A.   No.

Q.   You had previously testified that sometimes the managers were ready to let you out of the store, right?

A.   Yes, sometimes they were on the lookout.

Q.   So this wasn't every time, right?

A.   No.  Exactly.

Q.   So how would your manager know to come let you out of the store?

A.   Because he already knows at what time the workers leave.

Q.   Would you ever have to find your manager in the store?

A.   Only once, no more.

Q.   So you previously testified that you occasionally waited to be let out of the store, right?

A.   Well, no.  Like I said, it was only that one time, and the rest of the time it was only three to five minutes, that's it.

Q.   So what percent of the time after your shifts would you have to wait to be let out of the store?

A.   Let me say this once again.  It was only three

Page 43

REPORTER'S CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing proceedings was previously sworn to testify to the truth, the whole truth, and nothing but the truth; that said proceedings were taken by me stenographically and were thereafter transcribed into typewriting under my direction, said transcript being a true and accurate transcription of my shorthand notes.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.  In witness whereof, I have this date subscribed my name.


Dated:  December 28, 2023.



TAMARA BERLIN, CSR #9706

Certified Shorthand Reporter

Page  48

ROBERT R. VORHEES, ESQ.

robert.vorhees@ogletree.com

December 28, 2023

RE: SANCHEZ vs. SAM'S WEST, INC.

December 21, 2023, JUANA MEYO XIQUE, JOB NO. 6356035

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
   to schedule a time to review the original transcript at
   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
   Transcript - The witness should review the transcript and
   make any necessary corrections on the errata pages included
   below, notating the page and line number of the corrections.
   The witness should then sign and date the errata and penalty
   of perjury pages and return the completed pages to all
   appearing counsel within the period of time determined at
   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of
   Counsel - Original transcript to be released for signature
   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the
   time of the deposition.

Page 49

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_x_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 50

# EXHIBIT 38

PAGE 641

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

        Plaintiff,

vs.                          No. 2:21-cv-05122-

                                    SVW-JC

SAM'S WEST, INC. dba SAM'S CLUB,

an Arkansas corporation,

        Defendant.

_____/

VIDEOCONFERENCE

DEPOSITION OF MATTHEW ANDERSON

Stenographically taken before SUSAN L. GARSIDE

CSR No. 13712

December 19, 2023

Page 1

did.

Q.  Okay.  Okay.  So you took that call while you were working?

A.  Yes.

Q.  Okay.  What is your understanding of what this lawsuit is about?

A.  So the whole -- the whole lawsuit is about -- it's about people being, like -- being left -- you know, like -- like -- like they're at the exit door and then, you know, they're not being let out on time.  That's to my best understanding.

            (Reporter affirms hearing "not being let out on
            time.")

            THE WITNESS:  Yeah, I believe so.

            MR. SMITH:  She's just verifying that's what you said.

            THE WITNESS:  Yes.

BY MS. KIM:

Q.  Okay.  What work did you perform after clocking out?

A.  Work being performed after clocking out?

Q.  Did you perform work after clocking out?

A.  No, when I clock out, I'm going home.

Q.  Okay.  We'll come back to the survey a bit later.  Just thinking back from, you know, the start of

Page 14

A.   Only one, the one in Yuba City.

Q.   Okay.  Do you know what time adjustments are?

A.   Isn't that when, like -- like, say, you punch in and, like, say it was, like -- or, like, say, like -- I guess when they, like -- when you adjust time.  Like, say, for whatever reason, something, like, happened where you couldn't use the time clock or something, is it? -- or for whatever reason?

Q.   Okay.  Were you -- I can't -- I can't testify.  I just want to know what you know about time adjustments, what your understanding is.

A.   My understanding of a time adjustment -- say, like, you try to clock -- clock in/clock out, for whatever reason, and that you could later adjust it manually.  Like, say, for whatever reason you couldn't clock back in to lunch -- from lunch or whatever, and it would get adjusted or something like that.  That's to my best understanding.

Q.   Okay.  Were you familiar with time adjustments while working at Sam's Club?

A.   Yes, yes.  And I have had my time adjusted because of -- I think it only happened, like, a couple of times.  I've had it happen one time, for clocking back in or something.

Q.   Okay.  Can you tell me --

Page 31

A.   To my best recall.

Q.   Okay.  Can you tell me those times that you've had your time adjusted?

A.   That I've -- I can't tell you such -- specifically when they were.  It's been a while.  You know, I don't know for certain what -- when it was and stuff.  Can you ask the question again?

Q.   Yeah, why were they -- why was your time adjusted?

A.   Well, there was one time when I was -- when I -- I forgot to clock back in from (as said) lunch, that I can think of.  That was one time that I can think of.  And it got readjusted there.

Q.   Any other times?

A.   I believe there was one time when I accidentally clocked out instead of -- I think I accidentally clocked myself out instead of going to meal or something like that.  And I had them fix it.  I think that -- I think that's what happened.  That's one thing that was -- that's one that comes to my mind.

Q.   Okay.  Any other time?

A.   There -- there was one time when -- when carts was struggling hard, and I had clocked out.  And then I asked the manager, "Hey, could I" -- "could I stay overtime," kind of thing; asked if they could clock me

Page 32

back in or whatever, and I worked a little bit longer. And then I stayed overtime that way. And they -- I think -- yeah.

Q. Okay. Any other time?

A. I think I did that twice. I'm just trying to recall -- but to my best memory/recall, that I can actually remember doing it. That was a long time ago. That's to my -- to what I can remember I think I did.

Q. Okay. Were you aware that Sam's Club had a policy prohibiting working off the clock?

A. Yes.

Q. Were you trained at any time by Sam's Club on how to accurately keep track of your time?

A. I believe I took a CBL.

Q. What's a CBL?

A. Computer-based learning.

Q. Were you trained on time adjustments?

A. I believe I took a CBL on that. I have adjusted my time before.

Q. Did you ever personally make any time adjustments in the timekeeping system?

A. Yes.

Q. Okay. How many times did you personally make time adjustments?

A. I'm not sure. It would be for, like, you know,

Page 33

accidentally forgetting to, you know, clock back in from lunch.  Those couple of times, those are the only ones I can think of.

Q.  Okay.  What was the process for making the adjustment?

A.  Using the computer at work.  Signing into it and making the adjustment there.  It's kind of hard for me to describe.  That's basically it.

Q.  Okay.  Did you ever make adjustments to your time records when you worked the closing shift?

A.  Not that I can recall.  I don't think it was on closing shifts.  But that's to the best of my understanding.

Q.  Okay.  Focusing on the closing shifts that you worked throughout your entire employment as Sam's Club. Were you ever unable to leave the Club after you clocked out?

A.  So you mean, like, being at the exit door and waiting or something, because it was locked?

Q.  Yes; for any reason that you can't leave the store after you clocked out.

A.  I can think of, like -- there was, like -- only if, like -- there were few and far in between.  Usually, I would -- when I would go to clock out, I -- they would already be there, you know, by the exit door.  And they

Page 34

A.   Maybe just a little -- maybe just a little bit over.  But I don't have an exact time because it's kind of hard to get that because it's been so long.

Q.   Okay.  Do you recall any other times where you had to wait?

A.   Vaguely.  But very few times.  I can -- I can -- it's happened less than a handful of times.

Q.   Okay.  And why were you unable to leave the Club after your clocked out?

A.   Because they were still walking up to go unlock it.  I mean, it would be very brief.  They were coming up to unlock it, though.  So it wasn't like -- it wasn't like, "Oh, I'm here for half an hour because I'm waiting."  No, it wasn't.  It wasn't like that.

Q.   And when you say, "They were coming up to unlock it," who is "they"?

A.   Like the merchandising leads, usually, or -- or one of the merchandising managers.  That's how it would work.  They would come up with their -- like, their -- you know, they'd get off their forklift and they'd come up with their keys, you know, and, like -- and unlock the door.  And then I'd be on my merry way, go home.

Q.   Okay.  And then you said about -- it's been, like, less than a handful of times where you had to wait; correct?

Page 36

BY MS. KIM:

Q. Do you have an estimate?

A. It would -- it would -- it would vary. Then again -- but I -- I don't have an estimate.

Q. Okay. What did it vary from?

A. Like -- like, why would it vary? You know, if, like, I had to buy something. I could buy something when I was off.

Q. Okay.

A. Just go to the -- like, say, like, bananas or whatever I needed to take home, I could go buy it; you know, scan it, check it out, and then they would check the receipt and then I would be on my way. Sometimes it would take longer because I would go in to, you know, like, basically shop. And I'd use the scan-and-go thing, like the app and -- that's on my phone -- and make the purchase and get scanned out that way. And that's why it would -- that's most of why it would vary. That's what comes to my mind.

Q. Okay. So you did some personal shopping after you clocked out?

A. For myself, yes.

Q. Did you ever submit a time adjustment to adjust your punch-out time for the day to account for the time you spent waiting to be let out of the Club?

Page 44

A.   No.  No, I never had to.

Q.   But you said you waited maybe less than a handful of times, around five minutes, to get let out. Why didn't you submit a time adjustment for those?

A.   I didn't think I had to.

Q.   Did you ever ask if you could?

A.   No.

Q.   Was your time clock near the front door that you could have used to clock out?

A.   My time clock is right next to the break room, which is not near the front door.

Q.   Is there a time clock near the front door?

A.   It's towards -- it's not near the front door. It's towards the break room, which is towards the back, to the side of the building.

Q.   Okay.  But just in general, there is no time clock near the front door?

A.   There is no time clock near the front door, no.

Q.   Okay.  So for the times that you had to wait to be let out, could you have waited to clock out after -- once the manager arrived to let you out?

A.   Can you repeat that?  I'm trying to understand here.

Q.   Yeah.  You know, the time that you had to be -- oh, your video is off.

Page 45

A.  Yeah, I accidentally -- sorry, I -- yeah, sorry.

Q.  No worries.  So the times that you had to wait to be let out, could you have clocked out as soon as the manager arrived to let you out?

A.  I would have to walk to the -- back to the break room, is what I'm saying.  And that would require walking back.  Because the exit door is more towards the center of the building.  Like, you know -- and the time clock is more to like -- what is that? -- the east side of the building.  So it's -- to my best understanding of the question, then no.  Because that would require me to go back and then come back to the exit door, if I'm understanding what you're saying correct -- right?  Can you rephrase the question?  I'm trying to understand.

Q.  Yeah, I'm just trying to see if you could have just clocked out later, as soon as the doors were unlocked, instead of standing there after you clocked out, waiting to be let out.

A.  Oh, so you mean I could have, like, waited for the manager to come out, unlock the door, and then go clock out?

Q.  Correct.

A.  I would just clock -- I believe, in those instances, I just clocked out and I waited.

Q.  Okay.  But could you have?

Page 46

A.   You mean, like, I could have just -- well, I never tried, so I wouldn't have known, to my best understanding of -- because I would just go and clock out and then go to the door, if that makes sense.  I never tried to just stay on the clock until a manager comes.  I never would have thought about that.

Q.   Okay.  So how far is the exit door to the time clock?  How long did it take you to walk there?  Was it a couple minutes?

A.   It's not a couple minutes.  It's not too far.  To give a rough estimate of the amount of time it takes for me to go from the exit door to the break room, I guess a minute, to my best understanding.

Q.   Okay.  And then going back to when you took the survey.  Do you remember providing an answer giving the amount of time you spent in the Club after clocking out on closing shifts?

A.   Because the survey was some time ago, I do not recall that specific question.

Q.   Okay.  And then I think you talked about this earlier.  Do you remember the survey asking you whether or not -- or -- or whether -- how sure you were of your answer?

A.   I believe I said I was certain.

Q.   Do you remember saying that you were completely

Page 47

A.   Yes, after closing shifts, I would do that occasionally.

Q.   How long after the store closes are you allowed to -- were you allowed to do personal shopping?

A.   I was never told how long.  It was never brought up to me how long it would take.  Usually, when I would do it, I would just grab a couple of things and go; like, just a couple of things.  Like, whatever I could pretty much, like, store in my hand, most of the time; then I'd just be on my way.  It wouldn't be very long at all.  I was never told how long I could stay inside the store, to my best understanding.

Q.   Would it be correct to say that the vast majority of the shifts that you've worked Sam's Club have not been closing shifts?

A.   It was a mix.  So I worked a lot of opening, a lot of mid shift, and a lot of closing.  But I don't think I worked most of my shifts closing, to my best understanding.  I don't think I have.  It's been a mix, to my best understanding.

Q.   Okay.  Did anyone at Sam's Club ever tell you that you were supposed to adjust your time if you had to wait off the clock at the -- at the front door to be let out?

A.   I was never told of such conversations, to the

Page 54

best of my knowledge.

Q.   Let's talk about the survey for a second. The -- you said it was over the phone; right?

A.   Correct.

Q.   And was it -- it was done by a human being or a robot?

A.   It was done by a human being.

Q.   And did that person tell you, as part of the survey, that the -- that it was -- that it had to do with a lawsuit?

A.   If she did, she probably would have said it at the first part of the phone call.  But I do not recall the exact initial details of that phone call, right off the top of my head, at this moment.

Q.   And you -- is it correct that on the survey, you stated that you had never waited at the end of your shift?

A.   Well, according to what I was told, that I did say "never" -- and it was a little bit -- I had forgotten what I had -- that I had said that, to my best understanding.

Q.   Okay.  And it's -- and do you remember saying that you were completely sure in your answers on the survey?

A.   I do remember saying that.  I do remember saying

Page 55

REPORTER'S CERTIFICATE

I, SUSAN L. GARSIDE, a Shorthand Reporter, State of California, do hereby certify:

That MATTHEW ANDERSON, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, a review of the transcript was requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of January 2024.

SUSAN L. GARSIDE CSR NO. 13712

State of California

Page 60

HEIDI G. KIM, ESQ.

heidi.kim@ogletree.com

January 2, 2024

RE: CARLOS SANCHEZ   vs.  SAM'S WEST, INC.

December 19, 2023-JMATTHEW ANDERSON-JOB NO.6356014

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the

   time of the deposition.

Page 61

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 62

# EXHIBIT 39

PAGE 658

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

CARLOS SANCHEZ, individually and

on behalf of other individuals

similarly situated,

      Plaintiff,

vs.                                    No. 2:21-cv-05122-

                                   SVW-JC

SAM'S WEST, INC. dba SAM'S CLUB,

an Arkansas corporation,

      Defendant.

_____/


VIDEOCONFERENCE

DEPOSITION OF BRIAN McCRAY


Stenographically taken before SUSAN L. GARSIDE

CSR No. 13712

December 19, 2023


Page 1

Q.    And how many Clubs have you worked at?

A.    Just the one.

Q.    Are you familiar with what -- with time adjustments?

A.    Yes.

Q.    Okay.  What are they?

A.    Where you're able to change the time on your time card.

Q.    Were you familiar with time adjustments when you worked at Sam's Club?

A.    I had to adjust my time whenever I forgot to clock in.

Q.    Were you aware that Sam's Club had a policy prohibiting working off the clock?

A.    Yes.

Q.    Were you trained at any time by Sam's Club on how to accurately keep track of your time?

A.    Yes.

Q.    Were you trained on time adjustments?

A.    Yes.

Q.    And you said you made time adjustments when you forgot to clock in.  How many times did you forget to clock in, where you had to adjust your time?

A.    About three or four times.

Q.    Have you ever had to adjust your time for any

Page 14

other reason?

A.  No.

Q.  And what was the process for making that adjustment?

A.  You'd have to go on the computer and sign in and adjust the time.  And your manager would have to approve it.

Q.  Okay.  Did you ever make adjustments to your time records when you worked a closing shift?

A.  Only when I clocked in or -- yeah, that's it.

Q.  Okay.  So those are for the times when you had to -- or when you forgot to clock in?

A.  Yeah, that's it.

Q.  Okay.  During your employment, were you ever unable to leave the Club after you clocked out?

A.  Yes.

Q.  What percentage of the closing shifts that you worked were you unable to leave after you clocked out?

A.  Almost every night.

Q.  What was the reason why you were unable to leave after you clocked out?

A.  The front door was locked.

Q.  Okay.  What time do they lock the doors?

A.  8:00 o'clock.

Q.  Is that when the store closes?

Page 15

A.   Yes.

Q.   Okay.  And you were waiting for a manager or supervisor to let you out?

A.   Yes.

Q.   Would you wait by the front door and a manager would walk over and open the door to let you out?

A.   We'd wait outside the cafeteria, which was basically by the front door.

Q.   Was there a -- usually a manager positioned so he or she could see the door after hours?

A.   No.

MS. KIM:  I'm sorry, could we go off the record just for one minute?  I just need to -- something is happening in my room, with my pet.

MR. SMITH:  No problem.

MS. KIM:  Okay.  So sorry.  I'll be back.  Give me one minute.

(Recess.)

BY MS. KIM:

Q.   Okay.  Mr. McCray, you said there wasn't a manager position so he or she could see the door after hours; right?

A.   Yeah.

Q.   Where were the -- where were the managers, normally?

Page 16

A.   Rob.

Q.   Okay.   The same Rob as when you were in rotisserie?

A.   Well, he was -- he would -- yeah, yeah.

Q.   Okay.   You were going to explain something about Rob.   What was that?

A.   What?

Q.   You were about to explain something about Rob?

A.   Oh, no.   He was the only manager there at the time.   Or he was the closing manager, so he -- at 9:30, they'll be actually still there.

Q.   Okay.   Could you call a manager on the phone, before you clocked out, and have him or her meet you at the door?

A.   I didn't have the manager's number.

Q.   Could you get a walkie to call them and let them know, before you clocked out, that, you know, you need them to meet you at the door to let you out?

A.   Yeah, we used them to do that.   But -- yeah, we used them.

Q.   Okay.   So you have used walkies to contact the manager to let them know that you're about to clock out and you need them to let you out of the store?

A.   Yeah.   And some- -- and still have to wait for them to get from the back of the store.

Page 19

Q.   How many times did you call a manager through a walkie to let them know that you needed to be let out?

A.   Couple times, sometimes.  Two, three times.

Q.   Two or three times total of your employment?

A.   Oh, no.  It was an everyday thing.

Q.   So two or three times per day, you were calling them through the walkie so they can let you out after you clocked out?

A.   Yeah, and -- well, for other people, like -- because the other teams would be leaving too, so we'd have to call for them because we were the only ones with walkie-talkies.  So they'd -- yeah, they'd have to be let out by him.

Q.   Oh, I see.  So you were using your walkie to let them know about other employees that needed to be let out?

A.   Yeah, we didn't use them when we left because we were the last ones.  We knew we were able when he was there.

Q.   Okay.  I'm just trying to understand your testimony.

A.   Uh-huh.

Q.   Okay.  You said you guys are the only ones with the walkies.  Who are "you guys"?

A.   The merchandising crew.

Page 20

Q.   Okay.  Merchandising crew are the only ones that have walkies?

A.   That were left.  The cafe -- the cafe and rotisserie doesn't (as said) have radios.  You know, they didn't have them.

Q.   Okay.  But did any other department have walkies?

A.   Just the front end.  But they weren't there anymore.

Q.   They weren't there at the time of the closing shift?

A.   Yeah.  They got off at 8:00 -- or 8:30, I mean.

Q.   Okay.  So you used your walkie around two to three times daily to let managers know that employees needed to be let out?

A.   Yes.

Q.   Okay.  How about for you, personally?  Did you ever use walkies to let them know that you needed to be let out?

A.   No.  Well, we were all clocked out.  But he knew we were all clocked out, so he'd just wait or -- he'd either wait for the last of us to finish clocking out or, you know -- or he'd just be checking the work from -- to see if we finished before he let us out.

Q.   Okay.  So is it your testimony that you didn't

Page 21

waited until the manager opened the door.

Q. Okay. Did you typically leave the Club with a group of other employees?

A. Just my fellow merchandisers.

Q. Okay. And this is when you were in the merchandising position; right?

A. Yes.

Q. Okay. How about when you were in the other positions, in maintenance and rotisserie? Did you typically leave the Club with a group of other employees?

A. Not exactly because I wouldn't always be off at the same time as them. I had to stay until I was finished with whatever I was doing.

Q. Okay. When you did leave the Club with the group of other employees, how many other employees would leave with you?

A. Eight. That was when we -- when I was doing merchandising.

Q. Okay. Would all the employees arrive at the front at the same time?

A. Yeah, we'd all clock out at 11:30 and wait.

Q. Okay. When you reached the front of the store and the door was locked, how long did you wait at the front, on average, for the door to be opened?

A. Five to ten minutes.

Page 27

Q.   Did you ever submit a time adjustment to adjust your punch-out time for the day, to account for the time you spent waiting to be let out of the Club?

A.   No.

Q.   Why not?

A.   Because probably wouldn't have been allowed to.

Q.   Did you ever ask?

A.   No.

Q.   Was your time clock near the front of the door that you could have used to clock out?

A.   No.

Q.   Okay.   Now, thinking back to when you took the survey.   Do you remember providing an answer giving the amount of time you spent in the Club after clocking out on closing shifts?

A.   Yes.

Q.   When you answered that question on the survey, do you remember that you were asked how sure you were of your answer?

A.   Yes.

Q.   What was your response?

A.   That I was sure.

Q.   How did you decide that you were sure of your answer when you took the survey?

A.   Very sure (as said).

Page 31

can answer.

THE WITNESS:  What was the question?  Sorry.

BY MS. KIM:

Q.  Did you consider these activities when you answered the survey?

A.  What activities?

Q.  What we just talked about: personal shopping, whether or not you used the restroom after clocking out, having personal conversations with your co-workers.

A.  No.

Q.  Okay.  Why not?

A.  Because it didn't matter.

MS. KIM:  Okay.  Those are all my questions for now.

MR. SMITH:  Okay.  I have a few questions.

EXAMINATION BY MR. SMITH:

Q.  There was limited testimony about your training on adjustments with the time clock.  And you said that you did have to adjust your time clock, at times, if you forgot to clock in for the day; right?

A.  Yes.

Q.  Did any of the training that you received include instructions on to adjust your time clock based on time that you spent waiting at the end of your shift before you could leave the store?

Page 37

A.   No.   They always wanted us to be clocked out so that we didn't -- or so they didn't have to pay us overtime.

Q.   Okay.   So you -- you were supposed to clock out once your work was done, and you were supposed to wait?

A.   Yes.

Q.   You said that while you were waiting at the cafeteria, that the manager knew that you had clocked out and were waiting.   How did the manager know?

A.   When we all finished -- no, well, he knew we were all finished.   We all parked (as said) our -- and left.   And he -- we all parked (as said) at basically the same time.   He'd just, you know, wander around, check our work and stuff.

Q.   Okay.   So was there -- but was there any communication with him to tell him -- to let him know that everyone was done and waiting?

A.   Not exactly.   We all finished at the same time, so...

Q.   So he saw you -- he saw everyone finish and walk to the front?

A.   Yeah.

Q.   Okay.   You said that you would have to wait before you -- after clocking out and before being able to leave at least four times a week; right?

Page 38

Q.   And how often did you have to wait longer than ten minutes to be let out of the store?

A.   About half the time.  So no, I guess about a third of the time.

Q.   You said about once a week, it took less than five minutes -- the waiting took less than five minutes, before you could leave the store, about once a week.  But that was still time spent waiting; right?

A.   No, they -- he was at the door with the door open sometimes.

Q.   Sometimes.  But not once every week?

A.   Yeah.

Q.   Once every week?

A.   Yeah, roughly.

Q.   Okay.  Did anyone at Sam's Club ever tell you that you should be paid for the time that you spent waiting after you clocked out before you could be let out of the store?

A.   We always talked about it.  But we never, yeah, did anything about it, I guess.

Q.   No, what I mean is, did any manager or supervisor or trainer ever instruct you that, like, you should be getting paid for that time?

A.   No.

MR. SMITH:  That's all I have.

Page 40

REPORTER'S CERTIFICATE

I, SUSAN L. GARSIDE, a Shorthand Reporter, State of California, do hereby certify:

That BRIAN McCRAY, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, a review of the transcript was requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 2nd day of January 2024.

SUSAN L. GARSIDE CSR NO. 13712

State of California

Page 43

HEIDI G. KIM, ESQ.

heidi.kim@ogletree.com

                                        January 2, 2024

RE: CARLOS SANCHEZ   vs.   SAM'S WEST, INC.

December 19, 2023-BRIAN McCRAY-JOB NO.6356014

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

   to schedule a time to review the original transcript at

   a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

   Transcript - The witness should review the transcript and

   make any necessary corrections on the errata pages included

   below, notating the page and line number of the corrections.

   The witness should then sign and date the errata and penalty

   of perjury pages and return the completed pages to all

   appearing counsel within the period of time determined at

   the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of

   Counsel - Original transcript to be released for signature

   as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

   time of the deposition.

Page 44

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 45

# EXHIBIT 40

**PAGE 674**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail:  mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | Case No. **2:21-CV-05122-SVW-JC**<br><br>**PLAINTIFF'S CARLOS SANCHEZ'S CLASS ACTION TRIAL PLAN IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 4, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10A<br><br>Complaint filed: June 23, 2021 |

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION; MPA IN SUPPORT

**TABLE OF CONTENTS**

I.      INTRODUCTION AND OVERVIEW ........................................................1

II.     TRIAL PLAN ON CLAIM-BY-CLAIM BASIS ......................................1

    A.      First and Second Causes of Action for Failure to pay minimum wages and overtime. ......................................................................................2

        1.      Element No. 1: Performed Work for Defendant..............................3

        2.      Element No. 2: Worked Unpaid Hours (minimum wage)...............3

        3.      Element No. 3 (for Unpaid Overtime) worked overtime hours.......7

        4.      Element No. 4: Defendant Had Actual or Constructive Knowledge ................................................................................................7

        5.      Element 5: The Amount of Wages Owed .......................................9

    B.      Third Cause of Action for Waiting Time Penalties..............................11

        1.      Element No. 1: Employment ended. ..............................................11

        2.      Element No. 2: Defendant failed to Pay All Wages Due by End of Employment ..............................................................................12

        3.      Element No. 3: Daily Wage Rate...................................................12

        4.      Element No. 4: Defendant Willfully Failed to Pay Wages............12

        5.      Element No. 5: Amount of Statutory Wages Due .........................12

    C.      Fourth Cause of Action for Violations of the UCL..............................12

III.    ALLEGED AFFIRMATIVE DEFENSES ...............................................12

IV.     TIME ESTIMATE FOR TRIAL ............................................................13

V.      BIFURCATION AND/OR PHASING.....................................................13

VI.     AGGREGATE DAMAGES MODEL AND DISTRIBUTION PLAN......14

VII.    SPECIAL PROCEEDINGS....................................................................16

    A.      Special Master ....................................................................................16

    B.      Claims Proceedings ............................................................................17

VIII.   CONCLUSION......................................................................................17

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

## I.      INTRODUCTION AND OVERVIEW

Plaintiff, Carlos Sanchez, ("Plaintiff") hereby submits the following Class Action Trial Plan ("Trial Plan").[1] This proposed Trial Plan is submitted in conjunction with Plaintiff's renewed Motion for Class Certification to provide the Court and Defendant, Sam's West Inc., dba Sam's Club, ("Defendant" or "Sam's") with a practical overview of how, in post-certification proceedings, the claims will be adjudicated during the liability and damages phases.

The Trial Plan demonstrates that adjudication of these claims on a class basis will be manageable. In addition, the case management techniques discussed below confirm the efficacy of class treatment as opposed to potentially hundreds of inefficient individual actions. *See, e.g.*, *Bristow v. Lycoming Engines*, 2007 WL 1752602, *7 (E.D. Cal. Jun. 15, 2007) (trial plan establishes superiority element of Rule 23 class certification).[2]

## II.      TRIAL PLAN ON CLAIM-BY-CLAIM BASIS

The California Supreme Court has repeatedly recognized the "general rule" that "if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." *Noel v. Thrifty Payless, Inc.*, 7 Cal. 5th 955, 968, 445 P.3d 626, 635 (2019) (internal citations and quotations omitted).   "Courts primarily rely on bifurcation to deal with the issue of individualized damages." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 149 (C.D. Cal. 2007) (collecting cases). *See also Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 542 (N.D. Cal. 2012) (finding class wide and individualized issues regarding damages properly bifurcated). The pertinent question is whether any such individualized issues can be "managed fairly and efficiently." *Noel*, 7 Cal. 5th at 968 (quoting *Duran v. U.S. Bank National Assn.*, 59 Cal.4th 1, 28-29 (2014)).

---

[1] "Nothing in Rule 23 requires Plaintiffs to submit a formal trial plan with a motion for class certification." *Barbosa v. Delta Packing Co. of Lodi, Inc.*, No. 220CV01096TLNKJN, 2023 WL 5280009, at *6 (E.D. Cal. Aug. 16, 2023) (citing *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 n. 4 (9th Cir. 2005)).  Nevertheless, a trial plan "often assists in identifying the relationship between individual and common elements of proof" under Rule 23. *See,* Manual for Complex Litigation § 21.141 (4th ed. 2000). This preliminary Trial Plan can (and should) be modified to take into account any developments in the law and as the facts and evidence develop.

[2] The Bristow court denied certification, but with leave to amend to substitute a new named plaintiff. 2007 WL 1752602 at *1. The operative complaint was amended and the class certified three months later. 2007 WL 2695226 (E.D. Cal. Sep. 11, 2007).

-1-

### A. First and Second Causes of Action for Failure to pay minimum wages and overtime.

Labor Code section 1194, subdivision (a) provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit."

Labor Code section 1197 states: "The minimum wage for employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."

Under Labor Code section 510(a), "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek … shall be compensated at the [overtime rate of pay]."

***The elements of the claims for unpaid minimum and overtime wages are as follows:***

   (1) Plaintiff and the putative class performed work for Defendant;

   (2) Plaintiff and the putative class worked hours for which they were not paid minimum wages;

   (3) (For unpaid overtime wages) Plaintiff and the putative class worked overtime hours;

   (4) (For unpaid overtime wages) Defendant had actual or constructive knowledge of the unpaid overtime hours;

   (5) The amount of wages owed (i.e., whether minimum wage or overtime).

*See,* CACI No. 2700-2702; Lab. Code § 1194.

"Wages" include all amounts for labor performed by an employee, whether the amount is calculated by time, task, piece, commission, or some other method. (CACI No. 2700; Lab. Code § 200.) "Hours worked" is "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so …" (Wage Order No. 9, § 2(H).) Employees are "working" any time the employer's requirements do "not allow them to use the time effectively for their own purposes." *Morillion v. Royal Packing Co.,* 22 Cal.4th 575, 586 (2000).

-2-

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

Employers must take affirmative steps to prevent OTC work, beyond the mere promulgation of a written policy prohibiting OTC work. *Morillion,* 22 Cal.4th at 584. "The basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Martinez v. Combs*, 49 Cal.4th 35, 70 (2010) (emphasis in original). The relevant inquiry is whether the circumstances were such that the employer had knowledge of OTC work being performed "or else had the opportunity through reasonable diligence to acquire such knowledge." *Ketchum v. City of Vallejo*, 523 F. Supp. 2d 1150, 1163 (E.D. Cal. 2007).

**1.      Element No. 1: Performed Work for Defendant**

Defendant does not dispute that time spent by Plaintiff and the putative class members waiting off the clock (OTC) for a key carrier to let them out of Defendant's stores at the end of their closing shifts is compensable time under California law. Ex. 13 to Ex. A, Francis (30(b)(6)) Depo. at 112:13-24.

**2.      Element No. 2: Worked Unpaid Hours (minimum wage)**

a.      Evidentiary support from witnesses

Plaintiff, the putative class members; Defendant's 30(b)(6) and manager witnesses, and expert witnesses.

b.      Evidentiary Support from Documents

Uniform Asscoiate Pay Policy – California, Facility Closing/Overnight Proecdures Policy (AP 23), Associate Pay Management Guidelines Policy for California, Edit Timesheet ETA, Work Group and Block Scheduling Toolkit, and Sam's Club's Key and Door Control Policy AP-05.

Defendant has asserted that Plaintiff's unpaid wages claim is not manageable because Plaintiff cannot prove the hours spent waiting off the clock (OTC) to be released from the store locations at the ends for their closing shifts. Courts have repeatedly rejected this argument, so as not to incentivize Defendant companies from failing to keep adequate records. *See, e.g., Dynabursky v. AlliedBarton Sec. Servs. LP,* 2014 WL 1654030, at *4 (C.D. Cal. Apr. 24, 2014). Courts do not allow employers to fail to comply with their statutory obligations to compensate employees for all their hours worked, and to keep accurate, itemized records of their hours worked,

and then complain about the lack of precision in an employee's method of proving hours worked. *See, e.g., id.*

CACI 2703 addresses this precise issue, outlining how employees prove they worked time for which their employer did not pay them when, like here, the employer does not keep records of all hours worked:

> State law requires California employers to keep payroll records showing the hours worked by and wages paid to employees. If [Defendant] did not keep accurate records of the hours worked by the [Plaintiff and the putative Class], then [Plaintiff and the putative Class] may prove the number of overtime hours worked by making a reasonable estimate of those hours. In determining the amount of overtime hours worked, you may consider [Plaintiff and the putative Class's] estimate of the number of overtime hours worked and any evidence presented by [Defendant] that [Plaintiff and the putative Class's] estimate is unreasonable.

CACI 2703; *see also*, *Furry v. East Bay Publishing, LLC* (2018) 30 Cal.App.5th 1072 ("[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee. In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages." (citing *Hernandez v. Mendoza* 199 Cal.App.3d 721, 727 (1988)).

This concept is not new. The United States Supreme Court first recognized this principal in *Anderson vs. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946). As the *Mt. Clemens* court explained: "[w]hen an employer fails to maintain records of hours worked, the courts should not penalize employees for an inability to prove the precise number of hours."

The California Supreme Court in *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal.4th 1, 40-41 (2014), quoting *Mt. Clemens*, confirmed:

> When an employer's records are inaccurate or incomplete, the employee carries [his] burden by proving the amount and extent of work performed 'as a matter of just and reasonable inference.' The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. ***Under this burden-shifting framework, an employer is not allowed to benefit from its own poor recordkeeping.***

(*Id*; emphasis added.)

Defendant's classwide written policies demonstrate that Defendant has fallen short of the minimum legal duty of an employer to take affirmative steps to prevent OTC work. Specifically, although the exit doors are secured after the store is closed and must be opened before closing shift employees can leave for the evening, neither Sam's Closing Policy nor its Pay Policy instructs closing shift workers to wait until the doors are unlocked before clocking out. Instead, Sam's uniform pay policy instructs closing shift workers that they must clock out when no longer performing "work" but Sam's uniform pay policy does not identify time spent waiting for the exit door to be unlocked as off the clock "work." This same uniform pay policy also does not inform PCMS that time spent waiting for the exit door to be unlocked is a paid activity. And until May 3, 2023, Sam's did not inform PCMS that they should submit a time adjustment in the event of an exit delay (and, unsurprisingly, Sam's internal data shows that time adjustments are rarely, if ever, used for exit delays). Sam's time adjustment system does not provide a pay code for exit delays. Additionally, Sam's corporate representative testified that he is unaware of any training materials that would inform an Associate that time spent waiting to be released after they clock out is compensable and, with respect to the recent policy update, that Associates are not notified when policies are updated or revised. These common facts, in conjunction with representative evidence and timekeeping and compensation data (discussed below), show that Defendant violated its legal obligation to affirmatively prevent uncompensated OTC work by its closing shift employees, and has instead opted to sit idly by, allowing the uncompensated overtime to occur, to its own financial benefit.

    c.    <u>Representative Evidence and Electronic Data.</u>

Federal Rule of Evidence 702 permits admission of specialized knowledge by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." *See Abaxis, Inc. v. Cepheid*, 2012 WL 2979019, at \*1 (N.D. Cal. July 19, 2012). This inquiry is a "flexible one," where even "shaky" evidence "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010)). The jury, not the Court, determines how much weight to give the expert testimony.

*Lucent Techs., Inc. v. Microsoft Corp.*, 2011 WL 2728317, at *2 (S.D. Cal. July 13, 2011). *Daubert* and Rule 702 are "not guarantees of correctness," and the Court does not weigh one methodology over another. *Emblaze*, 52 F. Supp. 3d at 954. "[R]ejection of expert testimony is the exception rather than the rule." *Frye v. Ayers*, 2009 WL 1312924, at *4 (E.D. Cal. May 12, 2009).

Here, Plaintiff will present survey evidence from Dr. Jeffrey Petersen, Ph.D. to assist the trier-of-fact in making liability, damages and penalty determinations regarding unpaid wages due to the employer requirement to remain on the work premises after clocking out. Surveys are admissible under Rule 702 if they are (1) "relevant;" (2) "conducted according to accepted principles" (*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (cleaned up); and (3) "reflect[ive of] a reliable application of [reliable] principles and methods to the facts of the case" (Fed .R. Evid. 702(d)). Dr. Petersen's survey was conducted according to generally accepted survey principles. (Ex. W, Petersen Report at ¶ 94 ["The survey and the statistical analysis were performed in accord with peer-reviewed science regarding class action wage and hour cases."]).[3] This survey was designed by Dr. Petersen using sound survey principles, conducted telephonically by Davis Research, and analyzed by Dr. Petersen using the reliable application of peer-reviewed scientific techniques specifically relating to wage and hour class actions and electronic class data provided by Defendant.

The survey responses demonstrate that: 90% of the PCMs have incurred OTC wait time due to exit delays; the average wait time is 8.6 minutes; and PCMs experience exit delays on nearly 60% of their shifts. Ex. W, Petersen at ¶¶ 4-5. These figures result in an average unpaid time per

---

[3] Courts routinely accept surveys conducted by Dr. Petersen in wage and hour class actions. *See e.g. Vasquez v. Leprino Foods Co.*, 2023 WL 1868973, at *9 (E.D. Cal. Feb. 9, 2023) (finding Dr. Petersen's survey "sufficiently reliable" and denying defendant's MIL to exclude it); *Nucci v. Rite Aid Corp.*, 2020 WL 3187335, at *9, 15 (N.D. Cal. June 14, 2020) (finding that the wage and-hour class action survey conducted by Dr. Petersen in that case "was conducted according to accepted principles," "demonstrate[s] that whether a common policy was communicated across all class members is capable of classwide resolution" and "go[es] directly to liability"); *Guifu Li v. A Perfect Day Franchise, Inc.,* 2012 WL 2236752, at *13 (N.D. Cal. June 15, 2012) (cleaned up) ("Plaintiffs' experts, relying on data collection from surveyed class members, and using generally acceptable statistical methods, calculated the average payments due to the class for each of the class claims as well as PAGA penalties. The Court is satisfied that Plaintiffs have met their burden of establishing an approximate award based on reasonable inferences provided by a representative sample of the class.").

-6-

closing shift of 4.9 minutes. *Id.* at ¶ 5. The relative margin of error on this average meets the *Bell Standard*[4] at 10.1 percent. *Id.* at ¶ 87 The cooperation rate of 76% is an indicator that the data set of survey responses is an unbiased sample. *Id.* at ¶ 65. Additionally, the survey's response rate is more than sufficient to provide reliable results. *See, id.* at ¶¶ 60-67. In sum, the survey results lend powerful credibility to the fact that Defendant violated its legal obligation to affirmatively prevent uncompensated OTC work by its closing shift employees.

### 3.    Element No. 3 (for Unpaid Overtime) worked overtime hours.

a.    Evidentiary Support from Witnesses

Same as to Element No. 2.

b.    Evidentiary Support from Documents

Same as to Element No. 2.

c.    Representative Evidence, Expert Testimony, and Electronic Data.

Here, Plaintiff will utilize survey evidence from Dr. Petersen, along with expert testimony from David Breshears. Mr. Breshears, a certified public accountant in financial forensics, will evaluate timekeeping and compensation records from Defendant, reliably applying generally accepted scientific principles and methods in his analysis, to ascertain instances where PCMs incurred unpaid overtime as a result adding the average unpaid time per closing shift of 4.9 minutes to the employee's recorded hours.

### 4.    Element No. 4: Defendant Had Actual or Constructive Knowledge

a.    Evidentiary Support from Witnesses

Same as to Element No. 1. This will include PCM testimony that managers and supervisors were the ones who released PCMs from secured stores. *See, e.g.* Duran (happy camper) Decl. (ECF 47-3) at p. 389 at ¶ 7 (testifying that on occasions he has had to wait for someone to unlock the exit doors after clicking out, he was able to locate a manager or supervisor with a key nearby to let him out.). "[A] manager who arrives at a door to let out waiting employees is constructively made aware that employees were not let out in accord with company policy" and experienced "an [OTC] wait to be let out of the store." *Utne v. Home Depot U.S.A., Inc.*, 2022 WL 1443338, at

---

[4] *Bell v. Farmers Insurance Exchange,* 115 Cal.App. 4th 715 (2004).

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

*6, *8 (N.D. Cal. May 6, 2022); *see also*, *Jimenez v. Allstate Ins. Co.,* 2012 WL 1366052, at *10 (C.D. Cal. Apr. 18, 2012), aff'd, 765 F.3d 1161 (9th Cir. 2014) ("Plaintiff's declarants testify that their managers saw them working overtime either before or after their scheduled shifts or on the weekend, or otherwise were aware of such [OTC], and did not inquire as to whether overtime was being requested for such time or take any other action.").

### b. Evidentiary Support from Documents/Electronic Data

Same as to Element No. 1. Defendant's written policies and practices demonstrate that it knew or should have known that PCMs would experience OTC exit delays. As noted above, neither Sam's Closing Policy nor its Pay Policy instructs closing shift workers to wait until the doors are unlocked before clocking out. Instead, Sam's uniform pay policy instructs closing shift workers that they must clock out when no longer performing "work" but Sam's uniform pay policy does not identify time spent waiting for the exit door to be unlocked as off the clock "work." This same uniform pay policy also does not inform PCMS that time spent waiting for the exit door to be unlocked is a paid activity. And until May 3, 2023, Sam's did not inform PCMS that they should submit a time adjustment in the event of an exit delay (and, unsurprisingly, Sam's internal data shows that time adjustments are rarely, if ever, used for exit delays). Sam's time adjustment system does not provide a pay code for exit delays. Additionally, Sam's corporate representative testified that he is unaware of any training materials that would inform an Associate that time spent waiting to be released after they clock out is compensable and, with respect to the recent policy update, that Associates are not notified when policies are updated or revised.

Additionally, Defendant's supposed attempts to permit locked-in employees to exit amplifies Defendant's awareness that its own door-locking policy "create[s] the possibility [that] employees will not be able to exit immediately after clocking out." *Utne*, 2018 WL 1989499, at *5 (emphasis in original) (holding that the defendant's "line of argument" based on "efforts [] taken to ensure [locked-in] employees exit as quickly as possible…suggests [the defendant] is aware" that its lock-in policy makes it likely that its employees will be unable "to exit [the locked store] immediately after clocking out").

### c. Expert Testimony

Plaintiff may also present expert testimony from Gary White, who has extensive experience

in the retail industry. During the briefing on Plaintiff's earlier filed Motion for Class Certification (ECF 44), Mr. White opined:

> Sam's Club closing procedure does not allow for the timely release of clocked-out associates because key carrying managers have other duties which must be completed on closing shifts and therefore are often preoccupied and/or away from the store's front locked doors. … Sam's Club by virtue of its own practices should have known employees would have to wait off-the-clock during closing shifts when no key carrier was stationed at the doors to let associates out.

(ECF 54-2 at p. 4).

### 5.    Element 5: The Amount of Wages Owed

#### a.    Evidentiary Support from Witnesses

Same as to Element No. 2. Plaintiff's expert, Mr. Breshears, will be the primary witnesses for this element, based on his analysis of the available data and reasonable estimates drawn from the survey conducted by Dr. Petersen.

#### b.    Evidentiary Support from Documents/Electronic Data

Same as to Element Nos. 2 and 3.

Defendant has argued that some PCMs may have been paid for OTC time spent waiting to be released from its stores at the end of closing shifts because it maintains a general policy providing for time adjustments, but the only way to identify these PCMs would be to make an individualized inquiry into the circumstances surrounding each time adjustment to an "out" punch that was submitted during the relevant period. Contrary to Defendant's position, Plaintiff may prove damages by just and reasonable inference, using representative testimony, averaging, and reasonable estimates.

Cases like this one present precisely the sorts of circumstances that have sustained over almost 80 years of well-developed precedent allowing Plaintiffs in wage and hour cases to prove their damages by "just and reasonable inference." *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946) ("the solution [for incomplete or inadequate records] . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.") Rather, the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the

reasonableness of the inferences to be drawn from the employee's evidence." *Id.* at 687-688; *see also Porch v. Masterfoods, USA, Inc.*, 685 F. Supp. 2d 1058, 1074 (C.D. Cal. 2008) (quoting *Mt. Clemens*, 328 U.S. at 687) (reasoning that "imprecise evidence by the employee can provide a sufficient basis for damages").

Additionally, under the evidence here, Plaintiff can and will establish that time adjustments are rarely, if ever, used to account for exit delays. Indeed, prior to May 3, 2023, Sam's did not have any policies instructing PCMs to submit time adjustments for exit delays. Rather, a *general* time adjustment policy instructed PCMs to submit a time adjustment if they were "unable to clock in and/or out due to the nature of the job, or otherwise **perform work** while not clocked in." That policy did not instruct PCMs that time spent waiting to be released constitutes compensable "work," a complex legal concept which is unfamiliar to unsophisticated retail workers like PCMs. Additionally, Sam's time adjustment system requires a pre-established reason code for time adjustments submitted but *provides no code for exit delays*. The only options provided are: "Time clock not working[,] Performed customer service[,] Lost/Broken/Forgot badge[,] Missing punch[,] Other[,] Worked in another location[.]" (*Id.*) Thus, understandably PCMs, who typically do not possess legal degrees, lack awareness that exit delays legally constitute OTC work or that a time adjustment should be submitted.  (*See e.g.,* Duff Decl. at ¶ 12 ("no manager ever told us we could submit a time adjustment to be paid for the time"); Freyre Decl. at ¶ 13 ("I was not aware that I could submit a time adjustment for the time that I waited."); DiTullio Decl. at ¶ 13 ("We were never told we should be paid for the time we spent waiting or that we could submit a time adjustment form to be paid for the time."); Nazario Decl. at ¶ 11 ("I was not aware that I could submit a time adjustment for the time that I waited so I never submitted one.")). Likewise, even Sam's cherry-picked happy camper declarants who report unpaid wait time concede that they did not submit time adjustments for it. *See e.g.,* (ECF 47-3) Duran Dec. at p. 389, ¶ 7, Guzman Dec. at p. 380, ¶ 7, Phelps Dec. at p. 347, ¶ 4, Estrada Dec. at p.288, ¶ 5, Alverez Dec. at p. 323, ¶ 6.

Indeed, the time adjustment data produced by Sam's for the survey respondents shows that time adjustments are rarely, if ever, used for exit delays. Analysis by Mr. Breshears shows that of 15,363 time adjustments submitted between June 23, 2018 and February 5, 2021, only 2.2% may

*potentially* be related to unpaid exit wait time. Breshears at ¶ 32. Thus, while Sam's Associates may routinely submit time adjustments when they forgot to punch back in after a lunch break or their badge is lost, the evidence shows that time adjustments are rarely, if ever, submitted for unpaid exit wait time. Indeed, club managers testify that they are unaware of any time adjustments ever being submitted for this issue.

### B. Third Cause of Action for Waiting Time Penalties

An employer must pay all wages earned and unpaid to an employee immediately at the time of discharge. (Lab. Code § 201.) If the employer willfully fails to timely pay any final wages in accordance with section 201, the wages of such employee shall continue as a penalty from the due date thereof at the same rate until paid, up to 30 days. (Lab. Code § 203(a).)

"As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act *which was required to be done*." *Barnhill v. Robert Saunders & Co.*, 125 Cal.App.3d 1, 7 (1981) (emphasis added).

The elements of this claim are as follows:

(1) Plaintiff and the putative class's employment with Defendants ended within the 3-year statutory period (i.e., June 23, 2018 to the date of judgment. Cal. Code Civ. Proc. § 338(a); *Pineda v. Bank of America, N.A.*, 50 Cal.4th 1389, 1398 (2010);

(2) Defendant failed to pay Plaintiff and the putative class all wages due by that date;

(3) Plaintiff and the putative class's daily wage rate at the time their employment with Defendant ended;

(4) Defendant willfully failed to pay the wages; and

(5) The amount of statutory wages due.

(CACI 2704; Lab. Code § 203.)

#### 1. Element No. 1: Employment ended.

##### a. Evidentiary Support from Witnesses

Plaintiff; the putative Termination Wages Subclass members; Defendant' 30(b)(6) and manager witnesses. Each of these witnesses can easily identify (either by self-identification or by reference to Defendants' own business records).

##### b. Evidentiary Support from Documents/Electronic Data

-11-

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

Defendant maintains records of when each member of the putative Termination Wages Subclass stopped working for Defendant. The date of termination is clear from these records.

### 2. Element No. 2: Defendant failed to Pay All Wages Due by End of Employment

Same evidence as elements Nos. 2, 4, and 5 for Plaintiff's first and second causes of action (for unpaid minimum and overtime wages, respectively).

### 3. Element No. 3: Daily Wage Rate

Same evidence as elements Nos. 4-5 for Plaintiff's first and second causes of action (for unpaid minimum and overtime wages, respectively).

### 4. Element No. 4: Defendant Willfully Failed to Pay Wages

Same evidence as elements Nos. 2, 4, and 5 for Plaintiff's first and second causes of action (for unpaid minimum and overtime wages, respectively).

### 5. Element No. 5: Amount of Statutory Wages Due

Pursuant to Section 203, *supra*, determining the amount of statutory wages due is calculated simply by multiplying the daily wage by 30 days, for each employee to whom Defendant failed to provide all earned wages due, at the time of discharge. Plaintiff expects that each side's expert will calculate this amount and present it to the jury, although the Parties should be able to stipulate as to damages under Labor Code section 203.

### C. Fourth Cause of Action for Violations of the UCL

To state a claim under California's Business & Professions Code section 17200, et seq., the plaintiff must show an "unlawful, unfair or fraudulent business act or practice…" Bus. & Prof. Code § 17200; *Olsen v. Breeze*, 48 Cal.App.4th 608, 617-18 (1996); *Saunders v. Superior Court*, 27 Cal.App.4th 832, 839 (1994). "The UCL [Unfair Competition Law] focuses solely on conduct and prohibits "'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal.4th 800, 827 (1994) (citations omitted). Because Plaintiff's UCL claim is derivative of his Labor Code and Wage Order claims, Plaintiff will rely on the same evidence already described above, and below.

### III. ALLEGED AFFIRMATIVE DEFENSES

-12-

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

As discussed above, the main issue in this case is whether Defendant's standardized door-locking policy results in unpaid wait time for the PCMs. Notably, Defendant does not dispute liability. To the contrary, Defendant agrees that time spent waiting for the exit doors to be unlocked at the end of closing shifts should be paid. The Trial Plan set forth above outlines how Plaintiff intends to proceed in trial, if Plaintiff does not prevail on the issue of liability via summary adjudication.

Defendant alleges a number of affirmative defenses in its answer. The alleged affirmative defenses (many of which are merely arguments or inapplicable to statutory claims for unpaid wages) are without merit and can be resolved using the same common evidence outlined above.

## IV.   TIME ESTIMATE FOR TRIAL

Plaintiff estimates approximately 15 to 20 court days for trial. Plaintiff intends to call the witnesses identified throughout this trial plan, as well as a selection of approximately 8 to 12 putative class members. Plaintiff estimates about four hours for cross-examination of each of Defendant's 30(b)(6) and manager witnesses. Plaintiff also estimates about one-hour direct examination for each of the putative class members, and two hours of direct examination for the named Plaintiff. Additionally, Plaintiff estimates about six hours for direct examination of Plaintiff's expert witnesses, and 4 hours for cross-examination of Defendant's expert witnesses.

## V.   BIFURCATION AND/OR PHASING

At this time, Plaintiff does not propose bifurcating trial. Here, bifurcation would result in a waste of time and judicial resources. First, Plaintiff's damages and liability are intertwined in a way that it would be inefficient and cumbersome to split evidence into issues related to only liability versus only damages. Damages are always part of a plaintiff's prima facie case, thus necessitating that plaintiffs prove damages when establishing liability.

Additionally, bifurcating trial will duplicate efforts and require the same witnesses being called twice: first to testify as to liability, and next to testify as to damages. Each of Plaintiff's witnesses will be ready to testify about the exits delays the experience while working for Defendant. When doing so, they will also be ready to testify as to the amount of time they waited

-13-

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

off the clock at the end of their closing shift for a manager or supervisor to come unlock the door so that they could leave and how often. Thus, while they are on the stand, they can easily also testify as to the damages elements that follow from the unpaid exit delays.

Additionally, bifurcating trial would be contrary to the goals of promoting judicial economy and efficiency because bifurcation would result in two sets of opening statements, two sets of jury instructions, two sets of final arguments, and two sets of deliberations. The end result is twice the cost, twice the judicial resources, and twice the time. Bifurcation would surely inconvenience the Court and jurors. If a jury determines that Defendant is liable, they can then move on to deciding damages.

## VI.    AGGREGATE DAMAGES MODEL AND DISTRIBUTION PLAN

The Ninth Circuit has firmly held that individual damages issues do not prevent class treatment in wage and hour cases or preclude the courts from "aiding the class to obtain its just restitution." *Leyva v. Medline Industries Inc.,* 716 F.3d 510, 513-514 (9th Cir. 2013).  Indeed, "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action…." *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 699, n.28 (N.D. Ga. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir.2001)).

*Bell* refutes any argument from Defendant that there is no way to prove damages without individualized analysis.  *Bell v. Farmers Insurance Exchange,* 115 Cal.App. 4th 715 (2004). *Bell* involved a class of insurance adjusters who claimed to have been misclassified as exempt from overtime. *Id.* at 720-21. Defendant, Farmers Insurance Exchange (FIE), was found liable, in the amount of $120 million. *Id*. FIE appealed, arguing that the trial court improperly used statistical evidence to prove damages, and that the use of statistical evidence violated FIE's due process rights. *Id.* The Court of Appeal upheld most of the trial verdict, including the amounts for unpaid damages, and found that "proof of aggregate damages [at trial] reflected a level of accuracy consistent with due process …" *Id*. at 755.

The *Bell* court rejected defendant's argument that individualized proof, rather than aggregate damages, was required in class actions, discussing that such an argument "would challenge all

-14-

TRIAL PLAN ISO RENEWED MOTION FOR CLASS CERTIFICATION

class action judgments adopting reasonably expeditious means of distributing the recovery among class members." *Id.* at 750 (citations omitted). Specifically, "the alternative to the award of classwide aggregate damages may be the sort of random and fragmentary enforcement of the overtime laws that will fail to effectively assure compliance on a classwide basis." *Id.* at 751. The *Bell* court determined that the advantages of distributing damages on an aggregate basis, including that such a distribution would be less burdensome on the court and parties, outweighed the disadvantages:

> In *Mt. Clements*, the court held that 'the remedial nature of this statute and the great public policy which it embodies' justified a reduced standard of proof of damages. (*Mt. Clemens, supra*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515.) The same consideration militates in favor of a reasonably expeditious means of calculating and distributing classwide aggregate damages if individual adjudication of the entitlements of all class members, or a substantial portion of the members, would impose impossible burdens on the courts and litigants.

*Id.* Although there may be individual imperfections in the amounts found to be owed to the class members, the total amount owed to the class was based on a "just and reasonable" inference of the overtime hours worked and was, therefore, accurate. *Id.* at 750-51.

As a result of Defendant's failure to meet their statutory obligations and maintain employment records), Plaintiff will use aggregate proof to demonstrate damages, which is fully supported by *Bell* and its progeny.

Expert witnesses commonly and properly provide admissible damages analyses based on partial records, representative testimony, or other evidence, where a defendant's records are incomplete or inadequate. *See, e.g. Childress v. Ozark Delivery of Missouri L.L.C.,* 2014 WL 7181038, at *3 (W.D. Mo. Dec. 16, 2014); *Johnson.,* 2008 WL 1930681, at *8; *Bouaphakeo,* 765 F.3d at 799; *Donovan v. Williams Oil Co.,* 717 F.2d 503, 505 (10th Cir.1983); *U.S. Dep't of Labor v. Cole Enterprises, Inc.,* 62 F.3d 775, 781 (6th Cir.1995); *Minns v. Advanced Clinical Employment Staffing LLC*, 2015 WL 3491505, at *9 (N.D. Cal. June 2, 2015); *In re Nexium (Esomeprazole) Antitrust Litigation*, 297 F.R.D. 168, 182, 2013-2 Trade Cas. (CCH) ¶ 78589 (D. Mass. 2013); *In re High-Tech Employee Antitrust Litig..*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014).

Here, Plaintiff will present expert testimony on damages from David Breshears. Mr. Breshears, a certified public accountant in financial forensics, will calculate unpaid minimum wage and overtime wage and termination penalties. Mr. Breshears' damages analysis will rely on Defendant's own data and admissions to demonstrate the company's exposure "by just and reasonable inference."

Plaintiff also will rely on expert witness estimates based on extrapolation from reasonable estimates and partial records where defendant's records are incomplete or inaccurate. *See, e.g. Childress*, 2014 WL 7181038, at *3 (reasoning that expert could estimate damages in wage and hour class action through "reasonable extrapolation," based on the "policy rationale" discussed in *Mt. Clemens*). *See also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 799 (8th Cir. 2014) (permitting expert witness extrapolation from limited data sample to prove damages where the defendant's records were incomplete); *Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, at *8 (E.D. La. Apr.29, 2008); *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *18 (N.D. Cal. Apr. 4, 2014); see also Newberg on Class Actions § 12:5 (5th ed.) ("Plaintiffs may proffer an expert who offers a formula that she derived from the facts of the case that can be applied generally to all class members in order to approximate the aggregate amount of damages the defendant must pay.").

As noted above, with respect to time adjustments, analysis by Mr. Breshears shows that out of 15,363 time adjustments submitted between June 23, 2018 and February 5, 2021 for the survey respondents, only 2.2% may *potentially* be related to unpaid exit wait time. Breshears at ¶ 32. Even if all of these were credited to defendant (which is not required under *Mt. Clemens*) the impact on damages assessed would be minuscule.

## VII.   SPECIAL PROCEEDINGS

### A.   Special Master

Even assuming, *arguendo*, some damages could not be proved on a class basis, the PCMs could still recover through individual damages proceedings brought before a special master. *See, e.g., Spears v. First Am. eAppraiseIT*, 2014 WL 4647679, at *21-22 (N.D. Cal. Sept. 16, 2014) (reasoning that even where damages cannot be shown by extrapolation through representative

-16-

testimony and estimates, class members can still prove their damages individually without "numerous 'mini-trials' on specific individual class members."); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590, 593 (C.D. Cal. 2015) ("If calculation of individualized damages is complex, the court has numerous efficient means to resolve such issues, including questionnaires, surveys, representative testimony, the use of a special master and other aggregate analysis."); Newberg on Class Actions § 12:5 (5th ed.). *Cf. Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 21 (2007) .

### B.  Claims Proceedings

In *Tyson*, the Supreme Court recognized that a class can be certified under Rule 23(b)(3) even if not all class members have suffered injury as a result of the allegedly unlawful practice. *Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1049-1050 (2016).  "[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct." *Id.* at 1136 (citing *Newberg on Class Actions* § 2:3). In light of this possibility, "Rule 23 specifically contemplates the need for such individualized claim determinations *after* a finding of liability." *Briseno,* 844 F.3d at 1131 (emphasis added). In *Frlekin v. Apple*, the Ninth Circuit held that which class members are eligible to recover may be determined in post-litigation claims proceedings. 979 F.3d 639, 644 (9th Cir. 2020). *See also Sandoval v. Saticoy Lemon Ass'n*, 1990 WL 484150, at *2 (C.D. Cal. Apr. 27, 1990) ("Individual claims are often more suitably resolved after a determination of class-wide liability" and can be bifurcated from class liability proceedings).

## VIII. <u>CONCLUSION</u>

As Plaintiff's Trial Plan demonstrates, this matter can be fairly and efficiently tried as a class action.

Respectfully Submitted,

**BRADLEY GROMBACHER LLP**

Dated: January 3, 2024

By: */s/ Kiley L. Grombacher*
Kiley L. Grombacher
Attorneys for Plaintiff

-17-

# EXHIBIT B

PAGE 694

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | Case No. **2:21-CV-05122-SVW-JC**<br><br>**DECLARATION OF NAMED PLAINTIFF CARLOS SANCHEZ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 4, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10A<br><br>Complaint filed: June 23, 2021 |

DECLARATION OF CARLOS SANCHEZ ISO RENEWED MOTION FOR CLASS CERTIFICATION

DocuSign Envelope ID: C2G3E6E2-595D-497E-8244-1D0E5C72D2A9

I, Carlos Sanchez, hereby declare as follows:

I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

1.      I am a former employee of Sam's West Inc. ("Sam's Club" or "Sam's") and the named Plaintiff in this case. I was employed by Sam's Club as an hourly-paid employee from approximately June of 2019 through October of 2019.

2.      During my employment, I worked at the Sam's Club location in El Monte, California, as a Cashier.

3.      I worked approximately 35 to 40 hours per week. My shifts at Sam's were generally staggered, meaning I had mixed schedules, but I frequently worked closing shifts. When I worked closing shifts, my schedule was from around 2:00 p.m. to 10:00 p.m.

4.      The El Monte store closed to the general public at around 8:00 p.m. At that time the entrance doors would be closed and locked. Once that happened my job duties would be either ringing up the final customers; sweeping up; walking down the aisles checking for customers; handling go-backs; and/or closing out my register for the day. Once all of the customers were out of the store, the manager would lock the interior and exterior exit doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the time I worked at Sam's. There was usually only one manager on site at closing. At El Monte, when I worked there, this was usually either Kelly or another manager whose name I cannot recall.

5.      As closers, it was generally expected that we would keep working until the end of our scheduled shift time, but sometimes, if we had a slow day and were able to clean up and handle closing tasks earlier, the manager would let some of us go early.

6.      When I was permitted to leave early, usually the manager would just come up to me and say "okay, you can go." I would then head upstairs to the time clock, clock out and collect any personal belongings and then make my way back down to the exit doors. I was generally not accompanied by a manger while I did this. The manager was usually busy doing what she needed to do to close the store and leave.

7.      When I would get to the exit, I was not allowed to just leave the store. Plus, the door was locked so I had to find someone with keys to open it.  On the nights described above when my manager would let me leave early, I might be the only person waiting at the door or there

-1-

DECLARATION OF CARLOS SANCHEZ ISO RENEWED MOTION FOR CLASS CERTIFICATION

may be a couple of other people who the manager also told they could leave early.

8.    On the nights when I stayed until the end of my scheduled shift, typically there would be a couple of us waiting and/or looking for someone to let us out. Sometimes the manager would also be leaving around the same time we did, but we still had to wait for her to finish up everything she needed to do for the day before she came and opened the door for us. Most of time she left after us though.

9.    Regardless of whether we were leaving early, before the manager, or around the same time as the manager, we would have to track her down to open the door and let us out. Most of the time I or someone else would go hunt around the store for the manager to let us out. Sometimes I would use a talkie to call for the manager.

10.    Generally, this process of tracking down someone and getting let out would take about 10 to 20 minutes. This time was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

11.    It was really frustrating dealing with this issue on my closing shifts. The managers knew this was happening routinely but the culture at Sam's was such that we did not feel like we could complain too much. Basically, it was understood that you don't mess with managers or COS's because they control your job and you don't want them to cut your hours when you have bills to pay.

12.    I am participating in this lawsuit and seeking to be a class representative because I think it is important for the closing shift employees at Sam's to get the back wages Sam's owes them, and to ensure they are treated better in the future.

13.    I understand that as a class representative in this case, I represent the other present and past closing shift employees working for Sam's Club. I know that I must do what is best for the class of workers as a whole and not just me. I understand and accept that any resolution of a class action lawsuit, such as by settlement or dismissal, is subject to court approval, and must be in the best interests of the class.

14.    I am not aware of any conflicts between myself and other closing shift employees, or any reason why I cannot represent their interests in this litigation. I have represented this class by keeping in touch with my attorneys, providing information and discovery responses when

DocuSign Envelope ID: C2C3E6E2-595D-497E-8244-1D9E5C72D2A9

needed, and testifying at deposition.  I also will make myself available to testify at trial and will stay up to date on the development of the case.  I brought this case to get closing shift employees at Sam's Club what they are owed, and I have done and will continue to do all I can to make sure the class is well represented.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on __1/2/2024_____, at Covina, California.

DocuSigned by:

664199A1410F407...

Carlos Sanchez

-3-

DECLARATION OF CARLOS SANCHEZ ISO RENEWED MOTION FOR CLASS CERTIFICATION

# EXHIBIT C

**PAGE 699**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                     Plaintiff,<br><br>   v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                     Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF CHERYL JANEAN DUFF IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

DECLARATION OF CHERYL JANEAN DUFF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**PAGE 700**

DocuSign Envelope ID: AD16E682-6257-45A0-0228-BA2006B49209

I, Cheryl Janean Duff, hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee.  I worked for Sam's since from approximately April 2012 to February 2019.

3.    I worked at the Sam's Club location in Bakersfield, California. I worked as a "Customer Service Associate" throughout my employment.

4.    I was a full-time employee scheduled to work between 6 and 8 hours a day and 32 to 40 hours a week.

5.    The Bakersfield Sam's Club closes to the public at 8 PM. For the first six out of seven years of my employment, I frequently worked the closing shift, which was from 2 PM to 10 PM.

6.    After the closing announcement is made, the entrance door is closed and customers are no longer allowed to enter the store.

7.    After closing the store to the public, my general responsibilities were to finish assisting the customers in line, clean up my area, close the registers in the customer service area and count money.

8.    At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out.

9.    After I clocked out, I then would walk to the front of the store, but I was prohibited from leaving the building on my own by Sam's. Since the exit door was locked and there was no manager or key carrier stationed by the door, I would usually stand there and wait. Typically, about 4-5 other people waited with me for someone to come open the exit doors.

10.    To the best of my recollection, I typically waited 10-15 minutes after clocking out along with the rest of the employees, for someone to come let us out. We often used

1

DECLARATION OF CHERYL JANEAN DUFF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

the phone by the entrance as a PA or a walkie talkie to page a Closing Manager to come open the door.

11. Eventually, the Closing Manager (Vanessa or Miguel) would come and unlock the doors for us. Sometimes a team lead would show up to unlock the doors.

12. A couple of times, when the wait time was exceptionally long, I or one of my coworkers would complain to the Closing Manager (Vanessa or Miguel) when they showed up to open the door. Generally, when someone complained about the unpaid wait time, the response was simply to laugh it off or they would tell us they were busy with other work and got to us as soon as they could. On the times when I complained or I witnessed my co-workers complaining, no manager ever told us we could submit a time adjustment to be paid for the time.

13. The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and 40 hours per week. I did not receive overtime pay for this time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___3/14/2022___, at Bakersfield, California.

DocuSign by:

Cheryl Janean Duff
8F1CDE05419543E...
Cheryl Janean Duff

2
DECLARATION OF CHERYL JANEAN DUFF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT D

PAGE 703

DocuSign Envelope ID: D4975389-BB35-4BFA-B807-25533F3465ED

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>     Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF EMMANUEL GARCON IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

1

I, Emmanuel Garcon, hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a current employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I have been employed by Sam's Club as an hourly-paid employee since approximately August 2021.

3.    During my employment, I have worked at the Sam's Club location in Bakersfield, California. I work as a merchandiser.

4.    I work approximately 32 to 48 hours per week. My shifts at Sam's are from about 3:00 p.m. to 11:30 p.m. I almost always work the closing shift.

5.    The Bakersfield store closes at 8:00 p.m. Upon closing, the front entrance doors are locked and associates go through the store informing customers that the store is closed. My duties at closing consist of stocking the store. Only about two closing managers on duty have keys to the front doors. I do not recall anyone being stationed at the front of the store or by the door with keys during the time I have been working for Sam's.

6.    At the end of my shift, I inform my manager that I am clocking out and find a computer on the main floor to clock out. I then make my way towards the front exit of the store. I usually have to locate a radio and call for a manager to let me out of the store. On average I wait approximately 3 to 5 minutes before a manager comes and lets me out of the store. Sometimes I have to wait about 10 minutes before a manager comes and unlocks the doors. I frequently wait with 1 to 5 other people who have the same shift as me.

7.    The time it takes me to track down a manager and then wait at the doors is unpaid and off the clock. Because I sometimes work 8 hours in day and/or 40 hours in a week, some of this wait time results in me incurring unpaid overtime wages as well.

8.    Management is aware of the fact that we have to wait before they come to

2

unlock the doors because I routinely have to call them on the radio and tell them I am waiting to be let out of the store. My colleagues and I frequently complain amongst each other about the unpaid wait times because we just want to go home after our shifts.

9.    I have not complained to management about the wait time because I have complained to them about other issues and my concerns are always brushed off. This makes me feel like if I did complain about waiting to be let out of the store after I clock out, management would just ignore my concerns and not resolve the issue.

10.    It is frustrating dealing with this issue on a routine basis because I just want to go home after finishing my shift. I think if you were to add all the time I spent waiting to be let out the store after clocking out to my recorded hours, I would have incurred overtime a lot more often. I believe Sam's Club owes me back wages and overtime for this off the clock wait time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/17/2022_____, at Bakersfield, California.

DocuSigned by:

*Emmanuel Garcon*

D249E7AF5E4842E...

_____
Emmanuel Garcon

3

**PAGE 706**    Declaration of Emmanuel Garcon in support of Motion for Class Certification

# EXHIBIT E

PAGE 707

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>             Plaintiff,<br><br> v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>             Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF HOLLY WAGONER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

1

I, Holly Wagoner hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a former employee of Sam's West, Inc., ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee from approximately November 2020 through May 2021.

3.    During my employment, I worked at the Sam's Club location in Bakersfield, California. I worked as a Cashier.

4.    I worked approximately 20 to 30 hours per week. My shifts at Sam's were generally mixed, but I frequently worked closing shifts a few times a week. When I worked closing shifts, I would work from about 2:00 p.m. to 10:00 p.m. or 3:00 p.m. to 11:00 p.m.

5.    The Bakersfield store closed to the public at 8:00 p.m. At that time the main doors would be locked.

6.    Upon closing, my duties consisted of wiping down counters, sweeping and ensuring my area was clean.

7.    It was Sam's policy that all employees exit through the main doors after finishing their shifts. However, we were only permitted to leave once we could find someone to let us out of the store. In my experience, managers rarely had keys and usually only 1 or 2 maintenance workers would have keys to the front doors. During my employment at Sam's, I do not recall anyone standing by the front or near the doors with keys.

8.    At the end of my shift, I was able to clock out at any POS system throughout the store. I did not need a manager's approval before clocking out. After clocking out, I would be told by a manager to find someone with a key to let me out of the store. I would then have to walk around the store and find someone with a key, which was usually a maintenance employee.

2

PAGE 709    Declaration of Holly Wagoner in support of Motion for Class Certification

9.    Generally, the process of tracking down someone and getting let out would take about 5 to 10 minutes. I would usually be waiting with about 8 or 9 other people also waiting to be let out.

10.    The time I spent waiting was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

11.    It was really frustrating dealing with this issue on my closing shifts. The managers knew this was happening but did nothing to change the situation. I complained almost every shift to management, but they would not respond. I also heard others complain. It seemed as if having to search for someone with keys and waiting long periods of time after clocking out was the policy of the store.

12.    I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/15/2022_____, at Bakersfield, California.

DocuSigned by:

_____
D537342942F5447...
Holly Wagoner

3

PAGE 710    Declaration of Holly Wagoner in support of Motion for Class Certification

# EXHIBIT F

PAGE 711

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**

Sahag Majarian, II, Esq. (SBN 146621)

18250 Ventura Boulevard

Tarzana, California 91356

Telephone:  (818) 609-0807

Facsimile:   (818) 609-0892

E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF SETH THOMAS KELLER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

DECLARATION OF SETH THOMAS KELLER IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION

**PAGE 712**

DocuSign Envelope ID: C713FE01-D920-4FF4-BCFF-7C34CB937ED2

I, Seth Thomas Keller, hereby declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee. I worked for Sam's for approximately one month beginning in June 2021.

3. I work at the Sam's Club location in Citrus Heights, California. I worked as a "Cafe Associate" throughout my employment.

4. I was a full-time employee scheduled to work 8 hours a day and 20 to 40 hours a week.

5. The Citrus Heights Sam's Club closes to the public at around 8 PM. The majority of the time I worked the closing shift.

6. After the closing announcement is made, the entrance door is closed and customers are no longer allowed to enter the store.

7. After closing the store to the public, my general responsibilities were to finish assisting the customers in line, clean up the café and guest area, pull things out of the freezer to prepare for the next day.

8. At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out.

9. After I clocked out, I then would walk to the front of the store, but I was prohibited from leaving the building on my own by Sam's. Since the exit door was locked and there was no manager or key carrier stationed by the door, I would usually stand there and wait. Typically, about 3-6 other people waited with me for someone to come open the exit doors.

10. To the best of my recollection, I typically waited 10-15 minutes after clocking out along with the rest of the employees, for someone to come let us out. We just waited in the cart storage area for someone to eventually come let us out. I was afraid to leave

the area and look for a manager because I could miss my opportunity to be let out.

11.    Eventually, the Closing Manager on duty would come and unlock the doors for us.

12.    The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and 40 hours per week. I did not receive overtime pay for this time.

I declare under penalty of perjury under the laws of the State of Colorado and the United States of America that the foregoing is true and correct.

Executed on _____4/7/2022_____, at Colorado Springs, Colorado.

_____
Seth Thomas Keller

---

2

DECLARATION OF SETH THOMAS KELLER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT G

PAGE 715

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>               Plaintiff,<br><br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>               Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF MICHAEL SCHIRATO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

I, Michael Schirato, hereby declare as follows:

1.　　I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.　　I am a former employee of Sam's West, Inc. ("Sam's Club or "Sam's"). I was employed by Sam's Club as an hourly-paid employee for approximately one month during the summer of 2021.

3.　　During my employment, I worked at the Sam's Club location in Concord, California. I worked in the cold food/freezer department.

4.　　I worked approximately 40 hours per week. I always worked closing shifts. I would typically be scheduled to work from about 2:30 p.m. to 10:15 p.m.

5.　　Upon the store closing, the front doors would be locked by a manager. In my experience, only about one to two closing managers or team leads on duty would have keys to the front doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the time I worked for Sam's.

6.　　My duties at closing consisted of putting ice in the front cold cases.

7.　　At the end of my shift, I would clock out in the main floor breakroom. We were only permitted to clock out in this breakroom which was located on the main floor, but wasn't near the exit doors. After clocking out, I would walk to the front exit door and would wait for a manager to come and let me out of the store. I would usually be waiting with about 15 other people who also finished their shifts around the same time I did. On average I would be waiting about 15 to 25 minutes before a manager would come and unlock the doors. Sometimes I waited longer before a manager would come and let me out of the store. I would usually just wait by the doors and my colleagues would walk around the store and search for a manager.

8.　　The time after I clocked out until I was finally released was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

PAGE 717　　Declaration of Michael Schirato in support of Motion for Class Certification

DocuSign Envelope ID: A020F008-AC3F-44DA-BB2F-5F4170075A99

9.     It was really frustrating dealing with this issue after every closing shift. I just wanted to get home. I would be in a lot of pain from lifting the heavy ice and would really need to sit down. But we just had to stand and wait to be let out of the store.

10.     I never complained to management because I was worried that if I complained my job would be in jeopardy. I also never asked my manager to include the waiting time to my recorded hours because management made it very clear to me that overtime was discouraged. Further, I was told by management that I had to clock out right at the end of my scheduled shift.

11.     I think if you were to add all the time I spent waiting to be let out the store after clocking out to my recorded hours, I would have incurred overtime a lot more often. I believe Sam's Club owes me back wages and overtime for this off the clock wait time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/29/2022_____, at Walnut Creek, California.

DocuSigned by:

*Michael Schirato*
4E90D82E8C784C9...
_____
Michael Schirato

3
**PAGE 718**     Declaration of Michael Schirato in support of Motion for Class Certification

# EXHIBIT H

**PAGE 719**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>          Plaintiff,<br><br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>          Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF WILLANDRA SHYNE IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

1

I, Willandra Shyne, hereby declare as follows:

1.     I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.     I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee from approximately March 2019 through December 2019.

3.     During my employment, I worked at the Sam's Club location in Concord, California. I worked in the customer service department, where my job duties included taking care of returns and helping customers with any membership questions or issues.

4.     During my employment, I typically worked the closing shift. I was usually scheduled to work anywhere from 30-40 hours per week. I recall most of my shifts were around 8 hours long. For closing shifts, I was generally scheduled to work from 2:00 p.m.- 10:00 p.m.

5.     The Concord Store closed to the public at 8:00 p.m., but it usually took a little longer until all of the customers were out of the store.

6.     Between 8:00 pm and the time that the last customer left the store, the only door that remained open was the main exit where receipts are checked. Once the last customer left, this main door would be locked as well. The main door is the only door associates like me were permitted to leave from during and after closing. As I remember it, only the managers had keys and the ability to unlock the main door. Once the main door was locked, the managers would go back to doing their work. I do not recall anyone being assigned to stay by the door to let associates out.

7.     Once the store was closed, I would generally start my closing duties, which included grabbing a cart of go backs and returning the items to their assigned spot. I would also fold clothes and make sure the store was organized for the morning crew. Once I finished all of my work, I would then typically clock out for the day. I did not need permission from a manager to clock out but I did need a manager to unlock the main door so I could actually leave. Sam's did not permit me to just leave the store after

clocking out.

8.    After I clocked out, I would make my way to the main door. Sometimes there would already be a group of other associates waiting by the door to be let out and if one of them had already told the managers that people were waiting to leave, I would just go wait with them. Other times, if no one had alerted the managers, I would walk around looking for a manager or a team lead who could radio the manager and let them know we needed to be let out. There were usually somewhere between 5 and 10 people waiting to be let out with me and we usually waited anywhere from 5 to 15 minutes after cocking out before being let out.

9.    We would often complain to the managers who eventually came and unlocked the door for us, saying, "we've been waiting here ready to leave." Although they managers would say they were "sorry" about the wait, they never offered to pay us for our time and the situation continued on.

10.    As noted above, I often worked scheduled shifts that lasted 8-hours per day and also, sometimes worked 40 hours per week. When all of the unpaid wait time is added on top of my on-the-clock time, I often worked more than 8 hours per day and/or 40 hours per week but was not paid overtime for this time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/16/2022_____, at Antioch, California.

_DocuSigned by:_

_Willandra Shyne_

_____
8C58833A2CFB413...
Willandra Shyne

---

3

**PAGE 722**    Declaration of Willandra Shyne in support of Motion for Class Certification

# EXHIBIT I

PAGE 723

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
       kgrombacher@bradleygrombacher.com
       lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                 Plaintiff,<br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF JULIE HALLIBURTON IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

I, Julie Haliburton, hereby declare as follows:

1.      I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I am a current employee of Sam's West, Inc. dba Sam's Club ("Sam's Club" or "Sam's"). I am employed by Sam's Club as an hourly-paid employee. I have worked for Sam's since approximately May 2017.

3.      I work at the Sam's Club location in Corona, California. I was hired work as a "Cashier Associate" and, as of March of 2019, I presently work as a "Home Meals Solutions ("HMS") Associate."

4.      As a Cashier Associate, I was, a full-time employee scheduled to work 8 hours a day and approximately 40 hours a week. As of March 2019, I've been a part-time employee working 8-20 hours per week.

5.      The Corona Sam's Club closes to the general public at around 8 PM on the weekdays and Saturdays, and on Sundays at around 6 PM. I have worked the closing shift the majority of the time while I was a full-time employee, and occasionally as a part time employee.

6.      At closing time, the entrance door is locked and customers are no longer allowed to enter the store. After the last customer exits the store, the exit door is also locked.

7.      After closing the store to the public, my general responsibilities when I was a Cashier were to finish ringing up customers, close-out the cash register and turn in the money in the drawers, and clean up the register area. Now as an HMS Associate my closing duties entail throwing out food that will expire the next day, putting products on the shelf, and cleaning up my department.

8.      At the end of my shift, I walk to the time clock which is located in the breakroom upstairs and use my badge code to clock-out.

9.      After I clock out, I then walk to the front of the store, but I am prohibited from

1

DECLARATION OF JULIE HALLIBURTON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

leaving the building on my own by Sam's. Since the exit door is locked and there is typically no manager or key carrier stationed by the door, I stand there and wait. Typically, about 1-5 other people wait with me for someone to come open the exit doors.

10. To the best of my recollection, I, along with the rest of the employees, typically wait 5-15 minutes after clocking out, for someone to come let us out. To try to expedite our release, we look for a radio to call a manager to come unlock the door or we walk around the store looking for a manager to come unlock the doors. Many times, I have observed my manager e on a forklift working on his own closing duties.

11. Eventually, the Manager (Russell, Sheila, Mauricio, Lupita or others whose names I cannot recall) will come and unlock the doors for us.

12. A couple of times, when the wait time was exceptionally long, I or one of my coworkers would complain amongst ourselves. I also complained to my Manager Sheila about my schedule because my shift often ended a quarter past the hour and this caused me to wait longer for a Manager to unlock the door than when my shifts ended on the hour.

13. When I worked full time, the time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and/or more than 40 hours in a week. I was not paid overtime for this time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____, at Corona, California.

_____
Julie Halliburton

DECLARATION OF JULIE HALLIBURTON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT J

PAGE 727

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF ANDREW TOVAR IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

I, Andrew Tovar, hereby declare as follows:

1.     I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.     I am a former employee of Sam's West Inc., ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee from approximately 2016 through 2018.

3.     During my employment, I worked at the Sam's Club location in El Monte, California. I worked as a cashier.

4.     I worked approximately 20 to 30 hours per week, and my shifts were generally 6 to 8 hours long. My shifts varied but I worked a closing shift about once every other week. When I worked a closing shift I would work from approximately 3:00 p.m. to 10:00 p.m.

5.     The El Monte location closed to the public at 8:00 p.m. Upon closing, a manager would lock the front entrance doors. In my experience only about two to three managers had keys to the front doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the closing shifts during the time I worked for Sam's.

6.     My duties at closing consisted of checking the receipts of customers leaving the store, putting returns back on the floor and placing the money from the cash register in the counting machine.

7.     At the end of my scheduled shift, I would walk upstairs to the breakroom and clock out on the time clock. I did not need a manager's approval to clock out. I would then walk down the stairs towards the front doors. It was Sam's policy that we could only exit through the front doors and needed to find a manager to come unlock the doors to let us out of the store.

8.     Sometimes a team lead would call a manager for me on their radio, but other times I would just have to wait until a manager would come to let me out the store. At

Declaration of Andrew Tovar in support of Motion for Class Certification

the El Monte store, typically only managers had keys to the front doors. Frequently, I would also have to walk around the store and find a manager myself. This was difficult because Sam's Club is a very large store and managers would be doing their own closing duties. I would then have to walk back to the front doors and wait, usually with six to seven other people who had the same shift as me. On average, I would be waiting about 15 to 30 minutes before a manager would come and unlock the doors and let me out of the store.

9. The time it would take me to track down a manager and then wait at the doors was unpaid and off the clock. Because I sometimes worked 8 hours in day, some of this wait time resulted in me incurring unpaid overtime wages as well.

10. It was really frustrating dealing with this issue because it happened every closing shift. I did complain to management about the unpaid wait time in passing, but they would just brush it off and never did anything to fix the situation. I also heard some of my colleagues complain to management, but nothing ever changed so I know that management ignored their concerns.

11. It was really difficult raising any concerns with management because I had complained about other things in the past, and my concerns were always ignored. This also made it difficult to try and ask for a time adjustment for all of the time I spent off the clock waiting to leave the store. I think if you were to add all the time I spent waiting to be let out the store after clocking out to my recorded hours, I would have incurred overtime a lot more often. I believe Sam's Club owes me back wages and overtime for this off the clock wait time.

12. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/15/2022_____, at Monrovia, California.

DocuSigned by:

_____
118747669C084D2...
Andrew Tovar

3

**PAGE 730**    Declaration of Andrew Tovar in support of Motion for Class Certification

# EXHIBIT K

PAGE 731

DocuSign Envelope ID: 2B0B09D3-41FD-4140-BD86-8592417AB39D

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>     Defendant. | **Case No: 2:21-CV-05122-SVW-JC** *[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF PABLO OLAVARRIA, JR. IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

1

**PAGE 732**    Declaration of Pablo Olavarria, Jr. in support of Motion for Class Certification

I, Pablo Olavarria, Jr. hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a former employee of Sam's Club. I was employed by Sam's Club as an hourly-paid employee from approximately June, 2019 through March, 2020.

3.    During my employment, I worked at the Sam's Club location in El Monte, California. I worked as a maintenance employee and then freezer/cooler stocker.

4.    I worked approximately 40 hours a week.  Typically, my schedule would be scheduled to start at 3:00 p.m. and end at 11:30 p.m.

5.    At the El Monte store where I worked, the store typically closed to the public at around 9 p.m. and most employees working the closing shift would be scheduled to work until 11:30 p.m.

6.    When the store closed to the public, there would typically be loud speaker announcements that the store was closing.  Once the last customers left, the doors to the store would be locked.  It was my understanding that only a manager or supervisor had the ability to lock or unlock the doors.

7.    My closing job duties included maintenance or loading and unloading pallets and ensuring perishables in the refrigerated section were restocked.

8.    My closing duties occurred at the back corner of the store.  Once I had completed my duties, including stocking and restocking and loading and unloading, I would walk upstairs to the office area to clock out using my employee badge.   I could not use a mobile device to clock in or out.

9.    I would then go to the front of the store.  I, along with the other employees waiting to clock out, would typically use the PA system to call a manager or supervisor to unlock the door.  Typically, 12-15 employees would be waiting to be released.  We would talk amongst ourselves, or help other employees in the café, (which was located at the front of the store) with their closing duties.

2

PAGE 733    Declaration of Pablo Olavarria, Jr. in support of Motion for Class Certification

10.    We typically spent a half an hour waiting for a manager, although sometimes it would be as short as five minutes and sometimes as long as an hour.

11.    After the door was unlocked, we would line up and leave one by one. There was a receipt search for those who had made purchases or whom had bags.

12.    The managers knew that employees were waiting. The lights turned off at 11:30 p.m. which was a signal to most employees that the closing shift was ending.

13.    I, along with others, made complaints to management. We said we wanted to go home to our families and were waiting a long time. Most of these were ignored but on some of the occasions I complained, they allowed me to adjust my time. This made me feel like Sam's understood that I should be paid for this time, but it happened only once or twice. I couldn't understand why I typically was prohibited from submitted a time adjustment or clocking out right before I exited the store and why my co-workers, who complained of the same thing, were also not paid for this time.

14.    Even though we complained, I feared if I complained too much, I would lose my job or be treated poorly by management.

15.    I believe that as a result of the off the clock time I incurred for waiting at the door and going through security checks at closing time, that I worked over forty hours a week while I was an employee of Sam's Club.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on __4/9/2022__, at El Monte, California.



Pablo Olavarria, Jr.

3

**PAGE 734**    Declaration of Pablo Olavarria, Jr. in support of Motion for Class Certification

# EXHIBIT L

**PAGE 735**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>     Plaintiff,<br> v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>     Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF LORRAINE RIGOLI IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

I, Lorraine Rigoli, hereby declare as follows:

1.      I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I am a former employee of Sam's Club. I was employed by Sam's Club as an hourly-paid employee from approximately September 2015 through February of 2019.

3.      During my employment, I worked at the Sam's Club location in Glendora, California. I worked as a grocery stocker.

4.      I worked approximately 25-30 hours per week. My shifts were typically 5 hours on week days and 8 hours on the weekends.  My schedule was fairly consistent as this was a secondary part-time job. I worked closing shifts.

5.      The Glendora store closed at approximately 8:00 p.m. but my shift was usually over around 10:00 p.m.

6.      At closing time, there would be an announcement that the store was closing and we would escort the remaining customers to the cashiers.

7.      Once the customers had left the store, I performed my closing duties which included restocking the shelves and organizing them, pulling groceries forward, making the shelves look nice and dumping all of the empty cardboard into the bin.

8.      After my closing duties were done, I clocked out by swiping my badge on an electronic pad. I would then make my way to front doors, where I would meet up with other associates who had clocked out and were waiting to be let out. Sam's did not permit us to leave the store freely. Instead, in order to be let out, we had to find a manager to unlock the front door so that we could leave the building. Sometimes one of us would page a manager from the customer service paging system. We would then often wait at least 5-10 minutes for the manager to come and let us out of the store but during the holidays, there were times where we had to wait as long as 25 minutes for the manager to let us out of the store.

9.      When the manager would come to unlock the door, we would often complain

2

PAGE 737      Declaration of Lorraine Rigoli in support of Motion for Class Certification

about having to wait to be let out of the store but the response was simply that they "were busy" with their other work. I recall that one time, a coworker asked if their clock out time could be adjusted due to the wait time, but we were told an adjustment could only be done if we waited more than 15 minutes and we needed to get a manager's approval first.

10. Because I was typically scheduled to work 8 hours shifts on the weekends and this wait time happened off the clock at the end of those shifts, I often worked more than 8 hours in day but was not paid overtime for this time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ____3/9/2022____, at West Covina, California.

DocuSigned by:

_____
Lorraine Rigoli
0D19D9261E99AC8

**PAGE 738**    Declaration of Lorraine Rigoli in support of Motion for Class Certification

# EXHIBIT M

**PAGE 739**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF ARMANDO CORTES TOSCANO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

I, Armando Cortes Toscano, hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a current employee of Sam's West Inc. ("Sam's Club" or "Sam's"). I was hired by Sam's Club as an hourly-paid employee in approximately 2016.

3.    I was initially hired at the store in Stanton, California as a freezer/cooler associate. I currently work at the Sam's Club location in La Habra, California. I was employed as a floor associate between 2017 to 2019 and am now working as a meat cutter.

4.    I work approximately 40 hours per week. During my employment as a floor associate, I would almost always work a closing shift. I would work from about 1:00 p.m. to 9:30 p.m.

5.    The La Habra store would close to the public around 8:30 p.m. Upon closing, a manager would lock the front entrance doors. My duties at closing consisted of ensuring the floor was stocked, cleaning the floor and getting the store ready for the next day. When I worked closing shifts, generally two managers would have keys to the front entrance door. I do not recall anyone being stationed at the front of the store or by the store with keys.

6.    At the end of my shift, I would go to the breakroom located on the main floor, and scan my badge on the time-clock to clock out. I did not need a manager's approval to clock out. After clocking out, I would make my way to the front entrance doors to leave. At the La Habra location, employees were only allowed to leave through the main entrance doors. But, because the doors were locked, a manager needed to unlock the doors before we could leave.

7.    Frequently, I had to walk around the store to find a manager that could come let me out of the store. This usually took between 15 to 20 minutes because the managers would be completing their own tasks. Sometimes the managers would be at the very

2

PAGE 741 Declaration of Armando Cortes Toscano in support of Motion for Class Certification

DocuSign Envelope ID: D787BAB3-29C5-4843-869D-6FDD78A3D431

back of the store at the dock and/or receiving area.

8.    Typically, there would be about 10 other people also waiting at the front entrance waiting to be let out of the store. This time I spent waiting was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

9.    It was upsetting and frustrating having to wait to leave the store after almost every closing shift. I really needed to get home to my family. Management was aware that we would all be waiting to be let out because they would see us standing at the doors after almost every closing shift. I did not complain to management because I was worried about making a bad impression and was worried about losing my job.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/15/2022_____, at Anaheim, California.

DocuSigned by:

_____
6C636EE1B14E4EB...
Armando Cortes Toscano

PAGE 742 Declaration of Armando Cortes Toscano in support of Motion for Class Certification

# EXHIBIT N

PAGE 743

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                    Plaintiff,<br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                    Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF JESSICA BUTLER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

I, Jessica Butler, hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a current employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I have been employed by Sam's Club as an hourly-paid employee from approximately June 1997 through the present.

3.    For the past twelve years, I have worked at the Sam's Club location in Murrieta, California. I was employed as a forklift driver and a merchandiser up until 2021. I am now working as a front end associate.

4.    I work approximately 40 hours per week. I have had mixed schedules during my employment with Sam's. When I was working as a forklift driver and merchandiser I typically worked closing shifts. When I worked closing shifts. My schedule was generally from 3:00 p.m. to 11:30 p.m.

5.    The Murrieta store closes to the public around 8:00 p.m. Once all customers leave the store, the front doors are locked and an alarm is set by the manager on duty. As a forklift operator and merchandiser my job duties at closing consisted of loading trucks, taking merchandise to the floor, stocking the floor and the freezers. Generally, there was only one manager on duty that had a key to the front entrance and 1 to 2 team leads that had keys. It was Sam's policy that we could only leave through the front entrance doors after our shifts. I do not recall anyone being stationed at the front of the store or by the door with keys when I worked the closing shift.

6.    At the end of my shift I would clock out in the breakroom upstairs. I did not need a manager's approval to clock out. I would then make my way towards the front entrance. It was Sam's policy that we needed to find a manager to come unlock the doors and let us out of the store. Frequently, I had to look around the store for a manager or announce on the intercom that I needed a manager to come let me out of the store.

7.    Usually, the process of tracking down a manager took between 15 and 20

minutes, but sometimes it could take up to 30 minutes. Managers were typically doing their own tasks throughout the store making it difficult to find one who could let me out. Frequently, there were about 10 to 12 people also waiting with me. This time was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

8.     It was really frustrating dealing with this on my closing shifts. I did frequently complain to management about the waiting time, but they would either ignore my complaints or respond by saying that the managers will let us out of the store when they can. I also heard other employees complain to management, although nothing was ever done to remedy the situation.

9.     It was also generally known amongst employees that Sam's would limit the amount of overtime employees could earn, and employees could not earn any overtime unless approved by a store manager. It was also generally known that Sam's would penalize employees who earned more than 8 minutes of overtime.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___3/15/2022___, at Hemet, California.

DocuSign by:

_____
AE3F1C5EF4954D8
Jessica Butler

**PAGE 746**     Declaration of Jessica Butler in support of Motion for Class Certification

# EXHIBIT O

**PAGE 747**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No: 2:21-CV-05122-SVW-JC** *[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF CARRIE CODIROLI-AQUINO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

**PAGE 748**  Declaration of Carrie Codiroli-Aquino in support of Motion for Class Certification

DocuSign Envelope ID: 6GFEC07C-1B74-4B4A-9A0A-725AECBD6ED2

I, Carrie Codiroli-Aquino, hereby declare as follows:

1.	I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.	I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee from approximately September 2019 through September 2021.

3.	During my employment, I worked at the Sam's Club location in Palm Desert, California. I worked as a membership specialist.

4.	I worked approximately 32 hours per week. I almost always worked the closing shifts. My shifts were usually scheduled from about 2:00 p.m. to 9:30 p.m. or 10:00 p.m. during the week or on Saturdays. If I was working on a Sunday, my shifts were generally scheduled from about 10:15 a.m. to 7:00 p.m.

5.	The Palm Desert store closed to the public at around 8:00 p.m. during the week and on Saturdays. On Sundays the store would close at around 6:00 p.m. Upon closing, the front doors would be locked. Only about two to three closing managers or team leads would have keys to the front doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the time I worked for Sam's.

6.	My duties at closing consisted of cleaning my area, disposing of food returns, doing go-backs and folding clothes.

7.	At the end of my shift, I would walk upstairs to the break room and clock out on the time clock. I would then walk down the stairs and wait by the front exit doors for a manager to let me out of the store. It was the Palm Desert store's policy that we could only exit through the main exit doors and had to wait for a manager to unlock the doors before we could leave. Usually, I would have to find someone with a radio who could call for a manager to come and let me out of the store. Sometimes it was difficult finding someone with a radio and I would have to walk around the store trying to find someone that could page the manager for me.

2

Declaration of Carrie Codiroli-Aquino in support of Motion for Class Certification

8. I would usually be waiting about 10 to 15 minutes before a manager would come and let me out of the store. I would usually be waiting with 5 to 10 other people. It would take a while for a manager to come unlock the doors and let us out of the store because I observed closing managers were typically completing their own closing duties around the store.

9. The time it would take me to track down a manager and then wait at the doors was unpaid and off the clock. Because I sometimes worked 8 hours in day, some of this wait time I believe should have been paid at time and a half.

10. It was really frustrating dealing with this issue because it happened every closing shift. It was annoying because my husband would typically pick me up for work and be waiting in the parking lot for me to get out of the store.

11. I frequently complained to my manager Susan, but I was told that it was just the way it was and that managers would only come once to unlock the doors when everyone was clocked out ready to leave. I also heard several of my colleagues complain to management, but nothing was ever done to rectify the situation.

12. When I was hired at Sam's Club I was informed by management that I had to clock out at the end of my scheduled shift time no matter what. Management told me that I was not permitted to incur overtime unless it was approved in advance or we would get written up.

13. Shortly after I was hired at Sam's I did ask management about getting paid for the time I spent off-the-clock waiting for a manager to let me out of the store. I was told by management that I was not allowed to be paid for this time.

14. I think if you were to add all the time I spent waiting to be let out the store after clocking out to my recorded hours, I would have incurred overtime a lot more often. I believe Sam's Club owes me back wages and overtime for this off the clock wait time

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

3

PAGE 750   Declaration of Carrie Codiroli-Aquino in support of Motion for Class Certification

Executed on _____3/29/2022_____, at Palm Springs, California.

Carrie Codiroli-Aquino

DocuSigned by:

AEF147E8FEA0485...

Carrie Codiroli-Aquino

**PAGE 751** Declaration of Carrie Codiroli-Aquino in support of Motion for Class Certification

# EXHIBIT P

**PAGE 752**

DocuSign Envelope ID: 9E5183D2-EE34-4B71-0B5A-894B48569441

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                    Plaintiff,<br><br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                    Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF JUAN CARLOS FREYRE JR. IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

I, Juan Carlos Freyre Jr., hereby declare as follows:

1.     I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.     I am a former employee of Sam's West Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee. I worked for Sam's from approximately November 9, 2020 to January 31, 2022.

3.     I worked at the Sam's Club location in Palmdale, California. I worked as a "Cart Attendant" and then as a "Tire Technician."

4.     During my time as a "Tire Technician" I did not work a closing shift. The Tire Department closed before or at the time that the store closed to the general public.  I understand that, during the time I was a "Tire Technician" I am not a part of the class in this action.

5.     This declaration will focus on my time working for Sam's as a "Cart Attendant" from approximately November 9, 2020 through May 4, 2021. From that experience I base this declaration.

6.     I was a part-time employee scheduled to work shifts from 6 to 8 hours per day and approximately 35-40 hours a week.

7.     The Palmdale Sam's Club closes to the public at 8 PM on the weekdays and Saturday and 6 PM on Sundays. I have frequently worked the closing shift, which was from 1 PM to 9:30 PM. After the store closed to the public, the doors were locked.

8.     After closing the store to the public, my general responsibilities were to collect the carts in the parking lot and transfer them to the cart area near the building. After this was done, I had to go back into the building to assist the stockers with merchandising. However, because the doors were locked, I would have to use my walkie to radio a manager to come unlock the door and let me in.

9.     At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out.

1
DECLARATION OF JUAN CARLOS FREYRE JR. IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

10. After I clocked out, I would then walk to the front of the store, but I was prohibited from leaving the building on my own by Sam's. Since the exit door was locked and no one with the ability to unlock it was present near the door, I would stand there and wait. Typically, about 2-5 other people waited with me for someone to come open the exit doors.

11. To the best of my recollection, I typically waited 10-30 minutes after clocking out along with the rest of the employees for someone to come let us out. We used a walkie talkie to call a Closing Manager to come let us out. Oftentimes, I would have to search around the store to locate a manager and ask him to come unlock the door.

12. Eventually, the Closing Manager (either Matthew or Bryant) would come and unlock the doors for us.

13. Those of us who were waiting complained about the unpaid wait amongst ourselves. I was not aware that I could submit a time adjustment for the time that I waited.

14. The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and/or 40 hours a week.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___3/16/2022___, at Palmdale, California.

DocuSigned by:

_____
06D4DF30CD9147A...
Juan Carlos Freyre Jr.

2
DECLARATION OF JUAN CARLOS FREYRE JR. IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION

# EXHIBIT Q

**PAGE 756**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                     Plaintiff,<br>   v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                     Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF NELLY WYSS IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

**PAGE 757**    Declaration of Nelly Wyss in support of Motion for Class Certification

I, Nelly Wyss, hereby declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee for a few months in 2020.

3. During my employment, I worked at the Sam's Club location in Riverside, California. I worked as a stocker.

4. I worked approximately 40 hours per week. My shifts were generally from 3:00 p.m. to 11:00 p.m. I almost always worked the closing shift.

5. The Riverside store closed to the public at around 8:00 p.m. My duties at closing included ushering customers out of the store and folding clothes. Upon closing, associates would walk around the store ensuring customers left the store. Once all customers left the store, a manager would lock the doors. Only one manager on duty would have keys to the front doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the time I worked for Sam's.

6. At the end of my shift, I would walk to the breakroom on the main floor and scan my badge to clock out. I did not need a manager's approval to clock out and I was permitted to clock out as soon as my shift ended. I would then make my way to the main entrance. It was the Riverside store's policy that all employees had to exit through the main exit doors and wait for a manager to come let us out. Sometimes I would just wait at the doors until a manager came, but other times I would need to find the on duty manager to come let me out.

7. I usually waited about 10 to 15 minutes before a manager would come and let me out of the store. There were usually about 5 to 6 other people also waiting to be let out. I think it took so long for a manager to come unlock the doors because I observed that the on duty manager was typically doing their own tasks around the store.

8. The time it would take me to track down a manager and then wait at the doors

2

Declaration of Nelly Wyss in support of Motion for Class Certification

was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

9.    It was really annoying and frustrating dealing with this issue because it happened almost every shift. During my last few weeks of employment with Sam's, I remained clocked in until I saw a manager approaching the doors. I would then go to the break room, which was near the front of the store and clock out. I was reprimanded by my manager and informed that remaining on the clock while waiting to be let out was not permitted by Sam's and that I had to clock out at the end of my scheduled shift.

10.    I never made a formal complaint to management about the wait times, but I did mention it to my manager in passing. My manager did not respond. I figured if I made any formal complaints, I would just be ignored or not taken seriously. My colleagues and I did complain almost daily amongst each other.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___3/16/2022___, at Riverside, California.

DocuSigned by:

_____
D83CD99F3E37401...
Nelly Wyss

---

3

Declaration of Nelly Wyss in support of Motion for Class Certification

# EXHIBIT R

**PAGE 760**

DocuSign Envelope ID: A0484532-81B8-4EE8-A8A2-F6250B282768

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>               Plaintiff,<br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>               Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF JONATHAN CORTIJO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

1

Declaration of Jonathan Cortijo in support of Motion for Class Certification

I, Jonathan Cortijo, hereby declare as follows:

1.     I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.     I was employed by Sam's Club as an hourly-paid employee for about 4 years from approximately January of 2017 through June of 2020.

3.     During my employment, I worked at the Sam's Club location in Roseville, California. I started off working in the food court but after that I moved around to other departments.

4.     From around January to April of 2018, I worked the overnight shift as a Stocker. My overnight shifts went from 9:30 p.m. to 6:00 a.m. While working this shift I would see the closing shift employees wait around for someone to let them out after clocking out for the day. I would also sometimes hear those employees calling for Managers over the PA system to be let out.

5.     In May of 2018, I started working as a Floor Associate in the Hard-Line Department, where I typically worked several closing shifts per week.

6.     I believe I was technically a part time employee of Sam's but I was still scheduled to work anywhere from 32 to 40 hours per week. I recall most of my shifts were around 6 to 8-hours long. For closing shifts, I was generally scheduled to work from 2:00 p.m. to 10:00 p.m.

7.     The Roseville Store closed at 8:00 p.m., but it usually took until around 8:30 p.m. until all of the customers were out of the store. Generally, a little before 8:00 p.m. there would be an announcement that the store was closing and the song "Closing Time" would come on over the PA system.

8.     At that time, I would typically start walking around the store and see if I could help any customers and advise them that the store was closing and that they needed to head to the registers to make their purchases.

9.     Around the same time, the people at the entrance who check memberships would stop letting people in and that door would be locked. Between 8:00 pm and the

2

Declaration of Jonathan Cortijo in support of Motion for Class Certification

time that the last customer left the store, the only door that remained open was the main exit where receipts are checked. Once the last customer left, this main door would be locked as well. The main door is the only door associates were permitted to leave from during and after closing. These doors were equipped with video cameras that recorded our activity.

10. Once the main doors were locked, I continued with my closing duties. I generally did a spot check around my area to confirm no additional customers remained. I would then go through my sections, clean up, make sure all the products were lined up on the shelves, make sure anything missing was restocked and spot for the forklift driver, if needed. Finally, I would break down and remove any boxes that remained in my area. I would then typically go upstairs and punch out at the time clock in the breakroom past the café.

11. After I clocked out, I was prohibited by Sam's from leaving the building. Since I was not free to leave, I would then go wait at the main door with any other associates who also needed to be let out. Typically, there were about 5 of us waiting there. Sometimes we would call the closing manager on the PA system to come let us out but often the PA system was turned off and one of us would have to go search around the store to find a manager or shift leader and ask him or her to open up the door. Either way, this process usually took anywhere from 15 to 30 minutes after clocking out.

12. Once the manager or shift leader came and unlocked the door, I still had to wait an additional time while any Associate purses, backpacks and lunch bags were checked. Also, if any Associates had made a purchase, the items would be compared against the receipt. These security checks added an additional 2 to 5 minutes of wait time at the end of my closing shifts before I could leave.

13. There was always a manager or shift leader involved in the process who was aware that I and my co-workers would often wait such long periods of time to be let out of the store after clocking out. My co-workers and I also frequently complained about

3

Declaration of Jonathan Cortijo in support of Motion for Class Certification

this unpaid time among ourselves and on at least one occasion I recall bringing the issue to the attention of the shift lead, but nothing was ever done to fix the situation which was very frustrating.

14.    As noted above, I often worked scheduled shifts that lasted 8-hours per day and also sometimes worked 40 hours per week. When all of the unpaid wait time is added on top of my on-the-clock time, I often worked more than 8 hours per day and/or 40 hours per week but was not paid overtime for this time. I believe that Sam's owes me unpaid wages, including overtime, for all of my spent waiting off-the-clock to be released from the store at the end of my closing shifts.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___2/23/2022___, at Orangeville, California.

DocuSigned by:

_____
3CC2CBEEDF734DA...
JONATHAN CORTIJO

4

Declaration of Jonathan Cortijo in support of Motion for Class Certification

# EXHIBIT S

PAGE 765

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>        Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF DERRICK MAXWELL IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

DECLARATION OF DERRICK MAXWELL IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

DocuSign Envelope ID: 2088EZC3-8F64-4E3D-9650-DA136E4E477A

I, Derrick Maxwell, hereby declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee. I worked for Sam's from approximately December 2021 to March 2022.

3. I work at the Sam's Club location in Elk Grove, California. I worked as a "Cashier" throughout my employment.

4. I was a part-time employee scheduled to work between 7 and 8 hours a day and 36 to 40 hours a week.

5. The Elk Grove Sam's Club closes to the public at 8 PM. I frequently worked the closing shift.

6. After the closing announcement is made, the entrance door is locked and customers are no longer allowed to enter the store.

7. After closing the store to the public, my general responsibilities were to finish assisting the customers in line, empty the trash cans, wipe the cash register and belt, place "go backs" on the shelves, and occasionally fold some clothes.

8. At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out.

9. After I clocked out, I then would walk to the front of the store, but I was prohibited from leaving the building on my own by Sam's. Since the exit door was locked and there was no manager or key carrier stationed by the door, I would usually stand there and wait. Typically, about 10 or more other people waited with me for someone to come open the exit doors.

10. To the best of my recollection, I typically waited 20-30 minutes after clocking out along with the rest of the employees, for someone to come let us out. We often used the phone by the entrance as a PA or a walkie talkie to page a Closing Manager (Pa or

1

DECLARATION OF DERRICK MAXWELL IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Ashley) to come open the door. On some occasions, I would have run around looking for Pa or Ashley to come open the door.

11. Eventually, the Closing Manager (Pa or Ashley) would come and unlock the doors for us.

12. Waiting to be let out was specially distressing for me because I have a medical condition that requires that I take medications at prescribed times. Because of this I complained to the Store Manager, whose name I cannot remember, to inform him that I had to wait to be let out after I clocked out. He was very dismissive of my complaints, and told me that a Closing Manager will get there when they can.

13. I had the impression that overtime was not allowed because the Walmart One portal would add ½ point to the employees' disciplinary total anytime we clocked out after our scheduled shift end time.

14. The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and 40 hours per week. I did not receive overtime pay for this time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/17/2022_____, at Elk Grove, California.

_____
Derrick Maxwell

2

DECLARATION OF DERRICK MAXWELL IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT T

PAGE 769

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                    Plaintiff,<br><br>  v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                    Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF MICHAEL J. DITULLIO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

I, Michael J. DiTullio, hereby declare as follows:

1.    I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    I am a former employee of Sam's Club. I was employed by Sam's Club as an hourly-paid employee.  I worked for Sam's from approximately June 2019 to March 2021.

3.    I work at the Sam's Club location in San Bernardino, California. I was hired and worked as a "Stocker" throughout my employment.

4.    I was a part-time employee scheduled to work from 5 to 8 hours a day and approximately 25 hours a week.

5.    The San Bernardino Sam's Club closes to the public at around 8 PM on the weekdays and Saturday and around 6 PM on Sundays. I have generally worked the closing shift, which was scheduled from 3 PM to 11:00 PM on weekdays and Saturday and 5 PM to 10 PM on Sundays.

6.    After the closing announcement is made, the entrance door is locked and customers are no longer allowed to enter the store.

7.    After closing the store to the public, the exit door is also locked so there is no way to get in or out of the club without keys.

8.    Once the customers leave the store, my general responsibilities were to straighten up aisles, restack merchandise, and get pallets from the back to restock merchandise.

9.    At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out. Sometimes I would use the computers located on the floor.

10.    After I clocked out, I would then walk to the front of the store, but it was Sam's policy that I was prohibited from leaving the building on my own s and since the exit door was locked and no one with the ability to unlock it was present near the door, I

1

DECLARATION OF MICHAEL J. DITULLIO IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

would have to stand there and wait. Typically, about 2-5 other people waited with me for someone to come unlock the exit doors. Sometimes, more people would gather if the food court staff left at the same time as my department.

11.   To the best of my recollection, I typically waited 10-15 minutes after clocking out along with the rest of the employees, while we waited for someone to come let us out. We used a walkie talkie to call a Closing Manager to come let us out.

12.   Eventually, the Closing Manager, typically, Sonia would come, oftentimes in a forklift, and unlock the doors for us. Sometimes a team lead would show up to unlock the doors.

13.   A couple of times, when the wait time was exceptionally long, I or one of my coworkers would complain to the Closing Manager Sonia about it as we called her over on the walkie talkie. Generally, when someone complained about the wait time, the response was that they'll be there in a minute.  We were never told we should be paid for the time we spent waiting or that we could submit a time adjustment form to be paid for the time.

14.   The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts generally resulted in me working more than 8 hours a day.  I was not paid for this overtime I was owed.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/17/2022_____, at San Bernardino, California.

_____
3FDEEAB478F747E...
Michael J. DiTullio

DECLARATION OF MICHAEL J. DITULLIO IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT U

**PAGE 773**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF YOLANDA MARTINEZ IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**Complaint filed: June 23, 2021** |

1

DocuSign Envelope ID: 72A77762-548F-40CD-A0F1-316B4F1E520C

I, Yolanda Martinez, hereby declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I am a former employee of Sam's West, Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee from approximately December 2020 through February 2022.

3. During my employment, I worked at the Sam's Club location in San Bernardino, California. I initially worked in the café and then worked in HMS ("home meal solutions").

4. I worked approximately 36 hours per week. My shifts at Sam's were initially from about 1:30 p.m. to 10:00 p.m. and later changed to 12:30 p.m. to 9:00 p.m. I almost always worked a closing shift.

5. The San Bernardino store closed at 8:00 p.m. My duties at closing consisted of cleaning the kitchen when I was working in the café and when I was in HMS, I would restock the shelves. Upon closing, employees would go down the aisles telling customers that the store was closed. Once all the customers were out of the store, the closing managers would lock the front entrance. Only about two closing managers on duty would have keys to the front doors. I don't recall anyone being stationed at the front of the store or by the door with keys during the time I worked for Sam's.

6. At the end of my shift, I would walk upstairs to the break room and clock out on the time clock. I would then walk down the stairs and would try to find a manager in the store to let them know that I was heading to the front door and needed to be let out. I didn't have a radio so I would have to walk around the entire store until I found a manager. One time it took me around 45 minutes to locate a manager, but most times it would take a couple of minutes. After locating a manager, I would then go to the front entrance and wait, usually with about 10 other people, for a manager to come and let us out of the store. The front entrance doors were the only doors we were permitted to leave

2

from. Typically, after alerting a manager that I was off the clock and needed to be let out, it would take, on average, about an additional 10 to 15 minutes for a manager to come and unlock the doors so that I could go.

7.     The time it would take me to track down a manager and then wait at the doors was unpaid and off the clock. Because I sometimes worked 8 hours in day and/or 40 hours in a week, some of this wait time resulted in me incurring unpaid overtime wages as well.

8.     It was really frustrating dealing with this issue because it happened so routinely. Sometimes I would have to call my babysitter while I was waiting to be released from the store and rearrange my childcare because it was taking so long to be let out of the store following my shift.

9.     I complained more than once to management about having to wait long periods for a manager to come and let me out of the store. I would also see other people complain to management. However, management would typically laugh at our complaints or not respond. They acted like it was no big deal and just part of the job.

10.     This whole process of finding a manager and then having to wait to be let out after clocking out was really annoying. One time, I was so fed up that I remained clocked in until someone came to the door and then went to go clock out once I saw a manager coming. This got me in trouble, because I incurred overtime, which was strongly discouraged from management. I was told by a manager that I was required to be clocked out at the end of my shift and could not remain clocked in if I was not actively working in the store. I think if you were to add all the time I spent waiting to be let out the store after clocking out to my recorded hours, I would have incurred overtime a lot more often. I believe Sam's Club owes me back wages and overtime for this off the clock wait time.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

3

Executed on ____3/11/2022____, at Riverside, California.

DocuSigned by:

6F6ADB86518F4A3...
_____
Yolanda Martinez

# EXHIBIT V

**PAGE 778**

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone:  (818) 609-0807
Facsimile:   (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>                    Defendant. | **Case No: 2:21-CV-05122-SVW-JC**<br>*[Assigned for all purposes Hon. Judge Stephen V. Wilson]*<br><br>**DECLARATION OF ANDREW NAZARIO IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br><br>**Complaint filed: June 23, 2021** |

---

DECLARATION OF ANDREW NAZARIO IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION

I, Andrew Nazario, hereby declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I am a former employee of Sam's West Inc. ("Sam's Club" or "Sam's"). I was employed by Sam's Club as an hourly-paid employee. I worked for Sam's from approximately January 2020 to March 2020.

3. I worked at the Sam's Club location in Santa Clarita, California. I worked as a "Floater Associate"

4. I was a part-time employee scheduled to work shifts from 6-8 hours per day and approximately 30-38 hours a week.

5. The Santa Clarita Sam's Club closes to the public at 8 PM. The majority of the time I worked the closing shift. After the store closed to the public, and the last customer existed the building, the doors were locked.

6. After closing the store to the public, my general responsibilities included walking down the aisles and making sure that there were no customers remaining in the building, restocking merchandise, moving around fixtures, and moving pallets with merchandise.

7. At the end of my shift, I would walk to the time clock which was located in the breakroom upstairs and use my badge code to clock-out.

8. After I clocked out, I would then walk to the front of the store, but I was prohibited from leaving the building on my own by Sam's. Since the exit door was locked and no one with the ability to unlock it was present near the door, I would stand there and wait. Typically, about 3-5, other people waited with me for someone to come open the exit doors.

9. To the best of my recollection, I typically waited 5-10 minutes after clocking out along with the rest of the employees for someone to come let us out.

10. I would grab a walkie talkie from the manager's office, if it was available, and

1

DECLARATION OF ANDREW NAZARIO IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I would announce that I clocked out was and ready to leave. Otherwise, I would inform an associate that I was heading towards to the front, and that if they came across a manager, to please inform them that I was ready to leave. The Closing Manager Hernan would eventually show up at the front and unlock the door for us.

11.    Those of us who were waiting complained about the unpaid wait amongst ourselves and sometimes to Hernan when he came to unlock the door. I was not aware that I could submit a time adjustment for the time that I waited so I never submitted one.

12.    The time I spent after clocking out waiting for the doors to be unlocked so I could leave at the end of my closing shifts resulted in me working more than 8 hours a day and/or 40 hours a week.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _____3/25/2022_____, at Victorville, California.

DocuSigned by:

*Andrew Nazario*
5C92BCAAB4C34AB...
Andrew Nazario

DECLARATION OF ANDREW NAZARIO IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# EXHIBIT W

**PAGE 782**

# Carlos Sanchez, et al. v. Sam's West Inc. et al.

United States District Court
Central District of California – Western Division
Case Number: 2:21-cv-05122-SVW-JC

Report of Plaintiff's Survey and Statistical Expert
For Class Certification

December 31, 2023

Jeffrey S. Petersen, Ph.D.
Allman & Petersen Economics, LLC
7677 Oakport Street, Suite 610
Oakland, CA 94621
(510) 382-1550
www.allmaneconomics.com

**TABLE OF CONTENTS**

I.   Assignment and Results in Brief                                              4

II.  Professional Qualifications                                                  6

III. Sample Survey Methodology                                                  11

     Sample Surveys in Litigation                                               11

     The Duran Decision and the Sample Survey of the Class Members  in          13
     this Case

     The Legal Foundation for Surveys in Class Action Wage and Hour Cases       15

     The Legal Foundation for Utilizing Averages from Survey Results to Project 17
     Class Wide Damages

     Sampling Plan for Survey and Statistical Analysis                          19

     Research Objectives                                                        21

     Mode of Data Collection                                                    21

     Sampling Frame                                                             21

     Construct and Pre-test Survey Instrument                                   24

     Design and Select Sample                                                   31

     Recruit and Measure Sample                                                 33

     Code Data                                                                  34

IV.  Data and Statistical Analysis                                              34

     Response Rate, Cooperation Rate and Nonresponse Bias Analysis             34

     Statistical Analysis of Potential Bias in Survey Responses                39

     Validity and Reliability of the Survey Data                               43

     An Example of a "Gold Standard" Validation of a Survey Response Average
     Regarding Off-the-Clock Time                                              47

2

**PAGE 784**

V.  Summary of Survey Responses                                           48

VI. How the Survey Data is Used to Extrapolate to the Class               53

VII.  Conclusion                                                          54


**LIST OF TABLES AND FIGURES**

Table 1: Employment Status of Survey Participants                        49

Table 2: Frequency of Having to Wait to Leave Facility After Clocking Out From
     Closing Shift                                                       50

Table 3: Frequency of Waiting to Leave Facility After Clocking Out       50

Table 4: Duration of Waiting to Leave Facility After Clocking out From Closing Shift   51

Table 5: Summary of Survey Questions Used for Statistical Purposes       52


Figure 1: Survey Design and Process                                      20

**PAGE 785**

**I.  Assignment and Results in Brief**

*Assignment*

1.  I have been retained by Bradley / Grombacher, LLP in *Carlos Sanchez, et al. v. Sam's West, Inc. dba Sam's Club* (hereafter "this matter") to conduct a survey of the putative class members regarding the frequency and duration of off-the-clock waiting time to exit the workplace at the end of closing shifts.

*Results in Brief*

2.  The survey was completed by 400 putative class members who worked at least twenty closing shifts for the Defendant during the class period.  These survey participants were selected randomly based on employment data provided by the Defendant.   Eight of the individuals that completed the survey had "lead" in their job titles during their entire employment within the class period.  Ten individuals never worked at a Sam's Club store within the putative class. These individuals were excluded from the analysis of the survey data.  Therefore, the number of survey responses that comprise this analysis is 382 (hereafter "the survey respondents").

3.  The survey and the statistical analysis of the survey data were performed in accord with peer-reviewed science regarding class action wage and hour cases.[1,2]  This peer-reviewed research details survey methodology that is unique to wage and hour class actions.  Importantly, the research shows how to comply with the decisions in *Duran v. U.S. Bank Nat. Assn.*[3] and *Bell v. Farmers Insurance.*[4]  The *Duran* decision clearly identified problems with statistical sampling,

---

[1] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015.
[2] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.
[3] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.
[4] *Bell v. Farmers Insurance Exchange* (2004) Cal.App 4th, 715, 9 Cal.Rptr.3d 544.

4

**PAGE 786**

and the survey sample in this matter has none of the problems deemed unacceptable by the California Supreme Court. This sample size was determined based on the court decision in *Bell v. Farmers Insurance.*[5] In *Bell*, the Court accepted a ten percent margin of error and rejected a 32 percent margin of error. Due to this decision, a ten percent margin of error is often referred to as the *Bell Standard*. The *Bell Standard* was achieved for the survey in this matter (*Sanchez v. Sam's Club*) as the sample size of 382 yielded a margin of error of 10.0 percent on the number of minutes to be used for class wide damages projections.[6]

4. The survey responses yielded the following results regarding the percentage of closing shifts when employees had to wait to exit the warehouse after clocking out and the average waiting time:

- 90 percent of survey respondents stated they had off-the-clock waiting time,

- the average wait time was 8.6 minutes.

5. The number of unpaid minutes for the survey respondents is based on the frequency of waiting to be released from the warehouse and the average wait time. The survey respondents reported waiting on 59.0 percent of shifts. The adjusted waiting time average based on this frequency is as follows:

- average unpaid time per closing shift is 4.9 minutes.

6. Statistical testing did not show any nonresponse bias. The response bias analysis showed a small potential for bias for knowledge of the lawsuit prior to taking the survey. After accounting specifically for this potential bias, the average unpaid time per closing shift is 4.8 minutes. **The**

---

[5] *Bell v. Farmers Insurance Exchange.* 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.
[6] The margin of error was computed based on a class size of 15,954. It is my understanding that the actual class size is likely lower, therefore, the margin of error is lower than 10.0 percent.

**PAGE 787**

**valid and reliable statistic for projection to the population of putative class members for unpaid time per closing shift is 4.8 minutes.**

7. If the trier of fact wants to utilize a very conservative model for awarding damages, then damages can be based on 4.3 minutes per closing shift. This is the lower bound of the 95 percent confidence interval for unpaid off-the-clock waiting time. Using 4.3 minutes as the basis for awarding damages results in a **97.5 percent probability that the defense is not overpaying for damages**.

## II.  Professional Qualifications

8. My resume, fee schedule and list of trials and depositions in the last four years are attached as Exhibit A. I received a Ph.D. in economics from the University of Utah. My primary fields of expertise are labor economics, statistics, survey methodology and forensic economics. My publications in the fields of labor economics, forensic economics, survey science and statistics have been cited 169 times, according to Google Scholar. I have publications in the following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of Policy Analysis and Management, and the American Journal of Industrial Medicine. In addition, I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[7]

9. I am an adjunct associate professor of economics at St. Mary's College in Moraga, California where I teach graduate and undergraduate economics courses. I am the Vice President of the

---

[7] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

6

**PAGE 788**

American Academy of Economic and Financial Experts (AAEFE).  AAEFE was founded in 1988 and is devoted to the advancement of research and methodology in forensic economics.

10.  I have substantial expertise in projecting class-wide damages based on conducting surveys and utilizing inferential statistical analysis, i.e., using the data sample of survey responses to project to a larger population.  My experience is in the form of academic qualifications and litigation consulting experience.

11.  I am the lead author of peer-reviewed journal articles regarding survey methodology and statistical analysis in class action wage and hour cases.  The title of the articles and the citations are below:

- "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

- "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015.

The article on survey methodology describes the unique aspects of conducting surveys in wage and hour class actions and remedies for potential bias among the survey respondents.  The article on margin of error describes how to project class-wide damages from survey data and protect defendants from overpaying.

12.  I have conducted surveys in 26 class actions, or PAGA cases, and 24 of the surveys were in wage and hour cases.  In the class action wage and hour class case *Kristal Nucci et al. v. Rite Aid Corporation*, the Honorable Judge Lucy H. Koh cited the results of a survey I conducted several times in her order for class certification.[8]  Judge Koh writes, "Dr. Petersen's expert report and underlying survey demonstrate that whether a common policy was communicated across all class

---

[8] *Kristal Nucci, et al. v. Rite Aid Corporation, et al*.  Case number 19-CV-01434-LHK.  Order Denying Motion to Strike and Granting Class Certification.

7

**PAGE 789**

members is capable of class-wide resolution.  Importantly, these common questions are not merely peripheral, but rather, go directly to liability on a class-wide basis."[9]  In another wage and hour case where I conducted a survey, *Li et al. v. A Perfect Day Franchise Inc.*,[10] Judge Koh presided and accepted the survey results as the basis for awarding damages.[11]  In the federal case titled *Coleman v Brown*, I was designated as the survey expert in a Special Master research team appointed by the Honorable Kimberly Mueller.[12]  My role was to supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

13.  I was trained in survey protocol, survey design, and survey question writing during my employment with the United States Government Accountability Office (GAO) as a Senior Economist.  The GAO is the non-partisan research entity for members of Congress.  I have also conducted a survey outside of litigation during my tenure as a postdoctoral fellow at the University of California, Berkeley.  I designed the survey and oversaw the administration to the survey participants who were trauma victims treated at San Francisco General Hospital.  The results of the survey were presented at the American Association for the Surgery of Trauma annual meeting and published in the conference proceedings.[13]

---

[9]Ibid, p.26.

[10] Case number 5:10-CV-01189-LHK.

[11] Judge Koh writes in the decision, "Plaintiffs engaged the firm of Allman & Petersen Economics, LLC to conduct a survey of the class and prepare an expert report as to the monetary compensation due to the class. That survey and report are described in detail in the Declaration of Jeffrey S. Petersen. *See* Petersen Decl. ¶¶ 3-26 & Ex. C. Plaintiffs' experts, relying on data collected from surveyed class members, and using generally acceptable statistical methods, calculated the average payments due to the class for each of the class claims as well as PAGA penalties. Petersen Decl. ¶¶ 17-20 & Ex C ¶¶ 10, 14, 17A, 17B. The Court is satisfied that Plaintiffs have met their burden of establishing an approximate award based on reasonable inferences provided by a representative sample of the class."

[12] *Ralph Coleman, et al. v. Edmund Brown, Jr, et al.*  Case number 2:90-cv-0520 KJM KJN P.

[13] Petersen, Jeffrey S., L. Papadakis, D. Morabito, A. Boccellari, R.C. Mackersie "Return Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, p.223.

**PAGE 790**

14. I have presented at nine professional conferences of survey experts, statisticians and damages experts regarding conducting surveys in class action wage and hour cases and projecting damages from the survey responses.  Recently, I was the chair of a conference session on using the "Reference Manual on Scientific Evidence" as an expert witness.  I have also presented at CLE seminars for attorneys on surveying in wage and hour class actions in light of the U.S. Supreme Court Decision in *Tyson Foods v. Bouaphakeo*.  The titles of the presentations and the conferences are listed below:

- "The Reference Guide on Survey Research," Western Economic Association Annual Conference, San Diego, CA July 2023.

- "Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing," Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

- "Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, June 2022.

- "Wage and Hour Surveys: Assisting With the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Conference of the American Academy of Economic and Financial Experts, April 2021.

- "Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020 and June 2023.
- "The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

- "Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

- "The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

- "Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

9

**PAGE 791**

- "Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Conference of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

15. I have published two peer-reviewed journal articles that utilize inferential statistical analysis from survey data.[14,15]  According to Google Scholar, one of the articles has been cited 98 times.

16. I have worked on 128 class action cases as a survey expert, statistical expert, or damages expert.[16]  The breakdown between plaintiff and defense retentions in these cases is 89 percent for plaintiffs and 11 percent for defendants.  I have testified at trial for both plaintiffs and defendants in class action cases.  I have testified at trial four times in class action wage and hour cases where I conducted a survey on behalf of plaintiffs.  I have also testified at trial on behalf of defendants where I analyzed the survey conducted by plaintiffs' expert.

17. I have worked on over 50 individual wage and hour cases where I conducted a telephone interview with the plaintiffs in the cases.  I asked the plaintiffs to provide estimates of hours worked, off-the-clock work time, frequency of meal and rest periods, and/or unreimbursed job-related expenses.  The estimates provided by the plaintiffs were subsequently used to project the amount of unpaid wages they may be due.  These interviews have provided me a unique perspective on how to structure a survey in a wage and hour class action.  This one-on-one interaction allowed me to assess what individuals can recall and estimate; and what potential biases may be in the estimates.  I have two important conclusions from this experience.  First, unpaid off-the-clock work time, interrupted meal and rest periods, and not receiving meal and

---

[14] Petersen, Jeffrey S. and Craig Zwerling, "Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, Volume 34, Number 3, 1998.
[15] Petersen, Jeffrey S. and Phillip Allman, "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017.
[16] One hundred seventeen of these cases were wage and hour.  In addition to these matters, I have worked on over 3,000 legal cases involving income loss for individual plaintiffs.  Retentions on these matters are approximately two-thirds plaintiff and one-third defendant.

10

**PAGE 792**

rest periods are distinctive in individuals' memories.  Second, informing the plaintiffs that they may be questioned by the defense about the accuracy of their answers significantly reduces the likelihood of biased responses.

### III.  Sample Survey Methodology

18.  I designed the survey instrument in this matter that was administered to the survey participants by Davis Research (see Exhibit B for the survey instrument).  This section describes the methodology for designing the survey instrument and the acceptability of sample surveying in legal proceedings.  This section also accounts for the reasons a survey was conducted in this matter – it is the most efficient and effective data gathering method to determine the frequency and duration of off-the-clock waiting time.

#### *Sample Surveys in Litigation*

19.  Sample surveying is an accepted method in legal proceedings as stated in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (hereafter "*Reference Manual on Scientific Evidence*"):

> *Sample surveys* are used to describe or enumerate the beliefs, attitudes, or behavior of persons or other social units.  Surveys typically are offered in legal proceedings to establish or refute claims about the characteristics of those individuals … As a method of data collection, surveys have several crucial potential advantages over less systematic approaches.  When properly *designed, executed, and described*, surveys (1) economically present the characteristics of a large group of respondents or other units and (2) permit an

11

**PAGE 793**

assessment of the extent to which the measured respondents or other units are likely to adequately represent a relevant group of individuals or other units.[17]

20.  The *Reference Manual on Scientific Evidence* states that surveys are an efficient way to inform the trier of fact.  Also, the failure to conduct a survey suggests that survey responses would have been unfavorable to the plaintiff:

> Although surveys are not the only means of demonstrating particular facts, presenting the results of a well-done survey through the testimony of an expert is an efficient way to inform the trier of fact about a large and representative group of potential witnesses. In some cases, courts have described surveys as the most direct form of evidence that can be offered.[18]  Indeed, several courts have drawn negative inferences from the absence of a survey, taking the position that failure to undertake a survey may strongly suggest that a properly done survey would not support the plaintiff's position.[19,20]

21.  The *Reference Manual on Scientific Evidence* also states that attorneys may participate in drafting the survey questions:

> An early handbook for judges recommended that survey interviews be "conducted independently of the attorneys in the case."  Some courts interpreted this to mean that any evidence of attorney participation is objectionable.  A better interpretation is that the attorney should have no part in carrying out the survey.  However, some attorney

---

[17] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.361-362.

[18] Footnote #60 from Reference Manual -- *See, e.g.*, Morrison Entm't Group v. Nintendo of Am., 56 Fed. App'x. 782, 785 (9th Cir. Cal. 2003).

[19] The cases cited that support this issue are found in footnote #61 in the Reference Manual -- Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 695 (2d Cir. 1994); Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 357 (7th Cir. 1983); Medici Classics Productions LLC v. Medici Group LLC, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); Citigroup v. City Holding Co., 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. Feb. 10, 2003); Chum Ltd. v. Lisowski, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).

[20] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.372.

**PAGE 794**

involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population.[21]

I typically collaborate with attorneys on the survey questions for the reason noted above – "to ensure relevant questions are directed to the relevant population." The *Reference Manual on Scientific Evidence* further states that whether attorneys are involved in drafting the questions is largely irrelevant, since the "key issues for the trier of fact concerning the design of the survey are the objectivity and relevance of the questions on the survey and the appropriateness of the definition of the population used to guide sample selection. These aspects of the survey are visible to the trier of fact and can be judged on their quality, irrespective of who suggested them."[22]


*The Duran Decision and the Sample Survey of Class Members in this Case*

22. The California Supreme Court's decision in *Duran v. U.S. Bank Nat. Assn.*[23] (hereafter *Duran I*) is the benchmark case addressing the use of statistical sampling as a basis for proving liability and damages in wage and hour cases. The *Duran I* decision recognized that statistical sampling may be an appropriate means of proving liability and damages in wage and hour class actions, as well as managing individual issues that could arise, provided that the statistical sampling be developed with expert input and allows the defendant an opportunity to contest the model. The Court identified several flaws in the methodology of the *Duran I* sampling plan that should be avoided when using surveys and statistical sampling. The three key flaws are: (1) the size of the sample was too small (22 individuals), (2) the sample was not random and resulted in

---

[21] Ibid, p.374.
[22] Ibid, p. 374.
[23] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.

13

**PAGE 795**

selection bias, and (3) the margin of error was too high due to a sample size that was too small. The margin of error that the Court identified as too high was 43.3 percent.

23.  The appellate level decision in the *Duran* case (filed January 17, 2018) (hereafter *Duran II*) noted two important flaws regarding survey data that was gathered by plaintiff's survey expert.[24] First, there were substantial differences in responses regarding hours worked between surveys conducted in 2008 and 2015.  Second, the margin of error was calculated based on total hours worked instead of overtime hours.

24.  The sample survey data in this matter has none of the flaws identified in *Duran I*.  The sample size of 382 survey responses is a large sample that is representative of the population of putative class members.  The sample is representative of the population of  putative class members because it was drawn from a process in which every individual that worked twenty closing shifts for Defendants had an equal likelihood of participating in the survey.  The margin of error on the averages of the survey results that can be utilized for liability, damages and/or penalties range from 5.0 percent to 10.0 percent.[25]  Therefore, the error rates are substantially lower than the error rate that was rejected in *Duran I*.

25.  The sample survey data in this matter has none of the flaws identified in *Duran II*.  First, the reason for the variance in the survey responses in *Duran II* was that the survey respondents were asked different questions about work hours in 2008 and 2015.  Therefore, although it appeared there was recall bias, there was no way to assess if there was bias because of the structure of the questions.  The margin of error on the Duran II survey was 41.0 percent.  Therefore, it was very close to the margin of error that was rejected in *Duran I*.  The survey in this matter did not have a

---

[24] *Duran v. U.S. Bank National Association* (2018) 19 Cal. App. 5th 630.
[25] These margins of error are based on a class size of 15,954.  It is my understanding that the class size is likely smaller.  Therefore, the margins of error are lower.

**PAGE 796**

consistency of questions issue.  The margin of error for the survey results in this matter was nowhere near the values rejected in *Duran I and II*.

***The Legal Foundation for Surveys in Class Action Wage and Hour Cases***

26.  The Supreme Court of the United States ruling in *Anderson v. Mt. Clemens Pottery Co.* (United States Supreme Court 1946) shows that estimates of unpaid time can be the basis for projecting damages.  In the context of a survey, this legal decision shows that the focus of the trier of fact when evaluating the survey responses should be on the reasonableness of the estimates provided by the survey participants.  *Mt. Clemens* states that employees may provide testimony on the amount of damages when their employer fails to keep proper records and damages may be awarded based on this testimony (pp. 687-688):

> The solution [to the lack of employer records] is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the

15

**PAGE 797**

court may then award damages to the employee, even though the result be only approximate.

27.  The trier of fact in this matter is in the position of being able to determine if the survey responses can be utilized as a matter of "just and reasonable inference" for liability and/or damages.  The role of the survey expert is to devise survey questions that are unbiased and valid in order to provide the Courts with the best possible data on which to make this determination.

28.  In the matter of *Li v. A Perfect Day*, Federal Judge Lucy Koh used the aforementioned legal standard when determining liability and damages from sample survey results.  I was plaintiff's survey expert in this matter.  Judge Koh's decision states:

> Where an employer fails to maintain accurate payroll records, an employee carries his burden under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946), superseded by statute on other ground, Portal-to-Portal Act, 61 Stat. 86-87; *see also Brock v. Seto,* 790 F.2d 1446, 1448 (9th Cir. 1986); *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988). The Ninth Circuit has approved "approximated awards where plaintiffs can establish, to an imperfect degree of certainty, that they `have performed work and have not been paid in accordance with the FLSA.'" *Alvarez v. IBP, Inc.,* 339 F.3d 894, 914-15 (9th Cir. 2003) citing *Brock,* 790 F.2d at 1448 (internal quotation marks and alterations omitted). "In such instances, the only uncertainty is the amount of damage, not the fact that damages are due. Where an approximate award based on reasonable inferences forms a satisfactory surrogate for unquantified and unrecorded

16

**PAGE 798**

actual times, an approximated award is permissible." *Id.* (internal quotation marks, citations, and alterations omitted).

Under this burden shifting approach, both the Ninth Circuit and California courts have permitted district courts to award back wages based upon evidence of damages from a representative sampling of class members. *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988); *Amaral,* 163 Cal. App. 4th at 1189 ("*Anderson*'s reasoning has also been applied to permit class action plaintiffs to prove their damages for unpaid overtime by the use of statistical sampling."). Thus, where, as here, Plaintiffs have established liability for unpaid wages (see discussion above), and that Defendants have failed to maintain accurate payroll records, the court can rely on evidence of a representative sampling of class members regarding the damages owed to establish liability as to the class.[26]

***The Legal Foundation for Utilizing Averages from Survey Results to Project Class Wide Damages***

29.  If an average of survey responses is utilized to determine damages, the average will overpay some individuals and underpay other individuals, since survey respondents reported values higher and lower than the average.  There is legal precedent that this is acceptable in a class action wage and hour case, and the average of survey responses can be utilized to project class-wide damages.  The legal precedent is the decision about sampling and extrapolation in *Bell v.*

---

[26] *Li v. A Perfect Day Franchise Inc.*, United States District Court, Northern District of California, Case No. 5:10-CV-01189-LHK.

17

**PAGE 799**

*Farmers Insurance.*[27]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[28]  The *Bell Court* stated (p.8):

> It was within trial court's discretion, in class action on behalf of approximately 2,400 claims representatives against an insurance company seeking compensation for unpaid overtime, to use statistical methodology of random sampling and extrapolation for the determination of aggregate class-wide damages; trial court was permitted to weigh disadvantage of statistical inference, the calculation of average damages imperfectly tailored to the facts of particular employees, with the opportunity it afforded to vindicate an important statutory policy without unduly burdening the courts.

30.  The sample average in *Bell* that was used to project damages was 9.4 hours and the margin of error was 9.6 percent.  The award of damages based on a margin of error of ten percent or less is often referred to as the "*Bell Standard*" according to peer-reviewed literature:

> The computation of overtime damages based on the sample mean of 9.42 hours was accepted in the decision. The Bell decision states: ''We conclude that the proof of aggregate damages for time-and-a-half overtime by statistical inference reflected a level of accuracy consistent with due process under the Doehr balancing test.'' The Doehr balancing test refers to the United States Supreme Court decision in Connecticut v. Doehr (1991), which the Bell Court used as part of the assessment as to whether the sampling methodology was permissible. The ruling in Bell that a 9.6 percent margin of error was

---

[27] *Bell v. Farmers Insurance Exchange* (2004) Cal.App 4th. 715, 9 Cal.Rptr.3d 544.
[28] *Duran et al. v. U.S. National Bank Association* (2014)  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

**PAGE 800**

acceptable has led to courts accepting ten percent at the threshold for an acceptable margin of error. A ten percent margin of error is often called the ''Bell standard.''[29]

### *Sampling Plan for Survey and Statistical Analysis*

31. Figure 1 shows the methodology for the design and process of the survey that was conducted in this matter. This is a well-established methodology as described in *Survey Methodology* by Robert M. Groves.[30] Dr. Groves is a pre-eminent survey scientist and he was formerly the Director of the U.S. Bureau of the Census. Each step of the survey design and process is described below. This process resulted in a representative data set that is statistically reliable and valid.

---

[29] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, page 144.

[30] Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., *Survey Methodology*, John Wiley & Sons, New Jersey, 2009.

19

**PAGE 801**

**FIGURE 1: SURVEY DESIGN AND PROCESS[31]**



---

[31] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 47.

20

**PAGE 802**

*Research Objectives*

32.  The research objectives of the survey were to determine the following:

- the frequency that putative class members had off-the-clock unpaid time due to waiting to exit their place of employment at the end of closing shifts,

- the average amount of off-the-clock waiting time.

*Mode of Data Collection*

33.  The survey was administered telephonically by Davis Research.  According to peer-reviewed science on wage and hour surveys, telephone surveys tend to be the preferable method for obtaining survey responses.[32]  The data that can be gathered from telephone surveys allows for an accurate computation of the response and cooperation rates.  Telephone interviewers can also obtain the reason for refusal when someone refuses to participate in the survey.  The survey firm can record the number of calls it takes to have an individual complete the survey.  The aforementioned data points can be used in the analysis of nonresponse.

*Sampling Frame*

34.  Sampling frames are lists or procedures intended to identify all elements of a target population.  According to *Survey Research Methods* by Floyd Fowler, "Any sample selection procedure will give some individuals a chance to be included in the sample while excluding others.  Those people who have a chance of being included among those selected constitute the sample frame."[33]  The sample frame is evaluated based on: (1) how comprehensively it covers the target population, (2) whether the probability of being selected can be computed, and (3) how

---

[32] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015.
[33] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 15.

21

**PAGE 803**

efficiently the members of the sample frame can be contacted.[34]  Therefore, the sampling frame goes hand-in-hand with determining the method of data collection.

35.  The putative class members are the individuals who possess the knowledge to answer questions related to the research objectives since they experienced the working conditions during their employment with Sam's Club.  Therefore, they are the target population.  The selection process of participating in the survey was conducted using a simple random sample which is a generally accepted statistical method for ensuring that all members of a sample frame have an equal probability to be included in the survey.[35]  The random sampling process was conducted by Davis Research (see Exhibit B).  Every putative class member who worked twenty closing shifts or more during the class period had an equal probability of being selected to participate in the survey.

36.  The criteria of working twenty or more closing shifts to qualify for the sample frame is unbiased.  This criteria ensures that survey respondents had sufficient experience with the working conditions at Sam's Club in order to answer questions about the research objectives of the survey.  There was no response bias due to the twenty-shifts criteria.  Individuals do not have differential experiences with waiting time at the end of closing shifts based on working more or less than twenty shifts.  The only difference between these groups is that individuals who worked more than twenty closing shifts are more likely to provide valid and reliable survey responses because they have sufficiently experienced the policies that are the subject of the survey.

37.  I have used the twenty-shift criteria for inclusion in the sample frame in nineteen wage and hour surveys.  The first time I used the twenty-shift criteria was based on a hypothesis that this

---

[34] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 16.
[35] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.380.

22

**PAGE 804**

number of shifts would be sufficient exposure to the work environment to be able to answer survey questions regarding wage and hour issues. Twenty shifts is approximately one month of exposure to the work environment. At the culmination of the survey, I included the number of work shifts in the response bias regression equation and did not find that the number of shifts had a statistically significant effect on the survey responses. Therefore, whether individuals worked 21 shifts or 1,000 shifts, they were not providing differential responses based on their tenure at the employer.[36] For example, surveys on the frequencies of authorized and permitted rest breaks showed no difference due to work tenure. In other words, the length of employment had no effect on how many missed rest breaks the survey respondents were reporting. Since the twenty-shift criteria has not resulted in response bias in sixteen prior surveys, as shown by the regression analysis, I continue to use it as a criteria for inclusion in the sample frame.

38. The only individuals who met the criteria for the sample frame but had no potential to participate in the survey are those whose listed phone numbers were no longer in service and Davis Research could not obtain their current phone number. According to peer-reviewed research on wage and hour surveys, this is not a potential source of bias since there is no reason that an individual without a working telephone number should be any different than any of the other class members.[37] There is no logical reason that individuals who changed their phone number after discontinuing work with Defendant would have different work experiences than individuals that did not change their phone numbers. Sam's Club employees are not assigned to different jobs based on whether or not they changed phone numbers. Sam's Club employees are

---

[36] The exception to this statement is that differential experiences were reported based on tenure when it made sense. For example, in a survey I conducted of Rite Aid employees regarding the number of purchases to conform to the dress code, employees who work more shifts reported more purchases.

[37] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 28.

23

**PAGE 805**

not subjected to different work policies based on whether or not they changed phone numbers. Therefore, changing phone numbers has no correlation with having differential work experiences in this matter. Thus, the sample frame for individuals on the putative class list that worked twenty shifts or more and have working telephone numbers is valid based on the three criteria noted above. The target population was comprehensively covered, the probability of being selected can be calculated, and the sample members can be efficiently contacted.

***Construct and Pre-test Survey Instrument***

39. The survey instrument is the questionnaire that is administered to the survey participants [see Exhibit B for the survey instrument and pilot survey instrument in this matter]. The survey methodology textbook *Designing and Conducting Survey Research* states that the introduction of the survey instrument should build trust with the survey participants, so that they are more willing to be forthcoming with information:

> A questionnaire is a conversation, and, like most conversations, it builds on itself, beginning with an introduction. It is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have. From the researcher's point of view, there is a need to convince potential respondents that their participation is useful to both the survey's sponsor or client and the respondents themselves.[38]

40. The issue of trust between the survey respondent and survey interviewer has become more important over the last decade, due to the increase in identity theft and the perception among the general public that identity theft should be a genuine concern. Therefore, potential survey

---

[38] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

24

**PAGE 806**

respondents are not likely to participate in a survey unless they know why the survey is being conducted and how their responses are going to be used.  Therefore, the "double blind" method is not advisable in a wage and hour class action survey.  A double-blind survey would require that the survey respondents be unaware of the survey sponsor and the purpose of the survey.  In other words, the survey respondents are "blind" about the purpose of the survey.  The *Reference Manual on Scientific Evidence* advises that the double-blind method be utilized "whenever possible."[39]  Therefore an analysis of whether it is possible to use the double-blind method is warranted.

41.  When a survey respondent is first contacted on the phone it is imperative to gain their trust as noted above.  If a survey is conducted using the double-blind method, the survey interviewer cannot inform the survey respondent why they are calling.  The dialogue would be as follows if a double-blind survey were utilized in this matter:

- (Survey Interviewer) – I am calling to conduct a survey regarding your work experiences with Sam's Club.

- (Survey Respondent) – Why do you want this information?  How is it going to be used?  Who are you calling on behalf of?  What is this all about?

- (Survey Interviewer) – Sorry, I cannot answer any of those questions, all I can do is ask you the survey questions.

When the survey respondent does not have these important questions answered, they are likely to terminate the call and not participate in the survey.   As noted above, the survey methodology textbook *Designing and Conducting Survey Research* states that during the initial phase of the survey "it is important to inform potential respondents about the purpose of the study in order to

---

[39] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.410-411.

25

**PAGE 807**

convey its importance and alleviate any concerns that potential respondents are likely to have."[40]

This is why a double-blind survey was not used in this matter. Moreover, data was collected from the survey respondents to assess whether any potential bias is contained in the responses.

42. The advisable method for conducting the survey in this matter is to make the survey interviewer and the respondents "as blind as possible." Therefore, the scripted survey introduction only revealed that the survey is regarding work-related issues at Sam's Club as part of a litigation matter and the survey participants need to be accountable to defendants regarding their responses. No other information about the litigation was divulged unless the survey participant expressed concern about participating in the survey and potentially having to be questioned by the defense. If this occurred, then a script was read assuring the survey participant that no legal action could be taken against them for participating in the survey.

43. The California Court of Appeals decision in *McCleery v. Allstate Insurance*[41] also shows why double-blind surveys should not be used in wage and hour class actions. A double-blind anonymous survey was conducted in the *McCleery* matter as the basis for projecting class-wide damages.[42] The *McCleery* Court's decision did not allow the survey results to be used to project class-wide damages. The decision highlights the importance of transparency in conducting surveys in litigation so that the defense can defend itself against claims made against them.[43] Transparency is also necessary to induce accountability among the survey respondents. Double-blind surveys do not have transparency and do not impose accountability. According to peer-

---

[40] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.
[41] *McCleery v. Allstate Insurance* (2019) 37 Cal. App. 5th 434.
[42] Ibid., see page 2.
[43] Ibid., see page 25.

26

**PAGE 808**

reviewed research on class action wage and hour surveys, transparency and accountability are essential parts of survey methodology in wage and hour class actions.[44]

44.  Finally, there is an ethical consideration to disclose to the survey participants that the survey is part of litigation.  If a double-blind survey is conducted, survey participants do not know they are participating in litigation.  If the trier of fact subsequently requires the survey participants names to be disclosed, which occurred in *Duran*, individuals who were promised anonymity are no longer anonymous.  Their survey responses will be shown to their current or former employer.  Individuals should be informed about this possibility and a double-blind survey does not allow this information to be conveyed.

45.  The mental process of answering questions from a survey instrument is generally found in four groups of processes: comprehension, retrieval of information, estimation and judgement, and reporting of an answer.[45]  Comprehension includes both the question being asked and the instructions previously given on the survey instrument.  Therefore, both the question and the instructions must be easily comprehended.  Retrieval is the process of recalling information relevant to answering the question.  Estimation and judgement are the processes of combining or supplementing the recall of information.

46.  In this matter, comprehension of the questions is not likely to be an issue.  The topics are very straightforward and familiar to the survey respondents.  The more difficult issue is the retrieval of information interacting with estimation and judgement.  All of the survey participants have the necessary information stored in their memories, since they experienced the working

---

[44] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32.

[45] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 220-222.

**PAGE 809**

conditions at Sam's Club warehouses.  However, in the process of retrieving this information, their process of estimation and judgement may be influenced by their self interest in anticipation of receiving a payout from the litigation.  Therefore, the defendants in this matter could potentially overpay due to inflated survey responses.  This situation is known as moral hazard which is defined as "any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly."[46]  According to peer-reviewed literature on wage and hour surveys, the solution to self-interest bias and moral hazard in a wage and hour survey is to conduct the survey without anonymity and to ensure the survey participants are aware they need to be accountable for the accuracy of their survey responses:

> Survey researchers should assess potential bias among surveyed class members in class action wage and hour cases through the lens of moral hazard.  Moral hazard has been described as 'any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly.'  Survey respondents who are anonymous bear no risk associated with inflating their work hours because there is no accountability.  Anonymous survey respondents can be very costly to the defense because inflated estimates of work hours lead to higher damages.  Survey respondents who are not anonymous bear considerable risk when inflating a work hour estimate.  They might look foolish, and possibly be subject to perjury, if they cannot substantiate their estimate of work hours during a deposition and/or trial testimony.  Informing survey respondents in a class action wage and hour case at the outset of the survey that they may be questioned

---

[46] Krugman, Paul R. 2009. *The Return of Depression Economics and the Crisis of 2008*. New York: W.W. Norton.

**PAGE 810**

by the defense about the accuracy of their answers is a useful tool in limiting moral hazard.[47]

47. In accord with peer-reviewed science, the survey in this matter was not conducted anonymously or confidentially. To control for the potential of self-interest bias, the following statement was read to the survey participants during the introduction of the survey:

> This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible. Your answers will not be anonymous and you may be questioned by the defendants about your answers.

48. The survey instrument asked respondents to provide the following information regarding their employment with Sam's Club June 2017 to the present:

- if they were currently employed by Sam's Club,

- their job title,

- the frequency they had to wait at the exit door of the warehouse after clocking out at the end of closing shifts,

- the duration of waiting time at the exit door during closing shifts.,

49. The survey also asked the respondents to provide the following information:

- their level of certainty about the responses they provided in the survey,

- level of education,

- age,

- gender,

---

[47] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32-33.

**PAGE 811**

- whether they knew anything about a lawsuit involving Sam's Club, and if "yes", an open-ended question about what they knew.

50.  The survey instrument was pretested on 15 randomly selected putative class members. During the pretest, some survey participants requested a Spanish version. Therefore, the survey instrument was translated into Spanish. Following the pretest, an additional 25 survey responses were gathered during the pilot phase of the project. The pretest and the pilot are utilized to assess question clarity, question comprehensiveness and question acceptability.[48] Clarity refers to whether the respondents understand the questions. Comprehensiveness refers to offering survey participants the complete range of alternatives. Acceptability refers to burdensome questions and/or the invasion of privacy. The results of the pretest and pilot studies were sent to me by Davis Research. The conclusion I drew based on the survey responses and a conversation with Jason Kerns, who supervised the survey administration by Davis Research, was that the survey questions did not need to be revised. The criteria of clear, unbiased and comprehensive questions noted above was met.

51.  The survey instrument was subsequently administered to 350 additional randomly selected putative class members to arrive at the full sample of 400 survey responses. These survey participants were selected randomly based on employment data provided by the Defendant. After the survey was conducted, further employment information was provided by Defendants that listed the job titles and store locations of the survey respondents.   Eight of the individuals that completed the survey had "lead" in their job titles during their entire employment within the class period. Ten individuals never worked at a Sam's Club store within the putative class.

---

[48] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 38.

**PAGE 812**

These individuals were excluded from the analysis of the survey data.  Therefore, the number of survey responses that comprise this analysis is 382.

***Design and Select Sample***

52.  The pilot survey responses were utilized to determine the full sample size of the survey, based on a targeted margin of error of approximately five percent for the proportional variables. There is no guidance in statistical science quantifying what constitutes a margin of error that is too high, with respect to sample survey data in class action cases.  For example, a margin of error that is "too high" is found in a sample mean of survey data of likely voters prior to an election. If there are only two candidates on the ballot and the sample mean shows that one candidate will receive 52 percent of the vote and the margin of error is five percent; then the margin of error is obviously "too high."  The margin of error shows that an outcome could be that this candidate may only receive 47 percent of the vote.  The survey cannot make a prediction about who is likely to win the election.  This type of reasoning does not apply to liability or damages calculations in a class action wage and hour case.  The margin of error is a statistic in a wage and hour case that assists the trier of fact by providing information about the magnitude of potential error in the results.  Whether it is "too high" is a subjective assessment to be made by the trier of fact when balancing the welfare of plaintiffs and defendants.[49]

53.  There is legal precedent that a margin of error of ten percent or less is acceptable in a class action wage and hour case if damages are to be projected from the average of the survey responses.  The legal precedent is the decision about margin of error in *Bell v. Farmers Insurance*.[50]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of

---

[49] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.
[50] *Bell v. Farmers Insurance Exchange* (2004) Cal.App 4th. 715, 9 Cal.Rptr.3d 544.

31

**PAGE 813**

representative testimony in an overtime class action."[51]  The peer-reviewed statistical method for projecting damages in a class action wage and hour case when the margin of error is above ten percent is to use the lower bound of the confidence interval.[52]

54.  A pilot study is utilized to determine the number of survey responses for the desired margin of error.  The sample size is based upon the size of the class and the type of questions to be asked of the survey participants.  The formula for determining the sample size when proportions are the data being gathered is as follows[53]:

$$n = (Z^2 (p (1 - p)) N) / (Z^2 (p (1 - p) + (N - 1) ME^2)$$

where,

| | | |
|---|---|---|
| n | = | sample size |
| N | = | population size (i.e., the size of the class) |
| Z | = | Z score for the level of confidence |
| p | = | unknown proportion for the sample |
| ME | = | acceptable margin of error for the proportional variable |

The statistical analysis was performed at the 95 percent level of confidence.  According to the *Reference Manual on Scientific Evidence*, a 95 percent confidence interval is widely accepted among scientists:

---

[51] *Duran et al. v. U.S. National Bank Association* (2014)  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

[52] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

[53] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 167.

32

**PAGE 814**

Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[54]

55.  The class size has been assumed to be 15,954.  It is my understanding that the class size is likely smaller than this amount.  Therefore, all the margins of error computed in this report will likely be reduced when the actual class size is determined.  Based on the assumed class size of 15,954, a five percent margin of error for the proportional questions would require a maximum sample size of 360 survey responses.

56.  Survey responses that ask about continuous non-proportional issues require a different method for assessing the sample size to achieve the targeted margin of error.  An example of a continuous non-proportional issue in this matter is the average number of hours of off-the-clock waiting time per shift.  The pilot survey responses to this question were utilized to determine the sample standard deviation.  Based on the sample standard deviation, it was determined that a sample size of 400 survey responses will yield a margin of error of ten percent or less.

### *Recruit and Measure Sample*

57.  This phase of the project refers to the implementation of the survey instrument to the survey participants.  To encourage participation, an incentive payment of a $10 gift card was offered for completing the survey.  The American Association of Public Opinion Research (AAPOR) lists incentive payments on their best practices guide:

---

[54] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

33

**PAGE 815**

Specific procedures designed explicitly to stimulate survey cooperation or participation should be considered, such as … offering monetary (i.e., cash) or non-monetary (some other valued reward) incentives to encourage participation.[55]

58.  The reason it is a best practice to give an incentive payment is that survey participants are less likely to rush through a survey when they receive a payment for their time.  The survey participants feel their time is being respected and are more likely to give a thoughtful response.  There is no bias due to offering an incentive payment to survey participants in a class action wage and hour survey.  In fact, the failure to give an incentive payment will result in biased responses because survey participants will be in a hurry to finish the survey.

*Code Data*

59.  The data was coded by Davis Research and sent to me in an Excel spreadsheet.

**IV.  Data and Statistical Analysis**

*Response Rate, Cooperation Rate and Nonresponse Bias Analysis*

60.  The following information regarding completed surveys, attempted contacts and refusals is contained in the report by Bill Davis of Davis Research[56] (see Exhibit B):

| | |
|---|---|
| Number of Completed Surveys | 400 |
| -- survey participants who were always "leads" | 8 |
| -- survey participants who never worked in class store | 10 |
| -- survey responses used in analysis | 382 |
| | |

---

[55] American Association of Public Opinion Research, "Best Practices for Survey Research," https://www.aapor.org/Standards-Ethics/Best-Practices.aspx.

[56] The number of leads and the number never worked in a class store was determined by Dr. Petersen's analysis of the employment data provided by defendants after the survey was completed.

34

**PAGE 816**

| | |
|---|---|
| Number of Individuals that Could Potentially be Contacted | 3,840 |
| | |
| Number Randomly Selected for Potential Contact | 1,963 |
| -- Number with invalid / wrong numbers | 171 |
| -- Language Barrier (non-Spanish, English) | 2 |
| Total Selected that Could Potentially be Surveyed | 1,790 |
| | |
| Number Contacted and Refused to Participate | 124 |
| -- Hard Refusals | 104 |
| -- Consent Refusals | 20 |
| | |
| Cooperation Rate -- Total (AAPOR) | 76% |
| | |
| Response Rate (AAPOR) | 22% |

There were 124 individuals who refused to participate in the survey.  Bill Davis states in his report that the refusals are "within the normal and expected range for this type of survey" (see Exhibit B).  Davis Research tracked the time of refusal and the reason for refusal.  There were 104 individuals that refused during the introduction (see first paragraph of survey introduction in Exhibit B).  These individuals are labeled "hard refusals" as they were adamant about not participating in the survey.  AAPOR recommends that these individuals should not be contacted again, and therefore, follow up calls were not placed.[57]  These "hard refusal" individuals are not a potential source of bias in the data.  They are simply individuals that do not tend to participate in surveys.  This does not indicate they would provide different responses than the individuals that did complete the survey.

---

[57] American Associate of Public Opinion Research, "Current Knowledge and Considerations Concerning Survey Refusals," September 2014, https://www.aapor.org/Education-Resources/Reports/Survey-Refusals.aspx, page 10.

35

**PAGE 817**

61.  There were 20 "consent refusals."  These individuals either refused after hearing the part of the survey introduction that states they will not be anonymous, or they terminated during the survey.[58]  The likely explanation for these individuals' refusals to participate is fear of the litigation process or concern about participating in the survey affecting their employment.  This means there is no reason to infer that these individuals who refused would have answered the survey questions differently than the individuals that participated in the survey.

62.  The average number of calls placed to individuals who completed the survey and the refusals is 2.1 and 2.2 respectively.  I performed a difference in means t-test at the 95 percent level of confidence and there is not a statistically significant difference in these values.  Therefore, there is no potential bias regarding the timing of answering the calls from Davis Research and individuals choosing to participate in the survey or refusing.

63.  The response rate of 22 percent is not an indicator of bias.  The now superseded second edition of the *Reference Manual on Scientific Evidence* (published in 2000) stated that certain response rates needed to be achieved to obtain an unbiased data set.  However, during the last two decades, a substantial amount of research has been conducted on response rates and none has found that a specific rate is an indicator of bias.  The third edition of the *Reference Manual on Scientific Evidence* (published in 2011) contained none of the language about specific response rates that was in the second edition.  The third edition states that "reasonable estimates" can be obtained even if there is a relatively low response rate:

> Contrary to earlier assumptions, surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates. The key is whether

---

[58] Three individuals terminated during the survey.

**PAGE 818**

nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.[59]

64.  Moreover, one of the pre-eminent scholars on survey research is Robert Groves[60], and his research clearly shows that response rates do not tell a clear picture of potential bias.  Public Opinion Quarterly, the peer-reviewed journal of the American Association for Public Opinion Research, devoted an entire issue to the subject of non-response bias.  Dr. Groves wrote the lead article titled "Nonresponse Rates and Nonresponse Bias in Household Surveys." In this article, Dr. Groves addresses the issue of whether there is a singular level for a response rate that shows response bias is present.  He concludes definitively that there is not:

> Many surveys of the U.S. household population are experiencing high refusal rates. Nonresponse, can, but need not, induce nonresponse bias in survey estimates.  Recent empirical findings illustrate cases when the linkage between nonresponse rates and nonresponse biases is absent.[61]

Groves further states,

> Assembly of methodological studies whose designs permit estimation of nonresponse bias shows that empirically there is no simple relationship between nonresponse rates and nonresponse biases. That is, research results comport with the assertion that covariances between survey variables and response propensities are highly variable across items within a survey, survey conditions, and populations. Hence, there is little empirical

---

[59] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.385.

[60] Dr. Groves was the head of the United States Bureau of the Census from 2009 to 2012 and is currently a professor in the math and statistics department at Georgetown University.

[61] Groves, Robert M., "Nonresponse Rates and Nonresponse Bias in Household Surveys," *Public Opinion Quarterly*, Volume 70, No. 5, Special Issue 2006, page 646.

**PAGE 819**

support for the notion that low response rate surveys de facto produce estimates with high nonresponse bias.[62]

65. The cooperation rate of 76 percent is an indicator that the data set of survey responses is an unbiased sample. The peer-reviewed survey textbook *Designing and Conducting Survey Research* establishes a numeric measure of the level of bias in survey data based on the cooperation rate. This publication states that if a survey has a high cooperation rate, then the estimates projected from survey data will not be badly biased. A minimum cooperation rate of 50 percent should be achieved:

> In researching this issue over many years and testifying in courts of law about sample representativeness, we have generally found that when cooperation rates (the percentage of persons contacted who complete the survey process) in a survey decline below 50 percent, that survey should be regarded with some caution as the basis for precise quantitative statements about the population from which the sample was drawn. When the cooperation rate exceeds 80 percent, even if the nonrespondents differ from those who respond, the overall estimates will not be badly biased.[63]

66. Another method for analyzing the potential for differences between the respondents and nonrespondents is to assess the differences in responses for individuals who were difficult to get on the phone to take the survey, versus those who responded relatively quickly.[64] The individuals who were difficult to contact are more likely to be representative of the individuals who did not take the survey. A correlation analysis was performed that assessed whether

---

[62] Ibid., page 670.

[63] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 196.

[64] Freedman, David, Robert Pisani, and Roger Purves, *Statistics, 4th Edition*, New York: W.W. Norton & Company, 2007, page 344.

38

**PAGE 820**

differences in number of calls influenced survey responses. There was no correlation between the number of calls and the survey responses.

67. All 21 stores are represented in the survey responses. Table A (Exhibit C) shows the percentage of survey respondents by store location. Table A also shows the percentage of hours worked at the stores by the survey respondents. When defendants provide similar employment information for all class members, I can compare the survey respondents to the non-sampled class members. I understand that the Defendant will be providing this information on January 10th. It is highly likely that this comparison will result in the survey respondents being representative of the non-sampled class members in terms of employment at the store locations in the class due to the sampling process utilized in the selection of survey respondents[65] and the bias analysis already conducted to date.[66] Large samples that are randomly collected result in unbiased data sets. This is a tenet of generally accepted statistical science.

***Statistical Analysis of Potential Bias in Survey Responses***

68. Multiple regression was utilized to assess whether the survey responses were biased due to response bias. The regression used the least squares method where the dependent variable is the survey response (responses to questions 2 and 3) and the independent variables are employment status, employment length, taking survey on first call, taking survey on second or third call, certainty of response, gender, age, level of education, knowledge of the lawsuit and years when employed.[67] The magnitude of the relationship between the survey estimates and the

---

[65] Freedman, David, Robert Pisani, and Roger Purves, *Statistics, 4th Edition*, New York: W.W. Norton & Company, 2007, page 339.

[66] I can also conduct a representativeness analysis of job titles upon receipt of the employment information for all class members.

[67] Due to the issue of multicollinearity with employment status and employment length, dummy variables were constructed for the years 2017, 2018, 2019, and 2020

39

**PAGE 821**

independent variables is shown in the coefficients resulting from the regression.  Whether the coefficient is statistically significant from zero is shown by the t-statistic.

69.  Multiple regression analysis is a widely accepted method for determining the effect of different variables on the variable in question as explained in the *Reference Manual on Scientific Evidence*:

> Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.  For example, a multiple regression analysis might estimate the effect of the number of years of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.[68]

The *Reference Manual on Scientific Evidence* also discusses the widespread use of the least squares method by statisticians and its use in legal proceedings:

> Most statisticians use the least squares regression technique because of its simplicity and its desirable statistical properties. As a result, it also is used frequently in legal proceedings.[69]

70.  The results of the regressions are shown in Exhibit D.  The variables that are statistically significant in both regressions are employment status, employment length, certainty of response, gender, and knowledge of the lawsuit.  Overall, the regression results show that damages projected from the sample average are valid and reliable.  There are no glaring examples of bias

---

[68] Rubenfeld, Daniel L., "Reference Guide on Multiple Regression," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.305.
[69] Ibid., p.337.

40

**PAGE 822**

in the survey responses.  However, if the trier of fact makes a different determination, each statistically significant variable is assessed below to show how damages can be adjusted.

71.  Current employees reported waiting less frequently and for shorter durations than former employees when controlling for the other factors that may influence survey responses.  The magnitudes of the differences shown by the regression equations are 14.6 percent and 1.6 minutes, respectively.  In other words, current employees reported waiting to exit the warehouse on 14.6 percent fewer shifts and the average wait time was 1.8 minutes less than former employees.  The issue for the trier of fact when considering this difference is whether they determine one group is biased.  The potentially biased groups are either the current or former employees.  If the trier of fact determines that the former employees are biased, then damages should be reduced by 20 percent.  If the trier of fact determines that the current employees are biased, then damages should be increased by 34 percent.  An example of bias that might be present in the current employees' survey responses is that they are concerned about their survey responses affecting their employment.  Due to this concern, they may have underreported waiting frequency and duration.

72.  Employment length is a statistically significant factor in the survey responses.  Therefore, I have computed a weighted average of the duration of unpaid waiting time.  The weighted average is 4.2 minutes.  Therefore, if the trier of fact determines that damages should be projected based on the length of employment, then damages projected from the sample average should be reduced by 11 percent.

73.  Survey respondents who were "completely sure," or "very sure" of their responses reported higher waiting frequency and duration.  In other words, the individuals who were less certain of

41

**PAGE 823**

their responses reported less frequent waiting and shorter waiting times.  Therefore, in the face of uncertainty, survey respondents were conservative in their estimates.

74.  The regression results show that survey respondents that worked in the earlier part of the class period did not claim higher waiting frequencies or durations than class members that worked in the latter part of the class period.  In other words, events that occurred farther in the past were estimated as occurring with the same frequency as events that occurred more recently.

75.  Survey respondents that reported knowing something specific about the lawsuit prior to taking the survey gave higher estimates of frequency and duration of waiting time.  However, these survey respondents comprise a relatively small percentage of the total number of respondents (7.3 percent), therefore, their influence on the overall average is small.  Accounting for the difference in the responses between those that knew specifics about the litigation and those that did not, changes that sample average from 4.9 minutes to 4.8 minutes.

76.  The variables that account for whether a call from Davis Research was answered on the first, second or third attempt are included in the model to account for potential bias.  Individuals that answer on the first call are the least likely to be biased since they did not receive a voice mail from Davis Research about participating in a survey for litigation.  Individuals that answered on the second or third call have the most potential for bias since they received a voicemail and answered soon after.  Therefore, they may be eager to participate.  Neither of the variables regarding call attempts were statistically significant.  Thus, there is no bias associated with either of these variables.

77.  Peer-reviewed literature on awarding damages shows that when survey responses are conclusive that 90 percent of class members experienced unpaid wages, failure to award

42

**PAGE 824**

damages to the class is the most speculative result possible.  The peer-reviewed literature explains why this conclusion can be drawn:

> if the burden of proof were reversed and defendants were subjected to the standards put forth in *Bell* to show they do not owe compensation to the class members, they would face an impossible hurdle.  In fact, zero damages could be the most speculative number possible when judged by generally accepted statistical standards.  If statistical science shows damages are due the class with 95 percent reliability, then awarding zero damages is speculating.[70]

### *Validity and Reliability of the Survey Data*

78.  The *Encyclopedia of Survey Research Methods* has comprehensive coverage regarding the topic of validity and all references in this section are from this publication.  Validity has a specific meaning in statistics and survey research.  Validity is "primarily a measurement term, having to do with the relevance of a measuring instrument for a particular purpose … A research investigation is said to have internal validity if there are valid causal implications and is said to have external validity if the results are generalizable."[71]  Internal validity "refers to the extent to which the methodological research design used by a researcher can provide empirical evidence to test the possible cause-and-effect relationship between an independent variable (the antecedent), X, and a dependent variable (the consequence)."[72]  In this matter, internal validity refers to determining the relationship between estimates of off-the-clock work time and the

---

[70] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.151.
[71] Knapp, Thomas, "Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.
[72] Lavrakas, Paul J., "Internal Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.

**PAGE 825**

calculation of damages.  External validity refers "to the extent to which the research findings based on a sample of individuals or objects can be generalized to the same population that the sample is taken from."[73]  The internal and external validity of the survey responses is the subject of this report.

79.  An important part of the validity of the survey responses is "construct validity."  In survey research, construct validity assesses how well the variable(s) of interest have been measured and can be assessed based on the reasonableness of the survey responses:

> Construct validity addresses the issue of how well whatever is purported to be measured actually has been measured …  In most cases, for survey measures to have high construct validity they also should have good "face validity."  Face validity is a commonsensical notion that something should at least appear on the surface (or "at face value") to be measuring what it purports to measure.[74]

Guidance on determining construct validity is to examine the survey instrument and the administration of the instrument.  This allows for an assessment of the value of the survey questions:

> The single best way to think about the likely construct validity of a survey variable is to see the full wording, formatting, and the location within the questionnaire of the question or questions that were used to gather data on the construct. In this way one can exercise informed judgment on whether or not the question is likely to have high construct validity. In exercising this judgment, one should also consider how the question was

---

[73] Kalaian, Sema A. and Rafa M. Kasim, "External Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.
[74] Lavrakas, Paul J., "Construct Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.

**PAGE 826**

administered to the respondents and if there were anything about the respondents themselves that would make it unlikely for them to answer accurately.[75]

80. Construct validity can also be assessed based on "whether answers given by various demographic groups are within reasonable expectations."[76] Section V of this report shows the results of the survey questions. The trier of fact can review the results and determine, in accord with all the facts presented in the matter, if the survey results are reasonable.

81. Reliability has several meanings within survey research.[77] One measure of reliability is "internal consistency" which is "agreement among the items in an instrument."[78] This form of reliability is demonstrated in the responses to questions 2 and 2A. Question 2 asked respondents about the frequency of off-the-clock waiting to exit the warehouses at the end of closing shifts. Survey respondents that stated "most of the time," "occasionally," or "rarely" were subsequently asked question 2A, in which they were asked to provide a percentage estimate of the occurrence of off-the-clock waiting. The correlation coefficient between the Likert scale response and the percentage response is -0.63. This statistic shows a correlation between the categorical response (the Likert scale) and the percentage response. This demonstrates reliability in the survey responses, since there is "logical agreement" between questions 2 and 2A – individuals who gave a higher frequency on the Likert scale also gave a relatively higher response on the percentage question.

82. Another measure of reliability refers to the consistency of measurement over time and is called "test-retest." In this method, the "test" is the initial survey and the "retest" is asking the same questions to some survey participants at a later date. This method should be employed if

---

[75] Lavrakas, Paul J., "Construct Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.
[76] Lavrakas, Paul J., "Construct Validity," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.
[77] Lavrakas, Paul J., "Reliability," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.
[78] Lavrakas, Paul J., "Reliability," *Encyclopedia of Survey Research Methods*, SAGE Publications, 2008.

45

**PAGE 827**

the survey researcher thinks environmental factors may influence the survey participants' answers. For example, if a resort in Hawaii was conducting a customer satisfaction survey, the answers could be influenced if it was a rainy day. The survey participants should be surveyed again on a sunny day to investigate if that changes their answers. This issue does not apply to wage and hour surveys. Also, test-retest is ineffective if survey participants may engage in learning about the issue in between the test and the retest. This is an issue for wage and hour surveys. The test-retest process can only assess potential bias if respondents do not engage in practice effects – engaging in learning about the survey issue and changing a response as a result of what has been learned. Practice effects are present to a greater extent when survey responses may be subject to strategic behavior.[79] Moreover, the survey participants may think they are being contacted a second time because their legal representative didn't like the first response and are being encouraged to increase it. They could alternatively think they gave an answer that will get them in trouble with their employer and may decrease it. This type of behavior is called "social desirability bias." It results when someone answers a question in a manner to present themselves in a favorable light rather than giving a valid answer.[80]

83. The Supreme Court of the United States ruling in *Anderson v. Mt. Clemens Pottery Co.* (United States Supreme Court 1946) is also instructive about how test-retest should be conducted in a class action wage and hour case. According to the ruling, the "test" (i.e., the survey in this matter) is the responsibility of the plaintiffs and the "retest" is the responsibility of the defense (pp. 687-688):

---

[79] Collie, Alexander, Paul Maruff, David G. Darby and Michael McStephen. "The Effects of Practice on the Cognitive Test Performance of Neurologically Normal Individuals Assessed at Brief Test-Rest Intervals," *Journal of the International Neuropsychological Society.* 2003. Volume 9, page 419.

[80] Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., *Survey Methodology*, John Wiley & Sons, New Jersey, 2009, page 168.

**PAGE 828**

an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence.

***An Example of a "Gold Standard" Validation of a Survey Response Average Regarding Off-the-Clock Time***

84.  A typical criticism I have read in defense expert's reports in class action wage and hour cases is that survey respondents will suffer from memory issues leading to inflated survey responses that will cause defendants to overpay for damages.  A survey I conducted in a class action wage and hour case in 2019 directly contradicts this claim.  The case is *Aldapa v. Fowler Packing*.[81]  In the *Aldapa* matter I was able to perform a "gold standard" validation because the "true recorded values" could be compared with the survey responses.[82]   The survey participants were farm workers that performed piece-rate work that involved picking fruit.  During the first four years and seven months of the class period, the class members were only paid for the actual pieces of fruit they picked but they were also required to perform pre-shift, mid-shift, and post-shift work related to their picking (hereafter "non-productive time") for which they were not compensated.  This changed in November 2015.  They still had to perform non-productive work, but they began being paid for this work time and it was documented in a payroll code titled "non-

---

[81] *Beatrice Aldapa et al. v. Fowler Packing Company, Inc. et al.* (United States District Court, Eastern District of California, case number: 1:15-CV-00420-DAD-SAB).
[82] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 417.

47

**PAGE 829**

productive time." The class period ended in June 2018, so there are two years and eight months of payroll data for non-productive time. The survey participants were asked to estimate their pre-shift, mid-shift and post-shift non-productive time during the entire class period. The average of their estimates was 38.4 minutes. The payroll data showed an average of 39.2 minutes. <u>Therefore, the survey responses were almost exactly equivalent to the actual data.</u>[83]

## V.  Summary of Survey Responses

85.  Table 1 shows the employment status of the survey respondents. Twenty-two percent of respondents are currently employed by Sam's Club and 78 percent are former employees. Thirteen percent of respondents report working at more than one Sam's Club location. These respondents were informed that they should average their work experiences at the different locations during the class period. These respondents were also informed to not include work at the locations that are not part of the class action. Following the conclusion of the survey, defendants provided job titles and store locations for the survey respondents. Eight respondents always had "lead" in their job title during their employment in the class period. Ten respondents never worked at a store designated within the putative class stores. These eighteen individuals were excluded from the analysis of the survey responses. Therefore, the basis for the analysis in this report is 382 survey responses.

---

[83] This is the only wage and hour survey I have conducted where a "gold standard" validation process could be conducted.

**PAGE 830**

**Table 1: Employment Status of the Survey Participants**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 1 | Currently employed by Sam's Club? | Yes | 87 | 21.8% |
| | | No | 313 | 78.3% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 400 | 100.0% |
| 2 | Worked at more than one at Sam's Club location? | Yes | 53 | 13.3% |
| | | No | 347 | 86.8% |
| | | DK / REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | Total | 400 | 100.0% |
| | Always had "Lead" in job title during class period?[1] | Yes | 8 | 2.0% |
| | | No | 392 | 98.0% |
| | | | ---------- | ---------- |
| | | Total | 400 | 100.0% |
| | Identified as not working at a class covered store[1] | Yes | 10 | 2.5% |
| | | No | 390 | 97.5% |
| | | | ---------- | ---------- |
| | | Total | 400 | 100.0% |

1.  Based on employment data provided by Defendants after survey was conducted.

86.  Table 2 shows the responses to the survey question regarding the frequency of waiting to exit the warehouse after clocking out.  Ninety percent of survey respondents reported waiting to exit the warehouses during closing shifts after clocking out.  The ten percent of survey participants that stated they did not wait had the following responses: 8.4 percent stated they never waited, 1.6 percent said they never worked a closing shift, and 0.5 percent answered "don't know."

49

**PAGE 831**

**Table 2: Frequency of Having to Wait to Leave Facility After Clocking Out from Closing Shift**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 2 | Frequency of waiting to leave facility after clocking out? | Always | 94 | 24.6% |
| | | Most of the time | 118 | 30.9% |
| | | Occassionally | 91 | 23.8% |
| | | Rarely | 39 | 10.2% |
| | | Never | 32 | 8.4% |
| | | No Closing Shifts[1] | 6 | 1.6% |
| | | DK / REF | 2 | 0.5% |
| | | | ---------- | ---------- |
| | | Total | 382 | 100.0% |

1. Response to question was "I never worked closing shifts."
2. Total reporting waiting time = 89.5%.  Margin of error = 3.0%.

87.  The survey participants who reported off-the-clock waiting time "most of the time," "occasionally," or "rarely," were asked a follow up question to estimate the percentage of closing shifts with waiting time.  Table 3 shows that the average survey response for the percentage of shifts waiting to leave the facility after clocking out is 59.0 percent.  The margin of error on this average is 5.0 percent.

**Table 3: Frequency of Waiting to Leave Facility After Clocking Out**

| Question # | Question (Abbreviated) | Number of Responses | Average | Margin of Error |
|---|---|---|---|---|
| 2A | Percent of shifts having to wait after clocking out[1] | 367 | **59.0%** | 5.0% |

1. Respondents who answered "always" or "never" to question #2 were coded as 100 percent and 0 percent, respectively.

88.  Table 4 shows the average duration of off-the-clock waiting time at the end of closing shifts.  The average survey response is 4.9 minutes after removing outlier response defined as being

50

**PAGE 832**

more than two standard deviations from the average.   After accounting for the responses of the individuals that knew something specific about the litigation prior to taking the survey, the average duration of unpaid waiting time is 4.8 minutes.  The relative margin of error on this average is 10.0 percent.

**Table 4: Duration of Waiting to Leave Facility After Clocking Out from Closing Shift**

| Question # | Question (Abbreviated) | Number of Responses | Average | Margin of Error |
|---|---|---|---|---|
| 3 | Minutes of waiting time per shift after clocking out[1] | 364 | 6.1 | 11.2% |
| | -- Remove Outliers | 342 | 4.9 | 9.9% |
| | -- Adjusted for Knowledge of Lawsuit | 342 | **4.8** | 10.0% |

1. Accounts for the shifts when the survey respondents reported they did not have to wait.

89.  Table 5 shows the survey participants' level of certainty about their answers, level of education, age, gender and knowledge of the lawsuit.  Sixteen percent of survey respondents knew about a lawsuit involving Sam's Club prior to taking the survey.  The percentage of survey participants that knew any of the specific claims of the lawsuit is 7.3 percent.

51

**PAGE 833**

**Table 5: Summary of Survey Questions Used for Statistical Purposes**

| Question # | Question (Abbreviated) | Response | Number | Percent |
|---|---|---|---|---|
| 4 | Certainty of survey responses. | Not Sure at All | 3 | 0.8% |
| | | Slightly Sure | 4 | 1.0% |
| | | Moderately Sure | 58 | 15.2% |
| | | Very Sure | 131 | 34.3% |
| | | Completely Sure | 184 | 48.2% |
| | | DK / REF | 2 | 0.5% |
| | | | ---------- | ---------- |
| | | | 382 | 100.0% |
| 5 | Level of education | Less Than High School | 14 | 3.7% |
| | | GED | 12 | 3.1% |
| | | High School | 159 | 41.6% |
| | | Vocational Degree | 15 | 3.9% |
| | | Some College | 111 | 29.1% |
| | | College Degree | 61 | 16.0% |
| | | Graduate Degree | 9 | 2.4% |
| | | DK / REF | 1 | 0.3% |
| | | | ---------- | ---------- |
| | | Total | 382 | 100.0% |
| 6 | Age | Average | 34 | |
| | | Youngest | 19 | |
| | | Oldest | 80 | |
| 7 | Gender | Male | 251 | 65.7% |
| | | Female | 130 | 34.0% |
| | | Nonbinary | 1 | 0.3% |
| | | REF | 0 | 0.0% |
| | | | ---------- | ---------- |
| | | | 382 | 100.0% |
| 8 | Know anything about a lawsuit involving Sam's Club prior to taking survey? | Yes | 62 | 16.2% |
| | | No | 318 | 83.2% |
| | | DK / REF | 2 | 0.5% |
| | | | ---------- | ---------- |
| | | Total | 382 | 100.0% |
| 9 | Know any specifics about lawsuit in this matter? | Yes | 28 | 7.3% |
| | | No | 354 | 92.7% |
| | | | ---------- | ---------- |
| | | Total | 382 | 100.0% |

52

**PAGE 834**

## VI.  How the Survey Data is Used to Extrapolate to the Class

90.  The survey has been conducted on a sample of the class members.  The analysis in this report has shown that the survey data is valid and reliable for extrapolating to the putative class members that did not participate in the survey (the non-sampled population).  The margin of error for the average of unpaid time is less than ten percent, therefore, the *Bell Standard* has been achieved and damages can be determined from the sample average.

91.  An average survey response that conforms to the *Bell Standard* is a fair and balanced statistic for projecting class-wide damages.  The reason it is a "fair and balanced" statistic is that there is an equal probability that damages computed from an average will be too high or too low.  Therefore, the probability of overpayment or underpayment is equally shared by plaintiffs and defendants in the litigation.

92.  An alternative to projecting damages from the survey average is to use the boundaries of the 95 percent confidence interval.  According to peer-reviewed research, using the lower bound of the confidence interval to project damages results in a 97.5 percent probability that defendants are not overpaying for damages.[84]  The lower bound of the confidence interval for the unpaid off-the-clock waiting time is 4.3 minutes.  If the trier of fact determines the survey results are valid and reliable, then there is a 97.5 percent probability that defendants will not overpay for class-wide damages if 4.3 hours per shift is used as the basis for projecting unpaid off-the-clock waiting time.

93.  The survey results and statistical analysis will be provided to the damages expert in this matter to calculate class-wide damages.

---

[84] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.149.

**PAGE 835**

## VII.  Conclusion

94.  Davis Research obtained 382 survey responses that are the foundation for the analysis in this report.  The survey and the statistical analysis were performed in accord with peer-reviewed science regarding class action wage and hour cases.  The methodology utilized in this report has resulted in valid and reliable survey responses.  The statistical analysis of the survey responses showed no systemic bias.  Therefore, response bias does not exist in the survey data.

95.  Nonresponse to the survey is not a source of bias in the survey data.  The cooperation rate indicates that individuals that refused to take the survey did not bias the results.  There is no indication that individuals who refused to take the survey would have provided responses that favored defendants.  This conclusion is drawn from the statistical analysis of call attempts and a review of the responses to reasons for refusals.

96.  The survey responses can be utilized to project to the population of putative class members.  Ninety percent of class members experienced unpaid waiting time at the end of closing shifts.  The average number of closing shifts where putative class members experienced off-the-clock waiting to exit the work facility is 59.0 percent.  The average duration of off-the-clock waiting time is 4.8 minutes per shift.

97.  I am prepared to testify to the contents of this report in deposition or at trial if called upon to do so.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____

Jeffrey S. Petersen, Ph.D.

12/31/23
Date

54

**PAGE 836**

# EXHIBIT A

# JEFFREY S. PETERSEN

Allman & Petersen Economics, LLC                    Phone: (510) 382-1550
7677 Oakport Street, Suite 610                       FAX: (510) 382-1472
Oakland, CA 94621                         E-mail: jeff@allmaneconomics.com

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2003 – present | ***Partner***<br>Allman & Petersen Economics, LLC<br>Oakland, California |
| 2014 – present<br>1999 – 2001 | ***Adjunct Associate Professor of Economics***<br>St. Mary's College<br>Moraga, CA |
| 1998 – 2003 | ***Senior Economist***<br>U.S. Government Accountability Office (formerly the General Accounting Office)<br>San Francisco, California |
| 1999 – 2001 | ***Economics Instructor***<br>Golden Gate University<br>San Francisco, California |
| 1995 – 1998 | ***Postdoctoral Fellow***<br>University of California, Berkeley |
| 1990 – 1995 | ***Research and Teaching Assistant***<br>University of Utah<br>Salt Lake City, Utah |

## EDUCATION

| | |
|---|---|
| 1996 | Postdoctoral Training Program in Health Economics<br>University of California, Berkeley |
| 1995 | Ph.D. in Economics, University of Utah |
| 1989 | B.A. in Economics, San Jose State University |

## PUBLICATIONS

***Peer-Reviewed Book***

> *"Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003 (co-authored with David Levine, Frank Neuhauser, Richard Reuben, and Christian Etcheverria).

**PAGE 838**

***Peer-Reviewed Journal Articles***

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019 (co-authored with Phillip Allman).

"The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017 (co-authored with Phillip Allman).

"Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015 (co-authored with Phillip Allman and William Lee).

"Carve-Outs from the Workers Compensation System," *Journal of Policy Analysis and Management*, 2002, Volume 21, No. 3, (co-authored with David Levine and Frank Neuhauser).

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws," *Industrial Relations*, 2000, Volume 39, No. 2.

"A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3, (co-authored with Craig Zwerling).

***Other Publications***

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," proceedings of the 2019 Allied Social Sciences Association, National Association of Forensic Economics Section (co-authored with Phillip Allman).

"International Responses to an Aging Labor Force," *Work Options for Mature Americans*. Teresa Ghilarducci and John Turner eds., Notre Dame, Indiana: University of Notre Dame Press, 2005. (co-authored with Charles Jeszeck, Anthony Defrank, Katherine Leavitt, Janice Peterson, Yunsian Tai, and Howard Wial).

"Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers," in *The Economics of Prevailing Wage Laws,* Peter Philips and Hamid Azari eds., Ashgate Publishing, 2005. (co-authored with Erin Godtland).

"Private and Public Sector Employment Policies to Extend the Labor Force Participation of Older Workers," *Proceedings of the 55th Annual Industrial Relations Research Association Annual Conference, 2003.*

"Return to Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,* 1999, (co-authored with Lara Papadakis, Diane Morabito, Herb Ochitill, Alicia Bocellari, and Robert Mackersie).

*Jeffrey S. Petersen, page 2 of 5*

**PAGE 839**

*Portable Pensions for Casual Labor Markets: Lessons from the Operating Engineers Central Pension Fund*, Quorum Books, Westport, CT, 1996 (co-authored with Teresa Ghilarducci, Garth Mangum, and Peter Philips).

### Selected General Accounting Office Reports

"Older Workers: Policies of Other Nations to Increase Labor Force Participation," GAO-03-307, Feb. 2003

"Older Workers: Demographic Changes Pose Challenges for Employers and Workers," GAO-01-85, Nov. 2001

"Characteristics of Persons in Labor Force Without Pension Coverage," GAO/HEHS-00-131, Aug. 2000

"Social Security Reform: Implications of Raising the Retirement Age," GAO/HEHS-99-112, Aug. 1999

## REVIEWER FOR PEER-REVIEWED JOURNALS AND BOOKS

Industrial Relations (University of California, Berkeley)

Perspectives (peer-reviewed section of the Social Security Bulletin)

Journal of Legal Economics

Palgrave Macmillan, Economics & Business Publications

The Earnings Analyst

## PRESENTATIONS

"Profiles in Survey Research: The Intersection of Public Opinion and the Law," Panelist, Pacific Chapter of the American Association of Public Opinion Research, November 2023.

"The Reference Guide on Survey Research," Western Economic Association Annual Conference, San Diego, CA, July 2023.

Chair for Session "The Reference Manual on Scientific Evidence," Western Economic Association Annual Conference, San Diego, CA, July 2023.

"Statistical Evidence in Wage and Hour Class Actions," Webinar hosted by Strafford Publications, June 2023.

"Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing," Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

"Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, July 2022.

*Jeffrey S. Petersen, page 3 of 5*

**PAGE 840**

"Wage and Hour Surveys: Assisting with the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Meeting of the American Academy of Economic and Financial Experts, April 2021.

"Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

"The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

"Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

"The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

"Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

"Surveys in Class Action Wage and Hour Cases," CLE Seminar, San Francisco, CA, October 2018.

"Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

"Working to Age 70 or Older – How Much Does Intention Matter?  Evidence from the Health and Retirement Study," 28th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, March 2016.

"Policies to Extend the Labor Force Participation of Older Workers" – Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Washington, DC, Jan. 2003.

Discussant for the panel "The Population Age 50-70 -- Past Trends and Future Projections" at the National Academy of Social Insurance conference on the Implications of an Aging Workforce for Income Security and Employee Benefits, Washington, D.C., Nov. 2001

"Raising the Eligibility Ages for Social Security Benefits: Work and Health Issues Associated with this Policy Change" - School of Public Policy, University of California, Los Angeles, Jan. 2001

"The Labor Market for Older Workers" - Bay Area Labor Economists Fall Workshop, Public Policy Institute of California, San Francisco, CA, Nov. 2000

"Raising the Eligibility Ages for Social Security Benefits: An Analysis of the Policy Implications" - Association for Public Policy Analysis and Management Annual Research Conference, New York, NY, Oct. 1998.

"Carving Out Construction Employees from the Workers Compensation System in California: Putting Theory into Practice" - Industrial Relations Research Association Section of the Allied Social Sciences Association

*Jeffrey S. Petersen, page 4 of 5*

**PAGE 841**

Annual Meeting, Chicago, IL, Jan. 1998
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Return to Work Following Acute Traumatic Injury"
- American Association for the Surgery of Trauma Annual Meeting, Boston, MA Sept. 1999
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws"
- Health Economics Research Organization Section of the Allied Social Sciences Association Annual Meetings, New Orleans, LA, Jan. 1997

"Retirement from the Construction Industry" – University of California, Berkeley, Department of Demography, May 1995.


## HONORS

| | |
|---|---|
| Vice President, American Academy of Economic and Financial Experts | 2022-present |
| Member of the Board of Directors, American Academy of Economic and Financial Experts | 2017-2020 |
| National Research Service Award, Public Health Postdoctoral Fellowship, U.S. Department of Health and Human Services | 1995-1997 |
| Outstanding Scholar Athlete Honor Roll, San Jose State University | 1988-1989 |
| NCAA Division I Tennis Team, San Jose State University | 1987-1989 |


## PROFESSIONAL ORGANIZATIONS

American Economic Association

National Association of Forensic Economics

American Academy of Economic and Financial Experts

American Association for Public Opinion Research

Western Economic Association International


*Jeffrey S. Petersen, page 5 of 5*

**PAGE 842**

# ALLMAN & PETERSEN ECONOMICS, LLC

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max Allman, MA, CFA

7677 Oakport Street, Suite 610 • Oakland, CA 94621
TEL (510) 382-1550  FAX (510) 382-1472

## FEE SCHEDULE (1/5/22)

(1)  Economic research and analysis, report preparation, document review, office and client consultations, deposition preparation and trial preparation.[1]

| | |
|---|---|
| -- Ph.D. Economist | $600 / hour |
| -- Senior Economist | $425 / hour |
| -- Economist or CPA | $275 / hour |
| -- Survey Administration | $125 / hour |

(2)  Deposition testimony[2]  $750 / hour

(3)  Arbitration and trial testimony[3]  $750 / hour

(4)  Travel time  $250 / hour

---

[1] Bills will be submitted periodically and are due upon presentation, not at the conclusion of the case.

[2] Payment for deposition testimony shall be paid in accordance with C.C.P. '2034 (i) (3) --i.e. payment of an expert's fees for the anticipated length of a deposition shall be paid at the commencement of his/her deposition, and any outstanding balance shall be paid within five days of receiving an itemized statement of the expert's services.

[3] All invoices to date must be paid prior to trial testimony.  In addition, an additional retainer must be paid prior to the trial testimony based upon the estimated invoice for the testimony.

**PAGE 843**

**Trial & Deposition List for Jeffrey S. Petersen (Last Four Years)**

| | Case | Case Number | Jurisdiction | Date |
|---|---|---|---|---|
| **Trials & Arbitrations** | Yumul et al. v. Indus Investments et al. | BC565881 | Los Angeles | April, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | September, 2019 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | September, 2021 |
| | Chavez, et al. v. California Collision | RG17865765 | Alameda | August, 2022 |
| | Vasquez v. Leprino Foods | 1:17-cv-00796-AWI−BAM | Eastern District of California | March, 2023 |
| | Carroll v. City and County of SF | CGC-17-562580 | San Francisco | April, 2023 |
| **Depositions** | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | June, 2019 |
| | Dueker et al. v. CRST Expedited | 2:18-cv-08751-FMO-FFM | Central District of California | September, 2019 |
| | Nevarez et al. v. Costco Wholesale Corp. | 2:19-cv-03454-SVW-SKx | Northern District of California | January, 2020 |
| | Sephora Wage and Hour Cases | CGC-16-550894 | San Francisco | June, 2020 |
| | Dhawan v. Regents of the Univ. of CA | RG18911598 | Alameda | October, 2020 |
| | Van Bebber v. Dignity Health | 1:19-cv-00264-DAD-EPG | Eastern District of California | October, 2020 |
| | Ayala v. UPS Supply Chain Solutions | 5:20-cv-00117-PSG-AFM | Central District of California | February, 2021 |
| | Christensen v. Carter's Retail | 8:20-cv-00776 JLS (KESx) | Central District of California | April, 2021 |
| | Nucci v. Rite Aid | 19-CV-01434-LHK | Northern District of California | June, 2021 |
| | Crump v. Hyatt | 4:20-cv-00295-HSG | Northern District of California | June, 2021 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | August, 2021 |
| | Williams v. Saint Joseph's | 30-2020-01134268-CU-OE-CXC | Orange | September, 2021 |
| | Johnson v. Bakersfield Memorial | BCV-19-102016 | Kern | October, 2021 |
| | Powell v. Saint Joseph's | STK-CV-UOE2019-0011155 | San Joaquin | October, 2021 |
| | Castillo v. Western Range | 3:16-cv-00237-RJC-VPC | District of Nevada | November, 2021 |
| | Cruz v. Bruceville Terrace | 34-2018-00245506 | Sacramento | November, 2021 |
| | Larson v. Mark Twain Medical Center | 19CV44062 | Calaveras | November, 2021 |
| | Aldapa v. Fowler Packing | 1:15-CV-00420-DAD-SAB | Eastern District of California | December, 2021 |
| | Vasquez v. Leprino Foods | 1:17-cv-00796-AWI−BAM | Eastern District of California | January, 2022 |
| | Hinds v. Fedex Ground | 3:18-cv-01431-JSW (EDL) | Northern District of California | March, 2022 |
| | Rodriguez v. Walmart | 2:20-cv-07045 AB(KKx) | Central District of California | May, 2022 |
| | Sanchez v. Sam's West, Inc. | 2:21-cv-05122-SVW-JC | Central District of California | May, 2022 |
| | Cruz v. Talentscale | RIC1821842 | Riverside | May, 2022 |
| | Villanueva v. Select Employment Services | 3:17-cv-06875-JCS | Northern District of California | September, 2022 |
| | Perez v. Leprino Foods | 1:17-cv-00686-AWI-BAM | Eastern District of California | October, 2022 |
| | Stafford v. Bojangles Restaurants | 3:20-cv-266-MOC | Western District of North Carolina | October, 2022 |
| | Dieves v. Butte Sand Trucking | CVCS19-0001082 | Sutter | November, 2022 |
| | Adelman v. Starbucks | 3:20cv-01178-JD | Northern District of California | February, 2023 |
| | Carroll v. City and County of SF | CGC-17-562580 | San Francisco | March, 2023 |
| | Castro v. Gardner Trucking | 4:20cv-05473-YGR | Northern District of California | April, 2023 |
| | Villegas v. Duarte Nursery | 2014212 | Stanislaus | May, 2023 |
| | Ames v. San Antonio Regional Hospital | CIVDS2018953 | San Bernardino | May, 2023 |
| | Porcayo v. So Cal Land Maintenance | 30-2021-01236054-CU-OE-CXC | Orange | September, 2023 |
| | Charles v. Varsity Tutors | 19CV347249 | Santa Clara | October, 2023 |
| | Carbajal v. Imperial Maintenance Services | STK-CV-UOE-2016-0001100 | San Joaquin | October, 2023 |
| | Torres v. Johnston Nurseries | BCV-19-100830 TSC | Kern | December, 2023 |

# EXHIBIT B



# SAM'S CLUB EMPLOYEE SURVEY

## METHODS REPORT

October 5, 2023

**PAGE 846**



TABLE OF CONTENTS

| | |
|---|---|
| **3** | Overview |
| **3** | Population of Interest and Sampling Procedures |
| **4** | Study Design |
| **4** | Pretesting |
| **5** | Interview Training Procedures |
| **5** | Final Disposition / Response Rate |
| **7** | Appendix |

A.  Survey Instrument (English)

B.  Survey Instrument (Spanish)

C.  Certificate of Accuracy

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 847**



---

**OVERVIEW**

This report summarizes the methods used for the 2023 Sam's Club Employee Survey.  The data gathered comes from a random sampling of 400 current and former employees that were on a list provided to us.  Our role was programming the questionnaire, pre-testing the survey instrument, conducting live telephone surveys, monitoring, validating surveys and delivering a raw data file to Jeff Petersen, who handled survey design and data analysis.

**POPULATION OF INTEREST AND SAMPLING PROCEDURES**

400 telephone interviews were conducted with eligible respondents between September 7, 2023 and October 3, 2023.  To be eligible, respondents needed to confirm they were a former or current employee of Sam's Club.  Participants were offered a $10 gift card to participate in an interview that averaged 8 minutes in length.  The survey was offered in the respondent's choice of English and Spanish. 9 respondents chose to do the survey in Spanish, the balance were done in English.

A total of 3,840 names were given to us. We randomly selected 1,970 names from this list to use for the study. After calling every record in the sample frame at least one time, records that were found to be non-working or wrong numbers were run through a phone number append process performed by Marketing Systems Group, a company that services the research data collection industry.  Among the 225 records were sent for information lookup,  116 records received a new telephone number contact.  Among those 116 updated records, 5 surveys were completed as a result of updating the telephone number.

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 848**



## STUDY DESIGN

The final questionnaire was programmed into a computer-assisted telephone interviewing (CATI) system, which offers many benefits when conducting surveys by telephone. CATI randomizes the order names are called, allows appointments to be set and controls skip patterns so only the appropriate questions are asked. The interviewer simply reads each question over the telephone and enters the answers given. The CATI program also performs various quality control functions, including only accepting eligible codes to be entered by an interviewer.

As dialing of the telephone listings proceeded, the sample management system stores and uses the call history information to guide the days and times the next call is made. The goal is to try people at different times of the day and different days of the week.

The system also produces daily reports summarizing all interview attempts and outcomes during data collection. These reports allowed the project team to continuously monitor interviewing progress and provide ongoing feedback to the interviewing staff. The mean number of attempts to all records was 3.6, the median was 3, the highest number of attempts to any one record was 12.

## PRETESTING

Prior to the start of full-scale data collection, the survey instruments were thoroughly pre-tested. The main goal of pre-testing was to ensure that all questions were clearly understood and could easily be answered by respondents, and that the questionnaire flowed smoothly from one question to the next.

Pretesting results indicated that some people were interested in completing the survey in Spanish. Davis submitted the survey instrument for translation with a professional translation company on September 18, 2023. At an additional cost, Davis also acquired a "certificate of accuracy" document and completed a professional review with a second translator to verify the translation's accuracy.

The pre-test interviews were also used to ensure that the survey's length of administration remained within acceptable limits. A hard-copied version of the questionnaire is shown in the appendix section at the back of this report.

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 849**



## INTERVIEWING TRAINING PROCEDURES

When hired, interviewers complete a professional interviewer training program. Prior to beginning work on the study, all interviewers were required to attend a briefing session where the study was discussed and reviewed in detail.  The briefing provided interviewers with an overview of the study and included a question-by-question review of all items included in the survey.  The briefing also covered best-practice approaches for dealing with different interviewing situations and provided specific instructions to follow when documenting the results of each call attempt.

During fielding, our quality assurance staff conducted ongoing live, non recorded, monitoring of interviews.  Post fielding validation calls were placed to 10% of the survey respondents who had completed a survey.  The validation call consisted of confirming with the named respondent that they indeed completed the survey with a Davis Research staff member.  The validations were 100% affirmative.

## FINAL DISPOSITION

The statistics that follow represent the outcome of the last call placed to each individual at the moment in time that we reached 400 surveys.

|  | Total |
|---|---|
| **Total Records Received with Phone Numbers, prior to random selection of people to survey** | 3840 |
|  |  |
| Total records not selected as part of random process | 1870 |
| Duplicate phone numbers (Removed prior to calling) | 5 |
| Do Not Call List (Removed prior to calling) | 2 |
| Total records in sample frame used | 1963 |
|  |  |
|  |  |
| **Total Interviews Completed (A)** | 400 |
|  |  |
| **Refusals (all) (B)** | 124 |
| Language Barrier (Non-Spanish) | 2 |

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 850**



| | |
|---|---|
| Invalid telephone numbers / Wrong numbers | 171 |
| Reached but were not eligible to do survey or deceased | 4 |
| **Called but not reached for duration of study (C)** | 1262 |
| | |
| | |
| COOPERATION RATE = (A)/(A+B) | 76% |
| RESPONSE RATE= (A)/(A+B+C) | 22% |

*\* The refusals include 98 people that refused during the introduction process, 18 people that refused after the full introduction text was read, 2 people that refused to finish the survey after they started, and 6 people that requested to be put on a Do Not Call list.*

The cooperation and response rates percentages are within the normal and expected ranges for surveys of this type.

I am prepared to testify regarding the information contained in this report.

Bill Davis
Managing Member
Davis Research LLC

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 851**

**DAVIS**
RESEARCH

APPENDIX

Appendix A- SURVEY INSTRUMENT (English)

Appendix B- SURVEY INSTRUMENT (Spanish)

Appendix C- CERTIFICATE OF ACCURACY

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 852**



Appendix A- SURVEY INSTRUMENT (English)

Respondent Name:  _____

Hello, may I please speak with [RESPONDENT NAME]? I am not selling anything.

### IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Who's Calling":

This is _____, I am with Davis Research calling to speak with [RESPONDENT FIRST NAME] about his/her work for Sam's Club and we are offering $10 for completing a five minute survey.

### IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Why are you calling? / Can you tell me what you are calling about?":

We have been asked to conduct a survey by the lawyers who are bringing claims on behalf of current and former employees of Sam's Club in a pending lawsuit.

### IF THERE IS NO ANSWER, LEAVE THE FOLLOWING VOICE MAIL:

Hello, I am _____ calling from Davis Research and I am not trying to sell you anything. I am calling to conduct a survey about employment issues at Sam's Club at the request of lawyers who are bringing claims on behalf of current and former Sam's Club employees in a pending lawsuit.  Please return my phone call at _____ so I can administer the survey to you.  This survey should take approximately five minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

### ONCE RESPONDENT IS ON THE PHONE:

Hello, I am calling about your work for Sam's Club and I am not trying to sell you anything.  I am _____ calling from Davis Research.  I am calling to conduct a survey about employment issues at Sam's Club at the request of lawyers who are bringing claims on behalf of current and former employees in a pending lawsuit.  This survey should take approximately five minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

[DISPO HERE – 99 TO CONTINUE]

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by Sam's Club attorneys about your answers.  Therefore, take your time when responding to the questions.  Even if you're not completely sure of the exact answer to a question, please give me your best

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 853**

**DAVIS RESEARCH**

estimate. If you don't know the answer to a question, it is also okay to answer "I don't know." We simply need survey answers that are as accurate and honest as possible.

**READ ONLY IF NEEDED:** You will be represented by the attorneys representing the employees at no cost to you if Sam's Club wishes to ask you about your survey answers. It is illegal for Sam's Club to take action against you for participating in this survey. It is unlikely you will be questioned by the attorneys for Sam's Club, we simply need to inform you it is possible.

**READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:** Your anonymity cannot be guaranteed. It is illegal for Sam's Club to take action against you for participating in this survey.

**NOTE TO PROGRAMMER:** If respondent refuses to participate in the survey, please read the following:

01 CONTINUE INTO SURVEY
99 REFUSED

[IF 99 HERE OR REFUSED OR DNC IN INTRODUCTION OR IF MID-TERM AFTER Q1 READ. DON'T ALLOW MID-TERM UNTIL AFTER Q1]

[REFUSAL_REASON]

It is very important to understand why you are not willing to take the survey. Can you please tell me your reason?

**CODE RESPONSE VERBATIM**

[READ]

[INTERVIEWER: Did you read either of these two optional items during the introduction?]

**(A) READ ONLY IF NEEDED:** You will be represented by the attorneys representing the employees at no cost to you if Sam's Club wishes to ask you about your survey answers. It is illegal for Sam's Club to take action against you for participating in this survey. It is unlikely you will be questioned by the attorneys for Sam's Club, we simply need to inform you it is possible.

**DAVIS**
RESEARCH

**(B)  READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:** Your anonymity cannot be guaranteed.  It is illegal for Sam's Club to take action against you for participating in this survey.

01 Yes, I read both of those.
02 Yes, but read A only
03 Yes, but read B only
04 No

1.      Are you currently employed by Sam's Club?

    1.  Yes
    2.  No

    999.  (DO NOT READ) Refused [GO TO CONCLUDING STATEMENT]

1A.    [if Q1 = 1]  What is your job title with Sam's Club? [capture verbatim]
       [if Q1 = 2]  What was your job title when you worked for Sam's Club? [capture verbatim]

    998.  (DO NOT READ) Don't know
    999.  (DO NOT READ) Refused

1B.    Have you worked at more than one Sam's Club location?

    1.  Yes
    2.  No

    998.  (DO NOT READ) Don't know
    999.  (DO NOT READ) Refused

    **SKIP LOGIC:**
    - If Q1B = 2, 998 OR 999, SKIP TO Q2 INTRO, PART I
    - If Q1B = 1, Read following statement, "if you worked at any of the following Sam's Club stores please disregard those work experiences when answering the survey questions: Fresno, Folsom, Fountain Valley, Fullerton, Gardenia, Long Beach, Ontario, or South Gate.  Please average your work experiences from the other Sam's Club locations you worked at in California from June 2017 to the present."; SKIP TO Q2 INTRO PART II

    1   Continue



2    Only worked at stores in the cities mentioned [SKIP TO CONCLUDING STATEMENT]

**[Q2 INTRO, PART I]**  This survey only pertains to your employment with Sam's Club at California locations starting in June 2017.  If you worked with Sam's Club prior to this time period, or you worked at a warehouse outside of California, please disregard that work when answering the questions.

**[Q2 INTRO, PART II]**  One final instruction, this survey only pertains to when you worked closing shifts.  A closing shift means that at the end of your shift, the store had closed to customers for the day and the front doors were closed such that no more customers could enter.

2.    When you clocked-out from your closing shifts and walked to the door to exit the warehouse, how frequently did you have to wait for a supervisor to let you out of the warehouse?  Did you have to wait … **[NOTE TO INTERVIEWER:** Read all choices**]**

1. Always
2. Most of the time
3. Occasionally
4. Rarely
5. Never

997.   (DO NOT READ) I never worked closing shifts
998.   (DO NOT READ) Don't Know
999.   (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q2 = 5, 997, 998 OR 999, SKIP TO Q4
- If Q2 = 1 SKIP to Q3 INTRO

2A.    What percentage of your closing shifts did you have to wait for a supervisor to let you out of the warehouse?

[**NOTE TO PROGRAMMER:** If Q2A = 01, enter percentage in variable 2A-1.  If Q2A = 02, enter start of range in 2A-1 and second number in 2A-2.]

01 ENTER ACTUAL NUMBER **[ENTER PERCENTAGE]**
02 RESPONDENT GIVES RANGE **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 856**



998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused


**Q3 INTRO**: My next question is about how long you had to wait for the supervisor to let you out of the warehouse.  This question is only regarding how long you spent waiting at the door.  Do not include the time you spent walking from the time clock to the door.  I want to know about the typical or average amount of time waiting at the door.  If you experienced very long wait times on only a few occasions, do not include those in your time average estimate.  I just want to know what typically happened.

[**NOTE TO INTERVIEWER**: Pause and then ask "Do you have any questions about these instructions or are you ready to proceed with the survey?"]

[**NOTE TO INTERVIEWER:** If respondent has questions about instruction, please inform them all you can do is re-read the instructions and then re-read the instructions]

3.      On the days you had to wait for a supervisor to let you out of the warehouse at the end of your closing shifts, how long did you typically have to wait?

[**NOTE TO PROGRAMMER:** Allow for responses in seconds or minutes and code accordingly]

[**NOTE TO PROGRAMMER:** If Q3 = 01, enter time amount in variable 3-1.  If Q3 = 02, enter start of range in 3-1 and second number in 3-2.]

01 [ENTER MINUTES]
02 [ENTER SECONDS]
03 RESPONDENT GIVES RANGE [ENTER RANGE] **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused

We are almost finished, I just have a few concluding questions that will be used for statistical purposes.

4.  Please think about all the work experiences you have described for me during this survey.  How sure are you that the answers you gave me accurately describe your experiences working for Sam's Club?  Would you say…

1. Not sure at all

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 857**

**DAVIS**
RESEARCH

2. Slightly sure
3. Moderately sure
4. Very sure
5. Completely sure

998. (DO NOT READ) Don't know
999. (DO NOT READ) Refused

5. What is the highest level of education you have completed? [DO NOT READ CHOICES]

1. Less than High School.
2. GED
3. High School Diploma
4. Vocational Degree
5. Some College
6. College Degree
7. Graduate Degree
8. Other (Specify)

999. (DO NOT READ) Refused

6. What is your age?

ENTER AGE

999. (DO NOT READ) Refused

7. What is your gender?

1. Male
2. Female
3. Nonbinary
4. Other (please specify)

999. (DO NOT READ) Refused

8. Prior to my call today, did you know anything about a lawsuit involving Sam's Club?

1. YES

2. NO

998. (DO NOT READ) Don't know

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 858**



999.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q8 = 2, 998 OR 999, SKIP TO CONCLUDING STATEMENT

9.  Please tell me, in as much detail as you can, everything you can remember about the purpose of any lawsuit involving Sam's Club.  I am going to type your answer as you speak it, so it would help me if you speak slowly while I type.  Please don't tell me how you learned what you know or who told you – just tell me what you know about the purpose of any lawsuit involving Sam's Club.

TYPE OPEN-ENDED ANSWER

**[PROBE REPEATEDLY "WHAT ELSE DO YOU REMEMBER ABOUT THE PURPOSE OF ANY LAWSUIT REGARDING SAM'S CLUB?" UNTIL THE RESPONDENT SAYS "NOTHING"]**

**CONCLUDING STATEMENT:** That's all the questions I have for you. Thank you very much for your help. Would you like me to send you $10 via Amazon or Starbucks gift card?

Amazon
Starbucks
DO NOT READ, Prefers check

EMAIL
It will arrive in about 7 days. What email address would you like it sent to?
CAPTURE AND CONFIRM EMAIL.

Mailing (IF CHECK SELECTED AT CONCLUDING STATEMENT)

What is your mailing address:

Street
City, State Zip



Appendix B- SURVEY INSTRUMENT (Spanish)

**INSTRUMENTO DE ENCUESTA PREVIO A LA PRUEBA -- BORRADOR**

Nombre del encuestado: _____

Hola, ¿podría hablar con [RESPONDENT NAME]? No estoy vendiendo nada.

**SI LA PERSONA QUE ATIENDE EL TELÉFONO DICE: "¿Quién habla?":**

Mi nombre es _____, trabajo para Davis Research y llamo para hablar con [RESPONDENT FIRST NAME] sobre su trabajo para Sam's Club. Ofrecemos $10 por completar una encuesta de cinco minutos.

**SI LA PERSONA QUE ATIENDE EL TELÉFONO DICE: "¿Por qué llama? / ¿Puede decirme por qué llama?":**

Nos ha pedido que realicemos una encuesta por parte de los abogados que presentan reclamos en nombre de empleados actuales y anteriores de Sam's Club en una demanda pendiente.

**SI NADIE RESPONDE, DEJE EL SIGUIENTE MENSAJE DE VOZ:**

Hola, mi nombre es _____ y estoy llamando de Davis Research. No estoy vendiendo nada.  Llamo para realizar una encuesta sobre los problemas de empleo en Sam's Club, a pedido de los abogados que están presentando reclamos en nombre de empleados actuales y anteriores de Sam's Club en una demanda legal pendiente.  Por favor, llámeme al teléfono _____ para realizar la encuesta.  La encuesta tomará aproximadamente cinco minutos. Como agradecimiento, le enviaremos una tarjeta de regalo de $10 por haber completado la encuesta.

**CUANDO EL ENCUESTADO ESTÉ AL TELÉFONO:**

Hola, le llamo sobre su trabajo para Sam's Club, no estoy intentando venderle nada.  Mi nombre es _____ y estoy llamando de Davis Research. Le estamos llamando para realizar una encuesta sobre los problemas de empleo en Sam's Club, a pedido de los abogados que están presentando reclamos en nombre de empleados actuales y anteriores en una demanda legal pendiente.  Esta encuesta tomará aproximadamente cinco minutos. Como agradecimiento, le enviaremos una tarjeta de regalo de $10 por haber completado la encuesta.

[DISPO HERE – 99 TO CONTINUE]

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 860**



Esta encuesta es parte de un litigio y por eso necesito que sus respuestas sean lo más precisas posible.  Sus respuestas no serán anónimas y es posible que los abogados de Sam's Club lo cuestionen sobre sus respuestas. Por eso tómese su tiempo para responder a las preguntas. Aunque no esté completamente seguro/a de la respuesta exacta a una pregunta, por favor deme su mejor estimación.  Si no sabe la respuesta a una pregunta, también está bien contestar "No lo sé".  Simplemente necesitamos respuestas a la encuesta que sean lo más precisas y honestas posible.

**LÉALO SOLO SI ES NECESARIO:** Usted estará representado sin costo por los abogados que representan a los empleados si Sam's Club desea preguntarle acerca de sus respuestas de la encuesta. Es ilegal que Sam's Club tome medidas contra usted por participar en esta encuesta. Es poco probable que sea interrogado por los abogados de Sam's Club, simplemente tenemos que informarle que es posible.

**LÉALO SOLO SI EL ENCUESTADO SOLICITA ANONIMATO:** Su anonimato no puede ser garantizado. Es ilegal que Sam's Club tome medidas contra usted por participar en esta encuesta.

**NOTA PARA EL PROGRAMADOR:** Si el encuestado se niega a participar en la encuesta, lea lo siguiente:

01 CONTINUAR CON LA ENCUESTA
99 SE NEGÓ A RESPONDER

[IF 99 HERE OR REFUSED OR DNC IN INTRODUCTION OR IF MID-TERM AFTER Q1 READ. DON'T ALLOW MID-TERM UNTIL AFTER Q1]

[REFUSAL_REASON]

Es muy importante entender por qué no está dispuesto a participar en la encuesta.  ¿Podría decirme su razón?

**INGRESAR LA RESPUESTA PALABRA POR PALABRA**

[READ]

[INTERVIEWER: ¿Leyó alguno de estos dos opciones durante la introducción?]

    **(A) LÉALO SOLO SI ES NECESARIO:** Usted estará representado por los abogados que representan a los empleados sin costo para usted si Sam's Club desea preguntarle acerca de sus respuestas de la encuesta. Es ilegal que Sam's Club tome medidas contra usted por



participar en esta encuesta. Es poco probable que sea interrogado por los abogados de Sam's Club, simplemente tenemos que informarle que es posible.

**(B) LÉALO SOLO SI EL ENCUESTADO SOLICITA ANONIMATO:** Su anonimato no puede ser garantizado. Es ilegal que Sam's Club tome medidas contra usted por participar en esta encuesta.

01 Sí, leí ambas.
02 Sí, pero solo leí A
03 Sí, pero solo leí B
04 No

1.      ¿En este momento está usted empleado por Sam's Club?

   1.  Sí
   2.  No

   999.  (NO LEER) Se negó a responder [GO TO CONCLUDING STATEMENT]

1A.      [if Q1 = 1] ¿Cuál es su puesto de trabajo con Sam's Club? [capture verbatim]
[if Q1 = 2] ¿Cuál era su puesto de trabajo cuando trabajaba para Sam's Club? [capture verbatim]

   998.  (NO LEER) No lo sé
   999.  (NO LEER) Se negó a responder

1B.      ¿Ha trabajado en más de una sucursal de Sam's Club?

   1.  Sí
   2.  No

   998.  (NO LEER) No lo sé
   999.  (NO LEER) Se negó a responder

**LÓGICA DE OMISIÓN:**
   • SI P1B = 2, 998 O 999, PASE A LA INTRODUCCIÓN DE P2, PARTE I
   • Si P1B = 1, lea la siguiente afirmación: "Si trabajó para cualquiera de las siguientes sucursales de Sam's Club, no incluya esas experiencias de trabajo al responder las preguntas de la encuesta: Fresno, Folsom, Fountain Valley, Fullerton, Gardenia, Long Beach, Ontario o South Gate.  Le pedimos que hable en promedio de sus experiencias de trabajo en las otras sucursales de Sam's Club en



las que haya trabajado en California de junio de 2017 al presente."; PASAR A LA INTRODUCCIÓN DE P2, PARTE II

**[Q2 INTRO, PART I]** Esta encuesta solo se relaciona con su empleo con Sam's Club en sucursales de California a partir de junio de 2017.  Si trabajó con Sam's Club antes de este período o si trabajó en un depósito fuera de California, no incluya ese trabajo cuando responda a las preguntas.

**[Q2 INTRO, PART II]** Una última indicación: esta encuesta solo incluye su trabajo en turnos de cierre.  Un turno de cierre significa que, al final de su turno, se cerró la tienda a los clientes por ese día y se cerraron las puertas de entrada para que no pudieran entrar más clientes.

2.    Cuando había marcado su salida después de sus turnos de cierre y había llegado hasta la puerta para salir del depósito ¿con qué frecuencia tenía que esperar que un supervisor lo dejara salir del depósito?  ¿Tenía que esperar… **[NOTA PARA EL ENCUESTADOR:** Lea todas las opciones**]**

    1. Siempre
    2. La mayoría de las veces
    3. Ocasionalmente
    4. Casi nunca
    5. Nunca

    997.  (NO LEER) Nunca trabajé turnos de cierre
    998.  (NO LEER) No lo sé
    999.  (NO LEER) Se negó a responder

    **LÓGICA DE OMISIÓN:**
- Si P2 = 5, 997, 998 O 999, PASAR A P4
- Si Q2 = 1 PASAR a INTRODUCCIÓN DE P3

2A.    ¿En qué porcentaje de sus turnos de cierre tenía que esperar a que un supervisor lo dejara salir del depósito?

    [**NOTA PARA EL PROGRAMADOR:** Si P2A = 01, introduzca el porcentaje en la variable 2A-1.  Si P2A = 02, introduzca el inicio del rango en 2A-1 y el segundo número en 2A-2.]

    01 INTRODUCIR NÚMERO REAL **[ENTER PERCENTAGE]**



02 EL ENCUESTADO PROPORCIONA UN RANGO **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

998.  (NO LEER) No lo sé
999.  (NO LEER) Se negó a responder


**INTRODUCCIÓN DE P3**: Mi próxima pregunta es sobre cuánto tiempo tenía que esperar para que el supervisor lo dejara salir del depósito.  Esta pregunta incluye solo cuánto tiempo esperaba en la puerta.  No incluya el tiempo que demoraba en caminar desde el momento en que marcaba salida hasta la puerta.  Quiero saber sobre el tiempo típico o promedio que esperaba en la puerta.  Si solo en algunas ocasiones tuvo esperas muy largas, no las incluya en su cálculo de tiempo promedio.  Quiero saber lo que sucedía normalmente.

[**NOTA PARA EL ENCUESTADOR**: Haga una pausa y luego pregunte: "¿Tiene alguna pregunta sobre estas instrucciones o está listo para continuar con la encuesta?"]

[**NOTA PARA EL ENCUESTADOR:** Si el encuestado tiene preguntas sobre las instrucciones, infórmele que lo único que puede hacer es releer las instrucciones, y luego hágalo.]

3.      Los días que debía esperar que un supervisor lo dejara salir del depósito al final de sus turnos de cierre, ¿cuánto tiempo tenía que esperar normalmente?

[**NOTA PARA EL PROGRAMADOR:** Admita respuestas en segundos o minutos, e ingréselas como corresponde]

[ Si P3 = 01, introduzca el porcentaje en la variable 3-1.  Si P23 = 02, introduzca el inicio del rango en 3-1 y el segundo número en 3-2.]

01 [ENTER MINUTES]
02 [ENTER SECONDS]
03 EL ENCUESTADO PROPORCIONA UN RANGO [ENTER RANGE] **[ENTER TWO NUMBERS TO REPRESENT RANGE]**

998.  (NO LEER) No lo sé
999.  (NO LEER) Se negó a responder


Casi hemos terminado, solo tengo algunas preguntas finales que se utilizarán con fines estadísticos.

# DAVIS RESEARCH

4. Piense en todas las experiencias de trabajo que me ha descrito durante esta encuesta.  ¿Qué seguridad tiene de que las respuestas que me ha dado describen con precisión sus experiencias trabajando para Sam's Club?  Diría que está…

   1. Para nada seguro
   2. Algo seguro
   3. Moderadamente seguro
   4. Muy seguro
   5. Completamente seguro

   998.  (NO LEER) No lo sé
   999.  (NO LEER) Se negó a responder

5. ¿Cuál es el nivel de educación más alto que ha completado? [DO NOT READ CHOICES]

   1. Secundaria incompleta
   2. Diploma equivalente a la secundaria
   3. Diploma de secundaria
   4. Título técnico
   5. Algunos estudios universitarios
   6. Título universitario
   7. Título de posgrado
   8. Otro (especificar)

   999.  (NO LEER) Se negó a responder

6. ¿Cuál es su edad?

   INTRODUCIR EDAD

   999.  (NO LEER) Se negó a responder

7. ¿Cuál es su género?

   1. Masculino
   2. Femenino
   3. No binario
   4. Otro (especificar)

   999.  (NO LEER) Se negó a responder



8. Antes de mi llamada de hoy, ¿sabía algo sobre una demanda legal relacionada con Sam's Club?

> 1. SÍ

> 2. NO

> 998.  (NO LEER) No lo sé
> 999.  (NO LEER) Se negó a responder

> **LÓGICA DE OMISIÓN:**
> - Si P8 = 2, 998 O 999, PASE A LA CONCLUSIÓN

9. Le pido que me diga, de la manera más detallada posible, todo lo que pueda recordar sobre el propósito de cualquier demanda legal en relación con Sam's Club.  Voy a escribir su respuesta mientras usted hable, así que sería útil que hablara lentamente mientras yo escribo.  No me diga dónde escuchó lo que sabe o quién se lo dijo, solo dígame lo que sabe sobre el propósito de cualquier demanda legal relacionada con Sam's Club.

> ESCRIBIR RESPUESTA ABIERTA

> **[INVESTIGUE REPETIDAMENTE "¿QUÉ MÁS RECUERDA SOBRE EL PROPÓSITO DE CUALQUIER DEMANDA CON RESPECTO AL SAM'S CLUB?" HASTA QUE EL ENCUESTADO DIGA "NADA"]**

**CONCLUSIÓN:** Esas son todas las preguntas que tengo para usted. Muchas gracias por su ayuda. ¿Le gustaría recibir $10 en una tarjeta de regalo de Amazon o de Starbucks?

Amazon
Starbucks
NO LEER, Prefiere un cheque

CORREO ELECTRÓNICO
Llegará en 7 días aproximadamente ¿A qué dirección de correo electrónico le gustaría que la enviáramos?
CAPTURAR Y CONFIRMAR EL CORREO ELECTRÓNICO.

Dirección postal (SI SE SELECCIONÓ LA OPCIÓN DE CHEQUE EN LA CONCLUSIÓN)

Cuál es su dirección postal:

Calle
Ciudad, estado, código postal

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 866**



Appendix C- CERTIFICATE OF ACCURACY

**B BLEND**

Date: September 19th, 2023

## Certificate of Accuracy

Translated document: Marketing / Consumer/ Media Expert Translation

Date: September 19th, 2023                    Project #: 9236413

Source Language: English                        Target Language: Spanish
                                                (Mexico)

BLEND, the largest online professional translation agency, hereby certifies and states that the above mentioned document has been translated by a certified professional translator who has the background and experience needed to complete the translation. We further certify that, to the best of our knowledge, the translated document is an accurate translation of the original document and that it reflects the content, style and meaning of the original document.

This certificate only relates to the accuracy of the translation and not to the original content of the document. In accordance with our general terms and conditions, BLEND is not liable and will not be held liable for anything resulting from the use of the translation by the client or any other party.

Please find the translation attached.

Sincerely,
BLEND

GET BLEND LTD
13 Shonzino st. Tel Aviv Israel
info@team.getblend.com
1-770-752-4500

26610 Agoura Road Suite 240, Calabasas, CA 91302

**PAGE 867**

# EXHIBIT C

**Table A: Percent of Survey Respondents and Work Hours by Store Location**

| Store | % of Survey Respondents | % of Hours Worked by Survey Respondents |
|---|---|---|
| 4709 | 4.5% | 5.5% |
| 4735 | 3.1% | 4.4% |
| 4767 | 4.2% | 5.1% |
| 4799 | 3.4% | 3.8% |
| 4819 | 6.3% | 5.2% |
| 4822 | 6.3% | 5.1% |
| 4824 | 10.8% | 10.1% |
| 6235 | 1.3% | 0.8% |
| 6240 | 4.2% | 3.7% |
| 6378 | 5.2% | 5.1% |
| 6405 | 3.4% | 4.0% |
| 6433 | 4.5% | 4.8% |
| 6455 | 6.3% | 6.9% |
| 6609 | 2.1% | 2.5% |
| 6610 | 3.9% | 3.1% |
| 6612 | 5.0% | 5.5% |
| 6614 | 7.1% | 7.6% |
| 6621 | 3.9% | 4.0% |
| 6622 | 4.2% | 4.0% |
| 6624 | 5.0% | 4.3% |
| 6628 | 5.2% | 4.6% |
|  | --------------- | --------------- |
|  | 100.0% | 100.0% |

**PAGE 869**

# EXHIBIT D

**SUMMARY OUTPUT: Percent of shifts waiting is dependent variable**

| Regression Statistics | |
|---|---|
| Multiple R | 0.433103423 |
| R Square | 0.187578575 |
| Adjusted R Square | 0.157659372 |
| Standard Error | 0.347384773 |
| Observations | 367 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 13 | 9.835538074 | 0.756579852 | 6.269504473 | 1.20518E-10 |
| Residual | 353 | 42.59869163 | 0.12067618 | | |
| Total | 366 | 52.4342297 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 0.578086631 | 0.085634362 | 6.750638612 | 6.06177E-11 | 0.409668931 | 0.746504331 |
| Current Emp | -0.146675471 | 0.061595742 | -2.381259893 | 0.017783155 | -0.267816248 | -0.025534693 |
| Years Emp | -0.060956101 | 0.021034468 | -2.897915017 | 0.003991122 | -0.102324737 | -0.019587465 |
| First Call | -0.000490613 | 0.057130381 | -0.00858761 | 0.993153013 | -0.112849334 | 0.111868107 |
| 2nd or 3rd Call | 0.007288267 | 0.056299007 | 0.1294564 | 0.897070254 | -0.103435384 | 0.118011918 |
| Certain | 0.212884727 | 0.050076568 | 4.251184405 | 2.72545E-05 | 0.114398789 | 0.311370665 |
| College Deg | -0.023429076 | 0.047581943 | -0.492394272 | 0.622746746 | -0.117008816 | 0.070150664 |
| Age | -0.000225352 | 0.001488044 | -0.151442025 | 0.87971355 | -0.003151898 | 0.002701193 |
| Male | -0.120091597 | 0.039373494 | -3.050062009 | 0.002460901 | -0.197527723 | -0.042655471 |
| Know Specific | 0.174272748 | 0.070676944 | 2.465765191 | 0.014146964 | 0.035271907 | 0.313273589 |
| 2017 Work | -0.00054273 | 0.058711716 | -0.009243987 | 0.992629692 | -0.116011473 | 0.114926013 |
| 2018 Work | 0.034660771 | 0.061029535 | 0.567934378 | 0.57044058 | -0.085366443 | 0.154687986 |
| 2019 Work | 0.030257298 | 0.054532104 | 0.554852925 | 0.579346656 | -0.076991374 | 0.137505969 |
| 2020 Work | 0.086261827 | 0.055544133 | 1.553032202 | 0.121311502 | -0.022977209 | 0.195500863 |

**PAGE 871**

**SUMMARY OUTPUT: Unpaid time is dependent variable**

| Regression Statistics | |
|---|---|
| Multiple R | 0.375322792 |
| R Square | 0.140867199 |
| Adjusted R Square | 0.106712072 |
| Standard Error | 4.311007457 |
| Observations | 341 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 13 | 996.4485465 | 76.64988819 | 4.124335416 | 2.47538E-06 |
| Residual | 327 | 6077.224791 | 18.58478529 | | |
| Total | 340 | 7073.673338 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 4.14831236 | 1.11816482 | 3.709929239 | 0.000243539 | 1.94860809 | 6.34801663 |
| Current Emp | -1.642637734 | 0.79163314 | -2.074998696 | 0.038768304 | -3.199974155 | -0.085301313 |
| Years Emp | -0.567064737 | 0.271874393 | -2.085760015 | 0.03777523 | -1.101908306 | -0.032221169 |
| First Call | 0.193055533 | 0.721866867 | 0.267439249 | 0.789299581 | -1.227033528 | 1.613144594 |
| 2nd or 3rd Call | 0.581487251 | 0.708326753 | 0.820930804 | 0.412283749 | -0.811965087 | 1.974939589 |
| Certain | 2.278063383 | 0.646658479 | 3.52282303 | 0.000487724 | 1.005927654 | 3.550199111 |
| College Deg | -0.901164657 | 0.618130719 | -1.457886865 | 0.145831445 | -2.117179289 | 0.314849976 |
| Age | 0.00307776 | 0.020303921 | 0.151584516 | 0.879608121 | -0.03686503 | 0.04302055 |
| Male | -1.179855172 | 0.516101241 | -2.286092489 | 0.022888025 | -2.195152813 | -0.16455753 |
| Know Specific | 1.958911301 | 0.946475617 | 2.069690192 | 0.039266335 | 0.096961776 | 3.820860826 |
| 2017 Work | 0.506405124 | 0.769325556 | 0.65824555 | 0.510843513 | -1.007046811 | 2.019857059 |
| 2018 Work | 0.056478606 | 0.792996856 | 0.071221728 | 0.943264828 | -1.503540577 | 1.616497789 |
| 2019 Work | 0.373655474 | 0.699792073 | 0.533952139 | 0.593737434 | -1.003007056 | 1.750318004 |
| 2020 Work | 0.956721011 | 0.719715056 | 1.329305261 | 0.18467394 | -0.459134911 | 2.372576933 |

**PAGE 872**

# EXHIBIT X

**PAGE 873**

# UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARLOS SANCHEZ individually and on behalf of others similarly situated

vs.

SAM'S WEST, INC. DBA SAM'S CLUB

Case 2:21-CV-05122-SVW-JC

EXPERT REPORT OF DAVID BRESHEARS, CPA/CFF

January 3, 2024

**PAGE 874**

## I.    Introduction

1.   The opinions expressed in this report are my present opinions subject to the following reservations. Amendments or additions to this report may be required as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and/or the testimony of any other witness in deposition or at trial.

2.   I anticipate using at trial selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this report (i.e., redrafted to improve their presentation quality) and additional graphics illustrating concepts described in this report.

## II.    Assignment

3.   I have been retained by counsel for the named Plaintiff in the matter of *Carlos Sanchez v. Sam's West, Inc. dba Sam's Club* ("Defendant"). Plaintiff and Class Members have alleged that Defendant failed to pay for all hours worked, including overtime, due to time spent waiting to be released at the end of shifts during store closing procedures. I previously issued an expert report, dated June 3, 2022, where I reviewed the Declaration of Robert Crandall, MBA, dated May 11, 2022, and reviewed the time and pay records produced with respect to the named Plaintiff to respond to Mr. Crandall's assertion at paragraph 5 that "payroll data would [] not provide any information regarding the questions posed by this litigation."

4.   It is my understanding from counsel that Class Members are all current and former non-exempt employees who worked one or more "closing shifts" (defined as a shift in which the associate's punches reflect that they clocked out for the day at any time between 10:00 pm and 6:00 am)[1] for Defendant in California at any time from June 23, 2018 at the following store locations: (1) Bakersfield #4819; (2) Chino #6610; (3) Citrus Heights #4799; (4) Concord #6612; (5) Corona #4709; (6) El Monte #6614; (7) Glendora #6240; (8) La Habra #4735; (9) Murrieta #4822; (10) Oxnard #6455; (11) Palm Desert #6609; (12) Palmdale #4767; (13) Riverside #6378; (14) Roseville #6621; (15) Sacramento #6622; (16) San Bernardino #6624; (17) San Diego #6235; (18) Santa Clarita #4824; (19) Torrance #6628; (20) Vacaville #6433; and /or (21) Yuba City #6405. It is also my understanding that any individuals who held or hold the position of team lead are excluded from the Class.

5.   For purposes of this report, I have been asked to review the time and adjustment records produced in December of 2023 for survey respondents.

## III.    Summary of Expert Qualifications

6.   I am a Certified Public Accountant, licensed in the State of California, and Certified in Financial Forensics.  I am currently a partner at Hemming Morse, LLP, CPAs, Forensic and Financial Consultants.  My work in the accounting profession includes experience as

---

[1] i.e., including 10:00 pm and 6:00 am.

**PAGE 875**

an auditor and as a consultant.  My expert qualifications, including my testimony, are described in **Exhibit A** hereto.

7. I have consulted on and/or testified in over 450 matters involving class action-related disputes, including those arising under the FLSA and the California Labor Code. These matters have involved allegations of unpaid overtime, off-the-clock work, meal and rest break violations, employment misclassification, minimum wage violations, time shaving, record keeping violations, and unreimbursed business expenses.

8. My firm has been compensated for my review and analysis in this matter at my standard hourly rate of $600 per hour.  Others have assisted me in my work and my firm has been compensated for their work at their standard hourly rates.

## IV.    Summary of Opinions

9. I can use Defendant's time data to identify employee-specific "closing shifts" and apply a reasonable estimate of the off-the-clock time spent waiting to be released at the end of shifts during store closing procedures. So long as Defendant produces the same records as it did for survey respondents, I will be able to perform a similar analysis for each Class Member.

10. Based on my review of the time records, I have calculated at the applicable California minimum wage rate, for 361 employees and the named Plaintiff, potential off-the-clock damages of approximately $62,164 assuming 4.8 minutes per "closing shift." I have also calculated at the applicable California minimum wage rate, for 361 employees and the named Plaintiff, potential off-the-clock damages of approximately $55,581 assuming 4.3 minutes per "closing shift."

11. My review of the time adjustments appears to suggest that time adjustments do not relate to off-the-clock time spent waiting to be released at the end of shifts during store closing procedures.

## V.    Evidence Considered

12. In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field.  Those sources are identified throughout this report, as well as in **Exhibit B** to this report.

13. Specifically, I have been provided with two Excel files "WMSANCHEZ0000222_CONFIDENTIAL" and "WMSANCHEZ0000223_CONFIDENTIAL," which include (a) time punch detail, (b) "daily hours" detail, and (c) time adjustments.[2]

14. The time punch detail contains, among others, the following information: (a) employee ID (i.e., PUNCH_WIN_NBR), (b) store number, (c) punch date, (d) punch time, and (e) punch type (i.e., "in", "out meal", "in meal", and "out"). For purposes of this report, I have excluded from my analysis those time punches with a store number *not* listed above in paragraph 4, as well as those time punches related to eight employees that Plaintiffs' survey and statistical expert Dr. Jeffrey Petersen identified as always having "lead" in their job title.[3] As such, my analysis of the time punch detail relates to 361 employees from June 23, 2018 through November 10, 2023.

---

[2] The Excel files also include *time off* requests.

[3] i.e., employee IDs 213329817, 228935934, 226134940, 228946917, 211067189, 226170705, 208588624, and 218054278. If it is determined that other employees are excluded from the Class, I can

**PAGE 876**

15. The "daily hours" detail contains, among others, the following information: (a) employee ID, (b) store number, (c) business date (from June 23, 2018 through November 10, 2023), (d) pay category by type (e.g., regular, overtime, double time, vacation pay), and (e) the related number of hours. It appears that the business date is used by Defendant to calculate an employee's pay and reflects the calendar date.

16. The time adjustments contain, among others, the following information: (a) employee ID, (b) store number, (c) adjustment date, (d) time adjustment description (i.e., personnel update, paid vacation, and unpaid time off), (e) adjusted shift in time, (f) adjusted shift out time, (g) adjusted lunch out time, and (h) adjusted lunch in time. There are time adjustments from June 23, 2018 through February 5, 2021 for 273 of the 361 employees in my analysis.

17. As discussed in my prior expert report, I had also been provided with the time punch detail, "daily hours" detail and time adjustments for the named Plaintiff from June 21, 2019 through October 20, 2019 (i.e., "WMSANCHEZ0000006").

18. I have been provided with the Survey Instrument, the Survey Responses from Davis Research, and the Survey Responses and Analysis. It is my understanding from Dr. Petersen that with respect to the time spent waiting to be let out of the warehouse, the sample average is 4.8 minutes per closing shift and the lower bound of the 95% confidence interval is 4.3 minutes per closing shift.[4]

## VI.    Basis of Opinions

*Recorded Hours Worked*

19. I have used the punch times (as discussed above in paragraph 14) from "in" or "in meal" to "out meal" or "out" to determine, for each punch date, the number of recorded hours worked. For purposes of this report, as it is my understanding that the punch times are the basis on which employee were paid, I have excluded from my analysis those time punches where the recorded hours by employee punch date do not match to the related regular, overtime, and double time "daily hours" by employee business date (as discussed above in paragraph 15).[5]

20. I am informed by counsel that the California Labor Code provides that overtime is hours worked over eight in one workday and over 40 in any work week, as well as the first eight hours worked on the seventh consecutive day of work in any one work week. In addition, double time is hours worked over 12 in one workday and over eight on the seventh consecutive day of work in any one work week.

21. To determine regular, overtime, and double time hours with respect to the *recorded* hours worked (as discussed above in paragraph 19), I first summarized, the recorded hours worked per punch date and per work week. It appears that the standard work week was Saturday through Friday.

*Off-the-Clock Hours Worked*

22. As discussed above in paragraph 4, it is my understanding that a "closing shift" is a shift in which the employee's punches reflect that he or she clocked out for the day at any

---

update my analysis accordingly. (Forwarded email from Jeff Petersen, dated December 31, 2023 at 10:48 am, re: Sam's Club – Excluded Survey Participants.)

[4] Email from Jeff Petersen, dated December 22, 2023 at 4:53 pm, re: Sanchez v. Sam's Expert Reports.

[5] Of the 603,754 punch times analyzed, I have excluded 666 punch times, including duplicates.

**PAGE 877**

time between 10:00 pm and 6:00 am. I have been asked to assume that an employee waited off-the-clock to be released from the store on a shift when his or her last related out punch time was between 10:00 pm and 6:00 am.[6]

23. For purposes of this report, I have been asked to assume that, on those shifts when the last related out punch time was between 10:00 pm and 6:00 am, an employee waited, on average, 4.8 minutes off-the-clock to be released from the store. My analysis of the time punch detail indicates that 355 (of the 361) employees incurred 3.456.08 hours off-the-clock related to 43,201 shifts when they punched out between 10:00 pm and 6:00 am and had to wait to be let out of the building.[7]

24. I then determined, by business/calendar date, whether this additional time spent waiting off-the-clock is regular, overtime, and/or double time based on the California Labor Code and on recorded hours worked. Of the 3,456.08 off-the-clock hours (as discussed above in paragraph 23), 1,205.03 would be regular hours, 2,244.46 would be overtime hours, and 6.58 would be double time hours.

25. I have calculated off-the-clock damages as the applicable California minimum wage rate[8] multiplied by (a) one times the off-the-clock hours determined to be regular hours, (b) one and one-half times the off-the-clock hours determined to be overtime hours, and (c) two times the off-the-clock hours determined to be double time hours. Potential off-the-clock damages for the 355 employees total approximately $62,153, of which $15,776 relates to regular off-the-clock hours, $46,199 relates to overtime off-the-clock hours, and $177 relates to double time off-the-clock hours.

26. With respect to the named Plaintiff, my analysis of the time punch detail indicates that he incurred 0.80 hours off-the-clock related to ten shifts when he punched out between 10:00 pm and 6:00 am and had to wait 4.8 minutes to be let out of the building. Of the 0.80 off-the-clock hours, 0.48 would be regular hours and 0.32 would be overtime hours. Potential off-the-clock damages for the named Plaintiff, at the applicable California minimum wage rate, total approximately $12, of which $6 relates to regular off-the-clock hours and $6 relates to overtime off-the-clock hours.

27. As an alternative, I have been asked to assume that, on those shifts when the last related out punch time was between 10:00 pm and 6:00 am, an employee waited 4.3 minutes off-the-clock to be released from the store (i.e., Dr. Petersen's lower bound of the 95% confidence interval). My analysis of the time punch detail indicates that 355 (of the 361) employees incurred 3,096.07 hours off-the-clock related to 43,201 shifts when they punched out between 10:00 pm and 6:00 am and had to wait to be let out of the building. Of the 3,096.07 off-the-clock hours, 1,095.24 relates to regular off-the-clock hours, 1,995.09 relates to overtime off-the-clock hours, and 5.74 relates to double time off-the-clock hours. Potential off-the-clock damages, at the applicable California minimum wage rate, total approximately $55,571, of which $14,346 relates to regular off-the-clock

---

[6] For purposes of this report, I have assumed a new shift only when there is a gap greater than two hours between two instances of an employee's recorded work time (i.e., from "out meal" or "out" to "in meal" or "in") in order to keep together punch times that cross midnight as they have different punch dates.

[7] It appears that six out of the 361 employees did not work a "closing shift" as defined.

[8] The relevant California minimum wage rate is $11.00 per hour in 2018, $12.00 per hour in 2019, $13.00 per hour in 2020, $14.00 per hour in 2021, $15.00 per hour in 2022, and $15.50 per hour in 2023.

**PAGE 878**

hours, $41,070 relates to overtime off-the-clock hours, and $155 relates to double time off-the-clock hours.[9]

28. As an alternative, with respect to the named Plaintiff, my analysis of the time punch detail indicates that he incurred 0.72 hours off-the-clock related to ten shifts when he punched out between 10:00 pm and 6:00 am and had to wait 4.3 minutes to be let out of the building. Of the 0.72 off-the-clock hours, 0.43 would be regular hours and 0.29 would be overtime hours. Potential off-the-clock damages for the named Plaintiff, at the applicable California minimum wage rate, total approximately $10, of which $5 relates to regular off-the-clock hours and $5 relates to overtime off-the-clock hours.[10]

29. I will be able to perform a similar analysis for each Class Member if Defendant produces the same time data as it did for the survey respondents.

30. As discussed in my prior report, Dr. Crandall states that Sam's Club employees "utilized the time adjustment forms in order to be compensated for any wait time."[11] However, according to Robert Francis, who is currently a market people partner, he is not aware of any attendant code that an associate could select if he or she were making a time adjustment for time spent waiting to be released.[12] Similarly, according to documents produced by Defendant at WM-MARTINEZ0000367-384, there is no specific code for waiting at the end of a closing shift to be let out.

31. Based on my review of the time adjustments (as discussed above in paragraph 16), I can isolate the punches to which adjustments were made. Those that do not relate to clocking out at the termination of shift (i.e. adjusted shift in time, adjusted lunch out time, and/or adjusted lunch in time) would not impact the issue presented. Also, those that relate to a time adjustment description of paid vacation or unpaid time off would not impact the issue presented. Of the 15,363 time adjustments from June 23, 2018 through February 5, 2021 for 273 of the 361 employees in my analysis, 7,315 (or 47.6%) do not appear to relate to clocking out at the termination of shift between 10:00 pm and 6:00 am[13] and 7,249 (or 47.2%) relate to paid vacation or unpaid time off.

32. Only 799 (or 5.2% of 15,363) reflect an adjusted shift out time between 10:00 pm and 6:00 am. In addition, only 334 (or 2.2% of 15,363) time adjustments reflect an adjusted shift out time between 10:00 pm and 6:00 am that is not at the top of the hour or the bottom of the hour.

33. Similarly, all of the 15 time adjustments for the named Plaintiff (a) do not appear to relate to clocking out at the termination of the shift between 10:00 pm and 6:00 am or (b) relate to paid vacation.

---

[9] As another alternative, I could assume the amount of unpaid off-the-clock work time for closing shifts for those individuals surveyed - potential off-the-clock damages, at the applicable California minimum wage rate, total approximately $50,172, of which $13,033 relates to regular off-the-clock hours, $36,973 relates to overtime off-the-clock hours, and $165 relates to double time off-the-clock hours.

[10] As another alternative, I could assume the 15 minutes of unpaid off-the-clock work time based on Mr. Sanchez's declaration and deposition testimony - potential off-the-clock damages, at the applicable California minimum wage rate, total approximately $36, of which $18 relates to regular off-the-clock hours and $18 relates to overtime off-the-clock hours.

[11] Declaration of Robert Crandall, MBA: p. 5.

[12] Remote Videotaped 30(b)(6) Deposition of Sam's West, Inc. Robert Francis on March 1, 2022: p. 116.

[13] 477 time adjustments only have an adjusted shift in time, adjusted shift out time, adjusted lunch out time, and adjusted lunch in time of 12:00 am.

**PAGE 879**

34. If Defendant produces the same time adjustment data as it did for the survey respondents, I can perform a similar review for each Class Member.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Dated: January 3, 2024
Concord, CA


David Breshears

**PAGE 880**

Exhibit A



**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**CONCORD OFFICE**
1390 Willow Pass Road | Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

### Employment & Education

| | |
|---|---|
| 1999 – Present | **Hemming Morse**<br>**Forensic and Financial Consultants**<br>Partner, 2011 - Present<br>Manager, 2006 - 2010<br>Associate<br>Staff Accountant |
| 1998 | **California State University, Chico**<br>B.S. Accounting |

### Professional & Service Affiliations

- **Certified Public Accountant, State of California**
  - Since 2006

- **Certified in Financial Forensics**
  - Since 2008

- **American Institute of Certified Public Accountants**

- **California Society of Certified Public Accountants**

- **Association of Certified Fraud Examiners**
  - Associate Member

**PAGE 881**

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

CONCORD OFFICE
1390 Willow Pass Road | Suite 410
Concord, CA 94520
T: 415.836.4000

# DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

## Presentations & Seminars

- "Wage and Hour Law in the Era of the Wandering Workforce and Great Reshuffle", ABA 17th Annual Labor and Employment Law Conference, November 2023

- "E-Discovery & Electronically Stored Information 101" Beeson Tayer & Bodine, May 2013

- "How to Collect, Produce, and Use E-Documents: A Practical Primer", BASF - Labor & Employment Conference, Yosemite, February 2013

- "Forensic Accounting for Today's Busiest Practice Areas", Continuing Education of the Bar-California, March 2012

- "Utilizing Experts in Wage and Hour Litigation" Buchalter Nemer, July 2011

- "Class Action Employment Litigation" California Socity of Certified Public Accountants- State Steering Committee, August 2010

## Testimony

### Trial

- Munguia-Brown et al. v. Equity Residential et al (2023), U.S. District Court, Northern District Of California Oakland Division, Case No. 4:16-cv-01225-JSW-TSH

- Jose Hernandez v. The Bundox Restaurant Corp. (2019), Superior Court of the State of California County of San Francisco, Case No. CGC-18-570243

- William Lloyd Helmick, et al. v. Air Methods Corporation (2019), Superior Court of the State of California County of Alameda, Case No. RG13665373

- Julie Gunther v. Alaska Airlines, Inc. et al (2019) Superior Court of the State of California County of San Diego North County Branch Case No. 37-2017-00037849-CU-OE-NC

- Stacy Ernst, et al v. City of Chicago (2017) U.S. District Court, Northern District of Illinois, Eastern Division, Case No. 1:08-cv-04370

- Sanchez, et al. v. McDonald's Restaurants of California, Inc. (2017), Superior Court of the State of California County of Los Angeles, Case No. BC499888

- Honora Keller et al v. The Board of Trustees of California State University (2015) Superior Court of the State of California County of San Francisco, Case No. CGC-09-490977

- Amanda Quiles, et al v. Koji's Japan Incorporated, et al. (2014), Superior Court of the State of California County of Orange, Case No. 30-2010-00425532-CU-OE-CXC

**PAGE 882**

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

CONCORD OFFICE
1390 Willow Pass Road | Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

## Testimony

### Trial continued

- Ming-Hsiang Kao v. Joy Holiday, Joy Express, Inc., et al. (2014), Superior Court of the State of California County of San Mateo, Case No. CIV509729

- Salinas, et al. v. Imperial Irrigation District (2014) Superior Court of the State of California City and County of Riverside, Case No. 10017367

- Amerman v. Gurvinder Musafar (2013) Superior Court of the State of California County of Santa Clara, Case No. 112CV226364

- Michael J. Pexa v. Farmers Group, Inc. (2012) Superior Court of the State of California County of Sacramento, Case No. 34-2009-00034950

- Marina Puchalski and Rajeev Chhibber v. Taco Bell Corp. (2012), Superior Court of the State of California County of San Diego, Case No. GIC 870429

- Maria Martinez and Juana Guzman v. Jatco, Inc. (2011), Superior Court of the State of California County of Alameda, Case No. RG08397316

## Testimony

### Deposition

- Ruby Bonner et al. v. Providence Health System – Southern California (2023), Superior Court of California, Los Angeles, Case No. 21STCV09585

- Edward Bouissey, et al. v. Swift Transportation Co., Inc., et al. (2023), United States District Court, Central District of California, Case No. 2:19-cv-03203-VAP-KKx

- Joseph Gross v. Central Towing & Transport, LLC, et al. (2023), Superior Court of California, Alameda, Case No. 23CV031629

- LBF Travel Management Corp., and Michael Thomas v. Thomas DeRosa (2023), United States District Court, Southern District of California, Case No. 3:20-cv-02404-MMA-AGS

- Sally Packard et al. v. Saddleback Memorial Medical Center (2023), Superior Court of California, County of Orange, Case No. 30-2017-00952714-CU-OE-CXC

- Cody Lopez et al. v. Giorgio Armani Corp. (2022), Superior Court of California, County of Los Angeles, Central District, Case No. BC717329

- Chacon et al. v. Express Fashion Operations, LLC. (2022), United States District Court, Central District of California, Case No. 8:19-cv-00564

- Cody Meeks et al. v. Skywest Airlines, Inc. (2021), U.S. District Court, Northern District Of California, Case No. 17-cv-01012-JD

**PAGE 883**

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

CONCORD OFFICE
1390 Willow Pass Road I Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

## Testimony

### Deposition continued

- **Munguia-Brown et al. v. Equity Residential et al (2021),** U.S. District Court, Northern District Of California Oakland Division, Case No. 4:16-cv-01225-JSW-TSH

- **Hernan Hernandez, et al. v. Restoration Hardware,Inc. and HomeDeliveryLink, Inc. (2021),** Superior Court of California, County of San Bernardino, Case CIVDS1723322

- **Yessica Rodriguez, et al. v. California Payroll Group, Inc., et al. (2021),** Superior Court of the State of California, County of San Bernardino, Case No CIVDS 1829017

- **Sandy Duvet, et al. v. Pine Valley Center for Rehabilitation and Nursing (2021),** Superior Court of California, County of San Bernardino, Case CIVDS1723322

- **Omid Ahmad v. Lyft, Inc. (2020),** The American Arbitration Association, Case No. 01-20-0001-7550

- **Hernandez-Angel v. The Bundox Restaurant Corporation (2019),** Superior Court Of The State Of California County Of San Francisco, Case No. CGC-18-570243

- **Nicole Lopes, et al. v. Kohl's Department Stores, Inc. (2019),** Superior Court of the State of California County of Alameda, Case No. RG08380189

- **Paulette Diaz, et al. v. MDC Restaurants, LLC, et al (2019),** Eighth Judicial District Court In and For Clark County, State of Nevada, Case No. A-14-701633

- **Julie Gunther v. Alaska Airlines, Inc. et al (2019)** Superior Court of the State of California County of San Diego North County Branch Case No. 37-2017-00037849-CU-OE-NC

- **Matthew Carr, et al. v. Flower Foods, Inc. and Flowers Baking Co. of Oxford, LLC (2019)** U.S. District Court, Eastern District of Pennsylvania Case No. 15-6391

- **Luke Boulange, et al. v. Flower Foods, Inc. and Flowers Baking Co. of Oxford, LLC (2019)** U.S. District Court, District of New Jersey Case No. 16-2581

- **Abdul Nevarez et al v. Forty Niners Football Company, LLC. (2018)** U.S. District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-07013-LHK

- **William Lloyd Helmick, et al. v. Air Methods Corporation (2018)** Superior Court of the State of California County of Alameda, Case No. RG13665373

- **Melissa J. Clothier, et al v. Spar Marketing Services, Inc. (2018),** Superior Court of the State of California County of Alameda, Case No. RG12639317

**PAGE 884**

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

CONCORD OFFICE
1390 Willow Pass Road I Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF                    HEMMING.COM

## Testimony

### Deposition continued

- **Michael Carrow, et al v. FedEx Ground Package Systems, Inc., (2018)**, U.S. District Court, District of New Jersey, Case No. 1:16-cv-3026-RBK-JS

- **Paula L. Blair, et al v. Rent-A-Center, Inc., (2018)** U.S. District Court, Northern District of California, San Francisco Division, Case No. 3:17-cv-02335-WHA

- **Nick Neff, et al. v. Flower Foods, Inc., Lepage Bakeries Inc., and CK Sales Co., LLC (2018)** U.S. District Court, District of Vermont Case No. 5:15-cv-00254

- **Timothy Noll, et al. v. Flower Foods, Inc., Lepage Bakeries Inc., and CK Sales Co., LLC (2018)** U.S. District Court, District of Maine Case No. 1:15-cv-00493-JAW

- **Som Swamy, et al. v. Title Source, Inc (2018)** U.S. District Court, Northern District of California Case No. 17-CV-01175-JCS

- **Bernstein, et al. v. Virgin America, Inc. (2017)** U.S. District Court, Northern District of California Case No. 15-CV-02277-JST

- **Marley Castro et al. v. ABM Industries, Inc. et al (2017),** Superior Court of the State of California County of Alameda, Case No. RG14745764

- **Starvona Harris and Jonathan Strickland v. Best Buy Stores, L.P. (2017),** U.S. District Court, Northern District Of California Oakland Division, Case No. 4:17-CV-00446HSG

- **David Collinge, et al. v Intelliquick Delivery, Inc., et al. (July 2017),** U.S. District Court, District of Arizona Case No. CV12-00824-PHX-JWS

- **Stacy Ernst, et al v. City of Chicago (2017)** U.S. District Court, Northern District of Illinois, Eastern Division, Case No. 1:08-cv-04370

- **Sanchez, et al. v. McDonald's Restaurants of California, Inc. (2017),** Superior Court of the State of California County of Los Angeles, Case No. BC499888

- **David Collinge, et al. v Intelliquick Delivery, Inc., et al. (February 2017),** U.S. District Court, District of Arizona, Case No. CV12-00824-PHX-JWS

- **Salazar, et al. v. McDonald's Corp., et al. (2016)** U.S. District Court, Northern District of California Case No. 3:14-cv-02096-RS

- **Jamie Steeb v. Overlake Hospital Medical Center (2016),** Superior Court of the State of Washington for King County, Case No. 15-2-16399-0 SEAS

- **Bernstein, et al. v. Virgin America, Inc. (2016)** U.S. District Court, Northern District of California Case No. 15-CV-02277-JSTS

**PAGE 885**

# HEMMING | MORSE
### FORENSIC & FINANCIAL CONSULTANTS

**CONCORD OFFICE**
1390 Willow Pass Road I Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

## Testimony

### Deposition continued

- John Hance, et al. v. Super Store Industries (2016) Superior Court of the State of California County of Stanislaus, Case No. 673904

- Daniel Villalpando v. Exel Direct Inc. (2016) U.S. District Court, Northern District of California Case No. 3:12-cv-04137-JCS

- Chris Elliott, et al. v. Schlumberger Technology Corporation (2016), U.S. District Court, District Court of North Dakota, Fargo Division Civil Action No. 3:13-cv-00079

- Sanchez, et al. v. McDonald's Restaurants of California, Inc. (2015), Superior Court of the State of California County of Los Angeles, Case No. BC499888

- Betelhem Shiferaw v. Sunrise Senior Living Management, Inc. (2015) U.S. District Court, Central District of California Case No. 2:13-cv-02171-JAK-PLA

- Honora Keller et al v. The Board of Trustees of California State University (2015) Superior Court of the State of California County of San Francisco, Case No. CGC-09-490977

- Ming-Hsiang Kao v. Joy Holiday, Joy Express, Inc., et al. (2014), Superior Court of the State of California County of San Mateo, Case No. CIV509729

- Fraser, et al. v. Patrick O'Connor & Associates, L.P. (2014), U.S. District Court, Southern District of Texas Case No. 4:11-cv-03890

- Salinas, et al. v. Imperial Irrigation District (2014) Superior Court of the State of California City and County of Riverside, Case No. 10017367

- Smith, et al. v. Family Video Movie Club, Inc. (2013), U.S. District Court, Northern District of Louisiana Case No. 1:11-cv-01773

- Lang v. DirecTV, Inc. (2013) U.S. District Court, Eastern District of Louisiana Case No. 2:10-cv-01085-NJB-SS

- Sabas Arredondo, et al. v. Delano Farms Company, et al. (2013), Eastern District of California, Fresno Division Case No. 1:09-cv-01247-LJO-DLB

- Gabriel Fayerweather v. Comcast Corporation (2012), Superior Court of the State of California County of San Diego, Case No. C-08-01470

- Green v. Konica Minolta Business Solutions U.S.A., Inc. (2012), U.S. District Court, Northern District of Illinois Eastern Division, Case No. 11-CV-03745 (N.D. Ill.)

- Marina Puchalski and Rajeev Chhibber v. Taco Bell Corp. (May 2012), Superior Court of the State of California County of San Diego, Case No. GIC 870429

**PAGE 886**

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

CONCORD OFFICE
1390 Willow Pass Road I Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

### Testimony

**Deposition** continued

- Marina Puchalski and Rajeev Chhibber v. Taco Bell Corp. (April 2012), Superior Court of the State of California County of San Diego, Case No. GIC 870429

- Martin Marine v. Interstate Distributor Co. (2012) Superior Court of the State of California County of Alameda, Case No. RG073582777

- Maria Martinez and Juana Guzman v. Jatco, Inc. (2011), Superior Court of the State of California County of Alameda, Case No. RG08397316

### Selected Case Experience

- Engaged as damage expert by plaintiff, to analyze and quantify; meal and rest period claims, improper distribution of gratuities, and off-the-clock hours, for an upscale restaurant chain.

- Engaged as damage expert by defendant, a farm labor contractor, to evaluate claims related to off-the-clock hours worked and expense reimbursement for small tools for over 20,000 employees.

- Engaged as neutral accounting expert by plaintiff and defendant to calculate potential unpaid hours worked and additional overtime premiums for commission bonuses, for a manufacturing/engineering firm.

- Expert for the plaintiff. Retained to determine the frequency and magnitude of time shaving claims of a mid-size manufacturing firm.

- Provided consulting services to defense counsel in a class-action wage and hour matter, which alleged that hundreds of County employees were paid improper overtime wages under the FLSA. Prepared analyses using hours worked records, compensation data, employee records, and other data to determine the proper calculation of employees' regular rate of pay and related overtime compensation.

- Assisted counsel in preparing a case involving unpaid overtime, meal and rest break violations, and off-the clock time for an employee of a hotel chain. Reviewed employment history files, time records, and  other documents to determine the number of potential violations and to quantify damages.

**PAGE 887**



**CONCORD OFFICE**
1390 Willow Pass Road I Suite 410
Concord, CA 94520
T: 415.836.4000

# DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

## Selected Case Experience continued

- Assisted expert for plaintiffs' counsel in a class-action wage and hour matter, which alleged that over 250 small business banking officers were improperly classified as exempt. Reviewed statistical sample of hours worked, salary and commission related earnings, paid time off records, and other data to determine the damages related to unpaid overtime and missed meal breaks.

- Assisted expert for plaintiffs' counsel in a class action matter against a fortune 500 company, which alleged that a class of several hundred individuals was misclassified as independent contractors in the state of Washington. Prepared analysis of average earnings across all class members and performed comparison to national averages for similarly situated employees and independent businesses. Performed business valuation services to determine economic value of independent contractor assets and to incorporate any discounts that may apply related to the controls and requirements of the customer/employer operating agreement.

- Assisted expert for plaintiffs' counsel in a class-action matter against a Fortune 500 company, which alleged that over 75,000 California employees were required to pool their tips with supervisory employees in direct violation of the California Labor Code.

- Provided consulting services to plaintiffs' counsel in a class-action wage and hour matter, which alleged that hundreds of employees were not paid the proper "living wage" in accordance with the company's contractual obligation. Created a database of hours worked and earnings information from paper and electronic records, and then providing damages estimates based on a variety of assumptions and legal theories.

- Advised counsel on class certification issues by applying economic and statistical approaches to analyze evidence relating to class member variation, if any, and to determine both liability and damages.

- Consulted for Health Provider in a dispute involving a guaranteed maximum price contract for the construction of various structures. Assisted the expert in analyzing construction costs incurred and calculating the amount due to the general contractor.

- Performed statistical and contractual analysis for labor settlement or arbitration purposes, including analysis of pay and benefi ts, job content, productivity, labor costs, and profitability.

- Consulted clients in their efforts to identify overpayments of construction projects; discover errors and identify unreasonable project charges; identify weaknesses in contractual agreements; reduce risks of fraud, waste, and abuse; and recover payments made in error.

**PAGE 888**

**Exhibit A**



**CONCORD OFFICE**
1390 Willow Pass Road | Suite 410
Concord, CA 94520
T: 415.836.4000

## DAVID M. BRESHEARS, CPA/CFF

HEMMING.COM

### Selected Case Experience continued

- Prepared financial analyses in connection with assignments involving fraud, contract disputes and lost profits.

- Performed extensive research for a variety of cases, including cases involving fraud, contract disputes, and lost profits.

- Created various databases and/or tested the accuracy of databases created by others in order to assimilate large amounts of information to be presented in a meaningful manner.

- Managed audit engagements from planning to reporting, including delegation and review of staff assignments and control of time and expenses.

- Prepared and examined financial reports including research and analysis of technical accounting issues.

- Analyzed client accounting systems and related controls and developed specific recommendations for improvements.

**PAGE 889**

**Carlos Sanchez et al v. Sam's West, Inc. dba Sam's Club**
**Exhibit B: Evidence Considered**

Dfdnts Opposition to Pltfs Mtn for Class Cert -475023.pdf

Sanchez Depo Transcript-482596.pdf

WMSANCHEZ0000003.xlsx

WMSANCHEZ0000006.xlsx

(Filed) Decl. Dr. Jeffery Petterson Expert Report-474764.pdf

(Filed) Mtn for Class Certificaiton-474821.pdf

Crandall Dec.pdf

Declaration of Carlos Sanchez ISO Motion for Class Certification (signed....pdf

Deo Decl._Pages from Evidence ISO Opp.pdf

JohnReliga_PDFTran-482614.pdf

Francis Dec. Pages from Evidience ISO Opp-2.pdf

WMSANCHEZ0000222_CONFIDENTIAL.xlsx

WMSANCHEZ0000223_CONFIDENTIAL.xlsx

Survey Instrument -- Sam's Club.pdf

Survey Responses from Davis Research -- Sam's Club.xlsx

Survey Responses and Analysis -- Sam's Club.xlsx

Email from Jeff Petersen, dated December 22, 2023 at 4:53 pm, re: Sanchez v. Sam's Expert Reports

(Forwarded) Email from Jeff Petersen, dated December 31, 2023 at 10:48 am, re: Sam's Club – Excluded Survey Participants

WM-MARTINEZ0000367 - WM-MARTINEZ0000384

**PAGE 890**