PALOMA P. PERACCHIO, CA Bar No. 259034
paloma.peracchio@ogletree.com
CARMEN M. AGUADO, CA Bar No. 291941
carmen.aguado@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

MITCHELL A. WROSCH, CA Bar No. 262230
mitchell.wrosch@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

Attorneys for Defendant
SAM'S WEST, INC. DBA SAM'S CLUB

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendants. | Case No. 2:21-cv-05122-SVW-JC<br><br>**DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>[*Concurrently filed with Summary of Evidence; Evidentiary Objections to Plaintiff's Evidence; and Appendix of Evidence*]<br><br>Complaint Filed: June 23, 2021<br>Trial Date:      None<br>District Judge:  Hon. Stephen V. Wilson<br>                 Courtroom 10A, First St.<br>Magistrate Judge: Hon. Jacqueline Chooljian<br>                 Courtroom 750, Roybal |

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS
SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS                                                      Page

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

I.  INTRODUCTION ....................................................................................1

II. RELEVANT FACTS .................................................................................3

    A. Sam's Club's Business ........................................................................3

    B. Sam's Club Prohibits Off-The-Clock Work.........................................3

    C. Sam's Club's Policy Is To Compensate Associates For All Hours Worked Or Under Its Control..............................................................4

    D. Sam's Club Policy Is To Ensure PCMs Can Immediately Exit Clubs .............5

    E. Closing Practices Vary Club To Club .................................................6

    F.  Closing Practices Vary By PCM .......................................................7

    G. PCMs Can Submit Time Adjustments Or Punch Out Near The Exit ...............7

III. LEGAL STANDARD ...............................................................................8

IV. PLAINTIFF HAS NOT PROVEN THE ELEMENTS OF RULE 23 .................8

    A. Plaintiff Fails To Prove Commonality Or Predominance .................................8

        1.  Sam's Club's Policies Do Not Establish Commonality Or Predominance ..9

            (a)  The Court Already Ruled The Written Policies Do Not Establish Commonality and Predominance........................................ 10

            (b)  Sam's Club Policy Is To Ensure PCMs Can Promptly Exit The Clubs, Which Managers Implement Differently ............................... 11

            (c)  Sam's Club Policies Prohibit Off-The-Clock Work And Provide For Time Adjustments ................................ 13

        2.  Plaintiff's Survey Does Not Establish Commonality Or Predominance ... 14

            (a)  The Survey Is Inappropriate In This Case........................................ 15

            (b)  The Survey Is Not Probative of Liability ......................................... 16

                (i)  The Survey Defined "Closing Shift" Too Broadly...................... 16

                (ii)  The Survey Asked About Experiences For A Year Outside Of The Proposed Class Period..................................... 17

                (iii)  The Survey Does Not Account For Variation .......................... 18

                (iv)  The Survey Did Not Ask About Time Adjustments ................. 19

Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

(v)    The Survey Asks No Questions About Sam's Club's Knowledge ..................................................................... 21

(vi)    The Survey Responses Are Unreliable ..................................... 21

(vii)    The Survey Does Not Account For De Minimis Time ............... 21

(viii)    Other Evidence Shows That The Survey Cannot Establish Commonality Or Predominance .................................................. 22

3.   Sam's Club's Knowledge Of OTC Work Cannot Be Established Through Common Evidence .................................................................. 22

4.   Testimony From PCMs Demonstrate That Individualized Inquiries Predominate Over Common Questions ........................................ 23

B.   Plaintiff Fails To Establish Numerosity ................................................ 25

V. CONCLUSION ............................................................................................... 25

Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

## TABLE OF AUTHORITIES

**Page (s)**

**Federal Cases**

*Bayer v. Neiman Marcus Group, Inc.*
  861 F.3d 853 (9th Cir. 2017)......................................................................................8

*Castillo v. Bank of Am., N.A.*
  980 F.3d 723 (9th Cir. 2020).......................................................................9, 16, 21

*Howard v. CVS Caremark Corp.*
  2014 WL 11497793 (C.D. Cal. Dec. 19, 2014)........................................................9

*Jamie S. v. Milwaukee Pub. Schools*
  668 F3d 481 (7th Cir. 2012)......................................................................................8

*Jimenez v. Allstate Ins. Co.*
  765 F.3d 1161 (9th Cir. 2014)...................................................................................9

*Koike v. Starbucks Corp.*
  378 Fed. App'x 659 (9th Cir. 2010).........................................................................23

*Mays v. Wal-Mart Stores, Inc.*
  2018 WL 5024919 (C.D. Cal. Aug. 22, 2018)........................................................25

*Miles v. Kirkland's Stores Inc.*
  89 F. 4th 1217 (9th Cir. 2024)........................................................................13, 20

*Nevarez v. Costco Wholesale Corp.*
  2019 WL 7421960 (C.D. Cal. Dec. 26, 2019)..........................................................9

*Rodriguez v. Nike Retails Servs., Inc.*
  928 F.3d 810 (9th Cir. 2019)...................................................................................22

*Tyson Foods, Inc. v. Bouaphakeo*
  577 U.S. 442 (2016) ...................................................................................9, 15, 16

*Wal-Mart Stores v. Dukes*
  564 U.S. 338 (2011) .........................................................................8, 15, 16, 23

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*
  571 F.3d 953 (9th Cir. 2009)....................................................................................9

**Rules**

Fed. R. Civ. P. 23.............................................................................................8, 23, 25

Fed. R. Civ. P. 23(a) ..............................................................................................8

Fed. R. Civ. P. 23(b)(2) ..........................................................................................8

Fed. R. Civ. P. 23(b)(3) ...........................................................................8, 9, 17, 21

Fed. R. Civ. P. 30(b)(6) ..........................................................................................12

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS
SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

In 2022, Plaintiff moved to certify a class of all hourly associates of Sam's Club in California who worked one or more closing shifts, alleging Sam's Club's policies caused these associates to work off-the-clock. Specifically, Plaintiff argued that all Sam's Clubs in California lock their doors to the public after the clubs are closed, thereby "locking-in" closing associates at the end of their shifts. Per Plaintiff, these closing associates were required to clock out and then wait at the exits for key-carrying supervisors to arrive to let them out, and are therefore entitled to unpaid wages for off-the-clock work. On May 4, 2023, this Court denied Plaintiff's motion because common questions did not predominate over individual ones. (ECF No. 63 at 9.) The Court found that "Plaintiff ha[d] not submitted substantial evidence of a policy resulting in uncompensated waiting time, and that individualized questions regarding store-by-store variation and even shift by shift variation predominate." (*Id.* at 8.) Relying on substantially the same evidence as before, Plaintiff now moves to certify a class of hourly associates (excluding "Team Leads") who clocked out anytime between 10:00 p.m. and 6:00 a.m., at 21 of Sam's Club's 29 California locations ("Putative Class Members" or "PCMs"). Plaintiff, however, does not explain how this putative class is any more certifiable than the prior putative class, nor does Plaintiff address any of the issues that doomed his first motion. Rather, Plaintiff has simply repurposed the same motion the Court previously found lacking. Plaintiff's renewed motion should also be denied.

First, as was the case with Plaintiff's prior motion, Sam's Club's policies still require club management to ensure PCMs can promptly exit the clubs at the end of their shifts, and prohibit working off-the-clock. The policies further require that PCMs submit time adjustments for any time spent working off-the-clock, including for waiting to be let out of the club. Thus, Sam's Club's policies: (1) prohibit off-the-clock work; (2) mandate time adjustments; and (3) are "designed to let out PCMs in a timely

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

fashion," as the Court previously observed (ECF No. 63 at 6). As the Court ruled last time, the policies do not present common evidence that can satisfy predominance. (*Id*.)

Second, as was the case with Plaintiff's first motion, individualized questions predominate among the PCMs who work closing shifts at the 21 clubs at issue. These clubs continue to employ different practices to ensure that PCMs can exit in a timely fashion between 10:00 p.m. and 6:00 a.m. For example, some clubs position a member of management at the exit door before 11:30 p.m. so that the group of PCMs leaving at that time can simply walk through an unlocked door after clocking out. Some managers notify PCMs when the end of their shift is approaching and advise them to clock out and meet the manager at the exit. At other clubs, PCMs exit as a group along with a manager, after turning in equipment.

Third, as was the case with Plaintiff's first motion, certifying Plaintiff's class would mean certifying a class where a substantial number of PCMs were not injured at all because of varying individual circumstances. Plaintiff attempts to minimize this by submitting a deeply flawed survey that purports to measure the percentage of PCMs who have had to "wait" to be let out at the end of their shifts. Yet, the survey itself reveals that many PCMs report they *never* had to wait at the exits after clocking out, and fails to account for the fact that other PCMs, due to varying closing procedures, should never have waited to exit the clubs. For example, Plaintiff includes associates from Club # 6621 in Roseville in his survey and class definition, but associates there can and do let themselves out through the tire center door. At Club # 6433 in Vacaville, PCMs can and do let themselves out through the unlocked receiving door – yet they are also included in the survey. Individualized inquiries are needed to determine *why* a PCM at Club # 6621 or Club #6433 would wait for a member of management to open the exit door when the PCM could exit without assistance. Additionally, if PCMs from any of the 21 clubs were required to wait at the exit, further inquiry is needed to determine whether the PCMs submitted a time adjustment to be compensated for the wait time, and, if not, why not. Wait time is compensable time for which an adjustment

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

would be permitted under Sam's Club policies, and numerous PCMs – including a survey respondent – testified that they have submitted time adjustments for this. Yet Plaintiff's survey does not ask a single question about time adjustments. Plaintiff's survey is the *only* new evidence submitted with his renewed motion and it does not - and cannot - answer these fundamental questions.

Common questions do not predominate because there was no universal policy or practice that required PCMs to wait off the clock or resulted in PCMs waiting off the clock to be let out of the clubs. As was the case with Plaintiff's prior motion, the parties have submitted opposing evidence from each club, and the Court will need to consider each PCM's unique circumstances to determine whether the PCM experienced compensable wait time. This is needed for each PCM – over a seven-year period – at 21 different clubs. Plaintiff's renewed motion should be denied.

## II.  RELEVANT FACTS

### A. Sam's Club's Business

Sam's Club is a chain of membership-only retail warehouse clubs. (Robert Francis Decl., ¶ 3.) There are 29 Sam's Club locations in California. (*Id*.) Each Sam's Club has hundreds of employees, managed by a General (Club) Manager and Assistant Managers. (*Id*.) Club Managers have discretion as to how to run their clubs, so long as they comply with Sam's Club's policies and with California law. (*Id*.)

### B. Sam's Club Prohibits Off-The-Clock Work

Sam's Club's policy is to pay PCMs for all time worked, and for all time that they are under its control. (Summary of Evidence ("SOE") 1.) Sam's Club's "Associate Pay Policy – California" ("Pay Policy") has always expressly prohibited "off the clock work," which is defined as "any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic time adjustment." (SOE 2.)

At all relevant times, the Pay Policy has stated: "If you perform work while not clocked in, you must keep track of all time worked and immediately submit an

3

appropriate time adjustment for that time." (SOE 3.) It offers a non-exhaustive list of examples of "off the clock" work, including reporting to work at scheduled time but waiting to clock in, responding to work-related calls or emails while off the clock, or taking training manuals home to learn skills related to work. (*Id*.) It also discusses "other paid activities" associates should be compensated for, including waiting on the premises to receive medical attention at work, time spent in mandated drug and alcohol screenings, and time spent in meetings, for example. (*Id*.) It provides that:

> If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at your earliest opportunity.

Sam's Club's current Pay Policy, updated on May 3, 2023, also includes the following language (in bold):

> If you are unable to clock in and/or out due to the nature of your job, or you otherwise perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment form for that time at your earliest opportunity. **This may include a situation where you are unable to leave the facility immediately after clocking out**. If you are unable to fully capture such time while on the clock, you must keep track of that time and submit an appropriate time adjustment promptly.

However, the 2023 Pay Policy was essentially a tweak in language – not a change in substance – as Sam's Club's practice during the entire class period has been that associates who were unable to timely exit the clubs, through no fault of their own, are expected to submit time adjustments to be compensated for that time. (SOE 5, 6.)

**C. Sam's Club's Policy Is To Compensate Associates For All Hours Worked Or Under Its Control**

Sam' Club pays for all time recorded by PCMs through time punches and time adjustments. (SOE 1.) PCMs can submit time adjustments to correct their time records to ensure they are paid for all hours worked, including off-the-clock work, and time spent waiting off-the-clock to be let out of the club after closing. (SOE 3, 4, 5, 6, 41.) This has been true the entire class period. (SOE 6, 7.) PCMs can submit time

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

adjustments without management approval, at any time, at any of the many time clocks and computer terminals located throughout the club. (SOE 8, 46.) As part of the onboarding process, associates are trained on these policies related to off-the-clock work, timekeeping integrity, and time adjustments, all of which are part of Sam's Club's Associate Pay Policy - California. (SOE 9.) PCMs can also access relevant policies anytime via Sam's Club's intranet system. (SOE 9.)

**D. Sam's Club Policy Is To Ensure PCMs Can Immediately Exit Clubs**

Sam's Club's Facility Closing/Overnight Procedures Policy (AP-23) ("Closing Policy") is an asset protection policy that describes general closing procedures applicable to all clubs, including mobilizing alarms, performing interior security checks and exterior perimeter checks, locking entrance and exit doors, and otherwise securing the store. (SOE 11.) Pursuant to the policy, exit doors are locked once the last member has exited the building. (*Id.*) Thereafter, doors are unlocked when associates exit the club. (*Id.*) Sam's Clubs have designated "key carriers" who have keys to unlock the doors. (SOE 12.) All salaried managers (Assistant Managers, Co-Managers, or Club Managers) are key carriers. (*Id.*) There are also hourly-paid Team Leads in each club who are designated key carriers. (*Id.*) The prior Closing Policy, from 2017 to 2020, provided: "Position a salaried member of management or a responsible associate at a front door to ensure associates exit the facility in a timely fashion and secure manner after completing closing responsibilities." (ECF No. 44-2 at 88.) The current policy also prioritizes ensuring "associates are able to leave the building immediately after clocking out." (SOE 11.)

Club Managers have discretion to implement processes to ensure PCMs can promptly exit the clubs after completing their closing shifts. (SOE 14.) These processes vary from club to club depending on factors such as club size, staffing, and location. (*Id.*)

/ / /

/ / /

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

**E. Closing Practices Vary Club To Club**

Plaintiff seeks to certify a class of PCMs at 21 clubs in California who clocked out on at least one occasion between 10:00 p.m. and 6:00 a.m. (ECF No. 95 at 2.) There are generally two groups of PCMs that fall within this definition: PCMs whose shifts end at 11:30 p.m., and overnight worker PCMs whose shifts end at 5:30 a.m. (SOE 15.) PCMs are occasionally scheduled to leave at other times, but circumstances and situations will vary. (SOE 16.) Because every club is empowered to implement practices to ensure a prompt exit that works for their club based on their club's own needs, there is wide variety in PCMs' exiting experiences after 10:00 p.m., both from club-to-club, and PCM to PCM.

For example, some closing managers at Club # 6612, 6455, 6622, and 4767, notify their closing associates when their shift is about to end, and then go to the exit door to make sure the door is unlocked before the PCMs arrive. (SOE 18.)

Some closing managers at Club # 6621, 4819, 4767, 4822, 6612, 6235, 6433, and 4824, position themselves at the exit door between five and thirty minutes before closing to ensure PCMs can promptly exit the clubs. (SOE 19.)

Some closing managers at Club # 4824, 4822, 6624, and 4767 leave the doors unlocked at certain times so that PCMs can exit without management assistance. (SOE 20.)

Some closing managers at Club # 6405, 6612, and 6455 leave the club at 11:30 p.m. along with the PCMs, and accompany them as they walk out of the club. (SOE 23.)

Management at Club # 6628 perform on-the-clock bag checks of PCMs at the exit to the club. Once the bags are checked, the PCMs clock out at a nearby computer terminal and exit the club. (SOE 26.)

Some closing managers at Club # 6240, 6433, 6624, 4822, and 6405 accompany PCMs to the time clock to clock out at the end of their shifts, and then walk to the exit doors with the PCMs to unlock the doors. (SOE 27.)

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

Some closing managers at Club # 4709, 6609, and 6455 meet PCMs at the lock up cage or in the break room before they clock out to turn in equipment, and then walk with the PCMs to the exit doors after they have clocked out. (SOE 28.)

**F. Closing Practices Vary By PCM**

In addition to variation at the clubs, and among differing closing managers, there is variation among the PCMs as to how they exit the clubs after closing.

For example, some PCMs at Club # 6612 can and do exit through the receiving door without management assistance, and PCMs at Club # 6622 can and do exit through the tire center without assistance. (SOE 21.)

Some PCMs at Club # 6405, 4819, 6609, 4819, and 6610 notify their management that they will be clocking out, so that management can position themselves at the exit doors. (SOE 31.)

Some PCMs at Club # 6240 and 4819 communicate with management via radio before clocking out so that management know to head to the exits. (SOE 32.)

Some PCMs at Club # 6340, 6624, 6628, and 6614 wait until management arrive at the exits before clocking out. (SOE 34.)

Some PCMs shop for personal items after clocking out for the day, and then summon management to unlock the doors when they finish shopping, or voluntarily remain locked in the club while waiting for their ride. (SOE 33.)

**G. PCMs Can Submit Time Adjustments Or Punch Out Near The Exit**

All clubs have at least one time clock and several computer terminals where PCMs can clock out at the end of their shifts. (SOE 35.) Many PCMs choose to clock out at computer terminals near the exit doors. (SOE 36-38.) PCMs may simply wait to clock out until the exit doors are unlocked. (SOE 38.)

Hourly associates report that they are aware they can submit time adjustments to be compensated for any "wait time," and many PCMs report that they have submitted time adjustments for this purpose. (SOE 42, 43.) Some PCMs report that they are aware they can submit time adjustments for this purpose, but they have elected

7

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

not to, for various reasons. (SOE 45.) These variables have led to divergent experiences among PCMs – including many having never experienced any delay at all. (SOE 39.)

## III.  LEGAL STANDARD

A class action filed pursuant to Rule 23 is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *See Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011). That departure from the general rule requires that plaintiff – as the class representative – "possess the same interest and suffer[s] the same injury as the class members." *Id*. Thus, for a class to be certified, Plaintiff must first satisfy Rule 23(a), which requires that: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). *Id*. District courts must engage in a rigorous analysis to determine whether a plaintiff has satisfied the elements of Rule 23(a). *Id*. at 350 (stating Rule 23 is more than "just a pleading standard").

Plaintiff has failed to meet this standard and the Court should deny his motion.[1]

## IV.  PLAINTIFF HAS NOT PROVEN THE ELEMENTS OF RULE 23

### A. Plaintiff Fails To Prove Commonality Or Predominance

Under Rule 23(b)(3), the party seeking class certification must show that common questions of law or fact predominate over questions affecting individual members. The inquiry is whether a proposed class is "sufficiently cohesive to warrant

---

[1] Plaintiff also seeks certification under Rule 23(b)(2). (ECF No. 95 at 32-33.) However, Rule 23(b)(2) certification is inappropriate because individual determinations of class membership are necessary. See *Jamie S. v. Milwaukee Pub. Schools*, 668 F3d 481, 499 (7th Cir. 2012). Further, Plaintiff is a former employee of Sam's Club, and has testified that he plans to seek employment with the Sheriff's Department for Los Angeles County. (Plaintiff Deposition, p. 67:11-68:14.) As such, he lacks standing to pursue injunctive relief here. See *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 865 (9th Cir. 2017) (former employee lacks standing to seek injunctive relief against his former employer "absent a reasonably certain basis for concluding he or she has some personal need for prospective relief.")

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

adjudication by representation." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "To ensure that common questions predominate over individual ones, the court must ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Castillo v. Bank of Am., N.A.*, 980 F.3d 723, 730 (9th Cir. 2020) (citations and quotations omitted). "If many class members have no claim whatsoever because they were never exposed to the challenged conduct to begin with, the class does not satisfy Rule 23(b)(3)." *Id.*

To establish off-the-clock ("OTC") claims, Plaintiff must prove (1) that he "performed work for which he did not receive pay; (2) that defendants knew or should have known that plaintiff did so; but (3) that the defendants stood idly by." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). Plaintiff "must show 'substantial evidence' of a systematic policy that pressures or requires employees to engage in OTC work to demonstrate that common issues sufficiently predominate to establish a violation of California law on a class-wide basis." *Nevarez v. Costco Wholesale Corp.*, 2019 WL 7421960, at *1 (C.D. Cal. Dec. 26, 2019) (Wilson, J.). However, "where no substantial evidence points to a uniform, companywide policy," and "proof of off-the-clock liability would have had to continue in an employee-by-employee fashion," class certification is inappropriate." *Howard v. CVS Caremark Corp.*, 2014 WL 11497793, at *10 (C.D. Cal. Dec. 19, 2014).

Here, unharmed PCMs permeate the class, and individualized inquiries are needed to distinguish between potentially harmed and unharmed PCMs. This type of individualized analysis is not amenable to class treatment.

### 1. Sam's Club's Policies Do Not Establish Commonality Or Predominance

Plaintiff argues Sam's Club's Closing Policy, which requires the exit doors to be locked after members leave but before PCMs leave, necessarily results in waiting

time. (ECF No. 95 at 20.) He further argues that because Sam's Club's Pay Policy does not specifically identify this waiting time as compensable, waiting time necessarily goes uncompensated. (*Id.*) Plaintiff argues this establishes commonality because these policies work "in conjunction" to "create a work environment where PCMs are incentivized to clock out immediately when their shifts end, regardless of whether the doors have been unlocked," and "no policies informed PCMs that time adjustments should be submitted for exit delays." (ECF No. 95 at 23.) Plaintiff claims these policies also demonstrate that common issues predominate. They do not.

### (a) The Court Already Ruled The Written Policies Do Not Establish Commonality and Predominance

Plaintiff made identical arguments in his first motion. (ECF No. 44 at 9, 23-24.) Plaintiff argued the Closing Policy requiring that doors be locked after customers leave, read together with the Pay Policy requirements that PCMs should clock out after completing all work, and not listing waiting time as compensable, act as common evidence of unpaid OTC time, and also satisfy predominance. The Court rejected this argument, finding:

> [T]he critical gap [with] Plaintiff's syllogism is the assumption that the Closing Policy and Pay Policy necessarily results in associates incurring waiting time to be let out. Nothing in these policies speaks to when associates are to clock out in relation to when the doors are unlocked. Indeed, Plaintiff does not dispute that the Closing Policy requires a salaried member of management to '[p]osition a salaried member of management or a responsible associate at a front door to ensure associates exit the facility in a timely and secure manner after completing closing responsibilities.' Thus, included in the official policies that Plaintiff points to is a policy designed to let out PCMs in a timely fashion.

(ECF No. 63 at 6) (Citations omitted.) Plaintiff does not explain why the Court should reverse course this go-around. The "critical gap with Plaintiff's syllogism" remains, and the policies are not substantial evidence of a policy that pressures or requires PCMs to incur waiting time.

/ / /

/ / /

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

**(b) Sam's Club Policy Is To Ensure PCMs Can Promptly Exit The Clubs, Which Managers Implement Differently**

Plaintiff argues that common issues predominate because Sam's Club has a "no-policy policy" regarding exit door procedures, which results in systematic unpaid wait time. Most versions of the Closing Policy during the class period included specific language requiring a salaried member of management to be positioned at or near the front door to ensure prompt exit of associates. (SOE 11.) Plaintiff points to a 2020 version of the Closing Policy that did not include that specific language, arguing it results in a "no-policy policy." (ECF No. 95 at 25.) While this specific language was not included in the Closing Policy for a period of time during the class period, Sam's Club's expectation at all times has been that a key carrier will be available to unlock the club exit doors after closing to let hourly associates out of the club following the completion of their closing duties. (SOE 13.) Indeed, Sam's Club has already testified that the company's policy was always to have a manager or key carrier near the exit doors for this purpose. (*Id*.) Further, Sam's Club's current Closing Policy (effective June 2023) prioritizes ensuring "associates are able to leave the building immediately after clocking out." (SOE 11.)

Plaintiff argues that Sam's Club "acknowledges that it does *not* have a uniform policy regarding exit door procedures, but rather has a mere expectation that a key carrier will be available to unlock the club exits doors after closing to let hourly Associates out of the club following completion of their closing duties." (ECF No. 95 at 25.) From this, he deduces that Sam's Club "admits that it has a systematic unwritten policy – which overrides the written policy – which results in OTC wait time…" (*Id*.) This is a stretch, and the Court previously rejected this identical argument, finding the evidence Plaintiff cites in support are merely "generalized statements" that "do not amount to substantial evidence that there was a policy or practice of not following Defendant's policy to position a key holder at an entrance." (ECF No. 63 at 6.)

/ / /

11

Instead, the evidentiary record shows that both Sam's Club via Fed. R. Civ. P. 30(b)(6), and managers in every club confirm Sam's Club's policy, practice, and expectation during the class period has been that a key carrier must be at or near the exit of the club in time to ensure a prompt exit by associates, without delay. (SOE 11.) The fact that different managers have different practices demonstrates individualized issues predominate over common ones.

For example, closing manager Kenny Gonzales at Club # 6614 works until 10:00 p.m. for the sole purpose of ensuring PCMs whose shifts end at 10:00 p.m. can immediately exit the club. To this end, and because he is working only for this reason, he stations himself at the computer in the tire center, ten feet from the exit door, until right before 10:00 p.m. when he heads to the exit. (SOE 19.) At Club # 6433, closing manager Dwayne Humphrey arrives at the exit at 11:25 p.m. because he knows all PCMs who are in the building clock out and leave at 11:30 p.m. (*Id.*) Closing manager David Sowa at Club # 6455 meets his PCMs in the break room where they turn in their equipment and clock out, and he then walks with them to the exit doors so they can walk right out. (SOE 28.) At Club # 4767, closing manager Brian Baumgartner gives associates a 30-minute warning over their radios to meet him at the door when their shifts end at 11:30 p.m. (SOE 18.) Some closing managers at Club # 4767 and 4824 leave the exit doors unlocked for a period of time after closing. (SOE 20, 29.) As noted by the Court on the first go-around, the evidence establishes "that different stores employ different practices in ensuring that associates are let out in a timely fashion," and "[t]hese variations are critical in determining Defendant's liability as the question of whether or not individual PCM incurred waiting time would necessarily depend on the procedures of the store they were employed at." (ECF No. 63 at 7.)

Variation also abounds among "closing shifts," which Plaintiff defines as shifts in which associates clock out between 10:00 p.m. and 6:00 a.m. For example, Club # 4767 has an overnight shift of PCMs who are scheduled to work until 5:30 a.m., and opening manager Ange Yanez sets alarms on her phone to be sure to be at the door to

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

unlock it before they arrive. (SOE 17.) Some opening managers at Club # 4767 leave the doors unlocked after 4:00 a.m., so PCMs leaving after then would not wait for anyone to unlock the door for them – it is already unlocked. (SOE 29.) Plaintiff's renewed motion does not even attempt to harmonize the differing practices pertaining to the different closing shifts, and instead treats them all the same. *See Miles v. Kirkland's Stores Inc.*, 89 F. 4th 1217 (9th Cir. 2024) ("Given the uneven enforcement of the policy, the court would have to embark on a time-sensitive mission to figure out the individual circumstances of each proposed class member: which stores and managers enforced the bag check policy, what days this policy was enforced, which employees were subjected to them, and so on.")

Finally, although Plaintiff claims to have narrowed the class definition by excluding eight clubs, in an effort to "cure[] the defects the Court found previously[,]" (ECF No. 95 at 10), he does not explain how these 21 clubs is any more certifiable than the prior group of 29 clubs. Nor does he identify any uniform practices within this smaller group that result in more frequent wait time. Plaintiff has made no effort to identify clubs that have practices that actually cause waiting time. In any event, the practices at the 21 clubs at issue are as varied and result in as many individualized issues as those in the original 29 clubs.

### (c)  Sam's Club Policies Prohibit Off-The-Clock Work And Provide For Time Adjustments

Plaintiff does not dispute that Sam's Club's Pay Policy has always prohibited off-the-clock work and has required associates to submit time adjustments to ensure they are paid for all compensable time. (SOE 2.) Plaintiff instead argues that the policy – prior to May 2023 – did not expressly identify wait time as compensable work for which PCMs could submit time adjustments, which results in a uniform practice of unpaid wait time. (ECF No. 95 at 20.) This Court has already found that the absence of specific language in a policy does not support certification, in light of "Plaintiff's lack of substantial evidence of a systemic unwritten policy that resulted in OTC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

work[,]" Sam's Club's written policy prohibiting OTC work, Sam's Club's policy requiring a key carrier to be positioned at or near the front door to promptly let associates leave, and the "substantial evidence of varying closing procedures employed by individual facilities." (ECF No. 63 at 9, fn. 3.)

Plaintiff further argues that although the Pay Policy provides for time adjustments for OTC work, they are rarely used for wait time, arguing:

> [T]ime adjustment data produced by Sam's for the survey respondents shows that time adjustments are rarely, if ever, used for exit delays. Analysis by Plaintiff's damages expert, David Breshears, CPA/CFF, shows that of 15,363 time adjustments submitted between June 23, 2018 and February 5, 2021, only 2.2% may *potentially* be related to unpaid exit wait time.

(ECF No. 95 at 16.) This is inaccurate. Mr. Breshears found that of 15,363 time adjustments he reviewed over a 2.5 year sample period, 799 "reflect an adjusted shift out time between 10:00 p.m. and 6:00 a.m.," but he cannot identify the reason the time adjustments were entered. (ECF No. 96 at 879.) While Plaintiff infers from the data that "time adjustments are rarely, if ever, used for exit delays" (ECF No. 95 at 16), the inverse inference is equally valid - that the data shows 799 of 15,363 time adjustments were for exit delays (perhaps under the "Other" reason code, or erroneously under other codes). Plaintiff also infers that the data shows exit delays have largely gone uncompensated, but the opposite inference is just as valid – the data shows that exit delays are rare and have been compensated. The actual evidence shows that PCMs who may have experienced waiting time may have also submitted time adjustments, like Plaintiff's witness Jessica Butler and survey respondent Stephanie Somers, who both testified they submitted time adjustments for this reason. (SOE 43.) Thus, the data is not helpful to Plaintiff's argument.

**2. Plaintiff's Survey Does Not Establish Commonality Or Predominance**

Plaintiff argues he establishes commonality and predominance through "survey evidence demonstrating that 90% of the PCMs have incurred OTC wait time due to exit delays and that PCMs wait to be released on nearly 60% of their shifts." (*Id.*, at

14

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

20.) Plaintiff submits a declaration from his expert, Dr. Peterson, who conducted a telephone survey of PCMs. However, the survey is deeply flawed because it does not ask questions that allow for the determination of either liability or damages. As such, it would be pointless to extrapolate the survey responses to the entire class.

### (a)  The Survey Is Inappropriate In This Case

Plaintiff errs in supposing that *Tyson Foods* supports his argument that the survey demonstrates predominance. (ECF No. 95 at 28.) In *Tyson Foods*, a class of employees sued their employer for not paying overtime wages due under the FLSA. *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 447 (2016). The employer had an express policy to pay its employees only a limited amount of minutes (or in some cases nothing) for compensable time spent donning and doffing their gear. *Id*. Additionally, the employer did not "record the time each employee spent donning and doffing." *Id*. To prove the amount of uncompensated time, the plaintiffs "sought to introduce a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records." *Id*. at 456. The Court permitted the study, which consisted of "744 videotaped observations and [an analysis of] how long various donning and doffing activities took" in different departments. *Id*. at 450. In assessing whether this study was permissible evidence, the Court held that, because "each class member could have relied on that sample to establish liability if he or she had brought an individual action," the study was admissible.

The survey in the instant case is unlike the representative evidence in *Tyson Foods*. For starters, *Tyson Foods* did not involve telephone survey evidence at all. The survey proffered here is similar to what was rejected in *Dukes*. As noted by a district court in the Northern District, the "plaintiffs in *Dukes* sought to establish that a small number of employees had experienced sex discrimination, and then to extrapolate those results to the class as a whole. But an employee bringing an individual action would not have been able to rely on another employee's sex discrimination to establish her own claim. *In re: Autozone, Inc*., 2016 WL 4208200 at *15 (N.D. Cal. Aug. 10,

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

2016). In contrast, the "representational evidence in *Tyson Foods* would have been appropriate for an individual class member to use in an individual action because an employee cannot travel back in time and record how long it took to put on her equipment each day; instead, the employee can hire an expert to generate an average time." *Id.* (comparing *Dukes* and *Tyson Foods*). Unlike *Dukes*, the representational evidence in *Tyson Foods* "did not depend on individual employees' memories, it simply filled in a gap: there was a uniform policy 'not to pay for [certain] activities,' and plaintiffs needed to establish 'the amount of uncompensated work each employee did.'" *Id.; see also*, *Castillo,* 980 F.3d 732 ("Unlike in *Tyson Foods*, proof of liability in this case would require highly individualized inquiries. But Castillo has provided no common method of proof, or representative evidence of proving classwide liability on which each employee could have relied.")

Here, if an individual PCM filed these claims against Sam's Club, the PCM would not be able to use Plaintiff's survey to prove that Sam's Club caused waiting time. In that individual case, it would be the PCM's experience during *that* PCM's shifts and *that* PCM's club — not the experiences of other PCMs working different shifts at different clubs with different practices — that would be relevant. The survey here does not seek to fill in any evidentiary gaps. Nor do any such gaps exist. Thus, variation with closing practices distinguish this case from *Tyson Foods*.

### (b) The Survey Is Not Probative of Liability

#### (i)   The Survey Defined "Closing Shift" Too Broadly

Oddly, the survey defines "closing shift" as follows: "[a] closing shift means that at the end of your shift, the store had closed to customers for the day and the front doors were closed such that no more customers could enter." (ECF No. 96 at 856.) Clubs close at 8:00 p.m. on weekdays and 6:00 p.m. on Sundays, but Plaintiff's class definition pertains *solely* to closing shifts occurring after 10:00 p.m. (ECF No. 95 at 2.) As such, survey respondents may have reported waiting time outside of the timeframe used in the class definition. The below table illustrates the problem – these

16

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

survey respondents worked a variety of different "closing shifts," some of which fall within Plaintiff's class definition, others do not:

| Analysis of Closing Shifts Worked by Survey Respondents[2] | | | |
|---|---|---|---|
| Number of Closing Shifts Worked Ending Between 8pm and 6am | Number of Closing Shifts Ending Between 10pm and 6am | Number of Closing Shifts Outside of the Proposed Class Definition | Percent of Closing Shifts Outside of the Proposed Class Definition |
| 73,251 | 43,927 | 29,324 | 40.03% |

Additionally, a full 50% of shifts worked by 129 survey respondents ended between 8:00 p.m. and 9:59 p.m. (Crandall Decl., ¶ 29.) Based on this evidence, there is no reason to conclude respondents who reported waiting time referred to waiting time occurring after 10:00 p.m. It is just as plausible that respondents reported waiting time that occurred between 8:00 p.m. and 9:59 p.m., which has no probative value here. Even worse, forty-four survey respondents never worked a closing shift that ended between 10:00 p.m. and 6:00 a.m. in a relevant club, during the relevant timeframe, or were always a team lead and should have been excluded under Plaintiff's proposed class definition. (Crandall Decl., ¶ 36.) Nonetheless, Dr. Petersen concludes, "[n]inety percent of class members experienced unpaid waiting time at the end of closing shifts." (ECF No. 96 at 836.) Dr. Peterson's conclusion should be met with a heavy dose of skepticism considering he did not even tailor his questions to the proposed class.

(ii) *The Survey Asked About Experiences For A Year Outside Of The Proposed Class Period*

The survey asked whether the respondents experienced waiting time from 2017 to present, yet, the Rule 23(b)(3) class definition only includes PCMs from 2018 to present. (ECF No. 95 at 2.) The below table illustrates the problem – some survey respondents worked closing shifts dating back to June 2017, yet, when asked if they experienced wait time, the survey did not ask them to limit their responses to the actual class period:

---

[2] Crandall Decl., Ex. 4.

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

| Analysis of Closing Shifts Ending Between 10pm and 6am Worked by Survey Respondents[3] | | | |
|---|---|---|---|
| Number of Closing Shifts Worked from 6/23/2017 to 11/9/2023 | Number of Closing Shifts Worked from 6/23/2018 to 11/9/2023 | Number of Closing Shifts Outside of the Putative Class Period | Percent of Closing Shifts Outside of the Proposed Class Period |
| 50,449 | 43,927 | 6,522 | 12.93% |

Whether a PCM experienced waiting time in 2017 is not probative, but there is no way to determine whether respondents who reported waiting time were referring to 2017 or early 2018, which is irrelevant.

### (iii)  The Survey Does Not Account For Variation

The survey merely assumes that all clubs, "closing shifts," and PCMs are the same. But the evidentiary record before the Court could not be clearer – variation permeates the class. PCMs at some clubs should *never* experience waiting time due to conditions *specific to those clubs*. For example, PCMs at Club # 6621 in Roseville should never experience waiting time because they can exit through the tire center without management assistance (SOE 21.). Indeed, PCM Eric Buteyn *only* exits through the tire center, and therefore has never been harmed. (*Id*.) Similarly, PCMs who work until 5:30 a.m. at Club # 4767 in Palmdale may *never* wait at an exit because the entrance door may be unlocked at 4:00 a.m. for the opening shift and remains unlocked for the day, and these PCMs just walk right out. (SOE 29.) Survey respondent Joceyln Yan testified that PCMs at Club # 6433 in Vacaville can exit through a back door without management assistance – this was confirmed by closing manager Cynthia Dasilva, who states that PCMs can and do exit using those doors. (SOE 21.) Further, all clubs have computer terminals near the exits doors, which PCMs could use to clock out from as soon as the key carrier arrives to unlock the doors. (SOE 35.) And, survey respondents at the same clubs during the same periods report opposite experiences with waiting time, as illustrated in the below table:

/ / /

---

[3] Crandall Decl., Ex. 6.

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

| Survey Respondents who Worked in the Same Store During the Same Time Period Reported Different Experiences[4] | | | |
|---|---|---|---|
| Club # | Respondent's Employee ID | Date Range Worked at Club Location | Survey Response to Q2: When you clocked-out from your closing shifts and walked to the door to exit the warehouse, how frequently did you have to wait for a supervisor to let you out of the warehouse? |
| 6610 Chino | 104215063 | 8/9/2017-12/7/2018 | Most of the Time |
| | 223611110 | 8/17/2017-7/2/2018 | Never |
| 4709 Corona | 103779881 | 6/23/2017-11/10/2023 | Never |
| | 103827934 | 6/23/2017-11/10/2023 | Always |
| 6614 El Monte | 224248001 | 4/14/2018-5/23/2019 | Never |
| | 224354626 | 5/26/2018-3/28/2019 | Occasionally |
| | 222449279 | 6/24/2018-4/20/2019 | Most of the Time |
| 6240 Glendora | 230634997 | 1/13/2023-6/4/2023 | Never |
| | 106575614 | 3/11/2023-10/7/2023 | Always |
| 4735 La Habra | 109411284 | 6/24/2017-11/10/2023 | Most of the Time |
| | 210117053 | 6/25/2017-11/9/2023 | Never |
| 6624 San Bernardino | 100494997 | 6/23/2017-11/8/2023 | Never |
| | 221311871 | 6/23/2017-11/10/2023 | Most of the Time |

The survey cannot explain this inconsistency at the individual club level, let alone class level. Individualized inquiries are needed to assess why one PCM experienced waiting time while another did not.

> (iv)  *The Survey Did Not Ask About Time Adjustments*

Dr. Peterson concluded, "[n]inety percent of class members experienced *unpaid* waiting time at the end of their closing shifts." (ECF No. 96 at 836.) (Emphasis added.) This is an illusory conclusion considering the survey did not ask whether the survey respondents were *paid* for the waiting time. The survey's failure to ask questions about time adjustments is remarkable, considering: (1) Sam's Club requires PCMs to submit

[4] Crandall Decl., Ex. 34.

19

them; (2) PCMs have submitted them for this reason; (3) management has advised PCMs to submit them for this reason; and (4) Plaintiff's own expert claims nearly 800 time adjustments were submitted in a sample period that could have been for wait time. Nonetheless, Dr. Peterson testified he did not ask respondents about time adjustments because they are "really a small issue." (Peterson Dep., 94:7-8.) Thus, included in the "ninety percent" of survey respondents who report experiencing wait time are those who also submitted time adjustments for their wait time.

As expected, when deposed, some survey respondents testified to submitting time adjustments. Survey respondent Stephanie Somers reported having experienced wait time in the survey, but testified to submitting time adjustments for waiting time. (SOE 43.) Because the survey did not ask about time adjustments, all the survey tells us is that Ms. Somers experienced wait time, but not that she was compensated for it. In fact, 175 survey respondents – 63.4% of all respondents – completed a time adjustment for at least one closing shift between 10:00 p.m. and 6:00 a.m. (Crandall Decl., ¶ 43.) Dr. Petersen could have asked respondents if they knew they could adjust their time records and why they chose not to make adjustments for any time spent waiting to exit. He also could have asked if they ever chose not to submit a time adjustment for time spent waiting to exit to understand whether there were individualized practices with respect to time adjustments. He did none of these things.

The survey's failure to ask questions about time adjustments is problematic. As the Ninth Circuit observed in *Miles*, because "employees could use time adjustment logs to record uncompensated time if they believed that their bags had been checked after clocking out…A court would have to scour through and analyze individual records to figure out if someone belongs to the class, undermining the efficiency of class adjudication." *Miles*, 89 4th at 1226. Same too here. In light of this evidentiary record showing a policy requiring the use of time adjustments, and PCMs using time adjustments for waiting time, allowing Plaintiff to use representative evidence to establish predominance would necessarily mean certifying a class with a substantial

Case No. 2:21-cv-05122-SVW-JC
DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

number of uninjured PCMs, like survey respondent Stephanie Somers, and Plaintiff's witness Jessica Butler. (SOE 43.) *See Castillo*, 980 F.3d 730 (9th Cir. 2020) ("If many class members have no claim whatsoever because they were never exposed to the challenged conduct to begin with, the class does not satisfy Rule 23(b)(3).")

### *(v)   The Survey Asks No Questions About Sam's Club's Knowledge*

Dr. Peterson offers no conclusions regarding the proportion of survey respondents who reported that management knew their waiting time was unpaid, as the survey did not ask a single question about Sam's Club's knowledge. The evidentiary record shows Sam's Club requires associates to submit time adjustments for wait time (SOE 3, 4, 5, 6), management instructing PCMs to submit time adjustments for waiting time (SOE 50), and PCMs submitting time adjustments for waiting time (SOE 43). Plaintiff's survey merely assumes knowledge by virtue of the fact that managers or supervisors would observe a PCM waiting – however, in light of all the evidence that wait time can be compensated, this alone is insufficient to establish Sam's Club's knowledge of OTC work.

### *(vi)  The Survey Responses Are Unreliable*

Dr. Peterson concludes that the "survey responses can be utilized to project to the population of putative class members." (ECF No. 96 at 836.) This is a false conclusion considering some survey respondents gave different answers when testifying under oath at their depositions, rendering the survey responses unreliable. In total, sixteen of thirty respondents testified to experiencing waiting time with less frequency than they reported in their survey responses. (Crandall Decl., ¶ 32, Ex. 7.) Same for average wait times. For example, respondent Linda Avalos went from claiming an average of 37.5 minutes of waiting time per shift to 22.5 minutes per shift when deposed. (Crandall Decl., ¶ 33.)

### *(vii) The Survey Does Not Account For De Minimis Time*

PCMs who do report wait time often reported that it was only under a minute or two. (SOE 40.) Such "minute" or "brief" periods of time may not be compensable

under California law. *Rodriguez v. Nike Retails Servs., Inc.*, 928 F.3d 810, 818 (9th Cir. 2019). Plaintiff's survey fails entirely to account for this. (Crandall Decl., ¶¶ 25, 26.) The survey instead includes respondents who have experienced *any* waiting time at all, including only seconds, in the "[n]inety percent of class members experienced unpaid waiting time at the end of their closing shifts." (ECF No. 96 at 836.) Those PCMs who incurred *de minimis* waiting time that is not compensable under California law are not injured, but there is no way to differentiate PCMs who never waited, from those who waited, and from those who waited a *de minimis* amount of time.

*(viii) Other Evidence Shows That The Survey Cannot Establish Commonality Or Predominance*

Other evidence undercuts the over-simplified survey findings, showing individualized inquiries are necessary to prove liability. Depositions of survey respondents confirm that many PCMs rarely or never experienced waiting time. For example, survey respondent John Pantoja testified he was able to exit the club without waiting 100% of the time. (SOE 39.) Survey respondent Julian Vasquez testified that every time he arrived at the exit doors, there was either already a manager there, or there was a Team Lead nearby who would come up to the doors immediately and unlock them. (*Id.*) Survey respondent Dinni Stringer testified that every time she arrives at the exit doors, a manager is there to unlock it. (*Id.*)

In sum, Plaintiff's contention that "the survey makes clear that virtually every member of the class will have been a victim of this policy at some time during the class period" (ECF No. 95 at 30), is wishful thinking.

**3. Sam's Club's Knowledge Of OTC Work Cannot Be Established Through Common Evidence**

Plaintiff must establish Sam's Club's knowledge of OTC work to prove his claims. He argues that because the evidence establishes that only managers and supervisors can unlock the exit doors, they would necessarily observe PCMs waiting, which is common proof. (ECF No. 95 at 21-22.) This presupposes waiting time

22

Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

occurred and that if it did, PCMs did not submit time adjustments. This is guesswork, far from actually proving knowledge, which Plaintiff is required to do. *See Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. [A party must] prove that there are *in fact"* commonality and predominance of common issues).)

Numerous Club Managers and closing managers have testified that they have never observed waiting time, nor received complaints by associates of waiting time. (SOE 49, 51.) Managers who have observed wait time have told those associates to submit time adjustments. (SOE 50.)

Because Sam's Club's policies provide for time adjustments for OTC work, including waiting time, the observation of exit delays would not trigger knowledge of unpaid OTC work. Further, some PCMs wait in the clubs by choice – to socialize, wait for others, or shop. (SOE 33.) Thus, determining whether managers had knowledge of unpaid OTC wait time requires individualized inquiry into each manager's experience. *Koike v. Starbucks Corp.,* 378 Fed. App'x 659, 661 (9th Cir. 2010) (affirming denial of class certification even though business pressures might lead to OTC work, because only individualized inquiries would determine whether employees engaged in OTC work and whether defendant had actual or constructive knowledge of it).

**4. Testimony From PCMs Demonstrate That Individualized Inquiries Predominate Over Common Questions**

PCM testimony confirms that individualized inquiries are needed to assess liability. For example, PCMs from at least two clubs (10% of the clubs in the class), can and do exit through doors besides the front exit. Tim Cook, Club Manager of Club # 6621 in Roseville, testified that PCMs can exit through the tire center, and PCM Buteyn at Club # 6621 in Roseville only exits through the tire center, without any management assistance. (SOE 21.) He has never waited to exit the club. (SOE 39.) In contrast, Plaintiff's witness, PCM Cortijo, a former associate at Club # 6621 in Roseville, claims to have experienced waiting time and that "the main door is the only door associates were permitted to leave from during and after closing." (ECF No. 96

23

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

at 763.) In light of this evidentiary record, only individualized inquiries could determine whether PCM Cortijo, or any other PCM at Club # 6621 in Roseville, ever had to wait at the exit door after clocking out.

In fact, the parties have submitted numerous conflicting declarations from PCMs at the same clubs who report opposite experiences with waiting time, which further necessitates the need for individualized inquiries. The below table illustrates the problem:

| Competing Declarations Waited = ✓ Never Waited = ✗ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clubs | 4819 | 6455 | 6610 | 6621 | 6614 | 6455 | 4819 |
| Plaintiff's Evidence | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Sam's Club's Evidence | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |

As the Court ruled with the prior motion, "the evidence provided by the parties raises individualized questions with respect to the experiences of [PCMs] within the same store." (ECF No. 63 at 7.) These questions remain.

Same too with time adjustments. Numerous PCMs submitted time adjustments for waiting time, and even more knew they could submit time adjustments for waiting time. (SOE 42, 43.) Whereas, Plaintiff's declarants claim to have never submitted time adjustment and not knowing that they could submit time adjustments for waiting time. Individualized inquiries are needed to identify which PCMs submitted time adjustments for waiting time, and which did not. Further inquiry is needed to assess whether the PCMs who did not submit time adjustments for waiting time knew they could do so but did not so, like PCM Carlos Duran. (SOE 45.)

Finally, as this Court previously ruled "[n]othing in [Sam's Club's] policies speaks to when associates are to clock out in relation to when the doors are unlocked." (ECF No. 63 at 6.) Some closing associates report that they clock out only after management has unlocked the exits. (SOE 34.) Other associates clock out at computer terminals near the exits to ensure they do not clock out until the exits are unlocked.

24

Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION

(SOE 26, 34, 36.) In contrast, some of Plaintiff's declarants state that they clocked out before the exits were unlocked, but they rarely explain why they did so.

Plaintiff has not proven commonality or predominance.

## B. Plaintiff Fails To Establish Numerosity

Plaintiff argues "Defendant has identified 3,867 individuals who have worked 20 or more closing shifts during the relevant class period. Thus, while the actual number of members of the putative class is likely somewhat higher, this subset of 3,867 PCMS easily satisfies numerosity." (ECF No. 95 at 31-32.) Plaintiff is referring to Sam's Club's response to an Interrogatory asking for the number of PCMs who worked 20 or more closing shifts from June 2017 to February 1, 2023. (Peracchio Decl., ¶ 30, Ex. BB.) But, the putative class for monetary relief consists of PCMs who worked one or more closing shifts at 21 clubs from June 23, 2018 to present. (ECF No. 95, at 2.) Thus, the number 3,867 contains a full year of PCMs who are not in the class. *See Mays v. Wal-Mart Stores, Inc.*, 2018 WL 5024919, (C.D. Cal. Aug. 22, 2018) (finding plaintiff did not establish numerosity, in part because "these numbers include an entire year, December 2013 to December 2014, that is inapplicable to a class beginning in December 2014.") Further, the class definition excludes the "Team Lead" position, but Plaintiff provides no evidence as to the number of Team Leads included in the 3,867 figure.

## V. CONCLUSION

Plaintiff has now had several years and several opportunities to certify a class. He has again failed to prove the elements of Rule 23, and the Court should again deny his motion.

DATED: February 7, 2024

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: */s/ Mitchell A. Wrosch*
     Paloma P. Peracchio
     Mitchell A. Wrosch
     Carmen M. Aguado
     Attorneys for Defendant
     SAM'S WEST, INC. DBA SAM'S CLUB

25        Case No. 2:21-cv-05122-SVW-JC

DEFENDANT SAM'S WEST, INC.'S OPPOSITION TO PLAINTIFF CARLOS SANCHEZ'S RENEWED MOTION FOR CLASS CERTIFICATION