**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com
        lking@bradleygrombacher.com

**MAJARIAN LAW GROUP APC**
Sahag Majarian, II, Esq. (SBN 146621)
18250 Ventura Boulevard
Tarzana, California 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
E-Mail: sahagii@aol.com

Attorneys for Plaintiff, CARLOS SANCHEZ individually
and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS SANCHEZ, individually and on behalf of other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAM'S WEST, INC. dba SAM'S CLUB, an Arkansas corporation,<br><br>Defendant. | Case No. **2:21-CV-05122-SVW-JC**<br><br>**PLAINTIFF CARLOS SANCHEZ'S REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: March 4, 2024<br>Time: 1:30 p.m.<br>Courtroom: 10A<br><br>Complaint filed: June 23, 2021 |

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................1

II.     Updated Class Definition ...................................................................................1

III.    Plaintiff's theory of the case – that SWI's policies fall short of the minimum legal duties of an employer by creating conditions where OTC work routinely occurs – meets the commonality and predominance requirements of Rule 23. ...................................................................................2

    A.      "Individual inquiries" are irrelevant to the central question of whether SWI's common policies resulted in uncompensated OTC work by PCMs. ...................................................................................................3

    B.      SWI's erroneous belief that it can shift its recordkeeping burden to PCMs in violation of *Troester* does not defeat certification. ...........................................6

    C.      SWI's critical failure to explicitly instruct PCMs that OTC exit delays are "work" nullifies SWI's purported policy against OTC work in this case. ...........................................................................................7

    D.      The Survey is Admissible and Establishes both Commonality and Predominance ............................................................................8

        1.   Plaintiff's survey evidence shows that statistical analysis may be used to manage class wide issues, including damages, at trial. ......10

        2.   Dr. Petersen has Reliably Applied Reliable Scientific Principles .10

          a.   The survey questions were clear and unambiguous. ...............10

        3.   Random sampling properly addresses variations among the population....................................................................................11

        4.   The survey negates manager variation..........................................11

        5.   That memory is fallible does not undermine the survey................11

        6.   There is no reason to ask about time adjustments (TAs)...............11

        7.   Dr. Petersen adequately adjusted for non-response bias...............12

    E.      Depositions were not random and overwhelming establish SWI's liability........................................................................................12

IV.     Numerosity is established under Plaintiff's updated class definition.........12

V.      Conclusion.......................................................................................................12

# TABLE OF AUTHORITIES

## Cases

*Brinker Rest. Corp. v. Sup. Ct.*
  53 Cal.4th 1004 (2012) ....................................................................................12

*Donohue v. AMN Servs., LLC*
  11 Cal.5th 58 (2021) ..........................................................................................8

*Jimenez v. Allstate Ins. Co*
  765 F.3d 1161 (9th Cir. 2014) .......................................................................1, 6

*Rai v. Santa Clara Valley Transp. Auth.*
  308 F.R.D. 245 (N.D. Cal. 2015) .......................................................................7

*Rannis v. Recchia*
  380 Fed. Appx. 646 (9th Cir. 2010) ................................................................12

*Senne v. Kansas City Royals Baseball Corp.*
  934 F.3d 918 (9th Cir. 2019) .............................................................................9

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*
  209 F.R.D. 159 (C.D. Cal. 2002)........................................................................1

*Troester v. Starbucks Corp.*
  5 Cal. 5th 829, (2018) ................................................................................ passim

*Tyson Foods, Inc. v. Bouaphakeo*
  136 S.Ct. 1036 (2016)....................................................................................9, 10

*Utne v. Home Depot U.S.A., Inc.*
  2022 WL 1443338 (N.D. Cal. 2022) ...............................................................6, 7

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011)........................................................................................1, 9

## Rules

Fed. R. Civ. Proc. Rule 23 .................................................................................. 1, 2

## I.    Introduction

Certification is proper if the common contentions of a case are capable of class-wide resolution in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 342, 349-50 (2011). Here, despite Defendant Sam's West Inc's ("SWI") contentions, Plaintiff's discrete theory of liability presents predominant common questions of law or facts, which can be adjudicated efficiently on common proof. The weight of Plaintiff's considerable evidence raises common questions which predominate over individual ones as to whether PCMs have incurred unpaid OTC work under *Jimenez v. Allstate Ins. Co*, 765 F.3d 1161, 1165 (9th Cir. 2014).

SWI's hollow legal arguments and meager factual assertions collapse under the substantial weight of Plaintiff's evidence. Plaintiff's survey, along with the deposition testimony of survey respondents ("SR(s)") taken by SWI, which Plaintiff has compiled for the Court in his Reply Summary of Evidence In Support of Renewed Motion for Class Certification ("RSOE"), make clear that Certification is warranted because Plaintiff has satisfied that common questions predominate as well as Fed. R. Civ. Proc. Rule 23's ("Rule 23") other demands.

## II.    Updated Class Definition

SWI provided overbroad data to Plaintiff, which Plaintiff used to conduct its survey. The data include *non*-PCMs–overnight shift workers and team leads (key-carrier supervisors); Dr. Petersen's Rebuttal Report ("PRR") removes these ninety-two (92) individuals from the survey. (PRR ¶ 1, Ex. A.) Also, to ensure exclusion of overnight shift workers, Plaintiff herein further narrows the proposed class definition. Courts can evaluate certification under Rule 23 using a class definition updated in the Reply brief. *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc*., 209 F.R.D. 159, 161 n. 1 (C.D. Cal. 2002).

Plaintiff's updated class definition is as follows (update in bold text):

All current and former non-exempt employees who worked one or more "closing shifts" (defined as a shift in which the Associate's punches reflect that they clocked out for the day at any time at or between 10:00 p.m. and **11:55 p.m.**) for Defendant in California at the following store locations: (1) Bakersfield #4819; (2) Chino #6610; (3) Citrus Heights #4799; (4) Concord #6612; (5) Corona #4709; (6) El Monte #6614; (7) Glendora #6240; (8) La Habra #4735; (9) Murrieta #4822; (10) Oxnard #6455; (11) Palm Desert #6609; (12) Palmdale #4767; (13) Riverside #6378; (14) Roseville #6621; (15) Sacramento #6622; (16) San Bernardino #6624; (17) San Diego #6235; (18) Santa Clarita #4824; (19) Torrance #6628; (20) Vacaville #6433; and /or (21) Yuba City #6405, at any time from June 23, 2018

-1-

(Monetary Relief Class)/ June 23, 2017 (Injunctive Relief Class)[1] until the date class notice is provided under Fed. R. Civ. P. 23(c)(2). Excluded from the Class are any individuals who held or hold the position of team lead.

The proposed Termination Wages Subclass would remain unchanged.

**III.  Plaintiff's theory of the case – that SWI's policies fall short of the minimum legal duties of an employer by creating conditions where OTC work routinely occurs – meets the commonality and predominance requirements of Rule 23.**

In his opening brief, Plaintiff presented substantial evidence of systemic policies that require, pressure, and/or encourage employees to engage in OTC work – namely, unpaid exit delays. Plaintiff's survey revealed that, as a result of these universal policies, ninety-one percent (91%)[2] of PCMs have incurred OTC wait time due to exit delays and that PCMs wait to be released on nearly sixty percent (60%) of their shifts. Plaintiff identified the specific universal policies and practices involved, including that (1) SWI's uniform Closing Policy requires all clubs to lock the entrance and exit doors through which its closing shift employees are required to leave (ECF 95-2 at SOE 4-5, 20); (2) SWI admits common and predominant deviation from its "expectation" that designated key-carriers be "at or *near*" the locked doors (during the time it was in effect prior to October 2020) (*id.* at SOE 17-18, 20-21); (3) SWI's universal Pay Policy mandates that PCMs "must…clock out when no longer performing work" but simultaneously omits the material information that PCMs should stay on the clock until the exit doors are opened (*id.* at SOE 6, 11); (4) SWI's universal Pay Policy omits the material information that exit delays are "work" or OTC "work" for which PCMs should be paid (*id.* at SOE 7-9, 12); and (5) SWI's strict prohibition of overtime creates a work environment where PCMs are incentivized to clock out when their shift ends, regardless of whether the doors have been unlocked (*id.* at SOE 10).

Plaintiff also highlighted SWI's failure to inform or instruct PCMs to submit a time adjustment ("TA(s)") for an exit delay or include a pay code in its system for exit delays. (*id.* at SOE 13-15, 22-23).  SWI's Policy requiring PCMs to submit TAs for their exit delay time runs

---

[1] SWI's argument that Mr. Sanchez lacks standing to represent the proposed Injunctive Relief class is based entirely on selective testimony from Mr. Sanchez that he is currently in college and someday hopes to work in law enforcement. This testimony does not undermine his allegations that he would return to work at SWI if its unlawful OTC wait time policy was enjoined.

[2] Of the remaining nine percent, 7.1% said they never waited, 1.6% said they never worked a closing shift and 0.6% answered they "do not know." Petersen Rebuttal Report at ¶ 9.

-2-

afoul of California law because it unlawfully shifts the burden of recordkeeping for regularly occurring worktime to PCMs, when instead California law clearly requires the employer, not the employee, keep track of additional work time that is regularly and routinely occurring, like the regularly and routinely occurring here. *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 848 (2018).

The depositions corroborate that SWI's policies fall short of the employer's minimum legal duties to affirmatively prevent OTC work from occurring. (*See e.g.,* RSOE 1-10, 12-13 18-21, 23-28, 31-32, 34-38, 41-43, 45-47, 52-57 after clocking out, PCMs must regularly wait for a key-carrier to unlock the door, SRs not trained that "standing around waiting" to be let out is "work", SRs not trained to stay on the clock until the door open, SRs trained to clock out to prevent overtime, SRs not trained to submit a TA for exit delays). The Ninth Circuit reminds district courts that evaluating competing evidence is "not a mere bean-counting exercise." *Miles v. Kirkland Stores Inc.,* 89 F.4th 1217, 1224 n. 3 (9th Cir. 2024). Both the "quantity and quality" of the evidence matters, so district courts must "rigorously analyze" the evidentiary content and "weigh their persuasiveness." *Id.* The quantity, quality, and persuasiveness of Plaintiff's evidence dwarfs SWI's minimal, cherry-picked declarations.

A.      **"Individual inquiries" are irrelevant to the central question of whether SWI's common policies resulted in uncompensated OTC work by PCMs.**

SWI has repeatedly affirmed its mere "expectation that a key carrier will be available to unlock the club exit doors after closing to let hourly associates out of the club following the completion of their closing duties." (*See*, RSOE 13; Francis Decl. (ECF 105-1) at ¶ 9 (same); Francis (30(b)(6) Depo. at102:21-103:4 (testifying to "an expectation" that a manager will be in eye or ear shot).) Whether such "expectation" meets SWI's affirmative obligation under California law to prevent, investigate, and compensate for unpaid wait time is a common question that can and should be answered for all PCMs at once in class action proceeding. SWI rests its opposition on largely untested[3] and remarkably self-serving declarations from a handful of closing managers providing generalized statements about their "routines" or "typical practices."

---

[3] With only seven business days to respond to the Opposition evidence (ECF 112), Plaintiff was only able to depose four out of SWI's twenty closing manager declarants (and is still awaiting transcripts); none of the seven Happy Camper declarants; none of the seven Team Lead declarants; and one of eight Hourly Associate declarants, despite a mutual agreement between the Parties to equally increase the number of depositions per side for the purpose of conducting witness depositions.

-3-

First, to the extent certain managers have implemented varying exit practices, the survey accounts for such behavior because the SRs included those practices in their responses of the frequency and duration OTC wait time. (Petersen Reply to the Crandall Declaration at ¶ 24.)

Second, even a cursory evaluation of SWI's evidence exposes that SWI's ad hoc methods result in unlawful OTC work: Managers Corey Leigh (¶ 6) Brian Baumgartner (¶ 7) and Carlos Calderon (¶ 6) testify to observing associates waiting to be let out. (RSOE 24); Cynthia Dasilva states that closing associates have complained to her about OTC exit delays multiple times (at ¶ 7) (RSOE 22); Kenny Gonzalez testifies of situations when he cannot be near the exit because of his other duties (¶ 8); Gabriel Sanchez testifies there are times he is unable to go to the exit door because of his closing duties (¶ 5) (RSOE 19); Michelle Draper testifies she only leaves with associates if "done with my closing duties" (¶ 4) (RSOE 23); Kaitlyn Farias (¶ 7) testifies that she has seen associates wait OTC;[4] Daniel Mora declares it is his "practice" to be at the door on time, but PCM Reed Van Lierop conversely testifies that he routinely waited for Mr. Mora to unlock the door (RSOE 28); Dwayne Humphrey has only been at Vacaville for 2 months (¶ 2) of a class period spanning 7 years; Angie Yanez's testimony (¶ 5) about opening the door at 5:25am is irrelevant to closing shift workers (RSOE 19); Team Lead, Michael Stringer, acknowledges that it takes him 3 minutes to drive to the exit on his forklift and that associates have waited OTC for him to arrive.(¶ 5); none of Team Leads Perkins (¶ 2), Guzman (¶ 4) or Estrada (¶ 2) attest to even being in the store after 9:00 p.m.; and hourly associate Robin Flores recanted the declaration upon which SWI relies. (*see* ECF 54-40). It is immaterial that some closing managers at Clubs 4746 and 4824 leave the door unlocked before 10:00 p.m. or the following morning. (RSOE 29).

Third, SWI's sudden—and unsupported (*see,* RSOE 21)—contention that PCM's can leave through alternate exits is disingenuous and violates company policy (Ex. 32, Francis (30)(b)(6) Depo. at 55:16-56:6). SWI misleadingly partially quotes Tim Cook's testimony to imply that PCMs can leave through a tire center door that can be unlocked with a code, but the *entire* testimony reads: "Q You've seen those employees leave for the ·night at the end of their shift through the tire center doors? A. ***Not at the end of their shift, no, usually for breaks or lunches. Again, I***

---

[4] There are two videos of associates waiting OTC at this location before the Court. One from an hourly associate (*see* ECF 44-5 at p. 262) and another taken by Plaintiff's investigator (*See,* ECF 96 at p. 366) (RSOE 23).

REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION

*typically don't work that late*." (ECF 103-1 at p. 127 at 67:18-23.) Similarly, Jocelyn Yan's testifies that a "side door" maybe be available  "you know, *before 9:00*." (Ex. 21, Yan Depo. at 35:19-25.) PCM Eric Buteyn, who claims he leaves though the tire center, also acknowledges that he and his colleague have waited for a manager at the exit, although he tries to fault himself and his co-workers for "moving too quickly," in his untested and attorney-drafted declaration. (¶¶ 4-6). Cynthia Dasilva's declaration is also untested and is vague: she testifies only that she is "aware" some associates have exited from the receiving door (violating company policy) (¶ 6), but not whether this occurred at the end of closing shifts. SWI's arguments amount to nothing more than smoke and mirrors. SWI's alleged "evidence" does not hold water compared to Plaintiff's robust and expansive portfolio of evidence in support of class certification. (*See e.g.* RSOE 23-29).

Fourth, SWI cannot legitimately argue that PCMs wait to clock out until the door is open based only on shaky testimony from a few supervisors and two non-PCMs[5] (RSOE 34.)

Fifth, SWI's contention that some associates shop after clocking out is immaterial. *See* Survey, (ECF 96) at pp. 856, (Q.2. "*When you clocked-out from your closing shifts and walked to the door to exit the warehouse*, how frequently did you have to wait for a supervisor to let you out of the warehouse?"); see also **Ex. 2**, Anderson at 51:14-52:7 (did not consider instances where he might have made purchases after clocking out in answering survey questions); **Ex. 8**, Hermann Depo at 38:5-16 (did not include time she made purchases in estimate of OTC exit delays); **Ex. 13**, Van Lierop Depo. at 35:2-11 (did not include shopping time in estimate); **Ex. 14,** Murillo Depo. at 28:6-16 (same); **Ex. 16,** Shanklin Depo. at 23:20-24:9 (estimate of time waiting to be let out is when he went straight to the door); **Ex. 27**, Colondres at 29:7-17 ("I didn't take that into account. I was only thinking of times that I clocked out and waited,

---

[5] Notwithstanding his unsigned declaration testimony, in deposition Mr. Gonzalez faced video evidence of a large group of closing shift employees waiting within view of the secured door from 11:45p.m.- 11:50p.m., none of whom went back inside to clock out once the doors were unlocked. (See, ECF 96 at pp. 384-385 at 54:20-55:12 (acknowledging watching PCMs wait and no one running back inside.) Managers Denise Flowers (6624), ¶ 9, John Religa (6628), ¶ 5; and Angela Deo (6614), ¶ 7 merely testify that there are computers in e.g. the tire department from which employees "can" wait and clock out, not that any PCMs actually have or do. (¶ 9). Team lead Estrada's (6628), ¶ 9 and hourly associate James Wilkes (6455), ¶ 6 untested declarations merely say it would be "possible" to wait and clock out. Team lead Nunez (6614) isn't even in the store after 9:00 p.m. (an acknowledges associates wait for him to arrive).  Finally, hourly associate Daniel Lopez Loaiza (6628), ¶ 3 paradoxically states that it is practice to wait and clock out after the key carrier arrives but also attests that he has waited off the clock on one or two occasions for a key carrier to arrive to unlock the door, ¶ 4.

REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION

went straight to the door."). SWI offers no reason why employees cannot be out of an employer's "control" while shopping, but then re-enter the employer's "control" when waiting to leave. This, in and of itself, is a common question.

Finally, Plaintiff has satisfied *Jimenez* with evidence that SWI knew or should have known unpaid work was occurring because, for example, managers and supervisors—the ones tasked to release locked-in PCMs—who arrived at locked doors to waiting PCMs "were made constructively made aware that employees were not let out in accord with company policy" and experienced "an [OTC] wait to be let out of the store." *Utne v. Home Depot U.S.A., Inc.*, 2022 WL 1443338, at \*6, \*8 (N.D. Cal. May 6, 2022); *see also*, *Jimenez*, 765 F.3d 1161 (same).

**B.  SWI's erroneous belief that it can shift its recordkeeping burden to PCMs in violation of *Troester* does not defeat certification.**

The California Supreme Court "liberally construe[s]" the Labor Code "to favor the protection of employees." *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 839, (2018) (cleaned up). Plaintiff's evidence powerfully demonstrates that PCMs experience OTC exit delay work on a regular basis. (*see generally,* RSOE) SWI incorrectly argues that PCMs can submit TAs for exit delay time and that PCMs "are aware they can submit TAs" to be compensated for wait time. (ECF 102.) There exists a large body of evidence showing that PCMs are *unaware* that TAs would be applicable to the wait time they regularly and routinely experience because PCMs are *unaware* that wait time is work time (*see e.g.* **Ex. 3**, McCray Depo. 37:22-38:6 (was not trained to submit a TA for exit delays, was trained to clock out and not get overtime); **Ex. 4,** Vasquez at 32:11-2 (did not think she was allowed to make a TA for exit delays); **Ex. 27**, Colondres at 26:5-13 (did not submit a TA for OTC wait time "because that – that just seems against the rules. I -- I don't want to add time."); **Ex. 30,** Robles Depo. at 46:8-47:4 (no manager told him to submit a TA when they saw him waiting).

Critically, SWI's approach—to shift the burden of recording regularly occurring exit delays via TAs to PCMs—offends *Troester*. *Troester* places the burden of tracking and accurately recording *all* regularly occurring working time (even *de minimis*)[6] squarely on employers. *Id.* at 848. "[E]mployers are in a better position than employees to devise alternatives that would permit

---

[6] PCMs incur an average of nine minutes OTC wait time, which is not *de minimis*. PRP at ¶ 6.

the tracking of small amounts of regularly occurring work time." *Id.* Thus, SWI cannot shift the burden of recording regularly occurring exit delay time via TAs to PCMs. *Id.*

Moreover, SWI has no evidence that TAs for exit delays were ever made outside of a smattering of testimony, mostly from supervisory employees, none of which identify when the TA allegedly occurred. (RSOE 8, 40-47, 50.) SWI dismisses Plaintiff's expert's evidence that TAs are rarely, if ever, used and argues that "[t]he *actual* evidence shows PCMs … *may have* [] submitted [TAs]" (ECF 102 at 14:20-24) based on testimony of two supervisory employees,[7] untested declaration testimony from a single hourly associate (not a PCM) and testimony from 2 PCMs, one who recanted his testimony in deposition. (RSOE 43). The salient point is that even if all of the 174 TAs (or 301, if those at exactly the 00 or 30 minute mark are included) (Breshears Supp. ¶ 25) applied to OTC exit delays (they do not), these numbers are unbelievably small relative to the total number of OTC exit delays PCMs experienced.[8] The survey shows that 91% of PCMs experienced OTC exit delays on 60% of their closing shifts. The TAs are simply not mathematically significant enough to defeat class certification; at most they apply to 3.3% of those shifts, but likely only apply to 1.9% of the affected shifts. (KLG Reply Decl. at ¶¶ 38-39.)

### C. SWI's critical failure to explicitly instruct PCMs that OTC exit delays are "work" nullifies SWI's purported policy against OTC work in this case.

Whether, as SWI disingenuously contends, it is SWI company policy to compensate employees for exit delay time is clearly a common question that should be decided as to all class members collectively. SWI relies on its general policy prohibiting OTC "work" and supposedly requiring TAs for unrecorded work. Yet SWI has no written policy instructing PCMs (and does not otherwise train or inform them) that "standing around waiting" to be let out at the end of their closing shifts constitutes "performing OTC work." (**Ex. 10,** Gray Depo. at 29:4-14.) SWI cannot remain silent as to whether exit delay time constitutes work and simultaneously insist that PCMs

---

[7] SWI refers to Stephanie Somers as a PCM but she is an excluded Team Lead. **Ex. 23**, at 13:24-14:3.

[8] Courts have rejected similar arguments that class certification should be denied because of individualized issues related to the fact that class members allegedly could submit "extra time requests" to be compensated for off-the-clock work. *Utne*, 2022 WL 1443338, at *8 ("concerns about whether some employees submitted TA forms, and thus were compensated for wait time, does not warrant decertification. The number of employees who submitted TA forms appears to be minimal…Questions regarding compensation via TA forms may be addressed at the damages phase, meaning common questions will still predominate as to whether employees were unpaid for wait time."); *Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 258 (N.D. Cal. 2015).

REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION

should, and do, know that exit delay time constitutes work. Ironically, in deposition, defense counsel objected that whether an exit delay constitutes work calls for a legal conclusion:

Q. Okay. Did you know that your time waiting at the door after clocking out at the end of your closing shifts should be paid?

A. No. Because I'm not working.

Q. Okay. So that was my next question. Do you consider your time waiting at the -- at the door at the end of your closing shifts to be work?

A. No. Just stuck.

Q. Okay. So if you waited at the end of your closing shift off the clock for someone to come open the door, would you consider that to have been off-the-clock work time?

MS. MOHSENI: Objection. Calls for legal conclusion. You can answer.

THE WITNESS: I was saying I never considered it working off the clock.

BY MS. JOYNER: Q. And no one ever told you it was off-the-clock work?

A. No. (**Ex. 27**, Colondres Depo. at 32:18-33:12)

SWI's SR depositions overwhelming show that PCMs, who typically do not possess law degrees, lack awareness that exit delays legally constitute OTC work or that a TA should be submitted. SR Santos testifies that after he clocked out, he did not perform any work but instead would just "walk to the door and wait until someone came" **Ex. 20,** Santos at 9:17-22. SR Meyo affirms not thinking he performs work while waiting for the doors to be opened: "No. I would just wait about three minutes to five[.]" **Ex. 5**, Meyo at 15:10-13; *see also* **Ex. 13**, Van Lierop at 25:19-26:2 (waited for doors to be unlocked after clocking out but did not do any "work tasks"), **Ex. 10,** Gray at 30:15-18 (never told time spent waiting to be released was OTC work). (*See e.g,* RSOE 1.) PCMs commonly incur unpaid time waiting to be released as SWI has sat idly—and knowingly—by, allowing the uncompensated wait time to occur, to its own financial benefit. SWI has failed to provide any evidence that any PCM has submitted an OTC exit delay TA and received compensation therefrom. This glaring absence of evidence points to commonality and predominance. SWI's illusory policy arguments against OTC work crumble. "To place the burden elsewhere would offer an employer an incentive to avoid its recording duty[.]" *Donohue v. AMN Servs., LLC*, 11 Cal.5th 58, 75 (2021).

**D.    The Survey is Admissible and Establishes both Commonality and Predominance**

The U.S. Supreme Court describes representative samples as "practicable means to collect and present relevant data establishing a defendant's liability." *Tyson Foods, Inc. v. Bouaphakeo*,

136 S.Ct. 1036, 1046 (2016) (cleaned up). The Court makes no distinction between video evidence and telephone evidence; both are viable forms of evidence that can be used by individual and class plaintiffs in furtherance of the remedial purposes of wage and hour laws. Moreover, SWI's assertion that video evidence carries more weight than telephone evidence is bold, given that Plaintiff requested, via formal discovery, video evidence known to be in SWI's possession portraying closing shift employees experiencing exit delays.  SWI not only failed to produce the video footage; SWI destroyed that video footage. (KLG Reply Decl. at ¶ 4)

"Because of [SWI's] dereliction of [its] recordkeeping duties," *Tyson* entitles Plaintiff, "to introduce a representative sample [i.e., the survey] to fill in an evidentiary gap created by [SWI's] failure to keep adequate records." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 940 (9th Cir. 2019) (cleaned up). Plaintiff uses the survey to fill gaps "rather than [to] overcome the absence of a common policy." *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 626 (N.D. Cal. 2022).  The survey is probative of SWI's liability, but "[l]iability does not rise and fall with the survey; rather it can be used alongside" Plaintiff's bounteous evidence (SWI's common policies, depositions, and declarations) to establish SWI's common, class-wide liability for unpaid wages. *Id.* (cleaned up). *Troester* explicitly endorses surveys to "estimate [unpaid] worktime" and "to compensate employees" based on estimated survey times. 5 Cal.4th at 848.

Furthermore, "[SWI's] reliance on *Wal-Mart Stores, Inc. v. Dukes* is misplaced." *Tyson Foods*, 136 S.Ct. at 1048.  The *Wal-Mart* plaintiffs were not similarly situated because they were unable to point to *any* common policy, so they could not "use representative evidence as a means of overcoming this absence of a common policy." *Id.* In stark contrast, Plaintiff points to SWI's strict door locking policy, its failed key-carrier "expectation," its practice to *not* inform PCMs to clock out until the doors have been unlocked, and its practice to *not* inform PCMs that exit delay time is work time that should be compensated. As a result of SWI's common and predominating policies, PCMs are similarly situated and their experiences bear strong relationship to one another. "[U]nder these circumstances the experiences of a subset of employees," obtained via Plaintiff's survey, "can be probative as to the experiences of all PCMs." *Id.* "[T]he study here could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action" against SWI.  *Id.* SWI's argument to the contrary, just like

REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION

all of its other arguments against the applicability of Plaintiff's survey, is flatly false.

### 1. Plaintiff's survey evidence shows that statistical analysis may be used to manage class wide issues, including damages, at trial.

Plaintiff can use statistical sampling evidence to prove liability to a class. *Tyson Foods*, 136 S.Ct. at 1048. Plaintiff submits the Declaration of Dr. Petersen, which describes a survey conducted for Plaintiffs' Renewed Motion (ECF 96 at pp. 782-872). Dr. Petersen's Report shows that the survey method is an appropriate research tool, and the responses generated from it, can assist the trier of fact in deciding liability, damages and penalties. (*E.g.*, PRR ¶¶ 1-8.) As discussed further herein and in the PRR and Petersen Reply to the Crandall Declaration ("P. Reply") the survey provides a valid and reliable projection of class-wide liability and damages, which is not prejudiced against SWI; if anything, it is an underestimate of what is actually owed.

### 2. Dr. Petersen has Reliably Applied Reliable Scientific Principles

Dr. Petersen's survey and his testimony thereon will assist the Court in its ruling on class certification because it is based on sufficient data, is the product of reliable principles and methods, and reflects a reliable application of the principles and methods to the facts of this case. Fed. R. Evid. 702(a)-(d). SWI's baseless objections to the survey derive from Mr. Crandall. Mr. Crandall's opinions are not based on sufficient facts or data, and are certainly not reflective of an application of generally accepted survey science and scientifical statistical principles. The unreliability and unhelpfulness of Mr. Crandall's assertions, which are not rooted in a valid scientific analysis, are likely reflective of Mr. Crandall's lack of credentials and lack of engagement in the scientific community as demonstrated in the P. Reply at ¶ 7:

|  | Dr. Petersen | Mr. Crandall |
|---|---|---|
| Peer-reviewed journal articles and books | 7 | 0 |
| Peer-reviewed journal articles on wage and hour surveys | 2 | 0 |
| Journal articles in edited volumes | 2 | 1 |
| Presentations at conferences of research professionals | 26 | 0 |
| Presentations on wage and hour surveys at conferences of survey experts, statisticians, and economic damages experts. | 9 | 0 |

#### a. The survey questions were clear and unambiguous.

SWI argues against the survey because SR were not told to assess only shifts that ended

-10-

after 10pm. (ECF 102) Any bias this creates would be an overestimate *in favor* of SWI, as the exit doors are opened and unlocked before 10:00 p.m. (P. Reply ¶ 9.) Hence, when the PRR removes responses from SRs who had no punch out times within the class definition of between 10:00p.m. and 11:55p.m.,[9] the injury rate *rises* to 91%. SWI's bald assertion the Class includes a substantial number of uninjured PCMs is directly contradicted by the survey.  (PRR ¶¶ 2, 6.)

### 3.    Random sampling properly addresses variations among the population

SWI's criticism that the survey included SRs who worked closing shifts dating back to June 2017 is moot because the statistical analysis showed no difference in SRs estimates of the frequency and duration of waiting time between 2017 and 2018. (PRR ¶ 10.)

### 4.    The survey negates manager variation.

SWI's assertion that the behavior of different managers undermines the survey's compelling results fails because SRs' answers are reflective of their respective manager's implementation of the closing shift policies. These answers overwhelmingly reflect *at least* a 91% class-wide injury rate.  (PRR ¶ 24.) Also notably, SWI's contrived table regarding so-called manager "variations" (ECF 103 at p. 19) is a useless because five of the thirteen individuals who Sam's selected for inclusion (IDs 100494997, 103779881, 103827934, 104215063, 210117053) are *not* PCMs because none of them worked a closing shift where they clocked out at between 10:00p.m. to 11:55p.m. *See* Ex. A to PRP; *see also* Exs. 43-45.

### 5.    That memory is fallible does not undermine the survey.

Experiencing unpaid OTC work time is an important event in an individual's life. Scientific literature support that more salient events like these are better remembered than less important and mundane events. Individuals, like PCMs, who regularly experience unpaid OTC work time will have the ability to sufficiently recall these significant events so as to provide a reasonable, reliable estimate of the frequency and duration of these events. (P. Reply ¶¶ 4-5.)

### 6.    There is no reason to ask about time adjustments (TAs).

TAs are irrelevant to the survey, which was designed to assess the breadth, frequency, and duration of class-wide OTC wait time injury. *Troester* places the burden on the SWI, not PCMs,

---

[9] As already discussed, Dr. Petersen's report is based on SRs who meet the updated Class definition based on punch out times, job title (never worked as "team lead"), and store location (worked at a Class store).

-11-

to maintain correct records of all compensable work time. When the employer has failed to keep the required records, "the consequences for such failure should fall on the employer, not the employee." *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal.4th 1004, 1053 n. 1 (2012).

### 7. Dr. Petersen adequately adjusted for non-response bias.

Dr. Petersen's report contains a six-page statistical analysis on nonresponse, replete with citations to respected scientific publications. These statistics show that the survey responses are not biased due to nonresponse. (P. Reply ¶¶ 36-37.) Mr. Crandall does not provide any data, statistical analysis, or citations to publications to support his assertion on nonresponse. (*Id.*)

### E. Depositions were not random and overwhelming establish SWI's liability.

Mr. Crandall bases his unreliability claims on SWI's depositions of thirty SRs. Fatally, Mr. Crandall and SWI "oversample[d] the current employees resulting in a biased data set from which nothing can be generalized to the population of [SRs] or [PCMs]." (Petersen Reply ¶¶ 3-4.) Random and representative sampling requires the ratio of SR deponents who are current employees and former employees to be roughly equivalent to that ratio in the survey. However, SWI deposed "more than twice" as many current employees as expected from a random sampling—resulting in a colossal "**99.4%**" probability that SWI's deponent selection was **not** a "random sample" as Mr. Crandall baselessly opines. (*Id.* (emphasis added).)

## IV. Numerosity is established under Plaintiff's updated class definition.

There are 288 SRs within the Monetary Relief Class definition, which begins June 23, 2018. (Supp Breshears at ¶ 10.) While the actual number of putative class members in the Monetary Relief Class is in the thousands, this subset easily satisfies numerosity. *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (numerosity generally satisfied by 40 members).

## V. Conclusion

Based on the above, Plaintiff respectfully requests that the Court grant Plaintiff's motion.

Respectfully Submitted,

Dated:  February 17, 2024          BRADLEY GROMBACHER LLP

By: */s/ Kiley L. Grombacher*
Kiley L. Grombacher
Attorneys for Plaintiff

-12-
REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION